David J. Jordan (1751)
david.jordan@stoel.com
Wesley F. Harward (15623)
wesley.harward@stoel.com
STOEL RIVES LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone:  801.328.3131

*Attorneys for Defendant Corporation of the
President of The Church of Jesus Christ of
Latter-day Saints*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| LAURA A. GADDY, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>      v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole,<br><br>              Defendant. | **MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) OR, ALTERNATIVELY, 12(B)(6)**<br><br>Case No. 2:19-cv-00554-EJF<br><br>The Honorable Evelyn J. Furse<br><br>**ORAL ARGUMENT REQUESTED** |

The Corporation of the President of The Church of Jesus Christ of

Latter-day Saints moves to dismiss Plaintiff Laura A. Gaddy's "Proposed Class

Action Complaint" (the "Complaint") (Docket 2) with prejudice (the "Motion").

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

SUMMARY OF RELEVANT ALLEGATIONS......................................................3

    A.    The Church's Teachings.........................................................................3

    B.    Ms. Gaddy's Beliefs. ............................................................................5

LEGAL STANDARD.............................................................................................6

ARGUMENT   .......................................................................................................7

    I.    THE FIRST AMENDMENT BARS COURTS FROM
INQUIRING INTO DISPUTES GROUNDED IN RELIGIOUS
BELIEF. .................................................................................................7

    II.    THE FIRST AMENDMENT REQUIRES DISMISSAL OF
EVERY ONE OF MS. GADDY'S CLAIMS. ..................................13

        A.    Ms. Gaddy's Fraud Claims Are Not Cognizable....................13

        B.    Ms. Gaddy's Breach of Fiduciary Duty Claim Is Not
Cognizable. ............................................................................15

        C.    Ms. Gaddy's Has No Claim for Intentional Infliction of
Emotional Distress. ................................................................17

        D.    Ms. Gaddy's RICO Claim Fails..............................................19

CONCLUSION.....................................................................................................21

103392859.1 0056812-00016

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Worldwide Church of God,*
  661 F. Supp. 1400 (D. Minn. 1987).....................................................................14

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).............................................................................................6

*Bryce v. Episcopal Church in the Diocese of Colo.,*
  289 F.3d 648 (10th Cir. 2002) ...........................................................................12

*Emp't Div. v. Smith,*
  494 U.S. 872 (1990)...............................................................................2, 15, 20

*Franco v. The Church of Jesus Christ of Latter-day Saints,*
  21 P.3d 198 (Utah 2001) .....................................................................................18

*H.R.B. v. J.L.G.,*
  913 S.W.2d 92 (Mo. Ct. App. 1995) ..................................................................16

*Hancock v. True Living Church of Jesus Christ of Saints of Last Days,*
  118 P.3d 297 (Utah Ct. App. 2005) ....................................................................14

*Hubbard v. J Message Grp. Corp.,*
  325 F. Supp. 3d 1198 (D.N.M. 2018) ..................................................................18

*Kedroff v. St. Nicholas Cathedral,*
  344 U.S. 94 (1952)...........................................................................................8, 9

*Kreshik v. St. Nicholas Cathedral,*
  363 U.S. 190 (1960).............................................................................................9

*Langford v. Roman Catholic Diocese of Brooklyn,*
  677 N.Y.S.2d 436 (N.Y. Sup. Ct. 1998).............................................................16

*Lemon v. Kurtzman,*
  403 U.S. 602 (1971)...........................................................................................12

*McClure v. Salvation Army,*
  460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896 (1972) ...............................12

*NLRB v. Catholic Bishop of Chi.,*
  440 U.S. 490 (1979)..............................................................................................10

*Paul v. Watchtower Bible & Tract Soc'y,*
  819 F.2d 875 (9th Cir. 1997) ...............................................................................18

*Peterson v. Shanks,*
  149 F.3d 1140 (10th Cir. 1998) .............................................................................7

*Petrell v. Shaw,*
  902 N.E.2d 401 (Mass. 2009)...............................................................................16

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian*
  *Church,*
  393 U.S. 440 (1969)...................................................................................9, 11, 14

*Religious Tech. Ctr. v. Wollersheim,*
  796 F.2d 1076 (9th Cir. 1986) .............................................................................20

*Serbian E. Orthodox Diocese v. Milivojevich,*
  426 U.S. 696 (1976)..............................................................................................10

*Tal v. Hogan,*
  453 F.3d 1244 (10th Cir. 2006) ...........................................................................19

*United States v. Ballard,*
  322 U.S. 78 (1944)...................................................................................11, 15, 19

*Van Schaick v. Church of Scientology of Cal., Inc.,*
  535 F. Supp. 1125 (D. Mass. 1982)......................................................................20

*Watson v. Jones,*
  80 U.S. (13 Wall.) 679 (1871) .......................................................................passim

*Webster v. JP Morgan Chase Bank, NA,*
  290 P.3d 930 (Utah Ct. App. 2012)......................................................................14

*Westbrook v. Penley,*
   231 S.W.3d 389 (Tex. 2007) ....................................................................6

*St. Joseph Catholic Orphan Soc'y v. Edwards,*
   449 S.W.3d 727 (Ky. 2014) .....................................................................6

**Rules**

Federal Rule of Civil Procedure 12(b) .........................................................6

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................2

**Other Authorities**

Victor E. Schwartz & Christopher E. Appel, *The Church Autonomy
   Doctrine,* Univ. Cincinnati L. Rev. 431 (2011)....................................7

# INTRODUCTION

Ms. Gaddy's Complaint essentially asks this Court to convene a modern-day inquisition into the teachings of The Church of Jesus Christ of Latter-day Saints (the "Church").  She asks this Court to be the inquisitor and to use its Article III power to pass judgment on the Church's doctrines.  Each of Ms. Gaddy's claims is based on her allegations that the Church's fundamental religious teachings are false.  Ms. Gaddy's claims would require this Court to adjudicate questions of profound theological import for the Church.  For example, the Court would be required to answer the following questions:

- Did God and Jesus Christ appear to Joseph Smith, the Church's founder, in 1820?

- Is the Book of Mormon the word of God?

- Are other books of the Church's canonical scripture true?

None of these questions belongs in a courtroom.  The law does not call on judges or juries to determine the truth or falsity of any religion.  It is not the province of judges or juries to determine whether Moses parted the Red Sea, whether Noah predicted and survived the flood, whether Mohammed ascended to heaven, whether Buddha achieved a state of enlightenment, whether Jesus walked on water, or whether Joseph Smith saw God and Jesus Christ.  Each of these issues

lies outside the purview of our legal system.  Any pronouncement by a judge or a jury that God does—or does not—exist would be meaningless.  The same is true for the various ways people have experienced God and used words to describe such experiences.  Any trial seeking to adjudicate such religious issues makes a mockery of both the court and religion.

No wonder, then, that the law in this country prohibits lawsuits like Ms. Gaddy's.  The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  The United States Supreme Court has for almost 150 years explained that "[t]he law knows no heresy" and "[i]n this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all."  Watson v. Jones, 80 U.S. (13 Wall.) 679, 728 (1871).  "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."  Emp't Div. v. Smith, 494 U.S. 872, 877 (1990).

In short, the First Amendment prohibits the state—including the judiciary—from wading into disputes rooted in religious doctrine.  The government may not

declare one religion true and another false.  The questions presented by Ms.

Gaddy's Complaint are quintessentially ones of faith and doctrine.  According to

her Complaint, Ms. Gaddy has lost her faith in the Church's teachings.  The First

Amendment protects her right to believe—or disbelieve—whatever she chooses.

The First Amendment also affords the Church and its members the same privilege.

A cause of action does not arise whenever an individual converts from one religion

to another, much less when an individual loses her religious faith.  It is for these

reasons that Ms. Gaddy's lawsuit fails and should be dismissed with prejudice.

## SUMMARY OF RELEVANT ALLEGATIONS

### A.    The Church's Teachings.[1]

The Church of Jesus Christ of Latter-day Saints is a Christian faith founded

by Joseph Smith in 1830.  Compl. ¶ 50.  According to Church scripture, in the

spring of 1820, Joseph Smith entered a grove of trees near his home to pray and

---

[1] The Complaint is 75 pages long and has 248 paragraphs.  Many of those allegations are mischaracterizations of—or outright falsehoods about—the Church's teachings and are little more than a laundry list of random criticisms. These include, for example, criticisms of artwork found in Church publications, lesson plans for children, films produced by the Church, and allegations of "mind control."  *See, e.g.*, Compl. ¶¶ 108-19, 210-12.  Although the Church disputes these allegations, this Motion will focus on the issues at the heart of Ms. Gaddy's Complaint.  Those include the Church's teachings about Joseph Smith, the Book of Mormon, and the Book of Abraham.

seek spiritual guidance.  Compl. ¶ 64; *see also Joseph Smith—History* 1:1-20.

Both God and Jesus Christ appeared in a pillar of light in response to Joseph

Smith's prayer.  Compl. ¶¶ 64, 183; *see also Joseph Smith—History* 1:1-20.  This

event is known in the Church as the "First Vision."  It was at that time that Joseph

Smith received a prophetic calling to restore Jesus Christ's full gospel to the earth.

Compl. ¶ 64; *see also Joseph Smith—History* 1:1-20.

A few years later, the prophet Joseph Smith was visited by an angel who

informed him of a book of scripture, written on gold plates, that contained the

teachings of ancient prophets who lived in the Americas.  Compl. ¶¶ 77-79; *see

also Joseph Smith—History* 1:27-65.  Eventually, the angel entrusted Joseph Smith

with the plates and he translated them into English by the power of God.  Compl.

¶ 79.  The result of this work is the Book of Mormon.  *Id.*; *Joseph Smith—History*

1:27-65.  The Book of Mormon is part of the Church's canonical scripture.

The Book of Abraham is also part of the Church's canonical scripture.  As

the name suggests, the Book of Abraham contains teachings of the Old Testament

prophet Abraham.  Compl. ¶ 93; *see also Introductory Note to the Pearl of Great

Price*.  It originated with Egyptian papyri that Joseph Smith translated beginning in

1835.  Compl. ¶¶ 92-95; *see also Introductory Note to the Pearl of Great Price*.

Since its founding, the Church has preached the gospel of Jesus Christ.  The worldwide Church is led by the First Presidency, consisting of the President of the Church and his two counselors.  Compl. ¶ 15.  The Church is also led by the Quorum of the Twelve Apostles.  Compl. ¶ 16.  Local Church congregations are led by volunteer lay leaders who donate their time and efforts to serve their faith.  Compl. ¶¶ 18-21.  The Church also engages in widespread missionary efforts throughout the world.  Compl. ¶ 125.  Thousands of missionaries, many of whom are young men and women, spread the gospel through sharing a message of faith in Jesus Christ and giving service.  *Id.*  These missionaries teach the doctrines foundational to the Church, including Joseph Smith's prophetic calling and the Book of Mormon.  Compl. ¶¶ 125-30.

### B.    Ms. Gaddy's Beliefs.

Ms. Gaddy is a former member of the Church.  Compl. ¶¶ 141-45.  In 2018, Ms. Gaddy lost her faith in the Church's teachings and resigned her membership.  Compl. ¶¶ 157, 163.  Ms. Gaddy now believes that Joseph Smith did not see God and Jesus Christ in 1820, that the Book of Mormon was not translated from gold plates, and that the Book of Abraham is untrue.  Compl. ¶¶ 158-60.

# LEGAL STANDARD

The Church moves for dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction or, in the alternative, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The Religion Clauses of the First Amendment constitute such a complete bar to adjudication of Ms. Gaddy's claims that many courts have described it as jurisdictional.[2]  Whether in this case the First Amendment is understood as a jurisdictional bar or an affirmative defense, Ms. Gaddy's Complaint fails to state a cognizable claim under both Rules 12(b)(1) and 12(b)(6).  "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "[O]nly a complaint that states a *plausible* claim for relief survives a motion to dismiss."  *Id.* at 679 (emphasis added).  And a court "will not supply additional facts, nor will [it] construct a legal theory for plaintiff that assumes facts

---

[2] Uncertainty whether to move under Rule 12(b)(1) or 12(b)(6) arises from lower-court disagreements whether the church autonomy doctrine constitutes a jurisdictional bar or an affirmative defense.  *Compare Westbrook v. Penley*, 231 S.W.3d 389, 398 (Tex. 2007) ("[C]ourts must decline jurisdiction over disputes" attempting to "regulate matters of religion."), *with St. Joseph Catholic Orphan Soc'y v. Edwards*, 449 S.W.3d 727, 737 (Ky. 2014) ("[T]he ecclesiastical-abstention doctrine is an affirmative defense.").

that have not been pleaded." *Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citation omitted).  Ms. Gaddy's Complaint against the Church must be dismissed.

## ARGUMENT

## I.   THE FIRST AMENDMENT BARS COURTS FROM INQUIRING INTO DISPUTES GROUNDED IN RELIGIOUS BELIEF.

Adjudicating Ms. Gaddy's Complaint would violate bedrock First Amendment law.  Under the Religion Clauses, a court cannot require a church to defend its religious doctrines.  Nor can a church be liable for preaching its religious beliefs, whether to its members or the world at large.  These principles of church autonomy are among the First Amendment's most fundamental protections for religious freedom.  Ms. Gaddy's Complaint blithely assumes that civil courts have the power to decide these religious matters.  They plainly do not.

For nearly 150 years, the United States Supreme Court has recognized church autonomy as a foundational principle of American law.[3]  In *Watson*, 80 U.S. at 679, the Supreme Court refused to adjudicate a property dispute between

---

[3] Useful doctrinal and historical background regarding the church autonomy doctrine and its application in tort cases can be found in Victor E. Schwartz & Christopher E. Appel, *The Church Autonomy Doctrine: Where Tort Law Should Step Aside*, 80 Univ. Cincinnati L. Rev. 431 (2011).

contending factions of a Presbyterian Church because it turned on disputed matters of religious doctrine.  The Court ruled that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them . . . ."  *Id.* at 727.  Guided by that principle, the Court deferred to the church's highest governing body and dismissed the lawsuit for lack of subject matter jurisdiction. *Id.* at 733.

Although infused with First Amendment principles, *Watson* was issued before *Erie* and selective incorporation and was thus technically not decided under the United States Constitution.  But in *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952), the United States Supreme Court fully embraced *Watson* as a principle of First Amendment law.  *Kedroff* involved a challenge to a New York law purporting to assert control over the appointment of a Russian Orthodox archbishop and the right to occupy a cathedral in New York.  Despite concerns that the Russian Communist regime controlled the church's Moscow authorities, *id.* at 106-07, the Court held that the law was void under *Watson*.  That opinion, the Court explained, "radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for

themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 116.  The right of a church to select its clergy, the Court held, "must now be said to have *federal constitutional protection* as a part of the free exercise of religion against state interference." *Id.* (emphasis added).

The Court explained that "[l]egislation that regulates church administration, the operation of the churches, [or] the appointment of clergy. . . prohibits the free exercise of religion." *Id.* at 107-08.  Government intrusion into a church's internal affairs "violates [the] rule of separation between church and state" and contravenes "the philosophy of ecclesiastical control of church administration and polity." *Id.* at 110, 117.  And in *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960), the United States Supreme Court held that these First Amendment limitations apply just as much to civil court proceedings as to legislative or executive actions.

*Watson* and *Kedroff* stand for a core principle of church-state separation: civil courts can no more adjudicate religious disputes than religious bodies can decide legal disputes.  Civil courts cannot "engage in the forbidden process of interpreting and weighing church doctrine." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969).  Such a process, the United States Supreme Court has held, "can play *no* role in any . . .

judicial proceedings" because it unconstitutionally "inject[s] the civil courts into substantive ecclesiastical matters." *Id.* at 450-51 (emphasis added); *see also NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979) ("It is not only the conclusions that may be reached by the [government] Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."). Nor is the principle of church autonomy narrowly limited to questions of religious doctrine. It "applies with equal force to church disputes over church polity and church administration." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976). Under the First Amendment, "civil courts exercise *no jurisdiction*" over "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id.* at 713-14 (emphasis added) (quoting *Watson*, 80 U.S. at 733-34). When a dispute concerns such matters, disaffected church members cannot enlist a civil court to overrule the decisions of church officials—regardless of the basis for the church's decision.

> Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of "fundamental fairness" or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance.

*Id.* at 714-15.

In short, civil courts are not arbiters of religious truth.  They have neither the jurisdiction nor the capability to adjudicate inherently religious or ecclesiastical matters: such issues are simply non-justiciable.  The First Amendment guarantees "the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths."  *United States v. Ballard*, 322 U.S. 78, 86 (1944).  As the United States Supreme Court explained, "[h]eresy trials are foreign to our Constitution.  Men may believe what they cannot prove.  They may not be put to the proof of their religious doctrines or beliefs."  *Id.*  Under our Constitution, the Court further elaborated, "[m]an's relation to his God was made no concern of the state.  He was granted the right to worship as he pleased, and to answer to no man for the verity of his religious views."  *Id.* at 87.  Whether God truly gave the Ten Commandments to Moses, whether Jesus of Nazareth was in fact resurrected, whether the archangel Gabriel indeed visited Mohammed—these and innumerable other religious questions are matters of belief, faith, and doctrine that lie beyond the purview of government.

The First Amendment thus limits the kinds of claims that can be brought against religious organizations.  Tort claims that require civil courts to entangle themselves in the examination of religious doctrines, beliefs, or polity, or that

interfere in church governance, are unconstitutional.  *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (First Amendment precludes judicial entanglement in religious affairs).  Applying this principle, the Tenth Circuit affirmed summary judgment against a disaffected minister who brought a sexual harassment suit against her church based on remarks made during internal church discussions of homosexuality.  *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002).  The court stressed that "[t]he church autonomy doctrine is rooted in protection of the First Amendment rights of the church to discuss church doctrine and policy freely."  *Id.* at 658.  In particular, this doctrine protects "the right of the church to engage freely in *ecclesiastical discussions with members and non-members*."  *Id.* (emphasis added).

Imposing liability on clergy (or churches) for their religious teachings or their spiritual relationships with congregants risks the irreparable erosion of the constitutionally protected autonomy of churches and, in time, the transfer of control over ecclesiastical affairs to the state.  For if a state can second-guess religious policy, procedure, or action by requiring a church to meet secular standards of 'care,' the state will effectively control the religious organization and its operations by threat of tort litigation and liability.  *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir.) (reasoning that an investigation and review of church

practices and decisions "could easily pass [control] from the church to the State"),

*cert. denied*, 409 U.S. 896 (1972).

## II.   THE FIRST AMENDMENT REQUIRES DISMISSAL OF EVERY ONE OF MS. GADDY'S CLAIMS.

Ms. Gaddy's claims fall into four categories: first, claims for various forms

of fraud, Compl. ¶¶ 183-204, 222-30; second, breach of fiduciary duty, *id.* ¶¶ 205-

21; third, intentional infliction of emotional distress, *id.* ¶¶ 241-48, and fourth,

violation of the RICO statute, *id.* ¶¶ 231-40.  Each of these claims is barred by the

First Amendment and is addressed in turn.

### A.   Ms. Gaddy's Fraud Claims Are Not Cognizable.

Ms. Gaddy brings three fraud-based claims against the Church.[4]  She asserts

a claim for common law fraud, alleging that the Church "has made materially false

statements of fact concerning the very foundation of Mormonism."  Compl. ¶ 183.

These so-called "false statements" fall into three categories: (1) the precise details

surrounding which heavenly personages appeared to the Church's first prophet,

Joseph Smith, during his First Vision, (2) the exact spiritual method by which the

prophet Joseph Smith interpreted ancient records and produced the Book of

Mormon, which is sacred Church scripture, and (3) the authenticity of Church

_____

[4] These are Ms. Gaddy's first, second, and fourth causes of action.

scripture called the Book of Abraham, which the Church teaches was revealed to the prophet Joseph Smith.  Compl. ¶¶ 183, 190, 199, 224.

An element of each of Ms. Gaddy's fraud claims is that the statements are false.  *See Webster v. JP Morgan Chase Bank, NA*, 290 P.3d 930, 936 (Utah Ct. App. 2012) (reciting the elements of fraud).  Accordingly, Ms. Gaddy's fraud claims would require an adjudication of whether the Church's teachings about Joseph Smith and its canonical scriptures are true.

But the First Amendment precludes this Court from any adjudication whatsoever of Ms. Gaddy's allegations.  Even to commence the inquiry would "engage [this Court] in the forbidden process of interpreting and weighing church doctrine." *Presbyterian Church*, 393 U.S. at 451.  That process "can play *no* role in any . . . judicial proceedings." *Id.* at 450 (emphasis added).  It is flatly unconstitutional.  Hence, courts have repeatedly declined to entertain disputes over claims of which version of religious facts is accurate.  *See, e.g., Hancock v. True Living Church of Jesus Christ of Saints of Last Days*, 118 P.3d 297, 300 n.2 (Utah Ct. App. 2005) (concluding that "[p]laintiffs' allegation that [one plaintiff] 'never met Christ face to face as promised' appears to be an entirely religious matter beyond the courts' ability to adjudicate"); *Anderson v. Worldwide Church of God*, 661 F. Supp. 1400, 1401 (D. Minn. 1987) (holding that the First Amendment

barred plaintiff's allegations against a church that it had fraudulently misrepresented that the world was coming to an end to obtain his donation).

The First Amendment's guarantee of church autonomy places beyond judicial scrutiny "all questions concerning the truth or falsity of religious beliefs or doctrines." *Ballard*, 322 U.S. at 88.  As the United States Supreme Court has emphasized, "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Smith*, 494 U.S. at 877.  Churches enjoy that right no less than individual believers.  Fraud claims based on religious facts are outside a civil court's jurisdiction—they are simply barred.

### B.    Ms. Gaddy's Breach of Fiduciary Duty Claim Is Not Cognizable.

Ms. Gaddy attempts to state a cause of action for "breach of equitably imposed fiduciary duties."  Compl. ¶ 206.  She claims that the Church and its leaders violated "equitably imposed fiduciary duties" by exercising "influence" over her by some type of "mind control."  Compl. ¶¶ 209-10.  The allegations about this "mind control" are little more than recitations about her participation in the Church's worship services, religion classes, and Church-sponsored activities.  Compl. ¶¶ 210-12.  She also alleges that the Church and its leaders violated their

fiduciary duties by teaching the same "false" doctrines on which she bases her fraud claims.

This breach of fiduciary duty claim is barred by the First Amendment for many of the same reasons her fraud claims are barred. The alleged duty she would impose springs from religious facts. But no actionable breach of a legal duty can arise from religious leaders teaching religious doctrine or urging their members to be devout. Again, adjudication of this claim would require this Court to determine what the Church's teachings are and whether they are true. This is unconstitutional. *See supra* § II(A).

Accordingly, courts have rejected breach of fiduciary duty claims against churches in the context of ecclesiastical relationships—especially ones affecting a person's "spiritual welfare." Compl. ¶ 207. *See, e.g., Petrell v. Shaw*, 902 N.E.2d 401, 406-07 (Mass. 2009) (rejecting a claim of fiduciary duty, in part, because the religious relationship between the plaintiff and her church and its leaders was only "that of a parishioner (like every other parishioner)," which under the First Amendment "provides no basis to support liability in a civil context"); *Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 436, 439 (N.Y. Sup. Ct. 1998) ("[I]t is impossible to show the existence of a fiduciary relationship [in clergyman-parishioner cases] without resort to religious facts."); *H.R.B. v. J.L.G.,*

913 S.W.2d 92, 99 (Mo. Ct. App. 1995) (adjudicating a breach of fiduciary duty claim "inevitably require[s] inquiry into the religious aspects of the [clergyman-parishioner] relationship" in order to establish "the duty owed by [a clergyman] to [his or her] parishioners").  The First Amendment completely bars Ms. Gaddy's claim for breach of a fiduciary duty.

### C. Ms. Gaddy's Has No Claim for Intentional Infliction of Emotional Distress.

Ms. Gaddy's claim for intentional infliction of emotional distress alleges that the Church's "conduct[,] consisting of knowingly and repeatedly misrepresenting the foundational facts of its organization, offends generally accepted standards of decency and morality."  Compl. ¶ 242.  In other words, by allegedly "teaching lay members a false version of its history while hiding the true facts," Ms. Gaddy claims that the Church's conduct "continues to be so extreme as to exceed all bounds of what is usually tolerated in a civilized community."  *Id.*

Yet again, this claim is nothing more than Ms. Gaddy's fraud claims couched in different terms.  Ms. Gaddy alleges intentional infliction of emotional distress because of the Church's communications regarding "the foundational facts of its organization."  *Id.*  Such communications are no more justiciable than her fraud claims—all of which rest on the truth or falsity of religious doctrine and belief.  Courts reject such claims when they turn on religious facts—as Ms.

Gaddy's claims do—even under far more extreme circumstances than those alleged here.  *See, e.g.*, *Paul v. Watchtower Bible & Tract Soc'y*, 819 F.2d 875, 879 (9th Cir. 1997) (dismissing emotional distress claim arising from church's practice of shunning); *Hubbard v. J Message Grp. Corp.*, 325 F. Supp. 3d 1198, 1221-22 (D.N.M. 2018) (holding that the Free Exercise Clause bars a claim against a religious organization for intentional infliction of emotional distress when that claim arose from an internal religious dispute involving shunning).

At bottom, all of Ms. Gaddy's claims "are merely an elliptical way of alleging clergy [or church] malpractice"—the claim that a clergyperson, or by extension a church itself, fell below some alleged standard of care while performing ecclesiastical duties.  *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 205 (Utah 2001).  Ms. Gaddy's real complaint is that she believes the Church is untrue.  But "courts throughout the United States have uniformly rejected claims for clergy [or church] malpractice under the First Amendment."  *Id*. at ¶ 17.  The inviolable principle of church autonomy dooms such claims.  *Id.* at ¶¶ 21-24.  Under the First Amendment, the Court has no power to decide whether a church's religious teachings are true or false.

### D.    Ms. Gaddy's RICO Claim Fails.

Ms. Gaddy's civil RICO claim fails for many of the same reasons as her fraud claims.  "The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006).  A "racketeering activity" is defined by statute as "any act which is indictable under federal law and specifically includes mail fraud, wire fraud and racketeering."  *Id.* (internal quotation marks and citation omitted).  This "racketeering activity" is frequently described as a "predicate act" or "acts."  *Id.* at 1262 (citation omitted).

Ms. Gaddy alleges two alternative "enterprises": first, various legal entities controlled by the Church, and second, missionaries, Church leaders, primary and Sunday school teachers, seminary instructors, and other religion teachers.  Compl. ¶¶ 232, 234.  This is absurd.  The idea that hundreds of thousands of current and former missionaries, Sunday school teachers, and other religious instructors are all *indictable* for preaching their religion is beyond the pale.  As the United States Supreme Court has taught, "[i]f one could be sent to jail because a jury in a hostile environment found [sincere religious] teachings false, little indeed would be left of religious freedom."  *Ballard*, 322 U.S. at 87.  To the contrary,  "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever

religious doctrine one desires." *Smith*, 494 U.S. at 877.  There is simply no basis to claim that the Church or its members could be indicted for teaching their religious beliefs.

Beyond the defects in Ms. Gaddy's "enterprise" theory, her allegations regarding the predicate acts also fail.  Ms. Gaddy claims that the Church has engaged in "mail and wire fraud" by using the postal service and electronic communications to teach about Joseph Smith's First Vision, the Book of Mormon, and the Book of Abraham.  Compl. ¶ 175.  This is nothing more than a rehashing of Ms. Gaddy's fraud claims.  And, as described above, the First Amendment bars an adjudication of those allegations.  *See, e.g.*, *Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125, 1138-39 (D. Mass. 1982) (declaring that plaintiff's RICO claims "would encounter further objection if the court should find Scientology entitled to protection as a religion" as "[i]n order not to risk abridging rights which the First Amendment protects, courts generally interpret regulatory statutes narrowly to prevent their application to religious organizations").  *Cf. Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088 n.14 (9th Cir. 1986) ("RICO was aimed principally at protecting the public from organized crime front enterprises, not at enabling a religious organization to

prevent the dissemination of doctrinal materials by a rival religious organization.").

Accordingly, her RICO claim fails.

## CONCLUSION

Each of Ms. Gaddy's claims is barred by the First Amendment.

Accordingly, the Church's Motion should be granted, and the Complaint should be

dismissed with prejudice.

DATED:  August 27, 2019.

STOEL RIVES LLP


*/s/ Wesley F. Harward*
David J. Jordan
Wesley F. Harward

*Attorneys for Defendant Corporation of
the President of The Church of Jesus
Christ of Latter-day Saints*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of August, 2019, a true and correct copy

of the foregoing **MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) OR,**

**ALTERNATIVELY, 12(B)(6)** was served via U.S. District Court CM/ECF

electronic notification on the following:

Kay Burningham
299 South Main Street, Suite 1375
Salt Lake City, UT 84111
kay@kayburningham.com


*/s/ Wesley F. Harward*