Kay Burningham (#4201)
kay@kayburningham.com
Kay Burningham, Attorney at Law
299 South Main Street
Suite #1375
Salt Lake City, Utah 84111
Phone: 1.888.234.3706

*Attorney for Laura A. Gaddy and the Class.*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| **LAURA A. GADDY**, individually and on behalf of all others similarly situated, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S FRCP 12(b) MOTION** |
| *Plaintiffs,* | (DEMAND FOR JURY TRIAL) |
| v. | **2:19-cv-00554-RJS-DBP** |
| **[The] CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,** a Utah corporation sole. | The Honorable Robert J. Shelby |
| *Defendant* | **(ORAL ARGUMENT REQUESTED)** |

COMES NOW PLAINTIFF LAURA A. GADDY, individually, and on behalf of all others similarly situated, and, hereby submits her Opposition to Defendant's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) or, Alternatively, 12(b)(6) (ECF# 6).

TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................................6

   A.  COP's False Statements of Fact are the Gravamen of the Complaint. ................6

   B.  Defendant Confuses Beliefs with Facts. .................................................6

II.  A FALSE STATEMENT OF MATERIAL FACT OFFERED AS AN INDUCEMENT TO JOIN A RELIGION IS A RECOGNIZED TORT, BEYOND FIRST AMENDMENT PROTECTION. ............................................................................................. 10

   A.  Van Schaick v. Church of Scientology. ................................................. 10

   B.  Molko v. Holy Spirit Association, Inc. ................................................... 11

III.  HISTORICALLY, FRAUD HAS BEEN EXCLUDED FROM FIRST AMENDMENT PROTECTION. ............................................................................................. 12

   A.  The SCOTUS has Suggested that Fraud is Not Protected Speech. .................... 12

   B.  Fraud has been Denied Protection under Religious Liberty Arguments. ............. 13

IV. SINCERELY HELD BELIEFS ARE PROTECTED; NOT NECESSARILY ACTIONS. ............................................................................................................ 15

   A.  Beliefs are Protected; Actions are not Necessarily Protected. ........................... 15

   B.  U.S. v Ballard: Truth of Belief Cannot be Questioned; Sincerity of Belief Can. ... 16

V.  PRECEDENT HOLDS THAT THE "CHURCH AUTONOMY DOCTRINE" IS AN AFFIRMATIVE DEFENSE, NOT AN ISSUE OF SUBJECT MATTER JURISDICTION. 17

VI.  TO RULE AS DEFENDANT URGES WOULD BE A GROSS EXPANSION OF THE CHURCH AUTONOMY DOCTRINE. ...................................................................... 18

   A.  Fraud in the Inducement Renders a Contact Voidable. ........................................ 19

   B.  Doe v. Presbyterian Church; Consent Needed to Apply CAD Defense. ............. 20

VII.  THE ARGUMENT THAT A CLAIM FOR BREACH OF FIDUCIARY DUTY IS NON-COGNIZABLE FAILS. ................................................................................ 22

   A.  COP as Fiduciary: Under Utah law, COP had a Duty to Disclose. .................... 23

   B.  Here, Fiduciary Duty Should Not be Determined as a Matter of Law. ................ 24

   C.  Under Utah Law, a Duty of Disclosure can Arise without a Fiduciary Duty. ......... 24

VIII.  CHALLENGES TO PLAINTIFF'S CAUSES OF ACTION FOR FRAUD INTHE INDUCEMENT AND FRAUDULENT CONCEALMENT MUST FAIL ............................. 25

IX.  DEFENDANT MISUNDERSTANDS THE APPLICATION OF CIVIL RICO. ............. 26

   A.  Members of the Enterprise Need Not be Indictable. ............................................. 26

   B.  Passive Instrument Enterprises are often Victims of a RICO Scheme. ............... 27

   C.  Cash is an Appropriate Item of Personal Property Damage under RICO ............ 29

X.  UTAH HAS RECOGNIZED THAT A CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS MAY BE BROUGHT AGAINST A RELIGION
............................................................................................................................ 30

XI. CONCLUSION ................................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Atl. Richfield Co.,*
  25 Cal. 4th 826, 24 P.3d 493 (2001), as modified ...................................... 12

*Bennett v. Coors Brewing Co.,*
  189 F.3d 1221 (10th Cir. 1999) .................................................................. 19

*Bryce v. Episcopal Church in Diocese of Colorado,*
  289 F.3d 648 (10th Cir. 2002) .............................................................. 18, 21

*Cantwell v. State of Connecticut,*
  310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352 (1940) .......................... 14

*Cedric Kushner Promotions v. King,*
  533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) .............................................. 27

*DeFalco v. Bernas,*
  244 F.3d 286 (2d Cir. 2001) ....................................................................... 27

*Doe v. First Presbyterian Church U.S.A. of Tulsa,*
  2017 Okla. 106, 421 P.3d 284 ................................................... 19, 20, 21, 22

*Doe v. Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints,*
  2012 WL 3782454 (D. Idaho Aug. 31, 2012) ............................................ 24

*Franco v. Church of Jesus Christ of Latter-day Saints,*
  2001 Utah 25, 21 P.3d 198 (Utah 2001) ...................................... 22, 23, 31

*Gonzalez v. Roman Catholic Archbishop of Manila,*
  280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929) ............................................. 13

*Gulbraa v. Corp. of the President,*
  159 P.3d 392, 2007 UT App 126 (Utah App., 2007) .................................. 31

*Hancock v. True Living Church,*
  118 P.3d 297, 2005 UT App 314 (Utah 2005) ...................................... 13, 14

*Hosanna–Tabor Evangelical Lutheran Church and School v. E.E.O.C.,*
  565 U.S. 171, 132 S.Ct. 694, 181 L.Ed.2d 650, fn. 4 ............................... 17

*In re EpiPen,*
  336 F. Supp.3d 1256 (D. Kan. 2018) ....................................................... 30

*In re The Bible Speaks,*
  869 F.2d 628 (1st Cir. 1989) ..................................................................... 12

*Jones v. Wolf*,
  443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979)..............................................18
*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*,
  344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952) ...................................................21
*LaSalle Bank Lake View v. Seguban*,
  937 F. Supp. 1309 (N.D. Ill. 1996) ........................................................................27
*Logsdon v. Harvanek*,
  510 F. App'x 697 (10th Cir. 2013) .........................................................................26
*Mecham v. Benson*,
  590 P.2d 304 (Utah 1979)......................................................................................19
*Mitchell v. Christensen*,
  31 P.3d 572 (Utah 2001)..................................................................................22, 23
*Molko v. Holy Spirit Assn.*,
  46 Cal. 3d 1092, 762 P.2d 46 (1988) ....................................................................11
*Mosier v. Maynard*,
  937 F.2d 1521 (10th Cir. 1991) .............................................................................14
*National Organization for Women, Inc.*,
  510 U.S. ................................................................................................................27
*Rayburn v. Gen. Conference of Seventh-Day Adventists*,
  772 F.2d 1164 (4th Cir. 1985)...............................................................................21
*Religious Technology Center v. Wollersheim*,
  796 F.2d 1076 (9th Cir.1986).................................................................................30
*Reynolds v. United States*,
  98 U.S. 145, 25 L.Ed. 244 (1878) .........................................................................15
*Safe Streets Alliance v. Hickenlooper*,
  859 F.3d 865 (10th Cir. 2017)...............................................................................29
*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)........................27, 29, 30
*Serbian Eastern Orthodox Diocese for United States of America and Canada v.
  Milivojevich*,
  426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) ...........................................13
*State v. Green*,
  99 P.3d 820, 2004 UT 76 (Utah 2004) .............................................................14, 15
*Tal v. Hogan*,
  453 F.3d 1244 (10th Cir. 2006)..............................................................................26
*Tilton v. Marshall*,
  925 S.W.2d 672 (Tex. 1996)..................................................................................14
*United States v. Alvarez*,
  567 U.S. 709, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012)................................12, 13
*United States v. Ballard*,
  322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) ................................................16
*United States v. Philip Morris USA, Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009).................................................................26, 27, 29

*United States v. Turkette*,
  452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)....................................26, 27
*Van Schaick v. Church of Scientology of California, Inc.*,
  535 F. Supp. 1125 (D. Mass. 1982)...................................................................... 10
*Watson v. Jones*,
  80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1871) ................................................. 20
*Yazd v. Woodside Homes*,
  143 P.3d 283 (Utah 2006)................................................................................ 22, 23

## Constitution

UT Const. I-4 Religious liberty (Utah Constitution (2016 Ed))……………………………25

## Statutes

18 U.S.C. § 704.................................................................................................... 12
18 U.S.C. § 1961(4).............................................................................................. 26
§ 1961(1).............................................................................................................. 29

## Rules

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 5
FRCP 12 (b)(6).............................................................................................. 17, 25
FRCP 12(b) ........................................................................................................... 1

## Other Authorities

Restatement (Second) Contracts §164(1) (1981) .......................................... 19
Restatement (Second) of Torts § 46 ............................................................... 31
Restatement (Second) of Torts § 525 (1977) ................................................ 13
*The Reverse-Entanglement Principle: Why Religious Arbitration of Federal Rights Is*
  *Unconstitutional*,
  128 Yale L.J. 2087 (2019)............................................................................. 19

## 1.  <u>PRELIMINARY STATEMENT</u>

As admitted by a prominent Columbia professor, considered the foremost scholar regarding Mormon Church founder Joseph Smith, Jr. and early Mormonism, and one of Defendant's key advocates for decades: "I think that for the Church to remain strong it has to reconstruct its narrative. The dominant narrative is not true; it can't be sustained[.]" [1]

### A.  COP's False Statements of Fact are the Gravamen of the Complaint.

Gaddy and those similarly situated ("Plaintiffs") bring a case against the 1923 entity, the Corporation of the President of the Church of Jesus Christ of Latter-day Saints ("COP").Their case is not against Smith, the founder of Mormonism.

Whatever Smith's motivations, what remains true is that COP has manipulated the factual history of early Mormonism and has lied about material facts concerning the creation of key scripture.  The creation of COP's "Correlation" Department (Compl. ¶¶ 39-42), reflected a conscious decision by the business entity to mislead its lay members with a false version of its history (Compl. ¶¶ 43-44, 125-126 & 129-130). Simply, this is a case of fraud in the inducement by COP.

### B.  Defendant Confuses Beliefs with Facts.

Defendant makes a threshold mistake by characterizing the Complaint's allegations as requiring adjudication of Mormon beliefs. (Mtn p. 6). Nowhere in the

---

[1] Richard L. Bauman, answering questions from a group of Mormons, *circa* summer 2016. https://www.youtube.com/watch?v=MA0YS8LWWX4, 44:00 (last viewed 10/06/2019).

Complaint do Plaintiffs challenge the truth or falsity of any belief or doctrine of the Church. Instead, Plaintiffs' allegations are based solely upon material misrepresentations of *fact*, which—had Plaintiffs known the truth—would have altered their decisions to remain in, or join, the Church (Compl. ¶199).

The *beliefs induced through those false statements of fact* conveyed by COP, are, among others, that the *Book of Mormon*, the keystone of the religion, is a *translation* from a record inscribed on gold plates by ancient Americans of Hebrew ancestry (Compl. ¶¶ 37, 134 & 183); that Smith was the man chosen by God to restore the original gospel of Christ [since] "all other creeds," [sects or churches] were corrupt (Compl. ¶¶ 62-64, 116, Ex. "K"); and that, through obedience to Mormon principles and ordinances, our eternal souls will be exalted and men may become one of many gods. (Compl. ¶¶57 & 94).

*Plaintiffs do not seek to challenge or adjudicate these beliefs. However, acceptance of these beliefs has been induced by COP through the following false statements of material fact, among numerous others, as set forth in the Complaint:*

- That Smith's 1820 first vision featured *two personages,* one of whom introduced the other, who then told Smith *that all creeds were false* [and therefore Smith was chosen to launch the restored gospel of Mormonism] (Compl. ¶¶ 65-68).

- That Smith studied [the "caractors" on] the plates and *translated* the *Book of Mormon* from inscriptions of the record of ancient Hebrew-Americans. (Compl. ¶¶ 76,106,109 & 111); and,

- That the Hebrew prophet Abraham inscribed his teachings on Egyptian papyri (Compl. ¶¶ 37, 92-96), and Smith accurately translated said papyri. (Compl. ¶ 96) Also that the *Book of Abraham* ("*B. of A.*") facsimiles depict Abraham (Compl. ¶¶ 120 & 138).[2]

COP has now admitted in a series of essays that these statements are false. COP has severely restricted dissemination of these essays, purportedly so as to "inoculate" members from the shock of discovering the falsity of the orthodox narrative they were taught. (Compl. ¶¶ 131-137 & Ex. "N"). These are the facts:

- In 1820, as stated in Smith's own 1832 writing, Smith sought the Lord, who forgave his sins—nothing more (Compl. ¶¶ 68 & 74).

- The *Book of Mormon* was not *translated* from an ancient record, but was *created* while Smith peered at a stone in a hat, the same stone he had previously used for scrying. (Compl. ¶¶ 85 & 134). [3]

- The *Book of Abraham* was not written by the Hebrew prophet; the papyrus recovered in 1967, from which Smith was said to have translated the words of Abraham, is a common Egyptian funerary document (Compl. ¶¶ 100-101) which does not mention Abraham.

---

[2] Absent disclaimer in the *Book of Abraham*, there is an implied representation that Smith did in fact translate from the papyri. However, he did not. The facsimile figures are claimed to depict the Prophet Abraham, but COP has admitted they do not.

[3] Whether divined or dictated from another document inside the hat, neither method constitutes "translating" from an ancient language into English.

Clearly, these are facts and not beliefs. Facts are susceptible to proof. Beliefs are not; if proven, beliefs become facts. Belief in Mormonism was and continues to be induced by COP's misrepresentation of material facts upon which it was founded. Those set forth above are just three of many such misrepresentations.[4]

The elements of a cause of action for common law fraud in Utah are:

(1) Defendant made a false statement about an important fact; and

(2) Either [it] made the statement knowing it was false, or [it] made the statement recklessly and without regard for its truth; and

(3) Defendant intended that plaintiff would rely on the statement; and

(4) Plaintiff reasonably relied on the statement; and

(5) Plaintiff suffered damages as a result of relying on the statement.

MJUI 2d CV1801 Elements of fraud. (Model Utah Jury Instructions (2018 Ed.))

The false statements of facts were made knowingly or recklessly by COP's employees/agents.  In the mid-1900s, COP created a department it purposefully mis-named "Correlation," which has, since that time, intentionally published false statements of material fact about its origins and history while distorting and whitewashing others. (Compl. ¶¶ 38-45).  COP intended that Plaintiffs would rely upon those false statements. Plaintiffs reasonably relied on those statements and were damaged as a result of that reliance.

---

[4] Additional false statements of fact made by COP are that Smith was a monogamist and that the Hill Cumorah, where a Church-sponsored historical pageant has taken place for years, is located in upstate New York (Compl. ¶ 102 (polyandry & polygamy), & ¶ 77, 105, 111-12, 160 & Ex. "C"  (Cumorah))

## II. A FALSE STATEMENT OF MATERIAL FACT OFFERED AS AN INDUCEMENT TO JOIN A RELIGION IS A RECOGNIZED TORT, BEYOND FIRST AMENDMENT PROTECTION.

Gaddy v. COP is similar to other cases which have found that, even in a religious context, fraudulent statements of *fact* [as opposed to religious *belief*] are not afforded First Amendment protection.

A.   Van Schaick v. Church of Scientology.

In Van Schaick v. Church of Scientology of California, Inc., 535 F. Supp. 1125 (D. Mass. 1982), cited by Defendant (Mtn. p. 25), the plaintiff claimed that Scientologists misrepresented, among statements of religious belief and other concededly secular facts, that "auditing" was scientifically proven to be conducive to health and well-being. The court reasoned that, although the statement involved a core practice of Scientology, "auditing," the statement itself was a factual one rather than a religious belief, and thus was not subject to a First Amendment religious liberty defense.

> Plaintiff's earlier Complaint used the word "would" instead of "scientifically guaranteed." The prior wording would quite clearly have raised First Amendment objections if Scientology was, in fact, entitled to protection as a religion. By replacing "would" with "scientifically guaranteed" plaintiff seeks to avoid that problem…

The court then went on to find that this statement was secular:

> The First Amendment protects utterances which relate to religion but does not confer the same license for representations based on other sources of belief or verification. Statements citing science as their source may provide the basis for a fraud action even though the same contention would not support such an action if it relied on religious belief for its authority… Id. at 1141, with re: Count V.

Similarly, the misrepresentations alleged in Plaintiffs' Complaint are factual, having non-religious sources of verification not reliant upon religious beliefs. Here, these factual statements have been proven false, though the truth remains hidden from faithful Mormons by COP.

The primary-sourced account of Smith's first vision was manipulated and changed to tell a precursor restoration event. A seer stone and a hat were used to create the *Book of Mormon* manuscript---that same stone with which Smith had tried to find buried treasure. The stone was hidden in a vault and was not depicted in COP's artwork. Instead, COP falsely taught that the manuscript was translated directly from "gold plates." In addition, Abraham's book was falsely claimed to have been a direct translation from a particular papyrus manuscript including facsimile vignettes as republished and explained in the modern canonized scriptures.

B.      Molko v. Holy Spirit Association, Inc.

The California Supreme Court has held that misrepresentation of material fact as an inducement to join a religion is actionable fraud. Molko was recruited into a religion through misrepresentations that the recruiters were not in fact religiously affiliated. In upholding his claim for fraud, the court reasoned:

> We find that judicial sanctioning of traditional tort liability for fraudulent recruitment satisfies these [compelling state interest and minimal/marginal burden] standards. First, its purpose and effect is plainly to advance the legitimate secular goal of protecting persons from being harmed by fraud. Second, it is nondiscriminatory: all organizations, religious or otherwise, may be held liable for damages caused by their fraudulent acts.

11

Molko v. Holy Spirit Assn., 46 Cal. 3d 1092, 1119, 762 P.2d 46, 61 (1988), as modified on denial of reh'g (Dec. 1, 1988), superseded on other grounds by statute, as stated in Aguilar v. Atl. Richfield Co., 25 Cal. 4th 826, 854, 24 P.3d 493, 513 (2001), as modified (July 11, 2001).

   See also In re The Bible Speaks, 869 F.2d 628, 645-46 (1st Cir. 1989), the Church could not  "…use the cloak of religion" to commit fraud or undue influence.

## III. <u>HISTORICALLY, FRAUD HAS BEEN EXCLUDED FROM FIRST AMENDMENT PROTECTION.</u>

   Defendant argues that its actions are protected by the Church Autonomy Doctrine ("CAD"). However, proper analysis of COP's actions begins with the Free Speech provision of the First Amendment, as fraudulent speech has historically been excluded from such protection.

A.   <u>The SCOTUS has Suggested that Fraud is Not Protected Speech.</u>

   In United States v. Alvarez, 567 U.S. 709, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012), Alvarez falsely told colleagues at a local government board meeting that he had received the Congressional Medal of Honor. He was arrested for violating the Stolen Valor Act, 18 U.S.C. § 704.

   Alvarez challenged the Act's constitutionality under the First Amendment. Importantly, "[his] statements were not shown to have been made to secure employment or financial benefits or admission to privileges reserved for those who had earned the Medal." Alvarez, 132 S. Ct. at 2542.  Thus, the Supreme Court found that lying without more (as Alvarez had) is protected speech; however, the Court specifically

denied false statements made "to effect a fraud" such protection, noting the distinction

that: "Fraud statutes, for example, typically require proof of a misrepresentation that is

material, upon which the victim relied, and which caused actual injury. See Restatement

(Second) of Torts § 525 (1977)." Alvarez, 132 S. Ct. at 2554.

      B.     <u>Fraud has been Denied Protection under Religious Liberty Arguments.</u>

Decades earlier, in a case challenging the decision of a church council, the

defendant sought First Amendment protection. The Supreme Court in Gonzalez v.

Roman Catholic Archbishop of Manila, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929),

strongly suggested that—had certain council actions risen to the level of fraud—the First

Amendment would not protect those actions.

Gonzalez involved a dispute over appointment of a chaplain, and whether the

person appointed was entitled to income accrued during the vacancy. Gonzalez

challenged the Roman Catholic Archdiocese council's decision. The Supreme Court

declined to insert itself into the tribunal's determination of the ecclesiastical controversy.

> In the absence of fraud, collusion, or arbitrariness, the decisions of the proper
> Church tribunals on matters purely ecclesiastical, although affecting civil rights,
> are accepted in litigation before the secular courts as conclusive, because the
> parties in interest made them so by contract or otherwise.

Id., 280 U.S.1, 16. (emphasis added) (internal citations omitted); *see also*

Serbian Eastern Orthodox Diocese for United States of America and Canada v.

Milivojevich, 426 U.S. 696, 698 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), which limited

Gonzalez by disavowing its arbitrariness exception, but, importantly, affirming its fraud

and collusion exceptions.

Utah law also excludes fraud from First Amendment protection. Hancock v. True Living Church, 118 P.3d 297, 2005 UT App 314 (Utah 2005), also cited by Def. (Mtn. p.19): "But here, Plaintiffs' claims do not necessarily implicate the Church's government, faith, or doctrine..." *Id.,* at ¶ 17 [Excluding claim for promise to see Christ, *Id.,* n. 2].

See also Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352 (1940) (door-to-door religious solicitation found to be protected religious speech, but "[n]othing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public." *Id.*, at p. 306).

Plaintiff finds no binding precedent holding that a religious organization may defend itself against a claim of fraud—meaning misrepresentation of material *facts*, not *beliefs*—by raising a religious liberty defense of any type, including the CAD.[5]

---

[5] Plaintiff does not raise issues of religious *beliefs*, but only issues of misrepresented *facts*, though in the context of religion. Assuming, *arguendo*, that the Court accepts Defendant's position that the statements at issue are religious beliefs, then COP has a dual burden: to show that the facts alleged necessarily require an adjudication of religious beliefs and, if that requirement is established, that those beliefs are sincerely held. "One seeking an exemption based on faith from a facially neutral, generally applicable statute, regulation, or common law principle must first demonstrate … that the application thereof would substantially burden his or her free exercise of religion… Before a court can determine whether a law or regulation substantially burdens one's free exercise rights, the individual generally must establish by a preponderance of the evidence that the beliefs avowed are not only religious in nature, but also sincerely held." *See, e.g.*, Mosier v. Maynard, 937 F.2d 1521, 1526 (10th Cir. 1991); Tilton v. Marshall, 925 S.W.2d 672, 677-78 (Tex. 1996).

## IV. <u>SINCERELY HELD BELIEFS ARE PROTECTED; NOT NECESSARILY ACTIONS.</u>

A.     <u>Beliefs are Protected; Actions are not Necessarily Protected.</u>

In *State v. Green 99 P.3d 820, 2004 UT 76 (Utah 2004),* the Utah Supreme Court had occasion to analyze *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878). It found that, as of 2004, the [U.S. Supreme Court] had "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law [especially a facially neutral law] that the State is free to regulate (citation omitted). *Green, supra.* at 99 P.3d 825.

The *Reynolds* court had explained: "[I]t is within the legitimate scope of the power of every civil government to determine whether polygamy or monogamy shall be the law of social life under its dominion." *Reynolds, supra.,* 98 U.S. 145, 166. Thus, although polygamist George Reynolds was entitled to *belief* in the Mormon doctrine of polygamy, when he *practiced* that doctrine, he was susceptible to criminal indictment. The Court reasoned that this intrusion by the government into religion was justified by its duty to protect peace and good order.

Here, the *actions* of COP in fraudulently inducing membership in its church through false statements of material fact are the types of *actions* that the state should protect against, without regard to the First Amendment, as more than speech is at issue.

As in *Reynolds*, COP has taken action in furtherance of its lies. By creating a "Correlation" Department, whose sole function is to ensure that the "orthodox" (*i.e.,* false) narrative is taught to its members and to potential members, COP has

demonstrated the intent to commit a fraud, to intentionally and consistently distort material facts in order to have its members rely to their detriment on those misrepresentations. Creation of such a "Department" to "correlate" the lies is more than lying; it is *action*, the type of criminal action which the government is entitled to protect against (see RICO analysis, *infra*).

B.  <u>U.S. v Ballard: Truth of Belief Cannot be Questioned; Sincerity of Belief Can.</u>

Def. cites United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (Mtn. pp. 16, 20 & 24).  However, Ballard's holding was limited to *beliefs*, and does not extend to *facts*. Indeed, the Ballards represented that they were divine messengers with the power to heal. *Id*., at 79.  The trial court instructed the jury that it could not consider the truth of the Ballards' beliefs (which were protected by the First Amendment), but it could consider whether the Ballards themselves *truly held those beliefs* (which was a fact susceptible to proof). The jury found that the Ballards did not truly believe their own representations, and on that basis, convicted them of fraud.

The Supreme Court found that the Ballard defendants could be convicted of fraud for falsely espousing something they truly did not believe, even if the *content* of that belief was not subject to judicial scrutiny.

Similarly, despite what COP represents (Mtn. p 6), Plaintiffs are not asking the Court to adjudicate the truth or falsity of the Church's religious beliefs. Rather, the gravamen of Plaintiffs' Complaint is that COP, through its employees and agents, induces and maintains in its members' beliefs based upon statements of fact that those

COP employees and agents themselves do not believe (or, more accurately that they, know to be false).  As with the Ballards, harming others by inducing them to beliefs based on factual statements one does not sincerely believe constitutes fraud.

COP knowingly induces belief through the false statements of material fact identified in the Complaint, among others. Church members have reasonably built their beliefs upon these false statements. When misrepresentation of facts is discovered, church members often lose their beliefs. *Thus, belief only becomes relevant as a consequence of COP's fraud*. Plaintiff is not asking the Court to adjudicate the truth or falsity of those beliefs, but only to address the false statements of fact upon which those beliefs were built.

For decades, COP has lured and secured its membership—either intentionally or at the very least recklessly—through false statements of fact material to its founding and history. It is axiomatic: A person is not permitted to commit fraud, whatever that person's beliefs.

## V.   PRECEDENT HOLDS THAT THE "CHURCH AUTONOMY DOCTRINE" IS AN AFFIRMATIVE DEFENSE, NOT AN ISSUE OF SUBJECT MATTER JURISDICTION.

Binding precedent holds that the CAD is an affirmative defense; it does not deprive the Court of subject matter jurisdiction. Therefore, Defendant may challenge Plaintiff's fraud causes of action only under FRCP 12 (b)(6). Both the U.S. Supreme Court and the 10th Circuit Court of Appeals have recognized that the CAD (in these contexts, the ministerial exception) "operates as an affirmative defense to an otherwise

cognizable claim, not a jurisdictional bar." Hosanna–Tabor Evangelical Lutheran Church and School v. E.E.O.C., 565 U.S. 171, 132 S.Ct. 694, 181 L.Ed.2d 650, fn. 4 (emphasis added); *see also* Bryce v. Episcopal Church in Diocese of Colorado, 289 F.3d 648, 654 (10th Cir. 2002).

Defendant's 12(b)(6) argument as to Plaintiff's fraud causes of action is also limited to its First Amendment defense. Therefore, if that defense fails, COP's challenge to Plaintiff's First, Second and Fourth causes of action should be denied.

## VI.   TO RULE AS DEF. URGES WOULD BE A GROSS EXPANSION OF THE CHURCH AUTONOMY DOCTRINE.

The Defense asserts that the CAD provides wholesale immunity from judicial involvement if the dispute involves church actions or if it even occurs in a religious setting. Such a view represents a severe distortion of the actual CAD. The doctrine is one of deference to church council rulings, not immunity from liability. Jones v. Wolf, 443 U.S. 595, 602, 99 S. Ct. 3020, 3026, 61 L. Ed. 2d 775 (1979).

Professor Marci Hamilton's views on the CAD are helpful.[6] "To say that religious liberty must encompass the right to harm others is to turn the First Amendment on its head."[7]  Professor Hamilton also argues that "society should not have to pretend that religious organizations do not engage in socially

---

[6] Marci A. Hamilton is a leading church/state scholar who holds the Paul R. Verkuil Chair in Public Law at the Benjamin N. Cardozo School of Law, Yeshiva Univ.
[7] Hamilton, The Waterloo for the So-Called Church Autonomy Theory: Widespread Clergy Abuse and Institutional Cover-Up, 29 Cardozo L. Rev. 225, 237 (2007).

dangerous behaviors, and, therefore, suffer the harmful consequences of their unchecked behaviors." *Id* at p.25.

The "reverse entanglement doctrine" posits that, just as the entanglement doctrine has been applied to ensure that the state does not interfere with religion, religion should be precluded from interference with the secular interests of the state. "What, then, does the Establishment Clause protect that other constitutional provisions do not? Simply put, the Establishment Clause's 'wall of separation between church and state' is what keeps religion out of government."[8]  To expand the CAD to allow a religion to commit fraud by [mis]representing the material facts upon which its beliefs are purportedly based would infringe upon the core right and duty of the government to protect the public from fraud.

A.    <u>Fraud in the Inducement Renders a Contact Voidable</u>.

"Under general contract principles, it is well established that a contract is void and unenforceable if produced through fraud." *See, e.g.*, Restatement (Second) Contracts §164(1) (1981)." Bennett v. Coors Brewing Co., 189 F.3d 1221, 1229 (10th Cir. 1999); *see also* Mecham v. Benson, 590 P.2d 304,307-308 (Utah 1979).

If proven to have been induced by fraudulently false statements of material fact, Plaintiff's consent to join the Church, and the others' similar consent, would be voidable. Thus, Plaintiffs would not be subject to the CAD, as explained in Doe v. First

---

[8] Sophia Chua-Rubenfeld, Frank J. Costa, Jr., "The Reverse-Entanglement Principle: Why Religious Arbitration of Federal Rights Is Unconstitutional," 128 *Yale L.J.* 2087, 2107 (2019) (quoting Thomas Jefferson) (internal citation omitted).

Presbyterian Church U.S.A. of Tulsa, 2017 Okla. 106, 421 P.3d 284, reh'g denied (June 4, 2018), cert. denied sub nom. First Presbyterian Church U.S.A. of Tulsa, Oklahoma v. Doe, 139 S. Ct. 940, 203 L. Ed. 2d 131 (2019).

      B.     Doe v. Presbyterian Church; Consent Needed to Apply CAD Defense.

Doe v. Presbyterian, through the 2019 denial of *certiorari*, was an attempt by various churches to expand the CAD.  Doe involved a lawsuit by an African man who was baptized to receive Christ, but specifically declined membership in the Church.  He received a promise from the church that it would not publicize his baptism, since he feared violent reprisal in Africa should his baptism become known there. In violation of the oral contract, the Church placed an announcement of his baptism on its public website.  Upon his return to Africa, Plaintiff was badly beaten, and killed another man while attempting to escape his persecutors.  Upon being sued, the Church raised the CAD as a defense, arguing that the rite of baptism prevented his breach of oral contract claim.

The Oklahoma Sup. Court explained the history of the CAD in the Tenth Circuit:

¶ 16 It is a fundamental principle in this country that all people have the "full right to entertain any religious belief, to practice any religious principle, and to teach [421 P.3d 289] any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights." Watson v. Jones, 80 U.S. 679, 728, 13 Wall. 679, 20 L.Ed. 666 (1871)… it is unquestioned that religious institutions have a protected right to create tribunals to resolve controverted questions of faith and for "the ecclesiastical government of all the individual members, congregations and officers within the general association." However, this ecclesiastical jurisdiction is limited: those who "unite themselves to such a body, do so with the implied consent to this government ... ". Watson, 80 U.S. at 729.8

¶ 17 Watson involved a property dispute that arose between different factions within a certain Presbyterian church by an appointed internal tribunal. The SCOTUS found

that the members had consented to the authority of the church and [ ] that the
church was part of a larger body within the Presbyterian church. Each church
consented to the governance of the larger church. Because all were members
within the church and the larger church organizational body and had consented to
being part of this religious organization, the SCOTUS said secular courts should
defer to the decision of the internal governing structure…

¶ 18 …[T]he pronouncements of Watson were further refined in Kedroff v. St.
Nicholas Cathedral, where SCOTUS recognized the authority and autonomy of the
church to be free from the secular control in matters of church government, faith
and doctrine under the guarantees of the First Amendment to the U.S. Constitution.
Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,
344 U.S. 94, 115–116, 73 S.Ct. 143, 154–155, 97 L.Ed. 120 (1952). In this context,
a church's freedom from secular control is solely based on membership in the
church…

 ¶ 19… [T]he foundation for a church to be entitled to this level of protection is
rooted in the pronouncements by the SCOTUS in Watson and Kedroff, outlining that
ecclesiastical protection for a church arises solely from membership and the
consent by the person to be governed by the church…

Doe v. First Presbyterian, *Id.,* at ¶¶ 16-19.

Defendant appears to claim absolute immunity whenever it asserts a belief that its

challenged actions are dictated by religious doctrine (Mtn. *passim*). However, this is not

the role of CAD, which bars judicial review in only two instances: 1) those involving

matters of church governance, faith, or doctrine; and, 2) those involving matters that the

parties have agreed (via membership) will be resolved by a Church tribunal or that arise

out of such proceedings. *Doe*, 421 P.3d at 288-89 (citing *Kedroff*, 344 U.S. at 115-16,

73 S.Ct. at 154-55, 97 L.Ed. 120 (1952)).

Outside of those narrow circumstances, the law is crystal clear that, as the Tenth

Circuit has noted, "churches are not—and should not be—above the law."  Bryce, 289

F.3d at 657 (quoting *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)).

In <u>Doe,</u> the Oklahoma Supreme Court held that, while *members* of the Presbyterian Church are impliedly subject to that church's laws because they freely chose to join it, the plaintiff in that case did not make that choice.  Likewise, here, while Plaintiffs joined the Mormon church, that choice in each instance was fraudulently induced by COP, and Plaintiffs therefore did not "freely" choose to do so.  The "agreement" between parties under which CAD might otherwise apply, as noted in *Doe*, was the product of fraud.  Moreover, this matter involves no issues of church governance, faith, or doctrine.  Therefore, CAD cannot apply here.

## VII.    <u>THE ARGUMENT THAT A CLAIM FOR BREACH OF FIDUCIARY DUTY IS NON-COGNIZABLE FAILS.</u>

Franco v. Church of Jesus Christ of Latter-day Saints, 2001 Utah 25, 21 P.3d 198 (Utah 2001) was wrongly decided. "We hold that the trial court correctly determined that Franco's claims against the LDS Church Defendants for… breach of fiduciary duty are barred by the First Amendment to the United States Constitution." *Id.,* at ¶ 39. But the *Franco* court did not take into consideration the lack of finding mispresented facts despite an inspection (Mitchell v. Christensen, 31 P.3d 572 (Utah 2001)) nor subsequently identified equitable factors (Yazd v. Woodside Homes, 143 P.3d 283 (Utah 2006).  In failing to consider these factors, the Franco court improperly favored clergy over other contexts, *e.g.*, attorney-client, doctor-patient, relationships in certain financial settings. The First Amendment does not permit a court to so favor clergy.

A. <u>COP as Fiduciary: Under Utah law, COP had a Duty to Disclose.</u>

The Utah Supreme Court held in Franco that clergy are not fiduciaries in the context of negligence-based claims. However, a promise that "we will never lead you astray" (Compl. ¶ ¶ 32 & 207) is an invitation to rely on Church leaders. It is an express promise that they will communicate fully and honestly with to their members, *i.e.*, the fiduciary duty of full disclosure.

Under Utah law, an equitable imposition of a duty to disclose, similar to that imposed upon a fiduciary, exists where a disparity in power and knowledge are demonstrated.  The Utah Supreme Court ("SCOUT") has held that a developer-builder may owe his buyer a duty to disclose information known to him concerning real property "…when that information is material to the condition of the property purchased[.]" Yazd v. Woodside Homes Corp., 143 P.3d 283, 289 (Utah 2006).  The Yazd court that certain equitable factors should be considered in order determining whether a duty to disclose arises:

> Age, knowledge, influence, bargaining power, sophistication, and cognitive ability are but the more prominent among a multitude of life circumstances that a court may consider in analyzing whether a legal duty is owed by one party to another. Where a disparity in one or more of these circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to unreasonable risk, *the law* may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage. [Emphasis Added].

23

*Id.*, at 56; see also Mitchell v. Christensen, 31 P.3d 572 (Utah 2001) (finding duty to disclose where nothing in buyer's inspection would have put buyer on notice of a defective pool).

Similarly, Plaintiffs would not have been on notice of the true facts (as opposed to the misrepresentations by COP), facts which have been historically distorted in and/or omitted from COP's "correlated" publications. Thus, whether characterized as a fiduciary duty or merely a duty to disclose, Plaintiffs are owed that duty.

B.     Here, Fiduciary Duty Should Not be Determined as a Matter of Law.

When the fraudulent statements at issue here were first promulgated, most Plaintiffs were young Church members who participated regularly and were subject to the constant assurance by the Brethren that the Church and its leaders "will never lead you astray." (Compl. ¶¶ 32, 144, 207). This promise was a personal invitation to place trust in COP, and it militates against a finding of no fiduciary duty as a matter of law. Clearly, whether such a duty existed it a question of fact.

The District Court for the District of Idaho reached the same conclusion in a case involving child sex abuse in the Mormon Church. "Idaho courts have not defined fiduciary or confidential relationships precisely, nor could they. The existence of a fiduciary duty is a question of fact[.]" Doe v. Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints, No. 1:09-CV-00351-BLW, 2012 WL 3782454, at *8 (D. Idaho Aug. 31, 2012).

C.     Under Utah Law, a Duty of Disclosure can Arise without a Fiduciary Duty.

A Utah jury instruction squarely addresses this duty to speak the whole truth. "If defendant made a statement, then [it] had a duty to tell the truth about the matter, to make a fair disclosure, and to prevent a partial statement from being misleading or

giving a false impression." MJUI 2d CV1807 Duty to speak the whole truth. (Model Utah Jury Instructions (2018 Ed.))

Under this rule, COP was required to disclose that there were multiple version of the first vision; that according to all primary accounts, Smith used a seer stone rather than translating from "golden plates" to create the *Book of Mormon*; and that the *Book of Abraham* was not written by Abraham, nor did it depict him in its facsimiles.

To find that clergy can never—as a matter of law—be fiduciaries or subject to a duty to disclose, would improperly favor religion and its clergy over secular fact patterns and in line with the reverse entanglement doctrine (Opp'n p.17), and would violate both the First Amendment and the Utah Constitution's guarantee that religion shall not be favored above the secular:  "[T]he State shall make no law respecting an establishment of religion…" UT Const. I-4 Religious liberty (Utah Constitution (2016 Ed.)),

### VIII.   CHALLENGES TO PLAINTIFF'S CAUSES OF ACTION FOR FRAUD INTHE INDUCEMENT AND FRAUDULENT CONCEALMENT MUST FAIL

Fraud in the inducement to contract (Compl. 2nd C/A, ¶ ¶ 189-204) and fraudulent concealment (Compl. ¶ ¶ 4th C/A 222-30) were ostensibly included in the "fraud claims" (Mtn., *passim*) which COP challenges on First Amendment grounds. Therefore, the challenge to each of these claims is subject to Plaintiff's foregoing arguments demonstrating that the CAD and other religious liberty arguments cannot be used as a shield against fraud claims. *(Opp'n, passim)*. Because no separate grounds for dismissal was argued under FRCP 12(b)(6), COP's challenge to those causes of action must fail.

## IX.     DEFENDANT MISUNDERSTANDS THE APPLICATION OF CIVIL RICO.

### A.     Members of the Enterprise Need Not be Indictable.

COP calls Plaintiff's RICO characterization "absurd," because members of the enterprises alleged in the Complaint could not possibly be "indictable." This argument fundamentally misunderstands the nature of enterprise. (Mtn. p. 24) Contrary to COP's misreading, the enterprise is not the defendant. It is irrelevant under RICO law whether the "enterprise" or any of its members are indictable for crimes alleged in the Complaint (Mtn. p. 24-26). Tal v. Hogan, 453 F.3d 1244, 1261 (10th Cir. 2006), cited by Def. (Mtn. p. 24), holds only that in order to qualify as predicate acts, the activities must be indictable offenses.

The RICO Act defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Only defendants are liable under RICO. No potential liability arises by being named as an enterprise or part of an enterprise. United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1111 (D.C. Cir. 2009). "There is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact. On its face, the definition appears to include both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." United States v. Turkette, 452 U.S. 576, 580–81, 101 S. Ct. 2524, 2527, 69 L. Ed. 2d 246 (1981).

"The evidence presented at Logsdon's trial shows that he used a number of legitimate businesses, including several travel agencies, to facilitate his fraudulent schemes. Under Miskovsky, the use of a legitimate business in this manner constitutes an enterprise..." Logsdon v. Harvanek, 510 F. App'x 697, 699 (10th Cir. 2013) (under Oklahoma State RICO Act).

     B.    <u>Passive Instrument Enterprises are often Victims of a RICO Scheme.</u>

"The Court has held that RICO both protects a legitimate "enterprise" from those who would use unlawful acts to victimize it, Turkette Id., at 452 U.S. 576, 591 and also protects the public from those who would unlawfully use an "enterprise" (whether legitimate or illegitimate) as a "vehicle" through which "unlawful ... activity is committed," National Organization for Women, Inc., *infra*., 510 U.S., at 259. Cedric Kushner Promotions v. King, 533 U.S. 158, 164, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001).

"… Congress wanted [RICO] to reach both 'legitimate' and 'illegitimate' enterprises." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499, 105 S. Ct. 3275, 3286, 87 L. Ed. 2d 346 (1985). The "enterprise" (whether legitimate or illegitimate) is a "vehicle" through which "unlawful ... activity is committed." National Organization for Women, Inc., v. Scheidler 510 U.S. 249, 259, 114 S.Ct. 798 (1994).

In fact, the RICO enterprise "may be the innocent vehicle through which unlawful activity is carried out." Philip Morris USA, Inc., 566 F.3d at 1111. Victims, instruments, and passive participants may be fully capable of satisfying the "enterprise" requirement. See N.O.W. Inc *supra*., 510 U.S. 249, 259 n.5 (1994).

Thus, although members of an enterprise may knowingly participate in the crimes, the members of the enterprise may also be "passive instruments" that are unknowingly manipulated by the defendant.  See, e.g., DeFalco v. Bernas, 244 F.3d 286, 307 (2d Cir. 2001) (holding that the alleged enterprise, which was a township, was the "passive instrument" of the defendants' racketeering activity); LaSalle Bank Lake View v. Seguban, 937 F. Supp. 1309, 1322 (N.D. Ill. 1996) ("…the enterprise itself is often a passive instrument or victim of the racketeering activity").

Additionally, cases where corporate subsidiaries, employees, etc. can't serve as the enterprise are where all the enterprise members are part of the same corporate structure.  Here, individual stakes, which are over the wards, are separate corporations. (Compl. ¶ ¶ 19 & 232-233). So are the educational institutions. (Compl. ¶ 234).

The facts alleged under Plaintiff's RICO cause of action deal with an unwitting enterprise, an association-in-fact of unpaid local Church members and missionaries and/or teacher/agents of COP. These associations-in-fact are an unwitting and passive group of individuals through which Defendant COP has accomplished its wire and mail fraud, (Compl. ¶ 234).

The lay local leaders, who serve in the wards under the jurisdiction of the independently incorporated stakes, are just such a group of unwitting individuals associated in fact.  They are not paid employees of COP.  Rather, the money they collect in the form of tithing and other donations is sent up to replenish the coffers of COP, now worth $100 billion. (Compl. Ex. 'A' org. chart).

The bond between COP and the members of the enterprise is the common belief in the principles of the Mormon Church and is a voluntary association. Local stakes and wards are not the alter egos of COP; they are legitimate businesses attempting to teach moral principles. Nonetheless, they are the vehicle for which COP accomplishes its goal to enrich itself by promulgating its carefully concocted and correlated scheme of lies.

C.      Cash is an Appropriate Item of Personal Property Damage under RICO

Defendant cites *Van Schaick* for the proposition that RICO should be limited to, "...§ 1964(c) to business loss from racketeering injuries..." *Van Schaick supra.,* at 1172 and Def's Mtn p.25. However, this idea was expressly overruled in *Sedima*, which was decided in 1985.

> … "racketeering activity" consists of no more and no less than commission of a predicate act, § 1961(1)… A reading of the statute belies any such requirement. Section 1964(c) authorizes a private suit by "[a]ny person injured in his business or property by reason of a violation of § 1962." Section 1962 in turn makes it unlawful for "any person"—not just mobsters—to use money derived from a pattern of racketeering activity to invest in an enterprise, to acquire control of an enterprise through a pattern of racketeering activity, or to conduct an enterprise through a pattern of racketeering activity. §§ 1962(a)–(c). If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 495, 105 S. Ct. 3275, 3284, 87 L. Ed. 2d 346 (1985).

See also *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017), which involved a claim against a marijuana farm. The plaintiffs were abutting landowners who alleged that the farm decreased the value of their property and brought a RICO claim.  The Tenth Circuit acknowledged that there was no injury to the plaintiff's

29

business "The Reillys do not claim to have any business-related rights at issue. So we only need to determine whether the Reillys plausibly alleged injuries to their *property rights*." Safe Streets All. v. Hickenlooper, 859 F.3d 865, 885 (10th Cir. 2017) The court decided the plaintiffs had pleaded sufficient injury to property and reversed the dismissal of the RICO claims.

RICO simply does not allow standing if the plaintiff has experienced only a personal injury.  Moreover, if injury to a business interest was required, one could never bring a consumer class action under RICO, and civil consumer fraud claims are one of RICO's biggest uses.  *See, e.g., In re EpiPen*, 336 F. Supp.3d 1256 (D. Kan. 2018);

Defendant also cites Religious Technology Center v. Wollersheim, 796 F.2d 1076 (9th Cir.1986) (Mtn. pp. 25-26). But Wollersheim was dismissed because the plaintiff failed to allege a pattern, *Id., at 366*.

## X.     UTAH HAS RECOGNIZED THAT A CAUSE OF ACTION FOR INTENTIONAL (HERE RECKLESS) INFLICTION OF EMOTIONAL DISTRESS MAY BE BROUGHT AGAINST A RELIGIOUS ORGANIZATION.

A cause of action for intentional infliction of emotional distress (IIED) under Utah law, contains these elements:

1. Outrageous and intolerable conduct; and

2. That defendant intended to cause emotional distress *or acted with reckless disregard of the probability of causing emotional distress;* and

3. Plaintiff suffered severe or extreme emotional distress that was caused by defendant's conduct. [Emphasis added]. MJUI 2d CV1501 Intentional infliction of emotional distress. (Model Utah Jury Instructions (2018 Ed.).

In addition to its First Amendment argument, COP argues that Plaintiff's cause of action for IIED must fail because the conduct by COP through its agents is not outrageous. Defendant cites cases re: shunning and internal religious disputes and claims that Plaintiff's argument is "merely an elliptical way of alleging clergy malpractice (Mtn. pp. 22-23)," borrowing that language from Franco, 21 P.3d at 206.  In Franco, that description was applied to causes of action arising from negligence, where a standard of care would have to be identified.

In contrast, intent (or even recklessness) does not involve a standard of care and therefore does not require this Court to identify one. For example, in Gulbraa v. Corp. of the President, 159 P.3d 392, 2007 UT App 126, ¶ ¶ 22-23 (Utah App., 2007). the plaintiff's ex-wife took his children to Japan. He alleged that the church instructed local leaders to conceal the children from him. The court ruled that his claims for IIED would not necessarily "unconstitutionally inject [the court] into substantive ecclesiastical matters," in that the command to hide his children was a "secular activity potentially amounting to a violation of generally applicable civil law," and was therefore "not barred under the entanglement doctrine." The court also found that whether such conduct was outrageous and intolerable, and whether plaintiff's distress was severe, were questions of fact.

The element of the tort is also satisfied by reckless conduct, defined as "[the] deliberate disregard of a high degree of probability that the emotional distress will follow,".... "and also, where [the perpetrator] knows that such distress is certain or substantially certain to result from [its] conduct." Restatement (Second) of Torts § 46 cmt. i.

Unlike in Franco, there is no need here to identify a standard of care. Here, the emotional distress arose from intentional (or at least reckless) conduct. COP, through its leaders, secreted in a vault the instrument Smith used to "translate" the *Book of Mormon* (Compl. ¶ 88); ripped out of the ledger book the only description in Smith's handwriting of what happened during the 1820 first vision (Compl. ¶ 70); and still maintains that it is Abraham depicted in the facsimiles sitting on the pharaoh's throne contemplating astrology (Compl. ¶¶ 120 &138). Even if not intentional, these actions are certainly reckless.

Whether Defendant's actions are extreme is a question of fact, and cannot be determined as a matter of law. As set forth in the *LDS Personal Faith Crisis [Report]* (Ex. #1), significant damages have occurred as a result of these misrepresentations (Compl. ¶ 244). "Challenges: Vanishing of existential foundation (loss of purpose), Questioning life after death, Loss of identity and values, Fear of losing family, friends, social network, and job, often unable to confide in anyone (can result in desperate

loneliness), Anxiety, depression, and at times, [suicidal thoughts]." (Compl. ¶ 244.) (Ex. #1, p. 55) [9]

## XI. <u>CONCLUSION</u>

Plaintiffs have demonstrated that the Complaint is about *facts*, not *beliefs*. When false statements of material fact are made with the intent to deceive, or recklessly and without regard for the truth, through a "Correlation" Dept., that constitutes fraud. That the fraudulent speech (*i.e.*, misrepresentations of *fact*, not *belief*) occurred in a religious setting is of no consequence.

Whether under free speech or religious liberty aspects, the First Amendment offers no protection to such activity. Furthermore, the Church Autonomy doctrine, is limited to matters of church governance, faith, or doctrine and to matters involving matters that the parties have agreed will be resolved by a Church tribunal or that arise out of such proceedings. (Opp'n, p. 22).  The sole argument made against Plaintiff's causes of actions 1, 2 and 4 is Defendant's First Amendment argument. Therefore, because Plaintiff has shown that fraud is not Constitutionally protected speech, Defendant's Motion with respect to these causes of action must be denied.

With respect to her Cause of Action for Breach of Fiduciary Duty (Compl. ¶¶ 205-221), Plaintiff has shown that *Franco* held only that a fiduciary relationship was not found on its particular set of facts.  However, five years later in *Yazd*, the court found a

---

[9] Though it has been confirmed by one lead author that this document was leaked with permission of the lead authors, Ex. #1 to this Opp'n, will be provided to Chambers and Counsel, but not attached for the public record. (Note: Complaint ¶244, should read "suicidal thoughts," not "suicide.")

duty to disclose where, as here, equitable factors which distorted the balance of power are shown. COP and Plaintiffs have vastly unequal bargaining positions. Two such factors are age (most grew up in the religion, and many of those were whisked away to serve missions shortly after high school graduation) and knowledge—COP has access to the primary source journals and other documents including the seer stone, yet denied access to Church members). (Compl ¶¶134 &197).

At the very least, COP had a duty to disclose the entire truth of material facts once it made a partial representation of fact. There are numerous pictures of Smith appearing to translate directly from plates promulgated throughout Mormon manuals (Compl. Ex. "D", "E", "F" and "I"), but no depiction of a seer stone as the instrument used to create the *Book of Mormon* has ever been published by COP.  See also Compl. Ex.  "H" and "G" depicting *Book of Abraham* false statements of fact.

Plaintiff has also shown that RICO can be alleged on these facts, in that the lay local leaders—Bishops and Sunday school teachers, missionaries—are unwitting, passive instruments through which COP has accomplished its fraud.  Alternatively, COP committed wire and mail fraud through its subsidiaries, e.g. Bonneville International, which broadcasts general conference, and Deseret Book, which sells its publications (Compl. ¶¶175-182 & 231-240).

There is no barrier to bringing such a claim against a religious organization. Furthermore, damage to personal property—in this case forfeited cash—is an item of damage recognized under RICO.

34

Finally, Utah recognizes IIED as an actionable tort against a religious organization. The "outrageousness" of COP's actions and the severity of Plaintiff's damages are questions of fact and cannot be determined as a matter of law. The treachery inherent in COP's actions with respect to its former members is indeed outrageous. In order to ensure that the Court would not rule that the damages are not severe as a matter of law, Plaintiff has attached the *LDS Personal Faith Crisis* [Report], (Opp'n. Ex.#1) detailing that severe damage.

WHEREFORE: Plaintiff requests the Court deny Defendant's Motion to Dismiss with prejudice. [10]

Dated: Oct. 8, 2019                                    Kay Burningham, Attorney at Law

_____/s/_____

Kay Burningham,

*Attorney for Laura A. Gaddy and the Class*

---

[10]The undersigned verifies that the word count of this Opposition, excl. items listed in DUCiv 7-1(b)(2)(A) is 7,997 words.