# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LAURA A. GADDY,<br><br>      Plaintiff,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHIRST OF LATTER-DAY SAINTS,<br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>2:19-cv-554-RJS-DBP<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

Plaintiff Laura Gaddy was a member of The Church of Jesus Christ of Latter-day Saints most of her life. She recently left the Church after discovering new information about the Church's founding, history, and doctrine—information she alleges the Church hid from her and its general membership. In short, Gaddy contends the Church has intentionally misrepresented its foundational history to induce faith in the Church and its teachings. Gaddy now asserts several claims against the Church, including fraud, Civil RICO, intentional infliction of emotional distress, and breach of fiduciary duty.

Defendant Corporation of the President of the Church of Jesus Christ of Latter-day Saints (the Church) argues the Free Exercise and Establishment Clauses of the First Amendment (the Religion Clauses) foreclose Gaddy's lawsuit because her claims implicate the Church's fundamental religious beliefs. Before the court is the Church's Motion to Dismiss, in which the Church asks the court to dismiss all claims.[1] For the reasons explained below, the Church's Motion is GRANTED.

---

[1] Dkt. 6.

# BACKGROUND[2]

After providing a brief overview of some of the Church's foundational beliefs at the heart of the dispute, the court outlines the facts relevant to Gaddy.

## I. Foundational Beliefs

Founded in 1830 by Joseph Smith, The Church of Jesus Christ of Latter-Day Saints has a worldwide membership now exceeding sixteen million.[3] Gaddy alleges the Church has intentionally distorted the foundational facts upon which the Church's beliefs are built.[4] In particular, Gaddy contrasts the Church's "false official narrative" of several foundational events with what she alleges are the "historically accurate" accounts.[5] She focuses on the Church's teachings about a spiritual event when Joseph Smith saw God and Jesus Christ (known as the First Vision), the origins of one of the Church's foundational books of scripture, the Book of Mormon, and another canonical text known as the Book of Abraham.

### A. The First Vision

#### 1. Official Church Narrative

According to the Church, in 1820, Smith entered a grove of trees to pray and seek spiritual guidance.[6] In response to Smith's prayer, God and Jesus Christ appeared to Smith and told him not to join any of the existing churches.[7] This event marked the beginning of Smith's mission to restore what he later taught was the true gospel of Jesus Christ.[8]

---

[2] Because this case is before the court on a motion to dismiss, the court accepts as true all well-pleaded factual allegations contained in the Complaint. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[3] Dkt. 2 (Compl.) ¶¶ 12, 50.

[4] *Id.* ¶¶ 2–3.

[5] *See, e.g.*, *id.* ¶¶ 64–75.

[6] *See id.* ¶ 64. Smith was fourteen years old. *Id.*

[7] *Id.* ¶¶ 64, 183.

[8] *Id.* ¶¶ 62, 64.

## 2. Purported Historically Accurate Version

Gaddy alleges the Church's official account of the First Vision is inconsistent with other accounts Smith gave over the years.[9] Several differing accounts of the First Vision were recorded, including in 1832, 1835, 1838, and 1842.[10] In those accounts, it is not clear that it was God or Jesus Christ that appeared to Smith.[11] The accounts depict various persons appearing to Smith, including the Lord, angels, an unidentified angel, two unidentified personages, and an angel named Moroni or Nephi.[12] The 1832 account, handwritten by Smith, describes only "the Lord" appearing, who forgave his sins.[13]

## B. Translation of the Book of Mormon

### 1. Official Church Narrative

According to the Church, the Book of Mormon is a translation of scripture originally inscribed on gold plates in reformed Egyptian.[14] The record was allegedly written by ancient prophets who lived in the Americas and was eventually buried in New York.[15] An angel directed Smith where to find the gold plates, which were also buried with spectacles called "interpreters."[16] While wearing the interpreters and looking at the gold plates, Smith translated into English the reformed Egyptian inscribed on the plates.[17]

---

[9] *Id.* ¶ 68.

[10] *Id.* ¶ 67.

[11] *Id.*

[12] *Id.*

[13] *Id.* ¶ 69.

[14] *Id.* ¶¶ 76–77.

[15] *Id.*

[16] *Id.* ¶¶ 77, 79.

[17] *Id.* ¶ 79.

## 2. Purported Historically Accurate Version

Gaddy alleges Smith dictated the Book of Mormon while looking at a "seer stone" that was placed in a hat.[18]  Smith explained that he read the words he dictated as they appeared on the stone.[19]  Under this theory, Smith created the Book of Mormon manuscript through divination, reading from a document buried inside the hat, dictation by inspiration, or some combination of those methods.[20]  Thus, Gaddy alleges Smith did not directly use gold plates to create the Book of Mormon.[21]

## C. Book of Abraham

### 1. Official Church Narrative

In 1835, the Church purchased Egyptian papyri containing writings in reformed Egyptian as well as three facsimiles (images).[22]  Smith translated the papyri into the Book of Abraham—a short book of scripture, separate from the Book of Mormon, written by the Hebrew prophet, Abraham.[23]  Smith also explained the facsimiles depicted scenes from Abraham's life.[24]  Canonized in 1880, the Book of Abraham tells of Abraham's early life and contains other teachings about God's relationship with mankind and the creation of the Earth.[25]

---

[18] *Id.* ¶ 84.

[19] *See id.* ¶ 85.

[20] *Id.* ¶ 84.

[21] *Id.* ¶ 85.

[22] *Id.* ¶ 92.

[23] *Id.* ¶¶ 92–93.

[24] *Id.* ¶¶ 93–94.

[25] *Id.* ¶ 94.

## 2. Purported Historically Accurate Version

Although the papyri from which the Book of Abraham was allegedly translated were believed to have been lost in a fire, they were rediscovered in 1966.[26] Egyptologists' subsequent translations of the papyri significantly differ from Smith's translation.[27] The facsimiles appear to depict ordinary Egyptian funerary rights and do not mention the prophet Abraham.[28] Gaddy alleges the Church eventually admitted the Book of Abraham was not written by the hand of Abraham and that the characters on the facsimiles do not represent what Smith originally described.[29]

## II. Laura Gaddy

Gaddy was raised as a member of the Church most of her life.[30] This included attending church for three hours on Sundays, participating in other activities during the week, and paying tithing.[31] After graduating from college, Gaddy married her husband in 2015, and the couple remained active participants in the Church.[32]

While preparing to teach a lesson for church in 2018, Gaddy came across videos online about mind control and religious extremism as it related to the Church.[33] These videos discussed other controversies about the Church's history, which led Gaddy to conduct additional research on those topics.[34] Gaddy learned there were multiple accounts of Smith's First Vision as well as

---

[26] *Id.* ¶ 97.

[27] *Id.*

[28] *Id.*

[29] *Id.* ¶ 101.

[30] *Id.* ¶ 141.

[31] *Id.* ¶¶ 142–43.

[32] *Id.* ¶ 156.

[33] *Id.* ¶ 157.

[34] *Id.* ¶¶ 158–59.

the role the seer stone played in the Book of Mormon's origin.[35]  She also learned that

Egyptologists contradicted Smith's translation of the papyri on which the Book of Abraham is

based.[36]

     After unproductive conversations about her concerns with her husband, friends, and

family members, Gaddy resigned from the Church.[37]  Gaddy is now in counseling to help

manage the emotional distress that has accompanied the loss of her faith in the Church.[38]

## LEGAL STANDARD

     The Church seeks dismissal of Gaddy's Complaint under Federal Rule of Civil Procedure

12(b)(1) for lack of subject matter jurisdiction or, in the alternative, under Rule 12(b)(6) for

failure to state a claim upon which relief can be granted.[39]  Although some courts have held that

claims implicating a church's religious beliefs may pose a jurisdictional bar to adjudication,[40] the

Tenth Circuit has concluded these motions should be considered under Rule 12(b)(6).[41]  This

court will proceed under the Rule 12(b)(6) standard.

     "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[42]  A claim

is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

---

[35] *Id.* ¶ 159.

[36] *Id.* ¶ 161.

[37] *Id.* ¶ 163.

[38] *Id.* ¶ 165.

[39] Dkt. 6 at 6.

[40] *See id.* n.2 (quoting *Westbrook v. Penley*, 231 S.W.3d 389, 398 (Tex. 2007)).

[41] *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 (10th Cir. 2002) ("Here, St. Aidan's Church raised the church autonomy defense on a motion to dismiss for lack of subject matter jurisdiction.  The motion would more appropriately be considered as a challenge to the sufficiency of plaintiff's claims under Rule 12(b)(6).").

[42] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

reasonable inference that the defendant is liable for the misconduct alleged."[43] When

determining whether a complaint meets these criteria, the court will "assume the truth of the

plaintiff's well-pleaded factual allegations and view them in the light most favorable to the

plaintiff."[44]

Here, the Church argues the First Amendment's Religion Clauses bar each of Gaddy's

claims. The Tenth Circuit has analogized such an argument to a government official's defense of

qualified immunity.[45] That is, if the First Amendment applies "to the statements and materials

on which plaintiffs have based their claims, then the plaintiffs have no claim for which relief

may be granted."[46]

## ANALYSIS

Gaddy brings six causes of action against the Church: common law fraud, fraud in the

inducement, breach of fiduciary duty, fraudulent concealment, Civil RICO (18 U.S.C. §

1962(c)), and intentional infliction of emotional distress. Before considering Gaddy's claims,

the court begins with a brief overview of basic First Amendment principles applicable to the

dispute, including the development of the church autonomy doctrine. After considering Gaddy's

fraud based claims in the context of those principles, the court then turns to Gaddy's three

remaining claims.

---

[43] *Id.* (citing *Twombly*, 550 U.S. at 556).

[44] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[45] *See Bryce*, 289 F.3d at 654.

[46] *Id.* Additionally, a heightened pleading standard applies when fraud is alleged. Under this standard, "a party must state with particularity the circumstances constituting [the] fraud or mistake." Fed. R. Civ. P. 9(b). Thus, Rule 9(b) generally requires a plaintiff "to identify the time, place, and content of each allegedly fraudulent representation or omission, to identify the particular defendant responsible for it, and to identify the consequence thereof." *Hafen v. Strebeck*, 338 F. Supp. 2d 1257, 1263 (D. Utah 2004) (citation omitted).

# I.     The First Amendment and the Church Autonomy Doctrine

## A.  The Religion Clauses of the First Amendment

The First Amendment provides in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"[47]  "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."[48]  This right "unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions."[49]

To effectuate those rights under the First Amendment, courts have long held that the truth or falsity of religious beliefs are beyond the scope of judicial review.[50]  In its seminal decision, *United States v. Ballard*, the Supreme Court observed,

> Men may believe what they cannot prove.  They may not be put to the proof of their religious doctrines or beliefs. . . .  Many take their gospel from the New Testament.  But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations.  The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many.  If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. . . .  The religious views espoused by respondents might seem incredible, if not preposterous, to most people.  But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect.  When the triers of fact undertake that task, they enter a forbidden domain.[51]

In short, notwithstanding that many find various religious claims patently unbelievable, courts may not inject themselves into resolving ecclesiastically based disputes.

---

[47] U.S. Const. amend. I.

[48] *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990).

[49] *McDaniel v. Paty*, 435 U.S. 618, 626 (1978).

[50] *See United States v. Ballard*, 322 U.S. 78, 86–87 (1944); *Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125, 1142 (D. Mass. 1982).

[51] 322 U.S. at 86–87.

## B. The Church Autonomy Doctrine

Over the years, courts—most notably, the Supreme Court—have expressed reluctance to involve themselves in religious disputes.[52]  In what has become known as the church autonomy doctrine, courts have recognized "the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government *as well as those of faith and doctrine.*'"[53]  The Supreme Court has therefore declined to intervene in property disputes between factions of a church that turned on questions of religious doctrine and practice;[54] it refused to second-guess a church's determination concerning the qualifications of a chaplain (or whether a candidate possessed them);[55] it struck down a statute changing who in the church would control a cathedral;[56] and it declined to consider a church's defrocking of a bishop and reorganization.[57]

But while it is "wholly inconsistent with the American concept of the relationship between church and state to permit civil courts to determine ecclesiastical questions,"[58] the church autonomy doctrine "is not without limits."[59]  Churches may not invoke the church autonomy defense to shield purely secular decisions.[60]  And "[b]efore the church autonomy doctrine is implicated, a threshold inquiry is whether the alleged misconduct is 'rooted in

---

[52] *See, e.g.*, *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871); *Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1 (1929); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 446 (1969); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976).

[53] *Bryce*, 289 F.3d at 655 (quoting *Kedroff*, 344 U.S. at 116) (emphasis added).

[54] *See Watson*, 80 U.S. (13 Wall.) at 727; *Presbyterian Church*, 393 U.S. at 449.

[55] *See Gonzalez*, 280 U.S. at 16.

[56] *See Kedroff*, 344 U.S. at 116.

[57] *See Milivojevich*, 426 U.S. at 710.

[58] *Presbyterian Church*, 393 U.S. at 445–46.

[59] *Bryce*, 289 F.3d at 657.

[60] *Id.*

religious belief.'"[61]  Put another way, the church autonomy doctrine does not place churches above the law or immunize them from tort liability where their alleged misconduct is unrelated to their religious beliefs.[62]  Courts must therefore decide whether a dispute presented "is an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law, or whether it is a case in which we should hold religious organizations liable in civil courts for purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization."[63]

By way of example, in *Bryce*, the plaintiff brought a sexual harassment claim against the Episcopal Church after being fired from her position as a youth minister.[64]  The plaintiff, who had recently had a civil commitment ceremony with her partner, was terminated for violating the Episcopal Church's doctrine on homosexuality.[65]  Her claim was based on the content of letters one of the church's reverends sent to church authorities as well as statements church members made during a parish meeting.[66]  Although the court acknowledged that some of the letters and statements may have been "offensive" or "incorrect," it determined they were not actionable because the statements fell "squarely within the areas of church governance and doctrine protected by the First Amendment."[67]

With these principles in mind, the court turns to Gaddy's six causes of action.

---

[61] *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).

[62] *Id.*

[63] *Id.* (quoting *Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997)).

[64] *Id.* at 652.

[65] *Id.* at 651–52.

[66] *Id.* at 652–53.

[67] *Id.* at 658.

## II. Gaddy's Fraud Based Claims

Three of Gaddy's causes of action relate to fraud: common law fraud, fraud in the inducement, and fraudulent concealment.[68]  To state a claim for fraud, Gaddy must allege

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.[69]

Gaddy's fraud claims relate principally to three of the Church's alleged misrepresentations of material fact:

- Joseph Smith saw God *and* Jesus Christ during the First Vision;[70]

- Joseph Smith translated the Book of Mormon from gold plates inscribed with reformed Egyptian characters using "interpreters" given to him from God;[71] and

- Joseph Smith accurately translated writings from Egyptian papyri about the Hebrew prophet Abraham into the Church's scripture known as the Book of Abraham.[72]

Each of these alleged misrepresentations directly implicates the Church's core beliefs.  Because a statement's falsity is an essential element of fraud claims, adjudicating these claims would require the court to do exactly what the Supreme Court has forbidden—evaluate the truth or

---

[68] These are Gaddy's first, second, and fourth causes of action.

[69] *See Webster v. JP Morgan Chase Bank, NA*, 2012 UT App. 321, ¶ 16, 290 P.3d 930.

[70] Dkt. 2 ¶¶ 64, 183.

[71] *Id.* ¶¶ 79, 183.

[72] *Id.* ¶¶ 92–93, 183.  Gaddy also cites a litany of other alleged misrepresentations as forming the basis for her fraud claims, *id.* ¶¶ 104–120, but these claims suffer from the same defects identified below.

falsity of the Church's religious beliefs.[73]  This court can no more determine whether Joseph Smith saw God and Jesus Christ or translated with God's help gold plates or ancient Egyptian documents, than it can opine on whether Jesus Christ walked on water or Muhammed communed with the archangel Gabriel.  The First Amendment prohibits these kinds of inquiries in courts of law.

Recognizing the court cannot adjudicate claims based on a Church's beliefs, Gaddy insists her Complaint does not challenge the truth or falsity of any of the Church's beliefs or doctrines.[74]  Instead, Gaddy contends she is challenging only the underlying facts upon which the beliefs are based, arguing "Facts are susceptible to proof.  Beliefs are not; if proven, beliefs become facts."[75]  In essence, Gaddy asserts the court can distinguish between the facts that support a church's beliefs from the beliefs themselves.[76]  The Church argues Gaddy's reasoning would "spell the end of religious freedom" because many religious beliefs relate to historical facts.[77]

The court agrees with the Church.  As an initial matter, Gaddy conceded at oral argument that no court has adopted the fact versus belief framework she advances.  And for good reason: that framework is unworkable.  Consider the statement "Jesus Christ was resurrected three days

---

[73] *See Ballard*, 322 U.S. at 86–87.  The elements for fraudulent concealment differ somewhat from the elements for fraud and fraudulent inducement.  To prevail on a claim for fraudulent concealment, a plaintiff must prove "(1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and (3) that there is a legal duty to communicate."  *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 10, 143 P.3d 283.  However, the Utah Supreme Court has clarified that the party's silence that renders it liable for fraudulent concealment "must amount to fraud[.]"  *McDougal v. Weed*, 945 P.2d 175, 179 (Utah 1997).  The court therefore considers the three fraud claims together.  In any event, Gaddy's fraudulent concealment claim would also fail because the court concludes the Church did not owe Gaddy a legal duty.  *See infra* Part V.

[74] Dkt. 23 (Opp'n) at 6–7.

[75] *Id.* at 9 ("Belief in Mormonism was and continues to be induced by [the Church's] misrepresentation of material facts upon which it was founded.").

[76] *See id.*

[77] Dkt. 26 (Reply) at 3–4.

after he died." Is that a statement of fact or belief? The answer depends, of course, on who is answering the question. To most Christians, the statement is a fact—though not verifiable using defined scientific methods, believers accept the reality of Christ's resurrection much as they accept that there are 24 hours in a day and seven days in a week. On the other hand, those outside of Christianity may view the resurrection as abjectly false, an impossible event no more factual than the tales of the Brothers Grimm. A facts versus beliefs approach presents a false dichotomy that fails to recognize that, when it comes to faith, facts and belief often are inextricably intertwined.

The better distinction, and the distinction drawn by other courts faced with fraud claims involving churches, is between *religious* and *secular* facts.[78] While courts can resolve "purely secular disputes" where a church is a party, courts ordinarily may not get involved where the alleged misconduct is "rooted in religious belief."[79] Unlike secular facts, believers accept religious facts—like Christ's resurrection or Muhammed's ascension into heaven—in the absence of objective proof. That is, religious facts require faith. Courts therefore cannot adjudicate fraud claims implicating religious facts because "[m]en may believe what they cannot prove."[80]

Here, Gaddy's fraud claims plainly concern the basic religious facts upon which the Church was founded. The nature of the First Vision and the origin of some of the Church's

---

[78] *See In re The Bible Speaks*, 869 F.2d 628, 645 (1st Cir. 1989) ("The [Free Exercise] clause does not allow purely secular statements of fact to be shielded from legal action merely because they are made by officials of a religious organization."); *Molko v. Holy Spirit Assn.*, 762 P.2d 46, 58 (1988) ("Our initial inquiry, then, is whether plaintiffs' actions for fraud implicate religious belief or religiously motivated conduct. If the former, the actions are barred. If the latter, further constitutional analysis is necessary.") (citation omitted); *Van Schaick*, 535 F. Supp. at 1141 ("Statements citing science as their source may provide the basis for a fraud action *even though the same contention would not support such an action if it relied on religious belief for its authority.*") (emphasis added).

[79] *Bryce*, 289 F.3d at 657–58 (citations omitted).

[80] *Ballard*, 322 U.S. at 86.

scripture are simply not proper subjects for judicial scrutiny. Indeed, if all a plaintiff had to do to get around the First Amendment was to challenge the facts underlying a church's religious beliefs, the Religion Clauses would offer little protection against de facto referenda on churches' faith and doctrines.

Gaddy nevertheless contends several courts have held that churches are not immune from tort claims grounded in fraud. She is correct. If, for example, prior to selling its van, a church rolled back the odometer to make it appear the van had fewer miles than it actually had, the church would be liable for fraud, and the First Amendment would pose no bar to the unsuspecting buyer's suit. Indeed, in each of the cases Gaddy cites, the court stressed it could address the claims at issue only because the dispute turned on purely secular facts.[81] That is not the case, however, when the fraud claims implicate the veracity of religious facts.

*Van Schaick v. Church of Scientology of California* is on all fours with this case. There, the plaintiff brought several fraud claims against the Church of Scientology.[82] The court concluded that not all of the plaintiff's claims were barred by the First Amendment. One of the counts "set[] forth purely secular representations . . . that defendant promised that [the plaintiff] would receive benefits, including training, room and board, and various work and research opportunities, after undergoing a period of auditing."[83] Adjudicating that claim would not force the court to consider the truth or falsity of religious doctrine.[84] But several other fraud claims depended on assertions the plaintiff was fraudulently induced to become a scientologist by false

---

[81] *See In re The Bible Speaks*, 869 F.2d at 645; *Molko*, 762 P.2d at 58; *Van Schaick*, 535 F. Supp. at 1141.

[82] *Van Schaick*, 535 F. Supp. at 1142.

[83] *Id.* at 1140.

[84] *Id.*

representations about the substance of Scientology doctrine.[85]  Noting that fraud claims require a finding the defendant knowingly made a false statement, the court acknowledged that "[proving] those elements—that the statement was false and that defendant knew of its falsity—becomes problematic when the statement relates to religious belief or doctrine."[86]  Accordingly, the court concluded that if the Scientology movement qualified as a religion for First Amendment purposes, *Ballard* would preclude the court from examining the veracity of the plaintiff's allegations.[87]

The reasoning in *Van Schaick* applies with equal force here.  Gaddy's fraud claims are not based on purely secular representations.  Rather, the claims go to the heart of several of the Church's foundational beliefs.  These are the types of claims *Ballard* forecloses.

Attempting to save her fraud claims, Gaddy advances two alternative arguments.  First, Gaddy notes the truism that while the First Amendment protects belief absolutely, it does not prevent the government from regulating religious conduct.[88]  Gaddy asserts the Church's proselytizing constitutes conduct that falls outside the First Amendment's protection.  But the Supreme Court has repeatedly confirmed that the free exercise of religion encompasses not only the freedom to believe, but also the right to profess those beliefs through proselytizing.[89]  Put

---

[85] *Id.* at 1142.

[86] *Id.*

[87] *Id.*  The court determined it needed further briefing on whether the Scientology movement was sufficiently established to be entitled to the First Amendment protections reserved for religious institutions.  *Id.* at 1144.

[88] *Reynolds v. United States*, 98 U.S. 145, 166 (1878) ("Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.").

[89] *See Smith*, 494 U.S. at 877 ("The free exercise of religion means, first and foremost, the right to believe *and profess* whatever religious doctrine one desires.") (emphasis added); *McDaniel*, 435 U.S. at 626 (noting that the free exercise clause "unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions").

another way, the Church is no more liable for preaching and teaching its beliefs than it is for espousing them.

Second, Gaddy argues that even if the court may not inquire into the truth of the Church's beliefs, it can assess whether the Church's beliefs are sincerely held.[90]  Regardless, the parties treated this argument only cursorily in the briefing, and Gaddy conceded at oral argument the Complaint nowhere alleges the Church's beliefs are not sincerely held.  The court therefore declines to consider this issue.[91]

In sum, none of Gaddy's arguments alters the court's conclusion that the First Amendment prohibits the inquiry her fraud claims would require.  Where a defendant successfully asserts a First Amendment defense at the motion to dismiss stage, the plaintiff has no claim for which relief may be granted.[92]  That is the case here.  Even accepting as true Gaddy's well-pleaded factual allegations, the court may not assess the veracity of the Church's religious beliefs.  Accordingly, Gaddy's fraud claims fail to state a claim for which relief may be granted.

---

[90] Dkt. 23 at 16–17.  Indeed, courts are sometimes forced to consider whether an individual's beliefs are sincerely held.  This inquiry is required, for example, when an individual seeks an exemption from a statute or regulation under the Religious Freedom Restoration Act (RFRA).  *See, e.g.*, *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001) (reciting as an element of a RFRA challenge that the belief at issue be "sincerely held").  But courts have expressed doubts about evaluating the sincerity of an entire organization.  *See Van Schaick*, 535 F. Supp. at 1144 (noting the U.S. Supreme Court's decision in *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) "suggests the difficulty of challenging the good faith of an entire organization and states that courts may not ordinarily consider intrafaith differences among adherents in determining whether a religious belief is sincerely held.").

[91] Gaddy also argues the Free Speech provision of the First Amendment does not protect fraudulent speech.  Dkt. 23 at 12–13.  But the Church's Motion relies only on the Religion Clauses of the First Amendment.  Even if Gaddy is correct, the Religion Clauses still mandate dismissal of Gaddy's fraud claims because the court may not inquire into the truth or falsity of the Church's religious claims.

[92] *See Bryce*, 289 F.3d at 654 ("If the church autonomy doctrine applies to the statements and materials on which plaintiffs have based their claims, then the plaintiffs have no claim for which relief may be granted.").

### III. Civil RICO

Gaddy alleges the Church's pattern of misrepresenting facts related to Joseph Smith's First Vision, the Book of Mormon, and the Book of Abraham constitutes a civil racketeering violation.[93] "The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity."[94] Racketeering activity is defined as "any act which is indictable under federal law and specifically includes mail fraud, wire fraud and racketeering."[95] Courts often refer to these underlying acts as "predicate acts."[96]

Much of the parties' briefing is dedicated to whether the Church, its local leadership, and members qualify as an "enterprise" under RICO.[97] But the court need not reach that question. The predicate acts that form the basis for Gaddy's RICO claim are the Church's alleged mail and wire fraud by using the postal service and electronic communications to spread falsehoods about Joseph Smith, the Book of Mormon, and the Book of Abraham. These predicate acts directly implicate the veracity of the Church's teachings. That is, the Church can be liable for mail or wire fraud only if the messages it communicated were false. But the court has already determined the First Amendment bars inquiry into the Church's religious beliefs. Just as the Church's First Amendment defense required dismissal of Gaddy's fraud claims, the same is true here. Gaddy's RICO claim fails to state a claim for which relief may be granted.[98]

---

[93] *See* Dkt. 2 ¶¶ 236–38.

[94] *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (citing 18 U.S.C. § 1962(a), (b), & (c)).

[95] *Id.* (internal quotation marks and citation omitted).

[96] *Id.*

[97] *See* Dkt. 6 at 19–20; Dkt. 23 at 26–29.

[98] *See Bryce*, 289 F.3d at 654.

### IV.      Intentional Infliction of Emotional Distress

Gaddy's claim for intentional infliction of emotional distress fails for similar reasons: it too is dependent upon her fraud claims.  To state a claim for intentional infliction of emotional distress, a plaintiff must allege the defendant (1) intentionally engaged in conduct toward the plaintiff with either (a) the purpose of inflicting emotional distress or (b) where any reasonable person would have known that such would result, and (2) the conduct is outrageous and intolerable.[99]  Here, the conduct Gaddy alleges to be outrageous and intolerable is the Church's pattern of "knowingly and repeatedly misrepresenting the foundational facts of its organization."[100]  Because the court concludes Gaddy's fraud claims must be dismissed—the conduct upon which her claim for intentional infliction of emotional distress is based—this claim fails as well.

### V.      Breach of Fiduciary Duty

Gaddy alleges a fiduciary relationship existed between Gaddy and the Church, and between Gaddy and the Church's local leaders.[101]  This relationship arose, Gaddy argues, from the trust she placed in Church leaders for "all matters spiritual," and from the "extraordinary influence" the Church exercised over her.[102]  Gaddy avers the Church breached its fiduciary duty by failing to "fully disclose the truth" of the Church's historical foundation.[103]

Under Utah law, breach of fiduciary duty claims require proof of four elements: "[1] the existence of a fiduciary relationship (such as attorney-client, physician-patient, or insurer-

---

[99] *See Jackson v. Brown*, 904 P.2d 685, 687–88 (Utah 1995).

[100] Dkt. 2 ¶ 242.

[101] *Id.* ¶ 206.  It is unclear whether Gaddy withdrew this claim at oral argument.  Because the parties briefed this issue and Gaddy did not formally withdraw her claim, the court briefly addresses this cause of action.

[102] *Id.* ¶¶ 208–10.

[103] *Id.* ¶¶ 118–19.

insured); [2] breach of the fiduciary duty; [3] causation, both actual and proximate; and [4] damages."[104]  Gaddy cites to no authority—Utah or otherwise—establishing that a legally cognizable fiduciary duty arises from purely ecclesiastical relationships.[105]  And, as Gaddy acknowledged at oral argument, the Utah Supreme Court has explicitly declined to recognize such a duty.[106]

In *Franco v. The Church of Jesus Christ of Latter-day Saints*, the plaintiff, a seven-year-old girl, sought counseling from church leaders shortly after being sexually abused by a teenage boy who attended the same congregation.[107]  After the leaders advised the plaintiff to "forgive and forget" and referred her to a non-licensed mental health counselor who gave the same recommendation, the plaintiff brought claims for negligence and breach of fiduciary duty against both the church and the leaders.[108]  The Utah Supreme Court concluded the First Amendment barred the plaintiff's claims because establishing the appropriate standard of care would improperly entangle the court with religion:

---

[104] *Gables at Sterling Village Homeowners Ass'n, Inc. v. Castlewood-Sterling Village I, LLC*, 2018 UT 04, ¶ 52, 417 P.3d 95.

[105] Gaddy asserts the Utah Supreme Court has held that "a developer-builder may owe his buyer a duty to disclose information known to him concerning real property 'when that information is material to the condition of the property purchased.'"  Dkt. 23 at 23 (quoting *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 16, 143 P.3d 283).  But the *Yazd* decision arose in a commercial context and did not require the court to grapple with the difficult issues implicated by the First Amendment protections afforded churches.  The court therefore does not find *Yazd* instructive.

[106] *See Franco v. The Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 24, 21 P.3d 198 ("Accordingly, we conclude that the trial court correctly determined that Franco's claim[] against the LDS Church Defendants for . . . breach of fiduciary duty [is] barred by the First Amendment to the United States Constitution.").  Gaddy argues *Franco* "was wrongly decided."  Dkt. 23 at 22.  But this court is bound by decisions of the Utah Supreme Court on matters of Utah law.  *See, e.g.*, *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) ("When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court . . . .").

[107] *Franco*, 2001 UT 25, ¶ 3.

[108] *Id.* ¶¶ 3–4.

Defining such a duty would necessarily require a court to express the standard of care to be followed by other reasonable clerics in the performance of their ecclesiastical counseling duties, which, by its very nature, would embroil the courts in establishing the training, skill, and standards applicable for members of the clergy in this state in a diversity of religions professing widely varying beliefs. This is as impossible as it is unconstitutional[.][109]

While *Franco* considered the breach of fiduciary duty in the context of clergy counseling, the court's reasoning similarly applies here. Gaddy asks the court to conclude that churches owe their members a fiduciary duty to disclose some category of facts. It is unclear from Gaddy's Complaint what exactly churches must disclose. But even if the court could define the scope of the duty, imposing such a duty would force the court to define a standard of care that could then be applied to "a diversity of religions professing widely varying beliefs."[110] This the court cannot do. Accordingly, Gaddy's claim for breach of fiduciary duty fails.

## CONCLUSION

Churches can be liable for fraud claims like anyone else. But the First Amendment bars such claims when they would require a court to consider the truth or falsity of a church's religious doctrines. For the reasons explained above, the Church's Motion is GRANTED without prejudice to Gaddy to seek leave to amend her Complaint.[111]

After the court heard oral argument and took this matter under advisement, but just before issuing its decision, Gaddy filed a Motion to Amend her Complaint.[112] That Motion is denied without prejudice as premature. However, now that the court has resolved the Church's

---

[109] *Id.* ¶ 23.

[110] *Id.*

[111] Dkt. 6.

[112] Dkt. 32.

Motion to Dismiss, Gaddy may file within forty-five (45) days a motion for leave to amend her Complaint.[113]

        SO ORDERED this 31st day of March 2020.

                        BY THE COURT:

                        _____

                        ROBERT J. SHELBY
                        United States Chief District Judge

---

[113] Gaddy may refile the same Motion to Amend (Dkt. 32) if she wishes, or may file a revised motion in view of this Order.