Kay Burningham (#4201)
kay@kayburningham.com
Kay Burningham, Attorney at Law
299 South Main St., #1375
Salt Lake City, Utah 84111
Phone: 1.888.234.3706

*Attorney for Laura A. Gaddy and the Class.*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| LAURA A. GADDY, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole.<br><br>*Defendant* | OPPOSITION TO MOTION TO DISMISS<br>AMENDED COMPLAINT<br><br>(Oral Argument Requested)<br><br>(DEMAND FOR JURY TRIAL)<br><br>2:19-cv-00554-RJS--DBP<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

## Contents

**I.   The Amended Complaint Challenges Defendant's Deceptive Recruitment and Indoctrination Practices, Conduct, not Belief. .......................................................... 6**

   A.   Defendant's Conduct, not Belief, is at Issue. .......................................................... 6

   C.   A Claim of Religious Belief is no Defense to Reprehensible Conduct ...................................... 9

**II   Absent a Recognized Exception under the Autonomy Cases, Defendant's Conduct is Subject to Neutral Laws of General Applicability. Plaintiffs Joined the Church without Consent, since Consent Defines the Limits of Church Autonomy, the Doctrine is Inapplicable to this Case. ...................................................................................... 10**

   A.   Church Autonomy Cases are Extremely Limited Exceptions to Smith's Rule........................ 11

   B.   Actions Subject to Autonomy must be Free from Fraud and with Consent to Church Government. 12

   C.   Without Consent, an Individual is not Subject to Internal Church Governance. ...................... 14

D.   The Rationale for Autonomy is to Protect Internal Church Decisions without granting Privilege to Ignore Neutral Laws of General Applicability, except where those Laws Conflict with Strictly Ecclesiastical Decisions of an Internal Church Judicature to which those Bound have Consented. 15

**III Assuming, Arguendo, that *Yoder* Applies to the Case at Bar, i.e., that Fraud laws Unduly Burden COP's Free Exercise, a Neutral Law Enacted for a Compelling State Interest may yet be Upheld where it is the Least Restrictive Means of Accomplishing that Interest. ................................................................................................................... 16**

A.   For Neutral Laws to Apply, a Compelling State Interest is not Required. ............................ 17

B.   Even if Balancing is Required, a Law is Nonetheless Constitutional if it Furthers a Compelling State Interest and is the Least Restrictive Means of Accomplishing that Interest. ......................... 18

**IV.  Protecting the Public from Fraud is at Least a Legitimate if not a Compelling Governmental Interest. Compliance with Fraud Laws is a Minimal Burden...................... 18**

A.   Fraud Laws Protect an Important if not Compelling State Interest.......................................... 18

B.   Any Imposition on Religious Exercise by Compliance with Fraud Laws is Minimal............. 20

**V.   The First Amendment is an Affirmative Defense, not a Bar. The AC places Sincerity at Issue. Thus, Dismissal on the Pleadings is Inappropriate. ....................................... 21**

A.   Per the Free Exercise Clause, COP must Demonstrate that a Sincerely Held Religious Belief is Substantially Burdened by Neutral Fraud Laws. Otherwise, its Defense Fails, and the Case can be Tried as any Other. ...................................................................................................................... 22

B.   Here, the Free Exercise Sincerity Threshold Cannot be Determined on the Face of the Amended Complaint; it is a question of Fact for the Jury Who can Assess Credibility. ................................. 23

**VI.  Even Assuming a Church's Defense is Analogous to Qualified Immunity, 12(B)(6) Dismissal is Inappropriate where Material Fact Issues Exist................................................ 25**

A.   Dismissal on the Pleadings is Inappropriate where Material Fact Issues Exist. ..................... 26

B.   Vague References are Insufficient to Invoke Constitutional Protections................................. 26

**VII   Fraud by Material Omission does not Require Adjudication of Truth. A Jury need only Determine Whether a Reasonable Person would want to Know the Omitted Facts Prior to Acting............................................................................................................................ 27**

A.   Second Cause of Action: Breach of Duty of Full Disclosure. ................................................ 28

B.   Third Cause of Action: Fraud in the Inducement to Enter a Contract .................................... 29

C.   Fourth Cause of Action: Fraudulent Concealment................................................................. 29

D.   Fifth Cause of Action: Violation of Utah Charitable Solicitations Act. ................................. 30

E.   Sixth Cause of Action: RICO. Material Omissions are Sufficient Predicate Acts.................. 32

**VIII CONCLUSION .............................................................................................................. 33**

**Cases**                                                                                    **Page(s)**

Archdiocese of Washington v. Washington Metro. Area Transit Auth.,
  281 F. Supp. 3d 88 (D.D.C. 2017) ....................................................................... 21
Axson-Flynn v. Johnson,
  356 F.3d 1277 (10th Cir. 2004) ......................................................................... 17
Big Squid, Inc. v. Domo, Inc.,
  2019 WL 3555509 (D. Utah Aug. 5, 2019) ....................................................... 24
Bistline v. Parker,
  918 F.3d 849 (10th Cir. 2019) ........................................................................... 24
Bradford v. Moench,
  670 F. Supp. 920 (D. Utah 1987) ...................................................................... 33
Bridge v. Phoenix Bond & Indem. Co.,
  553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) .............................. 34
Bryce v. Episcopal Church in the Diocese of Colorado,
  289 F.3d 648 (10th Cir. 2002) ............................................................... 13, 14, 27
Burwell v. Hobby Lobby Stores, Inc.,
  573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) ................................ 23
Cantwell,
  310 U.S. ........................................................................................................... 25
Doe v. First Presbyterian Church U.S.A. of Tulsa,
  2017 OK 106, 421 P.3d 284 ............................................................................. 15
Dunn v. White,
  880 F.2d 1188 (10th Cir. 1989) ......................................................................... 28
Employment Div., Dep't of Human Res. of Oregon v. Smith,
  494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) ........................... 10, 22
Espinosa v. Rusk,
  634 F.2d 477 (10th Cir. 1980) ........................................................................... 32
Gonzalez v. Roman Catholic Archbishop of Manila,
  280 U.S. 1, 50 S. Ct. 5, 74 L. Ed. 131 (1929) .............................................. 13, 14
Grace United Methodist Church v. City of Cheyenne,
  451 F.3d 643 (10th Cir. 2006) ........................................................................... 11
Hartman v. Moore,
  547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006) ................................ 27
Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,
  565 U.S. 171, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) ......................... 11, 12, 22
Jeffs v. Stubbs,
  970 P.2d 1234 (Utah 1998) ......................................................................... 19, 20
Jensen v. IHC Hosps., Inc.,
  944 P.2d 327 (Utah 1997) ................................................................................. 31
Jones v. Wolf,
  443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979) .................................... 14
Lyng v. Nw. Indian Cemetery Protective Ass'n,

485 U.S. 439, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988) ...................................... 18

McDougal v. Weed,
945 P.2d 175 (Utah Ct. App. 1997) ........................................................... 29

Medina v. Cram,
252 F.3d 1124 (10th Cir. 2001).................................................... 27, 29, 31

Miller v. Shell Oil Co.,
345 F.2d 891 (10th Cir. 1965) ................................................................. 24

Mitchell v. Christensen,
2001 UT 80, 31 P.3d 572 ...................................................................... 29

Molko,
46 Cal. 3d .......................................................................................... 20

Mosier v. Maynard,
937 F.2d 1521 (10th Cir. 1991) ............................................................... 25

Motion to Dismiss (ECF,
23 p. 19 ...................................................................................... 15, 29

Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,
575 U.S. 175, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015) .............................. 6, 14

Order of St. Benedict of New Jersey v. Steinhauser,
234 U.S. 640, 34 S. Ct. 932, 58 L. Ed. 1512 (1914) ..................................... 14

Our Lady of Guadalupe Sch. v. Morrissey-Berru,
2020 WL 3808420 (U.S. July 8, 2020) .......................................... 11, 12, 18

Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,
393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969) .................................. 13

Reynolds v. United States,
98 U.S. 145, 25 L. Ed. 244 (1878) .......................................................... 10

Schneider v. State of New Jersey, Town of Irvington,
308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939) ..................................... 32

Snyder v. Murray City Corp.,
124 F.3d 1349 (10th Cir. 1997) ............................................................... 22

Stone v. Salt Lake City,
11 Utah 2d 196, 356 P.2d 631 (1960) ...................................................... 33

United States v. Allen,
554 F.2d 398 (10th Cir. 1977) ............................................................... 33

United States v. Alvarez,
567 U.S. 709, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012) ......................... 17, 26

United States v. Ballard,
322 U.S. 78, 64 S. Ct. 882, 88 L. Ed. 1148 (1944) .................................. 7, 25

United States v. Corps. for Character, L.C.,
116 F. Supp. 3d 1258 (D. Utah 2015) ...................................................... 32

United States v. Hardman,
297 F.3d 1116 (10th Cir. 2002) ......................................................... 11, 21

United States v. Meyers,
95 F.3d 1475 (10th Cir. 1996)........................................................... 21, 23

United States v. Quaintance,

608 F.3d 717 (10th Cir. 2010) ...................................................................... 23

United States v. Rasheed,
  663 F.2d 843 (9th Cir. 1981) ................................................................ 25, 26

United States v. Seeger,
  380 U.S. 163, 85 S. Ct. 850, 13 L. Ed. 2d 733 (1965) ............................... 25

Watson v. Jones,
  80 U.S. 679, 20 L. Ed. 666 (1871) ....................................................... 12, 13

Wisconsin v. Yoder,
  406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ............................... 17

Wise v. Bravo,
  666 F.2d 1328 (10th Cir. 1981) .............................................................. 28

Yazd v. Woodside Homes Corp.,
  2006 UT 47, 143 P.3d 283 ................................................................. 29, 30

Yellowbear v. Lampert,
  741 F.3d 48 (10th Cir. 2014) ................................................................... 6

**Statutes**

18 U.S.C.A. § 1341 ............................................................................... 26, 33

U.C.A. § 13-22-4(2) ................................................................................... 33

Utah Code Ann. § 13-22-13 ........................................................................ 32

**Rules**

Fed. R. Civ. P. 12(b) ................................................................................. 24

**Other Authorities**

37 Am. Jur. 2d Fraud and Deceit § 145 ........................................................ 31

DUCivR 7-1(a)(3)(A) ................................................................................. 36

Free Exercise Reconceived: The Logic and Limits of Hosanna-Tabor,
  108 *Northwestern University Law Review* 1183 (2014) ............................... 16

**I.    The Amended Complaint Challenges Defendant's Deceptive Recruitment and Indoctrination Practices, Conduct, not Belief.**

    A.    Defendant's Conduct, not Belief, is at Issue.

COP frames the case as a dispute over belief (mtn. p. 11. Note: page references are to ECF stamp numbers).[1] It is not. Plaintiff and the putative class have resigned from the Church; this case is not about an intrachurch dispute over faith, doctrine or belief.

At their core, all the Amended Complaint's ("AC") claims are based on fraudulent misrepresentations of material fact, though in a religious context, through correlated missionary and instructional rhetoric (AC ¶1-2). These deceptive recruiting practices necessarily resulted in Plaintiffs' adopting a body of beliefs based upon calculated misinformation and in turn, no consent to join, or remain in the Church upon attaining adulthood (AC ¶4, 161).

---

[1] Plaintiff argued the distinction between fact and belief in her Opposition to Motion to Dismiss the [original] Complaint (ECF #23). She does not waive that argument but incorporates all arguments therein into this Opposition for all purposes. Justice Gorsuch identified the difference between religious fact and belief. "…Faith means belief in something concerning which doubt is still theoretically possible." William James, *The Will to Believe* 90 (1897)." Yellowbear v. Lampert, 741 F.3d 48, 54 (10th Cir. 2014). In a securities fraud case, the United States Supreme Court detailed the inappropriate conflation of facts and opinions: "A fact is "a thing done or existing" or "[a]n actual happening." An opinion is "a belief[,] a view," or a "sentiment which the mind forms of persons or things." (Internal citations omitted). Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 183, 135 S. Ct. 1318, 1325, 191 L. Ed. 2d 253 (2015). Joseph Smith's polygamy is a good example of the difference. Plaintiffs were taught that their founding prophet had but one wife. (AC ¶86, 115, 134). But as recently admitted, he had "up to 40" (AC ¶140). Polygamy *aka* Celestial Marriage is a doctrine of the Church. The fact that Smith engaged in it with scores of women is a fact, known to COP for more than a century, yet hidden from its members and those whom it proselytized. Smith's polygamy practice is just one of several key facts about LDS origins that, if disclosed, could have significantly altered Plaintiffs' actions with re: COP's church. COP hiding the seer stone that Smith used to create the *Book of Mormon*, only recently revealing its existence and how it was used to create key scripture, is another example of "a thing done or existing" or "[a]n actual happening." Id. at 183.

Apart from this Court's Order (ECF #33), no binding authority holds that religious facts are exempt from fraud claims and that only secular facts can so serve. Binding precedent merely holds that the truth of religious beliefs and doctrine cannot be adjudicated because determining the truth of those matters is beyond the ken of a secular court. United States v. Ballard, 322 U.S. 78, 84, 64 S. Ct. 882, 885, 88 L. Ed. 1148 (1944).

At oral argument on COP's Motion to Dismiss the original Complaint, in the context of the undersigned's argument for a distinction between fact and belief, the Court asked [assuming it adopted the undersigned's distinction] "what then is the role of faith?"  Though counsel does not now recall her answer, the Church itself says:  "The Apostle Paul taught that "faith is the assurance of things hoped for, the evidence of things not seen" (Hebrews 11:1). Alma made a similar statement: "If ye have faith ye hope for things which are not seen, which are true" (Alma 32:21).[2]

### B.  COP did not Sincerely Believe Key Facts that it Taught about LDS Origins.

Defendant taught Plaintiffs things about LDS origins which it did not sincerely believe. For example, at all relevant times COP concealed the fact that it had in its possession a brown seer stone, which it now admits was used by Joseph Smith to create the *Book of Mormon*. It had been hidden from its members and the public since the 19th Century until COP removed it from the vault and photographed it on August 2015 (AC ¶164, 219).  This was the same seer stone Smith used to attempt to find hidden treasure. Smith had been charged in a criminal hearing of the crime of glass looking; before he could be tried, he escaped the jurisdiction of the court (AC

---

[2] https://www.churchofjesuschrist.org/study/manual/true-to-the-faith/faith?lang=eng (viewed June 25, 2020).

¶44, 136). Instead, correlated material and all artwork intentionally misrepresented that Smith translated the *Book of Mormon* from gold plates (AC ¶60, 80-88 & Ex12).

At all relevant times Defendant misrepresented that the *Book of Abraham* facsimiles depict the Hebrew prophet Abraham (AC ¶87). COP has known for over a century that professional Egyptologists' translation is at odds with Smith's claimed translation of the Egyptian papyrus, the *Book of Abraham's* source and specifically the identity of the figures on its facsimiles (AC ¶50 & Ex 13B).

At all times that the misrepresentations occurred, COP's leaders in charge of Correlation did not sincerely believe what they were preaching, teaching, depicting and at least with respect to the *Book of Abraham* facsimiles, offering as scripture (AC ¶143-44).

In a statement that defies logic, COP has now admitted the seer stone method of "translation" (AC ¶136 & n. 47). What it really means is that the seer stone was the method used to create the *Book of Mormon* manuscript. It has also admitted that the facsimile figures in the *Book of Abraham* are not what Smith claimed (AC ¶137 & n. 48). These, along with additional facts about LDS origins set forth in the AC, had previously been characterized as "Anti-Mormon lies" (AC ¶106).

President Joseph Fielding Smith denied founder Joseph Smith used a seer stone (AC ¶142 "g") while COP had that very stone in its possession. He also appears to have removed the original and only hand-written account by founder Smith of his first vision (AC ¶55), in which Smith wrote that saw the Lord, who forgave him of his sins, with no reference to two personages or that all other creeds are false. COP has now admitted that the original account is not what has been taught in the dominant or correlated version (AC ¶139 & n. 49).

These facts about LDS origins are part of the dominant *aka* orthodox, correlated narrative that has been taught to potential and established members of the LDS Church throughout the 20th Century and well into the 21st Century (AC ¶135). This, despite Defendant warranting that founder Smith's teachings are "without error" (AC ¶29) and that LDS leaders will "never lead you astray" (AC¶ 28, 56).

COP's official historian lamented that LDS Brethren in charge of Correlation would not allow "real" history (AC ¶142 "l"). LDS agent-scholar Richard Bushman recently admitted that "[t]he dominant narrative is not true." (AC ¶142 "r").

Prior to widespread internet use, insular Mormons had no access to an accurate picture of LDS origins. Even now, to those whose beliefs have been built upon outright lies and omissions, LDS Brethren tell members to avoid the internet, and not to question LDS leaders (AC ¶222 & n. 80).  After accurate facts about LDS origins populated the internet, COP could no longer hide what they knew to be true. Only then did it take steps to admits the facts it had previously labeled Anti-Mormon lies (AC ¶165).

### C.  A Claim of Religious Belief is no Defense to Reprehensible Conduct

George Reynolds was indicted under a federal anti-bigamy statute; he raised a Free Exercise claim in defense. The rationale of the United States Supreme Court in upholding the conviction against a defense that his belief required the practice of polygamy is instructive.

> … the only question which remains is, whether those who make polygamy a part of their religion are excepted from the operation of the statute. If they are, then those who do not make polygamy a part of their religious belief may be found guilty and punished, while those who do, must be acquitted and go free. This would be introducing a new element into criminal law. Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.

Reynolds v. United States, 98 U.S. 145, 166, 25 L. Ed. 244 (1878).

The Reynolds Court reasoned that those who practice polygamy without a religious belief in the doctrine could be found criminals, while George Reynolds would be exempt if his Free Exercise claim were found to shield him from the anti-bigamy law. Likewise, if COP is shielded from fraud laws due to a claim of religious liberty, it would be unfair to those who desired to commit fraud, without a religious excuse.

## II  Absent a Recognized Exception under the Autonomy Cases, Defendant's Conduct is Subject to Neutral Laws of General Applicability. Plaintiffs Joined the Church without Consent, since Consent Defines the Limits of Church Autonomy, the Doctrine is Inapplicable to this Case.

As BYU law professor Frederick M. Gedicks wrote: "As I and others have argued, the position that religious belief and practice are unique and especially valuable activities thereby entitled to unique and special protection from burdensome government action is no longer tenable."[3]

> While the First Amendment provides absolute protection to religious thoughts and beliefs, the free exercise clause does not prohibit Congress and local governments from validly regulating religious conduct. Reynolds v. United States, 98 U.S. 145, 164, 25 L. Ed. 244 (1878). Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice. Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 879, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) (free exercise clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)" (internal quotation omitted)). Thus, a law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge. United States v. Hardman, 297 F.3d 1116, 1126 (10th Cir. 2002). On the other hand, if a law that burdens a religious practice is not neutral or generally

---

[3] *A Two-Track Theory of The Establishment Clause*. Boston College Law Review. Vol 43, Issue 5 (2002) p. 1073.

applicable, it is subject to strict scrutiny, and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest…A law is neutral so long as its object is something other than the infringement or restriction of religious practices. (Citations omitted).

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649–50 (10th Cir. 2006)

In Grace, the church argued its right to free exercise was burdened because it wanted to run a daycare center. The number of children and extended hours it desired was in direct violation of Cheyenne zoning laws applicable to a quiet residential area. In the case at bar, Defendant has yet to identify which exercise of its religious belief would be unduly burdened by subjection to the AC fraud laws.

    A.  <u>Church Autonomy Cases are Extremely Limited Exceptions to Smith's Rule.</u>

"Today we hold only that the ministerial exception bars [an employment discrimination] suit. We express no view on whether the exception bars other types of suits…There will be time enough to address the applicability of the exception to other circumstances if and when they arise." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 196, 132 S. Ct. 694, 710, 181 L. Ed. 2d 650 (2012). The decision did not expressly balance interests but upheld a discrete area of internal church governance.

Earlier this month the United States Supreme Court held Catholic school teachers' suits for employment discrimination were also precluded under the Ministerial Exception, which it now characterizes as church autonomy.[4]  But that case was also premised two teachers subjecting themselves to Catholic rule, and though they likely did not expect to have their civil

---

[4] Our Lady of Guadalupe Sch. v. Morrissey-Berru;, No. 19-267, 2020 WL 3808420 (U.S. July 8, 2020).

rights denied, they knew that they'd be bound by Catholic Ecclesiastical Courts when they accepted their employment.

Defendant asks the Court to apply a greatly expanded church autonomy doctrine (CAD) *in vacuo*, that is, without seating it in the context of established First Amendment jurisprudence (mtn. *passim*). However, a broad "church autonomy doctrine" beyond choice of clergy/teachers and intrachurch property disputes has not been recognized by the United States Supreme Court.

Moving forward from the Court's holdings in Hosanna Tabor, supra., and Our Lady of Guadalupe Sch, Id., if autonomy is offered as the rationale to allow churches' conduct that jeopardizes the non-consenting public, balancing the government's interest in protecting the public (in this case against fraud) with a church's interest in autonomy, whether expressly done or not, will be unavoidable.

B.  Actions Subject to Autonomy must be Free from Fraud and with Consent to Church Government.

Historically, limits of church autonomy have required that church actions be moral, fraud free and that one bound by church governance had previously consented to the same. "All who unite themselves to such a body **do so with an implied consent to this government and are bound to submit to it.**" Watson v. Jones, 80 U.S. 679, 729, 20 L. Ed. 666 (1871) [Emphasis added]. Thus, as far back as Watson, Id., consent to church governance was recognized as necessary threshold to being bound by that ecclesiastical body.

The Court, citing Watson, later expanded on additional prerequisites for deference to ecclesiastical courts. 'In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine **which does not violate the**

laws of morality and property, and which does not infringe personal rights, is conceded to

all.' (Citing Watson, 80 U.S. 679). Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull

Mem'l Presbyterian Church, 393 U.S. 440, 446, 89 S. Ct. 601, 604–05, 21 L. Ed. 2d 658 (1969).

[Emphasis Added].

> Justice Brandeis defined the civil court role:
>
> > In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise. (Citing Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1, 16, 50 S. Ct. 5, 74 L. Ed. 131 (1929).

Presbyterian Church, 393 U.S. at 447. [Emphasis added. The arbitrariness exception was

subsequently overruled, but the fraud and collusion exceptions have not been.]

Notwithstanding dicta in Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d

648, 655 (10th Cir. 2002) purporting to allow churches an almost *carte blanche* immunity from

tort actions where ecclesiastical activity is concerned, no binding authority has held that

intentional misrepresentations regarding known material facts about a church's origins, which

representations are not sincerely believed, is a protected exercise. And autonomy has been

limited to the choice of ministers (as in Bryce, 289 F.3d 648, where the issue involved discussion

of plaintiff Bryce's qualifications as a minister, and any alleged harassment was likely a result of

negligent, as opposed to intentional conduct, including a derivative claim by her partner), and

intrachurch real property disputes. Even the *Bryce* opinion cites Gonzalez' exception to fraud. Id.

at 655.

From Gonzalez, 280 U.S. 1, onward, the Supreme Court continues to suggest there is no

protection from judicial scrutiny for cases alleging fraud.  Jones v. Wolf, 443 U.S. 595, 609, 99

S. Ct. 3020, 3028, 61 L. Ed. 2d 775 (1979) n. 8 (1979).  Regardless of whether the statements

and omissions are characterized as fact, belief, or doctrine, Defendant cannot have it both ways:

it cannot avail itself of the protection of the First Amendment by arguing that its statements are

those of belief or doctrine if the substance of those statements are not sincerely believed. For, as

the Supreme Court recently held, every statement, even of opinion [belief], is evidence of at least

one fact—the state of mind of the person who makes the statement. Omnicare, Inc., 575 U.S. at

184.

       C.  <u>Without Consent, an Individual is not Subject to Internal Church Governance.</u>

The United States Supreme Court held long ago that one who consents to join a religious

organization is bound by its rules, impliedly acknowledging the inverse proposition—that

without consent one is not bound.

Decedent Wirth had voluntarily joined a monastic order. The questioned presented upon

his death was whether royalties from writing he authored during his lifelong membership devised

to the Order, or to Father Wirth's personal heirs. In finding for the Order, the Court reasoned that

where membership and commitment to the Order is voluntary, one is subject to its rules of

governance, including in this case, its ownership Wirth's royalties. Order of St. Benedict of New

Jersey v. Steinhauser, 234 U.S. 640, 34 S. Ct. 932, 58 L. Ed. 1512 (1914).

The holding and rationale of St. Benedict implies that where membership is not

voluntary, there is no consent to have one's property bound (or to be bound). Therefore,

application of church autonomy to avoid the fraud laws in the AC is not appropriate. Preventing

claims of Church members who were induced by fraudulent representations or omissions must

surely be against public policy. Though St. Benedict did not expressly hold, it is a logical

extension of that holding, particularly where, as in the case at bar, LDS leaders created a correlation committee (AC ¶1, 23-26) to promulgate rhetoric through proselytizing and teaching its members a version of LDS origins that its leaders, those who sanction correlation rhetoric, do not themselves believe (AC ¶3,142-43).

Cases applying the ministerial exception upheld in *Hosanna-Tabor* do not extend that exception to the GADDY facts. Unlike clergy selection and intrachurch property disputes, this case does not involve a *strictly* ecclesiastical decision for which there is an internal adjudicature. Indeed, the issue arises prior to and in the absence of any discussion between its leaders and members because it is the very promulgation of intentional misrepresentations used for induction into the organization that is at issue.

"There is no consent to be governed by a church's decisions where threshold questions surround a person's admission to that church." [5]  In the case at bar, Plaintiffs were induced to join by fraud. Fraud in the inducement vitiates a contract. It is *void ab initio.* (AC ¶167-182). Consent from the GADDY putative Class Plaintiffs was never obtained.

D.    The Rationale for Autonomy is to Protect Internal Church Decisions without granting Privilege to Ignore Neutral Laws of General Applicability, except where those Laws Conflict with Strictly Ecclesiastical Decisions of an Internal Church Judicature to which those Bound have Consented.

Protecting churches from the government's imposition re: internal or private affairs but falling short of a privilege to disregard neutral laws of general accountability which serve the

---

[5] Doe v. First Presbyterian Church U.S.A. of Tulsa, 2017 OK 106, ¶16 -23, 421 P.3d 284, 289 Opposition to Motion to Dismiss (ECF 23 p. 19-22) includes an in-depth discussion of this case and is incorporated herein by reference.

government's interest for the public to be secure in its rights and property, is the framework within which *Hosanna's* limitations as well as historical autonomy case law can best be understood. [6]

Consent as the concept which marks the outer limits of church autonomy is a logical, workable concept. "The church autonomy line of cases grows out of a notion of implied consent. When one joins a church, one accepts the religious choices made by the church. People can leave or stay. But so long as they choose to stay, they accept how the church handles its religious affairs." [7] However, where church membership is fraudulently induced, there is no consent (See AC ¶167-82, Third Cause of Action: Fraud in the Inducement).

**III** **Assuming, Arguendo, that *Yoder* Applies to the Case at Bar, i.e., that Fraud laws Unduly Burden COP's Free Exercise, a Neutral Law Enacted for a Compelling State Interest may yet be Upheld where it is the Least Restrictive Means of Accomplishing that Interest.**

Defendant argues that virtually any utterance "rooted in religious belief" is protected under church autonomy. But as discussed above, for a First Amendment defense to apply, that belief must be sincerely held.

While "…a facially neutral law may nonetheless unduly burden free exercise of religion when applied," Wisconsin v. Yoder, 406 U.S. 205, 220, 92 S. Ct. 1526, 1536, 32 L. Ed. 2d 15 (1972) Yoder's catch phrase, oft cited by religious organization advocates, has proven an

---

[6] See generally, Christopher L. Eisgrubert, Lawrence G. Sagertt, "The Vulnerability of Conscience: The Constitutional Basis for Protecting Religious Conduct" Univ. of Chicago Law Review (1994), who analogizes a church to a family re: private v. public conduct.
[7] Christopher C. Lund, "Free Exercise Reconceived: The Logic and Limits of Hosanna-Tabor," 108 *Northwestern University Law Review* 1183, p. 1194 (2014).

unworkable standard and its rule is restricted to claims involving hybrid rights.[8]  Yet Defendant does not raise a companion free speech challenge. It cannot—the First Amendment does not protect knowing falsehoods that harm others; it never has. United States v. Alvarez, 567 U.S. 709, 734, 132 S. Ct. 2537, 2554, 183 L. Ed. 2d 574 (2012).

COP claims a defense based on both the Free Exercise and Establishment clauses, but at its core, it is one of Free Exercise. This is not a case where a state actor would need to evaluate or determine content *prior to* its proselytizing. Holding COP liable for fraudulent recruitment and indoctrination practices will not chill instruction and proselytizing, but merely force those acts to become representative of what its leaders have known for over a century, established material facts about LDS origins.

Nor is it a law targeting religion. COP's claim to Establishment protection is weak. Rather, exempting intentional misrepresentations of material *religious* facts, but not *secular* facts, would seem to violate *Plaintiffs'* rights under the Establishment Clause. "…the Establishment Clause proscribes governmental " 'coercion of religious orthodoxy and of financial support by force of law and threat of penalty.'" (Internal citations omitted). Our Lady of Guadalupe Sch. v. Morrissey-Berru; No. 19-267, 2020 WL 3808420, at *15 (U.S. July 8, 2020).

A.  For Neutral Laws to Apply, a Compelling State Interest is not Required.

The government's harvesting and construction of a road in a national forest used by Native Americans for religious ceremonies was allowed to proceed despite a sincere belief that the construction would destroy their religious exercise which required privacy, an unobstructed

---

[8] Axson-Flynn v. Johnson, 356 F.3d 1277, 1301 (10th Cir. 2004).

view and peace and quiet. No balancing was required. Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 449-50, 108 S. Ct. 1319, 1325, 99 L. Ed. 2d 534 (1988).

    B.  Even if Balancing is Required, a Law is Nonetheless Constitutional if it Furthers a Compelling State Interest and is the Least Restrictive Means of Accomplishing that Interest.

Assuming, arguendo that balancing is required, a law may still be upheld against a free exercise challenge where it is the least restrictive means of accomplishing a state's compelling interest.

In the context of a land lease dispute between UEP (fundamentalist Mormon governing body) and its members, the Utah Supreme Court clarified the exception to Yoder that a law that burdens free exercise is nonetheless constitutional if it furthers a compelling state interest and is the least restrictive means of accomplishing that interest. The Court then identified access to the Courts as one such interest Jeffs v. Stubbs, 970 P.2d 1234, 1249–50 (Utah 1998).

**IV.  Protecting the Public from Fraud is at Least a Legitimate if not a Compelling Governmental Interest. Compliance with Fraud Laws is a Minimal Burden.**

    A.  Fraud Laws Protect an Important if not Compelling State Interest.

One induced to act based on intentional misrepresentations is acting without consent. S/he risks losing property and, in cases of religious fraud, the opportunity to choose one's beliefs which in turn govern all one's important life choices, based on reliable information.

Affinity fraud among Mormons is a huge problem. A 2018 a survey shows that Utah, a state whose residents are about 60% LDS, has the highest rate of Ponzi schemes by almost 2/3 above Florida, the next highest. "Utah has the highest rate of Ponzi schemes per capita in the

country by far, at 1.35 Ponzi schemes per 100,000 people. And the next highest state (Florida) is nearly *two thirds lower…*"[9]



According to Attorney Mark Pugsley, "…people in Utah are simply too trusting, particularly when the person soliciting an investment is in their ward or shares their religious affiliation."[10] In Gaddy, COP agents have invited that trust (AC ¶56). Government recognized the enormous problem and in 2010 the local SEC office began sponsoring annual fraud seminars.[11]

Paraphrasing the California Supreme Court, it is one thing when a person knowingly and voluntarily joins a church, yet quite another when one joins without his knowledge or consent re: the origins upon which that church is based. Even if liability for fraud is burdensome, it is not substantial. Tort liability for fraudulent recruiting practices impairs COP's ability to convert

---

[9] Pugsley, *Finally It's Confirmed: Utah Has More Ponzi Schemes Per Capita Than Any State in the Country. By Far.* April 29, https://rqn.com/blog/utahsecuritiesfraud/finally-its-confirmed-utah-has-more-ponzi-schemes-per-capita-than-any-state-in-the-country-by-far/#.XgKY1kdKi71 (Viewed July 4, 2020).

[10] Id.

[11] https://archives.fbi.gov/archives/saltlakecity/press-releases/2010/slc060310.htm (Viewed July 4, 2020).

nonbelievers, or retain children who have grown up in the religion, "…because some potential members who would have been recruited by deception [or children who attain majority] will choose not to associate with the Church." Molko, 46 Cal. 3d at 1117.

Compliance with fraud laws would not substantially burden COP. It need only avoid internal systemic deceit by refraining from intentional and systematic concealment of material facts about LDS origins which are known to it but have been kept from its members.

B. Any Imposition on Religious Exercise by Compliance with Fraud Laws is Minimal.

A substantial burden on free exercise must be shown before the burden of proof shifts to demonstrate that the law is the least restrictive means of accomplishing its compelling interest. In the context of a law denying religious advertisements on the side of a bus:

'[T]he First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on a litigant's religious practice.' …when a restriction merely prohibits one of a multitude of methods of spreading the gospel, and it does not "force[ ] [parties] to engage in conduct that their religion forbids" or prevents "them from engaging in conduct their religion requires," those parties are not "substantially burdened." (Internal citations omitted).

Archdiocese of Washington v. Washington Metro. Area Transit Auth., 281 F. Supp. 3d 88, 114–15 (D.D.C. 2017), aff'd, 897 F.3d 314 (D.C. Cir. 2018).

As in 281 F. Supp. 3d 88, COP "does not cite to any binding Supreme Court or [Tenth] Circuit precedent that would call for the invalidation of [or exemption from] a law when plaintiffs [here, Defendant] [is] not compelled, under the threat of either punishment or the denial of a benefit, to act." 281 F. Supp. 3d at 114–15.

Fraud laws do not compel COP to do anything. Indeed, they merely discourage it from intentionally promulgating religious facts that it knows to be false and omitting those facts which a reasonable person would want to know before joining or remaining in the Church.

Tenth Circuit cases find neutral laws of general applicability rarely substantially compromise those who raise Free Exercise claims. For example, with re: a "Church of Marijuana," the right to free exercise of religion does not relieve the obligation to comply with a valid and neutral law of general applicability on the ground that law proscribes (or prescribes) conduct that his religion prescribes (or proscribes). Even if such a neutral law substantially burdens religious practice, it does not have to be justied by a "compelling government interest," seemingly abandoning Yoder's standard. United States v. Meyers, 95 F.3d 1475, 1482 (10th Cir. 1996).

See also Hardman, 297 F.3d at 1130 where in consolidated cases re: applicability of federal statutes precluding possession of dead eagle parts/feathers without permit the Court acknowledged a compelling interest in protecting bald eagles, and that the statute would have a substantial burden on plaintiffs' free exercise of religion. It remanded to the trial court to determine "the least restrictive means of furthering [the] compelling governmental interest," justifying the burden.

Furthermore, if the state or federal legislature wanted to exclude a church from being subject to the various fraud laws, it could have so legislated. This was done in several states where the use of peyote has been allowed for religious ceremonies. [12]

## V.    The First Amendment is an Affirmative Defense, not a Bar. The AC places Sincerity at Issue. Thus, Dismissal on the Pleadings is Inappropriate.

COP characterizes the First Amendment as a bar to the AC claims, but "…the [ministerial] exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. Hosanna-Tabor Evangelical Lutheran Church and School, 565 U.S. at 195.

---

[12] Employment Div., Dep't of Human Res. of Oregon, 494 U.S. 890, 110 S. Ct.1606.

A.    Per the Free Exercise Clause, COP must Demonstrate that a Sincerely Held
Religious Belief is Substantially Burdened by Neutral Fraud Laws. Otherwise, its
Defense Fails, and the Case can be Tried as any Other.

Defendant must show that the exercise at issue is a "religious belief," that is "sincerely held," as a threshold to a Free Exercise defense. Snyder v. Murray City Corp., 124 F.3d 1349, 1352 (10th Cir. 1997), opinion vacated in part on reh'g en banc, 159 F.3d 1227 (10th Cir. 1998). Snyder challenged the law as a burden to his free exercise rights; there, sincerity of belief was part of his *prima facie* case. In GADDY, it is the second element of her prima facie case for common law fraud –Defendant *knew its statements were false*. (AC ¶135). But in order to avail itself of First Amendment protection, Defendant must also show it sincerely believed what it preached (its correlated rhetoric) and then identify how that belief would be substantially burdened by compliance with AC fraud laws.

Sincerity is a question of fact which concerns LDS leaders' credibility; their states of mind are at issue (AC ¶2-3, 141). They are those who have crafted and/or ratified correlated materials (AC ¶24-25, 36, 180).

Sincerity of belief must be established *before* the protections of the RFRA [and *a fortiori* the First Amendment], can be invoked. Justice Gorsuch's majority opinion found no issue with the trial court's 3-day evidentiary hearing. He references factors in Meyers, 95 F.3d at 1482, to determine whether the beliefs were religious and if so, sincerely held. United States v. Quaintance, 608 F.3d 717, 720 (10th Cir. 2010).

COP's corporate status is no bar to a determination of sincerity. Though the sincerity of defendant's religious beliefs was not disputed, the Supreme Court wrote that determining

sincerity is important because "a corporation's pretextual assertion of a religious belief in order to obtain an exemption under RFRA for financial reasons would fail." (Citing Quaintance, 608 F.3d 717) Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 717, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014).

     **B.**     **Here, the Free Exercise Sincerity Threshold Cannot be Determined on the Face of the Amended Complaint; it is a question of Fact for the Jury Who can Assess Credibility.**

In the context of an intellectual property right dispute, this Court has noted: "[I]t is only proper to dismiss a complaint based on an affirmative defense when the complaint itself admits all the elements of the affirmative defense. Citing Bistline v. Parker, 918 F.3d 849, 876 (10th Cir. 2019). Big Squid, Inc. v. Domo, Inc., No. 2:19-CV-193, 2019 WL 3555509, at *15 (D. Utah Aug. 5, 2019).

The AC alleges that COP, by and through the Brethren and others in charge of Correlation, did not, and do not, sincerely believe the truth of the statements they made, and continue to make (AC ¶169, 180, 200, 208, 219). When an affirmative defense raised in a Fed. R. Civ. P. 12(b) motion appears plainly of the face of the complaint, a motion may be dismissed on the pleadings. If that defense is based upon matters outside the complaint, factual issues prevent dismissal on the pleadings. Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965).

Whether COP's deceitful conduct involves sincerely held religious beliefs is just such an issue. By ignoring the sincerity factors in the AC, COP asks the Court to determine that COP's sincerity is either irrelevant or can be established as a matter of law. This would be a gross expansion of religious liberty. COP must establish that the conduct which Plaintiffs' have put in issue, statements that its scriptures were translated from ancient prophets' writings on ancient

documents, whether plates or papyrus, were sincerely believed when made. Mosier v. Maynard, 937 F.2d 1521, 1526 (10th Cir. 1991). This cannot be done from the pleadings.

In 1944 the U.S. Supreme Court addressed the conviction of defendant leaders of the "I AM" Church based upon their lack of "good faith" in the representations they made.  The sole jury issue was whether the Ballards believed their representations. Ballard, 322 U.S. at 84. The phrase "good faith" is used 13 times in the opinion. Ballard only forbade litigation of the truth of religious doctrine or beliefs but allowed the sincerity issue.[13]

Almost 40 years later, the Ninth Circuit decided a case on all fours with *Ballard*. Noting that the nature of the Church and its teachings were not at issue, the issue before the Court was whether its leaders made knowingly false misrepresentations in order to induce others to donate and whether they sincerely believed what they preached to others:

> If they made assertions with knowledge of the falsity of those assertions, then they could not have been acting pursuant to sincere religious belief. It, therefore, is not a question of whether the "Dare to be Rich" tenet is true or false. The focus is on the intent of Rasheed and Phillips in carrying out the program. It is this distinction that is critical in our First Amendment analysis. Thus, the Court has held that although the validity of religious beliefs cannot be questioned, the sincerity of the person claiming to hold such beliefs can be examined. United States v. Seeger, 380 U.S. 163, 185, 85 S. Ct. 850, 863, 13 L. Ed. 2d 733 (1965). The First Amendment does not protect fraudulent activity performed in the name of religion. Cantwell, 310 U.S. at 306.

United States v. Rasheed, 663 F.2d 843, 847–48 (9th Cir. 1981).

Even if its statements are characterized as beliefs, a representation of something that is not sincerely believed may be the basis of a fraud claim as shown in *Ballard* and Rasheed, 663

---

[13] In dissent, Chief Justice Stone posited a hypothetical where the fact of the Ballards' presence in San Francisco on a particular day could undoubtedly be adjudicated, thus separating fact from belief, even though in a religious context. Ballard, 322 U.S. at 89, while Justice Jackson's dissent criticized sincerity adjudication.

F.2d 843 The Ballard defendants represented they were agents of St. Germaine. In Rasheed, 663

F.2d 843, that God would quadruple your investment

The mail fraud statute under which Rasheed and Phillips were convicted is the very

statute Plaintiffs' claim COP violates as alleged in the AC RICO cause of action (AC ¶93). 18

U.S.C.A. § 1341 Rasheed, 663 F.2d 843 In both Ballard, and Rasheed, a jury found that church

leaders did not believe what they taught, and so it convicted them of fraud.

Nowhere does COP address the newly pleaded sincerity facts. To ignore sincerity would

allow a church to commit fraud on the public as a matter of law, regardless of whether its official

[correlated] beliefs are sincerely held. If Defendant does not sincerely believe what is preached

or taught, that satisfies both an element of common law fraud and is justification for no First

Amendment protection as to those statements and that practice. While lies are protected under

the First Amendment, those that rise to the level of fraud are not. Alvarez, 567 U.S. at 723.

### VI.    Even Assuming a Church's Defense is Analogous to Qualified Immunity, 12(B)(6) Dismissal is Inappropriate where Material Fact Issues Exist.

In its Order on the Motion to Dismiss the original Complaint, the Court compared

COP's defense to one of qualified immunity and wrote: "Here, the Church argues the First

Amendment's Religion Clauses bar each of Gaddy's claims. The Tenth Circuit has-analogized

such an argument to a government official's defense of qualified immunity. That is, if the First

Amendment applies "to the statements and materials on which plaintiffs have based their

claims, then the plaintiffs have no claim for which relief may be granted." (ECF Order, p. 7)[14]

---

[14]   A qualified immunity defense frequently arises in a *Bivens* claim where plaintiff must plead and show the absence of probable cause for pressing the underlying criminal charges. Hartman v. Moore, 547 U.S. 250, 250, 126 S. Ct. 1695, 1697, 164 L. Ed. 2d 441 (2006).

A.  Dismissal on the Pleadings is Inappropriate where Material Fact Issues Exist.

However, the Tenth Circuit reasoned only that *if* a church's actions are covered by the CAD, is it similar to qualified immunity Bryce, 289 F.3d at 654. Assuming, arguendo, that is so, qualified immunity as a basis for a 12(b)(6) dismissal is inappropriate where material facts are in dispute. Here, the AC places the sincerity of LDS leaders in dispute; thus, material fact issues preclude dismissal on the pleadings. Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir. 2001).

Nevertheless, taking a cue from the Court's language re: qualified immunity (Order p.7), the AC alleges facts re: COP/LDS leaders' lack of sincere religious belief in their representations about important LDS origins. Additionally, if COP claims its right to proselytize and teach is unduly compromised it must identify how.

B.  Vague References are Insufficient to Invoke Constitutional Protections.

Defendant must specify which conduct is threatened by the imposition of fraud laws. This it has not done. Nowhere in the motion is a type of conduct identified that is unduly burdened by AC fraud laws. Conclusory allegations of the violation of a Constitutional right [and arguably the exercise threatened or the grounds for imposition of a Free Exercise defense] are insufficient:

> Wise argues that 'clearly, the instant case supports a claim for damages under Section 1983.' Significantly, Wise has failed to demonstrate any substantial, identifiable federal constitutionally [sic] deprivation under the Due Process or Equal Protection Clauses of the Fourteenth Amendment warranting federal court scrutiny.

Wise v. Bravo, 666 F.2d 1328, 1332–33 (10th Cir. 1981).

Vague allegations were also held insufficient in an RFRA prisoner's claim:

> Plaintiff's vague assertion that he refused AIDS testing on generic "religious grounds" thus will not sustain a claim that he was entitled to any first amendment

protection against testing…Without more specific allegations, plaintiff's complaint fails to state a claim that the prison violated his right to religious freedom.

Dunn v. White, 880 F.2d 1188, 1198 (10th Cir. 1989)

The conduct Defendant wants protected does no impair its belief, faith or doctrine. If it is claimed to be proselytizing and teaching, any restriction there would be minimal because the rule would be simply: do not preach or teach that which you do not sincerely believe.

For an act to be characterized as "rooted in religious belief," one must have a sincere religious belief in that act. Thus, when COP made representations that Smith translated the *Book of Mormon* from gold plates and that the figures in the *Book of Abraham* depict the Hebrew Prophet Abraham who also wrote upon the Egyptian papyrus translated by Smith, COP must have sincerely believed those representations. If it did not, the First Amendment cannot be used to defend that conduct.

## VII    Fraud by Material Omission does not Require Adjudication of Truth. A Jury need only Determine Whether a Reasonable Person would want to Know the Omitted Facts Prior to Acting.

Allegations of intentional material omissions are sufficient to state a claim for all but the first cause of action in the AC. Utah law requires disclosure where a partial statement gives a misleading or false impression. Fraud and Deceit, AmJur 2d, § 209. [15] At all relevant times COP made numerous partial representations about LDS origins which omitted material facts. E.g., it

---

[15] Though not express, the Utah Supreme Court impliedly found a duty of disclosure independent of a fiduciary duty in both Yazd v. Woodside Homes Corp., 2006 UT 47, 143 P.3d 283, 289 and Mitchell v. Christensen, 2001 UT 80, 31 P.3d 572. Plaintiff incorporates discussion of the imbalance factors set forth in (ECF 23 p. 22-24) for all purposes herein.

made partial disclosures in correlated versions of the first vision (AC ¶48, 80, 139). It failed to disclose that Egyptologists opine that Smith's papyrus from which he claimed to translate the *Book of Abraham* is an ordinary Egyptian funerary text (AC ¶50). Never did it depict a seer stone as the source of the *Book of Mormon* (AC ¶60).

The Court incorrectly stated the law as to material omissions in the context of a fraudulent concealment claim: (Order, ECF, #33, note 73). The quotation is incomplete. Immediately following what is cited by the Court is this statement: "Making use of a device that misleads, some trick or contrivance that is intended to exclude suspicion and prevent inquiry, may also amount to fraudulent concealment." McDougal v. Weed, 945 P.2d 175, 179 (Utah Ct. App. 1997). This is exactly what COP has done for over half a century.

Determining fraudulent material omissions does not require adjudication of the truth or falsity of COP's correlated rhetoric; neither is there a necessary "standard of care" to be determined. The standard is determined objectively and is whether a reasonable person would consider the omitted information important to a decision to act with respect to the other party. Where material facts are disputed, what is reasonable is fact dependent and for the jury to decide. Medina, 252 F.3d at 1131.

A.  <u>Second Cause of Action: Breach of Duty of Full Disclosure.</u>

This claim is in the context of where a partial disclosure has been made and a full disclosure must be made in order to avoid a misleading statement. See discussion under subpart "C," *Infra*. Though COP argues this claim is the same as a claim for breach of fiduciary duty (mtn. p. 19, n. 6), it is not.

A fiduciary duty is clearly broader in that it includes duties of loyalty, reasonable care and others. Furthermore, in neither Jensen, infra., Yazd, supra., nor Mitchel, supra., can the word "fiduciary" be found. All these cases discuss the duty of full disclosure in the context of a single discreet act of fraudulent concealment.

B.  <u>Third Cause of Action: Fraud in the Inducement to Enter a Contract</u>

Plaintiffs' second cause of action for fraud in the inducement to contract is based upon members' agreement to pay 10% of their income in consideration for temple access, or to join the Church. Prior to being baptized one must declare s/he pays a full tithe. Prior to temple admission, and for continuing access to the temple, one must declare s/he pays a full tithe (AC ¶169-76). Mormonism stands alone among other Judeo-Christian churches in *quid pro quo* financial requirements. Certainly, material omissions casting serious doubt on the claimed source of the Church's scripture, had they been disclosed, would affect reasonable persons' decision to pay of a full tithe.

C.  <u>Fourth Cause of Action: Fraudulent Concealment.</u>

Plaintiffs claim for Fraudulent Concealment likewise involves a duty to disclose. Utah has recognized that material omissions, even in the context of a non-fiduciary relationship, are sufficient for a claim of fraudulent concealment:

> Fraudulent concealment requires that one with a legal duty or obligation to communicate certain facts remain silent or otherwise act to conceal material facts known to him. 37 Am. Jur. 2d Fraud and Deceit § 145. **Such a duty or obligation may arise from a relationship of trust between the parties, an inequality of knowledge or power between the parties, or other attendant circumstances indicating reliance. <u>Id.</u>** The party's silence must amount to fraud, i.e., silence under the circumstances must amount to an affirmation that a state of things exists which does not exist, and the uninformed party must be deprived to the same extent as if a positive assertion had been made. <u>Id.</u> Such "[c]oncealment or nondisclosure becomes fraudulent only when there is an existing fact or condition ... which the party charged is under a duty to disclose." <u>Id.</u> **Making use of a**

**device that misleads, some trick or contrivance that is intended to exclude suspicion and prevent inquiry, may also amount to fraudulent concealment.** Id. It is this aspect of fraudulent concealment that is at issue in the instant case. [Emphases added].[16]

Jensen v. IHC Hosps., Inc., 944 P.2d 327, 333 (Utah 1997), on reh'g (Aug. 22, 1997), on reh'g (Aug. 22, 1997).

The word "fiduciary" is not used in the *Jensen* opinion, which recognizes a claim for fraudulent concealment *apart* from a fiduciary duty, where inequality of knowledge or power and/or reliance is present. Here, as there, Defendant concealed key facts it should have disclosed. (AC ¶164, 185). COP has superior knowledge re: LDS origins (AC ¶61). COP invited reliance by promising "never to lead [its members] astray," (AC ¶28). This is not a "strictly ecclesiastical matter"; omitted facts about Mormon origins surely and demonstrably affected a decision to join or remain in the LDS Church as demonstrated in the LDS Faith Crisis Report (AC ¶145-46, 221-23) and thus, involve an important if not compelling interest in protecting the public against fraud.

D.  Fifth Cause of Action: Violation of Utah Charitable Solicitations Act.

The *Utah Charitable Solicitations Act* requires a church (who, though not required to register, must comply with the Act) in connection with any solicitation, to disclose "material facts necessary to make statements made, in the context of the circumstances under which they are made, not misleading." Utah Code Ann. § 13-22-13. It is a neutral law of general applicability. State officials do not screen content.

In a solicitation context, conceding that fraudulent appeals may [at times] be made in the name of charity and religion," frauds may [can still] be denounced as offenses and punished by

---

[16] (*Cf.* Order, ECF #33, n. 73).

law." Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147, 164, 60 S. Ct. 146, 152, 84 L. Ed. 155 (1939). "…the First Amendment does not protect fraud, including fraudulent statements in charitable solicitations." United States v. Corps. for Character, L.C., 116 F. Supp. 3d 1258, 1266 (D. Utah 2015). Fraud may lie in a narrowly drawn charitable solicitations statute Espinosa v. Rusk, 634 F.2d 477, 481–82 (10th Cir. 1980), aff'd, 456 U.S. 951, 102 S. Ct. 2025, 72 L. Ed. 2d 477 (1982).

Correlated information omits material facts necessary for members to donate. COP argues tithing is a commandment of God (mtn pps. 17-18). But statement this begs the question—in order to determine if one is in fact donating to God, one needs to know the material facts of LDS origins that were intentionally concealed. If the scriptures upon which they based their faith were fabricated by a 19th Century charlatan, surely facts strongly suggesting that conclusion are material (AC, ¶142 b & c, Ex 13A & 13B).

Contrary to COP's claim (mtn. p.19, n 7), a private right of action *can* be brought under the Act: "Nothing in this section precludes any person damaged as a result of a charitable solicitation from maintaining a civil action for damages or injunctive relief. U.C.A. § 13-22-4(2).

Stone v. Salt Lake City, 11 Utah 2d 196, 356 P.2d 631 (1960) (Mtn. p. 16-17, n 5) is distinguishable from the case at bar. In Stone, plaintiff did not allege fraud. Id. at 204. Additionally, there was no invited directive, unlike the specific lines for donative intent in COP-created tithing slips, on how the donations are to be used. (AC ¶6) Id. at 200.

Additionally, outright lies were told by COP's agents with respect to its use of tithing. (AC ¶4-6, 79). COP spent billions on its business affiliates, City Creek and Beneficial Life. (AC

¶5, 142 "s"). Fraud laws applied to misrepresentations in how it used or will use tithing places a minimal burden on its Defendant's exercise.

    E.  <u>Sixth Cause of Action: RICO. Material Omissions are Sufficient Predicate Acts.</u>

    COP challenges the AC RICO cause of action on no basis other than the First Amendment (mtn. p. 19). But if COP does not sincerely believe its material representations, either standing alone or absent full and fair disclosure, the First Amendment defense fails.

    Predicate acts of mail and wire fraud do not require a fiduciary duty in order to disclose material facts; omissions as part of a scheme to take property are enough. <u>United States v. Allen</u>, 554 F.2d 398, 410–11 (10th Cir. 1977); See also <u>Bradford v. Moench</u>, 670 F. Supp. 920, 925–926 (D. Utah 1987) holding "[t]o the degree plaintiffs' RICO claims are based on mail fraud, <u>18 U.S.C.A. § 1341</u>, concealment may be a basis for a "scheme to defraud," and support such a claim."[17] Thus, the alleged material omissions support the AC RICO claim (AC ¶¶199-205).

    The AC also includes factual allegations that COP's use of tithing is not what it represented. (AC ¶¶4-6, 79) Allegations that COP devised a scheme or artifice to defraud as to how Plaintiffs' tithing would be used are included as part of the RICO claim. Representations that tithing had not been and would not be used for profit-making businesses were made to Plaintiffs (AC ¶¶4-6, 79). They relied on representations that their donations would be used for what is indicated on the tithing slip (AC ¶6). However, under RICO where no showing of reliance is required.[18]

---

[17] Federal wire & mail fraud statutes are essentially identical; case law interpreting one is applied to the other.
[18] <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639, 655–57, 128 S. Ct. 2131, 2142–44, 170 L. Ed. 2d 1012 (2008).

F. <u>A Claim for Reckless Infliction of Emotional Distress Based on Fraudulent</u>

<u>Concealment of Material Information is Valid in this Case.</u>

A duty to disclose where a partial statement has been made, there exists inequities in knowledge and power in the relationship between the parties and the defendant has invited reliance, all exist in the case at bar. Defendant intentionally concealed the gospel essays admitting many of the facts it once characterized as Anti-Mormon lies, from Plaintiffs, reasoning that it wanted to "inoculate" its members (AC ¶65, & Ex. No. 2).

The outrageousness of that action cannot be seriously questioned where COP finally admitted many of the long known but hidden material facts about its origins and then took steps to delay giving notice of those admissions. This delay caused continuing grief in terms of additional years of decisions made based on incomplete information suffered by Plaintiffs. As set forth in the LDS Personal Faith Crisis report, the injuries are substantial and suffered not just by the naïve and lower socio-economic class, but by highly educated and financially successful members of the LDS Church. (AC Seventh Cause of Action, ¶218-224.)

## VIII <u>CONCLUSION</u>

The Amended Complaint puts Defendant's conduct, not beliefs, doctrine or faith at issue. Absent a recognized exception under the autonomy cases, which have thus far been limited to choosing clergy/teachers and intrachurch property disputes, Defendant's conduct is subject to neutral laws of general applicability. All fraud laws under which each cause of action is brought are rules of that sort.

In order to fall within church autonomy exception, those actions must be made by an internal ecclesiastical adjudicature, free from fraud and applied to those who have consented to be governed by that authority. Autonomy has not been expanded to fit the facts of this case.

Even if Yoder's rule is deemed to apply, under the Free Exercise Clause a neutral law enacted for a compelling state interest may yet be upheld if it is the least restrictive means of achieving that interest. Protecting the public from fraud is at least a substantial if not compelling government interest. Any Free Exercise burden would be minimal.

Fraud accomplished by material omission, which is all that is required under the AC causes of action for fraudulent concealment, violation of the Utah Charitable Solicitations Act and Civil RICO, does not require adjudication of truth. A jury need only determine whether a reasonable person would want to know the information intentionally omitted.

The law has not excepted compliance where lies about established facts known only to COP are used to recruit or indoctrinate. COP invited unquestioning trust. Plaintiffs should not be bound by COP's internal machinations when their membership was obtained without consent. Granting Defendants motion is inappropriate where its sincerity is at issue, even if autonomy is likened to qualified immunity.  Plaintiffs request that the motion be denied with prejudice.[19]

Respectfully,

DATED: July 21, 2020                              Kay Burningham, Attorney at Law

                                                            /s/  Kay Burningham
                                                            Kay Burningham

                                                       *Attorney for Laura A. Gaddy and the Class*

---

[19] I certify the Amended Opposition length is less than 9,000 words. DUCivR 7-1(a)(3)(A).