1                  IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4
      LAURA A. GADDY,                    )
5     individually and on behalf        )
      of all others similarly           )
6     situated,                         )
                                        )
7               Plaintiffs,             )
                                        )  Case No:   2:19CV0554
8          vs.                          )
                                        )
9     THE CORPORATION OF THE            )
      PRESIDENT OF THE CHURCH OF        )
10    JESUS CHRIST OF LATTER-DAY        )
      SAINTS, a Utah corporation        )
11    sole,                            )
                                        )
12              Defendant.              )
      _____       )
13

14

15

16

17

18                 BEFORE THE HONORABLE ROBERT J. SHELBY

19                       January 5, 2021

20                 ZOOM VIDEO MOTION HEARING

21

22

23

24
                          Reported by:
25               KELLY BROWN HICKEN, RPR, RMR
                         801-521-7238

```
1                        APPEARANCES OF COUNSEL

2    FOR THE PLAINTIFFS:          KAY BURNINGHAM ATTORNEY AT LAW

3                                 BY:  KAY BURNINGHAM

4                                      Attorney at Law

5                                 300 S. MAIN ST, STE 1375

6                                 SALT LAKE CITY, UTAH  84111

7

8

9    FOR THE DEFENDANT:           STOEL RIVES

10                                BY:  DAVID J. JORDAN

11                                     WESLEY F. HARWARD

12                                     Attorney at Law

13                                201 S MAIN ST STE 1100

14                                SALT LAKE CITY, UTAH  84111

15

16

17

18

19

20

21

22

23

24

25
```

1          SALT LAKE CITY, UTAH, TUESDAY, JANUARY 5, 2021

2                          *   *   *   *   *

3          THE COURT:  All right, everyone.  Let's go ahead

4    and go on the record in Case Number 2:19-CV-554.  It's

5    Gaddy vs. Corporation of the President of the Church of Jesus

6    Christ of Latter-Day Saints.

7          Before we begin and before we make appearances, let

8    me just state as I always do, first, that you're all welcome.

9    This is a public and open hearing even though it's being

10   conducted remotely.  And the purpose of that, of course, is

11   that we're in the middle of a global pandemic, and the general

12   orders entered by this court prohibit proceedings like this

13   from proceeding in person here in the court.  I'll remind

14   everyone that it's unlawful to record official judicial

15   proceedings in federal court by any means and for any purpose.

16   It's unlawful to use a recording for any purpose.

17         So I instruct anyone who's listening or watching

18   not to make any recording of this hearing.  There is one

19   official transcript of proceedings in federal court, it is the

20   one official record of proceedings in federal court.  It is

21   the transcript being prepared by our court reporter.

22         Having said that, let me invite you, counsel, to

23   make your appearances beginning with the plaintiff.  I think

24   Ms. Burningham, I see you.  Would you introduce yourself and

25   anyone else appearing with you?

1          MS. BURNINGHAM:  Yes, Your Honor.  Kay Burningham

2     for the plaintiff Laura Gaddy, and she should be connected

3     from the East Coast.

4          THE COURT:  I think I see her online.  Is that you,

5     Ms. Gaddy, if you would nod?

6          (Does so.)

7          THE COURT:  Great.  Thank you.

8          MS. BURNINGHAM:  Thank you.

9          THE COURT:  And, Ms. Burningham, will there be any

10     other counsel appearing with you today?

11          MS. BURNINGHAM:  No, there will not.  Mr. Romney is

12     assisting me.  He's my assistant, and he's assisting with the

13     technical details.

14          THE COURT:  Terrific.  Thank you.

15          MS. BURNINGHAM:  Thank you.

16          THE COURT:  And, Mr. Jordan, I see you on our zoom

17     call.  Will you make your appearance and anyone else who's

18     with you?

19          MR. JORDAN:  Thank you, Your Honor.  This is

20     David Jordan on behalf of the Corporation of the President of

21     the Church of Jesus Christ of Latter-Day Saints.  I have with

22     me in my office my associate Wesley Harward.  And I also see

23     on the line Mr. Randy Austin and Mr. Alexander Dushku, who are

24     attorneys with the law firm of Kirton and McConkie.  That firm

25     represents the Corporation of the President as outside counsel

1    in a variety of matters.  And they are joining not to make

2    appearances today, but simply to listen to the proceedings.

3           THE COURT:  All right.  Well, thank you.  Welcome

4    to all of you.  Welcome back, I guess I should say to some of

5    you.  This is our second hearing on motions to dismiss.  Just

6    by way of procedural background, of course, the plaintiff

7    filed her complaint sometime ago.  The defendants filed a

8    motion to dismiss.  And following oral argument I issued a

9    written memorandum decision dismissing Ms. Gaddy's first

10   complaint without prejudice to replead.  Miss Gaddy has

11   re-pled and filed an amended complaint.  The defendants have

12   again moved to dismiss.

13          This first part will be familiar to you, counsel.

14   I think we did this in our last hearing.  It's my practice in

15   most hearings.  Let me inform you what I've reviewed and share

16   with you my preliminary thoughts based on that review.

17          So I carefully reviewed all of your papers.  There

18   are four motions pending before us including the motion to

19   dismiss.  Ms. Gaddy filed three miscellaneous motions.

20   They're fully briefed.  I'll be providing a ruling on those.

21   I don't think there will be any need for oral argument on the

22   three miscellaneous motions.

23          I carefully reviewed the motion to dismiss.  I

24   reread several times my prior memorandum decision.  I read

25   very carefully the amended complaint, and we have, of course,

1    reviewed more cases than I care to count.  I think we reviewed

2    the legal authority.  I hope I understand it.  I believe I

3    understand your arguments.

4            With respect to the motion to dismiss, and let me

5    say this at the outset, I don't think Ms. Gaddy was with us

6    last time and others.  I almost always do this.  It's my

7    practice to share at the outset with the lawyers my

8    preliminary view of things.  It's just only that, a

9    preliminary review based on my review of the papers and

10   authority.  I'm always here with an open heart and an open

11   mind interested to learn what you think I have misunderstood

12   or misapplied.

13           The purpose for sharing these thoughts is to try to

14   help focus our oral argument and just to be transparent with

15   the lawyers so they know where the target is which they're

16   aiming.  So here are my thoughts about the motion to dismiss.

17           First, I'm disinclined to revisit my prior rulings.

18   I won't revisit the conclusions that I previously drew in the

19   memorandum decision and order that I entered before.  So I

20   think what will be helpful today is to focus on differences

21   between the complaint that was filed and dismissed and this

22   amended complaint as well as there are a number of new

23   arguments or different arguments advanced by the parties, most

24   notably by Ms. Gaddy.  Let me see if I can touch on what I

25   think are the central differences and share with you my views

1    about those matters.

2         First, it appears to me that the plaintiff attempts

3    to avoid at least my interpretation of Ballard, and I

4    recognize at the outset that I think Ms. Burningham doesn't

5    share my view about the law at least on some of these matters.

6    But you're stuck with the judge that you're stuck with.  It

7    appears that the plaintiffs have attempted to work around at

8    least my construction of Ballard in these ways.

9         First, suggesting that the subject matter in the

10   complaint is conduct and not belief.  I don't see any evidence

11   of that in the papers.  As I read the amended complaint, the

12   subject matter is focused on belief, doctrinal belief,

13   historical facts as they relate to doctrine, and especially

14   the profession or professing of those beliefs; in other words,

15   speech about religious matters.  I think I'm not at least

16   initially persuaded that there's any element of conduct here

17   that would move us outside of the realm of Ballard.

18        There's this I think a great emphasis in the papers

19   on whether this court can receive this complaint and

20   investigate these alleged misrepresentations.  If it does so

21   by examining whether the historical facts that are historical

22   beliefs at issue in the complaint are sincerely held by the

23   defendants.

24        Three thoughts about sincerity of belief.  I am

25   unaware of any authority supporting the proposition that the

1    sincerity of religious beliefs is a proper subject matter in a

2    case like the one before us.  I am, of course, familiar with

3    the RFRA cases in which quite naturally the sincerity of the

4    belief of someone who's seeking an exception or exemption from

5    a government rule or burden is relevant.  And I am familiar

6    with the cases.  I've read them several times, and they're a

7    little dense and difficult to understand because they're from

8    the 1940s.  But I read again Ballard and Rasheed which are

9    cases the plaintiff relies on for the proposition that we can

10   interrogate the defendants in this case and before a jury

11   about the sincerity of their beliefs and their statements

12   about their historical facts and doctrine.

13           I don't think RFRA applies, and it's -- my reading

14   of Ballard is that Ballard does not suggest examination into

15   sincerity of beliefs.  The holding in Ballard was narrow, as I

16   read it, and that is you cannot examine a church about the

17   truth or veracity of its religious claims.  There was

18   discussion back and forth about that element.  In that case

19   the trial court did invite the jury to consider whether those

20   beliefs espoused by the defendants were sincerely held, but it

21   wasn't the subject of any holding by the Court.

22           And to the extent that it's helpful, I'm very

23   persuaded by Justice Jackson's dissent on that case,

24   especially on this issue of the sincerity of beliefs and

25   whether it's appropriate for subject matter for inquiry in a

1    court of law.

2             Rasheed, I'll just -- I'm just not persuaded by

3    Rasheed.  I think it's not a persuasive writing from the

4    Ninth Circuit.  I think its reliance on -- let's see, well,

5    there was the conscientious objector case, and there was the

6    case from Connecticut that were both cited by the

7    Ninth Circuit in Rasheed for the proposition that we could

8    inquire about the sincerity of the belief and also that

9    religions couldn't avoid liability for fraud by invoking

10   religious views.  And I think both of those cases are not

11   strong cases for the Ninth Circuit to rely on.  And I don't

12   think that the sincerity of belief was a necessary component

13   to those cases -- to that case.

14            Let me further say, I do want to cite one passage

15   from Rasheed which I think we may be talking about today and I

16   think sort of draws into focus some of Justice Jackson's

17   concerns in Ballard.

18            In Rasheed, the Ninth Circuit said, of course, this

19   a 1981 decision, the Ninth Circuit said on Page, it's 847

20   bleeding on to 848 after describing the nature of the charges

21   against the defendants in that case, Rasheed and Phillips.  Of

22   course it was a criminal case for mail fraud.  The Ninth

23   Circuit went on to say that:  The First Amendment does not

24   protect fraudulent activity performed in the name of religion.

25            The court talks some about what the district judge

1    did there.  And then goes on to say:

2              To convict Rasheed and Phillips of mail fraud a

3    jury must have found that they knew of the falsity of their

4    statements pertaining to particular aspects of the Dare to Be

5    Rich program.

6              I think this is problematic for the reasons that

7    Justice Jackson talks about.  I think any examination into the

8    sincerity of a religious belief whether it's sincerely held in

9    the context of the fraud case presumes the falsity of the

10    belief in the first instance.  And as Justice Jackson says it

11    is unclear how you would untether the truth of the belief from

12    the sincerity of the person holding the belief.  I think it's

13    problematic.

14              So I don't think there's authority for the

15    proposition that sincerely held belief gets us outside of

16    Ballard, gets us away from Ballard.  But even if I was

17    inclined -- let me further add, the 10th Circuit in 1991 in

18    the Mosier case, that was a prisoner case, a RFRA case, made

19    the point, Judge Baldock did, on behalf of the circuit that --

20    let me read it.  I think this is important to get correct.  I

21    will admit, it's the not holding of the case, it's dicta, but

22    I think it's -- I think it's accurate.  I think it summarizes

23    the view of the 10th Circuit.  I'm reading from about Page, I

24    think it's 5 -- it's 1526.

25              Some asserted religious claims may be so bizarre,

1    so clearly nonreligious in motivation as not to be entitled to

2    protection under the Free Exercise Clause.  But apart from

3    that narrow category, courts carefully avoid inquiring into

4    the merits of particular religious beliefs in an effort to

5    gauge sincerity.  Scrutiny of the validity of particular

6    beliefs largely is beyond our judicial function because

7    religious beliefs need not be acceptable, logical, consistent

8    or comprehensible to others in order to merit First Amendment

9    protections.

10            It's the closest I can tell that the 10th Circuit

11   has come to addressing this question of sincerely held belief.

12   And I think the guidance from the circuit is, you can't ask.

13            I've mentioned Justice Jackson a couple times, and

14   let me share with you this passage because I'm persuaded by

15   it.  And again, I'm trying to let you know where the target

16   is.  About the sincerity of beliefs Justice Jackson said this

17   joined by Justice Frankfurter and Justice Roberts.  I'm

18   reading from Page 92 onto 93 of the Ballard decision.

19            I do not see how we can separate an issue as to

20   what is believed from considerations as to what is believable.

21   The most convincing proof that one believes his statement is

22   to show that they've been true in his experience.  Likewise,

23   that one knowingly falsified is best proved by showing that

24   what he said happened never did happen.  How can the

25   government prove these persons knew something to be false

1      which it cannot prove to be false?  If we try religious

2      sincerity severed from religious verity we isolate the dispute

3      from the very considerations which in common experience

4      provide its most reliable answer.

5              And that seems, that's pretty persuasive to me.

6      Beyond that, if we did accept the plaintiff's invitation here

7      to allow inquiry and interrogation into the sincerity of the

8      beliefs by the defendants, I can't in a million years

9      understand how that's a workable standard in a court of law.

10      I mean, how would we assess the sincerity of the belief held

11      by an organization.  And I know that Ms. Burningham cites some

12      cases talking about an organization having a belief.  But

13      let's talk about it here.  Would there be depositions of the

14      Prophet and the 12 Apostles and Quorum of the Seventy?  And

15      what if each person offered different and distinct answers to

16      questions about this.  And some of them say they don't know

17      whether these statements are true or false.  They take them on

18      faith or they believe some of it but not all of it or they

19      don't believe any of it?  They think it might be true or they

20      take it on faith.

21              And we'll get a whole gamut of responses to say

22      hypothetically, how then would we begin to invite a jury to

23      decide whether or not an organization -- oh, and I forgot.  At

24      what point in time did they sincerely hold the belief?  How

25      would we invite a jury to evaluate the sincerity of the belief

1    held by the Church at an undefined time in an undefined way?

2    I don't understand how that could work in practice.

3            The long and short of all that is I think that the

4    sincerely held belief examination is not one that I can

5    permissibly engage in here nor allow a jury to engage in.  I

6    don't think it's a way to escape Ballard.  I don't think it is

7    a way to avoid dismissal of the complaint.

8            The plaintiff also advances an argument.  It's not

9    a new argument.  It was advanced before, but it takes a

10   different form here with respect to the amended complaint.

11   Ms. Gaddy argues that in addition to express fraud all of her

12   claims save for the common law fraud claim can advance on the

13   theory of fraudulent omission.

14           But I think this runs directly into Ballard because

15   a fraudulent omission theory depends in the first instance on

16   the presumption that there's a falsity in the first instance,

17   something that requires further clarification, further

18   disclosure to place in context or to make a statement not

19   misleading or false, again, presumes the falsity of the

20   statement.  I think it would require the same examination

21   Ballard says we cannot make whether the statements are true or

22   false in the first instance.

23           There's a line of cases that Ms. Gaddy puts forward

24   and a line of argument about consent.  As I understand the

25   significance of consent, it's in Miss Gaddy's efforts to

1    invoke the ministerial exception and rely on the cases talking

2    about the ministerial exception.  But this just may be my own

3    limited, maybe I'm just not smart enough to understand it, but

4    I don't understand how the ministerial exception applies in

5    this case in any way, and I don't understand how consent then

6    is a question -- the relevance of that question for purposes

7    of this motion to dismiss.

8              And on that point I'll just note that Bryce was

9    made clear that the church autonomy doctrine, which is the one

10   that is primarily informing my view of the law is broader than

11   the ministerial exception.  So I don't think even if the

12   ministerial exception applied in one way it doesn't escape

13   Ballard.

14             The other difference I see here in the amended

15   complaint, material difference, is the treatment of tithing.

16   And as I see it, the plaintiff has changed her theory on

17   tithing at least somewhat.  We have the oral contract claim

18   which depends on the tithe, payment of the tithe as

19   consideration for some of the benefits that Ms. Gaddy sought

20   including access to the temple, temple marriage, temple

21   services and blessings and the like.  That claim, the oral

22   contract claim, strikes me as being squarely doctrinal.  The

23   concept of tithing, the justification, the purpose, the reason

24   for tithing is central to the religious beliefs of the

25   Mormon Church and many churches.  And I think it falls within

14

1    Ballard, as well.

2        The other place that tithing takes a different,

3    takes on a different role here, though, is in the racketeering

4    claim.  I understand the plaintiff to submit as a third

5    alternative basis for the racketeering claim statements by

6    Church officials and agents about the use of tithing that

7    Ms. Gaddy claims is false.  That strikes me as being outside

8    of the scope of Ballard.  At least on the papers I don't think

9    I'm persuaded by the Church's arguments that anything relating

10    to tithing is itself doctrinal in going to the origins, the

11    religious foundation of the Church or its beliefs.

12        And I think this is consistent with Justice

13    Jackson's view in his dissent, I think it's consistent with a

14    number of cases that just because you're a religion, I guess

15    I'm also thinking here of Rasheed, there are countless

16    examples --

17        And let me say for the benefit of those listening

18    we're here on a motion to dismiss under Rule 12.  And so for

19    purposes of this hearing, I'm directed to assume the truth of

20    all of the well pled factual allegations in the complaint.  So

21    what we're talking about here today are allegations.  They've

22    not been proven, and I've not assumed them to be proven.

23        But the allegation is the Church made material

24    misrepresentations about its use of tithing money after it had

25    been received and how it was or was not being used and that

1    that those statements were false.  And I think that seems

2    actionable.  That seems like an actionable theory against a

3    church.  I don't think that it falls within the amended --

4    excuse me -- the affirmative defense that the Church is

5    invoking here.

6         So let me summarize where I think that leaves us.

7    Let me give a preliminary ruling on the three miscellaneous

8    motions, and then let's hear from you, counsel.

9         If after hearing oral argument I held the same

10   views that I've just expressed in my preliminary comments I

11   think what that means at this point is that the plaintiffs and

12   I just part ways on the law as it would apply to the fraud

13   claims -- oh, and I think that as best I can tell those fraud

14   claims are at the heart of all the claims in the complaint

15   except the alternative RICO theory.  I think that the

16   consequence would be that all of the claims except the

17   racketeering claim fail and the racketeering claim would

18   survive only on that alternative theory relating to the use of

19   tithing for commercial enterprise related to the City Creek

20   Mall.

21        I have real questions about the adequacy of that

22   theory in view of this complaint.  I'll note that I'm not

23   making any rulings about that.  The parties haven't argued it,

24   and the defendants didn't raise it.  There's not a question

25   here, for example, about whether that claim is adequately

1    pled, could be supported, is actionable otherwise.  The only

2    argument advanced by the defendants on that claim and the rest

3    of the complaint is the church autonomy doctrine.

4          Because I would twice have dismissed the remaining

5    claims on the same theories or related theories, it seems to

6    me that we're probably at a point where I would not allow

7    further amendment of those claims, and then I don't know where

8    that would leave the plaintiffs or the defendants in what you,

9    how you wish to proceed.  I could imagine the plaintiffs

10   wanting to get on to the circuit to get an answer from a

11   different court or we could proceed here.  And I'm raising

12   this now outside the scope of what you've argued because I

13   want to try to serve the parties.

14         If that's where we land, it might be that the

15   plaintiffs would seek to replead the racketeering claim, and

16   that I would permit.  I raise this now because I could imagine

17   the defendants contemplating some other motion.  But if there

18   is another motion coming it should be directed at a complaint

19   that the plaintiff has had an opportunity to address in view

20   of our discussion today.

21         And that racketeering claim, this theory was not

22   the subject of our earlier hearing, so this would be the first

23   the plaintiff will have had the chance to hear the benefit at

24   least of my views.  And if there's -- if there is something

25   that can be corrected I think Rule 15 would require an

1    opportunity to do that.  But I will invite each of you before

2    we finish to help me understand where you think we're left, if

3    the ultimate rule is the one that I just shared with you.

4           And now I've already gone on for a long time.

5    Please bear with me for just a moment while I provide you an

6    oral ruling on the three miscellaneous motions.  I'll try to

7    be complete yet brief in my reasoning so you all have the

8    benefit of the record for this.  I'm not going to ask either

9    of you to prepare and submit a ruling or an order for me to

10   sign.  Our docket text -- our minute entry, rather, from this

11   hearing will refer to this portion of the transcript as the

12   Court's ruling on these motions and the basis for the ruling

13   on these motions.  They are these.

14          First, Ms. Gaddy's request for oral argument as to

15   defendant's pending motion to dismiss; second, Ms. Gaddy's

16   motion for leave to file additional exhibit to amended

17   complaint; and third, motion for judicial notice.  And I will

18   take each up in turn.  They are Docket Numbers 53, 57 and 59.

19          So first, the request for oral argument, Docket 53.

20   In this motion Ms. Gaddy makes two separate requests.  First,

21   she asks the Court to receive oral argument on defendant's

22   motion to dismiss her amended complaint.  And of course, we're

23   having that argument now.  The motion is granted in part with

24   respect to her request for oral argument.  Our local rule

25   provides that on request motions for oral argument will be

1    granted on good cause shown.  That's Rule 7-1(f).  There's

2    good cause.  We're having a hearing.

3            With respect to judicial notice, that's the second

4    request in her motion, she asks that I take judicial notice of

5    on five items.  I'm largely quoting here from her papers.

6            First, the absence of discussion concerning the

7    consent issue in my prior order; second, the absence of any

8    rebuttal to the consent issue arguments raised by the

9    plaintiff in the opposition briefs filed by the defendants;

10   third, the absence in all defense pleadings relating to both

11   motions to dismiss and any rebuttal to plaintiffs' arguments

12   regarding material omissions as not requiring adjudication to

13   the truth or falsity of a statement as it relates to a claim

14   of fraudulent concealment and fraud under RICO.  Again, I'm

15   largely quoting from the motion.

16           Fourth, the absence of rebuttal to plaintiffs'

17   argument that RICO does not require a fiduciary duty in order

18   for defendant to commit fraud through a scream or concealment

19   or even omission of material facts; and finally Number 5, the

20   lack of rebuttal to plaintiffs' argument that there is a

21   private right of action under the Utah Charitable

22   Solicitations Act.

23           I'll note that Rule 201 of the Federal Rules of

24   Evidence requires the Court to take judicial notice if a party

25   requests it and the court is supplied with the necessary

1      information.  This is Rule 201(c)(2).  The 10th Circuit has

2      explained that the rule governs only judicial notice of

3      adjudicative facts as opposed to legislative facts.  That's

4      explained in United States vs. Wolny, a 10th Circuit decision

5      from 1998.

6              The Court went on to explain:  Adjudicative facts

7      are simply the facts of a particular case, such as who did

8      what, where, when, how, and with what motive.

9              And actually, I'm sorry.  That is from the advisory

10     committee note to Subdivision A of Rule 201.

11             In contrast, the Court may not take judicial notice

12     of legislative facts, which are those relating to legal

13     reasoning and the lawmaking process whether in the formulation

14     of a legal principle or ruling by a judge or court or any

15     enactment of a legislative body.  That's Federal Rule 201,

16     Advisory Committee Notes to Subsection A.

17             The items in this motion that Gaddy seeks judicial

18     notice of are arguments and analysis or lack thereof.  They

19     are not in my judgment adjudicative facts, and for that reason

20     I deny Ms. Gaddy's request to the extent she moves the Court

21     to take judicial notice of those arguments.

22             Turning to Docket 57, Miss Gaddy's motion for leave

23     to file an additional exhibit to her amended complaint and

24     also some additional language, Ms. Gaddy moves under

25     Rule 15(d) of the Federal Rules of Civil Procedure for leave

1    to file those materials.  The Church does not oppose the

2    motion.  I think it's well taken.  There's good cause.  That

3    motion is granted.

4              If their complaint survives this motion to dismiss,

5    Ms. Burningham, I'll ask you to submit a revised amended

6    complaint with the additional exhibit and the additional

7    language.

8              MS. BURNINGHAM:  Thank you, Your Honor.

9              THE COURT:  Thank you.  For purposes of our

10   argument today I'll assume that's part of the complaint.

11             The third and final motion that we'll resolve

12   before hearing argument on the motion to dismiss is Docket 59,

13   Miss Gaddy's motion for judicial notice.  Here she asks that

14   the court take judicial notice of three items, quote,

15   contained within the Church's official newsroom report or on

16   the online version of the Joseph Smith papers, end quote.

17             The three items that she asks me to take notice of

18   are these, first, quote:  On August 4, 2015, defendant

19   published a never-before-seen photo of an opaque brown stone

20   which it claimed was used by Joseph Smith to translate the

21   Book of Mormon, end quote.  Second, quote:  Eye witnesses

22   claim that when Smith used the stone he placed it in a hat to

23   exclude exterior light, end quote.  Third and finally, that,

24   quote:  The brown stone has been in defendant's custody since

25   the Mormon pioneers crossed the plains in the mid

1    19th Century, end quote.

2            Again, turning to the rules that govern this,

3    Federal Rule of Evidence 201:  The court may take judicial

4    notice of an adjudicative fact only when the fact, quote, is

5    not subject to reasonable dispute because it, number one, is

6    generally known within the trial court's territorial

7    jurisdiction; or number two, can be accurately and readily

8    determined from sources whose accuracy cannot reasonably be

9    questioned, end quote.  That's language from Rule 201

10   Subpart B.

11           And as the 10th Circuit explained in O'Toole vs.

12   Northrop Grumman Corporation, quote:  In order for a fact to

13   be judicially noticed in disputability is a prerequisite, end

14   quote.

15           The Court went on to explain, the 10th Circuit did,

16   in the Estate of Locket by and through Lockett, a 2016

17   decision, that:  Care must be taken at the requisite notoriety

18   exists.  Every reasonable doubt upon the subject should be

19   resolved promptly in the negative, end quote.

20           This court will not take judicial notice of the

21   facts relating to the stone found on the Church's official

22   newsroom report or an online version of the Joseph Smith

23   Papers because at least in this court's judgment and in the

24   language of the Lockett this is not the appropriate setting

25   for judicial notice.

1          As the court in Lockett said:  Judicial notice is

2     proper when a fact is beyond debate, for instance, what time

3     the sun sets on a given day.  When courts have taken judicial

4     notice of contents of news articles they've done so for proof

5     of something that is publicly known, not for the truth of the

6     articles other assertions.  That's a quote as I said from

7     Lockett.  That's at Page 1111.

8          Here Miss Gaddy asks the court to accept as true

9     the contents of the Church's documents as it relates to the

10    stone, and I decline to do so.

11         So for those reasons Ms. Gaddy's request for oral

12    argument, Docket 53, is granted in part and denied in part.

13    Her motion for leave to file additional exhibit to amended

14    complaint, Docket 57, is granted.  Her motion for judicial

15    notice, Docket 59, is denied.

16         Let me ask if either of you wish to make a record

17    about those rulings before we turn to the motion to dismiss.

18         MS. BURNINGHAM:  Your Honor, I would only as to the

19    motion for judicial notice.  I believe that -- if you'll allow

20    me to do that?

21         THE COURT:  Please.

22         MS. BURNINGHAM:  Okay.  In the reply, and I believe

23    there was a little bit of a misunderstanding, if I may just

24    make my record.  We were not asking for, and there was some

25    confusion in the body of the request.  In the actual motion

1    it was not confusing.  This is verbatim what we wanted that:

2    On August 4, 2015, defendant published a, quote,

3    never-before-seen, unquote, photo of an opaque brown stone

4    which they claimed was used by Joseph Smith to translate the

5    Book of Mormon.  Attached is an accurate picture of the brown

6    stone, unquote.

7         We just offer that to show that the event took

8    place and not for the truth of the matter, but only that that

9    was when that happened and it was a never-before-seen event.

10   And also the same with eye witnesses, that those were noted.

11   And lastly, that the brown stone, this is where we amended it,

12   the brown stone has been in defendant's custody before the

13   death of Zina DH Young, one of Brigham Young's wife, on

14   August 28, 1901.

15        The deaths of Brigham Young and his wife Zina are a

16   matter of public record.  The defendant in its own literature,

17   yes, it is on the Internet, but it is the same as an admission

18   on the Internet, says that the stone has been in its custody

19   when it was transferred after Brigham Young died to -- but

20   before Ms. Young who donated it, she donated it.  And so just

21   by calculation by their respective deaths we could figure out

22   how long defendant has had that stone in its custody and

23   control.  And to me that is just -- that's the same as taking

24   notice of an element act when the sun set and the sun rose.

25   But that's my record, Your Honor.  Thank you.

1              THE COURT:  Thank you, Miss Burningham.

2              All right.  Why don't we turn to the motion to

3       dismiss.  It is the defendant's motion, but my preliminary

4       comments are not friendly to the plaintiffs' arguments and

5       position, so I think it probably makes most sense to begin

6       with the plaintiff.

7              Miss Burningham, this is the time for your

8       argument.  We'll hear any issues you wish to take up.  I just

9       shared as I said those preliminary views in the event that

10      they were helpful in framing your argument.  Go ahead, please.

11             MS. BURNINGHAM:  Thank you, Your Honor.  One

12      minute.  I've made notes about your tentative ruling, and I

13      think I'll take them in reverse order.

14             Skipping for a moment the tithing argument,

15      sub-argument in the RICO claim, I'd like to go to the material

16      omission.  I believe Your Honor stated a fraudulent omission

17      that you were not convinced that that was sufficiently

18      different enough from our other common law claims that would

19      allow us to survive in our RICO case.

20             And, Your Honor, just to clarify, our RICO claim is

21      claim number, the sixth cause of action.  The fifth one is

22      violation of the Utah Charitable Solicitations Act.  And both

23      of those statutory schemes, both RICO, which as you know is a

24      federal statute, and Utah Charitable Solicitations Act, which

25      is a state law, they deal with material omissions, not

1        fraudulent omissions.  And the importance there is that the

2        standard is not what is a reasonable church member or a leader

3        to do, but it's a standard of a reasonable person.  What would

4        a person that listens to this pitch, for lack of a better

5        word, to the preaching, to the solicitation, what would they

6        want to know before donating tithing or donating to a certain

7        church?  That is a reasonable standard.  That is outside the

8        purview in my opinion of the Church Autonomy Doctrine.

9                Now I'd like to read from Grace, which is -- excuse

10       me -- Grace citing Smith.  As you know, Your Honor, in the

11       1990s, there was a case called Employment Division vs. Smith

12       where it's a Supreme Court case.  And the plaintiff was denied

13       certain city benefits, I believe it was either workers' comp

14       or unemployment, because he violated the local law by smoking

15       marijuana.

16               And the court in Smith came up with a enough

17       standard that -- well, actually they clarified the long

18       history of church and state law on this issue.  And they said

19       that, and this is quoted in the 10th Circuit, re-quoted, and I

20       would like to read this for the record.

21               While the First Amendment provides absolute

22       protection to religious thoughts and beliefs the Free Exercise

23       Clause did not prohibit congress and local governments from

24       validly regulating religious conduct.

25               That's the distinction.  Preaching is conduct in my

1    mind.  Again, I know you addressed that and I respect your

2    opinion.  When you go out you preach.  You tell others who may

3    not know anything about your religion what it is you believe,

4    what it is your church is about, and that includes its history

5    often.  So this is different than just the beliefs that you

6    hold as an individual in your heart or that you share amongst

7    yourselves.  I see the difference there.

8              Grace cited Reynolds:  Neutral rules of general

9    applicability normally do not raise free exercise concerns

10   even if they incidentally burden a particular religious

11   practice.

12             And they cite Smith once again.  The Free Exercise

13   Clause does not relieve an individual of the obligation to

14   comply with the valid and neutral law of general applicability

15   on the ground that the law proscribes or prescribes conduct

16   that his religion prescribes or proscribes.  That means if a

17   law is both neutral and generally applicable it need only be

18   rationally related to legitimate governmental interest to

19   survive a constitutional challenge.  10th Circuit case of

20   United States vs. Hardman.

21             On the other hand, if the law burdens a religious

22   practice and is not neutral, then it's subject to strict

23   scrutiny.

24             And then the final phrase that's applicable is:  A

25   law is neutral so long as its object is something other than

1    infringement or restriction from religious practices.

2            Your Honor, respectfully both statutes, the RICO

3    statute and Utah statute, on charitable solicitations are

4    neutral laws.  They're general laws.  They're not targeting

5    the Mormon church or any church, and they should be applied

6    and served by the Church of Jesus Christ of Latter-Day Saints,

7    rather the President of the Corporation of the Church of Jesus

8    Christ of Latter-Day Saints.

9            Now segueing into those two causes of action I'd

10   like to address them.

11           THE COURT:  Excuse --

12           MS. BURNINGHAM:  RICO does not require adjudication

13   of the truth or falsity of a religious belief.  The

14   10th Circuit has specific jury instructions on RICO, and

15   those, if you'll indulge me, I'll just read the key

16   instructions there.  And this is not RICO, but the predicate

17   acts of wire fraud and mail fraud, which are what we have pled

18   as predicate acts for our civil RICO claim.

19           The key portion of the 10th Circuit jury

20   instruction on this is, quote:  A scheme to defraud is conduct

21   intended to or reasonably calculated to deceive persons of

22   ordinary prudence or comprehension.  A scheme to defraud

23   includes a scheme to provide another of money, property or

24   intangible services.  An intent to defraud means an intent to

25   deceive or cheat someone.  A representation is false if it is

1    known to be untrue or is made with reckless indifference as to

2    its truth or falsity.  And here's the key language.

3              A representation would also be false when it

4    constitutes a half truth or effectively omits or conceals a

5    material fact provided it is made with intent to defraud.  A

6    false statement is material, and it goes on to describe

7    materiality and causation.

8              There is no duty required for wire fraud and mail

9    fraud violations which again are predicate acts.

10             THE COURT:  Ms. Burningham?

11             MS. BURNINGHAM:  Yes.

12             THE COURT:  I wonder if you and I are just speaking

13    past each other on this point.

14             MS. BURNINGHAM:  Okay.

15             THE COURT:  I think with respect to your statement

16    of the law about the requirement of compliance with neutral

17    laws of general applicability, I think that's a fair and

18    accurate statement of the law.  I understand the Church

19    Autonomy Doctrine from Ballard and its progeny to be an

20    affirmative defense.  I mean, the 10th Circuit, the way as

21    best I understand it, the 10th Circuit has said it's a

22    affirmative defense akin to qualified immunity incumbent on

23    the defendant invoking the defense to show its application.

24             Can't both things be true?  That is, that churches

25    are required to comply with legal scheme with the laws enacted

1    by congress under different levels of review, strict scrutiny

2    or rational review, but also be true that Ballard and the

3    Church Autonomy Doctrine prohibit the court from applying at

4    least those provisions or those statutes that would require an

5    investigation into the truth or falsity of religious beliefs?

6    Isn't that -- you agree that Ballard is still valid law.  It's

7    not been overruled.

8         MS. BURNINGHAM:  I believe that Ballard is valid

9    law.  But cases involving material omissions do not require

10   adjudication of the truth or falsity of religious beliefs.

11        THE COURT:  So that was my first question for you.

12   Looking at the Utah Charitable Solicitations Act and also

13   thinking about what you said about the material facts,

14   disclosure of material facts in RICO, isn't your theory as

15   I've understood from your complaint, you think that there are

16   certain facts that are material that must be disclosed because

17   other facts, other statements that you attribute to the Church

18   you think are false or misleading unless they provide the

19   additional facts that you think they need to supply?  Isn't

20   that what makes those facts material in your theory?

21        MS. BURNINGHAM:  No, I don't think so.  I mean, I

22   can see how you characterize it that way.  But if you'll let

23   me explain, I think if we have as we do in this case the key

24   representation or one of three that we've argued since the

25   original complaint is that there is a misrepresentation as to

1    the process that was used in coming up with the Book of Mormon

2    and creating the Book of Mormon as Mr. Jordan used in one of

3    his pleadings.  Depicted in the montage of the gold plates as

4    we've shown and through the 70s, 80s, 90s up until 2012 or

5    even later are pictures of Joseph Smith looking directly at

6    the Gold Plates and translating them in the ordinary sense of

7    the word just as you would translate the Dead Seas Scrolls or

8    through a Urim and Thummim described as glasses to a

9    breastplate.  There has never been a depiction of Joseph Smith

10   looking at a brown stone in a hat.

11            And I think a person who was a potential convert to

12   the Mormon Church, a reasonable person would want to know that

13   the actual process or that the process that they have evidence

14   of is that he used a brown stone.  And they've had the stone

15   in their vault for over 100 years.  And that's reasonable

16   thing to know when you're deciding whether or not you're going

17   to believe that Joseph Smith is a prophet.  You want to know

18   the process by which the main scripture the Book of Mormon

19   came about.

20            THE COURT:  That statement, that argument you just

21   advanced, isn't it dependent on --

22            MS. BURNINGHAM:  Isn't it what?  I'm sorry.

23            THE COURT:  Isn't your argument that you just

24   advanced dependent on your assumption that some of the

25   statements made by the Church are either true or false?  I

31

1    mean, you have made a judgment in your argument that I just

2    heard about what actually happened in your view.  And you

3    think that fact needs to be supplied because if it's not

4    anything else that the Church has said about it is false or

5    misleading.  But it presumes the truth -- it presumes the

6    answer of the question, doesn't it?

7              MS. BURNINGHAM:  Well, I see what you're saying,

8    Your Honor.  But I think you can ask -- you can ask somebody,

9    would you want to know the vehicle that was used in creating

10   the Book of Mormon?  If there was a brown seer stone, the same

11   one that Joseph Smith used to try to find buried treasure that

12   he found in the well of a neighbor, I mean, I don't think you

13   have to get to the truth or falsity.  I think you can just go

14   to that, and you don't need to do that.

15             And if I can use -- I would like to show the stone

16   now since the judicial notice motion was denied.  This is a

17   picture of the seer stone.  And this brown opaque stone is

18   what was first published in August 2015.  And it was never

19   seen before by any Mormon.  It was kept in a vault, and it was

20   hidden.  And instead, correlation, and this goes back to your,

21   how do we adjudicate sincerity of different leaders of the

22   church.  We don't have to do that.  What we have to do is

23   realize, and this has been pled in the complaint or the

24   amended complaint and the complaint, that the 15, the

25   brethren, that is the First Presidency and the 12 Apostles,

1    they have the final word in Correlation.  What happens is that

2    somebody will write, this is the lesson manual for Sunday

3    School, or, this is what I'm going to say in a speech, or,

4    these are the pictures we're going to use for this ward, and

5    Correlation has to remove those.  Correlation is the alterego

6    of the Church, of the Church leaders.  They speak as one.

7    They believe as one.  And for centuries -- not for centuries,

8    for decades since at least the early 1960s when Correlation

9    was formed as a department they have made a choice to, and

10   there's all sorts of evidence for this, to omit the bad parts

11   about Church history and just paint a rosy picture.

12            In fact, Correlation, this came out in Gregory

13   Prince's biography about Leonard Arrington, who was you know a

14   church history for a while, quote:  With some amazement

15   Leonard recorded that the editors first used their own

16   judgment regarding what to publish --

17            This is speaking of Correlation and what things to

18   publish that are correlated material.

19            -- but then submitted it to managing director Doyle

20   Green to check.  He in turn worked through Correlation

21   committee review.  If a disagreement then emerged the proposed

22   publication went to the Quorum of Twelve where Thomas Monson,

23   Gordon Hinckley and Boyd Packer made the ultimate decisions.

24   There were subjects the editors were not allowed to broach,

25   end quote.

1              This process is the same today.  The three members

2    of the First Presidency of the Church of Jesus Christ of

3    Latter-Day Saints, President Russell Nelson, Dallin Oaks I

4    believe is the first counselor and Mr. Eyring, Henry Eyring is

5    the second.  They've all been serving in leadership capacities

6    since the mid 80s and have all been involved in Correlation in

7    deciding what version we teach to the members, we teach our

8    missionaries to in turn teach the converts.

9              And unfortunately what has been taught is a half

10   truth, it's a partial truth.  And the law we talked about in

11   the past complaint, and I don't mean to bring this up, I don't

12   mean to be disrespectful, but a partial truth, and this I

13   believe is the law in Utah, a duty arises to tell the whole

14   truth if a partial truth is misleading.

15             And that is in Am Jur.  We have that.  And that's

16   been in the jury instructions for Utah.  And I know that's not

17   law, but for as long as I've been admitted to the Bar, which

18   is the mid 1980s, the jury instruction has been that if the

19   defendant made a statement then it had a duty to tell the

20   truth about the matter, to make a fair disclosure and to

21   prevent a partial statement from being misleading or giving a

22   false impression.

23             This is the epitome of what the Church has done.

24   And I don't think Ballard protects them, and I'll tell you

25   why.

1              The Mormon Church has a sincere belief in honesty.

2    They teach their members to be honest.  And honesty as defined

3    by the Mormon Church in its 13th Article of Faith is, quote:

4    We believe in being honest, that's only partial, true,

5    benevolent, et cetera, et cetera.  Quote:  There are many

6    other forms of lying the teach.  When we speak untruths we are

7    guilty of lying.  We can also intentionally deceive others by

8    a gesture or a look, by silence or by telling only part of the

9    truth, which is what they've done.  Whenever we lead people in

10   any way to believe something that is not true we are not being

11   honest.

12             And that's from the LDS Manual of Gospel Principles

13   Chapter 31 on honesty.  More recently, of course this is 1982.

14   Marvin J. Ashton, elder, I believe, general authority.  Quote:

15   A lie is any communication given to another with intent to

16   deceive, unquote.

17             Now we submitted a case, I'm sure you're familiar

18   with this case, US vs. Jeffs, Lyle Jeffs.  It was before

19   Judge Stewart.  And the question there was whether or not

20   Mr. Jeffs could use his sincere belief or whether it was

21   sincere in the doctrine of -- I'm thinking -- the United

22   Order, whatever that doctrine is.  I've lost the word.  The

23   doctrine where you put everything together.

24             Pardon?  Yep.  Consecration, there we go.  Okay.

25             The Court -- there's a law about how you use food

1    stamps for everybody listening who's not familiar with it, and

2    I'm sure you are, Your Honor.  But there's a law how you use

3    food stamps.  And the FLDS Church, which is a fundamentalist

4    sect, which is not the church that we're involved with, the

5    corporation of the mainstream LDS Church, but the FLDS Church,

6    their members were getting foot stamps including their

7    leaders, and they were in turn donating either the food or, I

8    don't recall the exact facts, but they were donating it into a

9    bishop's warehouse or consecrating it so everybody could use

10   the proceeds of food stamps.

11              Well, Judge Stewart examined that and found that

12   most of the members did believe in the law of consecration,

13   but Lyle Jeffs didn't believe it because he had special

14   privileges.  He didn't abide by it.  So for him to raise a

15   sincerely, have a belief in consecration that was an issue of

16   fact, so the motion to dismiss was not granted for them

17   because that was an issue of fact.

18              In the case we have here with Laura Gaddy, free

19   agency is an LDS doctrine.  If you remember, and I don't know

20   your background, of course, but Mormons are taught that in the

21   preexistence there was a war in heaven and that Jesus Christ

22   and Lucifer were brothers.  And that one plan was proposed by

23   Lucifer, and it was essentially that, I'll go down and I'll

24   force or I'll make the humans do everything that you want them

25   to do; and the other plan was Christ's plan where he said, I

1    will leave it up to them.  I will give them freedom and free

2    agency of free choice.  And a third of the host of heaven went

3    with Lucifer who became known as the devil, and he wanted to

4    manipulate the free agency of the spirit children.  But then

5    Christ had the two thirds.

6           And free agency has been taught every decade

7    including this most recent one.  It started in 1971, Elder G.

8    Smith:  They gave up their right and claims free agency.  They

9    didn't learn the full consequences of that decision.  They

10   lost their right to choose, the right to make their own

11   decisions, speaking of the war in heaven and what happened.

12          Go down to 1987 with James E. Faust.  I was

13   roommates with his daughter.  He was a great guy.  Sorry.

14          The devil came before Christ and proposed to God,

15   the Father, behold here I am.  Send me.  I will redeem all

16   mankind.  Not one soul shall be lost.  This he proposed to do

17   by force destroying the free agency of man.  Free agency given

18   us through the plan of our Father is the great alternative to

19   Satan's plan of force.

20          1987, Dallin Oaks.  Free agency, the power to

21   choose and direct our thoughts and actions is a gift of God,

22   and we should resist any means that would compromise it.

23          2006, Wolfgang H. Paul, Second Quorum of the

24   Seventy.  Quote:  Every intelligent being must have the power

25   of choice.

1          The problem, Your Honor, is that the Church teaches

2     their members one thing, honesty and free agency, and they do

3     the exact opposite.  They manipulate the members by telling

4     partial truth, half truths, not disclosing things that a

5     reasonable person would want to know about their history, and

6     they force them basically to do what they think is right

7     without giving them a choice.

8          Thus, the Church does not have a sincere belief in

9     what they are doing in the manner that they preach, because

10    Correlation as a unit with one belief in that we need to --

11    you know, we need to, and I don't think it's -- I think there

12    is an intent to deceive.  I'm not assigning a moral component

13    to this.  They do intend to manipulate and deceive the

14    members.  I think they feel that it's for their own good, but

15    that does not excuse them.  And if they don't have a sincere

16    religious belief in doing that, and even Dallin Oakes has

17    said, we don't believe in lying to the Lord.  If they don't do

18    that but if their beliefs are the opposite or 180, I think

19    that puts them outside Ballard, and I don't think that Ballard

20    protects them in that type of scenario.

21          Unless you have a question I'll go on to something

22    else.

23          THE COURT:  Well, I think you've meant to include

24    in that portion of your argument the discussion about a

25    sincerely held belief.  Is the truth static in your mind?  Is

1    the formation of the belief static, or is it subject to

2    evolution temporally and by subject?  And how do we test it?

3    How would you propose that a jury would evaluate the sincerity

4    of the belief of the Church?

5         MS. BURNINGHAM:  Well, certainly I don't believe

6    truth is static.  And I think certain things -- an open-minded

7    person is open to all things.  But if the Church has had in

8    their vault for over 100 years the brown seer stone and has

9    never -- virtually never mentioned it, never displayed it,

10    never depicted it, in its missionary manuals, in its -- all of

11    its teachings, all of its correlated materials, it teaches

12    that Joseph Smith translated the Book of Mormon directly from

13    Gold Plates.  That's a manipulation.  And I don't think -- I

14    think, and this may help explain this.

15         If you bring up the elements of fraud, we've all

16    been taught that the elements of fraud, the first one is that

17    a statement was false.  And I'll just look at those for a

18    minute.  But that's just the order that we learn in law

19    school.  We don't necessarily have to try a case in that

20    manner.

21         So the usual elements of fraud, and I've broken one

22    up, but these are essentially the elements of fraud.  One, the

23    defendant made a statement about an important fact.  The

24    statement was false.  It made the statement knowing it was

25    false, or it made it recklessly without record of its truth.

1          Okay.  I'm just talking about the first three

2    elements, not reliance and damages.  Let's change the order.

3    Let's go down.

4          The Corporation of the President of the LDS Church

5    made a statement about an important fact, and it made a

6    statement without a sincere belief in it or made it recklessly

7    and without regard for its truth.

8          You can put that to a jury without getting to the

9    fact that the statement it made was, in fact, false.  That can

10   be after.  This can be bifurcated.  You can ask them to decide

11   whether or not they had a sincere belief in it.  They can be

12   shown certain things that happened and that they did.  We're

13   not asking you, ladies and gentlemen of the jury, to decide

14   how the Book of Mormon was really created.  We're only asking

15   you given the fact that the Church had this stone in their

16   vault for 100 years and never depicted it, do you think that

17   they sincerely believe that the way the Book of Mormon was

18   translated is the way they depicted it for decades and decades

19   directly from the Gold Plates?

20         Those are two separate questions.  And I really

21   think that's the way that can be done, especially when

22   sincerity is at issue.  I don't know if I answered your

23   question.

24         THE COURT:  If we accept your invitation to have a

25   jury weigh in on the sincerity of the belief of the Church at

40

1    whatever time --

2                MS. BURNINGHAM:  I'm sorry.  I didn't hear that

3    last phrase.  The belief in the Church what?

4                THE COURT:  At whatever time, at some point in

5    time --

6                MS. BURNINGHAM:  Okay.

7                THE COURT:  -- maybe when the statement is made,

8    how do we avoid what seems to me to be the principle that

9    motivated the rule in Ballard?  In Ballard the Supreme Court

10   said -- now I'm just reading from my own previous order.  This

11   is Page 8.  But this is the quote.  I think this is the

12   concept that gives rise to the Church Autonomy Doctrine, and

13   it seems to me your invitation invites the same concerns.  The

14   Supreme Court said:

15               Men may believe what they cannot prove.  They may

16   not be put to proof of their religious doctrines or beliefs.

17   Many take their gospel from the New Testament, but it would

18   hardly be supposed they could be tried before the jury,

19   charged with the duty of determining whether those teachings

20   contained false representations.  The miracles of the New

21   Testament, the divinity of Christ, life after death, the power

22   of prayer are deep in the religious convictions of many.  If

23   one could be sent to jail, and I'll just add or bankrupt,

24   because a jury in a hostile environment found those teachings

25   false, or I'll add, or concluded they weren't sincerely held,

1    little indeed would be left of religious freedom.  The

2    religious views espoused by respondents might seem incredible

3    if not preposterous to most people, but if those doctrines are

4    subject to trial before a jury charged with finding their

5    truth or falsity then the same can be done with the religious

6    beliefs of any sect.  When the triers of fact undertake that

7    task they enter a forbidden domain.

8         My question is, isn't the same harm occasioned upon

9    a church if we invite a jury, a potentially hostile jury, to

10    draw a conclusion about something that can't be proven and

11    risk imprisonment or judgment?

12         MS. BURNINGHAM:  Well, first of all, Your Honor,

13    this is not a hostile jury.  This would not be hostile.  You

14    can expect, I sure you know this, that there would be many

15    Mormon in the venire panel.

16         But regardless of that, sincerity is adjudicated in

17    RFRA cases all the time.  And in this case I see it as a

18    matter of credibility and the credibility of the combined

19    correlated position or belief versus, and this comes back to

20    the factors of belief distinction, and I know you don't want

21    to revisit that and I understand that.  But belief in

22    doctrine, certainly a civil court cannot adjudicate whether

23    blood atonement or what polygamy, celestial marriage -- excuse

24    me -- is an appropriate doctrine, whether baptism for the dead

25    is appropriate.  No, they can't adjudicate that.  But the

1    Supreme Court recently said in Omni care, the state of mind of
2    a person is something that can be adjudicated.  That is at
3    fact that is capable of misrepresentation.

4             The fact that the Church spun this story, and
5    that's not really up for debate.  But, you know, you have to
6    accept my allegations as true for purposes of the motion.  But
7    the fact that they only told part of the story or part of what
8    occurred or what they had access to as part of the artifacts,
9    that is a misrepresentation of fact in and of itself.  And, I
10   don't know.  I just don't see that it would be that difficult.

11            Now, I've tried, you know, a dozen or more cases,
12   well, almost two dozens cases, but, of course, Your Honor, I
13   defer to you.  It would be difficult, but a case comes to mind
14   where it says that, and I can't remember the exact language,
15   but these kinds of issues are very difficult.  And sometimes
16   there's a fine line that you need to walk, and it needs to be
17   walked, because otherwise if we take this to the extreme this
18   is why we have affinity fraud.  This is why Utah is the
19   largest, the most, the worst case in the nation for affinity
20   fraud, meaning that good members of the Mormon Church and
21   leaders of the Mormon Church, bishops and other people,
22   seminary teachers, the list goes on and on and I'm sure your
23   familiar with them, but they're able to entice or to garner
24   investments into whatever scheme they have because they're a
25   good Mormon.  And Utah outweighs by more than twice Florida,

43

1    which is the next closest state.

2              And the problem is it's not that hard from what

3    we're doing now.  Mormons, there's two separate groups of

4    Mormon.  There's the average lay Mormon, and then there are

5    the lay leaders that work in conjunction with the corporation

6    leaders.  And they're very different.  And they have different

7    goals, and some of them overlap, yes.  But they are

8    manipulated.  The average Mormon person is manipulated by the

9    defendant.

10             And even what Mark Pugs ley said in that chart on

11   how Utah is the largest or has the most cases of affinity

12   fraud, he says it's because there is, the people of Utah are

13   simply too trusting.  When you teach -- when you teach these

14   people to be honest, to be sincere, to have free agency that

15   even a look can be a lie and that you need to not omit

16   material information or tell partial truths they think that

17   the leaders do the same thing.  So they trust the leaders, and

18   they trust the people who are good Mormons and they invest.

19             And this is what leads to all the damage that we

20   have referenced in the faith crises report.  People that do

21   that and people that get involved in Mormonism they have

22   cognitive dissonance.  And they can't justify when they learn

23   all these facts that are true that they find out about what

24   the church has hidden from them for years, hidden from them,

25   they can't reconcile the two different teachings and reality

1     in their mind, and they become very depressed.

2                  And, in fact, the Church at this very moment is

3     negotiating with building mental health centers along the

4     Wasatch Front.  They recognized this is a problem, and this is

5     a problem that they created.  This kind of thing will not be

6     abated, and it needs to stop.  And the Church needs to own up

7     to what it has done.  And if it doesn't sincerely believe as

8     an affirmative defense, back to your question, this is an

9     affirmative defense.

10                 The Church did not identify in the motion to

11    dismiss what exactly they were protecting.  Now, if it's

12    preaching, which I'm just presuming, that's the same as in the

13    Jeffs case, the Lyle Jeffs.  The Court in US vs. Jeffs made

14    this really good observation, and I'd like to read that.  And

15    they're talking about, he's talking about burden.  And the law

16    as you know is that unless it's a substantial burden to the

17    free exercise, a small or minimal burden is not enough to keep

18    defendant from having to comply with the general law.  And

19    again, which would be RICO and the Utah Charitable

20    Solicitations Act.

21                 This is what the Court said in Jeffs:  The same

22    cannot be said here -- meaning referring to infringing upon a

23    free exercise right of the defendant.  The defendants are not

24    prevented from teaching the law of consecration.

25                 Defendants here in Gaddy are not prevented from

1    teaching that Joseph Smith created the Book of Mormon.  He was

2    inspired by God, and God inquired him to create it.  They can

3    teach that.  They just can't teach something that -- they just

4    can't omit talking about the brown stone.  If the brown stone

5    was used they need to disclose it because a reasonable

6    potential convert would want to know that.  Continuing on in

7    the Jeffs case.

8            The defendants retain the right and ability to

9    teach.  Those who have ability to do so with specific

10   reference to SNAP, that's the food stamp law, benefits may be

11   somewhat limited.  But it is one thing to curtail various ways

12   of expressing belief for which alternative ways of expressing

13   belief may be found; it is another thing to require a believer

14   to defile himself -- this is speaking about another case where

15   a prisoner had a choice to eat I think it was pork which is

16   determined to be defiling yourself in his religion.

17           So what we are doing is at most the SNAP statutes,

18   the food stamp statutes and regulations curtail various ways

19   in which the defendants can express their beliefs leading open

20   other methods of expressing those beliefs.  Thus, defendants

21   have not shown that they're sincerely held religious beliefs

22   related to teaching the law of consecration are substantially

23   burdened by the SNAP statutes and regulations.

24           This is something that the defense has pointed out.

25   They don't seem to think we have to go through the burden

1    analysis or the free exercise analysis.  They seem to think

2    that the Church Autonomy Doctrine just protects them like a

3    shield over all of this.  I don't believe that that's the way

4    that the law should be interpreted or is interpreted.  And I

5    think they have to show that there's a sincerely held

6    religious belief that will be substantially burdened.  And

7    even then I don't think that's the standard.  Let me strike

8    that for a moment.

9           I think the standard is if it's a general and valid

10   law of general applicability then they have to comply.  The

11   only out for them, the only way of noncomplying is to show

12   that it would just be against their religion to tell the

13   truth, to tell the whole truth and nothing but the truth, to

14   reveal these things that they have hidden.  Is that against

15   their religion?  No, because they believe in being honest, and

16   they believe in free agency.  They can't do that.  It does not

17   make sense for them.

18          THE COURT:  Have you shared with me,

19   Miss Burningham, everything you wanted to say about how we

20   would apply your sincerely held belief standard in this case?

21          MS. BURNINGHAM:  Let me think for one moment, Your

22   Honor.

23          THE COURT:  Of course.  And let me be clear.  I'm

24   asking, if I adopted your approach, have you answered my

25   question about how it would work?

1          MS. BURNINGHAM:  Have I answered your question

2    about how it would work?

3          THE COURT:  Have you told me what you wanted to?

4          MS. BURNINGHAM:  I see what you're saying.  I

5    envision -- let me make it more pointed and clear.  I envision

6    you would have a group of jurors, and we would be able to

7    submit -- I could take the depositions of half a dozen people

8    as representatives of the first presidency and Correlation,

9    and we would just ask about certain things.  And we would have

10   a limiting instruction to the jury telling them that you

11   can't -- you can't determine whether or not the stone was, in

12   fact, used to create the Book of Mormon, but you can only

13   determine whether it was an important part that somebody would

14   want to know, that a reasonable person would want to know, and

15   that Correlation who is the alterego of the defendant, that

16   Correlation was sincere in its belief in not teaching that the

17   stone was used given the fact that it had it in the vault for

18   years, and given the fact that the Church teaches that honesty

19   and free agency are important principles that everyone should

20   abide by.

21         THE COURT:  With respect to your theory, it's your

22   Subpart C theory in your racketeering claim, your Fifth Claim,

23   that the Church made misrepresentations about how its tithing

24   was going to be used or was being used --

25         MS. BURNINGHAM:  Yes, Your Honor.

```
 1                    THE COURT:  -- that theory is expressly invoked
 2      only in support of your Fifth Cause of action; is that right?
 3                    MS. BURNINGHAM:  Yes, Your Honor -- well, no.  I
 4      actually plead it all the way through as -- you know, frankly
 5      I'd have to look at the amended complaint.  I can't recall off
 6      the top of my head.  It is in the Fifth, the RICO claim.  And
 7      I believe it's also in the Utah statute for charitable
 8      solicitations, but I have to look.
 9                    THE COURT:  I didn't see it there.
10                    MS. BURNINGHAM:  Okay.
11                    THE COURT:  Maybe while Mr. Jordan is speaking or
12      we'll take a brief break --
13                    MS. BURNINGHAM:  I'm sorry.  I'm having a bit of a
14      problem.
15                    THE COURT:  I'm sorry.  I'm trying to speak up.
16      Maybe when Mr. Jordan is speaking, or we'll take a break in a
17      moment.  We've been going for about an hour and a half.
18                    MS. BURNINGHAM:  Okay.
19                    THE COURT:  Maybe you can look and you can let me
20      know if you think you made expressed reference to that theory
21      in support of any of your other causes of action besides the
22      RICO action.
23                    Before we break then, Ms. Burningham, have we touch
24      on all the subjects you wanted to address in your argument?
25                    MS. BURNINGHAM:  No.  I do have a few more, Your
```

```
 1    Honor.  And while we're at the tithing -- on the point of the
 2    tithing sub-argument under RICO Fifth Cause of action -- or
 3    the Sixth Cause of action, rather, if I can address that?
 4              THE COURT:  Thank you.
 5              MS. BURNINGHAM:  Thank you.  Yes.  The tithing
 6    slips, and I may be repeating myself.  But they're printed by
 7    the Church, and they give specific areas that the tithing will
 8    be used for, ward missionary, general missionary, Book of
 9    Mormon, humanitarian aid, temple construction, perpetual
10    education and other.  And they would believe, a normal Mormon
11    would believe that they would be used generally for what they
12    check or what they want them to be used for.
13              And that goes along with the tithing argument
14    that -- well, I don't even have to go over that because Your
15    Honor has already found that --
16              THE COURT:  Have you alleged that -- have you
17    alleged in the complaint that tithing is used for a different
18    purpose?  Let me ask a different question.
19              MS. BURNINGHAM:  Yes.
20              THE COURT:  In the context of your racketeering
21    claim or this theory, have you made an affirmative allegation
22    that there's a misrepresentation because tithing is being used
23    for -- the closest I could understand you got was you were
24    focusing on representations about the City Creek Mall.
25              MS. BURNINGHAM:  Yes.
```

1                    THE COURT:  A for profit venture.

2                    MS. BURNINGHAM:  Yes.  And Deseret -- yes.  And the

3       insurance company.

4                    THE COURT:  Have you alleged that there's a

5       misrepresentation concerning any of those things?

6                    MS. BURNINGHAM:  Yes, Your Honor.

7                    THE COURT:  Have you alleged that those statements

8       are false?

9                    MS. BURNINGHAM:  Yes, Your Honor.

10                   THE COURT:  Where did you allege that?

11                   MS. BURNINGHAM:  Let me see if I can find that.

12                   THE COURT:  Are you relying on Subpart S of your

13      lengthy statement of reasons to doubt the sincerity of the

14      Church's views about things?  That's in, what?  This is

15      Page --

16                   MS. BURNINGHAM:  Referring to the amended

17      complaint?

18                   THE COURT:  Right.  This is in -- it's right before

19      Paragraph 143.  Your complaint is not numbered, but I think it

20      is ECF Page 46.

21                   MS. BURNINGHAM:  Okay.  Let me just go down to

22      that.

23                   THE COURT:  It's the IRS whistleblower complaint.

24                   MS. BURNINGHAM:  Yes.

25                   THE COURT:  Is that the -- is that the allegation

1    that you think supports -- well, is that where you pled that

2    statements about use of tithing in support of the City Creek

3    Mall are false?

4            MS. BURNINGHAM:  Yes, Your Honor.  I believe that's

5    right.  Let me just look at that to make sure.  If you'll give

6    me one minute.

7            And also Paragraph 79, I'm not sure if that's

8    Paragraph 79, if you could page up to that, maybe.  This was

9    in the facts of the case of the amended complaint.  This has

10   the most particularized and specific -- and I'll just read a

11   few sentences from that.  There are several --

12           THE COURT:  I've got it here.

13           MS. BURNINGHAM:  Okay.

14           THE COURT:  What I didn't see was where you pled

15   the facts that would establish that these statements are

16   false.

17           MS. BURNINGHAM:  Yes, Your Honor.  If you drop down

18   to halfway through Keith McMullin, then a member of the

19   Corporation of the Presiding Bishopric, told the Tribune, not

20   one penny of tithing goes to church profit endeavors.

21           THE COURT:  Ms. Burningham, when you're reading

22   you're going really quickly.

23           MS. BURNINGHAM:  I'm sorry.

24           THE COURT:  And my court reporter can't keep up

25   with you.

1          MS. BURNINGHAM:  I'm sorry.  I'll just read that a

2     little slower then.

3          Keith McMullin, then a member of the Corporation of

4     the Presiding Bishopric, told the Salt Lake Tribune, quote,

5     not one penny of tithing goes to the Church's for profit

6     endeavors.

7          And at the same time if you drop down to

8     Footnote 31, at the time the statement was made in 2012,

9     Mr. McMullin had already issued checks from EPA's accumulation

10    of tithing principle for City Creek Mall development and the

11    Beneficial Life Insurance Company bailout.  And this is based

12    on a lower complaint.

13         Are you asking me if I expressly pled that this

14    statement was false, and they knew it was false and they knew

15    it was false under common law fraud?

16         THE COURT:  No.

17         MS. BURNINGHAM:  Okay.

18         THE COURT:  I think you've answered my question.

19         MS. BURNINGHAM:  Okay.  Thank you.  I incorporate

20    as everybody does all the facts in each of the causes of

21    action.  So that is a more specific iteration of those facts,

22    Your Honor.

23         THE COURT:  I interrupted.  You were speaking about

24    tithing, and there was something else you wanted to touch on

25    before we break.

1          MS. BURNINGHAM:  Okay.  You know, this might be

2     a -- let's see.  This might be a good place to break now

3     because I frankly lost my train of thought.

4          THE COURT:  All right.  Why don't we do this.

5          MS. BURNINGHAM:  But, Your Honor, just to clarify,

6     I do have -- from your tentative I do have two or three other

7     sections that I would like to address.

8          THE COURT:  Let's break now and come back and do

9     that so that our court reporter can stretch her fingers.

10         MS. BURNINGHAM:  They should be brief in light of

11    what has already been talked about.  Thank you.

12         THE COURT:  It's 3 o'clock.  Why don't we plan to

13    resume at 3:10.  And, counsel, at least, let me ask you just

14    to maybe mute yourself and turn off your videos.  But please

15    stay connected to the Zoom hearing so we can resume and so we

16    don't have to reconnect you all.

17         MS. BURNINGHAM:  Thank you, Your Honor.

18         THE COURT:  Thank you.  We'll be in recess.

19         (Recess.)

20         THE COURT:  Thank you.  Are we all ready to go,

21    Mr. Jordan?

22         MS. BURNINGHAM:  Your Honor, I just have a few.  I

23    won't have long.

24         THE COURT:  Let's go ahead and go back on the

25    record.

1           Go ahead, Ms. Burningham.  You have the floor.

2           MS. BURNINGHAM:  Not to make too fine a point on

3    it, but as to your procedural question, how does this work,

4    the question when you empanel the jury you ask these members

5    who were involved and who guided and who told Correlation what

6    they could say and what they couldn't say, did you have a

7    sincere belief in what you were telling us?  Did you believe

8    that Joseph Smith translated directly from Gold Plates or

9    while you were preaching that in the mission field and to the

10   young people, in the back of your mind did you know that there

11   was a brown stone in the vault that you were keeping hidden?

12          That's a question of sincerity and a question that

13   needs to be asked in this case because if the answer -- or if

14   a jury comes back and says no, whether by no impeachment or

15   other evidence that comes into evidence with a limiting

16   instruction, then there's no reason for the affirmative

17   defense to apply.  And we try the case as any other fraud case

18   because the belief has to be sincere.  There has to be a

19   sincere religious belief in order for Ballard and the Church

20   Autonomy Doctrine to apply.  That's just my point on the

21   procedural matter.

22          Now I'd like to show you just a video that goes to

23   this point.  And this could be introduced perhaps with a

24   limiting instruction.  This is Russell Nelson who in May of

25   2020, this is May of 2020, this is the first time that anyone

1    has shown what they have known to have happened.

2              (Video played.)

3              MS. BURNINGHAM:  Now, I just wanted to play that.

4    It's so short.  But I just want to say that I really respect

5    him for doing this at this point.  It's late, but at least

6    he's disclosing what they have known for a long time.  One

7    more time.

8              THE COURT:  Miss Burningham, it's outside the four

9    corners of the complaint.  It's not properly before the Court

10   in Rule 12.  We've seen it.  I've seen what you showed us.

11             MS. BURNINGHAM:  Okay.

12             THE COURT:  I don't think we need to see it again.

13   I'll just make a notation for the record here that as is --

14             MS. BURNINGHAM:  All right.

15             THE COURT:  -- as is my practice in the courtroom

16   when a video is played, I don't ask the court reporter to try

17   to transcribe it.  So we didn't try to transcribe the video

18   that you played, and it's not incorporated in the record for

19   that reason.  But I saw it.  I understand what you're saying.

20   Go ahead.

21             MS. BURNINGHAM:  All right.  Let me just look at my

22   notes for one minute, Your Honor.

23             I just don't think -- in conclusion I don't think

24   that the Church has identified which sincere belief is in

25   jeopardy by complying with either common law fraud or the

1    statutory causes of action that we pled, and I think that they

2    have to do that.

3            Now, not with common law fraud and fraud in the

4    inducement, those truths, sincerity is an element of those two

5    claims so we have the burden of proof on that.  But on all of

6    the other if a duty is found where partial truth has been

7    disclosed, then one has the duty to tell the whole truth or

8    make enough disclosures so it's not misleading.  Without the

9    elements of common law fraud they have to show us that it's a

10   sincere belief.  It's their burden in order to have the

11   affirmative defense apply.

12           And that's all I have to say right now.  Thank you.

13           THE COURT:  All right.  Thank you.

14           Mr. Jordan?

15           MR. JORDAN:  Thank you, Your Honor.  And let me say

16   from the outset that I appreciate your preliminary ruling.  It

17   gives me guidance, and I think it helps me to significantly

18   abbreviate my remarks today.

19           First of all, I want to follow the order of things

20   that Your Honor presented when you laid out what you described

21   as the central differences between the original complaint and

22   the amended complaint.  And I think the Court correctly

23   identified one of the significant problems in the way that

24   Ms. Gaddy has re-pled the case.

25           Whereas, the first go-round she attempted to set up

1    what I think is a false dichotomy between fact and belief.

2    She now sets up another false dichotomy between conduct and

3    belief.  That's significant for First Amendment jurisdiction

4    because the courts could not be more clear and Your Honor

5    could not have been more clear in your order that when we

6    analyze a conduct under the Free Exercise Clause of the

7    First Amendment we are not including speech about belief.

8    That's why Your Honor's ruling on Page 15 says this:

9             But the Supreme Court has repeatedly confirmed that

10   the free exercise of religion encompasses not only the freedom

11   to believe but also the right to profess those beliefs through

12   proselytizing.  Said another way, the Church is no more liable

13   for preaching and teaching its beliefs than it is for

14   espousing them.

15            And it's this failure to distinguish speech about

16   belief from conduct that I think leads Miss Burningham into

17   many of the flaws in her argument.

18            So for example, all of the cases that she cites,

19   the prisoner cases, the conscientious objector cases, the

20   marijuana cases, all of those cases deal with conduct.  They

21   don't -- they deal with somebody's desire to smoke marijuana

22   and whether a prison restriction on the use of marijuana is

23   unconstitutional or not under the Free Exercise Clause or

24   many, many other ways that that same issue comes to light.

25            But all of those cases deal in the context of

1    conduct like using marijuana or peyote or refusing to serve in

2    the military or whatever it might be, none of those cases, not

3    one, and I'm not aware of a single authority and I don't

4    believe there is one, that says that someone's ability to

5    teach or preach their beliefs is subject to any level of

6    scrutiny or any form of balancing test under the free exercise

7    strand of the First Amendment.

8             And because that's true, all of her arguments about

9    burden shifting and balancing tests are unavailing because all

10   of them failed to give proper regard to the distinction that

11   the Supreme Court has been careful to draw between on the one

12   hand belief and speech about your belief, preaching and

13   teaching your belief, on the one hand; and conduct on the

14   other hand.  So I think that is responsive to much of her

15   opposition to the motion to dismiss.

16            Now, I think Your Honor's second point was that in

17   the second -- in the amended complaint Ms. Gaddy has much to

18   say about sincerity and how somehow the concept of sincerity

19   of belief circumvents what would be the ordinary

20   constitutional analysis under the Church Autonomy Doctrine,

21   which is an amalgam of both the Free Exercise Clause and the

22   establishment clause.

23            I'll say this about sincerity.  I think Your Honor

24   started in exactly the right place.  I too, find

25   Justice Stone's comments in his non-majority opinion in

1   Ballard to be just logically correct.  And Your Honor quoted
2   them, but let me just say it again for emphasis.
3           For me the most salient piece of this opinion is
4   this:
5           How can the government prove these persons knew
6   something to be false which it cannot prove to be false?
7           I'm sorry.  It's not Justice Stone.  It was
8   Justice Jackson.  Justice Jackson's comment is unassailable
9   logic.  And it's the logic that Ms. Gaddy runs afoul of in her
10  brief because much of her brief is dedicated to the
11  proposition that because the evidence in her view is
12  overwhelming that certain beliefs of the Church are false,
13  certain teachings of the Church are false they cannot be
14  sincerely held.  No reasonable person could sincerely believe
15  what Joseph Smith said about the translation of the Book of
16  Mormon.  And somehow she thinks that then provides an exit
17  ramp on the analysis in Ballard and other Supreme Court cases.
18  But, of course, it doesn't.  The reasoning is circular.  It's
19  circular in just exactly the way that Justice Stone's logic
20  highlights.
21          I'll say this, also.  She cites to many RIFRA
22  cases, and that is also a diversion.  This of course is not a
23  RIFRA case.  We haven't pled RIFRA as a defense.  And as Your
24  Honor correctly pointed out, RIFRA arises in the context where
25  someone is asking for an exemption from an otherwise generally

1    applicable law or regulation.  And we're not asking for that

2    in this case.  RFRA is inapplicable.

3             But even in the pre-RFRA cases under the Free

4    Exercise Clause we come to the exact same place.  When the

5    conduct being complained about is the teaching and preaching,

6    it's not conduct at all for purposes of First Amendment

7    analysis.  We only talk about the balancing test of RFRA or

8    pre-RFRA cases or state cases that are outside the scope of

9    RFRA when we're talking about conduct other than teaching or

10   preaching your religion.

11            Now, I could point you to specific sections of

12   Ms. Gaddy's brief, but all I really have to do is look at

13   Item 1 in the table of contents to her opposition, in which

14   she said:  The amended complaint challenges defendant's

15   deceptive recruitment and indoctrinational practices, which

16   she then characterizes then as conduct, not belief.  And by

17   deceptive recruitment and indoctrinational practices, of

18   course she's talking about the things that the Church teaches

19   and preaches.  And that's absolutely protected.  Not protected

20   in some conditional way, but absolutely protected by the

21   First Amendment.

22            So enough said about that aspect of things.  I want

23   to say that I share Your Honor's view about this concept of

24   organizational sincerity.  It certainly is true that

25   organizations can have at any given point in time what they

1    may describe as their orthodox doctrine.  But to talk about

2    the sincerity of belief of an organization seems to me to be a

3    fraud concept, because of course sincerity is something that

4    is harbored in the individual human mind and heart.  And as

5    Your Honor has correctly pointed out, different people at

6    different points in time may take a different view of what

7    they consider to be orthodox and nonorthodox.  And to pretend

8    that somehow we have the ability to discern some

9    organizational sincerity of belief seems to me to be an

10   unworkable concept right from the beginning.

11           And then of course we should say something about

12   the problem of what I think of as a slight-of-hand analysis by

13   Ms. Burningham of the elements of fraud.  There's a reason

14   that falsity is the first element of fraud.  Her idea that

15   somehow we bifurcate the proceeding and we don't talk about

16   truth or falsity, we just talk about some concept of sincerity

17   and then we come back to the truth or falsity issue at some

18   later phase of the proceeding seems not only to be unworkable

19   for the reasons that Justice Jackson has indicated, but

20   completely inconsistent with the way the law is structured.

21   Truth or falsity is the first element of fraud because you

22   can't know something to be untrue or be insincere in your

23   belief as to its untruth if it's in fact true.

24           And so because in order to prove any fraud claim

25   you have to prove that the representation was false because

1    you can't get to the next step until you get over that hurdle

2    any discussion of insincerity is irrelevant.  You can't reach

3    it without deciding whether or not the representation is false

4    in the first place.  And if it's not a subject that's

5    justiciable and clearly for all the reasons Your Honor has

6    indicated in your original opinion and in your preliminary

7    opinion today, it's not justiciable then we never even come to

8    the issue of insincerity.

9            I do want to say a word about the Utah Charitable

10   Solicitations Act.  I have it in front of me.  It's

11   Section 13-22-13.  And the applicable subdivision says that

12   it's prohibited that any organization, anybody is prohibited

13   from making any untrue statement of a material fact or failing

14   to state a material fact necessary to make statements made in

15   the context of the circumstances under which they are made not

16   misleading.

17           So again, truth and falsity are at the heart of

18   that statute.  And of course one cannot reach the issues of

19   truth or falsity without trampling on the First Amendment.  So

20   that is going to be an unavailing cause of action that should

21   of course be dismissed on this complaint.

22           I'll also point out, and this is pointed out in our

23   briefs so I won't belabor it, there is no private right of

24   action under that statute, so that's an independent reason why

25   Your Honor ought to dismiss the claim.

1           Your Honor posed an interesting question to

2    Miss Burningham.  You said words to this effect, as I noted

3    them down, is the truth static?  That's an interesting

4    question because I think the case law is clear that any

5    religion, any religious organization is the owner of its own

6    historical narrative.  And the understanding that people have

7    at any given point in time of the significance of any element

8    in that historical narrative is owned by the religion and not

9    by the courts.  And it's not for anyone to say under the

10   establishment clause what's orthodox and what's not orthodox,

11   what's heresy and what's not heresy at any given point in

12   time.

13          So, for example, and I hope my Catholic friends

14   will forgive me for this analogy which has no basis in fact, I

15   offer it only by way of analogy.  The Catholic Church for

16   many, many years taught the Doctrine of Transubstantiation,

17   that in some miraculous and mystical way the host and the wine

18   were transmuted into the body and blood of Christ.  Now that's

19   not a doctrine of the Church of Jesus Christ of Latter-Day

20   Saints, but long taught by the Catholic Church.

21          Let's just imagine hypothetically for a moment that

22   in some private setting Pope Francis said, you know, I don't

23   really believe that and I never did.  The idea that we would

24   now subject the Catholic Church to lawsuit because

25   Pope Francis has decided that his view of the Doctrine of

1    transubstantiation has evolved in some way to me is foolish

2    and leads us head long into the establishment clause.

3            And that's because I think as the Bryce case

4    articulately points out, and this is also very much underlying

5    the Mary Elizabeth Blue Hull case, it's not the province of

6    government including the courts to define now or at any point

7    in time what is orthodox and what is heretical, because that

8    is a direct assault upon the establishment clause, because if

9    the government either through statute or through decisions of

10   the courts get into the business of deciding what is orthodox

11   and what is heretical, it is in a very real way establishing a

12   religion.

13           I point that out because I think it is the answer

14   to Ms. Burningham's suggestion that the Court ought to venture

15   into the world of deciding what's a truth, what's a half

16   truth, what's a partial truth.  That seems like a fraught

17   escapade for the Court to me, because in order to do that the

18   Court would have to make this kind of a declaration.

19   Missionaries of the Church of Jesus Christ of Latter-Day

20   Saints may no longer teach the Church's official version of

21   the First Vision without giving the person that they're

22   teaching a warning that in an account of the First Vision

23   offered in 1833 Joseph Smith is reported to have not mentioned

24   two personages but to have only mentioned one personage in his

25   vision.  It's almost like saying we're going to treat religion

1     like the way the state of California treats warnings about

2     prospective cancer dangers.  This particular teaching is known

3     to the state of California to be misleading to potential

4     converts.  That seems to me to be the height of foolishness.

5          You cannot teach about the Book of Mormon or say

6     that it was translated by the gift and power of God without

7     saying that sometimes Joseph Smith was not looking at the

8     plates.  Sometimes he was looking at a brown stone.  That's

9     Ms. Gaddy's view of the role of the courts, to decide what is

10    orthodox and what is not orthodox, what is heretical and what

11    is not heretical, and that is a very bad place to go.

12         And I can't do a better job than Ms. Gaddy did in

13    pointing out to the Court that these are core religious

14    beliefs or as the Court describes them in your original order

15    religious facts which are the subject of faith, I can't do a

16    better job than she did in illustrating that they are

17    religious facts about faith than to re-put up for you the

18    things that she shared with us on the screen about the war in

19    heaven and the philia relationship between Jesus Christ and

20    Lucifer or the role of human agency in the salvific process.

21    I think she illustrated admirably that these are in fact

22    matters of faith that are religious in nature and not as the

23    Bryce case teaches us, purely secular matters.  So I won't say

24    anything more about that.

25         I do want to say, Your Honor, in conclusion that --

```
 1                    THE COURT:  So before you --
 2                    MR. JORDAN:  Yeah, please.
 3                    THE COURT:  Before you conclude let's not skip over
 4        my comments about her fraud theories.  I'm concerned now after
 5        hearing from Miss Burningham that I misconstrued or
 6        misunderstood what I saw to be an evolution in her arguments
 7        about fraudulent nondisclosure or omission.  And maybe it's,
 8        maybe I do have it wrong.  Maybe she's talking about material
 9        omissions.
10                    MS. BURNINGHAM:  Yes, Your Honor.  Material.
11                    MR. JORDAN:  I think it matters not at all, Your
12        Honor, because for Your Honor to decide what is material to a
13        religious belief and what's not material to a religious belief
14        is the same thing as Your Honor having to decide what's
15        orthodox and what's heretical.  This court cannot decide that
16        a particular fact in a church's or a particular point of faith
17        in a church's narrative about its own origins is material and
18        what is not material.  That's -- that is a -- that is a
19        forbidden territory for the Court to venture into.
20                    THE COURT:  So let's turn then to tithing, or maybe
21        you were headed in that direction.
22                    MR. JORDAN:  That is exactly where I was going, and
23        thank you for guiding me back there.
24                    So I do understand I think what Your Honor has
25        said.  I think I share a concern that we don't really have the
```

1    kind of pleading at this stage that ought to survive a

2    Rule 12(b)(6) motion to dismiss.  So let me just speak to that

3    with some specificity.

4              I'm going to read now from Page 3, Paragraph 4 of

5    Ms. Gaddy's amended complaint.  It says this:

6              Gaddy and others similarly situated pay 10 percent

7    of their earnings as consideration for the right to

8    participate in temple ceremonies which promise intact families

9    that are to last throughout eternity and/or to join the

10   church.  Without that payment entrance is denied.  Absent COPs

11   underlying scheme of lies which form the basis for members'

12   beliefs tithing would not be paid.

13             Of course then she launches into her exposition of

14   the scheme of lies which focuses most predominantly on the

15   translation process of the Book of Mormon, the truth of LDS

16   scripture in the Pearl of Great Price, specifically the Book

17   of Abraham and the veracity of the church's teaching about the

18   First Vision, and particularly the fact that both God the

19   Father and his son Jesus Christ appeared to Joseph Smith in

20   that vision in April of 1820.

21             Well, if you're going to say as she does say that

22   the basis on which people were induced to pay tithing is the

23   preaching and the teaching of those doctrines which I just

24   read to the Court from her complaint together with her

25   statement that the inducement was that by paying tithing one

1    could receive the ordinance of baptism and thereby membership

2    in the Church and that eventually one would have the right to

3    participate in temple ceremonies so that they could receive

4    the promise of their family remaining intact throughout

5    eternity, you are in the same waters that Your Honor has

6    identified as forbidden.

7            You cannot allege that, I pay tithing so that I

8    could receive the ordinance of baptism with all its intended

9    blessings including the gift of the Holy Ghost and so that I

10   could enter the temple and receive sacred temple ordinances so

11   that I could receive the blessing of an internal family.

12           You cannot make those allegations and say that

13   there was fraud in the inducement in the payment of tithing or

14   fraud of any kind because you have grounded your claim, you

15   have grounded your claim in matters of religious faith, or as

16   Your Honor has described it, religious facts.

17           Well, whether or not people actually receive the

18   gift of the Holy Ghost as a blessing of baptism I don't think

19   is for the courts to adjudicate.  Whether or not families can

20   actually remain intact in the eternities after this life

21   because of temple ordinances received in part by qualifying

22   yourself through the principle of tithing, I don't think is

23   for any court in the land to adjudicate.  But that's the way,

24   Your Honor, that she's alleged it.

25           I think Your Honor has been, if I can be this bold,

1    overly generous to her pleading in describing it as something

2    that flows from her RICO allegations.  I do not believe that

3    is the gravamen of this amended complaint.  I believe the

4    gravamen of this amended complaint is what I have just quoted

5    from.

6              So that being said, Your Honor, where does that

7    leave us?  You suggested two possible courses of action.

8              THE COURT:  Before you move on --

9              MR. JORDAN:  Go ahead.

10             THE COURT:  -- maybe I didn't articulate it as

11    well.  I wasn't trying to articulate it fully in my opening

12    comments, but I don't want to deprive you an opportunity to

13    respond to this as I have to try to make sure that

14    Miss Burningham had a chance to respond to preliminary views

15    that I have.

16             I think what you just described is how I read the

17    Third Cause of action in the complaint, at least in part.  And

18    you're talking about the gravamen of the complaint, and I

19    don't even know if I take exception with the way you described

20    the gravamen of the tithing allegations in the complaint.

21             But as you know, I have to consider all of the

22    allegations in the complaint.  And at this stage plaintiffs

23    may plead alternative theories.  They may plead even

24    internally inconsistent theories at this point so long as

25    they're pled in good faith consistent with Rule 11, and I

1     presume these are.

2            And so the fact that religious components of the

3     tithe may bar the Court under Ballard and its progeny from

4     considering the Church's teachings, whether the tithe is

5     required and what amount, for what purpose, how it's decided,

6     and of course you do address this in your papers, how the

7     tithe will be used as doctrinal.  I think you've made a strong

8     case for that.  It's in the texts, some of the canons.

9            But it doesn't escape an allegation, I don't think,

10    or if you think otherwise let's talk about it, that any church

11    anywhere could make a misrepresentation about how it was going

12    to use funds it was soliciting from its church members.

13           And Justice Jackson I think shares my view about

14    that in the same opinion that I am so enamored with.  At the

15    end of his decision, he says:  I do not doubt that religious

16    leaders may be convicted of fraud for making false

17    representations in matter other than faith or experience, as

18    for example, if one represents that funds are being used to

19    construct a church when in fact they're being used for

20    personal purposes.

21           And I think that's consistent with virtually all

22    the courts that I've read who have weighed in on the question

23    of money and the solicitation of money and the use of money by

24    churches.  I'm left with an impression from the cases that

25    churches have no obligation to speak on the question of how

1    they're using a tithe or other donations to the Church.  But

2    if you do speak and your membership relies on it to their

3    detriment and you speak falsely of the matter of finance, I'm

4    not saying in every case, but it seems to me it would be an

5    unusual case where that would be a spiritual doctrinal issue

6    as opposed to a secular issue.

7          And that's what -- I do read allegations, I think I

8    read -- I mean, I've studied this pretty carefully trying to

9    make sense of it.  I think Ms. Gaddy pleads among other

10   things, you've told your congregation you don't use tithings

11   for certain commercial purposes, and then you did.  You used

12   them in support of a for profit venture, to build a mall.

13   That has nothing to do with faith.  It has to do with, what

14   did you do with the money that we gave you?

15         And your response, if that's right, if I'm reading

16   the complaint correctly and if I'm understanding the law

17   correctly then we have the Subpart C alternative theory in the

18   racketeering claim, the fifth cause of action, that seems of a

19   different kind than the other tithing allegations.  But what

20   do you say about that?

21         MR. JORDAN:  Yeah.  I do take your point.  As I

22   say, I think it's far too generous of a reading of the

23   complaint.  Let me read from Paragraph 20.  This is her

24   description of the scheme -- excuse me -- Paragraph 200.  This

25   is her description of the scheme or schemes to defraud Gaddy

1    and other class members.

2           It was by making false statements the substance of

3    which it did not sincerely believe to which Smith's account of

4    his First Vision was one where two persons appeared, one of

5    whom told him that all creeds were false, that Golden Plates

6    were the source from which Smith translated the Book of

7    Mormon, no seer stone was used in its creation, that the

8    Hebrew prophet Abraham wrote upon the papyri used by Smith to

9    translate the Book of Abraham and that the facsimiles included

10   therein depict Abraham; and/or, B, failing to disclose

11   material fact about LDS history; or, C, misstatements of fact

12   about how the Church used or would use tithing.

13          And it's that C that I think Your Honor is

14   highlighting.

15          But my point is this.  If that's attempted to be

16   pled it's poorly pled, so poorly pled and not argued in the

17   opposition brief in any significant way, certainly not in the

18   way Your Honor has described it, that I don't believe this

19   issue has been briefed to Your Honor in the way that it ought

20   to be and certainly not in the way that would create the sort

21   of appellate record that one would want if either side chooses

22   to avail themselves of an appeal in this case.

23          And for that reason, I want to hark to a suggestion

24   I think Your Honor was making.  Either Your Honor ought to

25   direct the parties to more fully brief this tithing issue,

1    which of course we would be happy to do so that we do have the

2    kind of record that we ought to have; or, I think you

3    suggested this, I don't know what Ms. Burningham's disposition

4    on point would be, or alternatively we ought to have a second

5    and final amended complaint where she does in fact lay out the

6    theories that Your Honor has alluded to.  And then upon

7    reviewing that complaint we will address them with an

8    appropriate motion if appropriate.

9            I'm happy to proceed in either way.  But I don't

10    think we have the kind of record based on the pleadings as

11    they now exist or the briefing as Your Honor now has it to

12    create the kind of clarity that I think Your Honor is entitled

13    to or that I believe an appellate court would be entitled to.

14            THE COURT:  Let me speak briefly to that before we

15    hear again from Miss Burningham.  And this is not a discussion

16    that we ordinarily have in a hearing because in my judgment

17    this issue was not squarely presented by the motion or the

18    opposition.  I'm raising the question given the unusual

19    circumstances of this case and where I think we would be left.

20    And I don't by those comments or my preliminary comments mean

21    to suggest any criticism of the lawyers for either side.

22    We've advanced and developed in the papers your arguments.

23    They're good and germane arguments on both sides to this

24    complain and its viability.  And I'm not asking for a

25    commitment from any of the lawyers, either.  You're both

1    entitled to an opportunity to consult with your clients before

2    you make a decision about how you wish to proceed.  And in any

3    event, we don't know how I'm going to rule yet because I

4    haven't had an opportunity to digest your arguments today and

5    try to figure out how or if they change my preliminary

6    orientation coming to the bench.  So it's premature at least,

7    and yet it seemed to me under the circumstances just under

8    fair notice to be in transparent for me to share my concerns.

9            I will say in response to your comments,

10   Mr. Jordan, I don't believe it would be fair for me to invite

11   further briefing on the issue because I think what I would be

12   doing is inviting a new Rule 12 motion, and I don't think

13   that's contemplated by the rules.  The defendants, unless you

14   can persuade me that I misread your papers, I think it's just

15   the sufficiency or plausibility of the pleading was not really

16   at issue.  I understood your argument to fall squarely in

17   invoking the Church autonomy doctrine as a defense to this

18   complaint.  And I think I'm required to evaluate each part of

19   each claim individually, and that's what I propose to do.  So,

20   look, we don't want a 100-page brief addressing every legal

21   argument that can be made here, and I'm not proposing that is

22   required or even it would be helpful.

23           That said, Miss Burningham, if you were left with

24   this complaint and one part of one claim that may not be pled

25   the way that you would like to have it that I suspect would

1    draw another motion from the defense, not a Rule 12(b) motion,

2    but some other rule, would you rather have it drawn to a

3    different complaint?  And again, you have an opportunity to

4    speak to your client.  But if you have thoughts or feelings

5    about how you think we should proceed procedurally I'd love to

6    hear them today.  And I'm not going to hold you to them.

7              MS. BURNINGHAM:  Well, Your Honor, I would need to

8    speak with my clients, and I would need some time to get back

9    to you on that.  I don't think I can speak to that right now.

10             THE COURT:  Fair.  Totally fair.  All right.

11             Ms. Burningham, what if anything do you have to say

12   in response to Mr. Jordan's substantive arguments about the

13   motion?

14             MS. BURNINGHAM:  Thank you, Your Honor.  Just five

15   or 10 minutes, I would say.

16             As to the tithing argument and his claim there, you

17   can have different reasons, and I think you stated this well,

18   about what you do and why you do it.  And one of the reasons

19   could be because you think you're going to get families are

20   forever by going to the temple, and another reason could be

21   that you believe that the tithing that you pay will be used

22   for religious purposes as are set forth in the tithing forms

23   that the Church sets forth.  And that's all I will say on

24   that.

25             I would just like to speak to the issue of whether

1    a corporation --

2                THE COURT:  Ms. Burningham --

3                MS. BURNINGHAM:  -- can be --

4                THE COURT:  Miss Burningham --

5                MS. BURNINGHAM:  -- determined.  I believe

6    Mr. Jordan spoke to that, and he said it would be difficult

7    and gave reasons why.

8                The case of <u>Burwell vs. Hobby Lobby</u>, which I cited

9    in my opposition says that, quote, says that:  A corporation's

10   pretextual assertion of a religious belief in order to obtain

11   an exemption, this is under RFRI, for financial reasons would

12   fail.

13               So a corporation can be questioned about their

14   sincerity.  I'm not saying that the Church here, the only

15   reason they exist is for financial gain.  We know they have

16   $128 billion, but I'm not saying that.  I'm just saying that

17   corporate sincerity can be determined.

18               Then there's one final point I would like to make,

19   Your Honor.  Mr. Jordan talked about and gave an example of

20   transubstantiation with the Catholic Church.  Again this goes

21   back, and I hate to beat the dead horse, but it goes back to

22   the fact of doctrine dichotomy.  Of course transubstantiation

23   is a doctrine.  And a secular court is not equipped to

24   determine the truth or falsity of a doctrine.

25               That's obvious.  That's not what we're doing.  But

```
 1    where the facts exist where the stone existed in the Church's
 2    vault for over 100 years, that's a horse of a different color,
 3    as they say in the Wizard of Oz.  And it's just not the same.
 4              THE COURT:  I'm going to get this wrong.
 5              MS. BURNINGHAM:  I'm sorry.  Are you laughing?
 6              THE COURT:  No.  At myself.
 7              MS. BURNINGHAM:  I'm having a hard time hearing.
 8              THE COURT:  No.  I'm sorry.  I was laughing at
 9    myself because I was trying to interrupt and I think you
10    couldn't hear me.  I was going laughing because the example I
11    was going to use I think is --
12              MS. BURNINGHAM:  I really can't hear you.  I just
13    got a couple words there.  I don't know if it's us.
14              THE COURT:  Mr. Jordan's having trouble, too,
15    maybe.  Can you hear me better now?
16              MR. JORDAN:  A little bit.
17              MS. BURNINGHAM:  No, we're not.
18              MR. JORDAN:  It is difficult to hear you now, Your
19    Honor.
20              THE COURT:  I'll speak up and see if I can try to
21    get through.  Can you hear me now?
22              MS. BURNINGHAM:  Not really.
23              THE COURT:  Really?
24              MR. JORDAN:  I can hear you a little better.
25              MS. BURNINGHAM:  I'll listen closely.
```

1              THE COURT:  One moment.  Let me see if there's

2    something I can do to adjust the volume out.

3              MS. BURNINGHAM:  It was a lot easier when we were

4    in person.  I'm old school.  And Mr. Jordan would be old

5    school since he's older than I am.

6              MR. JORDAN:  What a cheap shot.

7              MS. BURNINGHAM:  Sorry.  Just by a bit.

8              THE COURT:  Is this any better?

9              MS. BURNINGHAM:  I heard that, what a cheap shot.

10             THE COURT:  Is this any better?  No?  All right.

11             I'll do my best.  And I don't think there's a lot

12   more that I have to say.

13             On the point that you were just making,

14   Miss Burningham --

15             MS. BURNINGHAM:  That's better.

16             THE COURT:  -- as I understand one of the tenets of

17   the Church of Jesus Christ of Latter-Day Saints is that the

18   prophet receives divine revelation.  And the Mormon Church is

19   not alone in this view.  The Catholic Church of today is not

20   the Catholic Church of 2000 years ago, and the Mormon Church

21   has announced doctrinal changes in its view, as well, as a

22   result of what it says are inspiration to its leadership.

23             MS. BURNINGHAM:  Yes.

24             THE COURT:  Doesn't that strongly support the point

25   that Mr. Jordan was making, that the doctrines of the Church

1    themselves are not static, that in different ways and

2    different times the leaders of this church and other churches

3    have been inspired, that things that were previously taught

4    are no longer doctrinal, and that in some instances new

5    doctrines are revealed to church leaders?  And if you agree

6    that that happens, how does that impact your argument?

7                MS. BURNINGHAM:  Yes.  I certainly agree that that

8    happens.  But the Church has had the stone in the vault for

9    over 100 years.  That hasn't changed.  The Church has known

10   from the very beginning how Joseph Smith used the brown stone

11   to create the Book of Mormon.  And that's a fact.  It's not a

12   doctrine.

13               THE COURT:  Why do you say that's a fact?  How do

14   you know that?

15               MS. BURNINGHAM:  Because the existence of the

16   artifact.

17               THE COURT:  So that means that is -- so that is

18   evidence to you of a fact about how it was used and for what

19   purpose and when?

20               MS. BURNINGHAM:  Yeah.  Along with the witness

21   statements that have been known since 1830.

22               THE COURT:  And are you resolving conflicting

23   evidence --

24               MS. BURNINGHAM:  Those are eye witnesses.  Excuse

25   me.

```
 1                  THE COURT:  Are you resolving conflicting evidence
 2       in your own mind when you decide what in your view is truthful
 3       and what is untruthful?
 4                  MS. BURNINGHAM:  I just -- let me think about that.
 5       Am I resolving conflicting evidence?  No, because I'm not -- I
 6       have to pause myself.  I know what you're saying.  But I'm
 7       saying they could not have had a sincere belief that the stone
 8       wasn't used when they had it for a century or more.  They
 9       could not have that belief.  They could not legitimately or
10       credibly have that belief.
11                  THE COURT:  Okay.  Go ahead.  I interrupted.  You
12       were finishing your argument.
13                  MS. BURNINGHAM:  That's all.  And we can hear you
14       much better, by the way, as of five minutes ago.
15                  THE COURT:  Thank you.
16                  Mr. Jordan, anything more from the defense before I
17       take the matter under advisement?
18                  MR. JORDAN:  I'll just say this, Your Honor, on the
19       tithing point.  I do want to point Your Honor to Footnote 5 in
20       our opening brief on this motion to dismiss.  It's the
21       Stone v. Salt Lake City case in which the Utah Supreme Court
22       says:
23                  It is obvious that all of the funds the Church
24       collects would not be disbursed immediately and directly for
25       such purposes.  It is but common sense and common knowledge
```

1      that there is need for the exercise of management of such

2      funds for the ultimate accomplishment of the purposes stated.

3      How this is to be done to best serve those objectives is for

4      those in charge of the management of the Church to decide.  It

5      may well entail the keeping of collected funds in savings

6      accounts, bonds, real estate or any type of investment which

7      in the judgment of those in charge best suits that purpose,

8      close quotes.

9              All of that together with what I've said to Your

10     Honor about the doctrinal basis for tithing, about the

11     specific Subsection 120 of the Doctrine and Covenants, which I

12     have quoted to Your Honor, about the way the role that

13     inspiration plays, the way the voice of the Lord, the role

14     that plays in the disposition of tithing funds.

15             All of that I think speaks to the fact that Your

16     Honor will quickly find that the Court is in forbidden waters

17     by getting into the question of how tithing funds are used or

18     invested or how earnings from tithing funds are used.  That

19     just seems to me to be an extremely fraught area forbidden by

20     the First Amendment.  And I would encourage the Court not to

21     go there, at least not on the pleadings that you have before

22     you, which describe the motivations for the payment of

23     tithings in the very religious context of that is the way that

24     one receives admission into the Church through baptism or the

25     way that someone receives the opportunity to have temple

1    ordinances which promise blessings of eternal families.

2        All of that to me seems to be so significantly

3    intertwined as to risk the Court entangling itself in a way

4    that would be violative of the First Amendment.  Whether

5    Miss Gaddy could plead something different than she's now pled

6    rather than the entangled way that it's currently pled, I

7    don't know.  But I think on this pleading Your Honor would do

8    well to avoid the entanglement which she invites.  That's my

9    last word on that subject, Your Honor.

10        THE COURT:  And it might not be because I'd like to

11    follow up on that.

12        MR. JORDAN:  Okay.

13        THE COURT:  This is not the allegation in the

14    complaint, but let me make sure.  Let me test the limits of

15    your argument.

16        If the leadership of the Church announced

17    inspiration from God that tithing should now be 11 percent

18    instead of 10 and the extra percent of tithe will be used to

19    construct temples in new countries around the world to better

20    facilitate the communication of the Church's core teachings,

21    and instead the Church diverts that extra 1 percent, and they

22    buy Ferraris for the members of the Quorum of the Seventy and

23    they buy private airplanes and the like, to use an extreme

24    example, the fact that tithe was the vehicle for that process

25    absolves it of potential civil liability in your view under

1        the First Amendment.

2               MR. JORDAN:  No, I don't think so.  Your Honor has

3        presented an extreme example, and I think at some point one

4        can run afoul of Justice Jackson's point in his dissenting

5        opinion in Ballard in just the way that I think Your Honor is

6        describing your hypothetical.

7               But I do want to hasten to say that's not what's

8        alleged here.  And think of it this way in the light of the

9        Utah Supreme Court's opinion in Stone.  What if the Church had

10       decided that it would invest tithing dollars, rather than

11       putting them in a mattress somewhere it would invest tithing

12       dollars in real estate, not for the personal -- for the

13       personal benefit of the First Presidency to drive Ferraris

14       around as you've suggested, but because that seems like a

15       prudent investment strategy, more prudent than putting things

16       in a mattress, putting money in a mattress, and then those

17       funds ultimately, those investment funds are used for

18       appropriate church purposes?

19              Now if you make that the hypothetical, and that's

20       even a step beyond the reality here, but I don't want to talk

21       about the reality because I don't want to invite the factual

22       dispute about it.  But if you even take that as the

23       hypothetical, then the complaint goes nowhere at all, because

24       as the Utah Supreme Court says it's entirely up to the Church

25       as a matter of the Church autonomy doctrine how it invests

1    funds rather than putting funds in a mattress.  And

2    investments strategies are entirely within the Church autonomy

3    doctrine and can be changed from time to time.

4         Ms. Gaddy hasn't and can't allege that Church

5    leaders used tithing funds for their personal purposes.  The

6    most that she has to allege, and incorrectly so, but credited

7    for purposes of the motion to dismiss, the most that she can

8    allege is that the Church made a real estate investment.

9         If we ever got to discovery we would find out that

10   in fact tithing funds weren't used.  But we'll take the

11   allegations on their face.  The most she could say is the

12   Church made a real estate investment rather than putting

13   tithing funds in a mattress.  And that's just not good enough.

14   That's just not good enough.

15        THE COURT:  I don't think that's a fair

16   characterization of her allegations.  And it's a 65-page

17   complaint, and I don't mean to be yelling.  I'm speaking up so

18   you can hear me clearly.

19        MR. JORDAN:  I can hear you, and it's better, Your

20   Honor.

21        MS. BURNINGHAM:  No.  You're good.  We like it.

22        THE COURT:  There is a specific allegation in the

23   complaint that Ms. Gaddy was watching during General

24   Conference when she saw the prophet of the Church say, no

25   tithing funds are going to be used in connection with the

1     construction of City Creek Mall, for example.  And she says, I

2     saw that.  I don't know if she said in her complaint she

3     relied on it.

4              MR. JORDAN:  She doesn't.

5              THE COURT:  She said that it's false.  I don't

6     think she does that she relied on it.  I don't know that I saw

7     that in the complaint.  But thus that among other things that

8     are missing in a RICO allegation and thus my raising the

9     question about how I should treat it.

10             But do you mean in your argument, Mr. Jordan, to

11    suggest that your motion to dismiss squarely presented the

12    question of the plausibility or adequacy of her pleading up

13    that theory in the RICO claim?

14             MR. JORDAN:  Yes, I do mean to suggest that,

15    because three things have not been alleged appropriately, at

16    least.  One is falsity.  What we have is a footnote quote that

17    is double hearsay in the Salt Lake Tribune.  That's not an

18    allegation of falsity.  Two, we have no allegation of

19    materiality.  A fair reading of the complaint suggests that

20    Ms. Gaddy didn't stop paying tithing or kept paying tithing in

21    reliance on President Hinckley's statement, which is grossly

22    quoted out of contest in a General Conference talk given in a

23    ecclesiastical meeting.  But materiality is not alleged in any

24    way, and reliance is not alleged in any way.

25             The reliance that Miss Gaddy does allege is that, I

1    relied on the statement that I could be baptized and receive

2    the gift of the Holy Ghost through the ordinances of the

3    Church by committing to the principle of tithing.  And I could

4    qualify myself to go to the temple to receive eternal

5    blessings of eternal families.

6         That's the causal link that is drawn here and the

7    only one.  On this complaint as pled it falls woefully short.

8    And I do not believe in good faith that something else could

9    be alleged in yet another amended complaint.

10         But faced with these allegations, whether you want

11    to describe President Hinckley's statement as a purely secular

12    one, which I think if you read it in context you would not

13    construe it in that way, but if you did construe it in that

14    way, she would still fall short on at least those three

15    pleading failures.

16         THE COURT:  I'm going to put you in a really

17    difficult position right now.  I'm going to ask you if what

18    you're saying is that your motion to dismiss presented that

19    argument to the Court for resolution.  So the Church has

20    advanced that argument and placed it before the Court.

21         MR. JORDAN:  No.  It's not a hard -- it's not a

22    hard question.  It's a fair question, Your Honor, and I

23    welcome it.

24         THE COURT:  I just mean difficult because it may

25    implicate what is available in the future.

1            MR. JORDAN:  Right.  My point to that is the point

2       I tried to make before.  The way this complaint is framed, the

3       description of why tithing is paid or not paid is tied to,

4       very clearly to the promise blessings of tithing, the

5       scripturally promised blessings of tithing.  So I considered

6       it not a subject for briefing to make the arguments that Your

7       Honor just made.  It's why I said to you a few minutes ago, if

8       this is really a subject of concern, if you don't feel that

9       the subject of tithing including President Hinckley's remarks

10      made in context are so entangled with religious practice as to

11      be out of bounds under the First Amendment then I would

12      appreciate the opportunity to more fully brief this to Your

13      Honor.

14            If on the other hand Miss Gaddy wants to take

15      advantage through her counsel of the opportunity I think

16      you've offered to file yet another amended complaint then I'll

17      address it in the context of a motion.

18            But I come back to the point which I tried to

19      possit before, and that is I think for the sake of this court

20      and for any appellate court who might review it, this aspect

21      of Ms. Gaddy's brief varied and obscurious as I think it is in

22      reference to President Hinckley's isolated quote, I don't

23      think we made the record on that that you or an appellate

24      court would want to have.

25            THE COURT:  Thank you, Mr. Jordan.  I guess we'll

1    go one step at a time.  And Miss Burningham has already said

2    she would benefit from the Court's ruling first and then an

3    opportunity to consult with her client, and that makes good

4    sense to me.  So I'll take the matter under advisement and --

5            MS. BURNINGHAM:  Your Honor, excuse me.  May I just

6    address the Stone case he brought up?

7            THE COURT:  You may, of course.  Yes.

8            MS. BURNINGHAM:  It will take one minute.  Thank

9    you, Your Honor.

10           Stone is differentiated because in Stone the

11   plaintiff did not allege fraud and there was no invited

12   directive.  There was no partial, there were no blanks in the

13   tithing forms.  Fill it in here, and we'll use it for this and

14   this and this.  So this is different than the specific forms

15   as we have for the intent created by The church.

16           That's all, Your Honor.

17           THE COURT:  Thank you both for your time and your

18   argument today, as well as your briefing.  I will take the

19   matter under advisement.  And you've given me a lot to think

20   about, so I'm afraid I probably can't give you great guidance

21   about when you can expect a ruling from the Court.  But I

22   understand the importance of these issues to all involved, and

23   I can assure you we take the cases seriously as you do, and

24   we'll do the best we can to give you a good answer.

25           Thanks again, everyone.  Please remain safe and

```
 1     vigilant especially during these uncertain and dangerous

 2     times, and we'll be in recess.

 3               MS. BURNINGHAM:  Thank you.

 4               MR. JORDAN:  Thank you.

 5          (Whereupon, the court proceedings were concluded.)

 6                         *  *  *  *  *

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   STATE OF UTAH        )

 2                        ) ss.

 3   COUNTY OF SALT LAKE  )

 4              I, KELLY BROWN HICKEN, do hereby certify that I am

 5   a certified court reporter for the State of Utah;

 6              That as such reporter, I attended the hearing of

 7   the foregoing matter on January 5,2021, and thereat reported

 8   in Stenotype all of the testimony and proceedings had, and

 9   caused said notes to be transcribed into typewriting; and the

10   foregoing pages number from 3 through 90 constitute a full,

11   true and correct report of the same.

12              That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14              And hereby set my hand and seal, this ____ day of

15   _____ 2021.

16

17

18

19

20              _____
                         KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```