```
 1                 IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF UTAH, SOUTHERN REGION
 2        _____
                                    )
 3   LAURA A. GADDY,                )
     individually and               )
 4   on behalf of all others        )
     similarly                      )
 5   situated,                      )Case No. 2:19-cv-00554-RJS
                                    )
 6   Plaintiffs,                    )The Honorable
                                    )Robert J. Shelby
 7   V.                             )
                                    )
 8   CORPORATION OF THE             )
     PRESIDENT OF THE CHURCH        )
 9   OF JESUS CHRIST OF             )
     LATTER-DAY SAINTS, a Utah      )
10   corporation sole,             )
     Defendant.
11
12        _____
13
14
15
16
17
                   BEFORE THE HONORABLE ROBERT J. SHELBY
18
19                        FEBRUARY 13, 2020
20
                       MOTION TO DISMISS HEARING
21
22
23
24
            Reported by:  Kelly Sommerville, RPR, FCRR
25                        801.856.7939
```

1

```
1                    APPEARANCES OF COUNSEL

2

    FOR THE PLAINTIFF:
3

         Kay Burningham
4        KAY BURNINGHAM ATTORNEY AT LAW
         299 South Main Street, Suite 1375
5        Salt Lake City, UT 84111

6

7   FOR THE DEFENDANT:

8        David J. Jordan
         Wesley F. Harward
9        STOEL RIVES
         201 South Main Street, Suite 1100
10       Salt Lake City, UT 84111-4904

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
              1          SALT LAKE CITY, UTAH, FEBRUARY 13, 2020

              2                         *  *  *  *  *

              3          THE COURT:  Good afternoon, everyone, and

              4   welcome.  We'll call Case No. 2:19-cv-554.  Counsel,

    01:39PM   5   you're familiar to me, but why don't you take a moment

              6   and make your appearances, please.

              7          MS. BURNINGHAM:  Good afternoon, Your

              8   Honor.  Kay Burningham for the plaintiff, Laura Gaddy,

              9   and this is my assistant, Park Romney.

    01:39PM  10          THE COURT:  Thank you.

             11          MR. JORDAN:  Good afternoon, Your Honor.

             12   David Jordan and Wesley Harward of Stoel Rives on

             13   behalf of the defendant.

             14          THE COURT:  Terrific.  Thank you.  Welcome

    01:40PM  15   to all of you.  This is the time set for hearing on the

             16   defendant's motion to dismiss, and as is almost always

             17   the case, we have carefully reviewed your papers.  I

             18   think I understand your arguments.  I've studied the

             19   complaint.  It's quite long, but I mean, I think I

    01:40PM  20   understand the complaint and the plaintiff's theories,

             21   and we have invested significant energy into trying to

             22   understand what we think are the controlling

             23   authorities.  The parties cite a number of cases from a

             24   lot of jurisdictions, and I think I have a sense for

    01:40PM  25   that as well.
```

1          Mr. Jordan, it's the defendant's motion.

2     Do you care to begin?

3          MR. JORDAN:  Thank you, Your Honor.  As

4     Your Honor has noted, this is Defendant's motion to

01:41PM 5     dismiss.  We're seeking dismissal of the complaint on

6     First Amendment grounds.  I've noted for the Court in

7     our brief that it's not clear in the case law whether

8     this is really a 12(b)(1) motion or a 12(b)(6) motion.

9          THE COURT:  Did the Tenth Circuit resolve

01:41PM 10    that question in Bryce, did it not?

11         MR. JORDAN:  I think the Tenth Circuit

12    leads towards it being a 12(b)(6) motion.  I don't

13    think that's entirely clear, but I want to treat it

14    that way for today's purposes.  Ultimately, I think it

01:41PM 15    makes no difference to the outcome here.

16         And the way I'd like to begin my argument

17    today, Your Honor, is with just a brief summary of what

18    I think are some of the most instructive United States

19    Supreme Court cases arising under the First Amendment

01:42PM 20    in the context of the kind of fraud and intentional

21    infliction of emotional distress claims that we have

22    before us today.

23         First of all, from the Kedroff v. St.

24    Nicholas Cathedral of Russian Orthodox Church case,

01:42PM 25    Your Honor will recall that's a 1952 case from the

4

01:42PM

1   United States Supreme Court.  And there the Court said

2   that religious organizations have "the power to decide

3   for themselves, free from state interference, matters

4   of church government as well as those of faith and

5   doctrine."

6           That principle dates way back to the 1870s,

7   the Watson case, with which I know Your Honor is

8   familiar, and it runs through a long line of cases.

01:43PM

9           Of the same sort is the Presbyterian Church

10  in U.S. vs. Mary Elizabeth Blue Hull Memorial

11  Presbyterian Church case, a 1969 U.S. Supreme Court

12  case, where the Court said civil courts cannot "engage

13  in the forbidden practice of interpreting and weighing

14  church doctrine."

01:43PM

15          And to the same effect is the Ballard case,

16  United States vs. Ballard, in which the Supreme Court

17  said in 1944, "Heresy trials are foreign to our

18  Constitution.  Men may believe what they cannot prove.

19  They may not be put to the proof of their religious

01:43PM

20  doctrines or beliefs."

21          That said, I want to acknowledge from the

22  beginning that it is certainly not the law of this

23  country as laid down by the Supreme Court that

24  religious organizations are somehow exempt from fraud

01:44PM

25  claims, for example.

5

1           The problem that we have in this case, and

2    I think where the plaintiff runs afoul of the law here,

3    is that she wants to draw a distinction between what

4    she characterizes as beliefs and facts.  But that's a

01:44PM   5    false dichotomy and not one that's been accepted by any

6    court in this country as I read the case law.  Rather,

7    the distinction seems clear in the cases that the

8    important -- the important dichotomy is the difference

9    between what is religious and what is purely secular.

01:44PM   10   With that thought in mind, I turn to the plaintiff's

11   complaint.

12           THE COURT:  Before we do that, before we

13   surrender the case law, the defendant invokes the

14   church autonomy doctrine prominently in its papers.

01:45PM   15   And I'm -- I'm just now wondering whether there are two

16   separate but related -- I mean, I think there are two

17   separate but related doctrines here.  Does the church

18   autonomy doctrine, that language you cited from -- you

19   may have cited it from Watson.  It features heavily in

01:45PM   20   the Tenth Circuit decision in Bryce that the church

21   autonomy doctrine prohibits civil court review of

22   internal church disputes involving matters of faith,

23   doctrine, church governments, and policy.  And there

24   are a line of cases that involve or invoke the church

01:45PM   25   autonomy doctrine and often it involves the Title VII

6

cases, internal disciplinary matters.  It's not clear
to me whether the church autonomy doctrine applies to
just doctrinal statements or whether that's separate.

01:46PM

Bryce, for example, doesn't refer to
Ballard, and I don't know now whether Judge Tacha
referred to Watson.  It just has me wondering if when
we're looking at conduct, church conduct, church
disputes, church governance, whether that's a separate
thing than church doctrine, or maybe they're related.

01:46PM

I mean, they are related, but are they separate?

MR. JORDAN:  Well, I think they are closely
related.  I think there are different prongs of
different strands of case law that flow out of the
First Amendment.  Certainly, some of the case -- the

01:46PM

church autonomy doctrine tends to focus on the rights
of the church to control its own organization.  But you
do see in the cases reference to the fact that the
church autonomy doctrine also allows churches to
determine what is their religious belief, what is their

01:47PM

orthodoxy, if you will.

And we do have a strand of cases in which
it is perfectly clear, I think, that the church
autonomy doctrine includes this conception of churches
have a right not to be interfered with in determining

01:47PM

what their own religious doctrine is or what their

orthodoxy is.  And in that regard, I would point the

Court to the NLRB vs. Catholic Bishop of Chicago case,

a Supreme Court case out of 1979, in which the Court

was being faced with a question of whether the NLRB had

01:48PM  jurisdiction over certain religious schools.  And the

NLRB sought to draw a distinction between schools that

it characterized as wholly religious versus partly

religious.  The Supreme Court said you're on the wrong

track, NLRB.

01:48PM          And then to quote from the Court:  "It is

not only the conclusion that may be reached by the

board which may impinge on the rights guaranteed by the

religion clauses but also the very process of the

inquiry leading to findings and conclusions."

01:48PM          And so I think the church autonomy doctrine

incorporates or includes the idea that government may

not intrude on the process of determining for a

religious -- a religious organization what its beliefs

are, or which are the orthodox beliefs, or which are

01:48PM  the nonorthodox beliefs.

          THE COURT:  So I think that's well stated,

and this language in Bryce, I think, supports that

conclusion.  And I see now that Judge Tacha did cite to

Watson after this, but referring to the church autonomy

01:49PM  doctrine, Judge Tacha, in the circuit, explained that

```
 1    it's rooted in a long line of Supreme Court cases that

 2    affirm the fundamental right of churches to decide for

 3    themselves free from state interference matters of

 4    church government as well as those of faith and

 5    doctrine.

 6              Is the direct application then in -- well,

 7    I suppose there's more than one.  But one of the

 8    theories that I think I understand from the plaintiff's

 9    complaint, though counsel will help me correct any

10    misapprehension I might have, is that confronted with

11    the possibility of different explanations about certain

12    events, the church has elected at different times to

13    espouse different views.  Whether that's true or not

14    true, if that were so, would that fall squarely within

15    the church autonomy doctrine, the decision to account

16    for religious experiences or accounts in whatever way

17    the church chooses at whatever time it wishes?

18              MR. JORDAN:  I think that's very well said,

19    Your Honor, and also consistent with the reality that

20    churches are made up of members and over time their

21    membership changes.  Their organization will have new

22    leadership, and at different times people will express

23    their own thoughts about particular religious

24    doctrines.  And to say that a government should intrude

25    in the process of deciding at any given point in time
```

01:49PM (line 5)
01:49PM (line 10)
01:50PM (line 15)
01:50PM (line 20)
01:50PM (line 25)

9

1    what's the orthodox view, what's the correct view of

2    doctrine is to intrude in a way that I think Judge

3    Tacha is saying cannot be done.  And I want to come

4    back to the point because, of course, it's Tenth

5    Circuit law.

6              Bryce says, and I quote from Judge Tacha:

7    "Threshold" -- "The threshold inquiry is whether the

8    alleged misconduct is rooted in religious belief."  She

9    couldn't draw more clearly the distinction, which I

10   think is the right one, between what she calls purely

11   secular decisions and what she calls religious belief.

12             Now, with that said, I do turn to the

13   plaintiff's complaint here and I don't --

14             THE COURT:  I'm going to pull you back one

15   more time before we surrender the church autonomy

16   doctrine.  Do you think that it is broad enough that it

17   also captures, I think, the subject matter in Ballard,

18   which is to say that is the church autonomy doctrine

19   implicated in the question about deciding whether

20   representations made are secular or religious, or is

21   that a separate inquiry?

22             MR. JORDAN:  Well --

23             THE COURT:  By that, I mean, I read Ballard

24   to say we don't test the truth or falsity of religious

25   or ecclesiastical statements or beliefs, we could even

01:51PM (line 5)
01:51PM (line 10)
01:51PM (line 15)
01:52PM (line 20)
01:52PM (line 25)

1  call them facts, but we will review, under a different

2  standard, secular facts.  Now, is that part and parcel

3  of the church autonomy doctrine, or is it separate?

4          MR. JORDAN:  No, I think it's -- I think

01:52PM  5  it's part of the church autonomy doctrine, but it

6  overlaps into the more broad conceptions of both the

7  establishment clause and the free speech clause.

8          Now, Ballard is a mess of a case down

9  below.  Procedurally it's so hard to tell what actually

01:52PM  10  happened in this case because at the trial court level

11  the question of whether the beliefs of the defendants

12  as a criminal case were true or false was not allowed

13  to go to the jury.  And then at the Ninth Circuit that

14  decision was reversed, and the idea of the Ninth

01:53PM  15  Circuit was that the jury should have been able to

16  consider that.  And the Supreme Court says clearly, no,

17  that can't be right.  You can't be putting to a jury

18  the question of the truth or falsity of the beliefs.

19          But the bottom line to all of that is that

01:53PM  20  Ballard correctly recognizes that purely secular

21  representations by a religious organization are not

22  insulated from scrutiny of the law.

23          So, for example, I think a helpful case in

24  that regard is the Molko case which we cited to Your

01:54PM  25  Honor.  Molko's interesting because this is one in

which members of a church called the Holy Spirit
Association had misrepresented themselves as being
someone other than who they were.  They specifically
said we're not affiliated with any church.  Ultimately,
they were held to be accountable for that, and I think
that's absolutely right and consistent with the law.

If missionaries from any church went to
someone's door and said, "We're here representing the
Red Cross and we're collecting for the Red Cross" and
then took money and put it in their pockets, the fact
that they may indeed be missionaries of some church
doesn't insulate them from the purely secular
representation that we're here on behalf of the Red
Cross.  You can't do that.  That's just a fraud.

But it's equally true that every religion
has the right to preach its own doctrine.  That's at
the heart of the free speech clause.  And whether
others agree or disagree, we would never, as the case
law says, put someone to the proof of the verity of
their beliefs or claims, whether you want to
characterize them as facts or whether you want to
characterize them as beliefs.

THE COURT:  So too, I suppose if a stake
president was negotiating with Le Bus for bus rentals
to take members on a field trip and made

1    misrepresentations --

2              MR. JORDAN:  To Wendover.

3              THE COURT:  -- about something involving a

4    contract, that would fall outside of the First

01:56PM  5    Amendment protections because it's secular.

6              MR. JORDAN:  Just so, let's say the church

7    had a fleet of vehicles and after renting them for

8    three years decided that they were going to resell them

9    into the used-car market, and they rolled back the

01:56PM  10   odometers and created false odometer certificates,

11   they're not insulated from that fraudulent behavior.

12   They're held to account for that behavior because

13   that's a purely secular activity.

14             And so what we really have to do is

01:56PM  15   scrutinize the plaintiff's complaint on its face and

16   make a determination whether, in Judge Tacha's words,

17   the statements are rooted in religious belief or

18   whether they are purely secular in nature.

19             And there are lots of little tangents on

01:56PM  20   which the plaintiff's claims diverge, but the essence

21   of it is three essential claims.

22             One is this:  She claims that the teaching

23   that God, the father, and Jesus Christ appeared to

24   Joseph Smith in 1820 is false.  It's not historically

01:57PM  25   accurate by the plaintiff's allegations.  And she wants

1    to dispute it by saying that in different accounts that

2    Joseph Smith offered at different times during his

3    life, he only mentioned Jesus Christ and didn't mention

4    God, the father, as part of this vision.

01:57PM    5            It's notable, I would hasten to add, that

6    this is referred to in the church as "The First

7    Vision"; that a light descended from heaven, and in

8    this column of light, Joseph Smith saw two personages.

9            Well, if that's not rooted, in Judge

01:57PM    10   Tacha's words, in religious belief, I don't know what

11   else it could be.  Now, I don't purport to know how

12   visions work.  I don't know how they impact the rods

13   and cones of people's eyes or whether they impact the

14   rods and cones at all and somehow transmit directly

01:58PM    15   into the brain.  I don't know how columns of light

16   descend.  I don't know what frequency or

17   electromagnetic wavelength they operate on.  I don't

18   know if they're passing through the ionosphere and the

19   stratosphere and the troposphere, and I don't know what

01:58PM    20   they connect to on the other end.  I don't profess to

21   understand the physics of any of that.  But this is

22   never portrayed as some sort of scientific analysis.

23            It is, in the words of Joseph Smith

24   himself, a vision, and miraculous in its character, and

01:59PM    25   could not be more squarely within the realm of

14

religious belief.

I can contrast that with another
fundamental belief universally shared by most Christian
faiths, and that is the bodily resurrection of Jesus
Christ.  Is that a fact or is it a belief in the
paradigm which Ms. Burningham offers to us?  Well, she
says facts are things that are susceptible to proof,
and beliefs are not susceptible of proof.  I think
that's wrong analysis right from the start.

Well, was Jesus Christ's body resurrected?
If it's true, it's a fact.  It happened in historical
time.  Could we have a trial about it in this
courtroom?  Could we put 12 ladies and gentlemen in
that box and put evidence before them?  Could we call
on the historical testimony of the Roman soldiers who
guarded the tomb and said they saw his disciples come
and steal his body away?

And then the other side would put on
evidence to say no, the apostle saw him and recorded
their testimony of having handled his hands and feet.
Maybe we'll put some medical witnesses on the stand to
say after someone's body has been dead for three days,
it's medically impossible for them to resurrect.  We
could talk about that as a distinction between fact and
belief, but that's meaningless.  Just as it would be

absurd to think that we could put a jury in the box and
make a decision about that, and Your Honor could issue
an order saying Jesus was resurrected or he was not
resurrected.  In the end, religious beliefs, whether
02:01PM   you characterize them as fact or not, must forever
remain in the realm of faith, and as such are excluded
from scrutiny by the courts for the very reasons I have
suggested.

Ms. Gaddy's next central complaint is
02:01PM   that --

THE COURT:  Before you -- before you leave
the example that you just gave, I've been thinking of
another and trying to square it.  What do we think
of -- especially if we think of the old testament or
02:01PM   other religious texts and we think about parable.  Is
there any applicability of parable to religious text
and doctrine?

MR. JORDAN:  Well, it's an interesting
question, and I would answer it this way:  Parables are
02:01PM   typically put forward by religious teachers as an
analogy to some eternal principle.  You might have the
parable of the new -- of the good Samaritan, a parable
taught by Jesus during his lifetime.  Now, he wasn't
purporting to tell a historical fact about a man
02:02PM   walking down the road and seeing an injured person by

the wayside and giving him assistance.  He was offering
it as an example of the way that people should conduct
their lives and as a criticism of those who thought
that someone from Samaria was beneath people who were
from Israel.

            So whether he taught it by a specific
example that he knew of or whether he taught it just as
a parable, as an analogy, I don't know.  There are lots
of teachings in the Old Testament which some people
would say that's just a parable.  That's just an
analogy.  I don't want to accept that as fact.  So I
think we could find among the many Christian
denominations differences of opinion about whether
Moses actually parted the Red Sea.

            I think we could find many people who could
sit in that jury box and say I absolutely believe it
happened in a historical way by some miraculous means
that I do not understand.  And we would find others who
would sit in that jury box and say I don't take that to
be literal.  I take that to be an analogy for the fact
that God gave assistance to the children of Israel so
that they could escape bondage and live their religion
in another land.

            But which is the orthodox Christian view?
Not for us to say; not for me to say; not for the

17

1    courts of the United States of America to say.  Because

2    as -- as we read, the decision about whether or not men

3    can believe what they cannot prove is left to each

4    individual.  So that's how I would respond to Your

02:04PM    5    Honor's, I think, important question about the

6    difference between parable and historical fact.

7              The second principal complaint that Ms.

8    Gaddy has is that Joseph Smith, according to her, did

9    not translate the Book of Mormon by the power of God,

02:04PM   10    but this is sort of a quibble in my view.  She doesn't

11    like the use of the word "translate" because for her,

12    translation must be limited to the process by which

13    someone who is educated in two languages can read the

14    source language and render it into the target language

02:05PM   15    as if I were a fluent speaker of French, I might be

16    able to translate Les Misérables into English.  Now,

17    unfortunately, I'm not, but Joseph Smith never claimed

18    to be conversant in reformed Egyptian.  His statement

19    was and always was that he translated the Book of

02:05PM   20    Mormon by the power of God.  What does that mean in

21    terms of the physics, the process by which that

22    happened?  I have no idea.

23              THE COURT:  I'm not sure that I think --

24    that I agree with the way that you have framed the

02:05PM   25    second complaint.  I read it to be a little different

18

than that.  I think -- maybe I'm being overly
simplistic.  I think Ms. Gaddy's complaining that the
alleged misrepresentation here is that the church has
for many decades now represented it was a translation
from golden plates, and, in fact, the church knows and
believes that it was through the use of a seer stone in
accordance with Joseph Smith's original accounting and
third-party accounts.  And so it's a misrepresentation
of the manner of the translation is how I think I
understand the theory.

          MR. JORDAN:  Well, let me say a word about
that.

          THE COURT:  Whether it was inspired by God
one way or the other.

          MR. JORDAN:  Right.  I'll put it this way:
The belief of the church, as I understand it, is that
Joseph Smith was not capable of translating the plates
by scrutinizing the characters and in some way by
knowledge of the source language translating them into
the target language.  But rather that he used a means,
a Urim and a Thummim, a seer stone, whatever you want
to call it, which allowed him, by the process of
inspiration, by the gift and power of God, to be able
to understand what was on the plates, dictate them to a
scribe who wrote them down.  That, I think -- that's

19

how I would describe it to Your Honor.

But you make an important point.  It seems to be a quibble by Ms. Gaddy about the manner in which the translation process was accomplished and what role God or extra-natural processes like a Urim and Thummim or a seer stone were instrumental in that process.  But once again, to use Judge Tacha's words, that's an inquiry rooted in religious belief.  It's not a representation of a purely secular matter.  And to characterize it as anything other than something that's rooted in religious belief is to just belie what's before our eyes.

THE COURT:  And would you say that if there are, and I'm not saying this is true, but if it were alleged or pled and assumed to be true at this stage that there are alternative, variant descriptions of the process and the mechanics, even some that are inconsistent, that the church autonomy doctrine places outside the review of judicial process questions about whether the church adopts one view or another or changes its view over time?

MR. JORDAN:  That is said better than I have said it, Your Honor.  That's exactly right because it goes back to what we talked about before.  What is the orthodox view?  And it may certainly be the case

1   that different people at different times in their

2   individual beliefs hold different views of just exactly

3   what the process was.  And they're absolutely entitled

4   to, and courts will not judge them for the particular

02:09PM   5   view of orthodoxy that they hold in their faith.  So I

6   think you've said it just right.

7           I won't belabor the third point because

8   it's of the same kind.  Ms. Gaddy complains about the

9   church's belief that the Book of Abraham is true

02:10PM   10   canonical scripture that originated in some way from

11   the Biblical prophet Abraham.  Joseph Smith always said

12   that just as the Book of Mormon came by the gift and

13   power of God, so did the other scriptures that he gave

14   to the world and his believers.

02:10PM   15           And, again, you can quibble about that and

16   say, well, I can't connect this particular fragment

17   with what an Egyptologist says today is the

18   interpretation of some character.  What we can

19   certainly say is none of that has anything to do with

02:11PM   20   secular matters.  They're matters of faith.  They're

21   matters of religious belief.  They are not secular, and

22   as such, in accordance with Judge Tacha's ruling in

23   Bryce and all of the other cases that we've looked at,

24   is not for scrutiny by the courts.  So if I can now,

02:11PM   25   I'll turn to just two final points.

                    You have before you some supplemental
authorities that have been submitted by the plaintiffs.
Improperly so because they're submitted with arguments
in ways that are inconsistent with the Court's rules,
but I don't want to quibble about that.  I simply want
to point out that what Plaintiff has given to you are
largely RFRA cases, the Restoration of Religious
Freedom Act cases, which is not at issue here at all.

                    You know that RFRA cases typically arise in
the context usually in a criminal case, not always, but
someone is claiming that they're exempt from the
general application of a statute because of their
religious belief.  This arises in some of the peyote
cases, for example, where people say it's part of my
religion to smoke peyote as part of a religious
ceremony.  And in those circumstances, where a
generally applicable criminal statute, for example,
impinges substantially on the religious practice or
belief of an individual, they may -- they may assert
RFRA as providing them a right to be exempt from that
statute.

                    And in RFRA, just as in the old
conscientious objector cases, where people are claiming
an exemption from the generally applicable draft laws,
courts really look at three things.  One, is there some

22

government action that is substantially burdening the
exercise of their religion?  Two, is this really a
religious belief as opposed to just some philosophical
position?  And three, is the religious belief being
sincerely held?

So when you have a RFRA case, you are going
to at least potentially scrutinize whether someone is
asserting a sincere belief in order to be exempted from
this generally applicable statute.  That has nothing to
do with this case.  This is not a RFRA case.  It's not
a criminal case.  The church is not asserting any
exemption from some generally applicable criminal law.
And it couldn't in this case, of course, because the
Flowers case said that RFRA's unconstitutional as
applied to the state, so state fraud law wouldn't have
anything to do with any of this anyway.  But I just
want to make it clear that this is not a RFRA case, and
so the whole statutory concept of scrutinizing whether
someone's religious belief is sincerely held has
nothing to do with this case.

And then the final point I want to make
relates to the RICO claim here.  Once again, I don't
understand what RICO could have to do with this case.
Your Honor knows that the elements of a civil RICO
claim are investment in, control of, or conduct of an

enterprise through a pattern of racketeering activity.
And racketeering activity, of course, is the predicate
act aspect of civil RICO, and it requires that someone
be effectively indictable for the conduct that's in
question.  And that brings us back to the Ballard case,
which Your Honor referenced earlier, in which the
Supreme Court said if one could be sent to jail because
a jury in a hostile environment found religious
teachings false, little indeed would be left of
religious freedom.

          In as much as that is the case, we couldn't
indict Wesley Harward or anyone else for either
believing or preaching doctrine of The Church of Jesus
Christ of Latter-day Saints.  And by the same token,
because we can't indict them, their behavior in
believing, teaching, preaching that doctrine can't be a
racketeering activity.  And so we can't even get back
past first base in RICO analysis.

          So I conclude with this thought --

          THE COURT:  Well, hold that for a moment,
will you?

          MR. JORDAN:  Yes, sir.

          THE COURT:  If the Court -- if I agree with
you that the representations that form the core of the
plaintiff's complaint, the three, I'm going to say -- I

24

mean, there are statements throughout the complaint

about other material misrepresentations, but in the

complaint and in the opposition memorandum, I agree

with you that the plaintiff points primarily to those

02:16PM   three categories of statements that you just

referenced.

         If I conclude that representations

concerning those matters is within the heartland of

religious belief and not subject to court scrutiny,

02:17PM   then all of the claims fall on that basis; is that

true?  I mean, the racketeering claims would fall

because the predicate acts could not be unlawful.

There's no material misrepresentation for mail fraud or

wire fraud.  Even if there was a fiduciary duty, even

02:17PM   if there were, the Court could never assess whether

there was a breach of it through the misrepresentations

and so on through each of the claims.  And that's your

-- that's the primary thrust of your motion to dismiss,

is it?

02:17PM          MR. JORDAN:  It is exactly the thrust.

You've -- you've expressed it perfectly, Your Honor.

         THE COURT:  Okay.  All right.  I just

wanted to make sure I understood that there was

argument in the opposition and especially then in reply

02:18PM   about other elements of RICO, but I didn't understand

it.  And I understand you're advancing those arguments.

That's not in lieu of your position first stated, I

think, that there's no fraud in the first instance.

MR. JORDAN:  Right.  And no fraud because

you can never reach the question, which is fundamental

to any fraud claim or any RICO claim, and that is the

truth or falsity of the expression.  And because you

cannot reach that, as Your Honor's pointed out, you

just never get past the first step in analyzing any of

the other matters.

I close with a quote from the Smith case of

494 U.S. 877, again, a United States Supreme Court

case, in which the Court said, "The free exercise of

religion means, first and foremost, the right to

believe and profess whatever religious doctrine one

desires."

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Jordan.

Ms. Burningham, you have a different view

of things, I think.

MS. BURNINGHAM:  Yes, Your Honor.  Thank

you.  May I approach?

THE COURT:  Would you, please.

MS. BURNINGHAM:  Your Honor, I think Mr.

Jordan makes an argument that is very simple, and I

don't think it's that simple.  I don't think the law is
that simple.  I'm sure you've studied constitutional
law more than any of us have, and we know that
historically there have been a lot of cases whether in
the freedom of expression part under the First
Amendment, or the establishment portion, and the cases
decided thereunder, including Lemon and entanglement,
they're different aspects of the First Amendment
protection.  And all these are being claimed by the
defendant as an affirmative defense and so they have
the burden to show that they fit within this.

          Now, the church autonomy doctrine is a
relatively new thing that has sort of come -- I believe
it fits under establishment; that we don't want the
government impinging upon the church's right to do what
it wants.  But if you look at the cases under the
church autonomy doctrine, they basically fall into
maybe three different types of cases.

          You have the cases where somebody is trying
to -- wants a position, such as Gonzalez in the
Archbishop of Manila, where he felt like, I think it
was in a will, he was devised -- his family was devised
the position of archbishop, and yet in interior
decisions made by the church, they decided no, he
doesn't get it.  The Court was brought into the lower

27

court in Manila, and said, well, he should get it.  It
was overturned by the Supreme Court of the Philippines.
And would you like that cite, Your Honor?

THE COURT:  I'm with you.

MS. BURNINGHAM:  Okay.  And so that's the
ministerial exception, and that has been applied and
expanded to include and disallow claims under -- EEOC
claims, and we know that.

The next type of decision under the church
autonomy doctrine is a decision where it involves the
expulsion or excommunication of members, and the rules
and the guidelines there because they are completely
within the church's polity let's say.  Catholic
Churches and other churches have significant and
detailed inner judicial processes.  The Mormon Church
doesn't have a similarly complex and specified interior
judicature for lack of a better word.  It does have
some for excommunication.  It has its own process.

But we are talking about something that's
now affecting people outside the church.  If a
missionary goes outside in a different country or even
in the United States and preaches, as was done as we
cited as one of the predicate acts in RICO, that Joseph
Smith translated from gold plates, and this is what he
had, and this is the Book of Mormon, that's something

that's not just affecting the church and the body of

the church.  It affects people who rely upon that

statement and may join the church because they think,

oh, there are records that were found, and Joseph Smith

02:22PM   translated these through some ancient language called

reformed Egyptian.  That's a lot different than if he

found a seer stone, and the missionaries preached, oh,

yeah, I was looking at a seer stone in a hat.  And that

may not make a difference to everybody, but it

02:23PM   certainly is a fact that could make a difference to a

number of people.

And it's our position that Ballard and

progeny, including Bryce, they limit -- they limit the

misrepresentations, or they limit what -- when the

02:23PM   Court cannot be involved in religious cases to belief

and doctrine but not two things that can be proven in a

manner that is secular.

And for an example, I'll read from the Van

Schaick case, and that was a District Court case, a

02:23PM   Scientology case in Massachusetts, even though it

involved a Scientology case of California.  And in that

case, one of the misrepresentations that the plaintiff

was claiming that -- that the church had made was -- or

that an agent of the church had made was that during

02:23PM   auditing, the auditing procedure, which granted is a

doctrinal belief of Scientology, in going clear, you
need to be audited, and that is someone in the
Scientology religion will speak to you and talk about
your prior experiences in an attempt to make you clear
and make you free from past engrams.

So one of the allegations was that
Scientologists represented that auditing will make you
healthy and happy, and there is scientific evidence of
that.  And what the Court stated was that -- excuse
me -- that statements -- the holding was statements
citing science as their source may provide a basis for
a fraud action even though the same contention would
not support such an action if it relied on religious
belief or its authority.  That's what we've got here.
We've got sources of verification outside belief.  We
have with regard to one, two, and three, let me go
through them.

On one, the misrepresentation is the
misrepresentation not as counsel has characterized
it --

THE COURT:  Wait.  I'm sorry.

MS. BURNINGHAM:  Sorry.  Go ahead.

THE COURT:  Before you move on, it seemed
like you just made a leap in your argument.

MS. BURNINGHAM:  Okay.

30

```
 1              THE COURT:  And I want to make sure I'm
 2    following.  In that Scientology case, I mean, setting
 3    aside the questions in that case about whether
 4    Scientology was a religion in the first instance, the
 5    discussion was about the subject matter of the
 6    representation and the fact that the representation --
 7    the church's representation was that it was
 8    scientifically supported, this notion.
 9              MS. BURNINGHAM:  Right.
10              THE COURT:  And that's what distinguished
11    it from being religious or ecclesiastical in nature,
12    and that's why the Court could review it.  Is it not
13    the nature of the representation?
14              MS. BURNINGHAM:  Your Honor, I know that
15    distinction has been made historically between
16    religious -- in a religious context versus a secular
17    context, but I don't think that that is the limit.  I
18    don't -- I just think that cases have not come up that
19    have been on point that are analogous to the type of
20    case we have, and let me show you an example, if I can.
21              THE COURT:  But wasn't that the whole point
22    in the Van Schaick decision that you were just citing?
23              MS. BURNINGHAM:  I think that was the
24    holding, but I also think that the author of the
25    decision made the point that the jury has to decide
```

02:25PM

02:25PM

02:25PM

02:26PM

02:26PM

1    whether if there's other sources of verification, then

2    that takes it out of the belief that is covered in the

3    church, out of the limits of belief.

4                THE COURT:  How does it?  I mean, to Mr. --

02:26PM   5    would you address Mr. Jordan's argument from -- and it

6    was restated here.  I thought it was laid out well in

7    his papers.  All of the briefing in this case was

8    extraordinary, I thought.  But let's use the example of

9    Noah's ark.  I mean, are we going to put to a jury the

02:27PM  10    question about whether two-by-two Noah gathered all of

11    the species on the planet and put them on a boat and

12    that there was a flood for 40 days?  I mean, will we

13    put on scientific evidence to prove or disprove a

14    tenant of religious doctrine?

02:27PM  15                MS. BURNINGHAM:  No, Your Honor, no, we

16    wouldn't.  Those things have to be taken on faith.

17    It's too late.  Time has past, and we're not going to

18    do that.

19                THE COURT:  So is this a matter of the

02:27PM  20    availability of additional information here?  Is that

21    the distinction you are --

22                MS. BURNINGHAM:  In part.  Yes, Your Honor,

23    in part.  But it's also a matter of admissions by the

24    church.  The church has now admitted that it was a seer

02:27PM  25    stone.  And I quote from the essay on the seer stone,

32

1    that most evidence -- I'd like to read this, if you

2    don't mind.

3              THE COURT:  Go ahead.  Just, please, not

4    too fast for our court reporter who's trying to keep

02:27PM    5    up.  Thank you.

6              MS. BURNINGHAM:  Oh, sure.  I'm quoting

7    from the LDS essay on the seer stone:  "Most of the

8    accounts speak of Joseph's use of the interpreters or

9    the seer stone."  Some accounts indicate Joseph studied

02:28PM   10    the characters on a plate.  And the previous language,

11    when it was first published, was that the best evidence

12    was that the seer stone was used, even though Joseph

13    Smith only said the gift and power of God.

14              So what we have here is we have evidence

02:28PM   15    that is not religious evidence.  It's not just, well,

16    we believe that Joseph Smith used the plates.  We now

17    have the fact.  And this is going to maybe be a little

18    bit out there, but if you -- just in a general quantum

19    mechanics type of thing, okay, area, we have the

02:28PM   20    quantum foam, or we have all possibilities laid out

21    here.  And at some point, there is a point of

22    decoherence when what is possible, what is believed

23    becomes what is or what is a fact or what is

24    established, and that's what we have now here.  The

02:29PM   25    church has admitted and it has established that it was

the seer stone that they have hidden from the members
since it was brought over in 1947 with the pioneers
that was the method of creation of the Book of Mormon,
not that it was a translation from plates.

02:29PM      THE COURT:  Suppose there are conflicting
accounts of historical events, including the
crucifixion of Christ.

MS. BURNINGHAM:  Mm-hmm.

THE COURT:  Where does mystery and faith
02:29PM  fall within religious doctrine, and what role do courts
have in adjudicating different accounts of events?

MS. BURNINGHAM:  I understand, Your Honor.
I understand your concern.  And I guess the way I would
address it is that you ask a very good question about
02:29PM  where there was some statement, and it may have been
from Mr. Jordan, about how RFRA limits and applies
sincerity of belief in order to get out of a certain
regulation or statute.

What the church is doing here is claiming
02:30PM  belief that in order to get out of common law fraud or
any kind of wire fraud or mail fraud, they think that
they should be exempt from that.  And in order to do
that, they have to show that it affected -- that it
would seriously impinge on their religious beliefs.  I
02:30PM  have yet to hear what belief, what it is that we would

be hurting if we were to pursue a claim for fraud

against the church.

       THE COURT:  Well, I think the defendant's

position and the concern I read espoused by courts over

time is the state doesn't belong in adjudicating the

truth of religious beliefs.  And they are premised, of

course, on facts, which is why I think I share Mr.

Jordan's view about the distinction in the case as

being between secular facts and religious facts as

opposed to facts and beliefs.  Because I don't -- I

agree with him, and maybe I missed a citation in your

argument, suggesting that the correct standard is fact

versus belief.  Those seem too intertwined to me.  We

could have proven whether Christ died on a cross.  We

could have proven whether he was resurrected.

       MS. BURNINGHAM:  Right.

       THE COURT:  Any of the things in the Bible,

they're facts.

       MS. BURNINGHAM:  But once the proof is

there, as it is now, with the admissions by the church,

we've got the proof.

       THE COURT:  Wouldn't you say even based on

the allegations in the complaint, that what -- I think

what you've set out are alternative explanations for

events.  Does the church autonomy doctrine provide

35

1    religious institutions liberty to choose from among

2    alternative explanations and even change their -- even

3    change their official policy or doctrinal positions

4    about things?

02:32PM    5           MS. BURNINGHAM:  They should.  But in this

6    case, the church has had a correlation committee under

7    the Church Educational System since the mid-20th

8    century and what that -- what that department has done

9    is that it has consistently obfuscated and

02:32PM   10    misrepresented the facts of how these things came

11    about.  They've admitted now in the Book of Abraham

12    that even church Egyptologists, even Mormon

13    Egyptologists are now saying that Abraham is not

14    depicted in any of the facsimiles even though we still

02:32PM   15    have the Book of Abraham as scripture.  It still is

16    taught in student manuals.  We still have sketches of

17    facsimiles that say this is Abraham laying on the

18    throne or sitting on the throne of Pharaoh when it's,

19    in fact, Isis or Osiris or an Egyptian -- part of a

02:33PM   20    funerary document.  We have these misrepresentations

21    that are now admitted in the Book of Abraham essay, if

22    I may read from that, Your Honor, and I'll try to be

23    slow.

24           THE COURT:  I want you to do that, but will

02:33PM   25    you -- I'm going to do the same thing I did to Mr.

36

02:33PM

```
 1   Jordan, and I'm going to pull you back for a moment.
 2   Did you answer my question?  Does the church autonomy
 3   doctrine provide our religious institutions with
 4   autonomy to make decisions among competing accounts or
 5   beliefs and even to change those beliefs over time?
```

02:33PM

```
 6            MS. BURNINGHAM:  Yes.  But when there is
 7   evidence of a deliberate intent to hide the truth of
 8   how a church was formed or the origins of scripture,
 9   that is fraud.  And that is -- and in being able to
10   protect the citizens of the state against something
```

02:33PM

```
11   like that is a compelling interest of the state.  And I
12   don't think that any of the cases hold that a church,
13   if it knowingly and intentionally hides or
14   misrepresents facts about its origins or its scripture,
15   that they are exempt.
```

02:34PM

```
16            THE COURT:  Hold on.
17            MS. BURNINGHAM:  Okay.
18            THE COURT:  Hold on.  I mean, we should get
19   to the Book of Abraham for sure, but --
20            MS. BURNINGHAM:  Okay.
```

02:34PM

```
21            THE COURT:  -- let me just -- this is from
22   the Supreme Court.  You're familiar with the Ballard
23   decision of course.  You cited it and relied on it.
24   Both parties are -- we're all versant in it.
25            Speaking about religious freedom, the
```

02:34PM

freedom to believe and the freedom to act, especially the freedom to believe, the Supreme Court said this freedom embraces the right to maintain theories of life and of death and of the hereafter which are rank hearsay -- or heresy, rather, to followers of the orthodox faiths.  Heresy trials are foreign to our Constitution.  Men may believe what they cannot prove. They may not be put to proof of their religious doctrines or beliefs.  They may not be put to proof of their religious doctrines or beliefs.  Religious experiences which are as real as life to some may be incomprehensible to others.  Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the laws.  Many take their gospel from the New Testament.  But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations.  The miracles of the New Testament, the divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many.  If one could be sent to jail because of a jury -- excuse me -- because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom.  And then the Court goes on to say man's relation to his God was

made no concern of the state.

How do we get past the language from the
Supreme Court, which is binding on me, to testing the
veracity of allegations based on competing evidence
that may exist?  I assume, because we're in a Rule 12
posture, the truth of the well-pled factual
allegations, but how do I get beyond that language?

MS. BURNINGHAM:  Because everything you
just read, Your Honor, has to do with beliefs and
doctrine, and they're not facts.  And I know that the
distinction is they're not admitted facts.  They're not
-- let me just compare what -- I think this will
illustrate this nicely.

THE COURT:  Is it your view, then -- I
guess it must be your view that the church, and when we
say "the church," I think -- let's be more precise.
You're referring to the --

MS. BURNINGHAM:  The Corporation of the
President, Your Honor.

THE COURT:  Right.  Which I assume has had
different manifestations over time.  It's been
different people in different positions over time, and
we're assuming that it's one unitary --

MS. BURNINGHAM:  Well, highly correlated
since the '50s.

```
 1              THE COURT:  Your view is, your allegation
 2    is that the church simply doesn't really hold that
 3    belief.
 4              MS. BURNINGHAM:  Yes.  And that was the
 5    second part of my argument, that it's not sincere.
 6    They have -- J. Reuben Clark, in a discussion clear
 7    back in -- when the correlation committee was being
 8    formulated, there were two different ideas.  Should we
 9    go and tell the whole truth, or should we tell, as Boyd
10    K. Packer referenced, something that makes the little
11    grandmothers in Sanpete County happy or that assuages
12    them?  I haven't quoted him exactly.
13              One is sort of a fairytale, and the other
14    is the raw, unvarnished truth, and they picked the
15    former.  And that's what they've done for people who
16    grew up during that time.  And many people relied on
17    what was taught because from correlation, it went to
18    Sunday school, priesthood, all these manuals, and even
19    to the missionary manuals and to what was taught in
20    institute and seminary.
21              THE COURT:  Well, so let me draw you back
22    to Ballard then and see if I --
23              MS. BURNINGHAM:  Okay.
24              THE COURT:  -- can understand how you think
25    your case is different.
```

40

```
 1                    MS. BURNINGHAM:  Mm-hmm.
 2                    THE COURT:  The individuals at issue in
 3      Ballard were making representations about their ability
 4      to cure disease, both curable and incurable, because of
 5      the divinity of God.
 6                    MS. BURNINGHAM:  Right.
 7                    THE COURT:  And the purity of these
 8      individuals.
 9                    MS. BURNINGHAM:  And they were the
10      incarnation of St. Germain, as I recall, or something
11      like that.
12                    THE COURT:  Right.  That's right.  And
13      that's the context of the misrepresentations at issue
14      in that case.
15                    MS. BURNINGHAM:  It's a belief.
16                    THE COURT:  I'm sorry?
17                    MS. BURNINGHAM:  I'm sorry.  I just said
18      it's a belief.
19                    THE COURT:  That's a statement of fact, is
20      it not?  We can cure disease.  Is that a statement of
21      fact?
22                    MS. BURNINGHAM:  That's their belief, that
23      they can cure -- cure disease.  And, Your Honor, can I
24      point you to the chief justice's dissent?  I think it
25      will answer your question in Ballard.
```

1          THE COURT:  Of course.

2          MS. BURNINGHAM:  Okay.

3          THE COURT:  Let's recognize it's a dissent

4    but sure.

02:39PM   5          MS. BURNINGHAM:  Yes.  This is what he

6    said.  And he said:  If it were shown that a defendant

7    in this case had asserted as part of the alleged

8    fraudulent scheme that he had physically shaken hands

9    with St. Germain in San Francisco on a day named, or

02:40PM   10   that, as the indictment here alleges, by the exertion

11   of his spiritual power he had in fact cured hundreds of

12   persons afflicted with diseases and ailments, I should

13   not doubt that it would be open to the government to

14   submit to the jury proof that he had never been in San

02:40PM   15   Francisco and that no such cures had ever been

16   effected.

17          Those are facts.  And what I'm trying to

18   say by reading that part of the dissent is that we now

19   have proven facts, admitted facts that were hidden for

02:40PM   20   a century or more.

21          THE COURT:  Hold on one moment, will you,

22   please.

23          MS. BURNINGHAM:  Sure.

24          THE COURT:  So the dissenting opinion is

02:40PM   25   not binding authority on me.  The opinion of the Court

is the binding authority.  The representations,

everyone agrees, were false in the Ballard decision,

the facts of that case.  Specific factual

representations, I can cure your disease, statement of

02:41PM   fact, false.  And the Court said it's not our place to

adjudicate whether that's true or false.  The Court

said, and I'm bound by it, I mean, this isn't the

holding, but here's the explanation:  The religious

views espoused by respondents might seem incredible, if

02:41PM   not preposterous, to most people.  But if those

doctrines are subject to trial before a jury charged

with finding their truth or falsity, then the same can

be done with the religious beliefs of any sect.  When

triers of fact undertake that task, they enter a

02:41PM   forbidden domain.

            Is that not the domain that you're inviting

me to enter?

            MS. BURNINGHAM:  No, because these facts

have been admitted and established.

02:42PM             THE COURT:  So is the difference that --

            MS. BURNINGHAM:  It's an exception.

            THE COURT:  -- the Ballards didn't admit in

the record that they knew what they were saying was

false?

02:42PM             MS. BURNINGHAM:  They did at the lower

court, and that was allowed to be tried, and it was

tried.  And just like in the RFRA cases, it is our

contention that we should be allowed to -- if Your

Honor wants to -- decides to grant the motion to

02:42PM  dismiss, we should be allowed to amend, to plead that

the church did not sincerely believe that gold plates

were used to create the Book of Mormon; that Joseph

Smith said that he saw -- not that he did see, but he

said or wrote that he saw two percentages, and one of

02:42PM  them said all creeds are false.

And, Your Honor, if I can just compare the

two -- two characterizations, I think this will sort of

bring it all together, the difference.  I know it's a

little abstract.

02:42PM  THE COURT:  I'll follow as closely as I

can.

MS. BURNINGHAM:  Thank you, Your Honor.

THE COURT:  Thank you.

MS. BURNINGHAM:  Mr. Jordan stated if --

02:43PM  these are both -- let's see, I don't have the page.

Mr. Jordan, if you could help me.  I believe it's -- he

refers to our opposition at page 8 in his reply, and he

says that we make three claims.

THE COURT:  Yes, I remember that well.

02:43PM  MS. BURNINGHAM:  Do you have that?

```
 1              MR. JORDAN:  I'm not sure.  Are you
 2    referring to page 8 of my brief?
 3              MS. BURNINGHAM:  I think it is page 8 of
 4    the reply as well and page 8 of the opposition on both.
 5    It has three bullet points.
 6              THE COURT:  It was page 8, yes.
 7              MS. BURNINGHAM:  And mine on the opposition
 8    also has three bullet points, and they're compared.
 9              THE COURT:  I'm with you.
10              MS. BURNINGHAM:  Okay.  Thank you.  Reading
11    from the reply first, this is what he claims we are
12    asking the Court to do.
13              One, did God and Jesus Christ appear to
14    Joseph Smith in 1820?  That is not what we're claiming.
15    That's not what we want the Court to adjudicate.
16              Now, compared to my opposition, this is
17    what I say:  In 1820, as stated in Smith's own 19 -- or
18    1832 handwriting, Smith sought the Lord who forgave his
19    sins.  Nothing more.
20              What we want the Court to adjudicate is
21    whether Smith's report of what he saw is what the
22    church has been telling everybody or if it was a
23    conflated, exaggerated, manipulated tale, not the truth
24    of what happened but what Joseph Smith actually
25    reported.  And I apologize.  I think this is the most
```

obtuse of my three points and so if I may continue on
the other two.

        THE COURT:  Yes.  But may I ask a question
first?

        MS. BURNINGHAM:  Sure, sure.

        THE COURT:  I don't know if we'll get this
far.  The defendants haven't argued this point, and so
I don't think -- I said defendants -- defendant, so
we're not going to reach it, I don't think, in
resolving this motion.  But don't you plead that there
are differing accounts of the first vision even by
Joseph Smith himself?  And so would your fraud claim
depend on you proving which is true and thereby
demonstrating the falsity of the other representations?

        MS. BURNINGHAM:  No, I don't think so, Your
Honor.  The fraud claim would only prove what the
church has done to manipulate Smith's handwritten
report.

        THE COURT:  Well, did he account for it
differently in different places --

        MS. BURNINGHAM:  Yes.

        THE COURT:  -- at different times?

        MS. BURNINGHAM:  Well, he --

        THE COURT:  So are you depending on the
Court being able to adjudicate which of those accounts

1    was the true account such as it is in order to show

2    that the other --

3              MS. BURNINGHAM:  No.

4              THE COURT:  No?

02:45PM  5              MS. BURNINGHAM:  No, Your Honor.  What we

6    would be doing is, for instance, for 15 years there was

7    no mention of two separate personages or all creeds are

8    false.  That was from 1820, when the first vision was

9    supposed to have occurred, until 1835.  We could almost

02:46PM  10   take -- I can see discovery where we ask the church to

11   admit certain things, and then once those are admitted,

12   it's the reporting of what happened, not what did

13   actually happen.  That doesn't matter.  It's that the

14   church has manipulated the facts, what did happen.  Not

02:46PM  15   the beliefs out here but what actually did happen.

16             THE COURT:  And if I -- just to clarify a

17   point you made earlier, make sure I understand it

18   correctly, this courtroom is a suitable place to

19   adjudicate those facts, because unlike Noah's ark,

02:46PM  20   there are records that we can refer to, and now we can

21   test the truth or falsity of statements or accounts or

22   representations because of our proximity to the events.

23             MS. BURNINGHAM:  In part, yes, but not

24   only.  It's only where the misrepresentations rise to

02:47PM  25   fraud.  Not negligence.  Not we don't care.  I mean, we

47

1   made a mistake, or we're going to do this, or we're

2   going to say that this happened instead of that.  Only

3   when they rise to fraud and when there's evidence of

4   deliberate manipulation and deliberate concealment, and

02:47PM  5   I think we can prove that through the back door by

6   asking questions of sincerity.

7          THE COURT:  Okay.  You were saying this is

8   your -- did you say most obtuse example?

9          MS. BURNINGHAM:  Yes.  I apologize.  It was

02:47PM  10   number one.  But that is one that many people rely on

11   for joining the church, that all creeds were false.

12          So the next one, Mr. Jordan says, is we

13   asked the Court to prove, quote, and this is from page

14   8 of the reply, "Did Joseph Smith translate the Book of

02:47PM  15   Mormon by the power of God?"

16          That's not what we're asking.  We're

17   asking, and reading from my reply on page 8, "The Book

18   of Mormon was not translated from an ancient record but

19   was created while Smith peered at a stone in a hat, the

02:48PM  20   same stone he had previously used for scrying."

21          That's the admission.  That's what the

22   church has admitted in the gospel essay.  It seems

23   easy.  It doesn't seem like we'll have to have a lot.

24          And then the third item that we've claimed

02:48PM  25   from Mr. Jordan's reply:  "Is the Book of Abraham true

1    scripture from the Biblical prophet Abraham?"

2              And from our opposition:  "The Book of

3    Abraham was not written by the Hebrew prophet.  The

4    papyrus recovered in '67 from Smith was said to have

02:48PM    5    translated the words of Abraham as a common Egyptian

6    funerary document which does not mention Abraham."

7              And if right now I can just go to the essay

8    that I wanted to quote before since there's kind of a

9    segue here, Your Honor, may I?  Okay.

02:48PM   10              THE COURT:  One moment, please.

11              MS. BURNINGHAM:  Sure.

12              THE COURT:  Matters involving visions of

13    God, they're religious in nature, are they?

14              MS. BURNINGHAM:  Yes.

02:49PM   15              THE COURT:  Matters involving the origin of

16    doctrinal texts are inherently religious in nature, are

17    they?

18              MS. BURNINGHAM:  No.  I don't think that

19    always is true, no.  The Dead Sea Scrolls -- the Dead

02:50PM   20    Sea Scrolls -- I'm sorry.

21              THE COURT:  The origin of a religious text

22    is not a religious question, not a religious --

23              MS. BURNINGHAM:  Well, it could be, but I

24    don't think it necessarily is.

02:50PM   25              THE COURT:  Who decides that?

49

1          MS. BURNINGHAM:  Well, ordinarily the

2     church stays out of that stuff -- well, no, actually,

3     excuse me, Your Honor, let me just be clear.  I think

4     that there is case law that states that the Court is

02:50PM   5     the one who decides whether it's a religious issue or

6     not a religious issue, an issue of religious belief or

7     not.  And I would -- I would argue that these are not

8     any longer issues of religious belief because they are

9     now facts that have been admitted.  They're not in that

02:50PM  10     anything's possible type of realm anymore.  They've

11     been established and admitted.

12          THE COURT:  So just a judge decides

13     whether -- let's just assume that the representations

14     are facts concerning Christ.  Facts concerning Christ.

02:51PM  15     Any judge in a robe in a courtroom would decide whether

16     those representations relate to belief and religion or

17     are facts about something else?

18          MS. BURNINGHAM:  No, I don't think so.  I

19     think this case is very narrow, and it's only where the

02:51PM  20     church has admitted the truth of something that it

21     previously had not.

22          THE COURT:  We are talking past each other.

23          MS. BURNINGHAM:  Okay.

24          THE COURT:  What if the church took

02:51PM  25     different -- let's use a different example.  No, let's

1    not.  There's no need, I don't think, for a

2    hypothetical.  Let's suppose the defendant, at

3    different times, made different statements about Joseph

4    Smith's first vision, an inherently religious

02:52PM   5    experience.

6              MS. BURNINGHAM:  Yes.

7              THE COURT:  I decide whether those are

8    matters of religion or whether they're not based on

9    what?  You keep referring to statements of fact.  Give

02:52PM   10   me factual statements about what Joseph Smith saw, or

11   what he said, or what he said about what he saw, or

12   what others said he said about what he saw, it's all

13   about a religious matter, a vision involving God.  And

14   I would decide that that's not a religious matter

02:52PM   15   applying what test?

16             MS. BURNINGHAM:  No.  It is a religious

17   matter, but it's not -- but we have -- Your Honor, we

18   have -- I don't think the case law that holds something

19   is religious, if it's in a religious context, we can't

02:53PM   20   touch it versus a secular context, well, then we can

21   enter into it.  Once things have been established, that

22   difference doesn't make any sense anymore.

23             THE COURT:  But in the language of the

24   Supreme Court, again, going back to Ballard, and this

02:53PM   25   is different language, when considering the truth or

51

```
 1   falsity of the statements made by the Ballards,
 2   religious claims, the Supreme Court said we do not
 3   agree that the truth or verity of respondent's
 4   religious doctrines or beliefs should have been
 5   submitted to the jury.  Whatever this particular
 6   indictment might require the First Amendment precludes
 7   such a course.
 8               Isn't the whole point, isn't that whole
 9   discussion we're not in the business of deciding the
10   truth or falsity of religious statements?
11               MS. BURNINGHAM:  Of religious beliefs, Your
12   Honor.
13               THE COURT:  Okay.
14               MS. BURNINGHAM:  I see the difference you
15   don't see -- I mean, I understand how that has not been
16   addressed clearly in the case law, especially not in
17   the Tenth Circuit, but that's an open question.  But if
18   I could just read from the Book of Abraham real quick.
19               THE COURT:  Thank you.
20               MS. BURNINGHAM:  This is the admission in
21   the Book of Abraham essay:  "None of the characters on
22   the papyrus fragments mentioned Abraham's name or any
23   of the events recorded in the book," the Book of
24   Abraham.  "Mormon and non-Mormon Egyptologists agree
25   that the characters on the fragments do not match the
```

```
 1    translation given in the Book of Abraham.  Scholars
 2    have identified the papyrus fragments as part of a
 3    standard funerary text that were deposited with
 4    mummified bodies.  These fragments date to the third
 5    century B.C. and the first century C.E. long after
 6    Abraham lived."
 7              We've got facts now that have been
 8    admitted, so I'll move on, Your Honor, if that's all
 9    right, unless you have some more questions about this.
10              THE COURT:  No, that's helpful.  Thank you.
11              MS. BURNINGHAM:  Thank you.  If we go back
12    to Ballard, Ballard left open the question of whether
13    the Court could appropriately decide whether the
14    defendant sincerely believed what they were claiming.
15    I believe that's the correct interpretation.  I don't
16    want to overstep, but I think that was left open, and
17    that's what the lower court did, in fact, do.  And they
18    found that the Ballards didn't sincerely believe what
19    they taught, whether it's characterized as a fact or a
20    belief.  And it is a complicated history, the Ballard
21    case, but I believe there was a conviction, one, if not
22    two, and that was based upon their beliefs.
23              Anyway, to continue with that, the Ninth
24    Circuit case I submitted called Rasheed involves
25    sincerity of belief.  And it's our position that if
```

02:56PM

Your Honor is inclined to rule with the defense and
grant the motion to dismiss, that we would ask leave to
amend so that we can allege that COP's agents did not
sincerely believe what they were teaching from the
1950s, the time of correlation, until the gospel essays
were recently published, and that that lack of sincere
belief is evidence of fraud.  In the general sense of
the wire fraud and the mail fraud statute, intention to
deceive is all you need.  It's not the same with common

02:56PM

law fraud.  And I do think that even given the elements
of common law fraud, number one, a misstatement of fact
which is false, and, yes, how do you prove that, but
that the defendant knew to be false or believed
recklessly or said recklessly without sufficient proof.

02:56PM

I believe that we can show, through various
bits of evidence, most of which is in the control of
COP, that the church's leaders, the agents of COP did
not believe what they were teaching, and that that's
why they came out with the gospel essays because they

02:57PM

felt like it was about time to come clean.  And that
insincerity of belief, that lack of belief is evidence
of fraud on their part, and that we should be able to
prove that.

And the Ninth Circuit Court case of Rasheed

02:57PM

did just that.  It's the Ninth Circuit Court of Appeals

case and Rasheed had the Church of Hakeem.  Rasheed is
the named defendant.  He was the leader of the Church
of Hakeem.  And they had a program, they characterized
it as a belief or doctrine, called the "Dare to be
Rich" program where they -- if you don't mind me just
briefly summarizing this, Your Honor, where they taught
potential investors or members of their church to give
money and that if they believed, that God will make the
money grow, when, in fact, there was no investment and
it was just a Ponzi scheme.

          And the Court convicted these men on mail
fraud, the federal statute that's a predicate act in
RICO, and found that they were not credible; that they
did not believe what they told them.  And this involved
doctrine, a claimed doctrine by the Church of Hakeem,
that God will provide, and yet the Court convicted him
on fraud.  And the language in Rasheed is very helpful
here, if I may read briefly from it, Your Honor.

          THE COURT:  Thank you.

          MS. BURNINGHAM:  Speaking about the verdict
in the lower court:  The evidence is sufficient that a
jury could find beyond a reasonable doubt that Rasheed
and Phillips engaged in conduct --

          THE COURT:  I'm sorry, Ms. Burningham, if
you could slow down a little bit, please.  Our court

reporter can't possibly keep up.

MS. BURNINGHAM:  Am I too fast?

THE COURT:  You are when you're reading.
Thank you.

MS. BURNINGHAM:  Okay.  The evidence is
sufficient that a jury could find beyond a reasonable
doubt that Rasheed and Phillips engaged in conduct that
they knew was deceitful.  They made representations
concerning the source of the increased funds and
concealed the true source of those funds.

Just like Gaddy, in our case, they made
representations that -- COP made representations that
the scriptures were translated from gold plates when
the source of the scripture was, in fact, a seer stone.

Quote, and here's an aside, "Concealment of
a material fact is fraud within the scope of the mail
fraud statute."  And then going on, "They both
continued to operate the program over a period of time
with knowledge of their failure to disclose the true
source of the increased funds.  This intentional
misrepresentation created valuable undo advantage for
them, and thus was a scheme or artifice to defraud
within the meaning of the mail fraud statute."

The Ninth Circuit concluded that the
verdict should be upheld and that fraudulent intent may

1    be and is often proved by circumstantial evidence

2    including no sincerity of belief in what they're

3    preaching.

4                    One more quote, Your Honor:  "The principal

5    evidence of the fraudulent nature of the program, and

6    of Rasheed's and Phillips' knowledge of the deceit, is

7    the false impression they created concerning the source

8    of funds for the payments of the increase."

9                    I think that's good enough.  So I realize

10   that's the Ninth Circuit, Your Honor, and I guess I

11   would just say that I don't think that the RFRA cases

12   where we have in the Tenth Circuit, and these are some

13   of the cases I submitted to you recently, where we have

14   sincerity tested, and that can be done in the Tenth

15   Circuit.  I think we can test it in a case like this.

16   If the church, regardless of the truth of one, two, and

17   three of what Joseph actually wrote down versus what

18   may have been manipulated by COP, whether it was the

19   stone or not, whether it was the stone or gold plates,

20   or whether the Book of Abraham is mentioned or not in

21   the papyrus, regardless of that, let's put that aside.

22   If we can show that the agents, the leaders, those who

23   are directly in control of the correlation committee

24   didn't believe it, and we have evidence that they

25   didn't because why would they hide the stone?  Why

would they lock it up, like Grant Palmer said, and not

let anybody see it until August 4, 2015?  If we have

evidence that they did not have a sincere belief in

what they were preaching, then we can show fraud, at

least in a general sense.  And I don't think that they

can have it both ways to characterize these three

things that I have identified as facts or as beliefs,

well, then, we should be able to show that their

beliefs were insincere.

THE COURT:  Do you agree that a sincere

belief theory is not a theory -- you're asking about

potential amendment?

MS. BURNINGHAM:  Yes.

THE COURT:  You agree that that's not a

theory contained in your current complaint?

MS. BURNINGHAM:  It's not, except for the

third allegation of fraud is that they knew to be false

or recklessly presented without knowing the truth and

falsity so indirectly.  But I would plead it much

differently, and it's only that I -- it's only because

I'm, you know, I didn't see it the first time around,

but I do think that we have grounds for that.  I don't

think it's frivolous.

Counsel has made a motion to me, threatened

a Rule 11 motion, they haven't filed it, but we have

58

earnest misrepresentations, and the issue is whether we
protect the populous against certain crimes.  We do.
We -- do we protect them against fraud, intentional
fraud, intentional misrepresentation?  I think we
should.

THE COURT:  I don't know yet -- we'll
recess in a moment.  We've been going for an hour and a
half, and we'll give the court reporter a chance to
stretch her fingers, and then we'll conclude.  If --
and I'm not going to rule today.  I'm going to take
this matter under advisement.  But if the Court agrees
with the defendants as to the theory in the current
complaint and concludes that amendment would be
appropriate under Rule 15, how much time would the
plaintiff need to amend the allegations?  30 days?  Do
you need longer than that?

MS. BURNINGHAM:  45 would be nice, Your
Honor, just in case.

THE COURT:  Okay.

MS. BURNINGHAM:  Thank you.  I would like
to, when we get back, address a couple of other things.

THE COURT:  I think there's a little --
there's some more work, I think, for us before we
conclude.

MS. BURNINGHAM:  Thank you.

1          THE COURT:  Why don't we take a ten-minute

2   recess and come back at quarter after three.  Thank

3   you.

4          (Recess was taken.)

03:20PM  5          THE COURT:  Ms. Burningham, I think you had

6   the podium.

7          MS. BURNINGHAM:  Thank you, Your Honor.

8   Just a few more points.

9          THE COURT:  Of course.

03:20PM 10          MS. BURNINGHAM:  Your Honor, I'd like to

11   just make one more statement to maybe iron out our

12   position in response to a statement you've made, I

13   think, a few times on the record, that -- that the

14   church has had various opinions as to what happened or

03:20PM 15   as to its beliefs over time, and that we shouldn't make

16   a court of law determine which of those is true.  And I

17   understand your point.  But I think what we're doing is

18   something different, and what we're asking the Court to

19   do is slightly different, and these are fine

03:21PM 20   distinctions.  And I can't remember the case that said

21   that it's a fine distinction between religious or

22   secular belief sometimes, but I would also offer that

23   it's a fine distinction between deciding which of

24   several versions are true.  And the problem isn't that

03:21PM 25   there are many versions but that the church knows that

1    it has taught false -- false versions.

2          What the church has taught since

3    correlation is not true.  They know it's not true and

4    yet they've taught it.  And that's where sincerity

03:21PM  5    comes in.  So the question before the Court is not

6    whether the church's claims are true.  It's that the

7    church knowingly taught things it knew to be false.

8          It knew that since 1917 or 1912, when the

9    New York Times came out and the first Egyptologist back

03:22PM  10   in the late 19th century translated what was in the

11   Book of Abraham, that it was an impudent fraud.  It

12   knew that, but it continues to teach these young people

13   that this is the prophet Abraham's teachings, and that

14   this shows him doing such and such a thing and doing

03:22PM  15   this and that.  And it just flatly is not true.  Even

16   its own Egyptologists say that.

17          That's a little bit different, and that's

18   where I think -- and I don't think that it's -- I think

19   the compelling state interest comes in because we have

03:22PM  20   a duty to protect -- the state has a duty to protect

21   people from fraud, and that's more than just lying.

22   That's something more.

23          Also, if an individual is not sincere under

24   RFA, he doesn't get the benefit of a First Amendment

03:23PM  25   defense or an RFA defense, freedom of expression.  And

why should it be limited to the RFA cases?  If the
church authorities, the general authorities who decided
what to teach and what to put in correlation knew that
their correlated manuals were not correct based upon
03:23PM  evidence that they've had for centuries or a century
and a half, why should we allow them to avail
themselves of the First Amendment defense, when an
individual who doesn't believe that, you know, he
doesn't really need to wear a beard or that, you know,
03:23PM  he wants his Bible with him, why should they be put to
the test, I don't understand, or that marijuana's
necessary?  That's the question that I think is more
clear.

          And when we talk about a person, Hobby
03:23PM  Lobby, as you know, came down and gave corporations,
even for-profit corporations the right to opt out of
selling contraceptives under the Affordable Care Act.
Well, why should we allow the corporate entity here,
the Corporation of the President of the Church of Jesus
03:24PM  Christ of Latter-day Saints, to opt out of common law
fraud or wire fraud or mail fraud?  If we can establish
that its agent leaders did not sincerely believe what
they taught and we can establish the other elements of
fraud, that is that they were made recklessly, that
03:24PM  they knew they were false, that they intended that the

1    members and potential members would rely on those

2    statements, and that they did, in fact, rely on those

3    statements, and they were damaged.  I don't -- I see

4    that the cases are limited, but I don't see that

5    there's any reason within the holdings to limit them to

6    just RFRA cases.  That's my point on that.

7         And I'll leave that and proceed just to the

8    fiduciary duty and the RICO claims, if that's okay,

9    Your Honor.  Okay.

10        THE COURT:  Thank you.

11        MS. BURNINGHAM:  Thank you.  First, the

12   breach of fiduciary duty.  It's true that Franco did

13   hold that church leaders do not have a fiduciary duty,

14   but that was in the negligence context.  We have not

15   pleaded negligence in the complaint.  And, in fact, I

16   think there is a common law cause of action that if I'm

17   given leave to amend, I would draft it as a duty of

18   full disclosure.

19        And I think the two cases that come after

20   Franco, one was -- Franco was decided in March of 2001,

21   I believe.  And the next case by the Supreme Court was

22   Mitchell, and it involved property, and I think it was

23   a swimming pool that had leaks, and it was

24   foundationally compromised.  And even though the buyer

25   inspected the swimming pool reasonably, the seller was

63

held to have -- did not disclose the crack in the pool,
and they said the seller should have given full
disclosure to the buyer, and that was after Franco.

The next case was Yazd, and that was a
soils engineering report that was withheld from the
buyer by the seller.  And Yazd iterated certain -- I
don't have those in front of me now, but certain types
of inequities between the two parties, such as
knowledge, education, one in a superior position to the
other.  I have the list of them somewhere, but when
that happens, there's a duty of full disclosure.  And
we also have a jury instruction that requires a duty of
full disclosure.  And they cite -- and it's cited in my
brief, I believe.

But if you're going to speak on a matter,
and I think this applies to the church, if the church
is going to, in their correlated materials, say this is
-- Joseph Smith had plates and show him sitting at
plates and appearing to translate, they have to tell
the whole story.  They have to give a full and fair
disclosure.  They have to say that, well, most of the
records -- what they're saying now, most of the primary
source evidence says that he used a stone in the hat.
They can't just give a partial disclosure.

THE COURT:  So I think you've just, in that

```
 1    statement --
 2                MS. BURNINGHAM:  Yes.
 3                THE COURT:  -- raised at least three
 4    separate issues in my mind.  One is the existence of a
 5    fiduciary duty.  Am I not bound by the Supreme Court?
 6                MS. BURNINGHAM:  Yes.
 7                THE COURT:  And so, I mean, I think you're
 8    advancing a good faith argument about expanding or
 9    changing that law, but I'm the wrong -- I'm the wrong
10    court to do that, I think.
11                MS. BURNINGHAM:  Yes, Your Honor.  I would
12    withdraw my breach of fiduciary duty cause of action
13    and replace it with a breach of duty of full
14    disclosure.
15                THE COURT:  So then let's talk about the
16    full disclosure.  That arises, does it not, in Utah in
17    the context of commercial transactions?  And you don't
18    have a duty to speak when you are dealing at arm's
19    length with someone, but if you do speak on a subject,
20    you have to speak in a manner and make whatever
21    disclosure is necessary not to make your disclosure
22    misleading, right?
23                MS. BURNINGHAM:  Yes.  It has historically
24    been interpreted that way, yes.
25                THE COURT:  Yeah.  Are you aware of any
```

03:27PM (line 5)
03:27PM (line 10)
03:27PM (line 15)
03:28PM (line 20)
03:28PM (line 25)

```
 1    application by Utah courts outside of the commercial

 2    context?

 3              MS. BURNINGHAM:  I am not.

 4              THE COURT:  And I guess second is, what

 5    limiting principle would apply here?  I mean, let's

 6    think for a moment about the -- let's talk about the

 7    Catholic Church.

 8              MS. BURNINGHAM:  Mm-hmm.

 9              THE COURT:  How would we go about defining

10    the scope and subject matter of disclosures that are

11    required?  Is the church required to make disclosures

12    about the inquisition, and what are those disclosures?

13    Or what about the sex abuse scandal in the church, if

14    the church at times have made disavows of it?  Are

15    those different matters than doctrinal things?  Is the

16    Catholic Church required to say we don't think it's

17    physiologically possible that Noah, two-by-two, brought

18    in two of everything on the planet and put them on a

19    boat?  I mean, what's the limiting principle to that

20    concept in the context of religious theology?

21              MS. BURNINGHAM:  That's a good question,

22    Your Honor, and I don't think it's a standard-of-care

23    type thing.  It's once you have admitted that what you

24    taught was not true, you need to, you know, you need to

25    go ahead and tell the whole truth.  I mean, that's not
```

03:28PM (line 5)
03:28PM (line 10)
03:28PM (line 15)
03:29PM (line 20)
03:29PM (line 25)

66

1    a good answer, I have to admit.

2            THE COURT:  I mean, how would we apply it

3    here?  In the context of a contract about a pool or

4    building a structure on the Salt Flats, you know, if

03:29PM    5    you are in possession of information about the

6    foundation and the earth that you are going to build on

7    and you make a partial statement and it's false or is

8    false in context because you failed to provide the

9    additional information that would -- I mean, that's

03:29PM   10    just different than saying here is this entire

11    theological belief system, and we've made some

12    disclosures, and so now we have to say what?

13            MS. BURNINGHAM:  See, this is where I go

14    back to facts versus beliefs.  We don't have to

03:30PM   15    disclose the entire theological differences that some

16    Mormons are more liberal and they believe this or that,

17    and some are more fundamentally strict, no.  We have to

18    disclose that we've had -- we can't hide evidence.  We

19    can't hide the stone in our vault for 150 years.  If we

03:30PM   20    -- if we know about it, we should talk about it.  If

21    we're going to talk about how the Book of Mormon came

22    about, we can't just make up a fairytale.

23            THE COURT:  Well, it's a claim that --

24    that's a fraud theory, I think, the one we're talking

03:30PM   25    about.  In Utah, I think that's the fraud theory.  It's

1    a material omission of a -- or an omission of a

2    material statement or something.

3              MS. BURNINGHAM:  But, yes, I'm sorry.  I

4    think it could be characterized as common law, Your

03:30PM   5    Honor, a common law duty to tell the whole truth once

6    you've spoken.  And that's the thing, you don't have to

7    -- if you don't talk about it, then that's fine.  But

8    if you make representations, you need to make a fair

9    and full disclosure.  I'll go on, Your Honor, unless

03:31PM  10    you have another question about that.

11              THE COURT:  I just -- no.  I mean, this is

12    -- this may be our next conversation.  I don't know.

13    We should have an amendment in front of us if we're

14    going to get to this, but I just don't understand what

03:31PM  15    that would be.  So does the Catholic Church also

16    disclose that bushes don't ordinarily talk when they're

17    on fire?  I mean, I just don't know what the limiting

18    principle is to the --

19              MS. BURNINGHAM:  No, but if you knew

03:31PM  20    that --

21              THE COURT:  There's not physiological proof

22    that the entire planet was flooded for 40 days.

23              MS. BURNINGHAM:  Right.  I understand that.

24    But if you knew that the bush in the fire story was

03:31PM  25    completely made up, you shouldn't talk about it.

1          THE COURT:  Okay.  Okay.  I think you

2     wanted to speak also about one of your other claims.

3          MS. BURNINGHAM:  Right.  Just about the

4     RICO cause of action, Your Honor.  For mail and wire

03:32PM     5     fraud you don't have to prove reliance, you don't have

6     to prove causation.  You just have to show, under the

7     federal statute, that there was an intent to deceive,

8     and I think that that will easily be shown in this

9     case.  There was an intent to deceive because now

03:32PM    10     they've revealed what they had hidden for so long.

11          And counsel has -- has continually said

12     that, well, RICO can't be applied in cases involving

13     religions.  Well, that's not true.  Just over the past

14     few years, there's been several cases filed against the

03:32PM    15     Catholic Church and, in fact, the Vatican in a DC

16     Circuit case in 2018.  Just because it hasn't been done

17     or reported doesn't mean it can't be done.  It has yet

18     to be done.

19          And counsel cites I believe it's

03:32PM    20     Wollerscheim for some dicta, but there's no holding

21     that I know of that says that religious organizations

22     or purported religious organizations cannot be the

23     defendant in a civil RICO case or a criminal RICO case.

24     There's three attorneys general now that are

03:33PM    25     investigating whether or not they should prosecute the

Catholic Church under RICO, Virginia, I have the other

two on the tip of my tongue, but I don't have them in

front of me.  I just don't think that's the law.

Michigan, Iowa, and Virginia AGs have gone on record.

03:34PM          THE COURT:  I mean, I'm a little

handicapped in addressing the racketeering argument

that you just made.  It's really not developed in the

papers.  I know there's a great deal of law about the

elements of mail fraud and wire fraud, and they -- I

03:34PM   have in my mind that they apply differently sometimes

in the criminal context and in the civil context, and

I'm not convinced that the content of the communication

in a wire fraud or mail fraud has to be false.  It just

has to be in furtherance of, but none of this is in the

03:34PM   papers.  It's not briefed anywhere.  There's an

objection to the enterprise and a general argument made

by the defendant, at least in the opening papers, that

it's just a rehashing of the fraud claim.  And

including in your opposition, that's what I was just

03:35PM   studying, I don't -- I mean, nobody disputes that cash

is a --

          MS. BURNINGHAM:  Right.

          THE COURT:  I mean, we definitely are

talking about an enterprise, and you're arguing about

03:35PM   the passive enterprise in your papers, but the content

70

```
 1   of the wire or mail, I don't know what to do with that.

 2   What should I do with that in view of the briefing?

 3              MS. BURNINGHAM:  Your Honor, I would like

 4   to have leave to amend, and I would -- I mean, I would

 5   amend the RICO cause of action.  I don't think -- I

 6   think it was -- I think I can make it tighter, but I

 7   don't think there is any case law that holds that a

 8   religious organization cannot be a defendant or cannot

 9   be part of an enterprise, and the lower levels of the

10   wards and the stakes, they're passive.  And I just -- I

11   think it does fit.  Just because it hasn't doesn't mean

12   it can't.  And I don't think their objections that

13   they've taken are well taken.  I just don't think that

14   they briefed it at all.  I attempted to do it, and

15   perhaps I didn't do a good enough job.  But I don't see

16   any law that says -- that holds that -- RICO's been

17   expanding as you, I'm sure, know in some ways.

18              THE COURT:  Unfortunately.

19              MS. BURNINGHAM:  But --

20              THE COURT:  And I don't know how it applies

21   -- I mean, I don't -- I'm a little bit -- I'm candidly

22   a little bit confused about the racketeering theory

23   that you're advancing here.  I mean, ordinarily --

24   often, let me say often the theory is that one or more

25   persons are controlling an otherwise lawful enterprise
```

for an unlawful purpose, using it as a vehicle to
perpetuate a crime largely is why it was started,
right?

But I don't know -- I don't even know how
it would apply over -- I think your allegations are
that, what, 130 years, I mean, who are the persons that
are directing the affairs the enterprise?  They're
every president and every apostle for 100 years and
they all are acting with a unity of purpose.  I mean, I
just don't understand how that fits, but again, we're
outside the papers and probably talking about
allegations that will be in the next pleading, not in
this one.

MS. BURNINGHAM:  I will be glad to address
that then.  I can briefly make a statement.

THE COURT:  I'd love to hear what you think
about it.

MS. BURNINGHAM:  Okay.  Your Honor, the
corporation, of course, is the defendant, COP, and it
only acts through its agents and in this case agent
leaders.  The enterprise is an association, in fact, of
not only those agent leaders but the local leaders who
are -- and the missionaries who are unwitting members
of the enterprise.

THE COURT:  Yeah.  Okay.  What else, if

anything, have we not touched on that you think is

important to our motion?

MS. BURNINGHAM:  I just don't think -- the

only thing that I would say, Your Honor, is I don't

03:38PM   think that the First Amendment was ever meant to

insulate or immunize religious organizations from

crimes or torts that affect the public.  Thank you.

THE COURT:  Thank you.

Mr. Jordan, you don't disagree with that

03:38PM   last point?

MR. JORDAN:  I do not disagree with that

last point as I made clear.  If an organization,

whether religious or not, makes false representations

about purely secular matters, they can be held to

03:39PM   account to the law, including the laws of fraud.  So I

think that idea runs clearly through all of the cases.

Let me try to briefly sum up where I think

we are.  Maybe just a word about the United States vs.

Rasheed case which has been cited by Ms. Burningham.

03:39PM   The problem for the defendants in that case is that

they made representations about purely secular facts.

And Your Honor will remember that the facts of that

case are that, and I quote:  "At the outset of the

program, Rasheed represented to his ministers and to

03:39PM   potential ministers that the increases of God were

gifts from the church to ministers derived from profits
that the church made from its foreign investments in
gold, diamonds, and oil."

And in combination with that, what they --
of course the Court goes on to say:  "There is no
evidence that any such foreign investments ever
existed."

Well, if you say, "Give me your money, I'll
pay you back from the foreign investments I have in
gold, diamonds, and oil," and what you don't tell them
is that the payments were coming solely from the
donations of other members, you're just running a Ponzi
scheme.  If you say, "I have foreign investments in
gold, diamonds, and oil, and I'll pay you back from
those investments," and you're really just paying them
back from the money that you get from the next set of
investors/donors, you're making representations about a
purely secular matter.  There's nothing different or
unusual about United States vs. Rasheed.  It just falls
perfectly into the pattern that we see in Bryce and the
other cases.

THE COURT:  But if a defendant in that case
said, "And I make investments on Wall Street with the
advice and divine inspiration of God," then what?

MR. JORDAN:  Well, in your hypothetical, if

1   the minister said, "Give me your money because I

2   believe that I'm such a righteous person that God will

3   help me to invest this money wisely" and he invests it

4   in some stock that crashes, he's not going to be held

03:41PM   5   to account for that.

6           If he actually made the investment and it

7   didn't work out well, he lost the money, but he's not

8   -- he's not perpetuating a fraud.  If I tell you, "I

9   have investments in diamond mines in Zimbabwe, and I'll

03:42PM   10  pay you back the money that you donate to me with

11  interest and no penalty for withdrawal from those

12  investments in the Zimbabwe gold mine" and there is no

13  Zimbabwe investment and I just get the money from the

14  next investor/donor to give to you, that's just a Ponzi

03:42PM   15  scheme.

16          THE COURT:  But you're reverting back to

17  the easier case.  I mean, the harder case is the one

18  where you make a misrepresentation concerning God's

19  involvement in the performance of the funds that you

03:42PM   20  obtained.  And I guess you would say, what, then, in

21  that instance?  Would we investigate whether that was a

22  genuinely held belief by the person who makes the

23  statement?

24          MR. JORDAN:  No, I don't think we would.  I

03:42PM   25  think we would look at whether it's a statement about a

75

religious matter as opposed to a secular matter.  God
is -- God is directing my investment strategy.  That's
a purely religious matter.

             THE COURT:  What about --

             MR. JORDAN:  It's a hard case on the facts
obviously but still.

             THE COURT:  What about -- I'm trying to
pick the right historical example.  I don't know if
it -- I mean, Koresh, or what about -- who is the --
who is the man with the Kool-Aid?

             MR. JORDAN:  Excuse me.  The who?

             THE COURT:  The man with the Kool-Aid.

             MS. BURNINGHAM:  Jones.

             MR. JORDAN:  Oh, Jim Jones.

             THE COURT:  Jim Jones.  Not a problem,
right?  God told me we should all kill our children and
kill each other.  There's nothing to see here because I
say that it's divine inspiration from God.  That's an
extreme example, but --

             MR. JORDAN:  It is an extreme example but
one with which the courts have dealt, including the
U.S. Supreme Court.  There is a distinction drawn
between the preaching of religious beliefs and certain
actions that you advocate on the basis of those
religious beliefs.

So I might, in fact, have a religious
belief that we should execute people of a certain
philosophy that is different from our own, but the
courts distinguish that and say that's not within the
First Amendment.  There is a -- there is a conduct
versus extreme action distinction that runs through the
law.  But the courts are very, very careful to say the
kinds of actions we're talking about are not preaching
and teaching.  That's part of what the First Amendment
guarantees.

THE COURT:  Well, what about -- what about
inducements to act like in the form of paying tithing?
So if that's based on representations about God's plan
and divinity and 10 percent as opposed to executing
someone who proselytizes a different position, how is
that different, do you think?

MR. JORDAN:  I think it's completely
different because in the one case, I kill you.  In the
other case, I say to you, "God will bless you if you
pay tithing," and then the individual chooses for
themselves whether they believe that teaching and
whether they choose to act on it.  My right to preach
and proselytize and tell you what I think will bring
the blessings of God upon you is absolutely protected
by the First Amendment.

1           THE COURT:  What about -- what if the

2   statement is, "God will bless you if you abduct

3   children under the age of ten and you deliver them to

4   our church"?

03:46PM  5           MR. JORDAN:  I think there you've crossed a

6   line that the courts would not struggle too hard with.

7   We actually have a case like that in -- in one of the

8   supplemental authorities that's cited by the defendant.

9   And that particular supplemental authority was sort of

03:46PM  10  an extreme sect of Judaism that -- it's the U.S. vs.

11  Stimler case.  It comes out of the Third Circuit.  A

12  certain ultra-Orthodox Jewish sect that practices

13  what's called "gettin," and in gettin, as I understand

14  it from the case and don't obviously claim to be an

03:47PM  15  authority on it, one could use -- could require someone

16  else to sign a divorce decree.

17           And what was done in that case, and of

18  course it's a criminal case, is they kidnapped the

19  person in order to get them to sign this divorce

03:47PM  20  decree.  Well, the Court didn't have too much problem

21  with that because the Court says kidnapping is not

22  preaching.  Inciting to kidnap is a long stretch away

23  from religious belief, and I think that's where you're

24  going.  And there they found that the government had a

03:47PM  25  compelling interest to require people not to kidnap.

```
1              So I'm the first to acknowledge that you
2    can posit hypotheticals where people may be encouraged
3    by someone else's religious views to commit the
4    criminal act of kidnapping or murder or whatever it
5    might be.  But that's so far away from what the Supreme
6    Court has said about protecting people's right to teach
7    and believe what they choose to believe.
8              Which takes me, I think, to the whole
9    concept of what seems to be indicated here as a desire
10   to amend the complaint.  And as I understand what Ms.
11   Burningham is saying, she wants to amend to say a
12   little bit more about the insincerity of belief.  That
13   is going to take us nowhere, and I would encourage the
14   Court not to indulge her in that course.
15             THE COURT:  This is going to be a difficult
16   argument for you to make today.  This is not unique to
17   this case.  I don't know how we can begin to assess the
18   futility of a claim that we don't have before us and
19   proposed amendments we haven't yet seen.  Rule 15 is
20   one thing, and then what the circuit has said about it
21   is all together another.  We can't even begin to assess
22   the application of Rule 15 unless or until we see what
23   is proposed, can we?
24             MR. JORDAN:  Well, I think she's told us
25   enough about it, but if you need to see it in writing
```

and you feel compelled to allow her to put it in

writing, let me just put this stake in the ground for

future reference.  Because let's remember here that

we're putting people to real expense to resist claims

that ultimately cannot go anywhere.  There is no

allegation she can make in good faith that would be

consistent with Rule 11 that would get her anywhere on

the subject of sincerity of belief because the whole

inquiry is fraught.

I'm quoting now from the Presbyterian

Church in U.S. vs. Mary Elizabeth Blue Hull, United

States Supreme Court 1969.  Here's what it says,

engaging in just the kind of inquiry that she is

encouraging, "A civil court can make this determination

only after assessing the relative significance to the

religion of the tenants from which departure was found.

Thus, the 'departure from doctrine' element of the

Georgia implied trust theory requires the civil court

to determine matters at the very core of a religion,

the interpretation of particular church doctrines and

the importance of those doctrines to the religion.

Plainly, the First Amendment forbids civil courts from

playing such a role."

You may remember, Your Honor, that the Mary

Elizabeth Blue Hull case was one where two -- two

different denominations of the same religion who owned

property in common had separated from each other.  And

Georgia had a very unfortunate statute for determining

who ought to get the property.  It was called "the

03:51PM   departure from doctrine" statute.  So the Court was

being called upon to decide who had departed more from

the original doctrine of the mother church, which

faction had a more orthodox view of whatever the

original doctrine was determined to be.

03:52PM   And the Supreme Court said we're not going

there.  We're not engaging in whether this particular

belief is core or fundamental or which parts of the

church believe in this or don't believe in that.  It's

all a matter of religious doctrine, and we're not

03:52PM   wading into those waters at all.

And in the same vein, of course, I

mentioned it before, is the NLRB vs. Catholic Bishop of

Chicago case, Supreme Court 1979, where the Court said

this:  "The Court observed that in those cases the

03:52PM   schools had responded that their challenged actions

were mandated by their religious creeds.  The

resolution of such changes by the board, in many

instances, will necessarily involve inquiry into the

good faith of the position asserted by the

03:53PM   clergy-administrators and its relationship to the

school's religious mission.  It is not only the

conclusions that may be reached by the board which may

impinge on the rights guaranteed by the religion

clauses, but also the very process of inquiry leading

03:53PM   to findings and conclusions."

What -- what Ms. Burningham seems to be

suggesting here is that we'll start taking depositions

of church leaders to inquire into the sincerity of

their beliefs.

03:53PM   THE COURT:  Mr. Jordan, I don't know how to

apply that case law that you just cited me to claims

that aren't yet drafted or drawn or placed before the

Court.  I just don't even know where to begin that

process.  You --

03:53PM   MR. JORDAN:  As I say --

THE COURT:  You may be constructing a

fence, but it's not one that I can utilize today.

MR. JORDAN:  I hear you, Your Honor.  I'm

-- I'm laying down a fence, as you say, because this

03:54PM   plaintiff is wasting other people's time and money in a

frivolous pursuit of something which cannot be fairly

alleged under the laws of this --

THE COURT:  So that's a different question

than we have before us today.  There's Rule 12.

03:54PM   There's Rule 15.  There's Rule 11.  There are different

82

1   rules, and I don't have any Rule 11 issues in front of

2   me, nor do I -- nor could I assess any Rule 11 issues

3   in context of a complaint that isn't yet drawn.  I

4   understand what you're saying to me, but, of course, it

03:54PM  5   could just as easily be included in a letter to Ms.

6   Burningham when you receive a draft, if you do.

7           MR. JORDAN:  I take Your Honor's point, and

8   I know Your Honor understands I'm just trying to put a

9   stake in the ground here today.

03:54PM  10          THE COURT:  We also need to ensure the

11  availability of these forums to our citizens to

12  adjudicate important disputes in whatever way these

13  issues are resolved.  This is clearly an important

14  dispute and one of great interest to everybody here,

03:55PM  15  including the defendants.  I understand that.  And I

16  understand that there's expense involved with

17  evaluating and responding to a complaint, and that's

18  true in every case in this court.

19          MR. JORDAN:  I'll conclude with this final

03:55PM  20  thought, Your Honor.  I think from the very first case

21  Your Honor mentioned, the Bryce case, we have it as

22  clearly as we could have it that all of this analysis

23  turns on one thing.  Are we dealing with matters that

24  are religious in nature, or are we dealing with matters

03:55PM  25  that are wholly secular in nature?

1              To me, that could not be more obvious from

2    this complaint.  As Your Honor well knows, the first

3    element of any fraud claim is that the claims are

4    untrue, and that is a question which can never be

03:56PM   5    reached by a court when it comes to matters of

6    religion.  And so no matter how we spin, we will come

7    to the same constitutional dead-end for these cases.

8              And on that I will just conclude with the

9    quote Your Honor has already mentioned from Ballard:

03:56PM  10    "Men may believe what they cannot prove.  They may not

11    be put to the proof of their religious doctrines or

12    belief."

13              Thank you, Your Honor.

14              THE COURT:  Thank you.

03:56PM  15              Ms. Burningham, the last word, if you wish.

16    Anything more to add?  No?

17              MS. BURNINGHAM:  Just one second, Your

18    Honor.

19              THE COURT:  Of course.

03:57PM  20              MS. BURNINGHAM:  One moment maybe.  Just

21    two minutes, Your Honor.  I would just say that we're

22    in a day of fake news and false facts.  And the

23    defendant has admitted that certain things are not

24    true; that its scripture doesn't have anything to do

03:57PM  25    with Abraham.  That's a different case than having you

1    decide what's true and what's not.  Thank you, Your

2    Honor.

3            THE COURT:  Thanks to both of you.  As I

4    said, we'll take this under advisement, and an order

03:57PM    5    will be forthcoming.  Thank you.

6        (Whereupon, court proceedings were concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    REPORTER'S CERTIFICATE

2
            I, Kelly Sommerville, a Registered
3  Professional Reporter in and for the State of Utah, do
   hereby certify:
4
            I attended the hearing of the foregoing
5  matter on February 13, 2020, and thereat reported in
   Stenotype all of the testimony and proceedings had, and
6  caused said notes to be transcribed into typewritten
   form; and the foregoing pages numbered from 3 through
7  85 constitute a full, true and correct report of the
   same;
8
            I further certify that I am not of kin or
9  otherwise associated with any of the parties of said
   cause of action and that I am not interested in the
10 outcome of the matter;

11          And hereby set my hand this 25th day of
   January, 2021.
12

13

14



                 _____
17               Kelly Sommerville, RPR, FCRR

18

19

20

21

22

23

24

25
```