1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

LAURA A. GADDY,                      )
5     individually and on behalf     )
of all others similarly         )
6     situated,                      )
)
7          Plaintiffs,               )
)   Case No:   2:19CV0554
8        vs.                         )
)
9     THE CORPORATION OF THE         )
PRESIDENT OF THE CHURCH OF      )
10    JESUS CHRIST OF LATTER-DAY     )
SAINTS, a Utah corporation      )
11    sole,                          )
)
12          Defendant.               )
_____       )
13

14

15

16

17

18

                    BEFORE THE HONORABLE ROBERT J. SHELBY
19

                           January 5, 2021
20

                    ZOOM VIDEO MOTION HEARING
21

22

23

24

                           Reported by:
25              KELLY BROWN HICKEN, RPR, RMR
                           801-521-7238

```
 1                    APPEARANCES OF COUNSEL

 2    FOR THE PLAINTIFFS:          KAY BURNINGHAM ATTORNEY AT LAW

 3                                 BY:  KAY BURNINGHAM

 4                                      Attorney at Law

 5                                 300 S. MAIN ST, STE 1375

 6                                 SALT LAKE CITY, UTAH  84111

 7

 8

 9    FOR THE DEFENDANT:           STOEL RIVES

10                                 BY:  DAVID J. JORDAN

11                                      WESLEY F. HARWARD

12                                      Attorney at Law

13                                 201 S MAIN ST STE 1100

14                                 SALT LAKE CITY, UTAH  84111

15

16

17

18

19

20

21

22

23

24

25
```

1                SALT LAKE CITY, UTAH, TUESDAY, JANUARY 5, 2021

2                             *   *   *   *   *

3                THE COURT:  All right, everyone.  Let's go ahead

4      and go on the record in Case Number 2:19-CV-554.  It's

5      Gaddy vs. Corporation of the President of the Church of Jesus

6      Christ of Latter-Day Saints.

7                Before we begin and before we make appearances, let

8      me just state as I always do, first, that you're all welcome.

9      This is a public and open hearing even though it's being

10     conducted remotely.  And the purpose of that, of course, is

11     that we're in the middle of a global pandemic, and the general

12     orders entered by this court prohibit proceedings like this

13     from proceeding in person here in the court.  I'll remind

14     everyone that it's unlawful to record official judicial

15     proceedings in federal court by any means and for any purpose.

16     It's unlawful to use a recording for any purpose.

17               So I instruct anyone who's listening or watching

18     not to make any recording of this hearing.  There is one

19     official transcript of proceedings in federal court, it is the

20     one official record of proceedings in federal court.  It is

21     the transcript being prepared by our court reporter.

22               Having said that, let me invite you, counsel, to

23     make your appearances beginning with the plaintiff.  I think

24     Ms. Burningham, I see you.  Would you introduce yourself and

25     anyone else appearing with you?

```
 1              MS. BURNINGHAM:  Yes, Your Honor.  Kay Burningham
 2      for the plaintiff Laura Gaddy, and she should be connected
 3      from the East Coast.
 4              THE COURT:  I think I see her online.  Is that you,
 5      Ms. Gaddy, if you would nod?
 6              (Does so.)
 7              THE COURT:  Great.  Thank you.
 8              MS. BURNINGHAM:  Thank you.
 9              THE COURT:  And, Ms. Burningham, will there be any
10      other counsel appearing with you today?
11              MS. BURNINGHAM:  No, there will not.  Mr. Romney is
12      assisting me.  He's my assistant, and he's assisting with the
13      technical details.
14              THE COURT:  Terrific.  Thank you.
15              MS. BURNINGHAM:  Thank you.
16              THE COURT:  And, Mr. Jordan, I see you on our zoom
17      call.  Will you make your appearance and anyone else who's
18      with you?
19              MR. JORDAN:  Thank you, Your Honor.  This is
20      David Jordan on behalf of the Corporation of the President of
21      the Church of Jesus Christ of Latter-Day Saints.  I have with
22      me in my office my associate Wesley Harward.  And I also see
23      on the line Mr. Randy Austin and Mr. Alexander Dushku, who are
24      attorneys with the law firm of Kirton and McConkie.  That firm
25      represents the Corporation of the President as outside counsel
```

```
 1    in a variety of matters.  And they are joining not to make

 2    appearances today, but simply to listen to the proceedings.

 3              THE COURT:  All right.  Well, thank you.  Welcome

 4    to all of you.  Welcome back, I guess I should say to some of

 5    you.  This is our second hearing on motions to dismiss.  Just

 6    by way of procedural background, of course, the plaintiff

 7    filed her complaint sometime ago.  The defendants filed a

 8    motion to dismiss.  And following oral argument I issued a

 9    written memorandum decision dismissing Ms. Gaddy's first

10    complaint without prejudice to replead.  Miss Gaddy has

11    re-pled and filed an amended complaint.  The defendants have

12    again moved to dismiss.

13              This first part will be familiar to you, counsel.

14    I think we did this in our last hearing.  It's my practice in

15    most hearings.  Let me inform you what I've reviewed and share

16    with you my preliminary thoughts based on that review.

17              So I carefully reviewed all of your papers.  There

18    are four motions pending before us including the motion to

19    dismiss.  Ms. Gaddy filed three miscellaneous motions.

20    They're fully briefed.  I'll be providing a ruling on those.

21    I don't think there will be any need for oral argument on the

22    three miscellaneous motions.

23              I carefully reviewed the motion to dismiss.  I

24    reread several times my prior memorandum decision.  I read

25    very carefully the amended complaint, and we have, of course,
```

1    reviewed more cases than I care to count.  I think we reviewed

2    the legal authority.  I hope I understand it.  I believe I

3    understand your arguments.

4           With respect to the motion to dismiss, and let me

5    say this at the outset, I don't think Ms. Gaddy was with us

6    last time and others.  I almost always do this.  It's my

7    practice to share at the outset with the lawyers my

8    preliminary view of things.  It's just only that, a

9    preliminary review based on my review of the papers and

10   authority.  I'm always here with an open heart and an open

11   mind interested to learn what you think I have misunderstood

12   or misapplied.

13          The purpose for sharing these thoughts is to try to

14   help focus our oral argument and just to be transparent with

15   the lawyers so they know where the target is which they're

16   aiming.  So here are my thoughts about the motion to dismiss.

17          First, I'm disinclined to revisit my prior rulings.

18   I won't revisit the conclusions that I previously drew in the

19   memorandum decision and order that I entered before.  So I

20   think what will be helpful today is to focus on differences

21   between the complaint that was filed and dismissed and this

22   amended complaint as well as there are a number of new

23   arguments or different arguments advanced by the parties, most

24   notably by Ms. Gaddy.  Let me see if I can touch on what I

25   think are the central differences and share with you my views

1     about those matters.

2             First, it appears to me that the plaintiff attempts

3     to avoid at least my interpretation of Ballard, and I

4     recognize at the outset that I think Ms. Burningham doesn't

5     share my view about the law at least on some of these matters.

6     But you're stuck with the judge that you're stuck with.  It

7     appears that the plaintiffs have attempted to work around at

8     least my construction of Ballard in these ways.

9             First, suggesting that the subject matter in the

10    complaint is conduct and not belief.  I don't see any evidence

11    of that in the papers.  As I read the amended complaint, the

12    subject matter is focused on belief, doctrinal belief,

13    historical facts as they relate to doctrine, and especially

14    the profession or professing of those beliefs; in other words,

15    speech about religious matters.  I think I'm not at least

16    initially persuaded that there's any element of conduct here

17    that would move us outside of the realm of Ballard.

18            There's this I think a great emphasis in the papers

19    on whether this court can receive this complaint and

20    investigate these alleged misrepresentations.  If it does so

21    by examining whether the historical facts that are historical

22    beliefs at issue in the complaint are sincerely held by the

23    defendants.

24            Three thoughts about sincerity of belief.  I am

25    unaware of any authority supporting the proposition that the

1    sincerity of religious beliefs is a proper subject matter in a

2    case like the one before us.  I am, of course, familiar with

3    the RFRA cases in which quite naturally the sincerity of the

4    belief of someone who's seeking an exception or exemption from

5    a government rule or burden is relevant.  And I am familiar

6    with the cases.  I've read them several times, and they're a

7    little dense and difficult to understand because they're from

8    the 1940s.  But I read again Ballard and Rasheed which are

9    cases the plaintiff relies on for the proposition that we can

10   interrogate the defendants in this case and before a jury

11   about the sincerity of their beliefs and their statements

12   about their historical facts and doctrine.

13           I don't think RFRA applies, and it's -- my reading

14   of Ballard is that Ballard does not suggest examination into

15   sincerity of beliefs.  The holding in Ballard was narrow, as I

16   read it, and that is you cannot examine a church about the

17   truth or veracity of its religious claims.  There was

18   discussion back and forth about that element.  In that case

19   the trial court did invite the jury to consider whether those

20   beliefs espoused by the defendants were sincerely held, but it

21   wasn't the subject of any holding by the Court.

22           And to the extent that it's helpful, I'm very

23   persuaded by Justice Jackson's dissent on that case,

24   especially on this issue of the sincerity of beliefs and

25   whether it's appropriate for subject matter for inquiry in a

 1    court of law.

 2              Rasheed, I'll just -- I'm just not persuaded by

 3    Rasheed.  I think it's not a persuasive writing from the

 4    Ninth Circuit.  I think its reliance on -- let's see, well,

 5    there was the conscientious objector case, and there was the

 6    case from Connecticut that were both cited by the

 7    Ninth Circuit in Rasheed for the proposition that we could

 8    inquire about the sincerity of the belief and also that

 9    religions couldn't avoid liability for fraud by invoking

10    religious views.  And I think both of those cases are not

11    strong cases for the Ninth Circuit to rely on.  And I don't

12    think that the sincerity of belief was a necessary component

13    to those cases -- to that case.

14              Let me further say, I do want to cite one passage

15    from Rasheed which I think we may be talking about today and I

16    think sort of draws into focus some of Justice Jackson's

17    concerns in Ballard.

18              In Rasheed, the Ninth Circuit said, of course, this

19    a 1981 decision, the Ninth Circuit said on Page, it's 847

20    bleeding on to 848 after describing the nature of the charges

21    against the defendants in that case, Rasheed and Phillips.  Of

22    course it was a criminal case for mail fraud.  The Ninth

23    Circuit went on to say that:  The First Amendment does not

24    protect fraudulent activity performed in the name of religion.

25              The court talks some about what the district judge

```
 1    did there.  And then goes on to say:

 2              To convict Rasheed and Phillips of mail fraud a

 3    jury must have found that they knew of the falsity of their

 4    statements pertaining to particular aspects of the Dare to Be

 5    Rich program.

 6              I think this is problematic for the reasons that

 7    Justice Jackson talks about.  I think any examination into the

 8    sincerity of a religious belief whether it's sincerely held in

 9    the context of the fraud case presumes the falsity of the

10    belief in the first instance.  And as Justice Jackson says it

11    is unclear how you would untether the truth of the belief from

12    the sincerity of the person holding the belief.  I think it's

13    problematic.

14              So I don't think there's authority for the

15    proposition that sincerely held belief gets us outside of

16    Ballard, gets us away from Ballard.  But even if I was

17    inclined -- let me further add, the 10th Circuit in 1991 in

18    the Mosier case, that was a prisoner case, a RFRA case, made

19    the point, Judge Baldock did, on behalf of the circuit that --

20    let me read it.  I think this is important to get correct.  I

21    will admit, it's the not holding of the case, it's dicta, but

22    I think it's -- I think it's accurate.  I think it summarizes

23    the view of the 10th Circuit.  I'm reading from about Page, I

24    think it's 5 -- it's 1526.

25              Some asserted religious claims may be so bizarre,
```

1    so clearly nonreligious in motivation as not to be entitled to

2    protection under the Free Exercise Clause.  But apart from

3    that narrow category, courts carefully avoid inquiring into

4    the merits of particular religious beliefs in an effort to

5    gauge sincerity.  Scrutiny of the validity of particular

6    beliefs largely is beyond our judicial function because

7    religious beliefs need not be acceptable, logical, consistent

8    or comprehensible to others in order to merit First Amendment

9    protections.

10           It's the closest I can tell that the 10th Circuit

11   has come to addressing this question of sincerely held belief.

12   And I think the guidance from the circuit is, you can't ask.

13           I've mentioned Justice Jackson a couple times, and

14   let me share with you this passage because I'm persuaded by

15   it.  And again, I'm trying to let you know where the target

16   is.  About the sincerity of beliefs Justice Jackson said this

17   joined by Justice Frankfurter and Justice Roberts.  I'm

18   reading from Page 92 onto 93 of the Ballard decision.

19           I do not see how we can separate an issue as to

20   what is believed from considerations as to what is believable.

21   The most convincing proof that one believes his statement is

22   to show that they've been true in his experience.  Likewise,

23   that one knowingly falsified is best proved by showing that

24   what he said happened never did happen.  How can the

25   government prove these persons knew something to be false

1    which it cannot prove to be false?  If we try religious

2    sincerity severed from religious verity we isolate the dispute

3    from the very considerations which in common experience

4    provide its most reliable answer.

5           And that seems, that's pretty persuasive to me.

6    Beyond that, if we did accept the plaintiff's invitation here

7    to allow inquiry and interrogation into the sincerity of the

8    beliefs by the defendants, I can't in a million years

9    understand how that's a workable standard in a court of law.

10   I mean, how would we assess the sincerity of the belief held

11   by an organization.  And I know that Ms. Burningham cites some

12   cases talking about an organization having a belief.  But

13   let's talk about it here.  Would there be depositions of the

14   Prophet and the 12 Apostles and Quorum of the Seventy?  And

15   what if each person offered different and distinct answers to

16   questions about this.  And some of them say they don't know

17   whether these statements are true or false.  They take them on

18   faith or they believe some of it but not all of it or they

19   don't believe any of it?  They think it might be true or they

20   take it on faith.

21          And we'll get a whole gamut of responses to say

22   hypothetically, how then would we begin to invite a jury to

23   decide whether or not an organization -- oh, and I forgot.  At

24   what point in time did they sincerely hold the belief?  How

25   would we invite a jury to evaluate the sincerity of the belief

 1    held by the Church at an undefined time in an undefined way?

 2    I don't understand how that could work in practice.

 3            The long and short of all that is I think that the

 4    sincerely held belief examination is not one that I can

 5    permissibly engage in here nor allow a jury to engage in.  I

 6    don't think it's a way to escape Ballard.  I don't think it is

 7    a way to avoid dismissal of the complaint.

 8            The plaintiff also advances an argument.  It's not

 9    a new argument.  It was advanced before, but it takes a

10    different form here with respect to the amended complaint.

11    Ms. Gaddy argues that in addition to express fraud all of her

12    claims save for the common law fraud claim can advance on the

13    theory of fraudulent omission.

14            But I think this runs directly into Ballard because

15    a fraudulent omission theory depends in the first instance on

16    the presumption that there's a falsity in the first instance,

17    something that requires further clarification, further

18    disclosure to place in context or to make a statement not

19    misleading or false, again, presumes the falsity of the

20    statement.  I think it would require the same examination

21    Ballard says we cannot make whether the statements are true or

22    false in the first instance.

23            There's a line of cases that Ms. Gaddy puts forward

24    and a line of argument about consent.  As I understand the

25    significance of consent, it's in Miss Gaddy's efforts to

1    invoke the ministerial exception and rely on the cases talking

2    about the ministerial exception.  But this just may be my own

3    limited, maybe I'm just not smart enough to understand it, but

4    I don't understand how the ministerial exception applies in

5    this case in any way, and I don't understand how consent then

6    is a question -- the relevance of that question for purposes

7    of this motion to dismiss.

8            And on that point I'll just note that Bryce was

9    made clear that the church autonomy doctrine, which is the one

10   that is primarily informing my view of the law is broader than

11   the ministerial exception.  So I don't think even if the

12   ministerial exception applied in one way it doesn't escape

13   Ballard.

14           The other difference I see here in the amended

15   complaint, material difference, is the treatment of tithing.

16   And as I see it, the plaintiff has changed her theory on

17   tithing at least somewhat.  We have the oral contract claim

18   which depends on the tithe, payment of the tithe as

19   consideration for some of the benefits that Ms. Gaddy sought

20   including access to the temple, temple marriage, temple

21   services and blessings and the like.  That claim, the oral

22   contract claim, strikes me as being squarely doctrinal.  The

23   concept of tithing, the justification, the purpose, the reason

24   for tithing is central to the religious beliefs of the

25   Mormon Church and many churches.  And I think it falls within

14

1    Ballard, as well.

2            The other place that tithing takes a different,

3    takes on a different role here, though, is in the racketeering

4    claim.  I understand the plaintiff to submit as a third

5    alternative basis for the racketeering claim statements by

6    Church officials and agents about the use of tithing that

7    Ms. Gaddy claims is false.  That strikes me as being outside

8    of the scope of Ballard.  At least on the papers I don't think

9    I'm persuaded by the Church's arguments that anything relating

10   to tithing is itself doctrinal in going to the origins, the

11   religious foundation of the Church or its beliefs.

12           And I think this is consistent with Justice

13   Jackson's view in his dissent, I think it's consistent with a

14   number of cases that just because you're a religion, I guess

15   I'm also thinking here of Rasheed, there are countless

16   examples --

17           And let me say for the benefit of those listening

18   we're here on a motion to dismiss under Rule 12.  And so for

19   purposes of this hearing, I'm directed to assume the truth of

20   all of the well pled factual allegations in the complaint.  So

21   what we're talking about here today are allegations.  They've

22   not been proven, and I've not assumed them to be proven.

23           But the allegation is the Church made material

24   misrepresentations about its use of tithing money after it had

25   been received and how it was or was not being used and that

1    that those statements were false.  And I think that seems

2    actionable.  That seems like an actionable theory against a

3    church.  I don't think that it falls within the amended --

4    excuse me -- the affirmative defense that the Church is

5    invoking here.

6              So let me summarize where I think that leaves us.

7    Let me give a preliminary ruling on the three miscellaneous

8    motions, and then let's hear from you, counsel.

9              If after hearing oral argument I held the same

10   views that I've just expressed in my preliminary comments I

11   think what that means at this point is that the plaintiffs and

12   I just part ways on the law as it would apply to the fraud

13   claims -- oh, and I think that as best I can tell those fraud

14   claims are at the heart of all the claims in the complaint

15   except the alternative RICO theory.  I think that the

16   consequence would be that all of the claims except the

17   racketeering claim fail and the racketeering claim would

18   survive only on that alternative theory relating to the use of

19   tithing for commercial enterprise related to the City Creek

20   Mall.

21             I have real questions about the adequacy of that

22   theory in view of this complaint.  I'll note that I'm not

23   making any rulings about that.  The parties haven't argued it,

24   and the defendants didn't raise it.  There's not a question

25   here, for example, about whether that claim is adequately

 1    pled, could be supported, is actionable otherwise.  The only

 2    argument advanced by the defendants on that claim and the rest

 3    of the complaint is the church autonomy doctrine.

 4            Because I would twice have dismissed the remaining

 5    claims on the same theories or related theories, it seems to

 6    me that we're probably at a point where I would not allow

 7    further amendment of those claims, and then I don't know where

 8    that would leave the plaintiffs or the defendants in what you,

 9    how you wish to proceed.  I could imagine the plaintiffs

10    wanting to get on to the circuit to get an answer from a

11    different court or we could proceed here.  And I'm raising

12    this now outside the scope of what you've argued because I

13    want to try to serve the parties.

14            If that's where we land, it might be that the

15    plaintiffs would seek to replead the racketeering claim, and

16    that I would permit.  I raise this now because I could imagine

17    the defendants contemplating some other motion.  But if there

18    is another motion coming it should be directed at a complaint

19    that the plaintiff has had an opportunity to address in view

20    of our discussion today.

21            And that racketeering claim, this theory was not

22    the subject of our earlier hearing, so this would be the first

23    the plaintiff will have had the chance to hear the benefit at

24    least of my views.  And if there's -- if there is something

25    that can be corrected I think Rule 15 would require an

 1      opportunity to do that.  But I will invite each of you before

 2      we finish to help me understand where you think we're left, if

 3      the ultimate rule is the one that I just shared with you.

 4              And now I've already gone on for a long time.

 5      Please bear with me for just a moment while I provide you an

 6      oral ruling on the three miscellaneous motions.  I'll try to

 7      be complete yet brief in my reasoning so you all have the

 8      benefit of the record for this.  I'm not going to ask either

 9      of you to prepare and submit a ruling or an order for me to

10      sign.  Our docket text -- our minute entry, rather, from this

11      hearing will refer to this portion of the transcript as the

12      Court's ruling on these motions and the basis for the ruling

13      on these motions.  They are these.

14              First, Ms. Gaddy's request for oral argument as to

15      defendant's pending motion to dismiss; second, Ms. Gaddy's

16      motion for leave to file additional exhibit to amended

17      complaint; and third, motion for judicial notice.  And I will

18      take each up in turn.  They are Docket Numbers 53, 57 and 59.

19              So first, the request for oral argument, Docket 53.

20      In this motion Ms. Gaddy makes two separate requests.  First,

21      she asks the Court to receive oral argument on defendant's

22      motion to dismiss her amended complaint.  And of course, we're

23      having that argument now.  The motion is granted in part with

24      respect to her request for oral argument.  Our local rule

25      provides that on request motions for oral argument will be

1      granted on good cause shown.  That's Rule 7-1(f).  There's

2      good cause.  We're having a hearing.

3             With respect to judicial notice, that's the second

4      request in her motion, she asks that I take judicial notice of

5      on five items.  I'm largely quoting here from her papers.

6             First, the absence of discussion concerning the

7      consent issue in my prior order; second, the absence of any

8      rebuttal to the consent issue arguments raised by the

9      plaintiff in the opposition briefs filed by the defendants;

10     third, the absence in all defense pleadings relating to both

11     motions to dismiss and any rebuttal to plaintiffs' arguments

12     regarding material omissions as not requiring adjudication to

13     the truth or falsity of a statement as it relates to a claim

14     of fraudulent concealment and fraud under RICO.  Again, I'm

15     largely quoting from the motion.

16            Fourth, the absence of rebuttal to plaintiffs'

17     argument that RICO does not require a fiduciary duty in order

18     for defendant to commit fraud through a scream or concealment

19     or even omission of material facts; and finally Number 5, the

20     lack of rebuttal to plaintiffs' argument that there is a

21     private right of action under the Utah Charitable

22     Solicitations Act.

23            I'll note that Rule 201 of the Federal Rules of

24     Evidence requires the Court to take judicial notice if a party

25     requests it and the court is supplied with the necessary

 1    information.  This is Rule 201(c)(2).  The 10th Circuit has

 2    explained that the rule governs only judicial notice of

 3    adjudicative facts as opposed to legislative facts.  That's

 4    explained in United States vs. Wolny, a 10th Circuit decision

 5    from 1998.

 6           The Court went on to explain:  Adjudicative facts

 7    are simply the facts of a particular case, such as who did

 8    what, where, when, how, and with what motive.

 9           And actually, I'm sorry.  That is from the advisory

10    committee note to Subdivision A of Rule 201.

11           In contrast, the Court may not take judicial notice

12    of legislative facts, which are those relating to legal

13    reasoning and the lawmaking process whether in the formulation

14    of a legal principle or ruling by a judge or court or any

15    enactment of a legislative body.  That's Federal Rule 201,

16    Advisory Committee Notes to Subsection A.

17           The items in this motion that Gaddy seeks judicial

18    notice of are arguments and analysis or lack thereof.  They

19    are not in my judgment adjudicative facts, and for that reason

20    I deny Ms. Gaddy's request to the extent she moves the Court

21    to take judicial notice of those arguments.

22           Turning to Docket 57, Miss Gaddy's motion for leave

23    to file an additional exhibit to her amended complaint and

24    also some additional language, Ms. Gaddy moves under

25    Rule 15(d) of the Federal Rules of Civil Procedure for leave

 1     to file those materials.  The Church does not oppose the

 2     motion.  I think it's well taken.  There's good cause.  That

 3     motion is granted.

 4              If their complaint survives this motion to dismiss,

 5     Ms. Burningham, I'll ask you to submit a revised amended

 6     complaint with the additional exhibit and the additional

 7     language.

 8              MS. BURNINGHAM:  Thank you, Your Honor.

 9              THE COURT:  Thank you.  For purposes of our

10     argument today I'll assume that's part of the complaint.

11              The third and final motion that we'll resolve

12     before hearing argument on the motion to dismiss is Docket 59,

13     Miss Gaddy's motion for judicial notice.  Here she asks that

14     the court take judicial notice of three items, quote,

15     contained within the Church's official newsroom report or on

16     the online version of the Joseph Smith papers, end quote.

17              The three items that she asks me to take notice of

18     are these, first, quote:  On August 4, 2015, defendant

19     published a never-before-seen photo of an opaque brown stone

20     which it claimed was used by Joseph Smith to translate the

21     Book of Mormon, end quote.  Second, quote:  Eye witnesses

22     claim that when Smith used the stone he placed it in a hat to

23     exclude exterior light, end quote.  Third and finally, that,

24     quote:  The brown stone has been in defendant's custody since

25     the Mormon pioneers crossed the plains in the mid

1    19th Century, end quote.

2              Again, turning to the rules that govern this,

3    Federal Rule of Evidence 201:  The court may take judicial

4    notice of an adjudicative fact only when the fact, quote, is

5    not subject to reasonable dispute because it, number one, is

6    generally known within the trial court's territorial

7    jurisdiction; or number two, can be accurately and readily

8    determined from sources whose accuracy cannot reasonably be

9    questioned, end quote.  That's language from Rule 201

10   Subpart B.

11             And as the 10th Circuit explained in O'Toole vs.

12   Northrop Grumman Corporation, quote:  In order for a fact to

13   be judicially noticed in disputability is a prerequisite, end

14   quote.

15             The Court went on to explain, the 10th Circuit did,

16   in the Estate of Locket by and through Lockett, a 2016

17   decision, that:  Care must be taken at the requisite notoriety

18   exists.  Every reasonable doubt upon the subject should be

19   resolved promptly in the negative, end quote.

20             This court will not take judicial notice of the

21   facts relating to the stone found on the Church's official

22   newsroom report or an online version of the Joseph Smith

23   Papers because at least in this court's judgment and in the

24   language of the Lockett this is not the appropriate setting

25   for judicial notice.

22

1           As the court in Lockett said:  Judicial notice is

2     proper when a fact is beyond debate, for instance, what time

3     the sun sets on a given day.  When courts have taken judicial

4     notice of contents of news articles they've done so for proof

5     of something that is publicly known, not for the truth of the

6     articles other assertions.  That's a quote as I said from

7     Lockett.  That's at Page 1111.

8           Here Miss Gaddy asks the court to accept as true

9     the contents of the Church's documents as it relates to the

10    stone, and I decline to do so.

11          So for those reasons Ms. Gaddy's request for oral

12    argument, Docket 53, is granted in part and denied in part.

13    Her motion for leave to file additional exhibit to amended

14    complaint, Docket 57, is granted.  Her motion for judicial

15    notice, Docket 59, is denied.

16          Let me ask if either of you wish to make a record

17    about those rulings before we turn to the motion to dismiss.

18          MS. BURNINGHAM:  Your Honor, I would only as to the

19    motion for judicial notice.  I believe that -- if you'll allow

20    me to do that?

21          THE COURT:  Please.

22          MS. BURNINGHAM:  Okay.  In the reply, and I believe

23    there was a little bit of a misunderstanding, if I may just

24    make my record.  We were not asking for, and there was some

25    confusion in the body of the request.  In the actual motion

1          it was not confusing.  This is verbatim what we wanted that:

2          On August 4, 2015, defendant published a, quote,

3          never-before-seen, unquote, photo of an opaque brown stone

4          which they claimed was used by Joseph Smith to translate the

5          Book of Mormon.  Attached is an accurate picture of the brown

6          stone, unquote.

7                  We just offer that to show that the event took

8          place and not for the truth of the matter, but only that that

9          was when that happened and it was a never-before-seen event.

10         And also the same with eye witnesses, that those were noted.

11         And lastly, that the brown stone, this is where we amended it,

12         the brown stone has been in defendant's custody before the

13         death of Zina DH Young, one of Brigham Young's wives, on

14         August 28, 1901.

15                 The deaths of Brigham Young and his wife Zina are a

16         matter of public record.  The defendant in its own literature,

17         yes, it is on the Internet, but it is the same as an admission

18         on the Internet, says that the stone has been in its custody

19         when it was transferred after Brigham Young died to -- but

20         before Ms. Young who donated it, she donated it.  And so just

21         by calculation by their respective deaths we could figure out

22         how long defendant has had that stone in its custody and

23         control.  And to me that is just -- that's the same as taking

24         notice of an almanac act when the sun set and the sun rose.

25         But that's my record, Your Honor.  Thank you.

24

```
1              THE COURT:  Thank you, Miss Burningham.

2              All right.  Why don't we turn to the motion to

3    dismiss.  It is the defendant's motion, but my preliminary

4    comments are not friendly to the plaintiffs' arguments and

5    position, so I think it probably makes most sense to begin

6    with the plaintiff.

7              Miss Burningham, this is the time for your

8    argument.  We'll hear any issues you wish to take up.  I just

9    shared as I said those preliminary views in the event that

10   they were helpful in framing your argument.  Go ahead, please.

11             MS. BURNINGHAM:  Thank you, Your Honor.  One

12   minute.  I've made notes about your tentative ruling, and I

13   think I'll take them in reverse order.

14             Skipping for a moment the tithing argument,

15   sub-argument in the RICO claim, I'd like to go to the material

16   omission.  I believe Your Honor stated a fraudulent omission

17   that you were not convinced that that was sufficiently

18   different enough from our other common law claims that would

19   allow us to survive in our RICO case.

20             And, Your Honor, just to clarify, our RICO claim is

21   claim number, the sixth cause of action.  The fifth one is

22   violation of the Utah Charitable Solicitations Act.  And both

23   of those statutory schemes, both RICO, which as you know is a

24   federal statute, and Utah Charitable Solicitations Act, which

25   is a state law, they deal with material omissions, not
```

1    fraudulent omissions.  And the importance there is that the

2    standard is not what is a reasonable church member or a leader

3    to do, but it's a standard of a reasonable person.  What would

4    a person that listens to this pitch, for lack of a better

5    word, to the preaching, to the solicitation, what would they

6    want to know before donating tithing or donating to a certain

7    church?  That is a reasonable standard.  That is outside the

8    purview in my opinion of the Church Autonomy Doctrine.

9           Now I'd like to read from Grace, which is -- excuse

10    me -- Grace citing Smith.  As you know, Your Honor, in the

11    1990s, there was a case called Employment Division vs. Smith

12    where it's a Supreme Court case.  And the plaintiff was denied

13    certain city benefits, I believe it was either workers' comp

14    or unemployment, because he violated the local law by smoking

15    marijuana.

16           And the court in Smith came up with a enough

17    standard that -- well, actually they clarified the long

18    history of church and state law on this issue.  And they said

19    that, and this is quoted in the 10th Circuit, re-quoted, and I

20    would like to read this for the record.

21           While the First Amendment provides absolute

22    protection to religious thoughts and beliefs the Free Exercise

23    Clause did not prohibit congress and local governments from

24    validly regulating religious conduct.

25           That's the distinction.  Preaching is conduct in my

1    mind.  Again, I know you addressed that and I respect your

2    opinion.  When you go out you preach.  You tell others who may

3    not know anything about your religion what it is you believe,

4    what it is your church is about, and that includes its history

5    often.  So this is different than just the beliefs that you

6    hold as an individual in your heart or that you share amongst

7    yourselves.  I see the difference there.

8           Grace cited Reynolds:  Neutral rules of general

9    applicability normally do not raise free exercise concerns

10   even if they incidentally burden a particular religious

11   practice.

12          And they cite Smith once again.  The Free Exercise

13   Clause does not relieve an individual of the obligation to

14   comply with the valid and neutral law of general applicability

15   on the ground that the law proscribes or prescribes conduct

16   that his religion prescribes or proscribes.  That means if a

17   law is both neutral and generally applicable it need only be

18   rationally related to legitimate governmental interest to

19   survive a constitutional challenge.  10th Circuit case of

20   United States vs. Hardman.

21          On the other hand, if the law burdens a religious

22   practice and is not neutral, then it's subject to strict

23   scrutiny.

24          And then the final phrase that's applicable is:  A

25   law is neutral so long as its object is something other than

1      infringement or restriction from religious practices.

2              Your Honor, respectfully both statutes, the RICO

3      statute and Utah statute, on charitable solicitations are

4      neutral laws.  They're general laws.  They're not targeting

5      the Mormon church or any church, and they should be applied

6      and observed by the Church of Jesus Christ of Latter-Day

7      Saints, rather the President of the Corporation of the Church

8      of Jesus Christ of Latter-Day Saints.

9              Now segueing into those two causes of action I'd

10     like to address them.

11             THE COURT:  Excuse --

12             MS. BURNINGHAM:  RICO does not require adjudication

13     of the truth or falsity of a religious belief.  The

14     10th Circuit has specific jury instructions on RICO, and

15     those, if you'll indulge me, I'll just read the key

16     instructions there.  And this is not RICO, but the predicate

17     acts of wire fraud and mail fraud, which are what we have pled

18     as predicate acts for our civil RICO claim.

19             The key portion of the 10th Circuit jury

20     instruction on this is, quote:  A scheme to defraud is conduct

21     intended to or reasonably calculated to deceive persons of

22     ordinary prudence or comprehension.  A scheme to defraud

23     includes a scheme to deprive another of money, property or

24     intangible services.  An intent to defraud means an intent to

25     deceive or cheat someone.  A representation is false if it is

1    known to be untrue or is made with reckless indifference as to

2    its truth or falsity.  And here's the key language.

3           A representation would also be false when it

4    constitutes a half truth or effectively omits or conceals a

5    material fact provided it is made with intent to defraud.  A

6    false statement is material, and it goes on to describe

7    materiality and causation.

8           There is no duty required for wire fraud and mail

9    fraud violations which again are predicate acts.

10          THE COURT:  Ms. Burningham?

11          MS. BURNINGHAM:  Yes.

12          THE COURT:  I wonder if you and I are just speaking

13   past each other on this point.

14          MS. BURNINGHAM:  Okay.

15          THE COURT:  I think with respect to your statement

16   of the law about the requirement of compliance with neutral

17   laws of general applicability, I think that's a fair and

18   accurate statement of the law.  I understand the Church

19   Autonomy Doctrine from Ballard and its progeny to be an

20   affirmative defense.  I mean, the 10th Circuit, the way as

21   best I understand it, the 10th Circuit has said it's a

22   affirmative defense akin to qualified immunity incumbent on

23   the defendant invoking the defense to show its application.

24          Can't both things be true?  That is, that churches

25   are required to comply with legal scheme with the laws enacted

1    by congress under different levels of review, strict scrutiny

2    or rational review, but also be true that Ballard and the

3    Church Autonomy Doctrine prohibit the court from applying at

4    least those provisions or those statutes that would require an

5    investigation into the truth or falsity of religious beliefs?

6    Isn't that -- you agree that Ballard is still valid law.  It's

7    not been overruled.

8         MS. BURNINGHAM:  I believe that Ballard is valid

9    law.  But cases involving material omissions do not require

10   adjudication of the truth or falsity of religious beliefs.

11        THE COURT:  So that was my first question for you.

12   Looking at the Utah Charitable Solicitations Act and also

13   thinking about what you said about the material facts,

14   disclosure of material facts in RICO, isn't your theory as

15   I've understood from your complaint, you think that there are

16   certain facts that are material that must be disclosed because

17   other facts, other statements that you attribute to the Church

18   you think are false or misleading unless they provide the

19   additional facts that you think they need to supply?  Isn't

20   that what makes those facts material in your theory?

21        MS. BURNINGHAM:  No, I don't think so.  I mean, I

22   can see how you characterize it that way.  But if you'll let

23   me explain, I think if we have as we do in this case the key

24   representation or one of three that we've argued since the

25   original complaint is that there is a misrepresentation as to

1    the process that was used in coming up with the Book of Mormon
2    and creating the Book of Mormon as Mr. Jordan used in one of
3    his pleadings.  Depicted in the montage of the gold plates as
4    we've shown and through the 70s, 80s, 90s up until 2012 or
5    even later are pictures of Joseph Smith looking directly at
6    the Gold Plates and translating them in the ordinary sense of
7    the word just as you would translate the Dead Seas Scrolls or
8    through a Urim and Thummim described as glasses hooked to a
9    breastplate.  There has never been a depiction of Joseph Smith
10   looking at a brown stone in a hat.
11           And I think a person who was a potential convert to
12   the Mormon Church, a reasonable person would want to know that
13   the actual process or that the process that they have evidence
14   of is that he used a brown stone.  And they've had the stone
15   in their vault for over 100 years.  And that's reasonable
16   thing to know when you're deciding whether or not you're going
17   to believe that Joseph Smith is a prophet.  You want to know
18   the process by which the main scripture the Book of Mormon
19   came about.
20           THE COURT:  That statement, that argument you just
21   advanced, isn't it dependent on --
22           MS. BURNINGHAM:  Isn't it what?  I'm sorry.
23           THE COURT:  Isn't your argument that you just
24   advanced dependent on your assumption that some of the
25   statements made by the Church are either true or false?  I

1    mean, you have made a judgment in your argument that I just

2    heard about what actually happened in your view.  And you

3    think that fact needs to be supplied because if it's not

4    anything else that the Church has said about it is false or

5    misleading.  But it presumes the truth -- it presumes the

6    answer of the question, doesn't it?

7              MS. BURNINGHAM:  Well, I see what you're saying,

8    Your Honor.  But I think you can ask -- you can ask somebody,

9    would you want to know the vehicle that was used in creating

10   the Book of Mormon?  If there was a brown seer stone, the same

11   one that Joseph Smith used to try to find buried treasure that

12   he found in the well of a neighbor, I mean, I don't think you

13   have to get to the truth or falsity.  I think you can just go

14   to that, and you don't need to do that.

15             And if I can use -- I would like to show the stone

16   now since the judicial notice motion was denied.  This is a

17   picture of the seer stone.  And this brown opaque stone is

18   what was first published in August 2015.  And it was never

19   seen before by any Mormon.  It was kept in a vault, and it was

20   hidden.  And instead, correlation, and this goes back to your,

21   how do we adjudicate sincerity of different leaders of the

22   church.  We don't have to do that.  What we have to do is

23   realize, and this has been pled in the complaint or the

24   amended complaint and the complaint, that the 15, the

25   brethren, that is the First Presidency and the 12 Apostles,

 1    they have the final word in Correlation.  What happens is that

 2    somebody will write, this is the lesson manual for Sunday

 3    School, or, this is what I'm going to say in a speech, or,

 4    these are the pictures we're going to use for this ward, and

 5    Correlation has to approve those.  Correlation is the alterego

 6    of the Church, of the Church leaders.  They speak as one.

 7    They believe as one.  And for centuries -- not for centuries,

 8    for decades since at least the early 1960s when Correlation

 9    was formed as a department they have made a choice to, and

10    there's all sorts of evidence for this, to omit the bad parts

11    about Church history and just paint a rosy picture.

12          In fact, Correlation, this came out in Gregory

13    Prince's biography about Leonard Arrington, who was you know a

14    church historian for a while, quote:  With some amazement

15    Leonard recorded that the editors first used their own

16    judgment regarding what to publish --

17          This is speaking of Correlation and what things to

18    publish that are correlated material.

19          -- but then submitted it to managing director Doyle

20    Green to check.  He in turn worked through Correlation

21    committee review.  If a disagreement then emerged the proposed

22    publication went to the Quorum of Twelve where Thomas Monson,

23    Gordon Hinckley and Boyd Packer made the ultimate decisions.

24    There were subjects the editors were not allowed to broach,

25    end quote.

1           This process is the same today.  The three members

2     of the First Presidency of the Church of Jesus Christ of

3     Latter-Day Saints, President Russell Nelson, Dallin Oaks I

4     believe is the first counselor and Mr. Eyring, Henry Eyring is

5     the second.  They've all been serving in leadership capacities

6     since the mid 80s and have all been involved in Correlation in

7     deciding what version we teach to the members, we teach our

8     missionaries to in turn teach the converts.

9           And unfortunately what has been taught is a half

10    truth, it's a partial truth.  And the law we talked about in

11    the past complaint, and I don't mean to bring this up, I don't

12    mean to be disrespectful, but a partial truth, and this I

13    believe is the law in Utah, a duty arises to tell the whole

14    truth if a partial truth is misleading.

15          And that is in Am Jur.  We have that.  And that's

16    been in the jury instructions for Utah.  And I know that's not

17    law, but for as long as I've been admitted to the Bar, which

18    is the mid 1980s, the jury instruction has been that if the

19    defendant made a statement then it had a duty to tell the

20    truth about the matter, to make a fair disclosure and to

21    prevent a partial statement from being misleading or giving a

22    false impression.

23          This is the epitome of what the Church has done.

24    And I don't think Ballard protects them, and I'll tell you

25    why.

1            The Mormon Church has a sincere belief in honesty.

2       They teach their members to be honest.  And honesty as defined

3       by the Mormon Church in its 13th Article of Faith is, quote:

4       We believe in being honest, that's only partial, true,

5       benevolent, et cetera, et cetera.  Quote:  There are many

6       other forms of lying they teach.  When we speak untruths we

7       are guilty of lying.  We can also intentionally deceive others

8       by a gesture or a look, by silence or by telling only part of

9       the truth, which is what they've done.  Whenever we lead

10      people in any way to believe something that is not true we are

11      not being honest.

12            And that's from the LDS Manual of Gospel Principles

13      Chapter 31 on honesty.  More recently, of course this is 1982.

14      Marvin J. Ashton, elder, I believe, general authority.  Quote:

15      A lie is any communication given to another with intent to

16      deceive, unquote.

17            Now we submitted a case, I'm sure you're familiar

18      with this case, US vs. Jeffs, Lyle Jeffs.  It was before

19      Judge Stewart.  And the question there was whether or not

20      Mr. Jeffs could use his sincere belief or whether it was

21      sincere in the doctrine of -- I'm thinking -- the United

22      Order, whatever that doctrine is.  I've lost the word.  The

23      doctrine where you put everything together.

24            Pardon?  Yep.  Consecration, there we go.  Okay.

25            The Court -- there's a law about how you use food

1    stamps for everybody listening who's not familiar with it, and

2    I'm sure you are, Your Honor.  But there's a law how you use

3    food stamps.  And the FLDS Church, which is a fundamentalist

4    sect, which is not the church that we're involved with, the

5    corporation of the mainstream LDS Church, but the FLDS Church,

6    their members were getting food stamps including their

7    leaders, and they were in turn donating either the food or, I

8    don't recall the exact facts, but they were donating it into a

9    bishop's warehouse or consecrating it so everybody could use

10   the proceeds of food stamps.

11          Well, Judge Stewart examined that and found that

12   most of the members did believe in the law of consecration,

13   but Lyle Jeffs didn't believe it because he had special

14   privileges.  He didn't abide by it.  So for him to raise a

15   sincerely, have a belief in consecration that was an issue of

16   fact, so the motion to dismiss was not granted for them

17   because that was an issue of fact.

18          In the case we have here with Laura Gaddy, free

19   agency is an LDS doctrine.  If you remember, and I don't know

20   your background, of course, but Mormons are taught that in the

21   preexistence there was a war in heaven and that Jesus Christ

22   and Lucifer were brothers.  And that one plan was proposed by

23   Lucifer, and it was essentially that, I'll go down and I'll

24   force or I'll make the humans do everything that you want them

25   to do; and the other plan was Christ's plan where he said, I

1      will leave it up to them.  I will give them freedom and free

2      agency and free choice.  And a third of the host of heaven

3      went with Lucifer who became known as the devil, and he wanted

4      to manipulate the free agency of the spirit children.  But

5      then Christ had the two thirds.

6            And free agency has been taught every decade

7      including this most recent one.  It started in 1971, Elder G.

8      Smith:  They gave up their right and claims to free agency.

9      They didn't learn the full consequences of that decision.

10     They lost their right to choose, the right to make their own

11     decisions, speaking of the war in heaven and what happened.

12           Go down to 1987 with James E. Faust.  I was

13     roommates with his daughter.  He was a great guy.  Sorry.

14           The devil came before Christ and proposed to God,

15     the Father, behold here I am.  Send me.  I will redeem all

16     mankind.  Not one soul shall be lost.  This he proposed to do

17     by force destroying the free agency of man.  Free agency given

18     us through the plan of our Father is the great alternative to

19     Satan's plan of force.

20           1987, Dallin Oaks.  Free agency, the power to

21     choose and direct our thoughts and actions is a gift of God,

22     and we should resist any means that would compromise it.

23           2006, Wolfgang H. Paul, Second Quorum of the

24     Seventy.  Quote:  Every intelligent being must have the power

25     of choice.

1            The problem, Your Honor, is that the Church teaches

2      their members one thing, honesty and free agency, and they do

3      the exact opposite.  They manipulate the members by telling

4      partial truth, half truths, not disclosing things that a

5      reasonable person would want to know about their history, and

6      they force them basically to do what they think is right

7      without giving them a choice.

8            Thus, the Church does not have a sincere belief in

9      what they are doing in the manner that they preach, because

10     Correlation as a unit with one belief in that we need to --

11     you know, we need to, and I don't think it's -- I think there

12     is an intent to deceive.  I'm not assigning a moral component

13     to this.  They do intend to manipulate and deceive the

14     members.  I think they feel that it's for their own good, but

15     that does not excuse them.  And if they don't have a sincere

16     religious belief in doing that, and even Dallin Oakes has

17     said, we don't believe in lying to the Lord.  If they don't do

18     that but if their beliefs are the opposite or 180, I think

19     that puts them outside Ballard, and I don't think that Ballard

20     protects them in that type of scenario.

21           Unless you have a question I'll go on to something

22     else.

23           THE COURT:  Well, I think you've meant to include

24     in that portion of your argument the discussion about a

25     sincerely held belief.  Is the truth static in your mind?  Is

1    the formation of the belief static, or is it subject to

2    evolution temporally and by subject?  And how do we test it?

3    How would you propose that a jury would evaluate the sincerity

4    of the belief of the Church?

5         MS. BURNINGHAM:  Well, certainly I don't believe

6    truth is static.  And I think certain things -- an open-minded

7    person is open to all things.  But if the Church has had in

8    their vault for over 100 years the brown seer stone and has

9    never -- virtually never mentioned it, never displayed it,

10   never depicted it, in its missionary manuals, in its -- all of

11   its teachings, all of its correlated materials, it teaches

12   that Joseph Smith translated the Book of Mormon directly from

13   Gold Plates.  That's a manipulation.  And I don't think -- I

14   think, and this may help explain this.

15        If you bring up the elements of fraud, we've all

16   been taught that the elements of fraud, the first one is that

17   a statement was false.  And I'll just look at those for a

18   minute.  But that's just the order that we learn in law

19   school.  We don't necessarily have to try a case in that

20   manner.

21        So the usual elements of fraud, and I've broken one

22   up, but these are essentially the elements of fraud.  One, the

23   defendant made a statement about an important fact.  The

24   statement was false.  It made the statement knowing it was

25   false, or it made it recklessly without regard for its truth.

1          Okay.  I'm just talking about the first three

2     elements, not reliance and damages.  Let's change the order.

3     Let's go down.

4          The Corporation of the President of the LDS Church

5     made a statement about an important fact, and it made a

6     statement without a sincere belief in it or made it recklessly

7     and without regard for its truth.

8          You can put that to a jury without getting to the

9     fact that the statement it made was, in fact, false.  That can

10    be after.  This can be bifurcated.  You can ask them to decide

11    whether or not they had a sincere belief in it.  They can be

12    shown certain things that happened and that they did.  We're

13    not asking you, ladies and gentlemen of the jury, to decide

14    how the Book of Mormon was really created.  We're only asking

15    you given the fact that the Church had this stone in their

16    vault for 100 years and never depicted it, do you think that

17    they sincerely believe that the way the Book of Mormon was

18    translated is the way they depicted it for decades and decades

19    directly from the Gold Plates?

20         Those are two separate questions.  And I really

21    think that's the way that can be done, especially when

22    sincerity is at issue.  I don't know if I answered your

23    question.

24         THE COURT:  If we accept your invitation to have a

25    jury weigh in on the sincerity of the belief of the Church at

1    whatever time --

2             MS. BURNINGHAM:  I'm sorry.  I didn't hear that

3    last phrase.  The belief in the Church what?

4             THE COURT:  At whatever time, at some point in

5    time --

6             MS. BURNINGHAM:  Okay.

7             THE COURT:  -- maybe when the statement is made,

8    how do we avoid what seems to me to be the principle that

9    motivated the rule in Ballard?  In Ballard the Supreme Court

10   said -- now I'm just reading from my own previous order.  This

11   is Page 8.  But this is the quote.  I think this is the

12   concept that gives rise to the Church Autonomy Doctrine, and

13   it seems to me your invitation invites the same concerns.  The

14   Supreme Court said:

15            Men may believe what they cannot prove.  They may

16   not be put to proof of their religious doctrines or beliefs.

17   Many take their gospel from the New Testament, but it would

18   hardly be supposed they could be tried before the jury,

19   charged with the duty of determining whether those teachings

20   contained false representations.  The miracles of the New

21   Testament, the divinity of Christ, life after death, the power

22   of prayer are deep in the religious convictions of many.  If

23   one could be sent to jail, and I'll just add or bankrupt,

24   because a jury in a hostile environment found those teachings

25   false, or I'll add, or concluded they weren't sincerely held,

1      little indeed would be left of religious freedom.  The
2      religious views espoused by respondents might seem incredible
3      if not preposterous to most people, but if those doctrines are
4      subject to trial before a jury charged with finding their
5      truth or falsity then the same can be done with the religious
6      beliefs of any sect.  When the triers of fact undertake that
7      task they enter a forbidden domain.
8            My question is, isn't the same harm occasioned upon
9      a church if we invite a jury, a potentially hostile jury, to
10     draw a conclusion about something that can't be proven and
11     risk imprisonment or judgment?
12           MS. BURNINGHAM:  Well, first of all, Your Honor,
13     this is not a hostile jury.  This would not be hostile.  You
14     can expect, I sure you know this, that there would be many
15     Mormons in the venire panel.
16           But regardless of that, sincerity is adjudicated in
17     RFRA cases all the time.  And in this case I see it as a
18     matter of credibility and the credibility of the combined
19     correlated position or belief versus, and this comes back to
20     the fact versus belief distinction, and I know you don't want
21     to revisit that and I understand that.  But belief in
22     doctrine, certainly a civil court cannot adjudicate whether
23     blood atonement or what polygamy, celestial marriage -- excuse
24     me -- is an appropriate doctrine, whether baptism for the dead
25     is appropriate.  No, they can't adjudicate that.  But the

```
 1    Supreme Court recently said in Omnicare, the state of mind of
 2    a person is something that can be adjudicated.  That is the
 3    fact that is capable of misrepresentation.
 4              The fact that the Church spun this story, and
 5    that's not really up for debate.  But, you know, you have to
 6    accept my allegations as true for purposes of the motion.  But
 7    the fact that they only told part of the story or part of what
 8    occurred or what they had access to as part of the artifacts,
 9    that is a misrepresentation of fact in and of itself.  And, I
10    don't know.  I just don't see that it would be that difficult.
11              Now, I've tried, you know, a dozen or more cases,
12    well, almost two dozens cases, but, of course, Your Honor, I
13    defer to you.  It would be difficult, but a case comes to mind
14    where it says that, and I can't remember the exact language,
15    but these kinds of issues are very difficult.  And sometimes
16    there's a fine line that you need to walk, and it needs to be
17    walked, because otherwise if we take this to the extreme this
18    is why we have affinity fraud.  This is why Utah is the
19    largest, the most, the worst case in the nation for affinity
20    fraud, meaning that good members of the Mormon Church and
21    leaders of the Mormon Church, bishops and other people,
22    seminary teachers, the list goes on and on and I'm sure your
23    familiar with them, but they're able to entice or to garner
24    investments into whatever scheme they have because they're a
25    good Mormon.  And Utah outweighs by more than twice Florida,
```

```
 1    which is the next closest state.
 2              And the problem is it's not that far from what
 3    we're doing now.  Mormons, there's two separate groups of
 4    Mormons.  There's the average lay Mormon, and then there are
 5    the lay leaders that work in conjunction with the corporation
 6    leaders.  And they're very different.  And they have different
 7    goals, and some of them overlap, yes.  But they are
 8    manipulated.  The average Mormon person is manipulated by the
 9    defendant.
10              And even what Mark Pugsley said in that chart on
11    how Utah is the largest or has the most cases of affinity
12    fraud, he says it's because there is, the people of Utah are
13    simply too trusting.  When you teach -- when you teach these
14    people to be honest, to be sincere, to have free agency that
15    even a look can be a lie and that you need to not omit
16    material information or tell partial truths they think that
17    the leaders do the same thing.  So they trust the leaders, and
18    they trust the people who are good Mormons and they invest.
19              And this is what leads to all the damage that we
20    have referenced in the Faith Crisis Report.  People that do
21    that and people that get involved in Mormonism they have
22    cognitive dissonance.  And they can't justify when they learn
23    all these facts that are true that they find out about what
24    the church has hidden from them for years, hidden from them,
25    they can't reconcile the two different teachings and reality
```

1        in their mind, and they become very depressed.

2                And, in fact, the Church at this very moment is

3        negotiating with building mental health centers along the

4        Wasatch Front.  They recognized this is a problem, and this is

5        a problem that they created.  This kind of thing will not be

6        abated, and it needs to stop.  And the Church needs to own up

7        to what it has done.  And if it doesn't sincerely believe as

8        an affirmative defense, back to your question, this is an

9        affirmative defense.

10               The Church did not identify in the motion to

11       dismiss what exactly they were protecting.  Now, if it's

12       preaching, which I'm just presuming, that's the same as in the

13       Jeffs case, the Lyle Jeffs.  The Court in US vs. Jeffs made

14       this really good observation, and I'd like to read that.  And

15       they're talking about, he's talking about burden.  And the law

16       as you know is that unless it's a substantial burden to the

17       free exercise, a small or minimal burden is not enough to keep

18       defendant from having to comply with the general law.  And

19       again, which would be RICO and the Utah Charitable

20       Solicitations Act.

21               This is what the Court said in Jeffs:  The same

22       cannot be said here -- meaning referring to infringing upon a

23       free exercise right of the defendant.  The defendants are not

24       prevented from teaching the law of consecration.

25               Defendants here in Gaddy are not prevented from

1    teaching that Joseph Smith created the Book of Mormon.  He was

2    inspired by God, and God inspired him to create it.  They can

3    teach that.  They just can't teach something that -- they just

4    can't omit talking about the brown stone.  If the brown stone

5    was used they need to disclose it because a reasonable

6    potential convert would want to know that.  Continuing on in

7    the Jeffs case.

8              The defendants retain the right and ability to

9    teach.  Those who have ability to do so with specific

10   reference to SNAP, that's the food stamp law, benefits may be

11   somewhat limited.  But it is one thing to curtail various ways

12   of expressing belief for which alternative ways of expressing

13   belief may be found; it is another thing to require a believer

14   to defile himself -- this is speaking about another case where

15   a prisoner had a choice to eat I think it was pork which is

16   determined to be defiling yourself in his religion.

17             So what we are doing is at most the SNAP statutes,

18   the food stamp statutes and regulations curtail various ways

19   in which the defendants can express their beliefs leaving open

20   other methods of expressing those beliefs.  Thus, defendants

21   have not shown that their sincerely held religious beliefs

22   related to teaching the law of consecration are substantially

23   burdened by the SNAP statutes and regulations.

24             This is something that the defense has pointed out.

25   They don't seem to think we have to go through the burden

1    analysis or the free exercise analysis.  They seem to think

2    that the Church Autonomy Doctrine just protects them like a

3    shield over all of this.  I don't believe that that's the way

4    that the law should be interpreted or is interpreted.  And I

5    think they have to show that there's a sincerely held

6    religious belief that will be substantially burdened.  And

7    even then I don't think that's the standard.  Let me strike

8    that for a moment.

9           I think the standard is if it's a general and valid

10   law of general applicability then they have to comply.  The

11   only out for them, the only way of noncomplying is to show

12   that it would just be against their religion to tell the

13   truth, to tell the whole truth and nothing but the truth, to

14   reveal these things that they have hidden.  Is that against

15   their religion?  No, because they believe in being honest, and

16   they believe in free agency.  They can't do that.  It does not

17   make sense for them.

18          THE COURT:  Have you shared with me,

19   Miss Burningham, everything you wanted to say about how we

20   would apply your sincerely held belief standard in this case?

21          MS. BURNINGHAM:  Let me think for one moment, Your

22   Honor.

23          THE COURT:  Of course.  And let me be clear.  I'm

24   asking, if I adopted your approach, have you answered my

25   question about how it would work?

1          MS. BURNINGHAM:  Have I answered your question

2     about how it would work?

3          THE COURT:  Have you told me what you wanted to?

4          MS. BURNINGHAM:  I see what you're saying.  I

5     envision -- let me make it more pointed and clear.  I envision

6     you would have a group of jurors, and we would be able to

7     submit -- I could take the depositions of half a dozen people

8     as representatives of the first presidency and Correlation,

9     and we would just ask about certain things.  And we would have

10    a limiting instruction to the jury telling them that you

11    can't -- you can't determine whether or not the stone was, in

12    fact, used to create the Book of Mormon, but you can only

13    determine whether it was an important part that somebody would

14    want to know, that a reasonable person would want to know, and

15    that Correlation who is the alterego of the defendant, that

16    Correlation was sincere in its belief in not teaching that the

17    stone was used given the fact that it had it in the vault for

18    years, and given the fact that the Church teaches that honesty

19    and free agency are important principles that everyone should

20    abide by.

21         THE COURT:  With respect to your theory, it's your

22    Subpart C theory in your racketeering claim, your Fifth Claim,

23    that the Church made misrepresentations about how its tithing

24    was going to be used or was being used --

25         MS. BURNINGHAM:  Yes, Your Honor.

1           THE COURT:  -- that theory is expressly invoked

2     only in support of your Fifth Cause of action; is that right?

3           MS. BURNINGHAM:  Yes, Your Honor -- well, no.  I

4     actually plead it all the way through as -- you know, frankly

5     I'd have to look at the amended complaint.  I can't recall off

6     the top of my head.  It is in the Fifth, the RICO claim.  And

7     I believe it's also in the Utah statute for charitable

8     solicitations, but I have to look.

9           THE COURT:  I didn't see it there.

10          MS. BURNINGHAM:  Okay.

11          THE COURT:  Maybe while Mr. Jordan is speaking or

12    we'll take a brief break --

13          MS. BURNINGHAM:  I'm sorry.  I'm having a bit of a

14    problem.

15          THE COURT:  I'm sorry.  I'm trying to speak up.

16    Maybe when Mr. Jordan is speaking, or we'll take a break in a

17    moment.  We've been going for about an hour and a half.

18          MS. BURNINGHAM:  Okay.

19          THE COURT:  Maybe you can look and you can let me

20    know if you think you made expressed reference to that theory

21    in support of any of your other causes of action besides the

22    RICO action.

23          Before we break then, Ms. Burningham, have we

24    touched on all the subjects you wanted to address in your

25    argument?

1          MS. BURNINGHAM:  No.  I do have a few more, Your

2     Honor.  And while we're at the tithing -- on the point of the

3     tithing sub-argument under RICO Fifth Cause of action -- or

4     the Sixth Cause of action, rather, if I can address that?

5          THE COURT:  Thank you.

6          MS. BURNINGHAM:  Thank you.  Yes.  The tithing

7     slips, and I may be repeating myself.  But they're printed by

8     the Church, and they give specific areas that the tithing will

9     be used for, ward missionary, general missionary, Book of

10    Mormon, humanitarian aid, temple construction, perpetual

11    education and other.  And they would believe, a normal Mormon

12    would believe that they would be used generally for what they

13    check or what they want them to be used for.

14          And that goes along with the tithing argument

15    that -- well, I don't even have to go over that because Your

16    Honor has already found that --

17          THE COURT:  Have you alleged that -- have you

18    alleged in the complaint that tithing is used for a different

19    purpose?  Let me ask a different question.

20          MS. BURNINGHAM:  Yes.

21          THE COURT:  In the context of your racketeering

22    claim or this theory, have you made an affirmative allegation

23    that there's a misrepresentation because tithing is being used

24    for -- the closest I could understand you got was you were

25    focusing on representations about the City Creek Mall.

1          MS. BURNINGHAM:  Yes.

2          THE COURT:  A for profit venture.

3          MS. BURNINGHAM:  Yes.  And Deseret -- yes.  And the

4    insurance company.

5          THE COURT:  Have you alleged that there's a

6    misrepresentation concerning any of those things?

7          MS. BURNINGHAM:  Yes, Your Honor.

8          THE COURT:  Have you alleged that those statements

9    are false?

10          MS. BURNINGHAM:  Yes, Your Honor.

11          THE COURT:  Where did you allege that?

12          MS. BURNINGHAM:  Let me see if I can find that.

13          THE COURT:  Are you relying on Subpart S of your

14    lengthy statement of reasons to doubt the sincerity of the

15    Church's views about things?  That's in, what?  This is

16    Page --

17          MS. BURNINGHAM:  Referring to the amended

18    complaint?

19          THE COURT:  Right.  This is in -- it's right before

20    Paragraph 143.  Your complaint is not numbered, but I think it

21    is ECF Page 46.

22          MS. BURNINGHAM:  Okay.  Let me just go down to

23    that.

24          THE COURT:  It's the IRS whistleblower complaint.

25          MS. BURNINGHAM:  Yes.

```
 1                THE COURT:  Is that the -- is that the allegation

 2      that you think supports -- well, is that where you pled that

 3      statements about use of tithing in support of the City Creek

 4      Mall are false?

 5                MS. BURNINGHAM:  Yes, Your Honor.  I believe that's

 6      right.  Let me just look at that to make sure.  If you'll give

 7      me one minute.

 8                And also Paragraph 79, I'm not sure if that's

 9      Paragraph 79, if you could page up to that, maybe.  This was

10      in the facts of the case of the amended complaint.  This has

11      the most particularized and specific -- and I'll just read a

12      few sentences from that.  There are several --

13                THE COURT:  I've got it here.

14                MS. BURNINGHAM:  Okay.

15                THE COURT:  What I didn't see was where you pled

16      the facts that would establish that these statements are

17      false.

18                MS. BURNINGHAM:  Yes, Your Honor.  If you drop down

19      to halfway through Keith McMullin, then a member of the

20      Corporation of the Presiding Bishopric, told the Tribune, not

21      one penny of tithing goes to church profit endeavors.

22                THE COURT:  Ms. Burningham, when you're reading

23      you're going really quickly.

24                MS. BURNINGHAM:  I'm sorry.

25                THE COURT:  And my court reporter can't keep up
```

 1    with you.

 2              MS. BURNINGHAM:  I'm sorry.  I'll just read that a

 3    little slower then.

 4              Keith McMullin, then a member of the Corporation of

 5    the Presiding Bishopric, told the Salt Lake Tribune, quote,

 6    not one penny of tithing goes to the Church's for profit

 7    endeavors.

 8              And at the same time if you drop down to

 9    Footnote 31, at the time the statement was made in 2012,

10    Mr. McMullin had already issued checks from EPA's accumulation

11    of tithing principle for City Creek Mall development and the

12    Beneficial Life Insurance Company bailout.  And this is based

13    on a whistleblower complaint.

14              Are you asking me if I expressly pled that this

15    statement was false, and they knew it was false and they knew

16    it was false under common law fraud?

17              THE COURT:  No.

18              MS. BURNINGHAM:  Okay.

19              THE COURT:  I think you've answered my question.

20              MS. BURNINGHAM:  Okay.  Thank you.  I incorporate

21    as everybody does all the facts in each of the causes of

22    action.  So that is a more specific iteration of those facts,

23    Your Honor.

24              THE COURT:  I interrupted.  You were speaking about

25    tithing, and there was something else you wanted to touch on

                                                              53

1    before we break.

2              MS. BURNINGHAM:  Okay.  You know, this might be

3    a -- let's see.  This might be a good place to break now

4    because I frankly lost my train of thought.

5              THE COURT:  All right.  Why don't we do this.

6              MS. BURNINGHAM:  But, Your Honor, just to clarify,

7    I do have -- from your tentative I do have two or three other

8    sections that I would like to address.

9              THE COURT:  Let's break now and come back and do

10   that so that our court reporter can stretch her fingers.

11             MS. BURNINGHAM:  They should be brief in light of

12   what has already been talked about.  Thank you.

13             THE COURT:  It's 3 o'clock.  Why don't we plan to

14   resume at 3:10.  And, counsel, at least, let me ask you just

15   to maybe mute yourself and turn off your videos.  But please

16   stay connected to the Zoom hearing so we can resume and so we

17   don't have to reconnect you all.

18             MS. BURNINGHAM:  Thank you, Your Honor.

19             THE COURT:  Thank you.  We'll be in recess.

20             (Recess.)

21             THE COURT:  Thank you.  Are we all ready to go,

22   Mr. Jordan?

23             MS. BURNINGHAM:  Your Honor, I just have a few.  I

24   won't have long.

25             THE COURT:  Let's go ahead and go back on the

 1    record.

 2              Go ahead, Ms. Burningham.  You have the floor.

 3              MS. BURNINGHAM:  Not to make too fine a point on

 4    it, but as to your procedural question, how does this work,

 5    the question when you empanel the jury you ask these members

 6    who were involved and who guided and who told Correlation what

 7    they could say and what they couldn't say, did you have a

 8    sincere belief in what you were telling us?  Did you believe

 9    that Joseph Smith translated directly from Gold Plates or

10    while you were preaching that in the mission field and to the

11    young people, in the back of your mind did you know that there

12    was a brown stone in the vault that you were keeping hidden?

13              That's a question of sincerity and a question that

14    needs to be asked in this case because if the answer -- or if

15    a jury comes back and says no, whether by, you know,

16    impeachment or other evidence that comes into evidence with a

17    limiting instruction, then there's no reason for the

18    affirmative defense to apply.  And we try the case as any

19    other fraud case  because the belief has to be sincere.  There

20    has to be a sincere religious belief in order for Ballard and

21    the Church Autonomy Doctrine to apply.  That's just my point

22    on the procedural matter.

23              Now I'd like to show you just a video that goes to

24    this point.  And this could be introduced perhaps with a

25    limiting instruction.  This is Russell Nelson who in May of

1    2020, this is May of 2020, this is the first time that anyone

2    has shown what they have known to have happened.

3              (Video played.)

4              MS. BURNINGHAM:  Now, I just wanted to play that.

5    It's so short.  But I just want to say that I really respect

6    him for doing this at this point.  It's late, but at least

7    he's disclosing what they have known for a long time.  One

8    more time.

9              THE COURT:  Miss Burningham, it's outside the four

10   corners of the complaint.  It's not properly before the Court

11   in Rule 12.  We've seen it.  I've seen what you showed us.

12             MS. BURNINGHAM:  Okay.

13             THE COURT:  I don't think we need to see it again.

14   I'll just make a notation for the record here that as is --

15             MS. BURNINGHAM:  All right.

16             THE COURT:  -- as is my practice in the courtroom

17   when a video is played, I don't ask the court reporter to try

18   to transcribe it.  So we didn't try to transcribe the video

19   that you played, and it's not incorporated in the record for

20   that reason.  But I saw it.  I understand what you're saying.

21   Go ahead.

22             MS. BURNINGHAM:  All right.  Let me just look at my

23   notes for one minute, Your Honor.

24             I just don't think -- in conclusion I don't think

25   that the Church has identified which sincere belief is in

1     jeopardy by complying with either common law fraud or the

2     statutory causes of action that we pled, and I think that they

3     have to do that.

4            Now, not with common law fraud and fraud in the

5     inducement, those truths, sincerity is an element of those two

6     claims so we have the burden of proof on that.  But on all of

7     the other if a duty is found where partial truth has been

8     disclosed, then one has the duty to tell the whole truth or

9     make enough disclosures so it's not misleading.  Without the

10    elements of common law fraud they have to show us that it's a

11    sincere belief.  It's their burden in order to have the

12    affirmative defense apply.

13           And that's all I have to say right now.  Thank you.

14           THE COURT:  All right.  Thank you.

15           Mr. Jordan?

16           MR. JORDAN:  Thank you, Your Honor.  And let me say

17    from the outset that I appreciate your preliminary ruling.  It

18    gives me guidance, and I think it helps me to significantly

19    abbreviate my remarks today.

20           First of all, I want to follow the order of things

21    that Your Honor presented when you laid out what you described

22    as the central differences between the original complaint and

23    the amended complaint.  And I think the Court correctly

24    identified one of the significant problems in the way that

25    Ms. Gaddy has re-pled the case.

1          Whereas, the first go-round she attempted to set up

2     what I think is a false dichotomy between fact and belief.

3     She now sets up another false dichotomy between conduct and

4     belief.  That's significant for First Amendment jurisdiction

5     because the courts could not be more clear and Your Honor

6     could not have been more clear in your order that when we

7     analyze a conduct under the Free Exercise Clause of the

8     First Amendment we are not including speech about belief.

9     That's why Your Honor's ruling on Page 15 says this:

10          But the Supreme Court has repeatedly confirmed that

11     the free exercise of religion encompasses not only the freedom

12     to believe but also the right to profess those beliefs through

13     proselytizing.  Said another way, the Church is no more liable

14     for preaching and teaching its beliefs than it is for

15     espousing them.

16          And it's this failure to distinguish speech about

17     belief from conduct that I think leads Miss Burningham into

18     many of the flaws in her argument.

19          So for example, all of the cases that she cites,

20     the prisoner cases, the conscientious objector cases, the

21     marijuana cases, all of those cases deal with conduct.  They

22     don't -- they deal with somebody's desire to smoke marijuana

23     and whether a prison restriction on the use of marijuana is

24     unconstitutional or not under the Free Exercise Clause or

25     many, many other ways that that same issue comes to light.

```
 1                    But all of those cases deal in the context of

 2          conduct like using marijuana or peyote or refusing to serve in

 3          the military or whatever it might be, none of those cases, not

 4          one, and I'm not aware of a single authority and I don't

 5          believe there is one, that says that someone's ability to

 6          teach or preach their beliefs is subject to any level of

 7          scrutiny or any form of balancing test under the free exercise

 8          strand of the First Amendment.

 9                    And because that's true, all of her arguments about

10          burden shifting and balancing tests are unavailing because all

11          of them failed to give proper regard to the distinction that

12          the Supreme Court has been careful to draw between on the one

13          hand belief and speech about your belief, preaching and

14          teaching your belief, on the one hand; and conduct on the

15          other hand.  So I think that is responsive to much of her

16          opposition to the motion to dismiss.

17                    Now, I think Your Honor's second point was that in

18          the second -- in the amended complaint Ms. Gaddy has much to

19          say about sincerity and how somehow the concept of sincerity

20          of belief circumvents what would be the ordinary

21          constitutional analysis under the Church Autonomy Doctrine,

22          which is an amalgam of both the Free Exercise Clause and the

23          establishment clause.

24                    I'll say this about sincerity.  I think Your Honor

25          started in exactly the right place.  I too, find
```

```
 1      Justice Stone's comments in his non-majority opinion in
 2      Ballard to be just logically correct.  And Your Honor quoted
 3      them, but let me just say it again for emphasis.
 4                  For me the most salient piece of this opinion is
 5      this:
 6                  How can the government prove these persons knew
 7      something to be false which it cannot prove to be false?
 8                  I'm sorry.  It's not Justice Stone.  It was
 9      Justice Jackson.  Justice Jackson's comment is unassailable
10      logic.  And it's the logic that Ms. Gaddy runs afoul of in her
11      brief because much of her brief is dedicated to the
12      proposition that because the evidence in her view is
13      overwhelming that certain beliefs of the Church are false,
14      certain teachings of the Church are false they cannot be
15      sincerely held.  No reasonable person could sincerely believe
16      what Joseph Smith said about the translation of the Book of
17      Mormon.  And somehow she thinks that then provides an exit
18      ramp on the analysis in Ballard and other Supreme Court cases.
19      But, of course, it doesn't.  The reasoning is circular.  It's
20      circular in just exactly the way that Justice Stone's logic
21      highlights.
22                  I'll say this, also.  She cites to many RIFRA
23      cases, and that is also a diversion.  This of course is not a
24      RIFRA case.  We haven't pled RIFRA as a defense.  And as Your
25      Honor correctly pointed out, RIFRA arises in the context where
```

1      someone is asking for an exemption from an otherwise generally

2      applicable law or regulation.  And we're not asking for that

3      in this case.  RFRA is inapplicable.

4              But even in the pre-RFRA cases under the Free

5      Exercise Clause we come to the exact same place.  When the

6      conduct being complained about is the teaching and preaching,

7      it's not conduct at all for purposes of First Amendment

8      analysis.  We only talk about the balancing test of RFRA or

9      pre-RFRA cases or state cases that are outside the scope of

10     RFRA when we're talking about conduct other than teaching or

11     preaching your religion.

12             Now, I could point you to specific sections of

13     Ms. Gaddy's brief, but all I really have to do is look at

14     Item 1 in the table of contents to her opposition, in which

15     she said:  The amended complaint challenges defendant's

16     deceptive recruitment and indoctrinational practices, which

17     she then characterizes then as conduct, not belief.  And by

18     deceptive recruitment and indoctrinational practices, of

19     course she's talking about the things that the Church teaches

20     and preaches.  And that's absolutely protected.  Not protected

21     in some conditional way, but absolutely protected by the

22     First Amendment.

23             So enough said about that aspect of things.  I want

24     to say that I share Your Honor's view about this concept of

25     organizational sincerity.  It certainly is true that

 1    organizations can have at any given point in time what they

 2    may describe as their orthodox doctrine.  But to talk about

 3    the sincerity of belief of an organization seems to me to be a

 4    fraud concept, because of course sincerity is something that

 5    is harbored in the individual human mind and heart.  And as

 6    Your Honor has correctly pointed out, different people at

 7    different points in time may take a different view of what

 8    they consider to be orthodox and nonorthodox.  And to pretend

 9    that somehow we have the ability to discern some

10    organizational sincerity of belief seems to me to be an

11    unworkable concept right from the beginning.

12           And then of course we should say something about

13    the problem of what I think of as a slight-of-hand analysis by

14    Ms. Burningham of the elements of fraud.  There's a reason

15    that falsity is the first element of fraud.  Her idea that

16    somehow we bifurcate the proceeding and we don't talk about

17    truth or falsity, we just talk about some concept of sincerity

18    and then we come back to the truth or falsity issue at some

19    later phase of the proceeding seems not only to be unworkable

20    for the reasons that Justice Jackson has indicated, but

21    completely inconsistent with the way the law is structured.

22    Truth or falsity is the first element of fraud because you

23    can't know something to be untrue or be insincere in your

24    belief as to its untruth if it's in fact true.

25           And so because in order to prove any fraud claim

1      you have to prove that the representation was false because

2      you can't get to the next step until you get over that hurdle

3      any discussion of insincerity is irrelevant.  You can't reach

4      it without deciding whether or not the representation is false

5      in the first place.  And if it's not a subject that's

6      justiciable and clearly for all the reasons Your Honor has

7      indicated in your original opinion and in your preliminary

8      opinion today, it's not justiciable then we never even come to

9      the issue of insincerity.

10             I do want to say a word about the Utah Charitable

11     Solicitations Act.  I have it in front of me.  It's

12     Section 13-22-13.  And the applicable subdivision says that

13     it's prohibited that any organization, anybody is prohibited

14     from making any untrue statement of a material fact or failing

15     to state a material fact necessary to make statements made in

16     the context of the circumstances under which they are made not

17     misleading.

18             So again, truth and falsity are at the heart of

19     that statute.  And of course one cannot reach the issues of

20     truth or falsity without trampling on the First Amendment.  So

21     that is going to be an unavailing cause of action that should

22     of course be dismissed on this complaint.

23             I'll also point out, and this is pointed out in our

24     briefs so I won't belabor it, there is no private right of

25     action under that statute, so that's an independent reason why

1    Your Honor ought to dismiss the claim.

2            Your Honor posed an interesting question to

3    Miss Burningham.  You said words to this effect, as I noted

4    them down, is the truth static?  That's an interesting

5    question because I think the case law is clear that any

6    religion, any religious organization is the owner of its own

7    historical narrative.  And the understanding that people have

8    at any given point in time of the significance of any element

9    in that historical narrative is owned by the religion and not

10   by the courts.  And it's not for anyone to say under the

11   establishment clause what's orthodox and what's not orthodox,

12   what's heresy and what's not heresy at any given point in

13   time.

14           So, for example, and I hope my Catholic friends

15   will forgive me for this analogy which has no basis in fact, I

16   offer it only by way of analogy.  The Catholic Church for

17   many, many years taught the Doctrine of Transubstantiation,

18   that in some miraculous and mystical way the host and the wine

19   were transmuted into the body and blood of Christ.  Now that's

20   not a doctrine of the Church of Jesus Christ of Latter-Day

21   Saints, but long taught by the Catholic Church.

22           Let's just imagine hypothetically for a moment that

23   in some private setting Pope Francis said, you know, I don't

24   really believe that and I never did.  The idea that we would

25   now subject the Catholic Church to lawsuit because

1    Pope Francis has decided that his view of the Doctrine of

2    transubstantiation has evolved in some way to me is foolish

3    and leads us head long into the establishment clause.

4            And that's because I think as the Bryce case

5    articulately points out, and this is also very much underlying

6    the Mary Elizabeth Blue Hull case, it's not the province of

7    government including the courts to define now or at any point

8    in time what is orthodox and what is heretical, because that

9    is a direct assault upon the establishment clause, because if

10   the government either through statute or through decisions of

11   the courts get into the business of deciding what is orthodox

12   and what is heretical, it is in a very real way establishing a

13   religion.

14           I point that out because I think it is the answer

15   to Ms. Burningham's suggestion that the Court ought to venture

16   into the world of deciding what's a truth, what's a half

17   truth, what's a partial truth.  That seems like a fraught

18   escapade for the Court to me, because in order to do that the

19   Court would have to make this kind of a declaration.

20   Missionaries of the Church of Jesus Christ of Latter-Day

21   Saints may no longer teach the Church's official version of

22   the First Vision without giving the person that they're

23   teaching a warning that in an account of the First Vision

24   offered in 1833 Joseph Smith is reported to have not mentioned

25   two personages but to have only mentioned one personage in his

1    vision.  It's almost like saying we're going to treat religion

2    like the way the state of California treats warnings about

3    prospective cancer dangers.  This particular teaching is known

4    to the state of California to be misleading to potential

5    converts.  That seems to me to be the height of foolishness.

6          You cannot teach about the Book of Mormon or say

7    that it was translated by the gift and power of God without

8    saying that sometimes Joseph Smith was not looking at the

9    plates.  Sometimes he was looking at a brown stone.  That's

10   Ms. Gaddy's view of the role of the courts, to decide what is

11   orthodox and what is not orthodox, what is heretical and what

12   is not heretical, and that is a very bad place to go.

13         And I can't do a better job than Ms. Gaddy did in

14   pointing out to the Court that these are core religious

15   beliefs or as the Court describes them in your original order

16   religious facts which are the subject of faith, I can't do a

17   better job than she did in illustrating that they are

18   religious facts about faith than to re-put up for you the

19   things that she shared with us on the screen about the war in

20   heaven and the philia relationship between Jesus Christ and

21   Lucifer or the role of human agency in the salvific process.

22   I think she illustrated admirably that these are in fact

23   matters of faith that are religious in nature and not as the

24   Bryce case teaches us, purely secular matters.  So I won't say

25   anything more about that.

1           I do want to say, Your Honor, in conclusion that --

2           THE COURT:  So before you --

3           MR. JORDAN:  Yeah, please.

4           THE COURT:  Before you conclude let's not skip over

5    my comments about her fraud theories.  I'm concerned now after

6    hearing from Miss Burningham that I misconstrued or

7    misunderstood what I saw to be an evolution in her arguments

8    about fraudulent nondisclosure or omission.  And maybe it's,

9    maybe I do have it wrong.  Maybe she's talking about material

10   omissions.

11          MS. BURNINGHAM:  Yes, Your Honor.  Material.

12          MR. JORDAN:  I think it matters not at all, Your

13   Honor, because for Your Honor to decide what is material to a

14   religious belief and what's not material to a religious belief

15   is the same thing as Your Honor having to decide what's

16   orthodox and what's heretical.  This court cannot decide that

17   a particular fact in a church's or a particular point of faith

18   in a church's narrative about its own origins is material and

19   what is not material.  That's -- that is a -- that is a

20   forbidden territory for the Court to venture into.

21          THE COURT:  So let's turn then to tithing, or maybe

22   you were headed in that direction.

23          MR. JORDAN:  That is exactly where I was going, and

24   thank you for guiding me back there.

25          So I do understand I think what Your Honor has

1     said.  I think I share a concern that we don't really have the

2     kind of pleading at this stage that ought to survive a

3     Rule 12(b)(6) motion to dismiss.  So let me just speak to that

4     with some specificity.

5           I'm going to read now from Page 3, Paragraph 4 of

6     Ms. Gaddy's amended complaint.  It says this:

7           Gaddy and others similarly situated pay 10 percent

8     of their earnings as consideration for the right to

9     participate in temple ceremonies which promise intact families

10    that are to last throughout eternity and/or to join the

11    church.  Without that payment entrance is denied.  Absent COPs

12    underlying scheme of lies which form the basis for members'

13    beliefs tithing would not be paid.

14          Of course then she launches into her exposition of

15    the scheme of lies which focuses most predominantly on the

16    translation process of the Book of Mormon, the truth of LDS

17    scripture in the Pearl of Great Price, specifically the Book

18    of Abraham and the veracity of the church's teaching about the

19    First Vision, and particularly the fact that both God the

20    Father and his son Jesus Christ appeared to Joseph Smith in

21    that vision in April of 1820.

22          Well, if you're going to say as she does say that

23    the basis on which people were induced to pay tithing is the

24    preaching and the teaching of those doctrines which I just

25    read to the Court from her complaint together with her

1    statement that the inducement was that by paying tithing one

2    could receive the ordinance of baptism and thereby membership

3    in the Church and that eventually one would have the right to

4    participate in temple ceremonies so that they could receive

5    the promise of their family remaining intact throughout

6    eternity, you are in the same waters that Your Honor has

7    identified as forbidden.

8              You cannot allege that, I pay tithing so that I

9    could receive the ordinance of baptism with all its intended

10   blessings including the gift of the Holy Ghost and so that I

11   could enter the temple and receive sacred temple ordinances so

12   that I could receive the blessing of an eternal family.

13             You cannot make those allegations and say that

14   there was fraud in the inducement in the payment of tithing or

15   fraud of any kind because you have grounded your claim, you

16   have grounded your claim in matters of religious faith, or as

17   Your Honor has described it, religious facts.

18             Well, whether or not people actually receive the

19   gift of the Holy Ghost as a blessing of baptism I don't think

20   is for the courts to adjudicate.  Whether or not families can

21   actually remain intact in the eternities after this life

22   because of temple ordinances received in part by qualifying

23   yourself through the principle of tithing, I don't think is

24   for any court in the land to adjudicate.  But that's the way,

25   Your Honor, that she's alleged it.

1              I think Your Honor has been, if I can be this bold,

2     overly generous to her pleading in describing it as something

3     that flows from her RICO allegations.  I do not believe that

4     is the gravamen of this amended complaint.  I believe the

5     gravamen of this amended complaint is what I have just quoted

6     from.

7              So that being said, Your Honor, where does that

8     leave us?  You suggested two possible courses of action.

9              THE COURT:  Before you move on --

10             MR. JORDAN:  Go ahead.

11             THE COURT:  -- maybe I didn't articulate it as

12     well.  I wasn't trying to articulate it fully in my opening

13     comments, but I don't want to deprive you an opportunity to

14     respond to this as I have to try to make sure that

15     Miss Burningham had a chance to respond to preliminary views

16     that I have.

17             I think what you just described is how I read the

18     Third Cause of action in the complaint, at least in part.  And

19     you're talking about the gravamen of the complaint, and I

20     don't even know if I take exception with the way you described

21     the gravamen of the tithing allegations in the complaint.

22             But as you know, I have to consider all of the

23     allegations in the complaint.  And at this stage plaintiffs

24     may plead alternative theories.  They may plead even

25     internally inconsistent theories at this point so long as

 1     they're pled in good faith consistent with Rule 11, and I

 2     presume these are.

 3            And so the fact that religious components of the

 4     tithe may bar the Court under Ballard and its progeny from

 5     considering the Church's teachings, whether the tithe is

 6     required and what amount, for what purpose, how it's decided,

 7     and of course you do address this in your papers, how the

 8     tithe will be used as doctrinal.  I think you've made a strong

 9     case for that.  It's in the texts, some of the canons.

10            But it doesn't escape an allegation, I don't think,

11     or if you think otherwise let's talk about it, that any church

12     anywhere could make a misrepresentation about how it was going

13     to use funds it was soliciting from its church members.

14            And Justice Jackson I think shares my view about

15     that in the same opinion that I am so enamored with.  At the

16     end of his decision, he says:  I do not doubt that religious

17     leaders may be convicted of fraud for making false

18     representations in matter other than faith or experience, as

19     for example, if one represents that funds are being used to

20     construct a church when in fact they're being used for

21     personal purposes.

22            And I think that's consistent with virtually all

23     the courts that I've read who have weighed in on the question

24     of money and the solicitation of money and the use of money by

25     churches.  I'm left with an impression from the cases that

1    churches have no obligation to speak on the question of how

2    they're using a tithe or other donations to the Church.  But

3    if you do speak and your membership relies on it to their

4    detriment and you speak falsely of the matter of finance, I'm

5    not saying in every case, but it seems to me it would be an

6    unusual case where that would be a spiritual doctrinal issue

7    as opposed to a secular issue.

8         And that's what -- I do read allegations, I think I

9    read -- I mean, I've studied this pretty carefully trying to

10   make sense of it.  I think Ms. Gaddy pleads among other

11   things, you've told your congregation you don't use tithings

12   for certain commercial purposes, and then you did.  You used

13   them in support of a for profit venture, to build a mall.

14   That has nothing to do with faith.  It has to do with, what

15   did you do with the money that we gave you?

16        And your response, if that's right, if I'm reading

17   the complaint correctly and if I'm understanding the law

18   correctly then we have the Subpart C alternative theory in the

19   racketeering claim, the fifth cause of action, that seems of a

20   different kind than the other tithing allegations.  But what

21   do you say about that?

22        MR. JORDAN:  Yeah.  I do take your point.  As I

23   say, I think it's far too generous of a reading of the

24   complaint.  Let me read from Paragraph 20.  This is her

25   description of the scheme -- excuse me -- Paragraph 200.  This

1    is her description of the scheme or schemes to defraud Gaddy

2    and other class members.

3           It was by making false statements the substance of

4    which it did not sincerely believe to which Smith's account of

5    his First Vision was one where two persons appeared, one of

6    whom told him that all creeds were false, that Golden Plates

7    were the source from which Smith translated the Book of

8    Mormon, no seer stone was used in its creation, that the

9    Hebrew prophet Abraham wrote upon the papyri used by Smith to

10   translate the Book of Abraham and that the facsimiles included

11   therein depict Abraham; and/or, B, failing to disclose

12   material fact about LDS history; or, C, misstatements of fact

13   about how the Church used or would use tithing.

14          And it's that C that I think Your Honor is

15   highlighting.

16          But my point is this.  If that's attempted to be

17   pled it's poorly pled, so poorly pled and not argued in the

18   opposition brief in any significant way, certainly not in the

19   way Your Honor has described it, that I don't believe this

20   issue has been briefed to Your Honor in the way that it ought

21   to be and certainly not in the way that would create the sort

22   of appellate record that one would want if either side chooses

23   to avail themselves of an appeal in this case.

24          And for that reason, I want to hark to a suggestion

25   I think Your Honor was making.  Either Your Honor ought to

 1    direct the parties to more fully brief this tithing issue,

 2    which of course we would be happy to do so that we do have the

 3    kind of record that we ought to have; or, I think you

 4    suggested this, I don't know what Ms. Burningham's disposition

 5    on point would be, or alternatively we ought to have a second

 6    and final amended complaint where she does in fact lay out the

 7    theories that Your Honor has alluded to.  And then upon

 8    reviewing that complaint we will address them with an

 9    appropriate motion if appropriate.

10            I'm happy to proceed in either way.  But I don't

11    think we have the kind of record based on the pleadings as

12    they now exist or the briefing as Your Honor now has it to

13    create the kind of clarity that I think Your Honor is entitled

14    to or that I believe an appellate court would be entitled to.

15            THE COURT:  Let me speak briefly to that before we

16    hear again from Miss Burningham.  And this is not a discussion

17    that we ordinarily have in a hearing because in my judgment

18    this issue was not squarely presented by the motion or the

19    opposition.  I'm raising the question given the unusual

20    circumstances of this case and where I think we would be left.

21    And I don't by those comments or my preliminary comments mean

22    to suggest any criticism of the lawyers for either side.

23    We've advanced and developed in the papers your arguments.

24    They're good and germane arguments on both sides to this

25    complaint and its viability.  And I'm not asking for a

1    commitment from any of the lawyers, either.  You're both

2    entitled to an opportunity to consult with your clients before

3    you make a decision about how you wish to proceed.  And in any

4    event, we don't know how I'm going to rule yet because I

5    haven't had an opportunity to digest your arguments today and

6    try to figure out how or if they change my preliminary

7    orientation coming to the bench.  So it's premature at least,

8    and yet it seemed to me under the circumstances just under

9    fair notice to be in transparent for me to share my concerns.

10           I will say in response to your comments,

11   Mr. Jordan, I don't believe it would be fair for me to invite

12   further briefing on the issue because I think what I would be

13   doing is inviting a new Rule 12 motion, and I don't think

14   that's contemplated by the rules.  The defendants, unless you

15   can persuade me that I misread your papers, I think it's just

16   the sufficiency or plausibility of the pleading was not really

17   at issue.  I understood your argument to fall squarely in

18   invoking the Church autonomy doctrine as a defense to this

19   complaint.  And I think I'm required to evaluate each part of

20   each claim individually, and that's what I propose to do.  So,

21   look, we don't want a 100-page brief addressing every legal

22   argument that can be made here, and I'm not proposing that is

23   required or even it would be helpful.

24           That said, Miss Burningham, if you were left with

25   this complaint and one part of one claim that may not be pled

1     the way that you would like to have it that I suspect would

2     draw another motion from the defense, not a Rule 12(b) motion,

3     but some other rule, would you rather have it drawn to a

4     different complaint?  And again, you have an opportunity to

5     speak to your client.  But if you have thoughts or feelings

6     about how you think we should proceed procedurally I'd love to

7     hear them today.  And I'm not going to hold you to them.

8                 MS. BURNINGHAM:  Well, Your Honor, I would need to

9     speak with my clients, and I would need some time to get back

10    to you on that.  I don't think I can speak to that right now.

11                THE COURT:  Fair.  Totally fair.  All right.

12                Ms. Burningham, what if anything do you have to say

13    in response to Mr. Jordan's substantive arguments about the

14    motion?

15                MS. BURNINGHAM:  Thank you, Your Honor.  Just five

16    or 10 minutes, I would say.

17                As to the tithing argument and his claim there, you

18    can have different reasons, and I think you stated this well,

19    about what you do and why you do it.  And one of the reasons

20    could be because you think you're going to get families are

21    forever by going to the temple, and another reason could be

22    that you believe that the tithing that you pay will be used

23    for religious purposes as are set forth in the tithing forms

24    that the Church sets forth.  And that's all I will say on

25    that.

1               I would just like to speak to the issue of whether

2      a corporation --

3               THE COURT:  Ms. Burningham --

4               MS. BURNINGHAM:  -- can be --

5               THE COURT:  Miss Burningham --

6               MS. BURNINGHAM:  -- determined.  I believe

7      Mr. Jordan spoke to that, and he said it would be difficult

8      and gave reasons why.

9               The case of Burwell vs. Hobby Lobby, which I cited

10     in my opposition says that, quote, says that:  A corporation's

11     pretextual assertion of a religious belief in order to obtain

12     an exemption, this is under RFRI, for financial reasons would

13     fail.

14              So a corporation can be questioned about their

15     sincerity.  I'm not saying that the Church here, the only

16     reason they exist is for financial gain.  We know they have

17     $128 billion, but I'm not saying that.  I'm just saying that

18     corporate sincerity can be determined.

19              Then there's one final point I would like to make,

20     Your Honor.  Mr. Jordan talked about and gave an example of

21     transubstantiation with the Catholic Church.  Again this goes

22     back, and I hate to beat a dead horse, but it goes back to the

23     fact versus doctrine dichotomy.  Of course transubstantiation

24     is a doctrine.  And a secular court is not equipped to

25     determine the truth or falsity of a doctrine.

 1                   That's obvious.  That's not what we're doing.  But

 2       where the facts exist where the stone existed in the Church's

 3       vault for over 100 years, that's a horse of a different color,

 4       as they say in the Wizard of Oz.  And it's just not the same.

 5                   THE COURT:  I'm going to get this wrong.

 6                   MS. BURNINGHAM:  I'm sorry.  Are you laughing?

 7                   THE COURT:  No.  At myself.

 8                   MS. BURNINGHAM:  I'm having a hard time hearing.

 9                   THE COURT:  No.  I'm sorry.  I was laughing at

10       myself because I was trying to interrupt and I think you

11       couldn't hear me.  I was going laughing because the example I

12       was going to use I think is --

13                   MS. BURNINGHAM:  I really can't hear you.  I just

14       got a couple words there.  I don't know if it's us.

15                   THE COURT:  Mr. Jordan's having trouble, too,

16       maybe.  Can you hear me better now?

17                   MR. JORDAN:  A little bit.

18                   MS. BURNINGHAM:  No, we're not.

19                   MR. JORDAN:  It is difficult to hear you now, Your

20       Honor.

21                   THE COURT:  I'll speak up and see if I can try to

22       get through.  Can you hear me now?

23                   MS. BURNINGHAM:  Not really.

24                   THE COURT:  Really?

25                   MR. JORDAN:  I can hear you a little better.

 1                  MS. BURNINGHAM:  I'll listen closely.

 2                  THE COURT:  One moment.  Let me see if there's

 3      something I can do to adjust the volume out.

 4                  MS. BURNINGHAM:  It was a lot easier when we were

 5      in person.  I'm old school.  And Mr. Jordan would be old

 6      school since he's older than I am.

 7                  MR. JORDAN:  What a cheap shot.

 8                  MS. BURNINGHAM:  Sorry.  Just by a bit.

 9                  THE COURT:  Is this any better?

10                  MS. BURNINGHAM:  I heard that, what a cheap shot.

11                  THE COURT:  Is this any better?  No?  All right.

12                  I'll do my best.  And I don't think there's a lot

13      more that I have to say.

14                  On the point that you were just making,

15      Miss Burningham --

16                  MS. BURNINGHAM:  That's better.

17                  THE COURT:  -- as I understand one of the tenets of

18      the Church of Jesus Christ of Latter-Day Saints is that the

19      prophet receives divine revelation.  And the Mormon Church is

20      not alone in this view.  The Catholic Church of today is not

21      the Catholic Church of 2000 years ago, and the Mormon Church

22      has announced doctrinal changes in its view, as well, as a

23      result of what it says are inspiration to its leadership.

24                  MS. BURNINGHAM:  Yes.

25                  THE COURT:  Doesn't that strongly support the point

                                                                      79

1    that Mr. Jordan was making, that the doctrines of the Church

2    themselves are not static, that in different ways and

3    different times the leaders of this church and other churches

4    have been inspired, that things that were previously taught

5    are no longer doctrinal, and that in some instances new

6    doctrines are revealed to church leaders?  And if you agree

7    that that happens, how does that impact your argument?

8              MS. BURNINGHAM:  Yes.  I certainly agree that that

9    happens.  But the Church has had the stone in the vault for

10   over 100 years.  That hasn't changed.  The Church has known

11   from the very beginning how Joseph Smith used the brown stone

12   to create the Book of Mormon.  And that's a fact.  It's not a

13   doctrine.

14             THE COURT:  Why do you say that's a fact?  How do

15   you know that?

16             MS. BURNINGHAM:  Because the existence of the

17   artifact.

18             THE COURT:  So that means that is -- so that is

19   evidence to you of a fact about how it was used and for what

20   purpose and when?

21             MS. BURNINGHAM:  Yeah.  Along with the witness

22   statements that have been known since 1830.

23             THE COURT:  And are you resolving conflicting

24   evidence --

25             MS. BURNINGHAM:  Those are eye witnesses.  Excuse

1    me.

2             THE COURT:  Are you resolving conflicting evidence

3    in your own mind when you decide what in your view is truthful

4    and what is untruthful?

5             MS. BURNINGHAM:  I just -- let me think about that.

6    Am I resolving conflicting evidence?  No, because I'm not -- I

7    have to pause myself.  I know what you're saying.  But I'm

8    saying they could not have had a sincere belief that the stone

9    wasn't used when they had it for a century or more.  They

10   could not have that belief.  They could not legitimately or

11   credibly have that belief.

12            THE COURT:  Okay.  Go ahead.  I interrupted.  You

13   were finishing your argument.

14            MS. BURNINGHAM:  That's all.  And we can hear you

15   much better, by the way, as of five minutes ago.

16            THE COURT:  Thank you.

17            Mr. Jordan, anything more from the defense before I

18   take the matter under advisement?

19            MR. JORDAN:  I'll just say this, Your Honor, on the

20   tithing point.  I do want to point Your Honor to Footnote 5 in

21   our opening brief on this motion to dismiss.  It's the

22   Stone v. Salt Lake City case in which the Utah Supreme Court

23   says:

24            It is obvious that all of the funds the Church

25   collects would not be disbursed immediately and directly for

1    such purposes.  It is but common sense and common knowledge

2    that there is need for the exercise of management of such

3    funds for the ultimate accomplishment of the purposes stated.

4    How this is to be done to best serve those objectives is for

5    those in charge of the management of the Church to decide.  It

6    may well entail the keeping of collected funds in savings

7    accounts, bonds, real estate or any type of investment which

8    in the judgment of those in charge best suits that purpose,

9    close quotes.

10           All of that together with what I've said to Your

11   Honor about the doctrinal basis for tithing, about the

12   specific Subsection 120 of the Doctrine and Covenants, which I

13   have quoted to Your Honor, about the way the role that

14   inspiration plays, the way the voice of the Lord, the role

15   that plays in the disposition of tithing funds.

16           All of that I think speaks to the fact that Your

17   Honor will quickly find that the Court is in forbidden waters

18   by getting into the question of how tithing funds are used or

19   invested or how earnings from tithing funds are used.  That

20   just seems to me to be an extremely fraught area forbidden by

21   the First Amendment.  And I would encourage the Court not to

22   go there, at least not on the pleadings that you have before

23   you, which describe the motivations for the payment of

24   tithings in the very religious context of that is the way that

25   one receives admission into the Church through baptism or the

1    way that someone receives the opportunity to have temple

2    ordinances which promise blessings of eternal families.

3         All of that to me seems to be so significantly

4    intertwined as to risk the Court entangling itself in a way

5    that would be violative of the First Amendment.  Whether

6    Miss Gaddy could plead something different than she's now pled

7    rather than the entangled way that it's currently pled, I

8    don't know.  But I think on this pleading Your Honor would do

9    well to avoid the entanglement which she invites.  That's my

10   last word on that subject, Your Honor.

11        THE COURT:  And it might not be because I'd like to

12   follow up on that.

13        MR. JORDAN:  Okay.

14        THE COURT:  This is not the allegation in the

15   complaint, but let me make sure.  Let me test the limits of

16   your argument.

17        If the leadership of the Church announced

18   inspiration from God that tithing should now be 11 percent

19   instead of 10 and the extra percent of tithe will be used to

20   construct temples in new countries around the world to better

21   facilitate the communication of the Church's core teachings,

22   and instead the Church diverts that extra 1 percent, and they

23   buy Ferraris for the members of the Quorum of the Seventy and

24   they buy private airplanes and the like, to use an extreme

25   example, the fact that tithe was the vehicle for that process

1      absolves it of potential civil liability in your view under

2      the First Amendment.

3              MR. JORDAN:  No, I don't think so.  Your Honor has

4      presented an extreme example, and I think at some point one

5      can run afoul of Justice Jackson's point in his dissenting

6      opinion in Ballard in just the way that I think Your Honor is

7      describing your hypothetical.

8              But I do want to hasten to say that's not what's

9      alleged here.  And think of it this way in the light of the

10     Utah Supreme Court's opinion in Stone.  What if the Church had

11     decided that it would invest tithing dollars, rather than

12     putting them in a mattress somewhere it would invest tithing

13     dollars in real estate, not for the personal -- for the

14     personal benefit of the First Presidency to drive Ferraris

15     around as you've suggested, but because that seems like a

16     prudent investment strategy, more prudent than putting things

17     in a mattress, putting money in a mattress, and then those

18     funds ultimately, those investment funds are used for

19     appropriate church purposes?

20             Now if you make that the hypothetical, and that's

21     even a step beyond the reality here, but I don't want to talk

22     about the reality because I don't want to invite the factual

23     dispute about it.  But if you even take that as the

24     hypothetical, then the complaint goes nowhere at all, because

25     as the Utah Supreme Court says it's entirely up to the Church

```
 1    as a matter of the Church autonomy doctrine how it invests

 2    funds rather than putting funds in a mattress.  And

 3    investments strategies are entirely within the Church autonomy

 4    doctrine and can be changed from time to time.

 5            Ms. Gaddy hasn't and can't allege that Church

 6    leaders used tithing funds for their personal purposes.  The

 7    most that she has to allege, and incorrectly so, but credited

 8    for purposes of the motion to dismiss, the most that she can

 9    allege is that the Church made a real estate investment.

10            If we ever got to discovery we would find out that

11    in fact tithing funds weren't used.  But we'll take the

12    allegations on their face.  The most she could say is the

13    Church made a real estate investment rather than putting

14    tithing funds in a mattress.  And that's just not good enough.

15    That's just not good enough.

16            THE COURT:  I don't think that's a fair

17    characterization of her allegations.  And it's a 65-page

18    complaint, and I don't mean to be yelling.  I'm speaking up so

19    you can hear me clearly.

20            MR. JORDAN:  I can hear you, and it's better, Your

21    Honor.

22            MS. BURNINGHAM:  No.  You're good.  We like it.

23            THE COURT:  There is a specific allegation in the

24    complaint that Ms. Gaddy was watching during General

25    Conference when she saw the prophet of the Church say, no
```

1    tithing funds are going to be used in connection with the

2    construction of City Creek Mall, for example.  And she says, I

3    saw that.  I don't know if she said in her complaint she

4    relied on it.

5                MR. JORDAN:  She doesn't.

6                THE COURT:  She said that it's false.  I don't

7    think she does that she relied on it.  I don't know that I saw

8    that in the complaint.  But thus that among other things that

9    are missing in a RICO allegation and thus my raising the

10   question about how I should treat it.

11               But do you mean in your argument, Mr. Jordan, to

12   suggest that your motion to dismiss squarely presented the

13   question of the plausibility or adequacy of her pleading up

14   that theory in the RICO claim?

15               MR. JORDAN:  Yes, I do mean to suggest that,

16   because three things have not been alleged appropriately, at

17   least.  One is falsity.  What we have is a footnote quote that

18   is double hearsay in the Salt Lake Tribune.  That's not an

19   allegation of falsity.  Two, we have no allegation of

20   materiality.  A fair reading of the complaint suggests that

21   Ms. Gaddy didn't stop paying tithing or kept paying tithing in

22   reliance on President Hinckley's statement, which is grossly

23   quoted out of context in a General Conference talk given in a

24   ecclesiastical meeting.  But materiality is not alleged in any

25   way, and reliance is not alleged in any way.

 1            The reliance that Miss Gaddy does allege is that, I

 2    relied on the statement that I could be baptized and receive

 3    the gift of the Holy Ghost through the ordinances of the

 4    Church by committing to the principle of tithing.  And I could

 5    qualify myself to go to the temple to receive eternal

 6    blessings of eternal families.

 7            That's the causal link that is drawn here and the

 8    only one.  On this complaint as pled it falls woefully short.

 9    And I do not believe in good faith that something else could

10    be alleged in yet another amended complaint.

11            But faced with these allegations, whether you want

12    to describe President Hinckley's statement as a purely secular

13    one, which I think if you read it in context you would not

14    construe it in that way, but if you did construe it in that

15    way, she would still fall short on at least those three

16    pleading failures.

17            THE COURT:  I'm going to put you in a really

18    difficult position right now.  I'm going to ask you if what

19    you're saying is that your motion to dismiss presented that

20    argument to the Court for resolution.  So the Church has

21    advanced that argument and placed it before the Court.

22            MR. JORDAN:  No.  It's not a hard -- it's not a

23    hard question.  It's a fair question, Your Honor, and I

24    welcome it.

25            THE COURT:  I just mean difficult because it may

1    implicate what is available in the future.

2           MR. JORDAN:  Right.  My point to that is the point

3    I tried to make before.  The way this complaint is framed, the

4    description of why tithing is paid or not paid is tied to,

5    very clearly to the promise blessings of tithing, the

6    scripturally promised blessings of tithing.  So I considered

7    it not a subject for briefing to make the arguments that Your

8    Honor just made.  It's why I said to you a few minutes ago, if

9    this is really a subject of concern, if you don't feel that

10   the subject of tithing including President Hinckley's remarks

11   made in context are so entangled with religious practice as to

12   be out of bounds under the First Amendment then I would

13   appreciate the opportunity to more fully brief this to Your

14   Honor.

15          If on the other hand Miss Gaddy wants to take

16   advantage through her counsel of the opportunity I think

17   you've offered to file yet another amended complaint then I'll

18   address it in the context of a motion.

19          But I come back to the point which I tried to posit

20   before, and that is I think for the sake of this court and for

21   any appellate court who might review it, this aspect of

22   Ms. Gaddy's brief varied and obscurious as I think it is in

23   reference to President Hinckley's isolated quote, I don't

24   think we made the record on that that you or an appellate

25   court would want to have.

1          THE COURT:  Thank you, Mr. Jordan.  I guess we'll

2     go one step at a time.  And Miss Burningham has already said

3     she would benefit from the Court's ruling first and then an

4     opportunity to consult with her client, and that makes good

5     sense to me.  So I'll take the matter under advisement and --

6          MS. BURNINGHAM:  Your Honor, excuse me.  May I just

7     address the Stone case he brought up?

8          THE COURT:  You may, of course.  Yes.

9          MS. BURNINGHAM:  It will take one minute.  Thank

10    you, Your Honor.

11          Stone is differentiated because in Stone the

12    plaintiff did not allege fraud and there was no invited

13    directive.  There was no partial, there were no blanks in the

14    tithing forms.  Fill it in here, and we'll use it for this and

15    this and this.  So this is different than the specific forms

16    we have for donative intent created by the Church.

17          That's all, Your Honor.

18          THE COURT:  Thank you both for your time and your

19    argument today, as well as your briefing.  I will take the

20    matter under advisement.  And you've given me a lot to think

21    about, so I'm afraid I probably can't give you great guidance

22    about when you can expect a ruling from the Court.  But I

23    understand the importance of these issues to all involved, and

24    I can assure you we take the cases seriously as you do, and

25    we'll do the best we can to give you a good answer.

1                    Thanks again, everyone.  Please remain safe and

2        vigilant especially during these uncertain and dangerous

3        times, and we'll be in recess.

4                    MS. BURNINGHAM:  Thank you.

5                    MR. JORDAN:  Thank you.

6                (Whereupon, the court proceedings were concluded.)

7                              *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF UTAH          )

 2                           ) ss.

 3    COUNTY OF SALT LAKE    )

 4              I, KELLY BROWN HICKEN, do hereby certify that I am

 5    a certified court reporter for the State of Utah;

 6              That as such reporter, I attended the hearing of

 7    the foregoing matter on January 5,2021, and thereat reported

 8    in Stenotype all of the testimony and proceedings had, and

 9    caused said notes to be transcribed into typewriting; and the

10    foregoing pages number from 3 through 90 constitute a full,

11    true and correct report of the same.

12              That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14              And hereby set my hand and seal, this ____ day of

15    _____ 2021.

16

17

18

19

20              _____
                      KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```