2021 WL 2251819

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Utah.
Ria WILLIAMS, Petitioner,
v.
KINGDOM HALL OF JEHOVAH'S WITNESSES, Roy, Utah[1] Respondents.

[1] Additional Respondents: Watchtower Bible and Tract Society of New York, Inc., Harry Diamanti, Eric Stocker, Raulon Hicks, and Dan Harper.

No. 20190422
|
Heard November 9, 2020
|
Filed June 3, 2021

Second District, Ogden, The Honorable Mark R. DeCaria, No. 160906025

**Attorneys and Law Firms**

Attorneys:[2]

Robert Friedman, Amy L. Marshak, Mary B. McCord, Washington, D.C.; Irwin M. Zalkin, Alexander S. Zalkin, San Diego, California; Matthew G. Koyle, John M. Webster, Riverdale; for petitioner

Karra J. Porter, Kristen C. Kiburtz, Salt Lake City, for respondents

[2] Attorneys for Amicus Curiae: Troy L. Booher, Beth E. Kennedy, John J. Hurst

Chief Justice Durrant authored the opinion of the Court, in which Associate Chief Justice Lee, Justice Himonas, Justice Pearce, and Justice Petersen joined.

Williams v. Kingdom Hall of Jehovah's Witnesses, --- P.3d ---- (2021)
2021 UT 18

On Certiorari to the Utah Court of Appeals

Chief Justice Durrant, opinion of the Court:

### Introduction

**\*1 ¶1** Ria Williams filed an intentional infliction of emotional distress claim based on the manner in which Elders of the Kingdom Hall of Jehovah's Witnesses (Church) conducted a disciplinary hearing. Applying the test the United States Supreme Court established in *Lemon v. Kurtzman*,³ the district court concluded that the adjudication of this claim would violate the Establishment Clause of the First Amendment to the United States Constitution. Because recent changes in the Supreme Court's Establishment Clause jurisprudence require further development of the facts and legal arguments presented in this case, we vacate the decision by the district court and remand for additional proceedings. But the fact that we have overturned the district court's dismissal under the Establishment Clause should not be read to mean that an intentional infliction of emotional distress claim under this Clause is not an appropriate subject of dismissal, either generally or in this case. Rather, we vacate this dismissal only so that the district court may assess this case under the Supreme Court's recent modification of its Establishment Clause analysis.

---

3   403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

### Background⁴

---

4   Because, in reviewing an order on a motion to dismiss, "we accept the factual allegations in the complaint as true and interpret those facts and all inferences drawn from them in the light most favorable to the plaintiff," we rely on only those facts that have been alleged in Ms. Williams's complaint or that Ms. Williams does not dispute. *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 9, 104 P.3d 1226.

**¶2** Ria Williams and her family attended the Roy Congregation of the Jehovah's Witnesses Church. When Ms. Williams was fourteen years old, she met another Jehovah's Witnesses congregant. Initially, Ms. Williams and this congregant began seeing each other socially. But the relationship quickly changed and over the next few months the congregant physically and sexually assaulted Ms. Williams.

¶3 Soon after, the Church began investigating Ms. Williams to determine whether she had engaged in the serious sin of "porneia." According to the Church, porneia is "[u]nclean sexual conduct that is contrary to 'normal' behavior" and it includes "sexual conduct between individuals who are not married to each other." As part of this investigation, four Elders in the Church convened a disciplinary hearing to "determine if [Ms. Williams] had in fact engaged in porneia and if so, if she was sufficiently repentant for doing so." Ms. Williams voluntarily attended the hearing with her mother and stepfather.

¶4 At the beginning of the hearing, the Elders questioned Ms. Williams for forty-five minutes regarding her sexual conduct with the other congregant. And after this questioning, the Elders played an audio recording of the other congregant raping her.[5] While the Elders played the recording, Ms. Williams was "crying and physically quivering." Despite her "crying and protestations to not force her to relive the experience of being raped," the Elders played the recording for "four to five hours," stopping and starting it at certain points to ask Ms. Williams "about what was happening" and "suggesting that she consented to" the sexual acts portrayed.

---

5   The other congregant had recorded this incident and gave it to the Elders during their investigation of Ms. Williams.

---

**\*2** ¶5 As a result of this meeting, Ms. Williams continues to experience distress. Her symptoms include "embarrassment, loss of self-esteem, disgrace, humiliation, ... loss of enjoyment of life," and spiritual suffering. As a result, Ms. Williams filed a complaint against the Church for intentional or negligent infliction of emotional distress.

¶6 In response to her complaint, the Church filed a motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure. In the motion, the Church argued that the United States and Utah constitutions barred Ms. Williams's claims for intentional and negligent infliction of emotional distress.

¶7 After considering the motions and hearing arguments, the district court dismissed Ms. Williams's amended complaint, ruling that the Establishment Clause of the First Amendment to the United States Constitution barred Ms. Williams's claim. The court ruled that Ms. Williams's claims "expressly implicate key religious questions regarding religious rules, standards, ... discipline, [and] most prominently how a religion conducts its ecclesiastical disciplinary hearings."

¶8 For this reason, the court explained that it was unable to "disentangle" the alleged conduct from the religious "setting and context" in which it took place. So, even though the allegations in the complaint were "disturbing" to the court, it ruled that the Establishment Clause barred the court from adjudicating the claim. Ms. Williams appealed to the court of appeals.

¶9 In a unanimous decision, the court of appeals affirmed the decision and the reasoning of the district court, and Ms. Williams petitioned for a writ of certiorari, which we granted. We have jurisdiction under Utah Code section 78A-3-102(3)(a).

## Standard of Review

¶10 "On a writ of certiorari, we review the decision of the court of appeals ... and apply the same standard[s] of review used by the court of appeals. In conducting this review, we grant no deference to the court of appeals' decision."[6] When reviewing appeals from a motion to dismiss, we "review only the facts alleged in the complaint."[7] We "accept the factual allegations in the complaint as true and consider all reasonable inferences to be drawn from those facts in a light most favorable to the plaintiff."[8] We will affirm a district court's dismissal "only if it is apparent that as a matter of law, the plaintiff could not recover under the facts alleged."[9] "Because we consider only the legal sufficiency of the complaint, we grant the trial court's ruling no deference" and review it for correctness.[10]

---

6   *Pinney v. Carrera*, 2020 UT 43, ¶ 14, 469 P.3d 970 (alteration in original) (citation omitted).

7   *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 2, 21 P.3d 198 (citation omitted).

8   *Id.* (citation omitted).

9   *Id.* ¶ 10 (citation omitted).

10   *Id.* (citation omitted).

## Analysis

¶11 The First Amendment states, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[11] The United States Supreme Court has explained that the First Amendment's "first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion."[12] For this reason, past courts have treated the First Amendment as though it "erected a wall between church and state."[13] On one side of the wall is "freedom" or "independence from secular control or manipulation" for religious organizations.[14] And on the other side, a protection of "temporal institutions from religious interference."[15]

---

11   U.S. Const. amend I.

12   *Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

13   *Everson v. Bd. of Educ.*, 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

14   *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

15   *Watson v. Jones*, 80 U.S. 13 Wall. 679, 730, 20 L.Ed. 666 (1871).

---

**\*3** ¶12 "To safeguard this crucial autonomy," the Supreme Court has "long recognized that the Religion Clauses [of the First Amendment] protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs."[16] In short, the First Amendment grants religions "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."[17]

---

16   *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC.*, 565 U.S. 171, 199, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012) (Alito, J., concurring). The Supreme Court's decision in *Hosanna-Tabor* is illustrative of the common practice among courts of analyzing First Amendment challenges in this context—where governmental action intrudes into the areas of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them," *Watson*, 80 U.S. at 733—without distinguishing between the Establishment Clause and the Free Exercise Clause. Although in some contexts the protections provided by the two Religion Clauses differ, or even "exert conflicting pressures," *Hosanna-Tabor*, 565 U.S. at 181, 132 S.Ct. 694 (citation omitted), in this context the protections of the Religion Clauses converge.

17   *Hosanna-Tabor*, 565 U.S. at 186, 132 S.Ct. 694 (citation omitted).

---

¶13 But it has also long been recognized that "[n]o significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government."[18] For this reason, the Supreme Court has acknowledged that "total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable."[19] So notwithstanding statements prohibiting the "slightest breach"[20] in the wall between church and state, the Supreme Court has conceded that the "wall" between government and religion is more of "a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."[21]

18   *Lynch v. Donnelly*, 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

19   *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (citation omitted).

20   *Everson*, 330 U.S. at 18, 67 S.Ct. 504.

21   *Lemon*, 403 U.S. at 614, 91 S.Ct. 2105.

¶14 Yet, despite acknowledging that the First Amendment does not contain "precisely stated constitutional prohibitions," the Supreme Court, in *Lemon v. Kurtzman*, attempted to establish a three-part test that could be used to evaluate any challenged governmental action under the Establishment Clause: First, the action must have a secular purpose; second, its "principal or primary effect must be one that neither advances nor inhibits religion"; and third, it must not "foster 'an excessive government entanglement with religion.' "[22]

22   *Id.* at 612–13, 91 S.Ct. 2105 (citations omitted). Following the Court's decision in *Lemon*, courts have typically focused on the final prong of the test—the excessive entanglement prong—in determining whether the adjudication of a tort would violate the Establishment Clause. This is most likely because the "excessive entanglement" prong is most directly connected to the court's goal of preventing the government's active involvement in religious activity.

¶15 The Court applied this test in *Lemon*. In that case, the Court was tasked with evaluating the permissibility of a government program that provided funding for teachers of "secular subjects" at nonpublic religious schools.[23] Although in a previous case the Court had allowed a state to provide secular textbooks to religious schools (on the ground that it furthered the state's interest

in teaching "secular" subjects to all students), the Court concluded that the teacher reimbursement program at issue in *Lemon* violated the Establishment Clause.

23   *Id.* at 607, 615–16, 91 S.Ct. 2105.

**\*4 ¶16** The Court struck down the teacher reimbursement program because there was no permissible way for the state to verify that the state funds supported only secular education: "[u]nlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment."[24] Rather, the Court reasoned that compliance with the First Amendment would be possible only through a "comprehensive, discriminating, and continuing state surveillance" of the classrooms in religious schools.[25]

24   *Bd. of Educ. v. Allen*, 392 U.S. 236, 248, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

25   *Lemon,* 403 U.S. at 625, 91 S.Ct. 2105.

¶17 The Court explained that such a comprehensive system of enforcement would violate the First Amendment because that "kind of state inspection and evaluation of the religious content of a religious organization [was] fraught with the sort of entanglement that the Constitution forbids."[26] In other words, any attempt by the state to ensure compliance with the Establishment Clause's prohibition on funding religious activities would inevitably violate the Establishment Clause by creating "a relationship pregnant with dangers of excessive government direction of ... churches."[27]

26   *Id.* at 620, 91 S.Ct. 2105.

27   *Id.*

¶18 Following the Supreme Court's decision in *Lemon*, courts across the country, including our court, have attempted to apply the *Lemon* test in Establishment Clause cases.[28] But even though the *Lemon* test has become accepted in our case law, the United States Supreme Court has now largely discarded it.

28      See *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 12, 21 P.3d 198 (introducing the *Lemon* test).

¶19 The Court made its departure from the *Lemon* test explicit in *American Legion v. American Humanist Association*.[29] In that case—decided roughly fifty years after the decision in *Lemon*—the Court noted that although "the concept of a formally established church is straightforward, pinning down the meaning of a 'law respecting an establishment of religion' has proved to be a vexing problem."[30] The Court explained that "[a]fter grappling with [difficult Establishment Clause cases] for more than 20 years, [the Court in] *Lemon* ambitiously attempted to distill from the Court's existing case law a test that would bring order and predictability to Establishment Clause decisionmaking."[31] But, according to the *American Legion* Court, the *Lemon* Court's "expectation" that it "would provide a framework for all future Establishment Clause decisions ... has not been met."[32] In fact, it noted that in "many cases, th[e] Court ha[d] either expressly declined to apply the [*Lemon*] test or ha[d] simply ignored it."[33]

29      ––– U.S. ––––, 139 S. Ct. 2067, 2079–80, 2087, 204 L.Ed.2d 452 (2019) ("While the *Lemon* Court ambitiously attempted to find a grand unified theory of the Establishment Clause, in later cases, we have taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance."). In light of this recent development in Establishment Clause case law, we also disregard the *Lemon* test and disavow the reasoning in our previous cases to the extent they relied on the *Lemon* test. *See, e.g.*, *Franco*, 2001 UT 25, ¶ 12, 21 P.3d 198.

30      *Am. Legion*, 139 S. Ct. at 2080.

31      *Id.*

32      *Id.*

33      *Id.*

¶20 According to the Court, the problem with the *Lemon* test is that it is inadequate to address the "great array of laws and practices" that come before courts as part of Establishment Clause challenges.[34] As examples of this problem, the Court explained that, although the *Lemon* test may have helped the *Lemon* Court resolve the issue of whether the Establishment Clause prohibits government funding of secular teaching in religious schools, that test could not "explain the Establishment Clause's tolerance ... of the prayers that open legislative meetings"

or "the public references to God on coins, decrees, and buildings" among other things as illustrated by the Court's extensive Establishment Clause case law.[35] In other words, because a wide variety of governmental practices, laws, and customs potentially implicate the prohibitions of the Establishment Clause, the "rigid formula" of the *Lemon* test is inadequate to resolve the issues in many Establishment Clause cases.[36]

[34]   *Id.*

[35]   *Id.* at 2080–81 (citation omitted).

[36]   *Id.*

**\*5 ¶21** In lieu of the *Lemon* test, the *American Legion* Court applied what it described as "a more modest approach."[37] Under this approach, courts should eschew a "rigid formula" in analyzing Establishment Clause cases.[38] Instead, they should "focus[ ] on the particular issue at hand and look[ ] to history for guidance" in resolving the dispute.[39] As Justice Kavanaugh noted in his concurring opinion in *American Legion*, "each category of Establishment Clause cases has its own principles based on history, tradition, and precedent."[40] Accordingly, from this history, tradition, and precedent, Justice Kavanaugh suggests that courts should identify "an overarching set of principles."[41] Courts should determine how those principles apply to the case at hand after taking "all relevant circumstances into account."[42]

[37]   *Am. Legion,* 139 S. Ct. at 2087. The Court in *American Legion* specifically prescribed this approach for cases that "involve the [government's] use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations." *Id.* at 2081. Although this case does not involve the government's use of religious words or symbols, neither does it involve the circumstances that were at issue in *Lemon* (the potential government funding of religious education). Because the *American Legion* Court's approach is broad and flexible, we conclude that it can be fairly applied in the context presented by this case (the government's adjudication of what may be a religious dispute).

[38]   *Id.*

[39]   *Id.*

[40]   *Id.* at 2093 (Kavanaugh, J., concurring).

---

41   *Id.*

---

42   *Our Lady of Guadalupe,* 140 S. Ct. at 2067.

---

¶22 An example of the role history can play in this approach is illustrated by the Supreme Court's decision in *Marsh v. Chambers*.[43] In that case, the Court upheld the constitutionality of a state legislature's practice of beginning each legislative session with a prayer.[44] In arriving at this result, the Court considered the role this practice had played throughout our country's history. It explained that, from "colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom."[45] And it noted that it was common practice at every level of the federal judiciary to begin proceedings with an announcement that ended with the words "God save the United States and this Honorable Court."[46] So the Court concluded that the "opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country."[47] Based in part on this conclusion, the Court held that the practice of opening a legislative session with prayer did not violate the Establishment Clause.[48]

---

43   463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

---

44   *Id.* at 786, 103 S.Ct. 3330.

---

45   *Id.*

---

46   *Id.*

---

47   *Id.*

48      *Id.* at 790, 103 S.Ct. 3330. Although the Court in *Marsh* acknowledged that "historical patterns," standing alone, could not "justify contemporary violations of constitutional guarantees," the Court explained that "historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress." *Id.*

¶23 As the Supreme Court's decisions in *American Legion* and *Marsh*[49] illustrate, we need not rigidly apply the *Lemon* test in resolving Establishment Clause cases. Rather we should look to the principles underlying our Establishment Clause case law as a guide in our analysis. Additionally, we should consider whether our nation's historical practices can shed any light on the proper application of those principles in the context presented by cases such as the one now before us—where the disputed governmental action is the adjudication of a tort claim against a religious organization. The district court in this case did not conduct this analysis.

49      See *Am. Legion*, 139 S. Ct. at 2087 (noting that the *Marsh* Court "conspicuously ignored *Lemon*" in its history-based analysis).

**\*6** ¶24 In dismissing Ms. Williams's claims, the district court concluded that her claims "expressly implicate key religious questions regarding religious rules, standards, and discipline." Specifically, the court explained that her claims would require the court to consider the appropriateness of the manner in which "a religion conducts its ecclesiastical disciplinary hearings." For this reason, the court explained that it could not "disentangle" Ms. Williams's claims from the religious "setting and context" in which they arose. So the court held that the adjudication of her claims would involve the kind of excessive entanglement prohibited under the *Lemon* test.

¶25 Similarly, the court of appeals concluded that allowing Ms. Williams's claims to be litigated in this case "would require the district court to unconstitutionally inject itself into substantive ecclesiastical matters."[50] According to the court, a challenge to the "manner in which the Church conducted a religious judicial committee,"[51] would inevitably lead to an impermissible degree of "judicial oversight"[52] into an undeniably "religious activity."[53]

50      *Williams v. Kingdom Hall of Jehovah's Witnesses*, 2019 UT App. 40, ¶ 15, 440 P.3d 820.

51      *Id.*

52      *Id.* ¶ 15.

53      *Id.* ¶ 17.

¶26 Although the conclusion reached by the district court and the court of appeals may ultimately prove to be the correct one, we note that in reaching that conclusion both courts relied on the excessive entanglement test established in *Lemon*. But as we have noted, *Lemon* has been overtaken by more recent Supreme Court cases.⁵⁴ Because the district court applied the excessive entanglement test from *Lemon* instead of the approach followed in these more recent cases, we vacate the district court's decision and remand for any additional proceedings necessary to adequately conduct the Supreme Court's current approach to the Establishment Clause.

54      We note that two of these recent Supreme Court cases (*Am. Legion*, 139 S. Ct. 2067, and *Our Lady of Guadalupe*, ––– U.S. –––, 140 S. Ct. 2049, 207 L.Ed.2d 870) were issued after the district court and the court of appeals issued their decisions in this case. So, in vacating the district court's order, we are in no way criticizing the district court or the court of appeals for failing to follow the approach identified in those cases.

¶27 As noted, under the Supreme Court's current approach, on remand the district court should focus on the particular issue at hand and look to history for guidance as to the correct application of the Establishment Clause in this case.⁵⁵ In examining our history (including our case law), the court should identify "an overarching set of principles" and explain how those principles should be applied in this case.⁵⁶

55      The court may, of course, also consider the application of the Free Exercise Clause as well as any other grounds for dismissal raised by the Church.

56      *Am. Legion*, 139 S. Ct. at 2093 (Kavanaugh, J., concurring).

**Conclusion**

¶28 Because the district court relied on the test established in *Lemon v. Kurtzman*—a test that has recently been displaced by the Supreme Court—we vacate the court's decision and remand for additional proceedings. On remand, the district court should look to our history, tradition, and precedent to identify core Establishment Clause principles that may be applied to the facts of this case.⁵⁷

57   We regret that we cannot, at this stage in the litigation, provide the district court with more guidance regarding the application of such a broad standard. But because the standard is so broad and could potentially implicate so many factors, principles, historical practices, and facts, we conclude that it would be better to allow the district court to address this standard in the first instance in response to a renewed motion by one of the parties, should one be filed.

## All Citations

--- P.3d ----, 2021 WL 2251819, 2021 UT 18

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.