IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| LAURA A. GADDY, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Case No. 2:19-cv-00554-RJS-DBP<br><br>Chief Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

This case stems from the history, founding, and teachings of the Church of Jesus Christ of Latter-day Saints, commonly known as the Mormon Church. Plaintiff Laura Gaddy was a member of that religion for most of her life. She brings this putative class action lawsuit against the Church's religious corporation, Defendant Corporation of the President of the Church of Jesus Christ of Latter-day Saints (the Church). Asserting numerous fraud-related claims, Gaddy generally alleges the Church has intentionally misrepresented its founding to induce the faith of its members, even as its leaders hold no sincere religious belief in the version of events they promote.

In a prior order, the court dismissed Gaddy's original Complaint primarily because litigating her claims would have required an impermissible inquiry into the truth of the Church's religious teachings and doctrines.[1] Gaddy then filed an Amended Complaint in which she

---

[1] *See* Dkt. 33 (Memorandum Decision and Order Granting Motion to Dismiss) at 20.

asserts seven claims against the Church, many of which were also asserted in her original Complaint.[2]

Now before the court is the Church's Motion to Dismiss Gaddy's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[3]  The Church argues the First Amendment's Religion Clauses foreclose Gaddy's Amended Complaint because each claim still requires the court to impermissibly interfere with matters of church faith and determine the validity of the Church's religious teachings.[4]  For the reasons explained below, the Church's Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[5]

Gaddy was raised in the Church and remained a member for most of her adult life.[6]  In early 2018, she found online material concerning the Church's founding, history, and doctrine that conflicted with the Church's own teachings.[7]  Unable to reconcile what she discovered with her continued participation in the Church, Gaddy ultimately relinquished her membership.[8] Gaddy is now in counseling to help manage the emotional distress she experiences from her lost faith in the Church.[9]

---

[2] Dkt. 37 (Amended Complaint).

[3] Dkt. 38 (Motion to Dismiss Amended Complaint).

[4] *See id.* at 5.

[5] Because this case is before the court on a motion to dismiss, the court accepts as true all well-pleaded factual allegations contained in the Amended Complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[6] *See, e.g.*, *id.* ¶¶ 100, 102, 113.

[7] *Id.* ¶ 114–15.

[8] *Id.* ¶ 117.

[9] *Id.* ¶ 118.

## I.  Gaddy's Original Complaint

On August 5, 2019, Gaddy filed this putative class action lawsuit against the Church.[10] Her original Complaint was based on the theory that the Church intentionally misrepresents its history and founding to induce membership.[11]  Gaddy compared the Church's "false official narrative" of several foundational events with what she alleged are the "historically accurate" accounts.[12]  Gaddy primarily focused on three of the Church's core teachings, alleging each was deliberately misrepresented: (1) a spiritual event when the founding prophet Joseph Smith saw God and Jesus Christ (known as the First Vision); (2) the origins of one of the Church's foundational books of scripture, the Book of Mormon; and (3) the translation of another canonical text known as the Book of Abraham.[13]

Based on these alleged misrepresentations, Gaddy originally brought six causes of action on behalf of herself and others similarly situated for: (1) common law fraud, (2) fraudulent inducement, (3) fraudulent concealment, (4) civil RICO (18 U.S.C. § 1962(c)), (5) intentional infliction of emotional distress, and (6) breach of fiduciary duty.[14]  Gaddy's original civil RICO claim rested on her theory that the Church had engaged in both mail and wire fraud by communicating these false teachings.[15]  Gaddy's intentional infliction of emotional distress claim was also based on the Church's alleged doctrinal misrepresentations.  To support this claim, Gaddy alleged the Church's pattern of "knowingly and repeatedly misrepresenting

---

[10] Dkt. 2 (Original Complaint).

[11] *See id.* ¶ 2.

[12] *See, e.g.*, *id.* ¶¶ 64–75.

[13] *See id.* ¶¶ 64–75 (First Vision), 76–91 (Book of Mormon), 92–101 (Book of Abraham).

[14] *See id.* ¶¶ 183–248.

[15] *See id.* ¶¶ 175–77.

foundational facts of its organization" was outrageous and intolerable.[16]  Finally, Gaddy brought

a claim against the Church for breach of fiduciary duty.  She alleged a fiduciary relationship

arose between the Church leaders and its members for "all matters spiritual," because of the

"extraordinary influence" the Church exercised over its members.[17]  Gaddy maintained the

Church breached that duty by failing to "fully disclose the truth" concerning the Church's

historical foundation.[18]

## II.     The Church's Motion to Dismiss Gaddy's Original Complaint

On August 27, 2019, the Church moved to dismiss Gaddy's original Complaint.[19]  The

Church argued the Free Exercise and Establishment Clauses of the First Amendment (the

Religion Clauses) barred Gaddy's claims because each necessarily implicated the Church's

fundamental religious doctrines and teachings.[20]  The Church argued Gaddy's three fraud-based

claims, for common law fraud, fraudulent inducement, and fraudulent concealment should be

dismissed because adjudicating the claims would require the court to make an impermissible

inquiry into the truth or falsity of the Church's religious beliefs.[21]  Because Gaddy's remaining

claims for civil RICO, intentional infliction of emotional distress, and breach of fiduciary duty

were also dependent on the inquiry into the truth or falsity of the Church's teachings, the church

argued those claims should similarly be dismissed.[22]

---

[16] *Id.* ¶ 242.

[17] *Id.* ¶¶ 206, 208–10.

[18] *Id.* ¶¶ 218–19.

[19] Dkt. 6 (Motion to Dismiss Original Complaint).

[20] *See id.* at ECF 12.

[21] *Id.* at ECF 19 ("Ms. Gaddy's fraud claims would require an adjudication of whether the Church's teachings about Joseph Smith and its canonical scriptures are true.").

[22] *Id.* at ECF 21–22, 25.

Gaddy opposed the motion, arguing the First Amendment's Religion Clauses did not apply to the claims in her Complaint.[23]  Gaddy contended her fraud-based claims survived the motion for three reasons.  First, she disagreed that her claims challenged the Church's religious beliefs.[24]  Instead, she insisted her claims challenged only the facts underlying the Church's beliefs about its founding, not the religious beliefs themselves.[25]  Gaddy asked the court to distinguish between facts and beliefs, arguing, "[f]acts are susceptible to proof.  Beliefs are not; if proven, beliefs become facts."[26]  Second, Gaddy argued her fraud-based claims survived because the Church's proselytizing constituted conduct rather than belief.[27]  Third, Gaddy cursorily argued that even if the court could not determine the truth or falsity of the Church's beliefs, it may nevertheless assess whether those beliefs are sincerely held.[28]

### III.   Prior Order Granting the Church's Motion to Dismiss

In a March 31, 2020, Memorandum Decision and Order (the Prior Order), the court granted the Church's motion and dismissed Gaddy's original Complaint without prejudice, concluding the First Amendment's Religion Clauses barred each of Gaddy's claims.[29]  The Religion Clauses provide in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"[30]  The court acknowledged "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious

---

[23] *See* Dkt. 23 (Opposition to Motion to Dismiss) at 10.

[24] *See id.* at 6–7.

[25] *Id.*

[26] *Id.* at 9.

[27] *Id.* at 15–16.

[28] *Id.* at 16–17.

[29] Dkt. 33 (Memorandum Decision and Order Granting Motion to Dismiss).  The Prior Order also sets forth additional factual background not separately repeated here.

[30] U.S. Const. amend. I.

doctrine one desires."[31]  To effectuate these rights "courts have long held that the truth or falsity of religious beliefs are beyond the scope of judicial review."[32]  The court's ruling relied upon "the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government *as well as those of faith and doctrine*.'"[33]  This doctrine is known as the church autonomy doctrine.

But the court also recognized in its Prior Order that the church autonomy doctrine "is not without limits."[34]  Churches may not invoke the doctrine to shield purely secular decisions.[35]  To determine whether the church autonomy doctrine applies in any given instance, courts must decide whether the dispute presented "is an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law, or whether it is a case in which we should hold religious organizations liable in civil courts for purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization."[36]

Applying these principles to Gaddy's original Complaint, the court concluded the First Amendment barred each of her claims.[37]  The court dismissed Gaddy's three fraud-based claims because the falsity of religious beliefs was an essential element of each claim as pled.[38]  Gaddy relied on three core religious teachings as the bases for her fraud-based claims: the First Vision

---

[31] Dkt. 33 (MDO) at 8 (citing *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)).

[32] *Id.* (citing *United States v. Ballard*, 322 U.S. 78, 86–87 (1944); *Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125, 1142 (D. Mass. 1982)).

[33] *Id.* at 9 (citing *Bryce*, 289 F.3d at 655 (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952))) (emphasis in original).

[34] *Id.* (quoting *Bryce*, 289 F.3d at 657).

[35] *Id.*

[36] *Id.* at 10 (citing *Bryce*, 289 F.3d at 657 (quoting *Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997))).

[37] *See id.* at 20.

[38] *Id.* at 11.

and the translations both of the Book of Mormon and Book of Abraham.[39]  The court concluded the First Amendment required dismissal of the fraud based claims because their adjudication would require an examination into the truth or falsity of these core religious teachings.[40]

And each of Gaddy's three arguments in opposition failed.  First, the court rejected Gaddy's proposed distinction between challenging religious facts and religious beliefs, concluding "if all a plaintiff had to do to get around the First Amendment was to challenge the facts underlying a church's religious beliefs, the Religion Clauses would offer little protection against de facto referenda on churches' faith and doctrines."[41]  Instead, the court relied on the distinction other courts use to determine whether it may adjudicate fraud claims against a church. That is, whether the dispute is religious or secular.[42]  Because Gaddy based her claims on alleged misrepresentations implicating the Church's fundamental religious teachings, the court concluded the dispute was religious.[43]

The court also rejected Gaddy's argument that her claims challenged the Church's conduct, rather than its beliefs, recognizing "the Supreme Court has repeatedly confirmed that the free exercise of religion encompasses not only the freedom to believe, but also the right to profess those beliefs through proselytizing."[44]  Finally, the court declined to address Gaddy's argument concerning the sincerity of the Church's professed beliefs in its own teachings because,

---

[39] *See Id.*

[40] *Id.* at 11–12.

[41] *Id.* at 14.

[42] *Id.* at 13.

[43] *Id.*

[44] *Id.* at 15 (citing *Smith*, 494 U.S. at 877 ("The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."); *McDaniel*, 435 U.S. at 626 (noting that the Free Exercise Clause "unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions")).

as Gaddy conceded at oral argument, the Complaint did not allege the Church's beliefs were insincerely held.[45]

The court also dismissed Gaddy's civil RICO and intentional infliction of emotional distress claims because, as pled, they necessarily implicated the veracity of the Church's teachings.[46]  Gaddy predicated her civil RICO claim on mail and wire fraud relying on the Church's alleged misrepresentation of facts related to Joseph Smith's First Vision, the Book of Mormon and the Book of Abraham.[47]  But the court concluded the Church could be liable for these predicate acts only if the statements communicated were false.[48]  Gaddy's intentional infliction of emotional distress claim also relied on the alleged falsity of the Church's teachings because her claim was based on the Church's alleged pattern of "knowingly and repeatedly misrepresenting the foundational facts of the organization."[49]  For these reasons, the court concluded these claims were barred by the First Amendment's Religion Clauses.[50]

Finally, the court dismissed Gaddy's claim for breach of fiduciary duty after concluding Utah has not established a legally cognizable fiduciary duty arising from purely ecclesiastical relationships.[51]  Even if Utah recognized such a relationship, the court reasoned it could not define a standard of care that would apply to "a diversity of religions professing widely varying beliefs" without violating the First Amendment's Establishment Clause.[52]

---

[45] *Id.* at 16.

[46] *Id.* at 17–18.

[47] *See* Dkt. 2 (Original Complaint) ¶¶ 236–38.

[48] Dkt. 33 (MDO) at 17.

[49] *Id.* at 18.

[50] *Id.*

[51] *Id.* at 19.

[52] *Id.* at 20.

At bottom, Gaddy's original Complaint asked the court to adjudicate claims against the Church based on alleged misrepresentations of religious doctrine. Because her theories of liability depended upon the alleged falsity of the Church's teachings, the First Amendment placed Gaddy's dispute beyond the scope of judicial review.

## IV.   Gaddy's Amended Complaint

Gaddy filed her Amended Complaint on May 18, 2020.[53] Although it is longer and more detailed than her original Complaint, many of the claims, theories, and allegations in the Amended Complaint are duplicative of her prior pleading. Gaddy again brings claims against the Church for common law fraud, fraudulent concealment, fraudulent inducement, civil RICO (18 U.S.C. § 1962(c)), and intentional infliction of emotional distress.[54] These claims continue to rely on alleged misrepresentations concerning the First Vision, the Book of Mormon, and the Book of Abraham.[55]

But the Amended Complaint contains a handful of differences, including new factual allegations to support her common law fraud claim. Gaddy now alleges the Church also misleads members about its history with polygamy and about certain locations of events described in the Book of Mormon. Specifically, Gaddy alleges the Church historically taught members that certain events in the Book of Mormon happened on Hill Cumorah in upstate New York.[56] Recently, however, the Church has stated it does not take a position on the specific geographic locations of Book of Mormon events.[57] Gaddy also alleges the Church previously

---

[53] Dkt. 37 (Amended Complaint).

[54] *See id.*

[55] *See, e.g., id.* ¶¶ 130–31, 133.

[56] *Id.* ¶ 132.

[57] *Id.* ¶ 138.

taught members the prophet Joseph Smith had only one wife.[58]  Gaddy alleges Smith had multiple wives.[59]

In addition to these new factual allegations, Gaddy's Amended Complaint includes the theory of liability she previously argued in response to the Church's motion to dismiss, but which she had not previously pled.  Namely that the Church should be held liable on her common law fraud claim because its own leaders do not sincerely believe the versions of the Church's history, founding, and doctrines the Church teaches to its members.[60]

In addition to these new factual allegations and alternative theory of fraud liability, the Amended Complaint also advances two new causes of action, including a claim under the Utah Charitable Solicitations Act, and a claim for breach of the duty of full disclosure.[61]  Finally, the Amended Complaint includes a new alternative theory of liability for Gaddy's civil RICO claim based on misrepresentations to members concerning the Church's use of tithing.[62]  Gaddy now pleads as an independent basis for RICO liability that the Church misleads its members by falsely assuring them tithing funds are used only for "Church expenses and humanitarian aid."[63] For example, at the Church's semi-annual General Conference in April 2003, Gaddy alleges the Church's Prophet, Gordon B. Hinckley, made the following statement concerning the purchase and development of the for-profit commercial City Creek Mall in Salt Lake City, Utah:

---

[58] *Id.* ¶ 134.

[59] *Id.* ¶ 140.

[60] *See, e.g., id.* ¶¶ 2, 3, 141.

[61] *See id.* ¶¶ 150–66, 192–98,

[62] *See, e.g., id.* ¶¶ 2, 5, 6, 79, 200(C).

[63] *Id.* ¶ 6.

> I wish to give the entire Church the assurance that tithing funds have not and will
> not be used to acquire this property [City Creek Mall].  Nor will they be used in
> developing it for commercial purposes.[64]

Gaddy contends this representation is false, as "[s]everal billion dollars of [the principal tithing] fund was used for affiliated profit-making business entity expenses, including but not limited to the development of Salt Lake's City Creek Mall."[65]  Gaddy alleges "[t]his lie was repeated at least twice over the years until City Creek [Mall] was opened."[66]

## V.     The Church's Motion to Dismiss Gaddy's Amended Complaint

In its Motion to Dismiss Gaddy's Amended Complaint,[67] the Church largely reiterates its previous arguments offered for dismissal of Gaddy's original Complaint, maintaining the Religion Clauses compel dismissal of Gaddy's Amended Complaint for the reasons stated in the court's Prior Order.[68]  The Church contends the Amended Complaint must be dismissed to the extent Gaddy relies on statements concerning the First Vision and the translations of the Book of Mormon and Book of Abraham because the court has already dismissed her fraud claims based on these allegations.[69]  The Church also argues Gaddy's new factual allegations related to locations of events in the Book of Mormon, its history with polygamy, and its use of tithing funds fail to save her claims.[70]  According to the Church, adjudicating fraud-based claims on these facts also requires the court to determine the truth or falsity of the Church's religious

---

[64] *Id.* ¶ 79.

[65] *Id.* at ¶ 5.

[66] *Id.* at ¶ 79.

[67] Dkt. 38 (Motion to Dismiss Amended Complaint).

[68] *See id.* at 3–5.

[69] *Id.* at 12–13.

[70] *Id.* at 13.

teachings and beliefs.[71]  Finally, the Church argues Gaddy's new claims, including the new civil

RICO theory based on tithing use and the claim under the Utah Charitable Solicitations Act,

require the same impermissible inquiry into the truth or falsity of the Church's religious

beliefs.[72]

Gaddy opposes the Motion,[73] relying primarily on an argument she previously made in

support of her original Complaint but rejected in the court's Prior Order dismissing that

Complaint.  That is, Gaddy continues to maintain the Church's proselytizing constitutes conduct,

not belief.[74]  In a footnote, Gaddy also asserts she "does not waive" her previously argued

distinction between religious facts and religious beliefs.[75]  The court will neither revisit nor

disturb its prior ruling dismissing Gaddy's original Complaint.  To the extent the Amended

Complaint and the parties' arguments concerning the sufficiency of that pleading overlap with

factual allegations, arguments, and legal issues previously addressed, the court relies on and

incorporates its Prior Order.[76]

Gaddy's opposition does, however, raise two arguments why her re-pled claims survive

the Church's Motion to Dismiss that the court has not already addressed.  First, to save her

common law fraud claim, Gaddy argues her new allegations concerning the insincerity of the

Church's expressed religious beliefs present a threshold question of fact that cannot be disposed

of at this stage.[77]  Second, she argues her remaining re-pled claims survive because they rely on

---

[71] *Id.* at 14.

[72] *Id.* at 18–19.

[73] *See* Dkt. 47 (Opposition to Church's Motion to Dismiss Amended Complaint).  Because Gaddy did not include page numbers in her Opposition, the pagination refers to the page's position within the pdf file.

[74] *Id.* at 6–20.

[75] *Id.* at 6 n.1.

[76] Dkt. 33.

[77] *See* Dkt. 47 at 21–22.

fraudulent omissions rather than misrepresentations.[78]  Gaddy maintains that because these claims are based on material omissions instead of affirmative misrepresentations, the court may adjudicate the claims without examining the truth or falsity of the statements.[79]

The court addresses below these two new arguments Gaddy advances to avoid dismissal of her re-pled claims, her new claim for violations of the Utah Charitable Solicitations Act, and her new alternative civil RICO theory of liability.[80]

## LEGAL STANDARDS

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[81]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[82]  In determining whether a complaint satisfies these criteria, the court will "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."[83]

For the second time, the Church argues the First Amendment's Religion Clauses bar each of Gaddy's claims.  The Tenth Circuit analogizes such an argument to a government official's

---

[78] *Id.* at 27.

[79] *Id.* at 28.

[80] Gaddy's claim for breach of duty of disclosure was not included in her original Complaint.  *See* Dkt. 2 (Original Complaint).  Gaddy argues her claim for "Breach of Duty of Disclosure" is distinguished from her prior claim for breach of fiduciary duty.  Dkt. 47 (Opposition) at 28.  Gaddy states her claim for breach of the duty of disclosure "is in the context of where a partial disclosure has been made and a full disclosure must be made in order to avoid a misleading statement."  *Id.* at 28.  Arguing this claim is distinct from her previous claim for breach of fiduciary duty, Gaddy suggests this claim arises "in the context of a single discreet act of fraudulent concealment."  *Id.* at 29.  As argued, this claim is indistinguishable from her re-pled fraudulent concealment claim, and the court will not separately address it.

[81] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[82] *Id.* (citing *Twombly*, 550 U.S. at 556).

[83] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

defense of qualified immunity.[84]  That is, if the First Amendment applies "to the statements and materials on which plaintiffs have based their claims, then the plaintiffs have no claim for which relief may be granted."[85]

## ANALYSIS

### I.     New Theories

Gaddy re-pleads five causes of action: (1) common law fraud, (2) fraudulent inducement, (3) fraudulent concealment, (4) civil RICO (18 U.S.C. § 1962(c)), and (5) intentional infliction of emotional distress.[86]  As explained above, Gaddy's Amended Complaint includes two new sets of factual allegations and one new argument in support of these re-pled claims.  Neither the new facts nor her new arguments clear the First Amendment bar recognized in the court's Prior Order.[87]

### A.  New Factual Allegations: Hill Cumorah and Joseph Smith's Marriages

Like her original allegations concerning the First Vision and translation of the Book of Mormon, Gaddy's new factual allegations relating to the locations of events described in the Book of Mormon and the founding prophet Joseph Smith's marriages directly implicate the Church's core religious teachings.[88]  By adding facts concerning these issues Gaddy attempts to accomplish indirectly what she cannot do directly: that is, she seeks to attack the veracity of the

---

[84] *See Bryce*, 289 F.3d at 654.

[85] *Id.*  Additionally, a heightened pleading standard applies when fraud is alleged.  Under this standard, "a party must state with particularity the circumstances constituting [the] fraud or mistake."  Fed. R. Civ. P. 9(b).  Thus, Rule 9(b) generally requires a plaintiff "to identify the time, place, and content of each allegedly fraudulent representation or omission, to identify the particular defendant responsible for it, and to identify the consequence thereof."  *Hafen v. Strebeck*, 338 F. Supp. 2d 1257, 1263 (D. Utah 2004) (citation omitted).

[86] *See* Dkt. 37 (Amended Complaint).

[87] *See* Dkt. 33 (MDO) at 11–12 ("Because a statement's falsity is an essential element of fraud claims, adjudicating these claims would require the court to do exactly what the Supreme Court has forbidden—evaluate the truth or falsity of the Church's religious beliefs.") (citing *Ballard*, 322 U.S. at 86–87).

[88] Dkt. 37 ¶¶ 132, 134, 138, 140.

Church's teachings about the Book of Mormon and its doctrines by challenging the accuracy of certain facts contained in the text.  As this court previously explained, a plaintiff may not, for example, challenge in a court of law religious beliefs that Noah built an ark, loaded it with his family and representative animals of the world, and was thereby saved from world-engulfing floods.  Neither may a plaintiff circumvent this restriction by merely attacking religious accounts concerning the locations where Noah built the ark or where the ark came to rest.  If religious events themselves sit beyond judicial purview, religious beliefs concerning the details of those events must enjoy the same protection.

Religious beliefs concerning the details of events described in The Book of Mormon, the Church's foundational text, may not be severed from beliefs about the events themselves.  And whether described as the doctrine of polygamy, plural marriage, celestial marriage, or by another name, the Church's teachings concerning the issue and its practice are fundamentally religious in nature.  Adjudicating Gaddy's re-pled claims based on these two new sets of factual allegations would require the court to evaluate the truth or falsity of the Church's religious beliefs.  As explained in the Prior Order, the First Amendment prohibits that examination.[89]

## B.  New Theory of Liability: Sincerity of Belief

To avoid this prohibition, Gaddy contends her new factual allegations challenging the sincerity of the Church's professed beliefs in its own teachings present a threshold question of fact that the court cannot dispose of on a motion to dismiss.[90]  She argues the Church must first demonstrate the sincerity of its belief in its teachings about its founding, history, and doctrines before it may invoke the church autonomy doctrine.[91]  The court disagrees.

---

[89] *See* Dkt. 33 (MDO) at 11–12.

[90] *See* Dkt. 47 (Opposition) at 22–23.

[91] *Id.*

Gaddy is correct that courts are required to evaluate the sincerity of religious beliefs as a threshold question for litigants and prisoners seeking to assert affirmative rights under the First Amendment and the Religious Freedom Restoration Act (RFRA).[92]  It is well-established that claimants in these circumstances must demonstrate the sincerity of their religious belief before they may obtain relief.[93]  However, courts engage in this inquiry of those seeking religious accommodation or exception to a rule or law of general application in these types of cases for the purpose of ensuring the government accommodate only genuine religious beliefs that are sincerely held.[94]

This rationale is inapplicable here because the church autonomy doctrine is not an accommodation.  It is not an exception to a law of general application.  Rather, it is a "fundamental right of churches to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."[95]  Here, the Church has not raised the church autonomy doctrine as part of an effort to obtain religious accommodation or special exemption.  Thus, the reasoning behind the sincerity analysis applied in RFRA cases and to those plaintiffs asserting First Amendment claims, has no application here.

---

[92] *See id.* at 22 (citing *United States v. Meyers*, 95 F.3d 1475, 1482–84 (10th Cir. 1996); *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1352 (10th Cir. 1997) *vacated in part on reh'g en banc*, 159 F.3d 1227 (10th Cir. 1998) (en banc); *United States v. Quaintance*, 608 F.3d 717, 722–23 (10th Cir. 2010)).

[93] *See, e.g.*, *Meyers*, 95 F.3d at 1482 (noting "[u]nder the RFRA, a plaintiff must establish, by a preponderance of the evidence" the sincerity of their religious belief); *Snyder*, 124 F.3d at 1352 ("The first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held."); *Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir. 1991) (explaining sincerity analysis required for First Amendment claims by prisoners).

[94] *See id.*

[95] *Bryce*, 289 F.3d at 655 (internal quotation marks and citation omitted).

Gaddy also relies on two criminal cases where defendants raised the First Amendment as a defense to fraud charges.[96]  The court disagrees either case supports a threshold inquiry of sincerity before applying the church autonomy doctrine as a defense to civil fraud charges based on the misrepresentation of religious facts.

Gaddy first cites *United States v. Rasheed*, in which two defendants were convicted of mail fraud for using the mail to spread fraudulent information about the "Dare to be Rich" program associated with the Church of Hakeem.[97]  In that case, "[s]hortly after the Church of Hakeem was founded, Rasheed established the 'Dare to be Rich' program," teaching "if one donated money to the Church, one would receive an 'increase of God' of four times that amount within a particular period of time."[98]  At the initiation of the program, Rasheed represented "the increases of God were from profits that the Church made on investments."[99]  But the increases were actually coming from other members' payments into the program.[100]

The Ninth Circuit concluded an inquiry into the sincerity of the defendants' beliefs was critical to the analysis of their First Amendment defense, stating:

> [T]he issue in this case becomes whether [the defendants] held sincere religious beliefs in the allegedly fraudulent aspects of the 'Dare to be Rich' program.  If they made assertions with knowledge of the falsity of those assertions, then they could not have been acting pursuant to sincere religious belief.  It, therefore, is not a question of whether the 'Dare to be Rich' tenet is true or false.  The focus is on the intent of [the defendants] in carrying out the program.  It is this distinction that is critical in our First Amendment analysis.[101]

---

[96] Dkt. 47 (Opposition) at 24–25 (citing *United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981), and *United States v. Ballard*, 322 U.S. 78 (1944)).

[97] *Rasheed*, 663 F.2d at 847.

[98] *Id.* at 845.

[99] *Id.* at 846.

[100] *Id.*

[101] *Id.* at 847.

The Ninth Circuit's approach on this issue is neither controlling nor persuasive. Importantly, *Rasheed* is a criminal case, implicating *mens rea*.[102]  Beyond that, this court continues to believe for the reasons more fully explained in the Prior Order that the better inquiry in this context is whether the allegedly fraudulent statements are secular or religious in substance.[103]  The outcome in *Rasheed* would have been the same using this approach, and it would have enabled the Ninth Circuit to avoid unnecessary entanglement with ecclesiastical disputes.  The representation at issue in *Rasheed*—that the increases of God were "from profits made on investments"—is a secular representation the truth or falsity of which the court could inquire into without offending First Amendment principles.[104]  Where *Rasheed* is not binding on this court and employs unpersuasive reasoning, the court declines to follow suit.  Based on the weight of authority against such an approach, this court will not inquire into sincerity of belief prior to applying a church autonomy doctrine defense to fraud allegations in a civil lawsuit against a church based on religious representations and teachings.

Gaddy next cites *United States v. Ballard* to support her proposition that a threshold question of the sincerity of a defendant's religious belief in actions for fraud is appropriate before a defense of the First Amendment may apply.[105]  The court does not agree *Ballard* supports this approach.

In *Ballard*, two defendants were convicted of mail fraud after using the mail to organize and promote the religious "I AM movement."[106]  At trial, the parties agreed to withhold the issue

---

[102] *See id.* at 845 (noting the defendants were changed under 18 U.S.C. §§ 1341, 1503, and 1623).

[103] Dkt. 33 (MDO) at 13 (citing *Bryce*, 289 F.3d at 657–58; *Ballard*, 322 U.S. at 86).

[104] *See Rasheed*, 663 F.2d at 846.

[105] Dkt. 47 (Opposition) at 24–25.

[106] *Ballard*, 322 U.S. at 79.

of truth or falsity of the religious statements from the jury—"confin[ing] the issues [at that] phase of the case to the question of the good faith of respondents."[107]  After the jury returned a guilty verdict, the defendants appealed, arguing the issue of truth or falsity was improperly withheld from the jury.[108]  The Circuit Court of Appeals agreed, reversed the convictions, and ordered a new trial.[109]  On appeal, the Supreme Court reversed the Circuit Court's decision, holding "the District Court ruled properly when it withheld from the jury all questions concerning the truth or falsity of the religious beliefs or doctrines of [the defendants]."[110]  The Court refused to address the defendants' arguments "that the reversal of the judgment of conviction was justified on other grounds."[111]  The court reasoned it was more "appropriate to remand the cause to the Circuit Court of Appeals so that it may pass on the questions reserved."[112]  The holding of *Ballard* is limited to the question of whether truth or falsity of a religious belief should go to a jury—it did not address the propriety of a mail fraud conviction based on insincere religious representations.[113]

In a compelling dissent, Justice Jackson persuasively articulated the dangers of prosecutions based on the "misrepresentation of religious experience or belief."[114]  He first noted the difficulty in separating "an issue as to what is believed from considerations as to what is

---

[107] *Id.* at 81.

[108] *Id.* at 82–83.

[109] *Id.* at 83.

[110] *Id.* at 88.

[111] *Id.*

[112] *Id.*

[113] *See Ballard v. United States*, 329 U.S. 187, 201 (1946) (*Ballard II*) (Frankfurter, J., dissenting) ("[T]he case was remanded to the Circuit Court of Appeals without considering the question whether the First Amendment affords immunity from criminal prosecution for the procurement of money by false statements as to one's religious experiences.").

[114] *Ballard*, 322 U.S. at 92 (Jackson, J., dissenting).

believable."[115]  He went on to express concern with asking a jury to distinguish real religious experiences with "fancied ones" where "[s]uch experiences, like some tones and colors, have existence for one, but none at all for another."[116]  Importantly, Justice Jackson questioned "what degree of skepticism or disbelief in a religious representation amounts to actionable fraud."[117]  Recognizing religious adherents vary in how literally they read religious doctrines, he noted:

> Belief in what one may demonstrate to the senses is not faith.  All schools of religious thought make enormous assumptions, generally on the basis of revelations authenticated by some sign or miracle.  The appeal in such matters is to a very different plane of credility than is invoked by representations of secular fact in commerce.  Some who profess belief in the Bible read literally what others read as allegory or metaphor, as they read Aesop's fables.  Religious symbolism is even used by some with the same mental reservations one has in teaching of Santa Claus or Uncle Sam or Easter bunnies or dispassionate judges.  It is hard in matters so mystical to say how literally one is bound to believe the doctrine he teaches and even more difficult to say how far it is reliance upon a teacher's literal belief which induces followers to give him money.[118]

These dangers apply with equal force here where the Church faces potential civil liability for alleged misrepresentations concerning matters of its core doctrine and history.  The First Amendment's Religion Clauses bar secular courts from injecting themselves into disputes concerning church faith and doctrine.[119]  Plaintiffs cannot circumvent this bar by purporting to reframe the same issue as one directed only to the sincerity of a church's beliefs about the religious doctrines they challenge.  Unless or until the Tenth Circuit Court of Appeals or the Supreme Court instruct otherwise, this court continues to find the better reading of the great

---

[115] *Id.*

[116] *Id.* at 93.

[117] *Id.* at 93–94.

[118] *Id.*

[119] *See Bryce*, 289 F.3d at 655.

weight of authority on the issue confirms this approach.  The court declines Gaddy's request to apply a threshold question of sincerity before reaching the Church's First Amendment defense.

Moreover, Gaddy's claims would fail even if the court engaged in a threshold inquiry into the sincerity of the Church's beliefs in its teachings.  Gaddy argues "[i]f [a] Defendant [asserting a First Amendment defense] does not sincerely believe what is preached or taught, that satisfies both [] element[s] of common law fraud and is justification for no First Amendment protection as to those statements[.]"[120]  That is simply incorrect.  Falsity of a statement remains an essential element of a fraud claim.[121]  And whether or not Church leadership believes any representations made, the First Amendment prohibits the next step, which requires the court to examine the truth or falsity of the First Vision, the translation of the Book of Mormon, the Book of Abraham, or Gaddy's new doctrinal challenges.[122]

While churches and religious organizations are not exempt from fraud laws, the critical issue underpinning the church autonomy doctrine is whether the dispute is secular or religious.[123]  Where a plaintiff brings fraud claims against a church based on religious issues of faith or doctrine, the First Amendment applies as a defense.[124]  Here, Gaddy's common law fraud claim

---

[120] Dkt. 47 (Opposition) at 25.

[121] *See Webster v. JP Morgan Chase Bank, NA*, 2012 UT App. 321, ¶ 16, 290 P.3d 930.

[122] *See Ballard II*, 329 U.S. at 196–97 (Jackson, J., concurring) (noting criminal liability under the statute for mail fraud "requires, in my opinion, a provably false representation in addition to knowledge of its falsity to make criminal mail fraud.  Since the trial court is not allowed to make both findings, the indictment should be dismissed."); *Tilton v. Marshall*, 925 S.W.2d 672, 679 (Tex. 1996) ("Whether the statement of religious doctrine or belief is made honestly or in bad faith is of no moment, because falsity cannot be proved.").

[123] *See In re The Bible Speaks*, 869 F.2d at 645 ("The [Free Exercise] clause does not allow purely secular statements of fact to be shielded from legal action merely because they are made by officials of a religious organization."); *Molko*, 762 P.2d at 58 ("Our initial inquiry, then, is whether plaintiffs' actions for fraud implicate religious belief or religiously motivated conduct.  If the former, the actions are barred.  If the latter, further constitutional analysis is necessary.") (citation omitted); *Van Schaick*, 535 F. Supp. at 1141 ("Statements citing science as their source may provide the basis for a fraud action even though the same contention would not support such an action if it relied on religious belief for its authority.").

[124] *See Bryce*, 289 F. 3d at 657 (explaining the application of the church autonomy doctrine depended on "whether the defendants' alleged statements were ecclesiastical statements protected by church autonomy or purely

is based on ecclesiastical issues and implicates the Church's fundamental religious beliefs. Because the church autonomy doctrine applies to Gaddy's fraud allegations, she has failed to state a claim for common law fraud upon which relief may be granted.[125]

### C. New Theory: Fraudulent Omissions

Gaddy next argues her re-pled claims for fraudulent inducement, concealment, civil RICO, and intentional infliction of emotional distress survive because they are based in part on fraudulent omissions, as opposed to affirmative misstatements.[126]  Fraudulent omissions, Gaddy argues, do not require a determination of the truth or falsity of the underlying statements because liability may be based on the omission of material facts.[127]  Because her claims are based in part on material omissions, rather than falsity, she argues the First Amendment does not bar them.[128] This argument ignores the analysis required to adjudicate a Utah fraud claim based on omissions. At bottom, Gaddy's omission theory still requires the court to examine religious doctrines and teachings, and determine whether they are false or misleading absent additional disclosure.  This draws the court directly into the entanglement with religious liberty that courts are instructed to avoid.

A material omission may amount to actionable fraud under Utah law where a party has a duty to disclose material information known to the party, yet remains silent.[129]  That duty may arise when a speaker makes a material statement of fact that is misleading unless the speaker also

---

[125] *See id.* at 654.

[126] Dkt. 47 (Opposition) at 27.

[127] *Id.* at 27–28.

[128] *See id.* at 34 (arguing her fraud based claims "do[] not require adjudication of the truth.  A jury need only determine whether a reasonable person would want to know the information intentionally omitted.").

[129] *See Elder v. Clawson*, 384 P.2d 802, 804–05 (Utah 1963) (citations omitted).

includes "all material facts a listener would need to keep that statement from being misleading."[130]

Applying these principles here, the Church can be liable for fraud under an omission theory only if it has made a material statement that is misleading unless additional facts are supplied.[131] But the court can no better evaluate the allegedly misleading nature of a statement concerning religious belief or doctrine than it can a false statement. That is, the court cannot evaluate the misleading nature of the Church's statements without first ascertaining a certain truth about the matters at issue before then deciding whether the statement made could lead a listener to draw a conclusion at odds with that truth unless the Church made some additional statements. And even then, the court would have to decide what additional statements would be required to render the initial statement truthful and non-misleading. Here, Gaddy's allegations of material omissions concern the First Vision, translations of the Book of Mormon and Book of Abraham, locations of events described in the Book of Mormon, and the Church's history with polygamy.[132] These allegations directly implicate the truth of the Church's teachings concerning these matters. As the court has already articulated, the First Amendment bars this inquiry. Gaddy's remaining re-pled claims for fraudulent inducement, fraudulent concealment, intentional infliction of emotional distress, and two re-pled theories of liability under civil RICO fail to state a claim for which relief may be granted.[133]

---

[130] *Blackmore/Cannon Dev. Co., LLC v. U.S. Bancorp d/b/a U.S. Bank*, Case No. 2:08-cv-370 CW, 2010 WL 1816275, at *8 (D. Utah May 3, 2010) (citing *First Sec. Bank of Utah, N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1330–31 (Utah 1990) (there is duty in fraud to reveal "matters known to [a party] that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading") (quoting Restatement (Second) of Torts § 551, at 119 (1977)).

[131] *See id.*

[132] Dkt. 37 (Amended Complaint) ¶¶ 164, 177, 185, 196, 200(B), 219.

[133] *See Bryce*, 289 F.3d at 654.

## II.    New Claims

Gaddy also includes in her Amended Complaint a new cause of action for alleged violations of the Utah Charitable Solicitations Act, and an alternative theory of liability for her existing civil RICO claim.  The court addresses each in turn.

### A.    Utah Charitable Solicitations Act

The Utah Charitable Solicitations Act (the Act) prohibits, "[i]n connection with any solicitation, . . . making any untrue statement of a material fact or failing to state a material fact necessary to make statements made, in the context of the circumstances under which they are made, not misleading[.]"[134]  Gaddy alleges the Church's "solicitation" of tithing violates the Utah Charitable Solicitations Act because it has intentionally concealed or omitted material facts about the Church's history.[135]

The Church contends this new claim fails for two reasons.  First, the Church argues the Act does not create a private cause of action.[136]  Second, the Church maintains any claim under the Act in the context of this case necessarily requires an impermissible evaluation into the truth of the Church's statements based on religious teachings and beliefs.[137]

Assuming without deciding that the Act creates a private cause of action, the court concludes Gaddy's claim still fails because it impermissibly requires a determination of the truth of the Church's religious teachings.  The allegedly untrue or misleading facts underlying Gaddy's claim are those relating to "Mormonism and the [] Church's key historical events, including but not limited to the first vision, character of Joseph Smith and the source of [the

---

[134] Utah Code Ann. § 13-22-13(3).

[135] Dkt. 47 (Opposition) at 30–31.

[136] Dkt. 38 (Motion) at 18 n.7.

[137] *Id.* at 18–19.

Church's] scripture[.]"[138]  These facts directly implicate the truth of the Church's teachings.
That is, the Church can only be liable under the Act for "making any untrue statement" or
"failing to state a material fact necessary to make the statements made . . . not misleading[.]"[139]
As the court has already determined, the First Amendment bars this inquiry when the statements
at issue concern religious beliefs and doctrine.[140]  For the same reasons the Church's First
Amendment defense requires dismissal of Gaddy's claims based on fraudulent omissions,
Gaddy's Utah Charitable Solicitations Act claim also fails to state a claim for which relief may
be granted.[141]

## 2.      Civil RICO (18 U.S.C. § 1962(c))

The court previously dismissed Gaddy's civil RICO claim.  She reasserts the claim in her
Amended Complaint, but includes in the amended claim a new alternative theory of liability.[142]
Gaddy's new theory is based on statements by Church leaders related to the use of tithing funds,
i.e., that the funds would not be used for commercial purposes.[143]  Gaddy alleges these
statements were false because tithing funds were in fact used for commercial purposes, including
the development of the commercial City Creek Mall in Salt Lake City, Utah.[144]

"The elements of a civil RICO claim are: (1) investment in, control of, or conduct of (2)
an enterprise (3) through a pattern (4) of racketeering activity."[145]  Racketeering activity is

---

[138] Dkt. 37 (Amended Complaint) ¶ 196.

[139] *See* Utah Code Ann. § 13-22-13(3) (prohibiting in connection with any solicitation "making any untrue statement of a material fact or failing to state a material fact necessary to make statements made, in the context of the circumstances under which they are made, not misleading").

[140] *See* Dkt. 33 (MDO) at 10.

[141] *See Bryce*, 289 F.3d at 654.

[142] Dkt. 37 (Amended Complaint) ¶ 200(c).

[143] *Id.*; *see also id.* at ¶¶ 5, 6, 79.

[144] *Id.*

[145] *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (citing 18 U.S.C. § 1962(a)–(c)).

defined as "any act which is indictable under federal law and specifically includes mail fraud, wire fraud and racketeering."[146]  These underlying acts are commonly called "predicate acts."[147]  The predicate acts forming the basis for Gaddy's RICO claim are mail and wire fraud.[148]  In its Prior Order, the Court dismissed Gaddy's civil RICO claim because it rested on theories that depended on the truth or falsity of the Church's religious statements communicated through the mails and wires.[149]

Gaddy's new theory alleges the Church made misstatements of fact through the mail and wire communications about how the Church used or planned to use tithing funds.[150]  Gaddy alleges the Church used several billion dollars of principal tithing funds for profit-making business entity expenses, including the development of City Creek Mall.[151]  She further alleges the Church simultaneously and falsely assured members that "tithing funds have not and will not be used to acquire [the mall].  Nor will they be used in developing it for commercial purposes."[152]

The Church contends the First Amendment's Religion Clauses bar Gaddy's new tithing theory for the same reason the court previously dismissed Gaddy's initial RICO theories.[153]  The Church argues adjudicating the claim would require the court to determine whether the its actions were consistent with its scripture and official teachings.[154]  The Church maintains

---

[146] *Id.* (internal quotation marks and citation omitted).

[147] *Id.*

[148] Dkt. 37 (Amended Complaint) ¶ 202.

[149] Dkt. 33 (MDO) at 17.

[150] Dkt. 37 (Amended Complaint) ¶ 200(c).

[151] *Id.* ¶ 5.

[152] *Id.* ¶ 79.

[153] Dkt. 38 (Motion) at 16–17.

[154] *Id.*

because "[t]ithing is rooted in the Bible" and "commanded in a revelation recorded in another book of the Church's scripture, the Doctrine and Covenants," an examination of these teachings would entangle the court in an ecclesiastical dispute concerning the "proper use of the Lord's tithing funds."[155]  The Church notes "[l]eaders of the Church have, for many years, taught the principle of tithing from the pulpit, including in the Church's semi-annual worldwide conferences."[156]

Following the framing in the court's Prior Order, the issue presented is whether the allegedly false statements circulated through the mails and wires concerning the Church's use of tithing implicate a purely secular dispute or an ecclesiastical dispute "about discipline, faith, internal organization, or ecclesiastical rule, custom or law[.]"[157]  This distinction is required because the church autonomy doctrine only applies as a defense to alleged misconduct "rooted in religious belief."[158]  The doctrine "does not apply to purely secular decisions, even when made by churches."[159]  Indeed, the First Amendment "protects utterances which relate to religion but does not confer the same license for representations based on other sources of belief or verification."[160]  The court must therefore determine whether the Church's "alleged statements were ecclesiastical statements protected by church autonomy or purely secular ones."[161]

As alleged in the Amended Complaint, the court concludes Gaddy's third alternative civil RICO theory is based on a secular dispute concerning statements by Church leadership about the

---

[155] *Id.* at 16.

[156] *Id.* at 17.

[157] Dkt. 33 (MDO) at 10 (citing *Bryce*, 289 F.3d at 657).

[158] *See Bryce*, 289 F.3d at 657 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).

[159] *Id.*

[160] *Van Schaick v. Church of Scientology of California, Inc.*, 535 F. Supp. 1125, 1141 (D. Mass. 1982).

[161] *Id.*

specific ways tithing, once received, would in fact be spent.  Justice Jackson provided a helpful example in his dissenting *Ballard* opinion in the context of criminal convictions based on misrepresentations of religious beliefs.  There, he distinguished liability for fraud based on religious expressions with liability based on the misuse of donations, stating: "I do not doubt that religious leaders may be convicted of fraud for making false representations on matters *other* than faith or experience, as for example if one represents that funds are being used to construct a church when in fact they are being used for personal purposes."[162]  This example highlights the distinction between the religious teachings behind the principle of tithing, and the Church's statements to its members about its use of tithing proceeds.

Here, Gaddy does not challenge the Church's tithing doctrine or teachings related to it.  The court does not read her Amended Complaint to advance a claim that the doctrine is false.  Gaddy instead points to specific factual statements allegedly made by the Church through its representatives concerning the Church's use of tithing funds and alleges those statements are false.[163]  The inquiry required to adjudicate this claim does not implicate religious principles of the Church or the truth of the Church's beliefs concerning the doctrine of tithing.  This claim further does not require the court to determine whether the Church or its members were acting in accord with what they perceived to be the commandments of their faith.[164]  Gaddy has instead challenged secular representations concerning the use of money received by the Church.  While the statements were made by Church officials, the church autonomy doctrine does not apply as a

---

[162] *Ballard*, 322 U.S. at 95 (Jackson, J., dissenting) (emphasis added).

[163] *See* Dkt 37 (Amended Complaint) ¶ 79.

[164] *See Thomas v. Review Bd. of Ind., Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) ("Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith.  Courts are not arbiters of scriptural interpretation.").

defense.[165]   The Church has not asserted any other challenge to Gaddy's RICO claim based on

this alternative theory of liability.   Accordingly, Gaddy's RICO claim based only on this

alternative theory survives the Church's Motion to Dismiss.

## CONCLUSION

For the reasons explained above, the Church's Motion to Dismiss is GRANTED in part,

and DENIED in part.[166]   The Motion is GRANTED as to Gaddy's claims for common law fraud,

breach of the duty of full disclosure, fraud in the inducement to enter into an oral contract,

fraudulent concealment, violations of the Utah Charitable Solicitations Act (UCA §§ 13-22-1, et

seq.), her first and second alternative theories of civil RICO violations (18 U.S.C. § 1962(c)),

and intentional (reckless) infliction of emotional distress.   The Motion is DENIED as to Gaddy's

third alternative civil RICO theory of liability relating to alleged misrepresentations concerning

the Church's use of tithing.

After the court heard oral argument and took this matter under advisement, Gaddy filed a

Motion for Leave to File her Second Amended Complaint.[167]   That Motion is denied without

prejudice as premature.   However, now that the court has resolved the Church's Motion to

Dismiss her Amended Complaint, Gaddy may file within thirty (30) days a motion for leave to

amend her Amended Complaint.

---

[165] *See In re The Bible Speaks*, 869 F.2d at 645 ("The [Free Exercise] clause does not allow purely secular statements of fact to be shielded from legal action merely because they are made by officials of a religious organization.").

[166] Dkt. 38 (Motion).

[167] Dkt. 85 (Motion for Leave to File Second Amended Complaint).

SO ORDERED this 28th day of July 2021.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge