Kay Burningham (#4201)
kay@kayburningham.com
Kay Burningham, Attorney at Law
299 South Main Street, Suite #1375
Salt Lake City, Utah 84111
Phone: 1.888.234.3706

*Attorney for Laura A. Gaddy,*
*Lyle D. Small and Leanne R. Harris, Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| **LAURA A. GADDY** individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>**[The] CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,** a Utah corporation sole.<br><br>*Defendant* | **MOTION for LEAVE to FILE Proposed SECOND AMENDED COMPLAINT**<br><br>(DEMAND FOR JURY TRIAL)<br>Request for Oral Argument<br>**2:19-cv-00554-RJS--DBP**<br>Presiding Judge: Robert J. Shelby<br>Presiding Magistrate Judge: Dustin B. Pead |

**MOTION**

Plaintiffs seek leave to file the attached proposed Second Amended Complaint ("2AC") under Fed. R. Civ. P. 15(a)(2) in accordance with the Court's Orders of July 28, and August 24, 2021, Dkt Nos 100 & 104 respectively.

1

The additional named plaintiffs in the proposed 2AC have only recently discovered the alleged fraud, have claims similar to Ms. Gaddy's and are residents of Colorado and California.

## MEMORANDUM

The Court identified several issues in its Order (dkt. 100) that led to the dismissal of all but the RICO affirmative fraud claim re City Creek Mall. Plaintiffs have cured two of those issues in the proposed 2AC by: First, repleading fraud in the inducement based on the Brethren's ultimate approval of correlated material creating a reasonable inference among Plaintiffs that the Brethren believed what their correlated rhetoric (including art) conveyed. That is, the first element of fraud in the inducement is that the Brethren's correlated rhetoric gave rise to Plaintiffs' reasonable inference that the Brethren believed the correlated messages. The second element being that the Brethren did not so believe. Secondly, the 2AC separates failure to disclose into two causes of action: The Second Cause of Action, based on a duty to disclose (2AC ¶¶ 400) and the Third Cause of Action, based on intentional concealment/deceit (2AC ¶¶ 424). Recently the Tenth Circuit has held that a fraudulent nondisclosure claim under Utah law is a claim requiring a duty to disclose but requires no intent in order to prevail on a claim for fraudulent nondisclosure under Utah law. Marcantel v. Michael & Sonja Saltman Fam. Tr., 993 F.3d 1212, 1222 (10th Cir. 2021).[1]

---

[1] Unfortunately, several links throughout this motion are broken.

Additionally, in Fulton v. City of Philadelphia, Pennsylvania, 141 S. Ct. 1868, 1871, 210 L. Ed. 2d 137 (2021) the U.S. Supreme Court declined to overrule Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) making clear that it remains good law. That law should be applied to Defendant's actions and omissions where the Supreme Court has not specifically expanded the church autonomy doctrine("CAD") to the extent that COP argues.

Finally, Williams v. Kingdom Hall of Jehovah's Witnesses, 2021 UT 18, 491 P.3d 852 abrogated prior law that declined to find a fiduciary duty owed by an LDS bishop to a young LDS girl makes clear a path for this Court to find a limited duty of disclosure on the Gaddy facts. These claims will be addressed in turn under the Futility Argument, part 5 et. seq., below.

1. The Proposed 2AC is Brought in Good Faith and is Partly Based on Newly Discovered Evidence.

This Motion is based in part upon facts that could have only reasonably been discovered after the filing of the Amended Complaint (hereinafter "FAC") (Dkt 37, May 18, 2020). COP has a practice, as demonstrated over the past several years, of slowly leaking previously concealed information material to Plaintiffs.

The following newly discovered facts support Plaintiffs' proposed 2AC claims:

### a. *President Nelson recently admitted "we know" Smith used a seer stone(s) in a hat to create the Book of Mormon, thereby turning belief into fact.*

In a May, 2020 video (exact date omitted from publisher COP's website) LDS President Russel M. Nelson demonstrates how Smith used a seer stone(s) (conflated with urim and thummim, hereinafter "U&T") *in a hat* to create the Book of Mormon. He first stated that "we have a lot of suggestions about how it was done," but then proceeds to demonstrate only one (2AC ¶¶160-162). He said:

> …and we <u>know</u> that they had a table like this. We <u>know</u> they had golden plates, covered usually. And Joseph used these, uh, the urim and thummim, seer stones, in the, in the hat [demonstrating]. It was easier for him to see the light when he'd, uh, take that position… [Emphasis added]

Nelson's demonstration and the prior admissions of LDS agents and all eyewitnesses (See 2AC ¶68 & Early Admissions Table ¶) that the use of the stone in the hat was how it was done, if not acknowledging fact, at least indicate a lack of good faith in the correlated art depicting a literal translation directly from plates. (2AC Exhibit 7). The spectacles attached to breastplate (U&T) were only ever used to with re; the lost 116 pages; they were never used for the published B. of M. manuscript. (2AC ¶150)

The reenactment is evidence of a lack of good faith on the part of COP and supports the 2AC allegations that the Brethren had no sincere religious belief in the correlated art depicting direct translation of the B. of M. from gold plates. (2AC Ex. 7)

There is no indication that the information upon which Nelson based his demonstration was only recently discovered. Unlike the scores of depictions in the 1973

4

through October 2015, *Ensign,* a direct translation from gold plates, with or without spectacles attached to a breastplate, is admittedly not how it happened.

This admission, together with the "first-ever photo" of the opaque brown stone that has been in Defendant's custody since at least 1901 (2AC ¶¶152-154) can reasonably be interpreted to mean that Def. has known all along that Smith used the brown stone to create the Book of Mormon. Yet it has intentionally deceived plaintiffs regarding the process. This newly released evidence supports 2AC claims that the Brethren misrepresented their collective states of mind in that lay members of the Church reasonably inferred that their leaders believed what was depicted in the correlated art. Given what was disclosed by Nelson, that ubiquitous art was clearly not commissioned nor promulgated in good faith. [2]

> Per Chief Justice Stone's dissent:
>
> The state of one's mind is a fact as capable of fraudulent misrepresentation as is one's physical condition or the state of his bodily health (citations omitted)…Certainly none of respondents' constitutional rights are violated if they are prosecuted for the fraudulent procurement of money by false representations as to their beliefs, religious or otherwise.

United States v. Ballard, 322 U.S. 78, 90, 64 S. Ct. 882, 888, 88 L. Ed. 1148 (1944).

---

[2] The phrase "good faith" is used 13 times in Ballard.

> b. *<u>Plaintiffs only recently discovered the significance of COP's concealment of the metal plate used to print Facsimile No. 3 in the Book of Abraham.</u>*

As more fully explained in Plaintiff's Motion to Supplement the [F]AC with Exhibit no. 15 (Dkt 57-1), COP revealed on Oct. 29, 2018 in the hard copy of the Joseph Smith. Papers ("*JSP*") that it had in its possession the metal plate used to print Facsimile 3 in the Book of Abraham.³ On that same date in 2018, Defendant's *JSP* it also revealed Smith's Egyptian Grammar and Alphabet, included in the Kirtland Papers which had been in the Church's custody since 1855 (2AC ¶¶194 & Table ¶404 )

The metal plate was discussed online in late summer of 2020, after filing the FAC. Whoever made the plate apparently forgot to remove the ear of the God Anubis which remains on the plate shown in profile). (2AC ¶¶ 278-281). Before this was suggested, it could have been that the facsimile figure's no. 6, labeled a slave by Smith which shows a spike coming out of his head, was an errant mark on the facsimile. But, now that COP has admitted it was part of the lead plate that printed the facsimile, it is reasonable to infer that it was a purposeful if inartful cutting away of Anubis' jackal-like snout and ears to depict a human head, yet another fact which shows that COP concealed an important artifact and that the Brethren did not believe what they taught as scripture.

This plate has been in COP's possession since at least 1858, so it can now be reasonably inferred that the person who directed the carving of the plate intentionally changed what was on the papyrus that served as the basis for this scene, but

---

³ Previously, the artifacts used to print the facsimiles had been described as "woodcuts."

inadvertently left Anubis' ear, that is on top the slave's head. This newly discovered evidence supports the 2AC third Cause of Action for Fraudulent Concealment.

Since the motion to supplement was filed after the Motion to Dismiss, the Court limited supplementation to only if "If this complaint [FAC] survives…". [Dkt. 73, hearing transcript at. p. 21, lines 4-7.]

2. <u>Fulton v. City of Philadelphia Acknowledges Employment Division's Survival</u> and <u>Therefore arguably, its Application to the Facts in the Case at Bar.</u>

Recently the Supreme Court declined to overrule Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) which held that the First Amendment is not a defense to a neutral law of general applicability. Instead, the Court characterized the City's ordinance requiring placement of children with same sex couples as a law that is not "generally applicable," thereby avoiding the application of Emp. Div. v. Smith. Fulton v. City of Philadelphia, Pennsylvania, 141 S. Ct. 1868, 1871, 210 L. Ed. 2d 137 (2021)

The second question certified for appeal in Fulton, 141 S. Ct. 1868, was: "Should the Court revisit its decision in Emp. Div., Dept. of Hum. Res. of Oregon v. Smith, 494 U.S. 872?" Although significant amicus briefing on behalf of various religious institutions (including Def. herein) sought to convince the Court to overrule Employment Div., Chief Justice Roberts did not. By issuing such a narrow opinion, the Court implicitly acknowledged that 494 U.S. 872 remains valid. Fulton had no occasion to address the CAD but confirmed that most of the justices are reluctant to overrule Employment Div., Dept. of Human Resources of Oregon, 494 U.S. 872.

7

Fulton clarifies that Employment Div., Dept. of Human Resources of Oregon, 494 U.S. 872 remains good law.

> a. *Proselytizing and/or teaching is more than professing one's beliefs. Under Employment Div. , COP's alleged actions are subject to valid general laws.*

Employment Div. v. Smith specifically distinguished the exercise of professing one's belief from proselytizing. Plaintiff has always argued that Defendant's behavior *vis a vis* Plaintiff is *conduct* subject to regulation under valid fraud laws. This Court can and should craft an anti-fraud public policy due to Utah's status as the U.S. affinity fraud capital for over a decade. (2AC ¶¶ 21-22):

> But the "exercise of religion" often involves not only belief and *profession* but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, *proselytizing,* abstaining from certain foods or certain modes of transportation." [Emphasis Added.]

494 U.S. at 877.

Justice Scalia, writing for the majority, distinguished an Establishment Clause case which challenges a law targeted at religion, from a Free Exercise clause case, which allows free exercise but limits that conduct to the bounds imposed by a valid neutral law of general applicability. The Court has never held that one's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that government is free to regulate. Allowing exceptions to every state law or regulation affecting religion "would open the prospect of constitutionally required exemptions from civic obligations of almost every conceivable kind." 494 U.S. at 888.

The Supreme Court had previously written: "[T]he right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions, or, in other words, to be a minister of the type McDaniel was found to be." (Citations omitted) McDaniel v. Paty, 435 U.S. 618, 626, 98 S. Ct. 1322, 1327, 55 L. Ed. 2d 593 (1978). The McDaniel comment was dicta. McDaniel held only that religious ministers could not be denied the opportunity to serve as elected officials under the free exercise clause. Notwithstanding COP's claims, the case at bar is a Free Exercise case where conduct can and should be regulated. Smith's distinguishing of *proselytizing* from *professing* was part of a necessary rationale for its rule that religious beliefs do not excuse a [corporate] person from compliance with an otherwise valid law prohibiting *conduct* that government is free to regulate.

To date, the church autonomy doctrine (CAD) has not been expanded to override Smith to the degree COP proposes. Intentionally concealing material artifacts and documents, intentionally promulgating art that bears no relation to the stone admittedly used to create Defendant's key book, which stone was concealed in its archives for over a century, certainly demonstrate a longstanding pattern of deception under the mail and wire fraud predicate acts in Plaintiff's RICO claim (*any* intent to deceive) and fits the common law fraud allegations when a misrepresentation of the Brethren's states of mind is properly alleged as the first element.

Although the Tenth Circuit makes the secular v. ecclesiastical distinction, it has also suggested that a church's conduct is unprotected if not based on a sincere religious belief. Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648,

9

657 (10th Cir. 2002) The 9th Circuit has recognized that representations not sincerely believed by church leaders are not protected under the First Amendment.

> b. *All Fraud laws alleged to have been violated in the 2AC are neutral Laws of General Applicability; as such Def. must comply*.

Enforcement of the fraud laws would not create excessive entanglement for it wouldn't involve adjudicating the truth of religious beliefs, only whether the Brethren sincerely believed correlated representations identified in the 2AC. This is akin to a cross examination which can be accomplished through impeachment, together with a limiting instruction. Additionally, as to a duty to disclose, materiality is determined by a reasonable person standard, i.e. what would a reasonable person want to know before paying a full tithe and committing to Defendant's organization. Respectfully, it is not for the Court to decide what is material.

3. *In light of Franco's Abrogation, Leave to File the 2AC would not be Futile.*

In a claim for intentional infliction of emotional distress ("IIED") against Jehovah's Witnesses elders by a young female teen during a religious disciplinary hearing, the Utah Supreme Court held that courts should eschew application of the rigid Lemon test when analyzing Establishment Clause cases. Williams v. Kingdom Hall of Jehovah's Witnesses, 2021 UT 18, 491 P.3d 852. The Court disregarded the *Lemon* test and disavowed reasoning in its previous cases to the extent they relied on the test, specifically citing Franco v. The Church of Jesus Christ of Latter-day Saints, 2001 UT 25, ¶ 12, 21 P.3d 198, abrogated by Williams v. Kingdom Hall of Jehovah's Witnesses, 2021 UT 18, ¶ 12, 491 P.3d 852 n 29.

Paragraph 12 of Franco addresses the extent to which the judiciary may be involved in adjudicating religious matters.

On remand the Utah Supreme Court instructed the District Court to focus on the particular issue at hand, look to history for guidance as to the correct application of the Establishment Clause, and identify "an overarching set of principles" and explain how those principles should be applied in the case.

Williams, 2021 UT 18 ¶ 27.

Application of neutral principles of law fits these criteria. In Williams, 2021 UT 18, Appellant's counsel argued that the standard for outrageous conduct should apply regardless of whether the act takes place in a religious setting—it is the same.[4] Here, given the Gaddy facts (LDS Brethren's promise not to lead members astray, thereby extending invitations to the membership to trust them, created a special relationship, Defendant's superior access and knowledge of Mormon history, privity of contract between LDS members and COP via local leader agent interview where LDS must attest to belief in Smith as founder of restored gospel and commit to pay a full tithe in consideration for a temple endowment, etc.), the Court could justifiably find at least a limited duty to make a full and fair disclosure of information material to LDS members' decision to commit to the LDS Church under Utah Law.

To fail to recognize a duty in a religious context is surely unjust, in violation of Employment Div., and fails to contemplate overarching principles of a public policy against fraud, as well as the historic religious liberty jurisprudence separating conduct from belief that was established in Reynolds v. United States, 98 U.S. 145, 166, 25 L. Ed. 244 (1878).

---

[4] Utah Supreme Court - 11/09/2020 Oral Argument on Williams v. Kingdom Hall #20190422-SC

Inquiry into whether that duty was breached for failure to disclose material history and information about the Church's founder and and/or use of tithing is a fact question that would not involve adjudication of religious doctrine but only whether the Brethren believe what they teach, and/or how Smith interacted with the secular fraud laws in effect at the time he committed the underlying acts and/or disclosure re: how members' tithes have been used. [5] These secular facts are particularly relevant in that the activities underlying several charges, such as Smith's use of the brown stone to search for silver underlying the 1826 fraud charge, his secret adulterous relationships entered into up to a decade prior to the official polygamy revelation was written, his violation and conviction of Ohio law by creating the Kirtland Anti-banking Society, destruction of the *Nauvoo Expositor* Press because he didn't like what his former counselor wrote about him, are particularly material to Plaintiffs' decisions to commit to the church founded by such a man.

Utah case law originally held that whether a "confidential" relationship exists is a question of fact. Blodgett v. Martsch, 590 P.2d 298, 302 (Utah 1978). A confidential relationship exists for Plaintiffs in that the bishops' or stake presidents' interviews for a temple endowment is held in a private office and tithing records for Plaintiffs' performance of the contract are confidential. Later the Utah Sup. Ct. equated confidential with fiduciary, carving out a limited duty between a builder-seller and a

---

[5] Despite the polygamy doctrine, the question would not be a qualitative one, i.e. whether polygamy is a God inspired, proper or moral doctrine, but the secular facts about the intimate relationships between Smith and women other than his wife, Emma Hale. And, whether a reasonable person thinks those facts important in the context of committing to the LDS Church, whether initially or by deeper commitment through temple worthiness.

buyer. See Yazd v. Woodside Homes Corp., 2006 UT 47, at , ¶ 18, 143 P.3d 283 and Moore v. Smith, 2007 UT App 101, ¶ 39, 158 P.3d 562, 575.

    Gaddy's argument for a duty to disclose is based in part on an invitation to trust (we will never lead you astray), as well as the Yazd factors and privity of contract. Now that Franco has been abrogated, the path is clear for this Court on the Gaddy facts, to find that a limited duty existed in order to require COP to have disclosed information material to Plaintiff's decisions to fully commit to the COJCOLDS. "When policy considerations bear on a subject lodged firmly within the court's sphere, like the common law, it is entirely appropriate for the court to make the policy judgments necessary to get the law right." Yazd, 2006 UT 47, ¶20.

    As recently admitted in another case, COP has been using tithing funds from the very beginning of the organization's creation to fund commercial enterprises. If so, and if those funds come as a result of a *quid pro quo* contract with Plaintiff, why should the Church, who has promised it will never lead its followers astray be able to disregard otherwise applicable commercial law principles requiring disclosure? The rationale for the CAD is that churches deserve extra protection, but that is based on the assumption that the mission of a church is a purely spiritual and a moral one. That does not describe an organization that receives $6-8 billion ("B") annually, dumps $1-2 B of that amount into investment vehicles and then donates only $1.3 Billion to humanitarian causes over 25 years. (2AC ¶9)

    Litigating the 2AC fraud laws does not require excessive entanglement as. A jury can easily determine whether material items and information was concealed. Here a

13

confidential relationship existed, privity of contract existed, disparity of age, knowledge, influence, bargaining power, and sophistication. All Yazd factors exist and more, because of the overt invitation to trust by promising that Plaintiff would never be led astray.

> [The above list are all factors] that a court may consider in analyzing whether a legal duty is owed by one party to another. Where a disparity in one or more of these circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to unreasonable risk, the law may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage.

Yazd v. Woodside Homes Corp., 2006 UT 47, ¶16, 143 P.3d 283, 286

The only reason not to find a duty in this case is because of the claimed preemption of the CAD and yet ecclesiastical deference has historically only been found to apply where the church is a moral one. "In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all." Watson v. Jones, 80 U.S. 679, 728, 20 L. Ed. 666 (1871); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 114, 73 S. Ct. 143, 153, 97 L. Ed. 120 (1952). See also Hansel v. Purnell, 1 F.2d 266, 270 (6th Cir. 1924).

4. Respectfully, the Court should find Hansel's rationale Persuasive for a Public Policy against Fraud that Trumps the CAD.

In Hansel, 1 F.2d 266, plaintiffs claimed they were fraudulently induced by leaders of an ostensibly religious organization to donate their property and to work

unpaid. After they had been members for many years, they discovered that contrary to its representations, the organization was "[founded] for the fraudulent and corrupt purpose of borrowing the cloak of religion to disguise its true purposes and corrupt motives." Hansel at 270. The 6th Circuit reasoned that:

> This, of course, does not mean that any individual may be deprived of his constitutional right to worship God in accordance with the dictates of his own conscience, nor that a court will assume to determine the truth or error of any religious creed or dogma; but it does mean that no individual, or group of individuals, will be permitted to deceive and defraud others through and by false and fraudulent representations made under color of religion, no matter what that religion may be or under color of any other lawful purpose.

Hansel, 1 F.2d 266, 270

Despite subsequent members acting in good faith, the Court reasoned that:

> [I]f his [the founder's] pretensions to piety and righteousness are but sham and hypocrisy, to deceive and defraud others in joining this society and contributing their means and their labor thereto—then, notwithstanding the alleged fraud and fraudulent representations upon which plaintiffs rely for recovery occurred many years after the society was organized, and many people had, in good faith and for proper purposes, become members thereof, the initial fraud permeates the entire structure.

Hansel, Id. at 271.

Now that Franco has been abrogated there is no reason not to recognize a limited duty that COP owed its members. Enforcement of such a duty can be accomplished through neutral principles of law and would be a public policy correction toward eradicating Utah's ubiquitous affinity fraud.

Clergy parishioner fiduciary duties have been found in the supreme courts of Florida, New Jersey Colorado, and California in the context of child sex abuse. Richelle L. v. Roman Cath. Archbishop, 106 Cal. App. 4th 257, 130 Cal. Rptr. 2d 601, 609–16

(2003), as modified (Mar. 17, 2003), Though fraud of the type described in this case is not child sex abuse, it is almost as pernicious in its effect.

 Adjudicating sincerity, concealment and even disclosure does not invade a church's sole province over what is and is not doctrine or faith. It does not violate Ballard by adjudicating the truth of religious beliefs. It only asks whether the Brethren promulgated correlated information in good faith or concealed/did not disclose material facts about their founder, the church's founding and the use of the money received as a result of misrepresentations and omissions of those foundational facts. Smith's adultery, participation in folk magic, use of the same brown stone in treasure seeking that he used to dictate the Book of Mormon, his criminal and civil fraud history, are all secular facts, capable of determination by a court, without resort to forbidden inquiries.

 Intentional concealment of the stones and artifacts is a secular act and the type of activity that COP ostensibly denigrates for it claims to believe in full disclosure, honesty, etc. Thus, the active concealment of stones, artifacts, verification ordered in the 19th Century of Smith's adultery/polygamy through Jenson's history and affidavits of Smith's consorts or "wives" and other concealed items is not a protected exercise. It is a secular act of the very type that RICO fraud prohibits.

5. <u>Disclosure of Smith's Involvement with the Law, Similar to how Tithing is Used, is a Secular Matter, but Material to anyone when asked whether they Believe the LDS Church, founded by Smith, is the Restored Gospel of Jesus Christ.</u>

Franco's abrogation makes room for the Court to find a duty to disclose. Whether there was a full and fair disclosure of tithing used in commercial endeavors is certainly a

question appropriate for the jury in light of the many partial representations alleged in the 2AC. Similarly, a duty to disclose Smith's material criminal and civil fraud history would not violate Ballard or Tenth Circuit law. These are secular facts.

6. <u>The First Amendment's Guarantee is against Establishment of Religion, not Entanglement with Religion. Agostini, et. al. Demonstrates this Difference.</u>

Since Employment Div., Free Exercise requires only equal protection for religion. The bulk of Establishment jurisprudence has historically been applied to laws that confer a benefit by the states out of fear that the benefit would come with strings. The first two items of the *Lemon* test are helpful in deciding when the establishment clause is violated. But the defense wants to claim a violation of the Establishment Clause through entanglement via compliance with a neutral law of general applicability. This is not the law.

Historically, Establishment cases involve government laws that require some entanglement with religion, not neutral laws of general applicability. CAD exceptions to Employment Division have only been for church ministerial decisions and real estate transactions. Since Ballard, there has not been a Supreme Court case, whether under Free Exercise or Establishment jurisprudence, that deals squarely with fraud.

A degree of entanglement between church and state is inevitable and has always been tolerated.

> Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable (citation omitted) and we have always tolerated some level of involvement between the two. Entanglement must be "excessive" before it runs afoul of the Establishment Clause. See, e.g., Bowen v. Kendrick, 487 U.S., at 615–617, 108 S.Ct., at 2577–2579 (no excessive entanglement where

>government reviews the adolescent counseling program set up by the religious institutions that are grantees, reviews the materials used by such grantees, and monitors the program by periodic visits); Roemer v. Board of Public Works of Md., 426 U.S. 736, 764–765, 96 S.Ct. 2337, 2353–2354, 49 L.Ed.2d 179 (1976) (no excessive entanglement where State conducts annual audits to ensure that categorical state grants to religious colleges are not used to teach religion).

Agostini v. Felton, 521 U.S. 203, 233, 117 S. Ct. 1997, 2015, 138 L. Ed. 2d 391 (1997). "We therefore conclude that our Establishment Clause law has "significant[ly] change[d]" since we decided *Aguilar.*" Agostini v. Felton, at 237.

Adjudication of the claims made in the 2AC would not foster excessive entanglement because they do not require an ongoing relationship between church and state like that denied in Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), yet later, allowed in Agostini, 521 U.S. 203, where ongoing compliance issues need be continually addressed over time. In Gaddy, the interaction is due to Defendant's longstanding pattern of deceit concocted in order to induce Plaintiffs and those like them to rely on information that their church leaders did not sincerely believe or reasonably should not have believed or should have disclosed due to those leaders' invitation to their followers to trust them by promising to never lead them astray.

### 7. Conclusion: There are no Legal Barriers to Proceeding with Plaintiffs' Claims.

The First Amendment religious liberty defense is limited to sincerely held religious beliefs. *Employment Division v. Smith's* holdings that a law need only be rationally related to the government's interest (here, protection of the public from fraud) and that while beliefs cannot be regulated, exercise of those beliefs can, remain good

law. Since Utah no longer precludes a fiduciary relationship between church leaders and its members as a matter of law, the Court can and should take a step toward supporting public policy against fraud and allow leave to file the 2AC file.

    A disclosure requirement where an invitation to trust is made by religious leaders and accepted by followers, where those followers form their religious beliefs on incomplete material information known to its leaders, and in turn devote a substantial part of their lives and resources to an entire belief system that is not what it was represented to be, is just and fair and requires no more entanglement that what the Supreme Court has allowed since its decision in Lemon.

    Wherefore, the Court is respectfully requested to allow leave to file the 2AC.

                              Respectfully,

DATED: Sept. 27, 2021.   Kay Burningham, Attorney at Law

                            /s/ Kay Burningham
                            Kay Burningham

                            *Attorney for Laura A. Gaddy, Lyle D. Small and Leanne R. Harris*