David J. Jordan (1751)
david.jordan@stoel.com
Wesley F. Harward (15623)
wesley.harward@stoel.com
STOEL RIVES LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone:  801.328.3131

*Attorneys for Defendant Corporation of the
President of The Church of Jesus Christ of
Latter-day Saints*

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| LAURA A. GADDY, LYLE D. SMALL, and LEANNE R. HARRIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole,<br><br>Defendant. | **MOTION TO DISMISS SECOND AMENDED COMPLAINT OR, IN THE ALTERNATIVE, MOTION TO STRIKE**<br><br>Case No. 2:19-cv-00554-RJS<br><br>The Honorable Robert J. Shelby |

Corporation of the President of The Church of Jesus Christ of Latter-day Saints (the

"Church") moves to dismiss Plaintiffs' "Second Amended Class Action Complaint" (the

"Second Amended Complaint") (Docket 110) with prejudice (the "Motion") under Federal Rule

of Civil Procedure 12 for failure to state a claim upon which relief can be granted or, in the

alternative, to strike.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

SUMMARY OF RELEVANT ALLEGATIONS.................................................2

LEGAL STANDARD...........................................................................5

    I.    THE FIRST AMENDMENT BARS COURTS FROM
        INQUIRING INTO DISPUTES GROUNDED IN RELIGIOUS
        BELIEF AND CHURCH ADMINISTRATION ................................6

    II.   EACH OF PLAINTIFFS' CLAIMS FAIL ..........................................7

    III.  IN THE ALTERNATIVE, ALL NON "PURELY SECULAR"
        ALLEGATIONS SHOULD BE STRICKEN ...................................21

CONCLUSION.................................................................................22

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Anderson v. Kriser,*
    266 P.3d 819 (Utah 2011)................................................................................14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)......................................................................................4

*Bryce v. Episcopal Church in the Diocese of Colo.,*
    289 F.3d 648 (10th Cir. 2002) ...............................................................5, 10

*Daines v. Vincent,*
    190 P.3d 1269 (Utah 2008)..............................................................................8

*Gerwe v. Gerwe,*
    424 P.3d 1113 (Utah App. 2018)......................................................................8

*Jensen v. Cannon,*
    473 P.3d 637 (Utah App. 2020)....................................................................14

*Koch v. Koch Indus., Inc.,*
    203 F.3d 1202 (10th Cir. 2000) ................................................................8, 15

*N.L.R.B. v. Cath. Bishop of Chi,*
    440 U.S. 490 (1979)....................................................................................20

*Peterson v. Shanks,*
    149 F.3d 1140 (10th Cir. 1998) .................................................................4, 21

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l*
    *Presbyterian Church,*
    393 U.S. 440 (1969).............................................................................5, 10, 16

*Security Sys., Inc. v. Alder Holdings, LLC,*
    421 F. Supp. 3d 1186 (D. Utah 2019).............................................................8

*Serbian E. Orthodox Diocese for U.S.A. & Can. v. Milivojevich,*
  426 U.S. 696 (1976)...............................................................................5

*Stone v. Salt Lake City,*
  356 P.2d 631 (Utah 1960)............................................11, 12, 15, 19

*Tal v. Hogan,*
  453 F.3d 1244 (10th Cir. 2006) ........................................................18

*Yazd v. Woodside Homes Corp.,*
  143 P.3d 283 (Utah 2006)...........................................................15, 16

**Statutes**

RICO .........................................................................7, 17, 18, 19

*Utah Charitable Solicitations Act*...........................................17

Utah Code §§ 13-22-3, -4 ..........................................................17

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................4

Rule 9 ....................................................................................8, 14, 15

Rule 9(b) of the Federal Rules of Civil Procedure ...................8

Rule 12(f) ...................................................................................20

Rule 12 of the Federal Rules of Civil Procedure ....................20

**Constitutional Provisions**

First Amendment..................................................................passim

U.S. Const. amend. I ....................................................................5

**Other Authorities**

"Civil Rico." 2AC ¶¶ 481-535 .................................................17

ii

"Constructive Fraud Based on Breach of Promises of Future Performance." 2AC ¶¶ 451-62.......................................................................16, 17

"Fraud in the Inducement to Enter into an Oral Contract." 2AC ¶¶ 360-98 ...........................................................................................................7

"Fraudulent Concealment." 2AC ¶¶ 399-423, 424-50 ............................................14

*Church. These resources, together with the earnings of invested reserve funds, will accommodate this entire program* .........................................4

*Church. These resources, together with the earnings of invested reserve funds, will accommodate this program*....................................................9

Gordon B. Hinckley, *The Condition of the Church* (Apr. 2003)..............................4

*Joseph Smith—History* .................................................................................................1

## INTRODUCTION

Yet again, Plaintiffs attempt to air their *religious* grievances with the Church in this Court.  Their latest filing reads more like a manifesto than a legal pleading.  Undeterred by the Court's prior rulings—and decades of precedent from the United States Supreme Court—Plaintiffs replead or rephrase the same claims that the Church's *religious* teachings are false.  But the defects in those prior claims were not mere problems in phrasing or minor procedural technicalities.  Instead, the primary fatal flaw with each claim has been and remains the First Amendment.

This Court's orders could not have been clearer.  This Court's Memorandum Decision and Order Granting Defendant's Motion to Dismiss (Docket 33) (the "First Order") was unequivocal.  Courts may not "adjudicate fraud claims implicating religious facts."  First Order at 13.  Similarly, in its Memorandum Decision and Order Granting in Part and Denying in Part Defendant's Motion to Dismiss (Docket 100) (the "Second Order"), the Court reiterated its prior holding and explained that the "First Amendment's Religion Clauses bar secular courts from injecting themselves into disputes concerning church faith and doctrine."  Second Order at 20.  And "[w]here a plaintiff brings fraud claims against a church based on religious issues of faith or doctrine, the First Amendment applies as a defense."  *Id.* at 21.

The Second Amended Complaint is no different.  Indeed, just as the Court noted with the First Amended Complaint "[a]lthough it is longer and more detailed than her original Complaint, many of the claims, theories, and allegations in the Amended Complaint are duplicative of her prior pleading."  *Id.* at 9.  The only allegations in the Second Amended Complaint that have not been barred by the First and Second Orders relate to scattered allegations about the Church's use

of tithing funds.  But any claim based on those allegations should also be dismissed.  First, most

of those allegations are every bit as "rooted in religion" as the rest of the Complaint.  For

example, Plaintiffs' "wire fraud" allegation is that "[t]ithing was not used only for the Lord's or

Church purposes [reasonably interpreted as religious] but a substantial portion of tithes . . . was

used for investment and commercial development purposes."  Second Am. Compl. ("2AC")

¶ 293.  Second, the remaining claims fail because Plaintiffs have not adequately pleaded the

elements of the claim—primarily the element of falsity.  Accordingly, the entire Second

Amended Complaint should be dismissed with prejudice.

## SUMMARY OF RELEVANT ALLEGATIONS

A.   **The Church's Teachings About Joseph Smith's First Vision, the Book of Mormon, and the Book of Abraham.**[1]

The Church of Jesus Christ of Latter-day Saints is a Christian faith founded by the

prophet Joseph Smith in 1830.  2AC ¶¶ 25-32; Am. Compl. ¶ 43; Compl. ¶ 50.  According to

Church scripture, in the spring of 1820, Joseph Smith entered a grove of trees near his home to

pray and seek spiritual guidance.  2AC ¶ 26; Am. Compl. ¶ 47; Compl. ¶ 64; *see also Joseph

Smith—History* 1:1-20.  Both God and Jesus Christ appeared in a pillar of light in response to

Joseph Smith's prayer.  2AC ¶ 241; Am. Compl. ¶¶ 80, 82, 84; Compl. ¶¶ 64, 183; *see also

Joseph Smith—History* 1:1-20.  This event is known in the Church as the "First Vision."  It was

at that time that Joseph Smith received a prophetic calling to restore Jesus Christ's full gospel to

---

[1] This entire subsection is taken verbatim from the "Summary of Relevant Allegations" included in the Church's original Motion to Dismiss (Docket 6) and its subsequent Motion to Dismiss Amended Complaint (Docket 38).  To further illustrate that the basis of Ms. Gaddy's claims remain unchanged, this section includes references to the Second Amended Complaint, the Amended Complaint (Docket 37), and the original Complaint (Docket 2).

the earth.  2AC ¶¶ 26-32; Am. Compl. ¶ 82; Compl. ¶ 64; *see also Joseph Smith—History* 1:1-20.

A few years later, Joseph Smith was visited by an angel who informed him of a book of scripture, written on gold plates, that contained the teachings of ancient prophets who lived in the Americas.  2AC ¶ 27; Am. Compl. ¶ 49; Compl. ¶¶ 77-79; *see also Joseph Smith—History* 1:27-65.  Eventually, the angel entrusted Joseph Smith with the plates and he translated them into English by the power of God.  2AC ¶¶ 26-29; Am. Compl. ¶ 49; Compl. ¶ 79; *see also Joseph Smith—History* 1:27-67.  The result of this work is the Book of Mormon.  2AC ¶ 29; Am. Compl. ¶ 49; Compl. ¶ 79; *see also Joseph Smith—History* 1:27-65.  The Book of Mormon is part of the Church's canonical scripture.

The Book of Abraham is also part of the Church's canonical scripture.  As the name suggests, the Book of Abraham contains teachings of the Old Testament prophet Abraham.  2AC ¶ 37; Am. Compl. ¶ 50; Compl. ¶ 93; *see also Introductory Note* to t*he Pearl of Great Price*.  It originated with Egyptian papyri that Joseph Smith translated beginning in 1835.  2AC ¶ 37; Am. Compl. ¶¶ 50, 82, 88; Compl. ¶¶ 92-95; *see also Introductory Note to the Pearl of Great Price*.

Since its founding, the Church has preached the gospel of Jesus Christ.  The worldwide Church is led by the First Presidency, consisting of the President of the Church and his two counselors.  2AC ¶ 4 n.1; Am. Compl. ¶ 19; Compl. ¶ 15.  The Church is also led by the Quorum of the Twelve Apostles.  2AC ¶ 4 n.1; Am. Compl. ¶ 19; Compl. ¶ 16.  Local Church congregations are led by volunteer lay leaders who donate their time and efforts to serve their faith.  2AC ¶¶ 109-21; Am. Compl. ¶¶ 20-21, 27; Compl. ¶¶ 18-21.  The Church also engages in widespread missionary efforts throughout the world.  2AC ¶ 129; Am. Compl. ¶ 27; Compl.

3

¶ 125.  Thousands of missionaries, many of whom are young men and women, spread the gospel through sharing a message of faith in Jesus Christ and giving service.  2AC ¶ 129; Am. Compl. ¶ 27; Compl. ¶ 125.  These missionaries teach the doctrines foundational to the Church, including Joseph Smith's prophetic calling and the Book of Mormon.  2AC ¶ 126; Am. Compl. ¶ 70; Compl. ¶¶ 125-30.

**B.      Plaintiffs' Allegations Regarding Tithing.**

The Church teaches the doctrine of tithing—the practice of donating 10% of one's income to the Church.  2AC ¶ 10.  According to Plaintiffs, the Church teaches that tithing is necessary for "eternal salvation, and 'forever families'" and to "ensure safety from apocalyptic burning at the Second Coming of Jesus Christ."  *Id.*  Plaintiffs allege that the Church's practice is to set "aside money from annual donations including member tithing for a rainy day fund."  *Id.* ¶ 72.  The Church teaches that "Tithing Is Used to Help Jesus Christ's Church Grow."  *Id.* ¶ 229. Church leader Dallin H. Oaks taught:

> The Lord has directed by revelation that the expenditure of his tithes will be directed by his servants, the First Presidency, the Quorum of the Twelve, and the Presiding Bishopric (see D&C 120).  Those funds are spent to build and maintain temples and houses of worship, to conduct our worldwide missionary work, to translate and publish scriptures, to provide resources to redeem the dead, to fund religious education, and to support other Church purposes selected by the designated servants of the Lord.

2AC ¶ 230 (italics omitted).  A Church manual provides: "The tithes and offerings we give to the Church are used for the Lord's work" and provides examples of some of the uses.[2]  *Id.* ¶ 233.

---

[2] The Second Amended Complaint omits key quotations from the manual.  A copy of the full text is attached hereto as Exhibit C.  The Court may consider this quotation in its entirety because it is expressly referenced (including a hyperlink to the full text) in the Second Amended Complaint.

Plaintiffs also make allegations about statements made by Church leaders regarding the funding for the City Creek project.  Specifically, Plaintiffs quote a portion of a statement by former Church President Gordon B. Hinckley.  *Id.* ¶ 237.  A more complete quotation of his statement is:

> I call attention to that which has received much notice in the local press.  This is our decision to purchase the shopping mall property immediately to the south of Temple Square.
>
> The Church owns most of the ground on which this mall stands.  The owners of the buildings have expressed a desire to sell.  The property needs very extensive and expensive renovation.  We have felt it imperative to do something to revitalize this area.  But I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes.
>
> ***Funds for this have come and will come from those commercial entities owned by the Church.  These resources, together with the earnings of invested reserve funds, will accommodate this entire program.***

Gordon B. Hinckley, *The Condition of the Church* (Apr. 2003) (emphasis added) (attached as Exhibit A).

## LEGAL STANDARD

The Church moves for dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "[O]nly a complaint that states a *plausible* claim for relief survives a motion to dismiss."  *Id.* at 679 (emphasis added).  And a court "will not supply additional facts, nor will [it] construct a legal

theory for plaintiff that assumes facts that have not been pleaded." *Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citation omitted).

## ARGUMENT

### I.   THE FIRST AMENDMENT BARS COURTS FROM INQUIRING INTO DISPUTES GROUNDED IN RELIGIOUS BELIEF AND CHURCH ADMINISTRATION.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.  The United States Supreme Court has long held that "the truth or falsity of religious beliefs are beyond the scope of judicial review."  First Order at 8.  "In what has become known as the church autonomy doctrine, courts have recognized 'the fundamental right of churches to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'"  *Id.* at 9 (emphasis omitted) (quoting *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002)).

The precedential origins and history of the church autonomy doctrine are set forth both in the Church's original motion to dismiss and this Court's First Order and will not be repeated here.  (Dockets 6 & 33.)  Briefly summarized, the church autonomy doctrine prohibits courts from "engag[ing] in the forbidden process of interpreting and weighing church doctrine." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969).  The principle of church autonomy is not narrowly limited to questions of religious doctrine.  It "applies with equal force to church disputes over church polity and church administration." *Serbian E. Orthodox Diocese for U.S.A. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976).  "In short, . . . courts may not inject themselves into resolving ecclesiastically based

disputes."  First Order at 8.  In contrast, Courts remain able to adjudicate claims based on allegations regarding "purely secular" statements and decisions.  Second Order at 27.

## II.    EACH OF PLAINTIFFS' CLAIMS FAIL.

Plaintiffs again allege various fraud-based claims against the Church.  And each of those claims asserts several theories of liability.  Those claims and theories fall into two categories.  First, claims and theories previously dismissed—those based on religious facts that the Court previously held were barred by the First Amendment.  And second, theories related to the Church's use of tithing.  Each category is addressed in turn.

### A.    Plaintiffs' claims based on allegations regarding Joseph Smith's First Vision, the Book of Mormon, the Book of Abraham, and Church history must be dismissed.

Plaintiffs' Second Amended Complaint largely repeats the same basic allegations raised in the prior complaints.  Plaintiffs once again allege that the Church's *religious* teachings about Joseph Smith, the Book of Abraham, and the Book of Mormon are false.  Plaintiffs again complain about the way the Church teaches about its history and religious practices.  Indeed, Plaintiffs have continued to add *more* allegations about these topics.  The size of the Second Amended Complaint has ballooned to over 200 pages, excluding exhibits.

Plaintiffs have blatantly ignored both this Court's First Order and Second Order.  This Court held that it "can no more determine whether Joseph Smith saw God and Jesus Christ or translated with God's help gold plates or ancient Egyptian documents, than it can opine on whether Jesus Christ walked on water or Muhammed communed with the archangel Gabriel.  The First Amendment prohibits these kinds of inquiries in courts of law."  First Order at 12.  And the Court subsequently held that "the First Amendment bars" inquiry into "the Church's

teachings concerning," among other things, "the First Vision, translations of the Book of Mormon and Book of Abraham, locations of events described in the Book of Mormon, and the Church's history with polygamy."[3]  Second Order at 23.

The Court expressly rejected Plaintiffs' attempt to assert fraud, fraudulent inducement, fraudulent concealment, intentional infliction of emotional distress, and RICO claims based on these allegations.  *Id.*  Once again, all Plaintiffs' claims based on those allegations should be dismissed.  Plaintiffs' "new" claims about the First Vision, the Book of Mormon, the Book of Abraham, and teachings about Church history fail and must (again) be dismissed.

**B.      Plaintiffs' tithing-based claims fail as a matter of law.**

Plaintiffs have interwoven allegations and theories of liability about the Church's use of tithing funds throughout the Second Amended Complaint and the asserted causes of action.  The Second Amended Complaint consists of more than 555 paragraphs.  The relationship between the tithing-based allegations and the rest of the allegations is muddled.  It is also unclear exactly how Plaintiffs contend those tithing allegations relate to their theories of liability.  Murky as they are, the Church will attempt to address those theories.

---

[3] In defiance of this aspect of the Court's Second Order, the Second Amended Complaint is riddled with additional allegations criticizing Joseph Smith's practice of polygamy and generally assailing his character.  In light of this Court's previous orders, Plaintiffs and their counsel know perfectly well that such claims are barred by the First Amendment, but they remain insistent on using the judicial system as a public venue for their screed attacking the Church and its beliefs.

1.      **Plaintiffs' "Fraud in the Inducement to Enter into an Oral Contract" claim fails.**

Plaintiffs' first cause of action is for "Fraud in the Inducement to Enter into an Oral

Contract."  2AC ¶¶ 360-98.  Under Utah law, the elements of fraudulent inducement are

> (1) that a representation was made (2) concerning a presently existing
> material fact (3) which was false and (4) which the representor either (a)
> knew to be false or (b) made recklessly, knowing that there was
> insufficient knowledge upon which to base such a representation, (5) for
> the purpose of inducing the other party to act upon it and (6) that the other
> party, acting reasonably and in ignorance of its falsity, (7) did in fact rely
> upon it (8) and was thereby induced to act (9) to that party's injury and
> damage.

*Gerwe v. Gerwe*, 424 P.3d 1113, 1117 (Utah App. 2018) (quoting *Daines v. Vincent*, 190 P.3d

1269 (Utah 2008)).  And under Rule 9(b) of the Federal Rules of Civil Procedure, "a party must

state with particularity the circumstances constituting fraud or mistake."  This requires "a

complaint alleging fraud to 'set forth the time, place and contents of the false representation, the

identity of the party making the false statements and the consequences thereof.'" *Security Sys.,

Inc. v. Alder Holdings, LLC*, 421 F. Supp. 3d 1186, 1195 (D. Utah 2019) (quoting *Koch v. Koch

Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).  And under Rule 9, allegations of fraud may

be based "on information and belief" only "when the facts in question are peculiarly within the

opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's

belief."  *Koch*, 203 F.3d at 1237 (citation omitted).

The Second Amended Complaint cites to various "representations" about tithing on

which it bases its first cause of action.  *See* 2AC ¶ 366.  For example, Plaintiffs cite to a Church

lesson for children entitled "Tithing Is Used to Help Jesus Christ's Church Grow" and it

explains: "It is a privilege and a blessing to pay tithing.  We should feel good knowing that the

money we give for tithing helps the Church." *Id.* ¶ 229. It similarly quotes from the following statement by President Dallin H. Oaks:

> The Lord has directed by revelation that the expenditure of his tithes will be directed by his servants, the First Presidency, the Quorum of the Twelve, and the Presiding Bishopric (see D&C 120). Those funds are spent to build and maintain temples and houses of worship, to conduct our worldwide missionary work, to translate and publish scriptures, to provide resources to redeem the dead, to fund religious education, and to support other Church purposes selected by the designated servants of the Lord."

*Id.* ¶ 230 (italics omitted). And it cites to other general statements about the use of tithing "for the Lord's work." *See, e.g.*, *id.* ¶¶ 233, 245, 260, 273, 283-84.

Plaintiffs also make allegations about statements made by Church leaders regarding the funding for the City Creek project. Specifically, Plaintiffs quote a portion of a statement by President Hinckley.

> But I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property. Nor will they be used in developing it for commercial purposes.
>
> ***Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with the earnings of invested reserve funds, will accommodate this program.***

*See* 2AC ¶ 237; Ex. A (emphasis added).

Thus, Plaintiffs' tithing allegations fall into two categories. First, Plaintiffs make general allegations about the Church's uses of tithing funds and whether those uses really are "for the Lord's work." 2AC ¶ 233. Claims based on those allegations fail under the First Amendment. Second, Plaintiffs make specific allegations about the source of funds for the City Creek project. Claims based on those allegations fail because critical elements, like falsity, have not—and cannot be—pled. Both categories are addressed in turn.

10

112989015.3 0056812-00016

a.   **Plaintiffs' theories regarding general allegations about the use of tithing funds fail.**

Plaintiffs' theory regarding general tithing allegations violates the First Amendment.  To succeed on their claim, Plaintiffs would need to prove that the Church's statements about its use of tithing are false.  In other words, Plaintiffs ask this Court to determine whether the Church's use of tithing funds really is "for the Lord's work" and "to support other Church purposes as directed by the designated servants of the Lord."  2AC ¶¶ 230, 233 (italics omitted).  Examination of these teachings would impermissibly entangle this Court in an ecclesiastical dispute—the proper use of the Lord's tithing funds.  This process of "interpreting and weighing" the Church's teachings is "forbidden" by the First Amendment.  *Presbyterian Church*, 393 U.S. at 451.  The proper use of Church funds is a quintessential matter of "church government," one of the "fundamental right[s] of churches to decide for themselves, free from state interference" under the church autonomy doctrine.  First Order at 9 (emphasis omitted) (quoting *Bryce*, 289 F.3d at 655).

To begin with, Plaintiffs have not and cannot plead the essential element of falsity, except in the most conclusory manner.  In no objectively determinable (or constitutionally permissible) sense can the statements that tithing is used "for the Lord's work" or to "help Jesus Christ's Church grow" be found to be false.  And they are certainly not "purely secular" statements.  Plaintiffs cannot establish that the investment of donated funds—for future use by the Church— constitutes any kind of fraud.  The Church has every legal right under the First Amendment and

11

the laws applicable to any non-profit organization to invest a portion of its funds for future use *by the organization*.[4]

As to the allegations that the Church has not used tithing dollars for "religious" purposes, the Utah Supreme Court rejected this exact type of claim more than 60 years ago.  It explained:

> [I]t is obvious that all of the funds the Church collects would not be disbursed immediately and directly for such purposes.  It is but common sense and common knowledge that there is need for the exercise of management of such funds for the ultimate accomplishment of the purposes stated.  How this is to be done to best serve those objectives is for those in charge of the management of the Church to decide.  It may well entail the keeping of collected funds in savings accounts, bonds, real estate or any type of investment which, in the judgment of those in charge, best suits that purpose.

*Stone v. Salt Lake City*, 356 P.2d 631, 633-34 (Utah 1960).

Plaintiffs' entire framework presents a false dichotomy.  Plaintiffs attempt to draw a distinction between "commercial" and "religious," alleging that the Church uses tithing funds for "commercial" rather than "religious" purposes.  But that dichotomy dissolves upon inspection.  Plaintiffs describe the Church's *investment* of funds as "commercial" even though those same funds (now invested assets) are merely saved for future use by the Church.  Apparently,

---

[4] The Church has also repeatedly disclosed this practice to its members.  For example, President Hinckley explained at a worldwide conference in 1991 that unspent tithing funds are invested "to build reserves against what might be called a possible 'rainy day.'"  Indeed, Plaintiffs reference that talk in the Amended Complaint.  *See* 2AC ¶¶ 331, 340, 345.  Plaintiffs also disingenuously allege that the "information was not provided to" two of them since "they were female and not invited to the 1991 and 1995 priesthood conference sessions."  *Id.* ¶ 345.  This is slight-of-hand.  Tellingly, Plaintiffs do not allege that the information was inaccessible to them—rather only that it "was not provided" to them.  This is because President Hinckley's entire sermon was printed the following month in Church magazines and has always been accessible to all members of the Church.  Indeed, all sessions of the Church's General Conference for many decades are recorded, printed, and available to all members.

Plaintiffs would have no problem with the Church putting tithing funds in a low-interest savings account or in a mattress, but they claim it is somehow "fraud" to invest those funds in real estate to generate additional future value for use by the Church.  Said another way, Plaintiffs invite the Court to decide that placing unexpended tithing funds in a bank account is "religious" and consistent with "the Lord's work" but investing in real estate is "commercial" and does not "help Jesus Christ's Church to grow."  That is nonsensical and cannot constitute "fraud."[5]

But falsity is not the only element whose adjudication would require the Court to enter "forbidden territory" under the First Amendment.  The reliance element is similarly problematic—*as highlighted by Plaintiffs' own allegations*.  Plaintiffs explained on which statements they relied in making their determination to pay tithing.  Specifically, Plaintiffs committed to pay tithing "as a condition of membership in the . . . Church" and to obtain a "temple recommend."  2AC ¶ 386.  They relied on, among other things, the Church's teachings about the Book of Mormon and Joseph Smith in deciding to pay tithing and be baptized.  *Id.* ¶ 391.  Plaintiffs allege that tithing was "extorted" "not only by promising eternal salvation, and 'forever families' but by characterizing payment of a full tithe as 'fire insurance' to ensure safety from apocalyptic burning at the Second Coming of Jesus Christ."  *Id.* ¶ 10.

---

[5] The Utah Supreme Court has explained that, in donating money to a charitable organization, "it is only reasonable to assume that one making such contributions is aware of the controlling authority and the manner in which the institution is managed.  If he does not desire to entrust the management of his money to it, he has the privilege of keeping it . . .; or in giving it, he may impose conditions of trust which he could require the grantee to agree in accepting the money.  But if he fails to do so, by his act of donating his money he manifests his decision to entrust the control and disposition of his fund to the Church and those who manage it.  And the donor has no right to retrieve, control, or direct the manner in which the money so given shall be used simply because ha as made such contributions to the Church."  *Stone*, 356 P.2d at 633-34.  Plaintiffs have not and cannot plead that they placed "conditions of trust" on their donations.

In short, Plaintiffs' own allegations reveal that tithing itself (and the reasons people donate tithing) is inherently "rooted in religious belief." First Order at 13. There is no way to determine upon what an individual would "reasonably rely" in deciding to donate tithing without addressing the Church's *religious* teachings. In other words, if the Church's teachings are true and God has commanded the payment of tithing, then it is reasonable to pay it regardless of its use. Conversely, the donation of tithing to the Church is much less reasonable if the Church's teachings are not true. But those are precisely the questions this Court may not adjudicate under the First Amendment. Accordingly, the claim fails.

> **b.** **Plaintiffs' theories about the source of funds for the City Creek project fail.**

Plaintiffs have also failed to plead the required elements to support any claim based on allegations regarding the City Creek project.[6] Specifically, Plaintiffs have not and cannot plead that the Church's statements about the source of funds for City Creek were false. To plead falsity, Plaintiffs would have to allege that the funds for City Creek did not come from "commercial entities owned by the Church" and "earnings of invested reserve funds." They admittedly have no personal knowledge about Church finances or the City Creek project. And they do not actually plead that tithing principal was used. Instead, they allege that the Church "has in fact used at least interest (*if not principal*) on tithing donations to fund commercial ventures since the early days of" the Church. 2AC ¶ 8 (emphasis added).

---

[6] This Court previously held that President Hinckley's statement regarding the source of funds constituted a "secular representation[] concerning the use of money received by the Church" and did not implicate the church autonomy doctrine. Accordingly, the Church does not assert that doctrine as a defense to those allegations in this Motion.

14

The reason for Plaintiffs' lack of falsity allegations cannot be doubted—those exact allegations were recently rejected by a United States District Court.  In *Huntsman v. Corporation of the President of The Church of Jesus Christ of Latter-day Saints*, the plaintiff alleged that President Hinckley's statement was false.  Order Granting [32] Motion for Summary Judgment, No. 2:21-cv-02504, 2021 WL 4296208 (C.D. Cal. Sept. 10, 2021) (attached as Exhibit B).  The Church filed a motion for summary judgment demonstrating the source of funds for City Creek. *See id.*

The court concluded that "no reasonable juror could find Defendant made a misrepresentation."  *Id.* at 6.  The court reviewed the evidence about the funding of City Creek and determined that there were sufficient "earnings on [the Church's] invested reserve tithing funds" to pay for City Creek.  Thus, "a reasonable juror could only conclude that Defendant used 'the earnings of invested reserve funds' to fund the City Creek project—*i.e.*, [the Church] did exactly what [President] Hinckley said [the Church] would do."  *Id.* at 8.  Given that ruling, and the lack of personal knowledge by Plaintiffs here, they have no basis to plead falsity (let alone allegations sufficient to satisfy the heightened pleading requirements of Rule 9).  This is fatal to any fraud-based claims relating to allegations about the Church's use of funds for the City Creek project.

### 2.     Plaintiffs' "Fraudulent Non-Disclosure" and Fraudulent Concealment" claims fail.

Plaintiffs' second and third causes of action are for "Fraudulent Non-Disclosure and "Fraudulent Concealment."  2AC ¶¶ 399-423, 424-50.  Although pleaded as two separate causes of action, they are the same thing under Utah law.  *See Jensen v. Cannon*, 473 P.3d 637, 643 (Utah App. 2020) ("Utah, however, does not draw a distinction between the torts of fraudulent

nondisclosure and fraudulent concealment.").  The elements of the claim are "(1) the defendant had a legal *duty* to communicate information, (2) the defendant *knew* of the information he failed to disclose, and (3) the nondisclosed information was material." *Id.* at 642 (quoting *Anderson v. Kriser*, 266 P.3d 819 (Utah 2011)).

Here, Plaintiffs claim that the Church "failed to disclose that a substantial part of tithing is used to fund and/or develop commercial projects, including but not limited to City Creek Mall development [sic], the bailout of Beneficial Life Insurance Co. and many other projects over the last 50 years or more." [7]  2AC ¶ 408.  But that allegation fails to state a claim.

First, Plaintiffs cannot satisfy the "duty" element.  The Utah Supreme Court has noted that "[t]he determination of whether a legal duty exists falls to the court.  It is a purely legal question, and since in the absence of a duty a plaintiff will not be entitled to a remedy, it is the first question to be answered." *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 286 (Utah 2006). This Court correctly rejected Plaintiff Laura Gaddy's prior "Breach of Duty of Disclosure" claim for lack of duty.  *See* Second Order at 13 n.80.  And the Church is aware of no precedent for the proposition that a church has a duty to publicly disclose the use of its funds.

Second, Plaintiffs have not and cannot plead that the Church has not disclosed that it invests a portion of its funds for future use.  Indeed, the statement by President Hinckley

---

[7] Plaintiffs allege "upon information and belief" that tithing funds were used to "bailout" Beneficial Life Insurance Company for "commercial" and not "religious" purposes.  None of those allegations reference a specific "purely secular" statement by the Church asserting that tithing funds would not be used to support Beneficial Life or that any such statement was false. *See, e.g.*, 2AC ¶¶ 7-8, 104, 116, 123, 139, 381.  Regardless, such allegations are insufficient under Rule 9 because they do not set forth the basis for the alleged "belief." *Koch*, 203 F.3d at 1237.

112989015.3 0056812-00016

*expressly* refers to "earnings on invested reserve funds."  And, of course, the *Stone* case notes

that it is "obvious" that not all funds would "be disbursed immediately and directly" for the

"benefit of religion, for works of charity, and for public worship."  *Stone*, 356 P.2d at 633-34.

Ironically, Plaintiff Lyle Small admits that "he understood that [the Church] earned interest and

invested excess tithing in stocks and bonds but had never been told that the tithing funds were

actively used for commercial development or to fund Church businesses."  2AC ¶ 340.  But that

is nonsensical.  Plaintiffs cannot plausibly contend that they understood that the Church would

invest funds in "stocks and bonds" for future use but that somehow there was fraud for investing

in commercial development.[8]

       Third, Plaintiffs' theory would violate the First Amendment.  To adjudicate this claim the

Court would need to opine on what information is "material" to a member of the Church in

deciding whether to donate tithing.  "[M]ateriality as the term is used as an element of fraudulent

concealment and fraudulent nondisclosure" means "important."  *Yadz*, 143 P.3d at 289.  And

importance is "gauged by the degree to which the information could be expected to influence the

judgment of [the] person" taking the action.  *Id.*  But determining what statements are

"important" in the decision to pay tithing is precisely the "interpreting and weighing" of the

Church's teachings that is "forbidden" by the First Amendment.  *Presbyterian Church*, 393 U.S.

at 451.

---

[8] And as described above, Plaintiffs have not actually alleged that President Hinckley's statement about the source of funds for the City Creek project was false.  In that instance, the Church truthfully disclosed that funds would come from "commercial entities owned by the Church" and "the earnings of invested reserve funds."  Ex. B at 7 (ruling that the Church "did exactly what [President] Hinckley said [it] would do").

112989015.3 0056812-00016

3.     **Plaintiffs' "Constructive Fraud Based on Breach of Promises of Future Performance" claim fails.**

Plaintiffs' fourth cause of action is styled "Constructive Fraud Based on Promises of Future Performance."  2AC ¶¶ 451-62.  The Church is unaware of any cause of action recognized under Utah law by this name.  It appears to be a repeat of the same allegations raised in the prior causes of action.  For example, it recites the allegations about City Creek funds and allegations that the Church had not disclosed some information about the use of tithing funds.  *See, e.g.*, 2AC ¶¶ 455-57.  Accordingly, Plaintiffs' fourth cause of action fails along with the prior claims.

4.     **Plaintiffs' "Violations of the *Utah Charitable Solicitations Act*" claim fails.**

Plaintiffs' fifth cause of action is for violations of the "Utah Charitable Solicitations Act." 2AC ¶¶ 463-80.  Plaintiffs base this claim on allegations that the Church made "untrue statement[s] of a material fact or fail[ed] to state a material fact necessary to make statements made, in the context of the circumstance under which they are made, not misleading."  *Id.* ¶ 465 (citation omitted).  The allegations are the same as those advanced in the prior causes of action— the making of false statements about tithing or the failure to disclose information about tithing. Those allegations fail here for the same reasons they failed in the other fraud-based claims (*i.e.,* Plaintiffs' first, second, and third causes of action).

Ms. Gaddy's claim for "Violations of the Utah Charitable Solicitations Act" also fails because that statute does not create a private cause of action.  Rather, enforcement is left to the Utah Attorney General's Office and the Division of Consumer Protection.  *See* Utah Code §§ 13-22-3, -4.

5.      **Plaintiffs' "Civil Rico" claim fails.**

Plaintiffs' sixth cause of action is for "Civil Rico."  2AC ¶¶ 481-535.  Once again, Plaintiffs base this claim on allegations that the Church committed some type of fraud regarding its doctrinal teachings and its use of tithing funds.  Indeed, Plaintiffs cite to the very same paragraphs to support the RICO claim that were cited in their first cause of action.  *Cf. id.* ¶ 512 with 366.  Those allegations fail here for the same reasons they failed in the other fraud-based claims (*i.e.*, Plaintiffs' first, second, and third causes of action).

The RICO claim also suffers from other defects.  "The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity."  *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006).  A "racketeering activity" is defined by statute as "any act which is indictable under federal law and specifically includes mail fraud, wire fraud and racketeering."  *Id.* (internal quotation marks and citation omitted).  This "racketeering activity" is frequently described as a "predicate act" or "acts."  *Id. at 1261-62* (citation omitted).

Plaintiffs assert two separate sections of the Second Amended Complaint as the so-called "pattern of racketeering activity."  Specifically, Plaintiffs cite to paragraphs 140-290 and paragraphs 291-301.  2AC ¶¶ 517-19.  But none of those allegations amount to a pattern of racketeering activity.

Paragraphs 140-290 are all about the Church's religious teachings—including Joseph Smith's First Vision, the translations of the Book of Mormon and Book of Abraham, and Church history.  *Id.* ¶¶ 140-290.  But, as recognized by the Court, those statements cannot constitute predicate acts for purposes of RICO.  *See* First Order at 17.  That just leaves scattered statements

about the source of funds for City Creek.  As described above, Plaintiffs have not pleaded that President Hinckley's statement was actually false (nor could they in good faith in light of the holding in *Huntsman*).  So those statement cannot form the basis for a RICO claim.  And they do not constitute a "pattern" because they relate to only one issue—the funding of City Creek.

Paragraphs 291-301 similarly fail to allege a pattern of activity.  Those paragraphs do nothing more than repeat prior allegations.  And the tithing-based claim is that "[t]ithing was not used only for the Lord's or Church purposes [reasonably interpreted as religious] but a substantial portion of tithes . . . was used for investment and commercial purposes, including but not limited to City Creek Mall and bailing out Beneficial Life Ins. Co., and likely for the projects itemized in ¶ 8 above."  2AC ¶ 293.  But an adjudication of that allegation would violate the First Amendment.  This Court may not adjudicate whether the Church's use of funds was in, in fact, for the "Lord's or Church purposes."

Regardless, Ms. Gaddy has not identified any *criminal* conduct.  She has not alleged (nor can she) that the Church's use of funds constituted a crime.  It is not criminal for the Church to invest funds for future use.  To the contrary, the Utah Supreme Court recognized that it was "obvious" that churches were entitled to do exactly that.  *See Stone,* 356 P.2d at 633-34.  Here, Plaintiffs have not alleged even a single *indictable* activity—let alone a pattern.  Thus, the RICO claim fails and should be dismissed.

**6.    Plaintiffs' "Intentional (Reckless) Infliction of Emotional Distress" claim fails.**

Plaintiffs' final cause of action is for "Intentional (Reckless) Infliction of Emotional Distress."  2AC ¶¶ 536-43.  It is unclear whether this claim attempts to assert a theory of liability related to the Church's use of tithing funds (as opposed to a theory regarding the Church's

20

religious teachings).  If such a theory is indeed asserted, it must be based on the same deficient allegations as those already addressed herein.  Thus, this claim fails for the same reason as the prior claims.

> ### C.      The dismissal of the Second Amended Complaint should be with prejudice.

This case was filed in 2019.  Plaintiffs have enjoyed multiple opportunities to plead and replead their case.  Although styled as the "Second Amended Complaint" it is, in fact, at least the *seventh* version of the complaint when counting all proposed amendments (not counting several erratas).  There has been extensive and exhaustive briefing on the issues (indeed this motion will be the 111th document filed in this case).  And the Court will have issued at least three dispositive rulings.  Additional amendments will not change the result—the claims fail and are barred by the First Amendment.  Accordingly, the dismissal of Plaintiffs' claims should be with prejudice.

## III.    IN THE ALTERNATIVE, ALL NON "PURELY SECULAR" ALLEGATIONS SHOULD BE STRICKEN.

For the reasons stated above, Plaintiffs' case should be dismissed with prejudice.  In the event, however, that the Court determines that some piece of a cause of action survives, the Church requests that all other allegations be stricken from the Second Amended Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure.  Rule 12(f) provides that the "Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Here, the Court has repeatedly ruled that Plaintiffs may not base any claims on the Church's religious teachings.  Thus, all the allegations in the Second Amended Complaint about the Church's religious teachings, history, and beliefs are, by definition, "immaterial."  And unless those portions are stricken, the Church would be forced to respond to each paragraph in

21

the Complaint in violation of the First Amendment.  *See N.L.R.B. v. Cath. Bishop of Chi*, 440 U.S. 490, 496-502 (1979) (noting that even the "inquiry" into religious matters "necessarily raise[s] First Amendment problems," not just the "findings and conclusions").

In short, if the Court determines that some portion of Plaintiffs' claim is "purely secular" and is not otherwise dismissed, the Court should strike all other allegations from the Second Amended Complaint.[9]  Plaintiffs should then refile a new version of the complaint with only the operative allegations and remaining theories of liability.  In so doing, Plaintiffs should excise the immaterial allegations without altering the remaining allegations and legal theories.  *See Peterson*, 149 F.3d at 1143 (refusing to construct a legal theory that had not been pleaded).  The Church would then respond to that complaint.

## CONCLUSION

Each of Plaintiffs' claims is barred by the First Amendment or fails to state a claim. Accordingly, the Church's Motion should be granted, and the Second Amended Complaint should be dismissed with prejudice.  In the alternative, all immaterial allegations in the Second Amended Complaint should be stricken.

---

[9] Alternatively, the Court could dismiss the entire Second Amended Complaint without prejudice and allow Plaintiffs to file a new complaint consistent with the Court's order.  The Church is concerned, however, that such an approach would only result in yet another complaint with additional allegations rooted in religion.

DATED:  November 12, 2021

STOEL RIVES LLP

*/s/ Wesley F. Harward*
David J. Jordan
Wesley F. Harward

*Attorneys for Defendant Corporation of the
President of The Church of Jesus Christ of
Latter-day Saints*

23