Kay Burningham (#4201)
kay@kayburningham.com
Kay Burningham, Attorney at Law
299 South Main Street, Suite 1375
Salt Lake City, Utah 84111
Phone: 1.888.234.3706

*Attorney for Plaintiffs Laura A. Gaddy,*
*Lyle D. Small and Leanne R. Harris*

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| **LAURA A. GADDY, LYLE D. SMALL, LEANNE R. HARRIS,** individually and on behalf of all others similarlysituated,<br><br>*Plaintiffs,*<br><br>v.<br><br>**[The] CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,** a Utah corporation sole and DOES 1-50<br><br>*Defendant* | **OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT, OR IN THE ALTERNATIVE, MOTION TO STRIKE**<br><br>(DEMAND FOR JURY TRIAL)<br>**Request for Oral Argument**<br>**2:19-cv-00554-RJS-DBP**<br>Chief Judge: Robert J. Shelby<br>Chief Magistrate Judge: Dustin B. Pead |

## Table of Contents

**A.    INTRODUCTION**................................................................................................ 6

**B.    A LONG LINE OF CONTROLLING PRECEDENT DEMONSTRATES THAT THE CAD IS INAPPLICABLE TO THE 2AC CLAIMS.**............................................................ 6

**C.  BELOW IS AN OVERVIEW OF RELEVANT CHURCH AUTONOMY CASE LAW,** ............10

Watson v. Jones, 80 U.S. 679, 681, 20 L. Ed. 666 (1871)

Gonzalez v. Roman Cath. Archbishop of Manila, 280 U.S. 1, 16, 50 S. Ct. 5, 7–8, 74 L. Ed. 131 (1929), abrogated by Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich, 426 U.S. 696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976)

Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952)

Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich, 426 U.S. 696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976)

Jones v. Wolf, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979)

Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 658 (10th Cir. 2002)

**D.    A CAREFUL READING OF BALLARD DEMONSTRATES THAT ITS PROHIBITION AGAINST REQUIRING PROOF OF ONE'S RELIGIOUS BELIEFS ONLY APPLIES TO THE TRANSCENDENT, NOT THAT WHICH IS EMPIRICALLY PROVABLE,**.................................14

**E.    THE COURT CAN DETERMINE 2AC CLAIMS USING NEUTRAL PRINCIPLES.**............16

1.    Intentional Torts are Subject to Neutral Laws of General Applicability, Outside The Scope of the CAD, and Subject to the Rule In Reynolds and Employment Division v. Smith. ...........16

2.    Jones' Neutral Principles Rule has been Applied to a Variety of Claims .........................17

3.    Where there is no opportunity for internal resolution, and fraud can be determined without adjudicating the truth of religious doctrine, per Utah Open Court's provision, the Court should apply neutral principles of fraud and disclosure law to the 2AC claims. .................................23

**F.    ANALYSIS OF EACH 2AC CLAIMS REVEALS MOST ALL SURVIVE THE MTD.** ..........23

1.    FIRST C/A: FRAUD IN THE INDUCEMENT TO CONTRACT. ....................................23

2.    SECOND C/A: FRAUDULENT NONDISCLOSURE (BREACH OF DUTY TO DISCLOSE MATERIAL INFORMATION—no intent required) ............................................................24

a.    The Second Cause of Action Bases Duty on a Number of Factors. The First is a Partial or Misleading Representation.....................................................................................24

b.    The Rest of the Relationship Factors give Rise to a Limited Fiduciary Duty. ..............27

3.    THIRD C/A:  FRAUDULENT CONCEALMENT (INTENTIONAL) ....................................30

4.    FOURTH C/A: CONSTRUCTIVE FRAUD BASED ON BREACH OF PROMISES OF FUTURE PERFORMANCE ........................................................................................................30

5.    FIFTH C/A: BREACH OF THE UTAH CHARITABLE SOLICITATIONS ACT .................31

6.    SIXTH CAUSE OF ACTION: CIVIL RICO —18 U.S.C. § 1962(c) .....................................32

a.    The Claim Contains Affirmative Misrepresentations that are False ...........................32

b.    The Federal Mail & Wire Fraud Statutes Recognize Material Omissions...................33

c.    Below are Misleading Tithing Representations Due to Omissions.............................34

7.    SEVENTH C/A: INTENTIONAL (RECKLESS) INFLICTION OF EMOTIONAL DISTRESS 36

**G.    DEFENDANT'S MOTION TO STRIKE SHOULD BE DENIED.** ......................................37

Page(s)

TABLE OF AUTHORITIES

Alberts v. Devine,
　395 Mass. 59, 479 N.E.2d 113 (1985) ........................................................ 17
Bryce v. Episcopal Church in the Diocese of Colorado,
　289 F.3d 648 (10th Cir. 2002) ..........................................................passim
Cerritos Trucking Co. v. Utah Venture No. 1,
　645 P.2d 608 (Utah 1982) ................................................................. 31
Doe v. Liberatore,
　478 F. Supp. 2d 742 (M.D. Pa. 2007) ........................................................ 22
Doe v. Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints,
　No. 1:09-CV-00351-BLW, 2012 WL 3782454 (D. Idaho Aug. 31, 2012) ................... 22
Employment Div., Dep't of Human Res. of Oregon v. Smith,
　494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) ............................ 16, 37, 38
Franco,
　2001 UT 25, 21 P.3d 198 ................................................................. 28
Fulton v. City of Philadelphia, Pennsylvania,
　141 S. Ct. 1868, 210 L. Ed. 2d 151 (2021) ................................................ 38
Gonzalez v. Roman Cath. Archbishop of Manila,
　280 U.S. 1, 50 S. Ct. 5, 74 L. Ed. 131 (1929) ........................................... 1, 10
Guinn v. Church of Christ of Collinsville,
　1989 OK 8, 775 P.2d 766 ................................................................... 9
Gusow v. United States,
　347 F.2d 755 (10th Cir.) .................................................................. 33
Hansel v. Purnell,
　1 F.2d 266 (6th Cir. 1924) ............................................................... 29
Hartwig v. Albertus Magnus Coll.,
　93 F. Supp. 2d 200 (D. Conn. 2000) ....................................................... 21
Holy Spirit Ass'n for Unification of World Christianity v. World Peace & Unification
　Sanctuary, Inc.,
　No. 3:18-CV-1508, 2019 WL 3297469 (M.D. Pa. July 22, 2019) ............................. 18
Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,
　565 U.S. 171, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) ................................... 6
Hull v. Flinders,
　83 Utah 158, 27 P.2d 56 (1933) ........................................................... 31
Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-day Saints,
　239 W. Va. 428 ........................................................................... 21
Jeffs v. Stubbs,
　970 P.2d 1234 (Utah 1998) ......................................................... 18, 19, 23
Jensen v. Cannon,
　473 P.3d 637 (Utah Ct. App. 2020) ........................................................ 30
Jensen v. IHC Hosps., Inc.,
　944 P.2d 327 (Utah 1997), on reh'g ....................................................... 30
John Doe CS v. Capuchin Franciscan Friars,

520 F. Supp. 2d 1124 (E.D. Mo. 2007) ...................................................................... 22

Jones v. Wolf,
443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979)................................... 2, 12

Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,
344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952).............................. 1, 11, 16

Macdonald v. Grace Church Seattle,
No. C05-0747C, 2006 WL 2252866 (W.D. Wash. Aug. 4, 2006) .............................. 21

Marcantel v. Michael & Sonja Saltman Fam. Tr.,
993 F.3d 1212 (10th Cir. 2021) .................................................................... 30

Martinelli v. Bridgeport Roman Cath. Diocesan Corp.,
196 F.3d 409 (2d Cir. 1999)................................................................. 19, 21

Mary Doe SD v. The Salvation Army,
No. 4:07CV362MLM, 2007 WL 2757119 (E.D. Mo. Sept. 20, 2007)........................ 22

McKelvey v. Pierce,
173 N.J. 26, 800 A.2d 840 (2002) ................................................................ 20

N.L.R.B. v. Cath. Bishop of Chicago,
440 U.S. 490, 99 S. Ct. 1313, 59 L. Ed. 2d 533 (1979).................................... 37

Nash v. Post,
No. CV 04-4688 FLN, 2006 WL 8445091 (D. Minn. Aug. 30, 2006) ................... 21, 22

Neder v. United States,
527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).......................................... 33

Nielsen v. Archdiocese of Denver,
413 F. Supp. 2d 1181 (D. Colo. 2006) ............................................................ 21

Ogle v. Hocker,
279 F. App'x 391 (6th Cir. 2008) ................................................................. 18

Paul v. Watchtower Bible & Tract Soc. of New York, Inc.,
819 F.2d 875 (9th Cir. 1987).................................................................... 7, 8

Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,
393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969)......................... 11, 12

Puri v. Khalsa,
844 F.3d 1152 (9th Cir. 2017)................................................................... 18

Reynolds v. United States,
98 U.S. 145, 25 L. Ed. 244 (1878) .............................................................. 16

Roman Cath. Diocese of Jackson v. Morrison,
905 So. 2d 1213 (Miss. 2005)................................................................... 21

Scotts Afr. Union Methodist Protestant Church v. Conf. of Afr. Union First Colored
Methodist Protestant Church,
98 F.3d 78 (3d Cir. 1996)........................................................................ 17

Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich,
426 U.S. 696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976)........................... 2, 12

Skrzypczak v. Roman Cath. Diocese Of Tulsa,
611 F.3d 1238 (10th Cir. 2010) .................................................................. 6

Stone v. Salt Lake City,
11 Utah 2d 196, 356 P.2d 631 (1960).......................................................... 27

Synanon Found., Inc. v. California,
  444 U.S. 1307, 100 S. Ct. 496, 62 L. Ed. 2d 454 (1979)............................ 17
United States v. Ballard,
  322 U.S. 78, 64 S. Ct. 882, 88 L. Ed. 1148 (1944)....................... 15, 16, 22
United States v. Brown,
  79 F.3d 1550 (11th Cir. 1996) ................................................................. 33
United States v. Cochran,
  109 F.3d 660 (10th Cir. 1997) ................................................................. 33
United States v. Themy,
  624 F.2d 963 (10th Cir.1980) .................................................................. 33
United States v. Welch,
  327 F.3d 1081 (10th Cir. 2003) ............................................................... 33
Utah Gospel Mission v. Salt Lake City Corp.,
  425 F.3d 1249 (10th Cir. 2005) ............................................................... 19
Watson v. Jones,
  80 U.S. 679, 20 L. Ed. 666 (1871) ...................................................... 1, 10
Williams v. Kingdom Hall of Jehovah's Witnesses,
  2021 UT 18, 491 P.3d 852 .......................................................... 6, 19, 28
Williams v. United States,
  368 F.2d 972 (10th Cir.1966) .................................................................. 33
Wisconsin v. Yoder,
  406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)............................... 7
Wollersheim v. Church of Scientology,
  212 Cal. App. 3d 872, 66 Cal. Rptr. 2d 1 (Ct. App. 1989) ......................... 9
Yazd v. Woodside Homes Corp.,
  2006 UT 47, , 143 P.3d 283 .................................................................... 28
Zemaitiene v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day
  Saints,
  No. 2:16-CV-1271, 2019 WL 10817152 (D. Utah June 19, 2019)............................. 38

Statutes

18 U.S.C. § 1962(c).................................................................................. 2, 31
U.C.A. §13-22-4 .......................................................................................... 31
Utah Const. art. I, § 11 ............................................................................... 23

Rules

Fed. R. Civ. P. 12(f)..................................................................................... 38
Fed.R.Evid. 801(c) ...................................................................................... 20
FRCP 9 ........................................................................................................ 32

5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1380 (3d ed.
2019) ........................................................................................................... 38

## A.    INTRODUCTION

Defendant bases its defense to Plaintiffs' claims on the Church Autonomy Doctrine (CAD)[1] which is based on both the Free Exercise and Establishment Clauses. Plaintiffs submit a brief overview of the relevant historical jurisprudence from which the CAD evolved. They will next provide an overarching set of neutral principles of law which can and should be applied to the Second Amended Complaint (2AC) claims since to do so would not violate the First Amendment. The foregoing analysis complies with Williams v. Kingdom Hall of Jehovah's Witnesses, 2021 UT 18, ¶ 28, 491 P.3d 852, 859.

The tithing use claims will be addressed in depth in relation to the 6th Cause of Action brought under RICO, though they are pleaded alternatively in each prior claim. Finally, the Motion to Strike (MTS) will be addressed.

## B.    CONTROLLING PRECEDENT DEMONSTRATES THAT THE CAD IS INAPPLICABLE TO THE 2AC CLAIMS.

"Th[e] [CAD] prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity." Bryce, 289 F.3d at 655. Skrzypczak v. Roman Cath. Diocese Of Tulsa, 611 F.3d 1238, 1242 (10th Cir. 2010) holding the ministerial exception, a subset of the CAD, precludes hostile work environment claims by ministers against churches. See also Hosanna Tabor Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 196, 132 S. Ct. 694, 710, 181 L. Ed. 2d 650 (2012) decided solely on the ministerial exception.

---

[1] Wherever "Plaintiffs" is used, it is meant to it include named plaintiffs and putative class members.

Defendant argues that the Court cannot inject itself into disputes concerning church faith and doctrine (MTD p.1, citing the Court's 2nd Order, Dkt. 100 at 20). But those inquiries into faith and doctrine (a body of beliefs) are qualified in that they must be set in the context of an "internal church dispute."

Before the CAD is implicated, a threshold inquiry is whether the alleged misconduct is rooted in religious belief."

Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). But it does not follow that because the items or information concealed are related to LDS beliefs, that the act of concealing those items cannot be addressed in a civil court. It is the *conduct*, the *exercise*, which must be "rooted in religious belief.

The facts giving rise to the phrase concerned the Amish' sect's sincere belief that young people are better off working than attending public school after age sixteen. "Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests."

Wisconsin, 406 U.S. 205.

Paul v. Watchtower Bible & Tract Soc. of New York, Inc., 819 F.2d 875, 878 n.1 (9th Cir. 1987) is instructive for determining CAD applicability. Finding the practice of shunning to be church approved conduct, the 9th Circuit denied plaintiff's tort claims, declining to apply the CAD. Quoting Justice Brennan in *Serbian Orthodox Diocese* the Court wrote:

> [W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity…civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them… Ecclesiastical abstention thus provides that civil courts may not redetermine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity. Rather, we must accept as a given whatever the entity decides.[2] (Citations omitted.)

The Court then found the CAD irrelevant because Plaintiff's claim was based on shunning and "[she] is not alleging that new rules governing disassociation are improper under Church law. Nor does she seek relief for having been "wrongfully" disfellowshipped. Rather, she seeks relief for the harms she has suffered *as a result of conduct engaged in by the Jehovah's Witnesses that is presumably consistent with the governing law of the Church*…" [emphasis added.] Id. at 878. Instead, the Court applied a Free Exercise Analysis. After engaging in a balancing of interests, the Court found allowing the tort claims would be a direct burden on the exercise of shunning, which it also determined was not "a sufficient threat to the peace, safety, or morality of the community as to warrant state intervention." Id. at 883.

Similarly the Oklahoma Supreme Court found a minister's tort claims against his church which did not involve termination, outside the scope of the CAD because the controversy was concerned with the tortious nature of "religiously-motivated acts and not with their orthodoxy *vis-a-vis* established church doctrine." It found the justification

---

[2] Plaintiffs do not challenge COP's interpretation of canonical text, i.e. whether the Book of Mormon is the word of God or was translated by the power of God as Smith claims. Rather Plaintiffs challenge the distortion of facts historically presented as an inducement to that belief, and the omission of other facts which, had they been fairly disclosed, would have changed Plaintiffs' belief in the divinity of the Book of Mormon.

for judicial abstention. Guinn v. Church of Christ of Collinsville, 1989 OK 8, 775 P.2d 766, 773. Insistent that the CAD applies to the facts of the 2AC because they are the same claims (MTD 6) the COP has yet to tell us what religious exercise is jeopardized by compliance with fraud and disclosure laws.

A Scientology defector sued the church whose members campaigned to financially ruin him. The $30 million verdict was reversed and remanded due to the Supreme Court's new law imposing a ratio limit of punitive damages to compensatory. But the lower court found the Church's avowed religious practices of "coerced auditing," and "fair game," were not "constitutionally protected religious practices" Wollersheim v. Church of Scientology, 212 Cal. App. 3d 872, 893-98, 66 Cal. Rptr. 2d 1 (Ct. App. 1989), cert. granted, judgment vacated sub nom. Church of Scientology of California v. Wollersheim, 499 U.S. 914, 111 S. Ct. 1298, 113 L. Ed. 2d 234 (1991)

Unlike the Supreme Court cases cited below, the case at bar is not an internal church dispute such that the government would be taking sides, raising establishment issues. A dispute is ordinarily between two factions of a larger group. Plaintiffs herein resigned from the Church shortly after discovering the fraud. There was no antecedent dispute. Indeed, given Defendant's lack of an internal adjudicatory system (except for disciplinary hearings) and longstanding censorship, there was, and is no forum to engage in such a dispute within the LDS Church.

**C.  BELOW IS AN OVERVIEW OF RELEVANT CAD CASE LAW,**

**1.**   Watson v. Jones, 80 U.S. 679, 681, 20 L. Ed. 666 (1871).

Watson is generally acknowledged as the origin of ecclesiastical deference, later renamed the CAD. it was a dispute between a local Kentucky Presbyterian Church over the General church's position on slavery. The Church was governed by "an ascending series of judicatories--Church Sessions, Presbyteries, Synods, and a General Assembly." Id. at 681. When the general assembly decreed it opposed slavery, the lower KY body split and those who supported slavery sued civilly. The Watson Court reasoned that lower churches must abide by the decision of the top ecclesiastical tribunal because they had consented to do so. Id. at 710. Church tribunals can "define religious doctrines or principles, provided that in doing so they violate now [sic] law of morality…" Id. at 723.

**2.**   Gonzalez v. Roman Cath. Archbishop of Manila, 280 U.S. 1, 16, 50 S. Ct. 5, 7-8, 74 L. Ed. 131 (1929).

The Court reviewed a chaplain's challenge to a Manila archbishop's interpretation of the chaplaincy under a will.[3] The Court listed fraud as an exemption to Watson's rule re: ecclesiastical decisions. Though there was no mention of facts giving rise to fraud in the Supreme Court opinion, and no extant record of the Archbishop's decision, the Court held "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical,

---

[3] The decision of the Philippines Court is not available, but there must have been allegations of impropriety by Gonzalez since the Court itemized exemptions from the Archbishop's decision re the chaplaincy, based on fraud, collision or arbitrariness.

although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." [3]

**3.**   Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952)

Kedroff was a dispute between the Mother Russian Orthodox Church located in Moscow and the Russian Orthodox churches in North America over the use of  NYC's St. Nicholas Cathedral. The U.S. churches declared independence from the Mother Church. The NY Legislature recognized their administrative autonomy and NY courts found the local church leader had a right to use the cathedral. The Sup. Ct. reversed, reasoning the USSR Church had not acknowledged the schism; it held the NY law unconstitutional.

**4.**   Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969),

The General church established a commission to resolve an internal dispute with a local church over property. Instead of appealing the commission's adverse decision, the local church sued civilly. Locals argued the church had violated its own doctrine. The Supreme Court overturned the GA court's decision for locals, holding that adjudication of the property dispute using a "departure from doctrine" standard would violate the First Amendment. It found the departure-from-doctrine approach was not susceptible of the marginal judicial involvement contemplated in Gonzalez because **"***civil courts could adjudicate the rights under the will without interpreting or weighing church doctrine but simply by engaging in the narrowest kind of review of*

*a specific church decision—i.e., whether that decision resulted from fraud, collusion, or arbitrariness.***"**  [Emphasis added] Id., at 450–51.

**5.**    Serbian Orthodox Diocese v. Milivojevich, 426 U.S. 696 (1976)

The top ecclesiastical tribunal's decision to reorganize its dioceses was challenged as arbitrary. An Internal dispute arose from the Mother Church's division of the American-Canadian Diocese into three Dioceses. The Illinois state court agreed it was arbitrary after having reviewed the church's own laws. The Supreme Court held that reorganization of the Diocese is solely a matter of internal church government, even if arbitrary.[4]

**6.**    Jones v. Wolf, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979)

A local Presbyterian Church congregation split into two factions, each claiming the right to control church property. The Supreme Court held that where a claim depends only on "neutral principles of law" that are "completely secular in operation," the danger of a civil court deciding religious questions is absent and the Establishment Clause poses no barrier to relief. Id. at 602–03.

**7.**    Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 658 (10th Cir. 2002),

A gay youth minister was told she would be terminated after she and her domestic partner held a commitment ceremony. Prior to her termination, the Church

---

[4] "…whether or not there is room for "marginal civil court review " under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes…" the arbitrary exemption is no longer valid. Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich, 426 U.S. 696, 713, 96 S. Ct. 2372, 2382, 49 L. Ed. 2d 151 (1976) this is dictum as to fraud, since no claim of fraud was made.

held a discussion attended by the membership as well Bryce and partner, who chose to attend. An extensive internal church discussion amongst all re homosexuality ensued.[5] Disparaging comments were made. Held: the CAD prohibits civil court review of both the termination and harassment claims, the latter determined to be based on an internal dispute involving matters of faith, doctrine, church governance, and polity.

Plaintiffs 2AC claims are distinguishable from Bryce. The internal church discussion upon which the sexual harassment claims were based occurred in four meetings voluntarily attended by both Bryce and her partner. Derisive comments were made:

> • "Lee Ann is living in a sexual relationship outside of Christian marriage."
> • "When did you start having sex with Sara?"
> • "Gay people are very nice, but et. but it worries [me] why gay people want to work with children."
> • "My husband and I were always worried about the paper boy coming in, and we always protected our children from him."
> • "I am sorry that Lee Ann has chosen this lifestyle which precludes her from working with children."
> • "Of course Father Don is right, we can't let these gay people come into the church and work with our children."
> (Et. al.)

Id at 653

Plaintiffs' 2AC claims are not based on a voluntary internal church dispute. There never was an open discussion held by the LDS Church because the information and items were withheld from Plaintiffs and those like them. Plaintiffs were induced to

---

[5] Church imposed normative standards such as advocating heterosexual marriage to the exclusion of homosexuality, where they do not pose threat to the peace, safety, or morality of the community as to warrant state intervention are also not appropriate subjects of for civil adjudication. Cf. Brigham Young's doctrine of blood atonement.

believe based on a manipulated narrative of LDS history. Over the past few years, the misrepresented facts have been incrementally disclosed by Def., who has known about them for decades, if not over a century. (2AC ¶261 &193 re brown stone; ¶67-68 re stone in the hat process; ¶274-79 re lead plate used to print Book of Abraham facsimile no. 3).

The acts of concealment are not interpretations of doctrine but are indefensible conduct because COP does not claim the act of concealing material facts is "rooted in religious belief" like withdrawing your child from public school at age 16, or shunning former members.

## D.  A CAREFUL READING OF BALLARD SHOWS THAT A PROHIBITION AGAINST REQUIRING PROOF OF RELIGIOUS BELIEFS ONLY APPLIES TO THE TRANSCENDENT, NOT THAT WHICH IS EMPIRICALLY PROVABLE,

Bryce unfortunately interpreted Ballard broadly, as requiring a hard line distinction between religious and secular, interpreting "religious belief" as anything having to do with religion. But the "rooted in religious belief" standard applies to conduct; thus the distinction is actually between what is transcendent (religious beliefs) and what can be empirically proven (secular).

1. The Ballard Court did not Define what it Meant by Religious Belief.

Ballard was decided in the context of Guy Ballard's defense to mail fraud that he had seen St. Germain who anointed him his representative to among other things, heal the sick. The trial court removed from the jury the question of whether Ballard in fact had such experiences but they could ascertain whether Ballard was acting in good faith,

i.e., whether he believe in his claimed experience. The Supreme Court agreed, writing:

> Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. *87 Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many.

United States v. Ballard, 322 U.S. 78, 86–87, 64 S. Ct. 882, 886, 88 L. Ed. 1148 (1944)

Though Justice Douglas writing for the majority gave examples of "religious belief" he failed to define the term. The examples in the above quotation are all transcendent experiences. In dissent, Chief Justice Stone reasoned that had Ballard claimed that he had physically shaken hands with St. Germain in San Francisco "*on a day named*," the prosecutor could introduce evidence rebutting that fact, i.e., that Ballard was not in San Francisco on that day. Id at 89.

Caleb Mason posits that "[t]he *Ballard* rule cannot be construed as a blanket prohibition on all factfinding on questions about which a party has a religious belief." [6] Mason logically argues that "[a]s a matter of positive constitutional law [ ] there *must* be a domain of propositions which can be asserted and proved in courts, and a domain of "properly religious" beliefs which are epistemically off limits to the courts.[7] [Emphasis

---

[6] "What is Truth? Setting the Bounds of Justiciability In Religiously- Inflected Fact Disputes," Author: Caleb E. Mason, *Journal of Law and* Religion , 2010-2011, Vol. 26, No. 1 (2010-2011), pp. 91-139 Published by: Cambridge University Press.
[7] Id at p. 103

original.] Because it is the transcendent which are "beyond the ken" of civil courts. Id.

**E.  THE COURT CAN DETERMINE 2AC CLAIMS USING NEUTRAL PRINCIPLES.**

1. <u>Intentional Torts are Subject to Neutral Laws of General Applicability, Outside The Scope of the CAD, and Subject to the Rule In Reynolds and Employment Division v. Smith</u>.

Ordinarily, crimes [and intentional torts] involve conduct to which neutral laws generally apply, as recognized in Reynolds v. United States, 98 U.S. 145, 146, 25 L. Ed. 244 (1878)  and Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 877–80, 110 S. Ct. 1595, 1599–600, 108 L. Ed. 2d 876 (1990). The Court distinguished between professing beliefs and proselytizing. Id. at 877-78. The latter is conduct that can be regulated by a generally applicable neutral law. The standard violated by commission of a crime [intentional tort] applies to all regardless of defendant's religious identity or motive. This longstanding rule has only been limited by the Ministerial Exception, but not the CAD. The gay partner's claim of sexual harassment was in fact decided under the Ministerial Exception since it was dismissed as derivative from the protected communication re: Bryce's termination. *Bryce* at 659.

The following decision analyzed by Appellant's attorney in the Williams case is helpful.[8]

> In Alberts v. Devine, 395 Mass. 59, 479 N.E.2d 113 (1985), church leaders induced a psychiatrist to disclose confidential medical information obtained during counseling with Minister *Alberts. Id.* at 61–62. The superiors used the info. to deter leaders from reappointing Alberts as

---

[8] Williams v. Kingdom Hall, Utah Supreme Court No. 20190422-SC Appeal No. 20170783-CA District Court No. 160906025, Brief for Petitioner pp. 42-43, by Robert Friedman, INSTITUTE FOR CONSTITUTIONAL ADVOCACY and PROTECTION.

minister. Alberts sued them for inducing his doctor to violate confidentiality. *Id*. The Sup. Ct. rejected the superiors' First Amendment defense. The issue was whether Albert's religious superiors had the *civil* right to induce a psychiatrist to violate the duty of confidentiality owed to his patient. The court reasoned that it was *not* a dispute about religious faith, doctrine, church discipline or internal organization. *Id*. at 73 (emphasis added). Thus, *although the First Amendment "preclude[d] judicial inquiry as to whether a church rule provided that [the superiors] had the right to seek medical information from Alberts's psychiatrist"— a religious question on which Alberts's claim did not depend—"it d[id] not follow that it precludes the imposition of liability" for their decision to act on that claim of religious authority. [emphasis original] Id*. [9]

Likewise, Plaintiffs do not ask the Court to determine whether LDS doctrine allows lying for the Lord, [10] but only to determine whether the conduct based on that doctrine, if that in fact is an LDS mandated doctrine, violates civil law.

2.  Jones' Neutral Principles Rule has been Applied to a Variety of Claims

The following are examples of cases adjudicated using neutral principles of law.

Synanon Found., Inc. v. California, 444 U.S. 1307, 100 S. Ct. 496, 62 L. Ed. 2d 454 (1979) Attorney General could intervene in claim that charitable trust was not administered in accordance with trust instruments or state law; Scotts Afr. Union Methodist Protestant Church v. Conf. of Afr. Union First Colored Methodist Protestant Church, 98 F.3d 78, 95 (3d Cir. 1996) A quiet title action allowed by local church disaffected from regional administrative church. The court reasoned: "[T]he extent to which a court may permissibly inquire into disputes of this kind turns on the specific elements of the inquiry itself and the degree to which it might trench upon doctrinally

---

[9] *Id*.
[10] Prior references to "Lying for the Lord" as in Elder Oaks' denial of such a practice, were made to show that the Church's deceitful conduct is not a sincerely held religious belief.

sensitive matters, *rather than on conclusory labelling of the whole dispute as either "secular" or "ecclesiastical*." [emphasis added]; Ogle v. Hocker, 279 F. App'x 391 (6th Cir. 2008) Unpublished.  CAD did not preclude defamation or IIED claims by one minister against another minster based on words spoken in a sermon. Hocker did not claim that defamation is a practice of his church or is otherwise rooted in religious belief.; Puri v. Khalsa, 844 F.3d 1152 (9th Cir. 2017) Deceased spiritual leader's heirs' allegations that church general counsel and board members conspired to exclude them from management positions and to convert assets under their control for personal benefit could be decided by neutral principles; Holy Spirit Ass'n for Unification of World Christianity v. World Peace & Unification Sanctuary, Inc., No. 3:18-CV-1508, 2019 WL 3297469, at *9 (M.D. Pa. July 22, 2019) Neutral principles applied under the Lanham Act re trademark infringement disputes between religious organizations.

Utah applied neutral principles of law in the context of an unjust enrichment claim over a private trust. Jeffs v. Stubbs, 970 P.2d 1234, 1243–44 (Utah 1998) The Utah Supreme Court was not persuaded by "UEP's claim that we should refuse to resolve the claimants' case solely because of the assertion that Utah's courts cannot resolve disputes between religious entities," finding "that refusal would deny this fundamental right to the claimants. In addition, such a refusal of a remedy alone might constitute an action violative of state or federal Establishment and Free Exercise Clauses." Id. at 1250. "By resolving the dispute between the UEP and claimants, the trial court furthered the compelling state interest in keeping the courts open." Id.at 1251.

In Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249 (10th Cir. 2005) re the City's sale of plaza easement to church did not create excessive entanglement with religion, as required to establish a violation of the Establishment Clause. Finally, the Utah Supreme Court now seems open to considering the same  with re an IIED claim set in the context of a Church disciplinary proceeding. Williams, 2021 UT 18, *supra*.

Tort claims against a church for religiously motivated conduct can be adjudicated without determining the truth of doctrine or becoming excessively entangled. The following cases have distanced themselves from the stringent religious v. secular demarcation first used by some courts in the 1980s.

In Martinelli v. Bridgeport Roman Cath. Diocesan Corp., 196 F.3d 409, 430–32 (2d Cir. 1999) the Second Circuit allowed evidence of a fiduciary duty in a sex abuse case over claim that district court was interpreting church doctrine. "To the extent that the jury did consider religious teachings and tenets, moreover, it did so to determine not their validity but whether, as a matter of fact, Martinelli's following of the teachings and belief in the tenets gave rise to a fiduciary relationship between Martinelli and the Diocese" Id.

> Where a person's beliefs are alleged to give rise to a special legal relationship between him and his church, we may be required to consider with other relevant evidence the nature of that person's beliefs in order properly to determine whether the asserted relationship in fact exists. In doing so, we judge nothing to be heresy, support no dogma, and acknowledge no beliefs or practices of any sect to be the law.

Id. at 431.

The Court compared this limited purpose to a court's admonition to a jury over a hearsay objection under Fed.R.Evid. 801(c) writing: "Evidence of a statement made out of court may be inadmissible as hearsay to prove the truth of the facts asserted in it, but may be admissible for the non-hearsay purposes." Id.

McKelvey v. Pierce, 173 N.J. 26, 44–45, 800 A.2d 840, 851 (2002) The cognate CAD cannot be applied blindly to all disputes involving church conduct or decisions. Bryce, supra, 289 F.3d at 657. The doctrine is implicated only in those situations where "the alleged misconduct is 'rooted in religious belief.' " Ibid. [emphasis added]. Child sex abuse can in no way be said to be rooted in religious belief. Arguably, neither should concealment of information and items material to the formation of one's religious beliefs.

Though it has not admitted as much, the misconduct of concealment is not the exercise that Defendant seeks to protect. Instead it seems to be arguing that the religious facts and physical items that they have suppressed are the beliefs that cannot be "interpreted" under the CAD. This is not the law; it is the concealment that must be rooted in religious belief. "Rooted in religious belief" refers to the exercise, not to the religiously-affiliated things like the brown stone, lead plate, handwritten first vision account, Egyptian Grammar and Alphabet and other key items COP has suppressed.

Martinelli has been cited extensively in sex abuse cases where facts supporting the finding of a fiduciary duty are allowed against defendant church's First Amendment objections. Most have interpreted Martinelli as coining a parishioner plus rule where church leaders are not fiduciaries to all parishioners, but where other facts support the

20

establishment of a relationship of trust.

Subsequent cases have expanded Martinelli's holding Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-day Saints, 239 W. Va. 428, 453, n. 60, 801 S.E.2d 443, 468 (2017) Fact that Church had a notation system of ordinarily noting prior abuse by members, allowed into evidence over entanglement objection to show absence of note re member molester's prior abuse; Roman Cath. Diocese of Jackson v. Morrison, 905 So. 2d 1213, 1240–41 (Miss. 2005) First Amendment did not prevent Mother's claims for civil conspiracy, breach of fiduciary duty, infliction of emotional distress, fraud and fraudulent concealment, negligent hiring, arising out of alleged sexual abuse of her children by former Diocese priest; Hartwig v. Albertus Magnus Coll., 93 F. Supp. 2d 200, 212–14 (D. Conn. 2000) citing Martinelli, at 431:"[t]he First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters."; Nielsen v. Archdiocese of Denver, 413 F. Supp. 2d 1181, 1186–87 (D. Colo. 2006) Victims of abuse by former priests sued Church for negligence. Dismissal denied despite church's Establishment Clause defense.

Macdonald v. Grace Church Seattle, No. C05-0747C, 2006 WL 2252866, at *2 (W.D. Wash. Aug. 4, 2006) Claim of wrongful discharge based on church official's sex abuse of plaintiff is secular conduct, citing *Martinelli at* 431 **"**The First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters."; Nash v. Post, No. CV 04-4688 FLN, 2006 WL 8445091, at *7 (D. Minn. Aug. 30, 2006) Defamation

21

claim by putative child abuser against adult victim who reported abuser's acts to Catholic diocese. The Court reasoned that it "must distinguish between religious principles as facts as opposed to making a decision that a particular religious principle is valid." Id. "But only if a court's inquiry into a defamation action requires determination of the truth or falsity of religious belief, is such inquiry forbidden by the Free Exercise Clause (citing U.S. v. Ballard, 322 U.S.78, 87) Id. at *6; Doe v. Liberatore, 478 F. Supp. 2d 742, 772 (M.D. Pa. 2007) Breach of fiduciary claim against Diocesan defendants in sex abuse case allowed, given the issue only raised whether parties did not deal on equal terms but on one side there was "overmastering influence" and on the other "dependence, or trust, justifiably reposed." ; Mary Doe SD v. The Salvation Army, No. 4:07CV362MLM, 2007 WL 2757119, at *11 (E.D. Mo. Sept. 20, 2007) cause of action for negligent or intentional failure to supervise clergy not barred by First Amendment; John Doe CS v. Capuchin Franciscan Friars, 520 F. Supp. 2d 1124, 1133–34 (E.D. Mo. 2007) Claim for church's fraudulent non-disclosure of prior sexual misconduct of cardinal allowed to proceed; Doe v. Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints, No. 1:09-CV-00351-BLW, 2012 WL 3782454, at *8–11 (D. Idaho Aug. 31, 2012) Claim against church defendants for constructive fraud due to failure to investigate and warn of church member's proclivity for child sex abuse allowed. Fiduciary duty a question of fact in Idaho.

Plaintiffs have the "plus factor" necessary for the Court to find a fiduciary duty due to the Brethren's constant reassurance that they will never lead members astray.

(2AC ¶144).[11]

3.  <u>Where there is no opportunity for internal resolution, and fraud can be determined without adjudicating the truth of religious doctrine, per Utah Open Court's provision, the Court should apply neutral principles of fraud and disclosure law to the 2AC claims.</u>

There is no other choice for Plaintiffs. Since there is no discussion, let alone an open forum on these issues with the Church, in part because there is no ecclesiastical judicature unlike most all Christian churches who have established canon law and levels of dispute resolution, the Court should apply neutral principles of law to the 2AC claims. In accordance with Utah's own law, Plaintiffs should be allowed to proceed against Defendant who has perpetrated a grand deceptive scheme with a vast reach. "All courts shall be open, and every person, for any injury done to him in his person, property or reputation shall have a remedy by due course of law." Utah Const. art. I, § 11, cited in Jeffs v. Stubbs Supra., at 1250.

**F.  ANALYSIS OF EACH 2AC CLAIMS REVEALS MOST ALL SURVIVE THE MTD.**

1.  <u>FIRST C/A: FRAUD IN THE INDUCEMENT TO CONTRACT.</u>

This claim is pleaded in three alternatives. First, the stone in the hat method of Book of Mormon "translation" with plates "usually covered" has now been admitted by LDS President Nelson as of May 2020 (2AC ¶162). The admission means that the decades of art in 2AC Ex. 7 are false statements. The rest of the fraud elements are easily proven, as demonstrated in the *LDSPFC* report (2AC Ex. No. 1) and COP's

---

[11] Unlike other churches whose leaders urge followers to trust in the Lord.

employee Prof. Sweat's comment (2AC ¶¶148, 263).

Alternatively, repeated promises that we will never lead you astray (2AC ¶371) is a promise that the Brethren in good faith believe their correlated rhetoric, including the depictions in Ex. 7. The stone in the hat process is not something that they only recently discovered (2AC ¶68, ¶152-54 & ¶261.) Rather, they intentionally misled Plaintiffs (2AC ¶225-26), and continued to do so (2AC ¶262) until President Nelson published his demonstrative video. Wherefore, their statements of belief are pleaded as the first element of a fraud claim; the fact that they do not believe as the second element, and so forth, there is  no violation of Ballard.

Finally, despite COP's claim (MTD pp 14-15), Plaintiffs did in fact allege City Creek statements were false. (2AC ¶381 & 382). Tithing, even if limited to interest on tithing, was the original source of the reserve funds.

2. <u>SECOND C/A: FRAUDULENT NONDISCLOSURE (BREACH OF DUTY TO DISCLOSE MATERIAL INFORMATION—no intent required)</u>

a. <u>The Second Cause of Action Bases Duty on a Number of Factors. The First is a  Partial or Misleading Representation.</u>

The Second Cause of Action alleges partial misleading representations as one of a number of bases giving rise to a duty to disclose. "Additionally, Plaintiffs had been subjected to ongoing numerous misleading or partial representations promulgated by COP." (2AC  ¶402 ¶404 and ¶¶ 439-41.)

The Court has ruled that: "The Church can be liable for fraud under an omission theory only if it has made a material statement that is misleading unless additional facts

are supplied." (Dkt 100 2nd Order p. 23)  Here the Church has acknowledged that its prior representations (Ex. 7) were misleading by demonstrating what really happened. (2AC ¶¶161-62.) We know that the artwork (2AC Ex. 7, ¶226, p. 96, ¶ 232, ¶243 p.105, ¶248, p. 109, ¶253, ¶262, pp. 116-18, etc.) was misleading because of Nelson's subsequent admission. Likewise, we know the First Vision art (2AC ¶213, p. 88-9, ¶243, p.105, ¶248, p.109, ¶252, etc.) was misleading because of the concealed handwritten account by Smith (2AC ¶210) which has now been disclosed, at least somewhat, in an essay (2AC ¶240-42). Utah law requires a "fair disclosure," Second Ed., CV 1807, Model Utah Jury Instruction.

That Smith committed adultery with over two dozen women was an established fact as of the late 19th Century. (Temple Lot affidavits (2AC ¶48 & table p.167 top row.) "Adultery was a crime in all states where [Smith] resided." (2AC p.18 table, top row, ¶264, 265, 364, 370, & 405). Yet COP represented Smith and Emma as a happy monogamous couple without disclosing his dozens of adulterous relationships (2AC ¶239, 246c, 255 and ¶368). COP later disclosed the relationships, characterizing them as polygamous in the buried essay re polygamy in Kirtland Ohio (2AC ¶246c), though Smith had yet to receive the revelation on polygamy (2AC ¶40). In short, the Court will not have to prove the truth of the initial representations in violation of Ballard in order to show that they were misleading absent additional material facts because Defendant has done that with its subsequent admissions.

It's clear COP knew that the above-referenced representations, as well as many others throughout the 2AC, were misleading long before it read the 2013 *LDSPFCR*

(2AC Ex. 1). "Some things that are true are not very useful." (2AC ¶214); The Book of Abraham is not what the Church claims (2AC ¶78); *Mormon Enigma* (an honest biography of Smith's wife, Emma Hale) must be suppressed (2AC (¶216-17); the lead plate was deaccessioned (¶274-279, including p. 129) and, although in Defendant's possession for more than a century (2AC ¶77) along with Smith's *Egyptian Grammar and Alphabet* (2AC ¶194, ¶429 including fn. 109 and 2AC Ex. No. 4), was not disclosed until 10/29/2018 (2AC ¶194 & ¶167 table, last row).

The longstanding concealment scheme proves that an internal dispute over history, at least one where lay members were invited, never occurred in the LDS Church. Those who openly questioned were excommunicated (2AC ¶217 Fawn Brodie & D. Michael Quinn).[12] Church historian Leonard Arrington was demoted (2AC ¶81). During his decade long tenure he was forbidden to write about some subjects (2AC ¶82). Had he been allowed to publish his history, there might have been a dispute amongst LDS members about it. However, from at least 1961 when Correlation was created, all those who attempted to enter a dialogue were censored by the LDS in leadership positions.

i.    <u>Stone v. SLC is Distinguishable from the Case at Bar</u>.

Alternatively, Plaintiffs argue that the extensive commercial use of tithing, including stockpiling over $160 billion dollars ($128 in EPA, 2AC ¶89, ¶139 and $32 billion in shell accounts, 2AC ¶124) should have been disclosed to make the prior

---

[12] Six scholars "[t]he September Six" were excommunicated in 1993 in part, for writing about LDS history.

representations as to tithing use a "fair" disclosure.

COP argues that Stone v. Salt Lake City, 11 Utah 2d 196, 356 P.2d 631 (1960) precludes the 2AC claims re tithing use (MTD 2AC p. 25). But Utah requires disclosure of all material facts in order to make the representations not misleading.

The Stone complaint sought to enjoin two real estate transactions. No fraud, whether affirmatively or by material omission, by the Church toward LDS member Stone was alleged. 1959 (for the year 1958) was the last time expenditures were disclosed (**See Exhibit One to this Opposition**). Thereafter, is when Defendant sold the subject property. The fact that the Church had disclosed expenditures for decades prior to this transaction is likely why the Court wrote that Mr. Stone was deemed to know how the Church was managed. Id. at 201.

ii.   COP has been Investing Excess Tithing (at least interest) Since 1963

In 1963 N. Eldon Tanner (a Canadian banker) who had been working as an assistant to the Q12 for the past few years decided to invest tithing reserves. The decision was not announced to LDS members (2AC ¶72). From then onward, the Church stockpiled excess tithing, unbeknownst to its members. Indeed for the 25 year period between 1985 and 2010 the Church donated only $1.3 billion in humanitarian aid (2AC ¶9 & ¶293). That is $53 million a year, just 5.3% of the billion dollars it stockpiles annually since at least EPA's creation in 1997 (Ex "A" last line, to 2AC Ex. 5).

b.   The Rest of the Relationship Factors give Rise to a Limited Fiduciary Duty.

COP's duty was to make a fair disclosure. It did not because subsequently disclosed facts have now made the partial disclosures more fair. Franco's abrogation,

"*Franco*, 2001 UT 25, ¶12, 21 P.3d 198" Williams v. Kingdom Hall  2021 UT 18, 491 P.3d 852, 857[13] means that finding a fiduciary duty between the Brethren and LDS members is not foreclosed. There are many factors which argue in favor of the Court finding a limited fiduciary duty in the relationship between the Brethren and Plaintiffs such that all material facts about the Church's founder, Joseph Smith, and how tithing is used should have been disclosed. Those factors are privity of contract (2AC ¶360-398, ¶402) confidentiality (2AC ¶286 & 290, 452), imbalance in knowledge, age, influence, bargaining power, etc. (2AC ¶402) factors listed in Yazd v. Woodside Homes Corp., 2006 UT 47, ¶¶ 16-17, 143 P.3d 283, 286–87, and an invitation to trust the Brethren (2AC ¶339-402) Combined, a limited fiduciary duty to disclose Smith's legal history (2AC table ¶36 & ¶410 & 413) should be found.

COP writes that "Plaintiffs' own allegations reveal that tithing itself (and the reasons people donate tithing) is inherently "rooted in religious belief." (MTD p. 14) That exercise is not challenged, but under a limited fiduciary duty theory COP had a duty to advise Plaintiffs of Smith's secular legal history and most assuredly as material of a fact as a defective soils report is to a buyer of real estate. Had Plaintiffs known these things about the Smith, they might not have decided to commit or tithe to the Church.

The Church's disclosure that it has used tithing for commercial development since the days of the Brigham Young supports the argument that it should be subject to

---

[13] Williams. v. Kingdom Hall, 2021 UT 18 is briefed in more detail in Motion for Leave to File Overlength Memo in Support of Motion for Leave to File 2AC Dkt # 101, pps. 2-3

commercial disclosure requirements which Utah has found in real estate and other transactions.[14]

Additionally, and/or alternatively, had COP disclosed that it used tithing for commercial use and to build a hedge fund that is unrelated to the three or four fold mission of the Church (¶ 8, 21, 83, 174) contrary to its representations (2AC ¶ 229-230, 233, 237-238, 244-245, 258, 260, 273 & 283-284 this would have been a substantial factor affecting Plaintiffs' decision to tithe and commit their time and support to the Church.

The Sixth Circuit found the Frist Amendment was not a defense to Plaintiffs' claims against a church founder who used the religion as a pretense to satisfy his greed and lust. Hansel v. Purnell, 1 F.2d 266, 270 (6th Cir. 1924)  justified and. The case was discussed in depth in Motion for Leave to File 2AC, Dkt 105, pps 14-16. The Court was and is urged to consider the case and portions cited therein as persuasive with regard to Defendant's management style of hiring lawyers and business men, and those trained in organizational behavior (2AC ¶132), lack of professionally trained clergy (¶257), CES administered uniform system of censorship (¶125), lack of an internal dispute system (with the exception of local disciplinary councils) (2AC  ¶113-14, chart, p 47) and greed (net worth of $400 billion ¶357) while donating just 1.3 billion from 1985-

---

[14]  Huntsman v. Corp. of the President of the COJCOLDS, Case 2:21-cv-02504-SVW-SK, Dkt. 35-2, Declaration of Paull Rytting who writes about tithing used to fund ZCMI, the Hotel Utah, Deseret News, Deseret Book and the Deseret Gymnasium, which have always been characterized for members as profit-making businesses that are run independent of tithing (2AC ¶116)

2010 (2AC ¶ 293), which is just 5.3% of the billion it donates annually to EPA. (All this in light of Utah's shameful ranking as the leader by far in Ponzi Schemes for 2008-2018 (2AC ¶22-23 and chart, p. 13) mostly due to LDS affinity fraud.

3. THIRD C/A:  FRAUDULENT CONCEALMENT (INTENTIONAL)

The only difference between this claim and the Second Cause of Action is intent. Though  Marcantel v. Michael & Sonja Saltman Fam. Tr., 993 F.3d 1212, 1232 (10th Cir. 2021) has found that the Utah Supreme Court in *Anderson v. Kriser* didn't graft a fourth element onto the three elements that must be proved to prevail on a fraudulent nondisclosure claim, *Jensen v. Cannon*, 473 P.3d 637, 644 (Utah Ct. App. 2020),  . Jensen, id. is confusing. Fraudulent concealment, as opposed to nondisclosure, would seem to require an express element, and finding of intent to deceive, especially for purposes of sufficient evidence to allow a jury to consider exemplary damages for fraud.

The following language applies to the intentional concealment of items and information in this case. "Making use of a device that misleads, some trick or contrivance that is intended to exclude suspicion and prevent inquiry, may also amount to fraudulent concealment. It is this aspect of fraudulent concealment that is at issue in the instant case. Jensen v. IHC Hosps., Inc., 944 P.2d 327, 333 (Utah 1997), on reh'g (Aug. 22, 1997)  The intent aspect will also be briefed in conjunction with RICO, below.

4. FOURTH C/A: CONSTRUCTIVE FRAUD BASED ON BREACH OF PROMISES OF FUTURE PERFORMANCE

COP writes that Utah does not recognize this type of claim (MTD p. 18) Counsel is incorrect. 2AC ¶451-62 allege elements for deceit as recognized in Utah.

**CV1805 Promises and statements of future performance.**
A promise about a future act is a false statement of fact if plaintiff proves that defendant:
(1) never intended to keep the promise; and
(2) made the promise for the purpose of deceiving [name of plaintiff].

Second Ed., CV 1805. Model Utah Jury Instructions.

One who promises another to act in the future as an inducement to perform

some present act, impliedly asserts a present intent to carry out his promise. Hull v.

Flinders, 83 Utah 158, 27 P.2d 56, 57–58 (1933). See also Cerritos Trucking Co. v.

Utah Venture No. 1, 645 P.2d 608 (Utah 1982).

Plaintiffs were induced to commit their lives to the COJCOLDS (2AC ¶458-60) by

the Brethren's promises that they would "never lead them astray" (2AC ¶144). Whatever

else that phrase might mean, it at least means that the Brethren promised to act in good

faith toward its members. However, at the time the promises were made, COP had

numerous items concealed which it never intended to  disclose to its members.

Additionally, it hired artists to create the misleading representations in its artwork,

particularly with regard to the items used in Book of Mormon translation (2AC ¶147,

167, Exhibit 7). It was only due to information leaked online that Def. was forced to

make the disclosures that it has made over the last several years.

5.  <u>FIFTH C/A: BREACH OF THE UTAH CHARITABLE SOLICITATIONS ACT</u>

The defense claims that the *Utah Charitable Solicitations Act* does not allow a

private right of action (MTD at 23). Concededly, U.C.A. §13-22-4 is vague. Assuming

arguendo that COP is correct, the statute at least demonstrates an intent by the State of

Utah that churches are not exempt from a fair disclosure in the context of their

solicitations, with damages which exceed those limited by the statute.

6.    SIXTH CAUSE OF ACTION: CIVIL RICO —18 U.S.C. § 1962(c)

a.   The Claim Contains Affirmative Misrepresentations that are False

Defendant claims that the activity alleged in the 2AC doesn't meet the elements of a RICO claim (MTD pps 24-25). It claims ¶291-301 similarly fail to allege a pattern of activity (MTD 25) These paragraphs allege the scheme to defraud and incorporate by reference all acts & omissions described in prior paragraphs (2AC ¶481). However, the reference to ¶140 to 290 is confusing especially in light of ¶481 and should be replaced to read "**as alleged in paragraphs 1-480, inclusive.**" This will be part of the Motion to Supplement.

Plaintiffs note COP's claim that certain allegations upon information and belief are insufficient under FRCP 9 (MTD p. 9 & 16). Therefore, the bases for those allegations will be provided in a motion to supplement filed soon.

The following are affirmative representations claimed to be false:

- 2003: President Hinckley's statement re no tithing used in City Creek. (2AC ¶237); and

- *2006 and 2007:* COP owned *Ensign* & *Deseret News* make statements that no tithing is used for City Creek  (2AC ¶ 244); and

- 2012 COP agent Keith McMullin's statement to Bloomberg writer Carolyn Winter, published in the *Salt Lake Tribune* in 2012 that "not one penny of tithing goes to the church's for-profit endeavors." (2AC ¶ 258.) Interest on tithing can be construed by a reasonable person as included in the word, "tithing;" and

- 2016 If allowed, the Motion into Supplement will add the annual affirmative misrepresentations that donations "have been recorded and administered in

accordance with appropriate accounting practices, when EPA receivables have been deleted. (2AC ¶ 90-91).

b.  The Federal Mail & Wire Fraud Statutes Recognize Material Omissions.

The Supreme Court has held "material omissions" sufficient to constitute fraud under the federal mail and wire fraud statutes. *Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999). Material omissions are those reasonably calculated to deceive persons of ordinary prudence, *United States v. Brown,* 79 F.3d 1550, 1557 (11th Cir. 1996) (construing mail fraud statute). A material misrepresentation is one having a natural tendency to influence, or capable of influencing, the decision maker to whom it is addressed. *Neder,* 527 U.S. at 16, 119 S.Ct. at 1837.

A scheme to defraud by false representations may be accomplished by patently false statements or statements made with a reckless indifference as to their truth or falsity, and deceitful concealment of material facts may constitute actual fraud. *Williams v. United States,* 368 F.2d 972, 975 (10th Cir.1966), *cert. denied,* 386 U.S. 997, 87 S.Ct. 1317, 18 L.Ed.2d 345 (1967); *Gusow v. United States,* 347 F.2d 755, 756 (10th Cir.), *cert. denied,* 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). "[E]ven though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations." *United States v. Themy,* 624 F.2d 963, 965 (10th Cir.1980) (fraudulent intent is required) United States v. Cochran, 109 F.3d 660, 665 (10th Cir. 1997). See also United States v. Welch, 327 F.3d 1081, 1104–06 (10th Cir. 2003).

c.   Below are Misleading Tithing Representations Due to Omissions.

The 2AC itemizes numerous misleading representations re tithing that omit material facts that tithing (at least interest on tithing) was used extensively for investment and  commercial development, including to fund EPA (2AC ¶85, Ex. No. 5) and the 13 LLCs created in 2016 (2AC ¶266) that had a combined value of $32,769,914,000 in 2017.

EPA's Roger Clarke's statement which David Nielsen heard that it was important that "people should not know EPA's role as the source of the funds" (Dkt. 110-5, 2AC Ex. No. 5, ¶10 is more evidence of COP's intent to deceive its members.

The acts in the scheme purely related to financial disclose are:

- <u>1997</u> Funding EPA with tithing (2AC Exhibit no. 5, including Ex."A")
- <u>2003</u>  President Hinckley misrepresentations on City Creek (2AC ¶ 237)
- <u>2007</u> COP publications, the *Ensign* and *Deseret News* on City Creek.(2AC ¶244)
- <u>2009</u> Bail out of Beneficial Life using $600 million of tithing (at least interest if not principal) (2AC ¶116 and Exhibit 5, Dec. of David Nielsen, ¶¶9 & 10 & ex. "A" attached thereto & ¶139. Specific to RICO: ¶293, ¶532)
- <u>2012</u>  COP agent Keith McMullin's statement to Bloomberg writer Carolyn Winter, published in the *Salt Lake Tribune* in 2012 that "not one penny of tithing goes to the church's for-profit endeavors." (2AC ¶ 258) This is at least a partial misleading statement, if not an affirmative representation, because as admitted by the Church reserves are interest on tithing.
- <u>2016</u>  Creation of 13 companies to deceive its members and others about the amount of tithing it had accumulated and how LDS tithing is used. (2AC ¶266)
- <u>2016 </u> If allowed, the Motion into Supplement will add the annual affirmative misrepresentations that donations "have been recorded and administered in

accordance with appropriate accounting practices, when EPA receivables have been deleted. (2AC ¶ 90-91).

Material Omissions in addition to the financial omissions as a proof of Defendant's fraudulent scheme, are the concealed stones, artifacts, primary manuscripts, documents and information (2AC ¶404 table, ¶142 & 187), lack of sincere belief in many of their correlated representations (2AC ¶224 & 214) despite inviting Plaintiffs' trust by Church leaders promising that would never lead them astray (2AC ¶144), Smith's legal history demonstrating an immoral character (2AC ¶36) and the numerous other 2AC.

The mail and wires were used to transfer tithing or interest on tithing, money that was fraudulently obtained among and between these accounts through a pattern of racketeering (2AC ¶291-301)

In addition to the affirmative misrepresentations of fraud re City Creek, the failure to disclose that $600 million of tithing (even if just interest on tithing) was used to bailout of Beneficial Life in or about 2009 is a material omission sufficient to be part of a RICO scheme (2AC ¶118 and Exhibit 5, Dec. of David Nielsen, ¶9 & 10 & ex. "A" thereto & ¶139, specific to RICO (2AC ¶293, ¶532) is an act sufficient to be part of a RICO scheme.

Concealment of information and items related to history and creation of scripture is an intentional tort that is arguably recognized under the federal mail and wire fraud statutes for purposes of Rico. This too, does not require any adjudication of doctrine, only a description of the material items allegedly concealed and then a question to a

jury as to whether a reasonable person would have wanted to know about the existence of these items prior to committing to the church.

    d.  <u>Whether the Phrase "Earnings on Invested Reserve Funds" is misleading is a Jury Question.</u>

Whether Defendant had a duty to disclose additional facts so as to not make the prior representations misleading is the Court's decision, but whether the phrase "earnings on invested reserve funds" would be understood by a reasonable person to include investments on *tithing* is a jury question, especially given the ages and experience of named Plaintiffs (Gaddy was not born until 1985, Harris would have been a teen and Small in graduate school) and the misleading representations after 1991 and 1995 priesthood enough to disclose that tithing is the original source of those reserve funds such that it can be decided on a 12(b)(6) motion or is this a question of fact for the jury? Likewise, are two speeches at priesthood meetings in the early and mid-nineties sufficient disclosure and can that issue be decided on an MTD? (MTD, p. 17, n 4)

    7.  <u>SEVENTH C/A: INTENTIONAL (RECKLESS) INFLICTION OF EMOTIONAL DISTRESS</u>

Defendant urges dismissal of the IIED claim (MTD p. 28). This tort is a neutral law of general applicability. Whether an act is outrageous is a question of fact for the jury. Intentionally COP approved burying essays that disclose material facts about LDS history after being presented with the LDSPFCR that 3,000 disaffected LDS have been devastated suffering existential crises, suicidal ideation, destruction of familial relationships, insomnia, anxiety, and depression (2AC ¶17, Exhibit 1) is religiously

motivated conduct not protected by the CAD.

**G. DEFENDANT'S MOTION TO STRIKE SHOULD BE DENIED**.

COP argues that all references to non-secular matters be stricken. Because the court

has ruled that Plaintiffs cannot base any claim on religious teachings. (MTD 26-27) It

then cites N.L.R.B. v. Cath. Bishop of Chicago, 440 U.S. 490, 99 S. Ct. 1313, 59 L. Ed.

2d 533 (1979) which held that in the absence of a clear expression of Congress' intent

to bring teachers in church-operated schools within the jurisdiction of the Board, the

NLRB  Act did not authorize the Board to exercise jurisdiction over lay faculty members

at the church-operated schools. Id However NLRB was an administrative law, and not a

neutral law of general applicability.

However, under Employment Div., Dep't of Human Res. of Oregon v. Smith, 494

U.S. 872, 877–80, *supra*., neutral, generally applicable laws may incidentally burden

religion, These are the types of laws in the 2AC that require compliance by Defendant

unless specifically excepted. These laws have not been excepted under the CAD. The

2AC alleges that Def's *religiously motivated conduct* is in violation of fraud laws.

Plaintiffs do not seek to determine whether Smith translated the gold plates by the gift

and power of God into the Book of Mormon. Plaintiffs challenge Church's religiously

motivated conduct in promulgating since the 1960s-early 1970s misleading rhetoric,

statements, writing and especially commissioned artwork, that were not a fair

representation of LDS history. Defendant has now admitted that they posses previously

concealed stones, artifacts, primary manuscripts, documents and information material to

LDS history and thus material to Platinffs' decision to commit to the Church.

The rule in Employment Div. v. Smith that neutral, generally applicable laws may incidentally burden religion is the rule applicable to the facts of this case. Though urged to reconsider Employment Div. v. Smith by many attorneys working for religious organizations, Fulton v. City of Philadelphia, Pennsylvania, 141 S. Ct. 1868, 210 L. Ed. 2d 137 (2021) left its law intact but distinguished the case at bar in finding that the Philadelphia law requiring same sex couples be allowed to adopt was not neutral and generally applicable because it allowed for exceptions to the anti-discrimination requirement at the sole discretion of the Commissioner. The law was found to be a burden in violation of the agency's religious exercise by putting agency to choice of curtailing its mission or approving same sex couple relationships inconsistent with its beliefs;

Certainly, Fed. R. Civ. P. 12(f) striking allegations from a pleading is discretionary, but striking part of a pleading is a drastic remedy, narrowing the case without the benefit of an evidentiary record. See 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1380 (3d ed. 2019). The moving party must show that "that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration [ ] and that their presence in the pleading throughout the proceeding will be prejudicial to the moving party." Zemaitiene v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, No. 2:16-CV-1271, 2019 WL 10817152, at *1–3 (D. Utah June 19, 2019)

## H. CONCLUSION.

Def. has admittedly, by subsequent acknowledgment of additional material facts,

made certain partial and misleading representations during the lifetimes of Plaintiffs. Therefore, Def. would not be "put to the proof of their religious doctrines or beliefs," as forbidden in <u>Ballard</u> 322 U.S. 78, 86.

Additionally, since there was no internal dispute in the LDS Church, this case does not seek "civil court review of an internal church dispute involving matters of faith, doctrine, etc." <u>Bryce, 289 F.3d at 655</u>. Therefore, there is no basis for application of the CAD. COP's decades of religiously motivated conduct makes it a Free Exercise Case that requires balancing.

Additionally or alternatively, in conjunction with the Court's prior ruling that affirmative misrepresentations re City Creek are actionable, Plaintiffs argue that annually representing the Church  used "appropriate accounting principles." (2AC 69) is another affirmative misrepresentation. Material omissions with respect to tithing use is also justiciable based on Defendant's failure to fairly disclose that it used tithing to create "investment on reserves, or reserve funds.

Wherefore, Plaintiffs request that the Court deny the Motion to Dismiss and Motion to Strike. [15]

Dated this 10th Day of Dec, 2021                              Respectfully submitted,

by,

/S/ Kay Burningham

*Attorney for Laura A. Gaddy, Lyle D.*
*Small and Leanne R. Harris*

---

[15] 9, 499 words excluding items set forth in the local rules.