UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 96951 / February 21, 2023

ADMINISTRATIVE PROCEEDING
File No. 3-21306

| | |
|---|---|
| In the Matter of<br><br>ENSIGN PEAK ADVISORS, INC.,<br>and<br>THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS<br><br>Respondents. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Ensign Peak Advisors, Inc., and The Church of Jesus Christ of Latter-day Saints ("Respondents").

II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

From 1997 through 2019, Ensign Peak Advisors, Inc. ("Ensign Peak"), an entity which manages the assets, including the investment securities, of The Church of Jesus Christ of Latter-day Saints (the "Church"), failed to file with the Commission certain required forms ("Forms 13F") that would have disclosed the size of the Church's equity portfolio to the Commission and the public. Instead, the Church and Ensign Peak created thirteen limited liability corporations ("LLCs"), including twelve similar LLCs (the "Clone LLCs") with addresses located throughout the U.S., for the sole purpose of filing Forms 13F and preventing public disclosure by Ensign Peak of the Church's equity securities holdings. The Forms 13F that Ensign Peak filed in the names of these LLCs misstated, among other things, that they had sole investment and voting discretion over the listed securities, when Ensign Peak at all times retained discretion over all investment decisions.

Ensign Peak developed its approach to filing Forms 13F in the names of these LLCs with the knowledge and approval of the Church, which sought to avoid disclosure of the amount and nature of its assets. Through their institutionalized use of this approach for almost twenty years, Ensign Peak's significant role in the securities markets as an institutional investment manager was not disclosed to the Commission, the markets, and the investing public as required by Section 13(f) of the Exchange Act and Rule 13f-1 thereunder.

### Respondents

1. **The Church of Jesus Christ of Latter-day Saints** is a Utah corporation sole, headquartered in Salt Lake City, Utah, which was organized and operated to carry out the purposes of the faith known as The Church of Jesus Christ of Latter-day Saints. The Church has over 16 million members in more than 30,000 congregations across 160 countries. As referenced in this Order, "senior leadership of the Church" consists of the Church's First Presidency and Presiding Bishopric.

2. **Ensign Peak Advisors, Inc**. is a Utah nonprofit corporation headquartered in Salt Lake City, Utah. Ensign Peak is responsible for investing and managing the reserves of the Church. Ensign Peak is governed by a Board of Trustees, consisting of members of the Church's Presiding Bishopric and the Managing Director of Ensign Peak. Ensign Peak's Managing Director is appointed by the Church's First Presidency and reports to the senior leadership of the Church. Ensign Peak is exempt from registration as an investment adviser with the Commission under Section 203(b)(4) of the Investment Advisers Act of 1940, which exempts investment advisers that are charitable organizations that also solely advise other charitable organizations.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

## Facts

### Ensign Peak's Form 13F Filing Requirement

3. The Church created Ensign Peak in 1997 as an integrated auxiliary of the Church to manage the Church's investment securities. Ensign Peak has no shareholders or members. The securities portfolio managed by Ensign Peak consists of what the Church calls "reserve funds" or "reserves," which include U.S. equity and debt securities purchased with excess tithing, income and returns generated by Ensign Peak, and the assets of other Church integrated auxiliaries. Ensign Peak does not charge the Church management fees.

4. Section 13(f) of the Exchange Act and Rule 13f-1 thereunder require that institutional investment managers file Forms 13F with the Commission on a quarterly basis if they exercise investment discretion over at least $100 million in securities that are traded on a national securities exchange or on the automated quotation system of a registered securities association ("Section 13(f) Securities"). Pursuant to Rule 13f-1(b), an investment manager is deemed to exercise discretion over all accounts for which any person or entity under the control of the investment manager exercises investment discretion. Form 13F requires such institutional investment managers, among other things, to disclose to the Commission the fair market value of its Section 13(f) Securities under management. Forms 13F filed with the Commission are available to the public for review.

5. Throughout its history, the securities portfolio Ensign Peak managed for the Church contained a wide range of equity and fixed income assets. At its inception, Ensign Peak managed approximately $7 billion of Church assets, a significant percentage of which consisted of Section 13(f) Securities. The portion of Section 13(f) Securities in the portfolio grew to approximately $37.8 billion by 2020.

6. Throughout its history, Ensign Peak was required to file Forms 13F identifying and providing certain information about the Section 13(f) Securities that it managed for the Church.

### Formation of the Form 13F Filing Entities

7. By at least 1998, senior management at Ensign Peak was aware of Ensign Peak's requirement to file Forms 13F and communicated this requirement to senior leadership of the Church.

8. To prevent disclosure of the securities portfolio managed by Ensign Peak, the Church approved Ensign Peak's plan of using other entities, instead of Ensign Peak, to file Forms 13F. The Church was concerned that disclosure of the assets in the name of Ensign Peak, a known Church affiliate, would lead to negative consequences in light of the size of the Church's portfolio. Ensign Peak did not have the authority to implement this approach without the approval of the Church's First Presidency.

9. In 2001, at Ensign Peak's recommendation, the Church created a trust, and a separate LLC under the ownership of the trust, to file Forms 13F. The Church designated Ensign Peak's Managing Director as the trustee. Ensign Peak filed the first Form 13F identifying the Church's Section 13(f) Securities in the name of the trust's LLC. Senior leadership of the Church approved the creation of the first LLC to file Forms 13F.

10. The first LLC was assigned a location in Glendale, California, although it conducted no business at that site. Ensign Peak signed an investment management agreement ("IMA") with the LLC, and certain of Ensign Peak's employees were assigned to be investment managers for the LLC. However, notwithstanding the IMA, Ensign Peak failed to transfer investment discretion to the LLC. Ensign Peak filed the first Form 13F in the name of this LLC on February 26, 2003, for the year ended December 31, 2002. Ensign Peak filed later Forms 13F using the name of the LLC through the quarter ended September 30, 2006.

11. On March 15, 2005, the Church became aware that the public might link this first LLC to the Church because the person signing the Forms 13F was listed in a public directory as a Church employee. To address this issue, on March 21, 2005, the senior leadership of the Church approved a new reporting entity to be created with "better care being taken to ensure that neither the 'Street' nor the media [could] connect the new entity to Ensign Peak."

12. On December 1, 2005, Ensign Peak formed a second LLC as a Delaware nonprofit corporation, located in Wilmington, and named Ensign Peak's Managing Director as its general manager. Ensign Peak then filed Forms 13F in the name of this new LLC.

13. Several years later, in 2011, Ensign Peak became concerned that its portfolio had become so large that the Form 13F filings it made using the name of the second LLC might attract unwanted attention and sought the Church's approval to form additional LLCs to file Forms 13F. On May 19, 2011, the Church's senior leadership approved Ensign Peak's recommendation to "clone" the second LLC to create new Form 13F filers.

14. After obtaining Church approval, Ensign Peak formed new Clone LLCs for the purposes of filing Forms 13F. Five new entities were formed and given Delaware addresses, although none conducted business in Delaware.

15. In 2015, Ensign Peak became aware that a third party appeared to have connected the holdings of various LLCs back to Ensign Peak. Ensign Peak brought this issue to the attention of the Church. The senior leadership of the Church approved Ensign Peak's recommendation to "gradually and carefully adapt Ensign Peak's corporate structure to strengthen the portfolio's confidentiality."

16. On November 6, 2015, the senior leadership of the Church approved Ensign Peak's plan for the creation of additional Clone LLCs to further prevent disclosure of the Church's holdings managed by Ensign Peak. Ensign Peak formed six additional Clone LLCs, bringing the total to twelve.

**Structure and Management of the Clone LLCs**

17. Ensign Peak had authority over all of the LLCs throughout their existence. The Church also had indirect authority over all of these LLCs since the Church controlled Ensign Peak and approved the approach of using the LLCs to file Forms 13F (the "LLC Structure").

18. The Clone LLCs also entered into IMAs with Ensign Peak, whereby Ensign Peak was designated as the Clone LLCs' client. These IMAs assigned discretion and authority to manage the securities portfolio to the LLCs. The Managing Director of Ensign Peak signed each IMA on behalf of Ensign Peak. In his capacity as General Manager of the Clone LLCs, he also signed the IMAs on behalf of each relevant Clone LLC.

19. Despite the provisions in the IMAs stating that the Clone LLCs would have management authority, the Clone LLCs never exercised investment discretion over the Church's assets. Although Ensign Peak designated several of its own investment managers to serve as investment managers for each Clone LLC, these investment managers continued to manage the Section 13(f) Securities on behalf of Ensign Peak. They did not know which assets were allocated to the Clone LLCs and performed no functions for the LLCs outside of their existing responsibilities for Ensign Peak.

20. Many of the IMAs also contained a provision addressing proxy voting, stating that the LLC was not authorized to vote by proxy or otherwise any of the securities and property held in the securities portfolio assigned to it. Rather, each Clone LLC was required to forward any proxy solicitation materials and consent solicitations it received to Ensign Peak for consideration and action.

21. Each Clone LLC was set up with a "Business Manager," who, according to the terms of the LLC agreements, had responsibility for "the preparation and filing of the Company's governmental reports, returns, notices and the like, including reports required by law of investment managers or entities exercising investment discretion." However, the Business Managers performed no functions for the Clone LLCs outside of signing the Form 13F signature pages each quarter.

22. Ensign Peak was responsible for designating the Clone LLCs' Business Managers, many of whom were Church employees. Business Managers were selected because they had common names and a limited presence on social media, and were therefore less likely to be publicly connected to Ensign Peak or the Church. Ensign Peak provided the Business Managers very limited information about the Clone LLCs or why they were created.

23. Each Clone LLC was given an address outside of Utah although none of them conducted any business at those locations other than the receipt of mail. Ensign Peak chose multiple locations across the country for these purported offices to create the impression that the Clone LLCs conducted business operations throughout the U.S., making it more difficult to trace the Clone LLCs back to Ensign Peak or the Church.

24.     Each Clone LLC was also assigned a local phone number that would go directly to voicemail. An Ensign Peak senior manager instructed a Business Manager of one of the Clone LLCs to notify him of all voicemails from regulatory agencies to any of the Clone LLCs, but to delete all others.

### Ensign Peak Filed Misstated Forms 13F

25.     After the Clone LLCs were formed, Ensign Peak prepared and filed Forms 13F with the Commission under the names of the Clone LLCs.

26.     To prepare the filings, Ensign Peak maintained a list of all Section 13(f) Securities within its portfolio, and allocated these securities to the various Clone LLCs. Ensign Peak allocated newly-held Section 13(f) Securities to a Clone LLC at the end of a quarter, and also reallocated other Section 13(f) Securities to new LLCs as the number of LLCs increased. Ensign Peak's senior management then drafted the Forms 13F and filed them, generally before obtaining the Business Managers' signatures.

27.     Each Form 13F filed in the name of a Clone LLC misstated that the LLC had sole investment discretion for the securities listed, that there were no other managers for these securities, and that the Clone LLC had sole voting discretion over these securities. Even though the IMAs stated that Ensign Peak had delegated investment discretion, Ensign Peak continued to manage the entire portfolio and at all times maintained investment and voting discretion over all the securities listed in the Forms 13F.

28.     Each Form 13F was signed by the designated Business Manager. The signature page stated, "The institutional investment manager filing this report and the person by whom it is signed hereby represent . . . that all information contained herein is true, correct and complete[.]" However, Ensign Peak provided the Business Managers with insufficient information about the Clone LLCs or the securities assigned to them that would enable the Business Managers to make this representation. When Ensign Peak obtained the Business Managers' signatures for the Forms 13F, Ensign Peak gave the Business Managers only the signature pages of the Forms 13F and not the complete documents. In addition, the Forms 13F were often filed with electronic signatures before Ensign Peak actually obtained the Business Managers' handwritten signatures.

29.     Each Form 13F also misstated that the Business Manager signed the Form 13F from the address listed on the signature page. In fact, all Business Managers were located in Salt Lake City, and the addresses on the forms were used to convey the impression that the Clone LLCs were located across the country.

30.     The Church and Ensign Peak understood that Ensign Peak continued to make investment and voting decisions relating to the portfolio, and that the LLC Structure was created for the sole purpose of filing Forms 13F.

31.     Throughout its history, at least once each year, Ensign Peak's Managing Director met with the senior leadership of the Church to discuss Ensign Peak's activities, including at times the LLC Structure. Unanimous approval from the senior leadership of the Church was required

before Ensign Peak could deviate from the LLC Structure and file Forms 13F in Ensign Peak's own name.

32.     The Church and Ensign Peak continued to take the same approach to filing Forms 13F through the Clone LLCs despite two Church Audit Department ("CAD") internal audits of Ensign Peak – one in 2014 and one in 2017—that reviewed the LLC Structure. In discussions with Ensign Peak's senior management, although CAD did not recommend specific changes to the LLC Structure, CAD highlighted the risk that the SEC might disagree with the approach.

### The LLC Structure Was Made Public

33.     In May 2018, a public website reported that various entities that appeared to have ties to the Church had filed Forms 13F revealing holdings of approximately $32 billion. The website referenced evidence indicating that these entities' domain names were all registered to an entity tasked with overseeing and protecting the intellectual property of the Church, and that each of the LLCs identified listed a Business Manager whose name matched that of a Church employee.

34.     After the website reported this information, two Business Managers resigned their roles, voicing concerns about what they had been asked to do. Rather than changing the LLC Structure, two new Business Managers were assigned to replace the two who resigned.

35.     Ensign Peak continued to file Forms 13F through the Clone LLCs until February 14, 2020, when Ensign Peak filed a consolidated Form 13F for the quarter ended December 31, 2019. Ensign Peak's Form 13F consolidated securities previously listed on the various Forms 13F filed in the names of the Clone LLCs. Ensign Peak's first Form 13F disclosed its management of 1,659 Section 13(f) Securities valued at approximately $37.8 billion.

### Violations

36.     As a result of the conduct described above, Ensign Peak violated Section 13(f)(1) of the Exchange Act and Rule 13f-1 thereunder by failing to file Forms 13F in Ensign Peak's name. Ensign Peak also violated Section 13(f)(1) of the Exchange Act and Rule 13f-1 thereunder by filing misstated Forms 13F in the names of LLCs created for the sole purpose of filing Forms 13F.

37.     As a result of the conduct described above, the Church caused Ensign Peak's violations of Section 13(f)(1) of the Exchange Act and Rule 13f-1 thereunder.

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that:

A. Pursuant to Section 21C of the Exchange Act, Respondent Ensign Peak shall cease and desist from committing or causing any violations and any future violations of Section 13(f) of the Exchange Act and Rule 13f-1 promulgated thereunder;

B. Pursuant to Section 21C of the Exchange Act, Respondent the Church shall cease and desist from committing or causing any violations and any future violations of Section 13(f) of the Exchange Act and Rule 13f-1 promulgated thereunder;

C. Ensign Peak shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $4,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

D. The Church shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $1,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

E. Payment must be made in one of the following ways:

(1) Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Respondent's name as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Tracy Combs, Regional Director, Division of Enforcement, Securities and Exchange Commission, 351 S. West Temple, Suite 6.100, Salt Lake City, UT 84101.

F. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve

8

the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary