Kay Burningham (#4201)
kay@kayburningham.com
299 South Main Street #1375 Salt
Lake City, Utah 84111
Phone: 1.888.234.3706

*Attorney for Plaintiffs Laura A. Gaddy,
Lyle D. Small and Leanne R. Harris*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **LAURA A. GADDY**, **LYLE D. SMALL** and **LEANNE R. HARRIS**, individually and on behalf of all others similarly situated, | **PROPOSED THIRD AMENDED CLASS ACTION COMPLAINT** |
| *Plaintiffs,* | (DEMAND FOR JURY TRIAL) |
| v. | Case Number: **2:19-cv-00554-RJS-DBP** |
| **CORPORATION of THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,** a Utah corporation sole, and DOES 1-50 | Chief Judge: Robert J. Shelby |
| *Defendant.* | Chief Magistrate Judge: Dustin B. Pead |

## I  NATURE OF THE CASE

1.      Plaintiffs LAURA GADDY ("GADDY"), LYLE SMALL ("SMALL") and LEANNE

HARRIS ("HARRIS"), bring this case on behalf of hundreds of thousands of Mormons

who have resigned from the Mormon *aka* "LDS" Church, against [the] Corporation of the

President of the Church of Jesus Christ of Latter-day Saints ("COP"). The Church of Jesus

Christ of Latter-day Saints™ ("COJCOLDS" or "Church"), is a COP-owned trademark. [1]

---

[1] According to some researchers, Joseph Smith hoped the *Book of Mormon* would bring him "MORe-MONey,"

2.      The case concerns COP's decades long scheme whereby it mispresented how members' tithing was and would be used during the lives of Named Plaintiffs and all potential class members, while requiring 10% of their income, which would ostensibly be used for religious purposes, in order to gain full access to LDS member benefits. The Church's benefit of the bargain was to ensure a continual stream of tithing revenue to  not only pay for religious expenses of temple and building maintenance, LDS publications, missionary work, etc., but also unbeknownst to its faithful members, to expand the commercial holdings, both in mostly liquid hedge fund accounts, shell LLCs where billions were stashed without apparent connection to the church and commercial real estate, of the Mormon Corporate Empire ("MCE").

3.       COP through its agents, the Brethren and local lay leaders, conceived and carried out this scheme while preaching to its followers principles of honesty, including full disclosure, and individual free agency, as important religious principles that all LDS should live by and that are unique to the purportedly divine authority of the LDS Church.

4.      Ever since Joseph Smith bought and resold land in Jackson County Missouri to LDS Church member pioneers at inflated prices, Defendant leaders have been focused on financial success. Indeed, over three-quarters of the Sections of the original Doctrine and Covenants a key LDS scripture considered second only to the Book of Mormon, refers to financial interests of the church, including commandments.

5.      From 1915 to 1959, COP disclosed key internal financial information about tithing receipts and church expenses to its members and to the public. This practice ended after a period of deficit spending and investment losses. Since 1959, Church finances have not been voluntarily disclosed to either the average tithe-paying member or to the public.

6.      In 1857 LDS President Brigham Young boasted that [the Church] has "the greatest and smoothest liars in the world." [2]

7.      In a 1981 speech to CES teachers given at BYU, Apostle Boyd K Packer said: "Some things that are true are not very useful." And "We are required to tell the truth, but we are not required to tell the whole truth." [3]

8.      According to Ken Clark, a former decades long CES employee instructor, "…when the church or its leaders needed protection, it was, and is, okay to fib, deceive, distort, inflate, minimize, exaggerate, prevaricate or lie." [4]

9.      However, since the mid-20th Century Defendant has publicly disavowed a sincerely held religious belief or exercise of "Lying for the Lord,"

> "I suppose most mortals employ some exaggeration and a little of what someone called "innocent after-mindedness." But does this mean we condone deliberate and important misrepresentations of fact in a circumstance in which they are clearly intended to be believed and relied upon? Never! Lying is sinful, as it has always been, and there is no exempt category for so-called "lying for the Lord." Lying is simply outside the range of permitted or condoned conduct by Latter-day Saints—members or leaders." [5]

---

[2] Journal of Discourses, 4: 77, Brigham Young, 1857.

[3] Boyd K. Packer, "The Mantle is Far, Far Greater Than the Intellect," 1981, *BYU Studies*, Vol. 21, No. 3, pp. 259-271) and given in an address to religious educators at a symposium on the Doctrine and Covenants and Church history, Brigham Young University, 22 August 1981.

[4] Ken Clark, "Lying for the Lord." p. 40. Nov. 14, 2012. http://www.mormonthink.com/files/lying-for-lord-ken-clark.pdf. Published in 2008, updated 2012.

[5] Dallin H. Oaks, "Gospel Teachings About Lying," BYU Fireside Address, 12 Sept. 1993; *Clark Memorandum* [J. Reuben Clark Law School, BYU] (Spring 1994).

10.       From 2008-2018, Utah was the nationwide leader in affinity fraud. According to experts it leads by more than two-thirds ahead of the next state, which was Florida. The majority of Utah's population is Mormon. Attorney Mark Pugsley has worked in affinity fraud for decades and identifies that the problem causing this alarming data is that faithful LDS trust their leaders.

11.      Some LDS members concoct Ponzi schemes, duping faithful Mormons out of their life savings. They use the same methods used by COP leader-agents in relation to LDS faithful— they gain investors' trust by omitting facts material to the investment, while inviting investors to trust them, building a relationship with them and all the while intending to deceive them.[6]



12.      The Church instituted a program of correlation to ensure "purity of doctrine" in 1961, whereby all written, spoken, and artistic expressions, including graphics in Church-owned publications, and the content of speeches given in semiannual General Conference

---

[6] https://rqn.com/blog/utahsecuritiesfraud/finally-its-confirmed-utah-has-more-ponzi-schemes-per-capita-than-any-state-in-the-country-by-far/#.XgKY1kdKi71  Note: as of August 16, 2021, the above link cannot be found on the RQN website. Instead, a 404 Error message displays when linked.

have been within the exclusive control and subject to the content censorship of Defendant.

13.     In 1997, COP created Ensign Peak Advisors ("EPA"), incorporated as a non-profit entity. Upon information and belief, based on the Whistleblower Report and Declaration of former EPA senior portfolio manager, David A. Neilsen, essentially since its creation, billions of dollars of surplus tithing principal funds EPA. This fact is concealed from LDS members. (Exhibit No. 1, Declaration of Former EPA Employee, David A Nielsen ¶5)

14.     Based on admissions in another U.S. federal court case against it, COJCOLDS has used surplus tithing principal to fund commercial ventures since the early days of Mormonism. Tithing has been used not merely to invest, but to purchase, develop and manage ongoing businesses in many states and foreign countries: including over one million acres in the continental U.S. and Hawaii upon which COP runs farms, ranches, orchards, and hunting preserves. It also owns farmland in Australia, the U.K., Brazil, Canada, Argentina, and Mexico. A 290,000-acre Deseret Ranch in Florida keeps 44,000 cows and 1,300 bulls. COP's entire cattle operation includes calf- cow ranches in the U.S. and Canada, as well as stocker operations in Oklahoma and Texas and a feedlot in southwest Kansas. Its main operation is the Deseret Ranch of Florida east of Orlando. It also includes 1,700 acres of citrus trees, as well as timber, sod, and a fossilized-seashell business. COP's Hawaii Reserves, runs a water management company, sewage treatment works, and two cemeteries. Besides owning many residential and commercial properties in Utah cities, the Church owns multifamily residential units in most major cities in the United States.

15.     Upon information and belief, based upon the research of Scott Bidstrup (who calculated the larger figure), and according to anonymous financial experts publishing

collectively on a website entitled the Widows Mite (whose research indicates the smaller figure), the combined value of Defendant's real estate and security investment holdings as of 2021 are estimated to be from $255--$417 billion, more than double the value of any company on the 2020 Forbes Global 2000 list of wealthiest publicly traded companies.[7]

16.     Upon information and belief, according to the Whistleblower Report and the Widow's Mite authors, since at least 2000, once tithing funds have paid for budgeted religious expenses and building costs, any surplus is deposited into Defendant's investment accounts. After paying global religion related costs, Defendant saves the remainder of each year's donations which are then invested in a portfolio of stocks, bonds, private equity and other businesses; profits are reinvested

17.     Despite a COP-fostered impression that the construction of new temples is a large part of COP's expense, according to the widow's mite experts, "[t]he Church spends less than 10% of annual tithing dollars on temples."

18.     In 2009 Church funds were used to bailout Beneficial Life Insurance, a for profit Defendant owned business. In 2010, Defendant began using excess tithing principal which had been deposited directly into its investment funds to bolster the development of Salt Lake City's City Creek Mall, which opened for business in 2012. According to Mr. Nielsen's Whistleblower report, the funds used for City Creek Mall cost overruns were paid from 2010 through 2014, and totaled $1.4 billion dollars of never invested tithing, exclusively from EPA.

19.      Upon information and belief, based on a 2013 Associated Press report, the mall was

---

[7] https://widowsmitereport.wordpress.com/

expected to earn  $266 million dollars in sales after just one year of operation. As described

by the AP, as quoted in a *Christian Post* on June 20, 2013:

> City Creek Center is an impressive combination of architecture and technology
> covering two blocks in downtown Salt Lake City. It boasts "outdoor
> walkways, plazas, fireplaces and metal sculpture. Waterfalls, fountains and a
> trout pond are part of the village-like development, which includes
> condominiums and is joined by a glass-encased pedestrian bridge over Main
> Street.[8]

20.     In December of 2019, David A. Nielsen's "Letter to an IRS Director" commonly

known as the Whistleblower report, was highly publicized in the national press. Mr. Nielsen, a

former EPA senior portfolio manager exposed the fact that in 2019 EPA was valued at $128

billion dollar mostly liquid fund. He also exposed the historic practice of commingling tithing

with all other church funds and using tithing principal for commercial investment and

development, specifically revealing the use of $1.4 billion of tithing for City Creek Mall as

wells as the $600 million dollar bailout of Beneficial Life Insurance. Upon information and

belief, based upon a statement in the Whistleblower report, one EPA senior leader suspected

that tithing receipts as of 2019 were $6–$7 billion annually with perhaps $5–$6 billion in

expenses. Accordingly, the $1-2 billion surplus is invested and then used for commercial real

estate and business development. By comparison, and by its own admission, COP donated just

$1.3 billion in humanitarian aid over a 25-year period, from 1985 to 2010.

21.     Upon information and belief, according to Mr. Nielsen's Declaration, the Church did not

distinguish between investment of reserve funds and tithing principal. According to Neilsen:

---

[8] https://www.christianpost.com/news/wealthy-church-of-latter-day-saints-makes-266m-in-sales-from-lavish-mall.html
Note: the original AP report could not be located as of April 25, 2023.

> During my employment at EPA, EPA's senior leadership and other EPA employees referred to and revered all funds of EPA as "tithing" money, regardless of whether they were referring to principal or earnings on that principal. In addition, during my time at EPA, tithing donations from the Church's members were commingled with earnings that EPA had made. Every penny was referred to as the "widow's mite. [9]

22.    By the end of 2019, the Church had suffered a loss of many members through resignation due to its admission through a release of heretofore hidden artifacts and information that much of its historical narrative had been manipulated certain facts that would present its founding prophet and the source of the Book of Mormon in a more favorable light, in order to obtain and retain active LDS members. This included release for the first time ever the brown opaque stone that Joseph Smith used to "translate" the Book of Mormon. As admitted by current LDS Russel Nelson, the stone was placed in a hat into which Smith peered while dictating; the gold plates were nearby but "usually covered."

22.     Named Plaintiffs as well many members of the proposed class, had all resigned from the church by the time the Whistleblower Report was publicized in 2019. However, as set forth in Named Plaintiffs' individual fact summaries, had any of them known that their hard-earned tithes had been used for decades to fund commercial ventures, they would have immediately paused paying their tithing due to a distrust of the church and its prior representations that tithing was only used for religious purposes. That break would have led each of them to a search about the truth of the historical narrative which they had been taught and would have led to an earlier departure and resignation from lifelong membership in the LDS Church.

---

[9] Declaration of Nielsen, ¶ 6

23.     The table below lists some of the Church's commercial real estate investments made since the $1.6 billion was paid out for City Creek from 2010-2014. This is only a partial list, based on what is available through an internet search, with the exception of the New Zealand property information obtained from a conversation with an insider resident of New Zealand.

**TABLE OF SOME OF DEFENDANT'S REAL ESTATE DEALS SINCE 2014**

| DATE | LOCATION | DETAILS | PRICE/PROFIT | COMMENTS |
|---|---|---|---|---|
| Announced in September 2020, Ongoing development. | Church College of New Zealand (CCNZ) was a private secondary school in Temple View, Hamilton, New Zealand | The Church has torn down the prior church college. Now, in conjunction with NZ residential Construction developer Cambridge Homes it is building residential spec homes for sale. According to one NZ resident, the [initial] "planned new subdivision didn't come to fruition." | According to an individual who filed a complaint with the New Zealand Human Rights Tribunal.<br><br>"[The church is] converting tax free tithing funds from the USA into international Income producing assets. Empty chapels and schools are demolished and the land is sold for millions in profits. [There is] zero basis in the land because it was paid for with tithing funds in | Defendant is repurposing this land for Exclusively commercial use that was previously used for religious purposes. A church school was demolished and now the land is being sold for new spec homes. |

| | | | 1950's and appreciated in value for 70 years." | |
|---|---|---|---|---|
| 2021 | Maui, Hawaii | COP'S Property Reserve bought a Marriott Residence Inn located on the island of Maui. Neither of the two Hawaiian temples are located on Maui. | Nearly $100 million, according to *Pacific Business News.* | Hawaii Reserves, a COP property manager, also owns the Laie Courtyard by Marriott near the Polynesian Cultural Center |
| 2021 | Eastern WA state farmland. Easterday ranch properties (farmland) in eastern Washington State. | The *Salt Lake Tribune* reports that LDS-owned "Farmland Reserve's AgriNorthwest outbid a Bill Gates company "12,000 productive acres (potatoes, onions, and cattle herding)" including water rights to the church's vast landholdings. | $209 million | The *Tribune* noted that Defendant's vast holdings "include more than 600,000 acres in Florida, or about 2% of [its] overall landmass." |

| DATE | LOCATION | DETAILS | PRICE/PROFIT | COMMENTS |
|---|---|---|---|---|
| May, 2019 | Richardson, Texas, a town near Dallas | Raytheon Corp.'s new office campus, CityLine Project, sold to the Defendant's Property Reserve, Inc. The three-building, 500,000-square-foot office complex on Bush Turnpike east of Plano Road cost almost $100 million to develop in 2016. The four-story office campus houses almost 1,700 Raytheon Employees. | $1.5 billion | Richardson is 5-7 miles from the Dallas LDS Temple. Raytheon is the Massachusetts based high-tech defense contractor. The paper reporting the sale noted that in the Dallas area, the Property Reserve Inc. has apartments in Las Colinas & Plano & industrial bldgs. in Carrollton. |
| May 2019 | Irving, Texas, a town near Dallas. Las Colinas Community, | Builder JPI sold its new Jefferson Las Colinas, 386 Unit six-acre apartment complex. on Las Colinas Blvd., just north of Northwest Highway. Purchased by Defendant's Property Reserve Inc., county deed records show it was renamed Fountain Pointe Las Colinas. | Undisclosed purchase price. Tax Assessment at $45 Million. | Irving is 16-17 miles from the LDS Dallas temple. |

| Dec., 2017 | Chandler, Arizona, about ten miles from the Mesa LDS temple, which has recently seen lots of development by COP in the blocks surrounding the Mesa Temple. | Mattamy Homes bought thirty-seven acres belonging to Defendant through Property Reserve Inc. The land is at Pecos Road and Hartford Street in Chandler. The land, called Haven, is undeveloped land is zoned for 283 single- family homes. | $13.64 million | The LDS Church owns expansive real estate and bare land in the Phoenix region with holdings in both the East and West Valley |

| DATE | LOCATION | DETAILS | PRICE/PROFIT | COMMENTS |
|---|---|---|---|---|
| 2017 | Deseret Ranches sister firm buys 4,200 acres in Osceola County, Florida. The purchase is part of the Harmony Master planned Community. | The purchased acreage is about forty miles from the Orlando LDS temple. | $9.9 million | Defendant already owns 2% of Florida's land mass. |
| 2017 | Tract of land in eastern industrial Orlando initially purchased by a third-party developer in 2007 for about $100 million, then assigned to Defendant for joint venture development. Long-term development is for an area of almost 250 sq. miles. | More than half the acreage is planned for development with the original buyer. Plans are to convert COP owned Deseret ranch into a huge new city by 2080 that would house half a million people. | It is unknown what the financial consideration for the assigned property was, but Def. often receives in kind donations. | Development includes 220,000 homes, 100 million square feet of commercial and institutional space and almost 25,000 hotel rooms. The plan calls for more than sixteen communities. |
| 2016 | Bay Drive, Lahaina, Hawaii. Island of Maui. | COP's Ensign Peak Investments LLC recently acquired the property which has a 1,600-square-foot building on 5.3 acres. | At the time of the acquisition the property was valued at $3 million dollars. | There is no LDS temple or other LDS religious building on Maui. |
| 2015 | Riverton, Utah | COP's Suburban Land Reserve (SLR) requested the city approval of a master mixed use plan on several large land parcels between Bangerter Hiway & Mtn. View Corridor | COP owned the 540-acre farmland. The development would add 3,500 housing units and an 85-acre | The development is about six miles from the Jordan LDS Temple and about four miles from the LDS Taylorsville temple. Utah |

| | | | | |
|---|---|---|---|---|
| | | near 13400 South. | shopping center. | has 28 temples within its boundaries |
| 2014 | Philadelphia, PA. 1600 Vine Street Complex on the northern border of Philadelphia's downtown area. | Plans are for a mixed-use dev., with a 32-story tower with 258 apts., thirteen rental townhomes and a 24,000-square-foot mtg. house. It is located about half a mile from the Philadelphia Temple, finished in 2016. | Church officials will not reveal how much the project will cost, but it is estimated to run roughly $120 million. | The Mormon population of Greater Philadelphia is estimated at just 25,000 to 28,000. it already has 47 LDS mtg. houses. |

24.     COP fraudulently induced outsiders' as well as those who were already members, especially young peoples' (who as minors could not consent), faith-based conclusions about the divinity of the Church by misrepresenting how tithing is used. Decisions to be baptized, remain a member of the organization and importantly for most, to further commit to the Church by serving as a full-time mission, and/or qualifying and renewing qualification for temple access and participation, are all conditioned upon paying a full 10% of one's income as tithing. As recently as 2011, Defendant extorted tithing from its members by not only promising eternal salvation, and "forever families" but by characterizing payment of a full tithe as "fire insurance" to ensure safety from apocalyptic burning at the Second Coming of Jesus Christ.

25.     Additionally, it was not until after nationwide press about the IRS Whistleblower complaint and COP's Ensign Peak Advisor's (EPA) $128 Billion dollar fund was publicized in December 2019 that COP began to change its narrative with respect to how it uses tithing donations. Members had been led to believe that tithing was used only for religious purposes, and that church owned businesses were funded from LDS owned business profits or non-tithing donations from wealthy members and that their tithing was not used to expand the Mormon Corporate Empire.

26.     Plaintiffs[10] claim easily calculable special damages for payments of cash and the value of services rendered to Defendant by former members of the LDS Church. Plaintiffs also claim general damages, and if warranted, punitive damages, for COP's fraud

27.     In Depression Era 1930s, the LDS Church announces a comprehensive welfare program.

---

[10] The term "Plaintiffs" is used hereinafter as a short-hand designation meant to include both named Plaintiffs, GADDY, SMALL and HARRIS and those persons similarly situated, i.e., members of the potential or putative Class.

Federal Dept of Labor and Management, WPA administrative assistant Dean R. Brimhall visits

Utah in 1936 and writes: "most of the propaganda that has come out about the efforts of the Utah

church [to provide financial help to its members] is fictitious." That despite the myths that

Church welfare had enabled most of its members to avoid public assistance, "Utah as a whole

had a very heavy federal works program load," and it was "among the highest in the nation."[11]

28.     In the late 1950s based on a seven-million-dollar surplus, Henry D. Moyle a member of

the Quorum of the Twelve Apostles, starts to purchase large parcels of land for the Church and a

new property division of the Church is founded (which has changed names over the decades).

This occurs after the Church reported having a $7 million dollar tithing fund surplus. Doyle's

spending results in the Church becoming $8 million in debt soon thereafter.

29.     In 1963 N. Eldon Tanner, a former Canadian businessman, is chosen as First Counselor

in the First Presidency. Though not disclosed to the general membership, he enacts a principle

of setting aside money from annual donations including member tithing for a rainy-day fund.

Over the next two decades the church invests and grows exponentially. The Church expands its

prior practice of buying land to become a major landholder in several states. It invests in

commercial buildings and other profit-making ventures. Upon information and belief, based on

talks with local lay leaders who have resigned, Defendant begins fostering a belief among lay

members by secretly instructing the LDS local stake presidencies, ward bishopric members and

counselors and branch presidents and mission presidents that church business profits are

maintained separate from tithing donations, which are used solely for ecclesiastical purposes.

Plaintiffs cannot plead these facts with specificity since they are within the Defendant's

---

[11] Dean R. Brimhall letter to E.A. Rusk, 20 August 1938. University of Utah archives.

exclusive control.

30.   In 1977 an amendment is filed to COP's Articles of Incorporation that gives COP the right to acquire, manage and dispose of assets without authority from its own Church members.

31.   1981, LDS President Spencer W. Kimball proclaims the Three-Fold Mission of the Church in April General Conference. He outlines the three major elements of the mission or purpose of the Church to: proclaim the gospel, perfect the Saints, and redeem the dead.

32.   In 2012, the Church amends and adds a disclaimer to its tithing forms. Those forms, both pre and post 2012, are depicted below. With the exception of fast offerings, used to feed the poor at the local level, the categories listed below tithing are those that the Brethren had historically said tithing was used for (and as of 2009, humanitarian aid). As indicated by both Small and Harris, these categories lead a typical LDS member to believe that their tithing would be used for the categories listed below the tithing category, and that they could pay extra in each category above the required 10% tithing if they so choose. Because this information is exclusively within the control of Defendant, Plaintiffs cannot allege what COP's paid leader agents told the local lay leaders to relay to the average member of the LDS church with regard to the tithing categories. However, upon information and belief, based upon many interviews with former LDS, those categories listed generally coincided with the categories that Defendant wrote or said tithing would be used for, and led most LDS to believe that tithing would in fact be used for the categories listed.

33.   As Mr. Small explains, the extra categories might be for money one would like to send to missionaries, because a tithe payer had a particular interest in missionary work, or had grown up poor and wanted to help by paying more for humanitarian aid. Furthermore, the "overall mission" of the church in the post 2012 form was never discussed as anything other

than the three-fold or four-fold mission of the church. Never did Plaintiffs think that the tithing category was carte blanche for the Church to do what it wanted with the funds, and certainly not use it to profit and build up a huge stockpile of assets by investing in securities and real estate.



The 2012 Disclaimer (form on the right) states: "Though reasonable efforts will be made globally to use donations as designated; all donations become the Church's property and will be used at the church sole discretion to further the Church's overall mission." The prior disclaimer related only to the use of missionary funds.

34.    Upon information and belief based on an absence of such representations in the research conducted by Plaintiffs' counsel's firm, "Overall Mission" has never been defined to include significant commercial investment and development. Rather:

> Elder Simpson said the Sunday School purposes have been modified to conform more fully with the definition given by the First Presidency of the "overall mission of the Church." The new purposes of the Sunday School are: Proclaim the gospel by teaching members sound gospel doctrine in preparation for missionary service. Perfect the saints– by helping build members' testimonies through better teaching. Redeem the dead– by teaching members the plan of salvation and the importance of the higher ordinances of the gospel for every individual and his ancestors. Book of Mormon is the pivotal point of gospel. [12]

35.    In 1997, using a sports team analogy, the "overall mission of the church" is characterized in the context of purely ecclesiastical activities, no commercial activities noted.[13]

## PARTIES

36.    Plaintiffs LAURA GADDY, ("Gaddy") LYLE SMALL ("Small") and LEANNE HARRIS ("Harris") (cumulatively "Named Plaintiffs") bring this Complaint on behalf of themselves individually and all those persons similarly situated who have devoted most of their lives to the LDS Church, but have resigned relatively recently.

37.    Named Plaintiffs' allegations are based upon personal knowledge as to their own acts and experiences, based upon information and belief where a source of information is cited. And, as to all other matters, the allegations are based upon investigation, including information from former Church employees and other investigation conducted by their attorney.

38.    GADDY is a current resident of Stafford County, Virginia.

39.    SMALL is a resident of El Paso County, Colorado.

40.    HARRIS is a resident of San Luis Obispo County, California.

41.    Defendant COP is a holding company that owns and/or controls various wholly owned

---

[12] Updated 2 JAN 1988 12:00 AM MST https://www.thechurchnews.com/archives/1988-01-02/book-of-mormon-is-the-pivotal-point-of-gospel-154232 Last viewed July 28, 2021.
[13] Updated 18 OCT 1997 12:00 AM MDT https://www.thechurchnews.com/archives/1997-10-18/of-one-faith-one-testimony-129282 Last viewed July 28, 202.

subsidiaries and for-profit entities. COP's belief system (mainstream Mormonism), and the entire

corporate structure governing what is known as the LDS Church (its subdivisions, *dba*s, and

subsidiaries, including but not limited to the Church Education System ("CES"), Correlation

Department ("Correlation"), Intellectual Reserve Inc. ("IRI") Deseret Management ("DMC")

Bonneville International Corporation ("BIC") Ensign Peak Advisors ("EPA"), temples, local,

national, and global leaders, et. al.), along with the Corporation of the Presiding Bishopric

("CPB"), an entity subject to the direction of COP and which holds the real property of COP,

constitute the Mormon Corporate Empire ("Empire").

42.    COP oversees the Empire through a hierarchy of employees and agents described below,

and is headquartered in Salt Lake City, Utah. The LDS Church claims a membership of more

than sixteen million worldwide. COP has two primary functions: 1) to manage the tithing and

other income received through activities performed within the Empire; and 2) to ensure that all

instruction and education of local members, including young missionaries as well as potential

members recruited by those missionaries, are taught tightly correlated LDS doctrine and history.

43.    Administrators of COP's Church Educational System ("CES") work tightly with

Correlation. Each member of the First Presidency (who are also part of the executive Correlation

Department) sit on the Board of Directors of CES. The most senior of the twelve apostles also

serve on the CES board.

44.    COP operates meetinghouses or chapels across the United States and many other

countries in the world, including one in Gastonia, North Carolina, where GADDY attended and

local chapels nationwide attended by both SMALL and HARRIS. COP's principal place of

business is 50 E. North Temple, Floor 20, Salt Lake City, Utah.

45.     Based on news reports, it appears that Defendant COP has recently merged with the entity formerly known as CPB (Corporation of the Presiding Bishopric) who prior to the merger, changed its name to the Church of Jesus-Christ of Latter-day Saints. It has also come to our attention that there are dozens of entities created by Defendant whose names have no apparent affiliation with Defendant, and which entities act on its behalf. Therefore, Plaintiffs have added Doe Defendants.

46.     Ruling on class certification has yet to occur. Therefore, whenever allegations reference "Plaintiffs," it includes not only Named Plaintiffs, but all those similarly situated who could be part of the proposed Class, if certified.

47.     Occasionally Named Plaintiffs allege facts based upon information and belief without a source of information. When this occurs, the evidence is peculiarly within the custody and control of COP, especially as to how its spends LDS members' tithing and as to frequently altered online versions of its rhetoric including how members tithes are used.

## II.   JURISDICTION AND VENUE

48.     GADDY, SMALL and HARRIS bring their Complaint under federal diversity authority, 28 U.S.C. §1332, as the parties are completely diverse in citizenship and the amount in controversy for each claim exceeds $75,000.00, exclusive of costs and interest. The total claims of the proposed class exceed $5 million dollars.

49.     Venue is proper in this District under 28 U.S.C. § 1391(b). COP's headquarters and principal place of business is located in Utah and a substantial portion of the acts and omissions alleged herein to have been committed occurred and/or were originated within this District.

## III. FACTUAL ALLEGATIONS—THE MORMON CORPORATE EMPIRE.

50.     The  Mormon Corporate Empire is composed of distinct levels of participation: A) Paid

General Authorities; B) (Unpaid) Local Leadership; C) the Educational Empire; and D) For-profit Business Entities.

A) Paid General Authorities (GAs)

51.　 The Empire is led by fifteen apostles. Russell M. Nelson is the current president, sole officer, and shareholder of COP. The president selects two apostles as counselors. The three men function as the First Presidency, the governing body of the Empire. The Quorum of the Twelve Apostles (Q12) is the next highest-ranking governing body in the Empire, second only to the First Presidency. Together, the First Presidency and the Q12 are colloquially called "the Brethren," and constitute the highest-ranking General Authorities ("GAs").

52.　 Upon information and belief, based on written admissions by Defendant, the Brethren have historically participated in various businesses affiliated with the MCE, for which they received passive income and other benefits; however, as of 1996, they had abandoned the practice.

53.　 GAs besides the Brethren include the president and two counselors in the Corporation of the Presiding Bishopric ("CPB") which leads the Aaronic, or lesser priesthood as opposed to the Melchizedek or greater priesthood. CPB also manages and holds real estate owned by the Empire. The Seventies, of which as of April 2021, there are 99 General Authority Seventies and twelve quorums of Area Seventies. These quorums are spread out over global geographic areas. The first two quorums are considered GAs; the other ten are Area Seventies; upon information and belief, based upon the number of new seventies called in general conference each year and photographs of some quorums, dozens of men compose each quorum.

54.　 The Council on the Disposition of Tithes ("CDT") is comprised of the First Presidency, the Quorum of the Twelve Apostles (Q12), and the Presiding Bishopric (CPB). Every first Friday

of December these men meet together to examine and approve the allocation of the Church's funds from estimated tithes and offerings for the following year.





THE BRETHREN

COP   CORPORATION OF THE PRESIDENT

1st Pres.   FIRST PRESIDENCY

Q 12   QUORUM OF THE TWELVE

CES   CHURCH EDUCATIONAL SYSTEM

CC   CORRELATION COMMITTEE

IRI   INTELLECTUAL RESERVE, INC.

MTC   MISSION TRAINING CENTER

55.     **PROFIT or BUSINESS SIDE OF THE MORMON CORPORATE EMPIRE\***



**\***Diagram published in the *Arizona Republic* circa 1991. Beneficial Life Insurance (a division of Beneficial Financial Group) ceased writing insurance in 2009. According to the Declaration of David A. Nielsen (Exhibit No. 1 to this Complaint), COP used $600 million in tithing from EPA in an attempt to bail the company out of financial distress. We can now assume per statements made in another case against COP, that all of these businesses were initially funded with tithing surplus (excess over church related expenses) from LDS tithe payers. The "business" label as relayed to members and others means only that taxes are paid on the profit from these admittedly commercial ventures. These identified entitled in the chart above were well known to the average LDS who generally knew that they paid taxes and believed any reserves the church had were form investments of these business entity profits.



56.     The Empire is organized at the local level by stakes, or districts, which in turn oversee respectively, several wards or branches; both are geographic units which are similar to a parish. A branch is a quantitatively smaller version of a ward within the mission district boundaries. A district is a numerically smaller stake, generally found in missions. All stake leaders are called to serve by GAs. Stake officers call bishops/branch presidents to serve in the wards/branches.

57.     Each stake is a separate registered corporation sole under the North American Industry Classification System (NAICS). Historically, each stake had been considered a religious organization, while COP is listed as "other." The bishopric or branch presidency (which is composed of a bishop or branch president and his two counselors) is the leader of the ward and is supported by a clerk and an executive secretary who respectively attend to the ward's financial and administrative concerns. Primary among those duties is the collection of tithes.

58.     Per COP directive, local unpaid leaders are subject to the direction of COP's paid employee-leaders. COP provides correlated instructional materials and requires that the local leaders/teachers instruct members over whom they preside, teach solely from the contents of correlated manuals, "no outside sources" to be used. They also ensure that tithing and other money is collected from LDS members and remitted to COP. Local unpaid leaders cultivate commitments to free service by LDS members, whether at weekly meetings or as missionaries.

59.     In addition to unpaid local leaders, mission presidents head the mission districts by supervising unpaid missionaries around the world. Mission presidents receive a generous annual living stipend and other benefits for their family. They are called to serve by GAs.

60.     At the age of twelve, all LDS males are eligible to become members of the priesthood. No LDS females of any age are ordained to the priesthood but serve under its direction.

61.     The bishop and administrators, as agents but not employees of the COP, send the total amount of tithing collected to the COP, who returns only a tiny portion of what is collected to each local ward for its support and for local member needs. After Church operating expenses are paid, upon information and belief based on the information provided by Whistleblower David Nielsen, excess tithing proceeds of up to approximately $1-2 billion dollars annually, have been deposited in EPA or a similar type of fund since the early 2000s. These funds are used for investments and commercial projects to expand the Mormon Corporate Empire.

62.     By about 2016, the Church had amassed so much money that it secretly created thirteen LLC entities in the names of various Church employees. Combined, the thirteen companies owned stock valued at $32,769,914,000 as of 2017. Each of the thirteen companies have domains hosted by the LDS Church servers, which also hosted LDS.org and Mormon.org. All of them were registered on July 21, 2016. The names of the companies did not refer to the COJCOLDS in any way. COP created the thirteen companies to deceive its members and others about the amount of tithing it had accumulated and how LDS tithing is used. In February of 2023, the SEC fined Defendant and EPA a combined $5 million dollars for ¶13(f)(1) violations with respect to the above-described shell companies.

<u>The Mormon Church Educational System-- CES and Correlation</u>

63.     The Mormon Church Educational System (CES) includes several institutions which provide religious and secular education for both LDS and unaffiliated students in elementary, secondary, and post-secondary institutions such as BYU campuses and the LDS Business

College, as well as adult education and online programs. All rhetoric is carefully controlled by limiting teaching materials, including statements about tithing, to that which is Correlation-approved. A uniform system of censorship is administered by the CES Board of Directors.

64.     Correlation's executive committee consists of the three members of the First Presidency and the Q12, i.e., the Brethren, who have the final say on what is correlated and the substance of all rhetoric that is disseminated to the local members and missionaries. Under the direction of the Correlation's Executive Committee, the CES Board and the Curriculum Department serving within CES, compiles the content of all COP's official publications, including but not limited to what is taught at the local levels (stakes, wards, and branches), as well as the content of all missionary manuals and materials used to instruct the missionaries and in turn, used by those missionaries to recruit converts. Specificallly COP controls Correlation and has final authroity over all content in the following church-owned publications: *Ensign* magaizine, *Deseret News*, all Sunday school, Relief Society and priesthood manuals, all publications where the Intellectual Reserve copyright is used, all publications used by missionaries, as well as it television and films entities and websites. In 2019 COP began transferring all data from its official website, www.LDS.org to a newly purchased domain, which is now its official website: www.churchofjesuschrist.org.

65.     In order to facilitate this function, the CES, as approved by Correlation, ensures that only correlated messages are taught by all professional and local church leaders at all LDS institutions, schools, and conferences, including Sunday School, Relief Society (women's organization), Aaronic and Melchizedek Priesthood (men's organizations), Young Men,

Young Women (teen organizations for each gender) and Primary (children's organization),
and speeches at General Conference.

i. Missionaries

66.      Mormon/LDS missionaries are typically young men and women who are recruited
directly from high school and are indoctrinated for two months by COP employees at a
missionary training center ("MTC"). After completing the MTC training, they are sent for a
period of 18-24 months to a particular mission. Mission districts are located in most
countries in the world. There, the young missionaries recruit others to join the Church. Like
local LDS leaders, missionaries are not paid. Additionally, and typically, either the
missionary and/or their family must provide the missionary's support for the duration of
their mission. As of late 2012, the age to serve an LDS mission was lowered from 19 to 18
for men and 21 to 19 for women.

ii General Conference

67.      Twice a year in April and October, a world General Conference ("Conference") is
held at Temple Square in Salt Lake City (held today in the Conference Center adjacent to
Temple Square), where the Brethren and various GAs speak. Conference sessions are
broadcast
live and either attended, watched via satellite, or more recently streamed live on the internet, by
most all tithe paying LDS worldwide. Sessions last several hours each day of the chosen
weekend.

68.      At various times throughout the last half century and longer, the GAs has made
statements which have become an oft-repeated precept among LDS followers to the effect

that neither the prophet nor the Brethren, GAs, nor any of the LDS leaders will ever lead the members astray. This promise is initially instilled in young children's minds through song and continues to be emphasized throughout LDS members' lives. Plaintiffs sang the song "Follow the Prophet." This promise has been made by prominent leaders since the days of Mormon president, Brigham Young, and was repeated in Conference up through at least 2014.

69.    LDS followers are encouraged to rely on the counsel of the Brethren, GAs, and local leaders. Before they became GAs, most COP leaders were businessmen or professionals in the areas such as law, business, organizational behavior, and medicine. Most all have no formal theological training other than LDS religion classes at LDS affiliated post-secondary institutions.

D) Profit-Making Business Entities (Entities Subject to Government Taxation)

70.    Decades ago, the Church chose to disclose the existence of several of its business entities, leading LDS members to believe that those enumerated below were the extent of the church's for-profit entities and commercial endeavors.

i. Deseret Management Corporation ("DMC")

71.    Deseret Management Corporation is a private asset management holding company of for- profit businesses owned by COP and an integral part of the Empire. DMC's Board of Directors includes the First Presidency, and upon information and belief, three rotating members of the Quorum, and the Corporation of the Presiding Bishopric of the ("CPB").

72.    Bonneville International Corporation ("BIC") is a media broadcasting corporation and wholly owned subsidiary of the COP through its for-profit subsidiary, DMC. It began as

a radio and TV network. It now owns over a dozen stations in major markets and an NBC affiliate television station in its home market; it also manages additional radio stations. In 1980 BIC formed Bonneville Communications Corporation, primarily to broadcast General Conference.

73.     Deseret Book ("DB") is a for-profit Utah corporation and wholly owned subsidiary of DMC. It sells its publications through catalogs, e-mail, and the DeseretBook.com website. All publications sold are COP-approved through Correlation.

74.     Deseret News Publishing ("DNP") is a 1931 for-profit Utah corporation that publishes the *Deseret News*, one of two major Utah-based newspapers circulating in Salt Lake City, Utah.

75.     Deseret Digital Media (DDM) develops and manages the many websites owned by COP. ii Intellectual Reserve, Inc. ("IRI")

76.     Intellectual Reserve, Inc., as both a corporate subsidiary and a *dba* of COP, is subject to the oversight of Correlation. IRI owns COP's copyrights and trademarks. Since its incorporation in 1997, it is often listed as publisher of correlated educational material.

        iii Ensign Peak Advisors ("EPA" or "EP")

77.     EPA is an asset and investment management firm created in 1997 which, upon information and belief, has accumulated profits from investing tithing, including tithing principal, to over $128+ billion as of 2019, in a mostly liquid fund used to finance COP for- profit businesses, including cost over-runs from 2010-2014 for Salt Lake City's City Creek shopping mall. It was also used to bail-out Beneficial Life Insurance Company, another for-profit COP affiliate, which as of 2009 has ceased to write insurance policies.

78.     Members of the current LDS First Presidency have all held top leadership positions in

the Church since at least the mid-1980s and thus have spent decades directing Correlation.

Russell

M. Nelson and Dallin H. Oaks served as members of the Quorum of the Twelve Apostles

since at least the mid-eighties. Henry B. Eyring initially worked as a CPB counselor, and

later worked as part of the Quorum of the Twelve. Eyring has also spent much of his time as

LDS Commissioner of Education for a total of twenty-five years, in three different time

periods spanning from April 1985 to January 2005. He was also president of Defendant-

owned Ricks College Rexburg, Idaho, from 1971 to 1977. Oaks was also the eighth

president of BYU, from August 1971 to August 1980.

79.     GADDY, SMALL and HARRIS bring this putative Class Action Complaint against

COP to obtain damages for themselves and similarly situated persons injured by COP's

outright misrepresentations that tithing is and would be used for religious purposes, and other

partial misleading representations without a full and fair disclosure that the Church has used

tithing to grow a global financial empire since at least the 1970s.

## IV.   ALLEGATIONS OF SPECIFIC MISREPRESENTATIONS AND  INTENT TO DECEIVE APPLICABLE TO NAMED PLAINTIFFS &  POTENTIAL CLASS MEMBERS

80.     Below is a table of statements by the Brethren inviting the trust of its members. These

are those made relatively recently, many more have been made from the 19th Century onward.

**"WE WILL NEVER LEAD YOU ASTRAY," INVITATION TO TRUST TABLE**

| | YR. | REPRESENTATIONS | WHERE | WHO | SOURCE |
|---|---|---|---|---|---|
| A | 1972 | Quoting President Heber J. Grant, Seventh president of the COJCOLDS: "Brethren, keep your eye on the President of this Church. If he tells you to do anything and it is wrong and you, do it, the Lord will bless you for it. But you don't need to worry; **the Lord will never let his mouthpiece lead this people astray...**" | April Gen. Conf. 1972 | Marion G. Romney, Q12 | *https://www.church ofjesuschrist.org/ study/general-conference/1972/ 04/the-covenant-of-the-priesthood?lang =en* |
| B | 1961, 1972, 1973 & 1974 | Quoting President Harold B. Lee, Eleventh president of the COJCOLDS, who was quoting President Grant: **"The Lord will never let his mouthpiece lead this people astray."** | BYU 04/19/61 in *Ensign* 10/1972, p.7, 10/1973 General Conference, and in the *Ensign* 01/1974. | David B. Haight, Assistant to the Q12 | https://www.church ofjesuschrist.org/ study/general-conference/1973/ 10/you-are-different?lang=en g and https://www.church ofjesuschrist.org/ study/ensign/197 4/01/you-are-different?lang=en g |
| C | 1974 | "Our Responsibility to the Transgressor" "We are led today by the Lord through a prophet of God, **President Spencer W. Kimball… If we will follow him, we cannot go astray."** | Spoken at October 1974 General Conf. | N. Eldon Tanner Q12 | *https://www.church ofjesuschrist.or g/stu dy/general-conference/1974/ 10/our-responsibility-to-the-transgressor?lan g=eng* |
| D | 1976 | "In closing, I leave you this one thought: When Brother Marion G. Romney was called to be one of the Assistants to the Twelve, President Grant said, **"Marion, if you'll follow the President of this Church, you'll never go astray."** | BYU Devotional Septemb er 28, 1976 | LeGrand Richards, Q12 | *https://speeches.b yu edu/talks/legran d-richards/prophets -scriptures/* |

|  | YEAR | REPRESENTATIONS | WHERE | WHO | SOURCE |
|---|---|---|---|---|---|
| E | Feb. 26th 1980 | "From Fourteen Fundamentals of Following the Prophet," **"The prophet will never lead the Church astray."**<br><br>Mr. Small heard Ezra Benson's say this in 1980. | BYU | Ezra Taft Benson Q12 | https://speeches.byu.edu/talks/ezra-taft-benson/fourteen-fundamentals-following-prophet/ |
| F | Dec. 12, 1981 | **"Let us follow them [the LDS prophets] and avoid being led astray."**<br><br>Mr. Small heard or read this quotation by Mark Peterson in 1981, | Church (Deseret) News, p.16 | Mark E. Peterson Q12 | Church (Deseret) News, p.16 |
| G | 1960 & 1981 | "Opposition to the Work of God." Assay quoting Heber J. Grant, quoted by Marion G. Romney: **"The Lord will never let his mouthpiece lead the people astray."**<br><br>Mr. Small heard this statement by Mr. Assay at Conference. | *Conference and Conf Report Oct. 1960, p. 78. Ensign Nov. 1981* | Carlos E. Asay, Presidency of the 1st Q of the seventy. | *https://www.churchofjesuschrist.org/study/general-conference/1981/10/opposition-to-the-work-of-god?lang=eng* |
| H | 1964 & 1982 | "The Place of the Living Prophet, Seer, and Revelator." **"...here in 1964, we have a mouth- piece to whom God is revealing his mind and will. God will never permit him to lead us astray."**<br><br>Mr. Small heard President Lee make this statement on the radio when he Lyle was in Springville Utah. | "Address to Religious Educators," 07/08/64 | Harold B. Lee, 11th President of Church | "Address to Religious Educators," 7/8/64 in *Charge to Religious Educators*, 2nd ed. SLC: CES, 1982 p. 112 |
| I | 1987 | **"Neither the Pres. of the Church, nor the 1st Presidency, nor the united voice of the 1st Presidency and the Twelve will ever lead the Saints astray."** | "Follow the Brethren," Oct. 1987 Gen. Conf. | L. Aldin Porter, Presidency of the Seventy | https://www.churchofjesuschrist.org/study/general-conference/1987/10 |

| | | | | | /follow-the-brethren?lang=eng |
|---|---|---|---|---|---|
| J | Feb. 14th 1995 | "But We Heeded Them Not" **"The united voice of the First Presidency and the Twelve will never, never, never lead us astray."** | BYU Speech | L. Aldin Porter Presidency of the Seventy. | https://speeches.byu.edu/talks/l-aldin-porter/heeded- them-not/ |
| K | March 12, 1996 And Nov., 1997 | **"You keep your eyes riveted on the First Presidency and the Quorum of the Twelve Apostles. We will not lead you astray. We cannot."** <br><br> Mr. Small heard this quote by Mr. Ballard, at a BYU devotional, rebroadcast. Lyle heard it on several occasions. Ballard's promise was taped, saved on a cassette tape, and often replayed on Sundays by local teachers in his ward. | BYU "When Shall These Things Be?" & *New Era* "How to Find Safety & Peace." 11/1997 | M. Russel Ballard Q12 | *https://speeches.byu .edu/talks/m-russell-ballard/shall-things/ Also published the following year in:* *https://www. church ofjesuschrist. org/stu dy/new-era/1997/11/how- to-find-safety-and-peace?lang=eng* |
| L | April 1996 | **"I give you my solemn testimony that this Church will never be led astray."** <br><br> Both Leanne Harris and Lyle Small heard this at Conference on April 1996. | "Stand True & Faithful," April 1996 Gen. Conf. | Gordon B. Hinckley 15th President of the Church. | https://www. church ofjesuschrist. org/stu dy/general-conference/1996/04 /stand-true-and-faithful?lang=eng |

| | YEAR | REPRESENTATIONS | WHERE | WHO | SOURCE |
|---|---|---|---|---|---|
| M | Oct. & Nov., 1998 | "But if we listen to the voice of the Lord through His living prophet and follow his counsel, we will never go astray… The Lord has given some marvelous guarantees without any disclaimers. And this is one of them: He will choose the prophet, and **He will never let that man lead us astray.** Imagine for a moment the impact of that promise. There is at least one place we can turn for pure, unpolluted guidance."<br><br>**Leanne Harris heard Sister Jensen deliver the message at Oct 1998 Conference.** | Delivered live in Oct. 1998 General Conf. & published in the Nov. 1998 *Ensign*. | Virginia U. Jensen, first counselor to the 13th Relief Society General President. | https://www.churchofjesuschrist.org/study/general-conference/1998/10/come-listen-to-a-prophets-voice?lang=eng Published next month in: https://www.churchofjesuschrist.org/study/ensign/1998/11/ come-listen-to-a-prophets-voice?lang=eng |
| N | 2004 live; later printed in 2007 | "We have a singular protection not enjoyed by the world in general. **The prophet will never lead us astray.** President Wilford Woodruff wrote: **"The Lord will never permit me or any other man who stands as president of this Church to lead you astray.** It is not in the program. It is not in the mind of God."<br>**LAURA read this in the *Ensign*; Her recollection of the phrase, "it's not in the program," stuck in her mind. and refreshed her recollection.** | BYU Idaho, January 13, 2004, and then published in the 09/07 *Ensign*. | David E. Sorenson, Member of the Seventy | *https://www.churchofjesuschrist.org/study/ensign/2007/09/priesthood-agency- and-black-powder?lang=eng* |
| O | 2005 | **"The President of the Church will not lead the people of the Church astray. It will never happen."**<br><br>**GADDY, SMALL and HARRIS all heard this at conference. Faust was a favorite leader.** | *"Called and Chosen," 10/05 General Conference* | James E. Faust, 2nd Counselor in First Presidency | https://www.churchofjesuschrist.org/study/general-conference/2005/10/called-and-chosen?lang=eng |

| P | 2007 | Chapter 27: "Beware the Bitter Fruits of Apostasy." From the Lie of Joseph Smith: "If we follow the prophets and apostles and the revelations of the Church, we will not be led astray." "William G. Nelson reported: I have heard the Prophet speak in public on many occasions. In one meeting I heard him say: '**I will give you a key that will never rust,—if you will stay with the majority of the Twelve Apostles, and the records of the Church, you will never be led astray.'** The history of the Church has proven this to be true." <br><br>**In 2007 Mr. Small read this in the 2007 manual. He also heard it taught in Sunday School from that manual.** | Sunday School Manual Published by TCOJC OLD S © IRI, 2007, p. 324-325. | *Teachings of the Prophets: Joseph Smith* | *https://www.church ofjesuschrist.o rg/stu dy/manual/tea ching s-joseph-smith/chapter-27?lang=eng* |
| Q | 2014 | **"Fourth: The prophet will never lead the Church astray."** <br><br>**Lyle read this lesson with President Benson's quotation, read about and quoted here.** <br><br>**Laura heard Benson's statement quoted from Lesson 29 at Sunday School in 2014.** | *Lesson 29, D & C, 21 Intro.* | Quoting Pres. Ezra Taft Benson | *https://www.ch urch ofjesuschrist.o rg/stu dy/manual/doc trine- and-covenants-and- church-history-seminary-teacher-manual-2014/section-01/lesson-29?lang=eng* |
| R | 2014 | "Stay in the Boat and Hold On!" "Recently, I spoke at the new mission presidents' seminar and counseled these leaders: **"Keep the eyes of the mission on the leaders of the Church. … We will not and … cannot lead [you] astray."** <br><br>**Gaddy, Small and Harris all heard this quotation at Oct. 2014 conference. Laura remembers "stay in the boat and hold on," that accompanied the promise not to be led astray. Small and Harris also thought the quotation as phrased was memorable.** | Speech at Oct. 2014 General Conf. | M Russell Ballard, Q12 | https://www.c hurch ofjesuschrist.o rg/stu dy/general-conference/201 4/10/stay-in-the-boat- and-hold-on?lang=eng |

81.     Since at least 1981, the three-fold mission of the Church as broadcast in Conference talks and written rhetoric has been to: proclaim the gospel, perfect the Saints, and redeem the dead. In or about 2009 a fourth mission was added: to care for the poor and needy. These are alternately labeled the purposes of the Church in the Official LDS Handbook published in 2010, Section 2.2.

82.     The following are relatively recent specific examples of COP's misrepresentations about tithing use and communications in both text and artwork.  Upon information and belief, there are many more which have occurred since the mid-20th Century and are still occurring.

83.     Upon information and belief, based on a personal interview with a former LDS Church employee who had access to paystubs, LDS corporate leaders, including members of the twelve quorums of Seventy, each receive million dollar signing bonuses upon accepting their positions. The bonus is structured in such a way that the recipients are subject to loss or repayment of the bonus should they become disaffected and leave their positions in the COJCOLDS. Thus, COP makes certain that their leaders are invested in with a lifetime commitment to Defendant.

84.     Upon information and belief, based on an absence of such representations in the research conducted by Plaintiffs' counsel's firm, "Overall Mission" has never been defined to include significant commercial investment and development. Rather:

> Elder Simpson said the Sunday School purposes have been modified to conform more fully with the definition given by the First Presidency of the "overall mission of the Church." The new purposes of the Sunday School are: Proclaim the gospel by teaching members sound gospel doctrine in preparation for missionary service. Perfect the saints– by helping build members' testimonies through better teaching. Redeem the dead– by teaching members the plan of salvation and the importance of the higher ordinances of the gospel for every individual and his ancestors. Book of Mormon is the pivotal point of gospel."[14]

85.   In 1994 the Church Lesson for Children in LDS Primary Manual, Omitted Commercial Uses.

---

[14] Updated 2 JAN 1988 12:00 AM MST https://www.thechurchnews.com/archives/1988-01-02/book-of-mormon-is-the-pivotal-point-of-gospel-154232 Last viewed July 28, 2021.

"Tithing Is Used to Help Jesus Christ's Church Grow"
Pictures and Discussion

Display picture 3-26, Child Paying Tithing. Explain what happens to the tithing
after the bishop receives it. It is counted, and the tithing is sent to Church
headquarters. The leaders of the Church then use it in different ways to help the
Church grow, such as building temples and meetinghouses, providing materials
for us to study, and for seminaries to help us learn the gospel…

Tithing money pays the expenses for building and maintaining meetinghouses,
temples, and other Church buildings. Some tithing money pays for family history and
temple work.

Some tithing money is used to support missionary work.

Explain that tithing also helps pay for many other things, such as seminary and
institute programs. It is a privilege and blessing to pay tithing. We should feel
good knowing that the money we give for tithing helps the Church."[15]

All three named Plaintiffs, Laura Gaddy, Lyle Small and Leanne Harris, recall being taught.

Laura Gaddy was a young child in primary when she was taught this lesson. Leanne Harris was

a teenager who recalls reading this lesson, and Lyle Small also recalls the lesson.

86. <u>1994. Apostle Oaks' Tithing Use Omissions in April General Conference.</u>

His Speech Remains Available on Official LDS Website as of 2021. Dallin Oaks said:

> *The Lord has directed by revelation that the expenditure of his tithes will be
> directed by his servants, the First Presidency, the Quorum of the Twelve, and
> the Presiding Bishopric (see D&C 120). Those funds are spent to build and
> maintain temples and houses of worship, to conduct our worldwide missionary
> work, to translate and publish scriptures, to provide resources to redeem the
> dead, to fund religious education, and to support other Church purposes
> selected by the designated servants of the Lord.*

All Named Plaintiffs recall hearing this April 1994 statement by Elder Oaks in April

---

[15] The above is from "Lesson 42: Tithing," *Primary 3* (1994) pp. 208–12.[65]
https://www.churchofjesuschrist.org/manual/primary-3/lesson-42-tithing?lang=eng (last viewed 03/17/2021)

Conference.

87. From 1993 to the present. Priesthood Manual contains omissions re: Tithing Use.  The manual states: "The tithes and offerings we give to the Church are used for the Lord's work." The manual then lists the ways that tithing is used, none of which include commercial or investment purposes.

> Operate the missionary program. Build and maintain chapels, temples, and other buildings, Educate people in Church schools, seminaries, and institutes, Create, print, and distribute the scriptures, lesson manuals, and other Church materials, Further family history work, Provide for those in need, Meet the expenses of general conferences. [16]

Mr. Small recalls being this exact lesson taught from this manual. Laura Gaddy does not recall this teaching from the Priesthood manual. Leanne Harris recalls this lesson from the priesthood manual.

88.    In 1997, using a sports team analogy, the "overall mission of the church" as referenced in the post 2012 tithing form, is described in the context of purely ecclesiastical activities, no commercial activities noted. [17] HARRIS and GADDY, who live out-of-state periodically read the Church News online while they were members, and although they cannot say they read the particular references, to the "Overall Mission of the Church," cited herein, apart from the reference at the bottom of the 2012 change to the tithing slips, each recall the Church using that phrase, and never did it include tithing principal for commercial

---

[16] The above is published by the COJCOLDS: Duties and Blessings of the Priesthood: Basic Manual for Priesthood Holders, Part B, Lesson 30 "Tithes and Offerings." T[66] The link is accessible as of Feb. 12, 2021. https://www.churchofjesuschrist.org/study/manual/duties- and-blessings-of-the-priesthood-basic-manual-for-priesthood-holders-part-b/gospel-principles-and- doctrines/lesson-30-tithes-and-offerings?lang=eng The above quotation is from the January 2000 edition; however, upon information and belief, based upon conversations with former male LDS members, the same language is contained in the earlier manual, first published in 1993.
[17] Updated 18 OCT 1997 12:00 AM MDT https://www.thechurchnews.com/archives/1997-10-18/of-one-faith-one-testimony-129282  Last viewed July 28, 2021

ventures or investment in a hedge fund as revealed in the 2019 Whistleblower report.

89.    Gaddy and Harris, who live out-of-state, periodically read the Church News online while they were members, and although they cannot say they read the particular references to the "Overall Mission of the Church," cited herein, each recall that phrase, and never did it include using tithing, whether interest or principal, for commercial development purposes, or to invest in a hedge fund as revealed in the 2019 Whistleblower report."

90.    According to Lyle Small, who served as Sunday School President, Ward Mission leader, Elders Quorum Presidency first counselor, and Young Mens President, the phrase "overall mission of the church" was drilled into every one of the LDS ward members on a regular basis if they attended church regularly.

91.    Named Plaintiffs regularly watched or listened to Conference in the spring and fall each year. If a key speech were missed, each of them would read it in the *Ensign* Magazine, to which all had regular access and each read, or at least skimmed regularly. As an adult, Mr. Small's father bought him a yearly subscription to the *Ensign*, which continued giving him access through at least 2019. Mrs. Harris and her husband initially subscribed to the *Ensign* after their marriage in the late 1990s. After a few years, that subscription was gifted to the couple by Mr. Harris' grandmother who continued to provide them with it through at least 2019. Laura had continued access through her mother's subscription and/or  that of her local ward.

92.    At General Conference in April 2003, then LDS Prophet Gordon B. Hinckley announces with regard to the downtown redevelopment project, which would include City Creek Mall:

We have felt it imperative to do something to revitalize this area. But I wish to give the entire Church the assurance that tithing funds **have not and will not be** used to acquire this property. **Nor will they be used in developing it for commercial purposes.** Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with the earnings of invested reserve funds, will accommodate this program. [Bold emphasis added] [18]

93. GADDY, SMALL and HARRIS and upon information and belief, since this was a speech by then LDS prophet and president, most potential class Plaintiffs, either heard or read this speech. The definition of "invested reserve funds" was unknown to GADDY and HARRIS and was not recalled by SMALL from priesthood meetings he might have attended in the early or mid-1990s. Upon information and belief, based on conversations with potential class members, female plaintiffs did not recognize the term. The early 1990 speeches were obscure as to the meaning of invested reserve funds, connecting that phrase with income, which connotes taxable funds and something other than donations or tithing. Because priesthood-serving average male members knew that the Church did in fact own some commercial companies which paid taxes, like Deseret Book, Bonneville Communications and the Polynesian Cultural Center. All Plaintiffs had always been taught that tithing was used for religious purposes. Thus, it was reasonable for them to conclude that "earnings of invested reserve" funds came from the profit made by the previously disclosed and well-known church owned businesses like Deseret Book.

94.    The entire import of Hinckley's statement did not make an impression on GADDY'S young teen mind until years later because the statement merely aligned with the prior teachings that tithing was always used for religious purposes. Hinckley's promise never to use tithing for City Creek was confirmation of her prior understating for the uses of tithing. "Of course,

---

[18] President Gordon B. Hinckley, spoken at the Saturday Session at April 2003 General Conference, subsequently printed in the May 2003 *Ensign*, "The Condition of the Church, "pps. 5-6

tithing would not be used to build a commercial shopping center, these must be anti-Mormon rumors," she thought. Leanne Harris had similar thoughts when she heard the April 2003 statement. What Hinckley Meant by "Invested Reserve Funds" was not defined clearly defined by him in that speech.

90.    However, upon information and belief, according to David Nielson in the Whistleblower Report and his Declaration, at the time Hinckley made this statement EPA was "seeded with tithing money" (Nielsen Declaration ¶ 5) and Defendant had been commingling surplus tithing principal for several years (Whistleblower report and Nielson Declaration ¶ 6). Furthermore, according to a declaration by the Church's Director of Finance and Records Department, filed with the summary judgment motion brought by Defendant COP in the Huntsman case, from as early as the late 19th Century, all the Church's commercial projects were initially funded with "contributions". "In addition to building the temple and tabernacle at Temple Square, Brigham Young began establishing numerous commercial enterprises. These were financed with contributions that had been made to the Church." (Declaration of Paul Rytting ¶ 4, in Huntsman v. COP, United States District Court for the Central District of California, Case 2:21-cv-02504-SVW-SK Document 32-5)

91.      In 2004 an LDS Missionary Manual Omits that Tithing is Used for Commercial Projects:

*"Tithing funds are used to support the ongoing activities of the Church, such as building and maintaining temples and meetinghouses, carrying the gospel to all the world, conducting temple and family history work, and many other worldwide activities."* From *Preach My Gospel*, p. 79. This statement is contained in the manual used by all LDS missionaries worldwide, serving from 2004 through 2018, when the manual was updated. It was used by GADDY on her mission, and she preached the same message to potential members.

93.     With regard to the 20-acre development the Church was then tentatively calling City Creek Center, which included City Creek Mall, in December 2006, Defendant's *Ensign* magazine wrote and published the following:

> "The Church first announced three years ago it was planning to redevelop the downtown area to energize the economy of the city that houses its headquarters and to bolster the area near Temple Square. **No tithing funds will be used in the redevelopment." [19]**

All named Plaintiffs read the above article in the *Ensign* in December of 2006 or early that following year. At the time that statement was published, Mr. Burton, and/or the Church, speaking through the *Ensign,* either knew that tithing was used for commercial investment and development and had been for many years, or made that promise recklessly. Either way, when made, the Church had no intention of keeping that promise because all funding for church commercial projects had tithing as its source, as explained in the Huntsman case declaration.

94. The following statement was also made, and read by prospective members of the prospective Class who subscribed to the Church-owned *Deseret News.*

> "Money for the project is not coming from LDS Church members' tithing donations. City Creek Center is being developed by Property Reserve Inc., the church's real-estate development arm, and its money comes from other real-estate ventures. Doug Smeath," "Downtown renovation project", published in the COP-owned *Deseret News* March 27, 2007. [20]

---

[19] "Church Releases Plans for Downtown Salt Lake, *Ensign*, Dec. 2006, pp. 76–80**.** https://www.churchofjesuschrist.org/study/ensign/2006/12/news-of-the-church?lang=eng, Last viewed Feb 16, 2021. Although Bishop H. David Burton, Presiding Bishop of the Church is mentioned in the article. It is unclear whether he made the above statement or whether it is a representation directly by the Church who owns/ed and has/had control over all content in its Ensign publication. Nevertheless, the *Ensign* chief editor has the authority to speak for Defendant. Additionally, the *Ensign* magazine had the largest circulation of any church-owned magazine at the time and statements contained therein were intended to reach LDS members.
[20] https://www.deseret.com/2007/3/27/20009045/downtown-renovation-project respectively. (Last viewed Feb. 16, 2021).

95.   In 2010 *Deseret News* Advises Members to only use Church-approved Source Material.

In January of 2010, the Church owned *Deseret News* published an article titled "Use Proper Sources," that depicts a mother-daughter scene transparently designed to advocate continued mind control over Mormon Church membership. The story in the article is of a mother struggling to prepare a Church lesson, books strewn across her table. The daughter asks her mother why she doesn't just teach from the Church manual. "Why," she asks, "are you trying to boil down information? An inspired Church-writing committee has already done that for you." Daughter says that the manuals have been approved by the Quorum of the Twelve and the First Presidency. Mom, apparently a little dense in this scenario, looks confused. Daughter goes on to explain that all she needs to teach is in the approved manual which has been admittedly 'correlated' by the Brethren "… to ensure purity of doctrine, simplicity of materials, and control by the priesthood." Mother's concern disappears from her brow. She is relieved that the work (the thinking) has been done for her and she closes her books, shuts down her internet browser and returns from her brief, thinking escape, to the land of the unquestioning.[21]

93.   Laura was at BYU from 2009-2011. Although she did not personally subscribe to the Church owned and controlled *Deseret News*, she had a lot of callings and classes that were religion based. and the foregoing mother daughter story is "rings a bell" with her. She used a lot of sources from BYU to teach at the time and during her preparation read this article. At that time the article confirmed to her the importance of correlated sources and reading outside them was not something her church leaders wanted her to do.

---

[21] Use Proper Sources," *Deseret News*, Church News Section, Saturday Jan. 9, 2010 [no author credited]. (Salt Lake City: Deseret News Pub., 2010) (Accessed 07/03/2010.) https://www.thechurchnews.com/archives/2010-01-09/use-proper-sources-67734 (See Exhibit No. 6 to this Complaint filed herewith for the complete text of the article)

96.     Upon information and belief, based on Ms. Caroline Winters' blog, in 2011 or 2012, Keith McMullin, then a member of the Corporation of the Presiding Bishopric (CPB), told Caroline Winter, a Bloomberg Businessweek writer, that "**not one penny of tithing goes to the church's for-profit endeavors**." The statement was re-published in the *Salt Lake Tribune* on October 5, 2012. [22] Upon information and belief, based on information in the Whistleblower report, checks from EPA's Treasury containing only never-invested tithing had already been written when Mr. McMullin made this intentionally false public statement. The *Salt Lake Tribune* was the newspaper with the largest circulation in Utah as of that date. It was read by many LDS, including members of the potential class who reside in Utah, though it ordinally would not be subscribed to by those who live outside the State, including Named Plaintiff's.

97.     From a section in the December 2014 *Ensign* entitled "What we Believe," An unattributed author writes: "Tithing Helps Build up the Kingdom of God:" "Tithing allows the Church to build and maintain temples and meetinghouses, to support seminaries and institutes, to provide materials for Church members, and to sustain missionary, temple, and family history work."

---

[22] https://archive.sltrib.com/article.php?id=54478720&itype=cmsid

There is no disclosure that tithing is used for commercial projects.



"Tithing and other donations are given to the Lord through a member of your bishopric or branch presidency."

- Tithing funds are transmitted from wards and branches to Church headquarters, where a council that includes the First Presidency decides how these sacred funds will be used.

- Tithing pays for the cost of building and maintaining temples and meetinghouses.

- Tithing pays for the translation and publication of scriptures and lesson materials.

- Tithing helps pay for educating young members in Church schools, seminaries, and institutes of religion."[23]

---

[23] Under a section of the COJCOLDS *Ensign* magazine labeled: What We Believe, "Tithing Helps Build up the Kingdom of God," The author is unattributed. December 2014 *Ensign*, pp 8-9. Also online at:



All Named Plaintiffs recall seeing and reading this graphic in the December 2015 *Ensign* when it came out or shortly thereafter. It confirmed their longstanding understanding of how tithing was used solely for religious purposes.

98.  In the October 2018 issue of the *Ensign Magazine* publishes another misleading graphic about tithing:

https://www.churchofjesuschrist.org/study/ensign/2014/12/tithing-helps-build-up-the-kingdom-of- god?lang=eng
Viewed September 7, 2021.



TITHING MAY BE USED FOR:

Constructing and maintaining temples, churches, and other Church-owned buildings

Operating Church-education programs

Printing scriptures and other materials

Doing family history research

Providing welfare and humanitarian efforts

Doing missionary work

Providing Church activities for fellowshipping among ward or branch members

**LEARN MORE**
- Elder David A. Bednar, "The Windows of Heaven," October 2013 general conference
- Malachi 3:7–18
- "Tithing," *True to the Faith* (2004), 180–82

October 2018   **11**

All Named Plaintiffs saw and read this graphic when it  was published in the *Ensign* or shortly thereafter.  They rightly interpreted the word "may" as meaning that these are the only purposes for which tithing is allowed to be used.

99.     In 2021 a Church Online Magazine Misrepresents Tithing use: "Well, according

to a January 2021 article on tithing use by COP-owned online magazine, *LDS Living*. Entitled

"What is Tithing Money Actually Spent on?" it reads:

> Well, according to a Church Newsroom release published in 2019 [a later version
> links to a COP essay on tithing], donations are spread among six categories, and
> they all revolve around the four-fold mission of the Church: to teach the gospel to
> the world, to strengthen the membership of the Church, to perform saving
> ordinances for the dead, and to care for the poor and needy."[24]

This representation was after Named Plaintiffs resigned from the Church, but serves to show the

ongoing deceit in Defendant's publications about tithing.

100.    For all relevant times, since they became an adult at age eighteen, GADDY, SMALL and

HARRIS had confidential interviews with theirs LDS bishop, branch president, stake president

or direct mission leader prior to getting baptized and receiving a temple recommend. Whether at

age 8 or as an adult, that interview was conducted between the lay agent for COP and the

prospective member in an LDS chapel or facility used to hold LDS services, in a private room

with no others present, all leading to the aegis of confidentiality. Both the LDS leader and the

potential member expected confidentiality.

101.    Among the questions asked in the baptism and temple recommend interview were:

a.      Do you believe the Church and gospel of Jesus Christ have been restored through

the Prophet Joseph Smith? Do you believe that [current Church President] is a prophet of

God? What does this mean to you? And

b.      You have been taught that membership in the Church of Jesus Christ of Latter-day

Saints includes living gospel standards. Are you willing to obey the law of tithing? Do you

---

[24] https://www.ldsliving.com/what-is-tithing-money-actually-spent-
on/s/93817#:~:text=Building%2C%20Maintaining%2C%20and%20Repairing%20Meetinghouses,history%20research%
2C%20and%20emergency%20response.

understand what that means? [25]  (This tithing question is one of several, including others such as obeying the law of chastity and keeping the sabbath day [Sunday] holy.)

102.    Named Plaintiffs and most all potential class members also met with a bishop and/or stake president in order to take out their endowment in an LDS temple. This ordinarily occurred when the member was a young adult, or later in life if a convert. This meeting was called a temple worthiness interview. These questions include those asked in the baptism interview above, namely asked to confirm his or her testimony of Joseph Smith as the prophet of the restoration and/or the COJCOLDS as being the restored gospel of Jesus Christ and whether s/he obeys the law of tithing and/or pays a full tithe. Additional temple questions are asked as well. [26]

103.    The circumstances surrounding that temple recommend interview indicate that both the lay agent for Defendant and the member who wants to obtain their endowment, whether for a mission or a temple marriage (those two events are ordinarily the two for which an endowment may be taken out) expect confidentiality. Any records kept are considered confidential.

104.    Each December an LDS member meets with the bishop for tithing settlement, to declare whether s/he has paid a full tithe and to make up anything that is less than full for the year. Payments made and communications during tithing settlement are carried out confidentially. Each party has an expectation of confidentiality. If a full tithe is not paid, the temple recommend is not issued or renewed.

---

[25] From *Preach My Gospel* © 2004, pps 205-206.
[26] Note: At some point the question was changed to whether the interviewee has a testimony of the restoration of the gospel of Jesus Christ instead of an express reference to Joseph Smith.

## V.   **FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF LAURA GADDY**

105.    LAURA GADDY [27] was raised by her single mother who converted to the LDS Church in 1979, having relied on the correlated materials for her conversion and commitment to the Church. LAURA, along with her three older siblings, attended the LDS ward in Gastonia, North Carolina. She participated extensively in all the Church auxiliary programs from Primary onward, including Sunday School, Young Women and at age seventeen, Relief Society. She sang children's tunes about Smith's golden plates being a record made by [the ancient prophet] Nephi.

106.    She sang the song about the prophet never leading her astray. Chorus lyrics are:

> Follow the prophet, follow the prophet,
> Follow the prophet; don't go astray.
> Follow the prophet, follow the prophet,
> Follow the prophet; he knows the way. [28]

107.    Laura heard relied on the Church's leaders that they would never lead her astray. She heard or read and relied on the representations N, O, Q and R in the table contained herein with quotations from Church leaders that she and LDS members would not be led astray.

108.    A typical week during her childhood and youth was spent at the LDS Church for three hours on Sunday, learning about Mormonism at Family Home Evenings on Mondays, attending auxiliary activities for several hours on Wednesday nights and various Church activities on Saturday, including performing chapel janitorial duties. During these activities, most of which were held at the local chapel, she saw pictures of Smith translating directly from the gold plates Never did she see artwork showing Smith creating the *Book of Mormon* by using a brown stone buried in a hat, or of the brown stone as the artifact used to create the Book of Mormon.

---

[27] LAURA GADDY will be referenced as LAURA, with re events before her marriage to Mr. Gaddy.
[28] Chorus to "Follow the Prophet," *LDS Children's Songbook* (#110), Words and music: Duane E. Hiatt, b. 1937. © 1989 IRI.

109.   Laura's mother subscribed to the *Ensign* Magazine and Laura would skim through the monthly issues growing up, looking mostly at the pictures. As an adult, at least monthly during her time in the church she would skim through the latest copy of the *Ensign* while waiting in the foyer of her ward chapel, again mostly looking at the pictures and graphics. She did this more or less monthly throughout her membership in the Church, with adjustments on access while she served her mission.

110.   At twelve LAURA was worthy to attend the holy temple and be baptized for the dead.

111.   She attended the Church's girls camp. She also served in numerous callings from Relief Society President to visiting teaching coordinator and gospel study teacher.

112.   She had always been taught that tithing was used for church purposes and activities. She understood this to mean religious purposes and activities. Never in her life did she imagine her hard-earned tithing would be used to develop a mall or to finance commercial properties, especially when after she resigned, she discovered how little had been used for humanitarian aid.

113.   From age seventeen until early 2018, LAURA paid tithing on her earnings. She deposited the cash or a check in an envelope after filling out the form provided by the local ward. Her contributions were forwarded by her local ward bishopric to the COP.

114.   Since childhood, it was LAURA'S habit to listen to both Saturday and Sunday Conference sessions, in fall and spring, initially via broadcast to her local North Carolina chapel from Salt Lake City, where she was assured that her spiritual leaders would never lead her astray.

115.   She ordered temple garments, teaching materials, and mementos from Deseret Book online through Deseret Book's website and in person,

116.   LAURA graduated high school in 2004. From age 17 to 29 she drove 25-40 miles to

attend Institute and singles wards. At age 21 she worked as a waitress to save for a mission.

<u>LAURA's Dedicated Service to the Mormon Corporate Empire</u>.

117.    While living in Gastonia, in 2005 and 2007 LAURA's bishop recommended that she serve a mission. She prayed about it and in 2007 received her mailed calling from COP headquarters. All twelve members of her family gathered around while she opened the envelope to reveal she had been called to the Hamburg, Germany Mission. Having received the academic award for the German language in high school, at age twenty-one she left for her mission. LAURA, and upon information and belief based on interviews, many members of the putative class who served missions, financed them in whole or in part. Some have financed missions of others, including but not limited to their children and grandchildren.

118.    LAURA stayed just 2.5 weeks at the MTC due to her facility with the German language. While there, nothing but correlated information was presented, including the uses of tithing.

119.    Excited to serve, once in Germany LAURA served honorably for nineteen months working approximately 75-80 hours a week. After serving diligently, LAURA received credit for just two converts. Many times, potential converts would raise objections to what she attempted to teach, including the principle of tithing. When questioned she was instructed by her leaders to ignore adverse comments as they were "Anti-Mormon lies."

120.    She returned home discouraged, convinced that her personal imperfections were responsible for her failure to secure more converts. However, she remained faithful.

121.    While on her mission, she taught potential members that tithing was always used for religious purposes and would then list those set forth in her manual, *Preach My Gospel*.

> Tithing funds are used to support the ongoing activities of the church, such as building and maintaining temples and meetinghouses, carrying the gospel to all the world, conducting temple and family history work, and many other word wide activities.[29]

122.    Hearing lessons and sacrament meetings about talks for how tithing was used. Implied only used for gospel purposes. Laura attended tithing settlement with her bishop as an adult each year before her resignation. She met with the bishop and subsequently with the stake president for the temple recommend within the same month. This meeting was every other year. Woody Aud was Laura's bishop in the Gastonia ward from about 2003 to 2007. She also met with Branch President Beachem who served as president of her singles branch from 2003/04 to 2007.

123.    Beginning in 2004 when she was 18, at the end of each year she met with either Aud or Beacham for tithing settlement and honestly declared that she paid a full tithe. Every other year she met with Aud or Beacham to answer the temple recommend questions set forth above. After meeting with the Stake President Poole beginning in 2004 and up to 2007 when she left for Germany, was given a recommend. She relied on the longstanding representations that tithing was used for religious purposes as her impetus to pay tithing.

124.    It was  Stake President Poole of the Gastonia Stake who set her apart for her mission before she left 2007, he again asked her the worthiness questions as set forth above and she answered wholeheartedly believing that Smith was a prophet of God who translated the book of Mormon directly from gold plates, and trusting that her leaders used tithing exclusively for the religious purposes listed in the rhetoric she had relied upon set forth in the above paragraphs. Stake President Poole released her from her mission in 2009.  She

---

[29] *Peach My Gospel*, p. 79, third paragraph; IRI, 2004.

was particularly pleased when in 2009 the church added as a fourth mission to the three-fold

(now four-fold) mission of the church to care for the poor and needy and now that her

tithing money would have an additional worthy goal, one for which Christ would approve.

125.    The statement that no tithing would be used for City Creek Mall, merely confirmed

to her expectations based on prior church representations that tithing was only used for

religious purposes and so even though she heard it in 2003 from President Hinkley, that

statement accorded with her beliefs about tithing. Certainly, no tithing would be used for a

lavish shopping Mall. Had Hinkley told the truth that tithing in fact would be used for the

Mall, she would have immediately stopped paying and begun researching church finances

as well as issues about church origins. She would have searched outside correlated material

due to the breach of trust had Hinckley revealed in 2003 that tithes would be used for City

Creek. This would have led her to disaffection and ultimate resignation from the church

more than a decade before she did. She certainly would not have spent a year and a half of

her time serving a mission for a church who could not be trusted. It would have saved her

the humiliation of preaching to Germans who would scoff at her about Mormon teachings.

126.   When she returned home to North Carolina, she applied to and was accepted at

Western Carolina University. During this time, LAURA discussed her college plans with

Stake President Poole, who told her she should apply to a Church school. He looked at her

and said with the stern force of prophecy "You should go to BYU-Idaho. You will meet

your husband there." In reliance on that prophecy, she declined acceptance to her local

school and embarked on a 2,000- mile cross-country move to BYU-Idaho, in Rexburg.

127.   LAURA graduated BYU-Idaho with a bachelor's degree. While there, she took additional

LDS religion courses and attended Institute. She used the Institute and religion course manuals

which never hinted at the church's use of tithing for commercial purposes, or that Smith created

the Book of Mormon while looking at an opaque stone in a hat. She dated and remained in the

Rexburg area for four months after graduation in an attempt to fulfill her stake president's

prophecy but did not meet her husband.

128.    She found a job in her specialty in Florida and lived with an LDS family there for

approximately two years. After much discussion and counseling with her bishop where she

confided the hopes, fears, and disappointments of her young life, LAURA decided that Florida

was not the right place for her. She looked for a professional position elsewhere. But while in

Florida, she wrote a check for tithing every other week when she got paid and attended tithing

settlement each year and maintained her temple recommend.

129.    Ultimately, LAURA took a job in Texas and attended a singles ward, where she met

her husband in April 2015. They were married in the Rexburg Idaho Mormon temple in

December of 2015. Two of her sisters were barred from the ceremony since the older one was

not temple worthy and the younger deemed too young.

130.    During her youth and young adulthood, she encountered nothing that caused her to

question or contradict any of the misrepresentations about tithing made at conference or in COP

correlated material. She, like all others who have been raised in the LDS Church, had been

admonished not to read outside of COP-approved sources.

131.   In 2016 a friend of Laura's who had become disaffected from the Church told her that the

Church was building or had built Salt Lake shopping mall using tithing funds. Laura mentioned the

issue with her husband who checked several sites, among them, an LDS apologists' site. [30] that

---

[30]

https://www.fairmormon.org/answers/Mormonism_and_church_integrity/City_Creek_Center_Mall_in_Salt_Lake_City#Q
uestion:_Was_the_Church-

quoted directly from both the 2006 *Ensign* report and 2007 *Deseret News* article quoting LDS agents who assured members that no tithing was or would be used for City Creek Mall. Her husband relayed that information to her, and she dismissed her friend's claim as another example of Anti-Mormon propaganda.

132.    LAURA GADDY and her husband remained active. She taught Relief Society in her ward. During her biennial temple recommend interviews she met with Bishop Chad Reese in 2016-2017 and with Bishop Brown in 2017-2018. There, she readily acknowledged that she paid a full tithing. Although she was alerted to the possibility that tithing was used for City Creek in 2016 by her friend, her husband's research citing church sources reinforced Hinckley's 2003 message that no tithing was used for the huge shopping mall. As such, she continued to pay a full tithe and serve her church leaders without question.

133.    She had relied upon COP's representations that tithing was used for Church expenses like missionary and educational funds, temples, religious building upkeep and maintenance, *Book of Mormon* publication, and as of 2009, aid to the poor.

<u>A Shocking Discovery Leads to Research</u>

134.    Then, in February of 2018, she was preparing a lesson for Relief Society. In search of conference talks to supplement her lesson she googled "Mormon videos" and came across a link to a video of an interview with Josh Durham, a Mormon physician, who talked about mind control and Steve Hassan's B.I.T.E. model of religious extremism in the context of Mormonism.

135.    Dr. Durham stated that Smith lied about his personal participation in polygamy. Initially, GADDY did not believe what she was hearing, she wanted to prove Dr. Durham wrong. She had

funded_redevelopment_project_in_downtown_Salt_Lake_City_known_as_City_Creek_Center_funded_using_tithing.3F
(Last accessed Feb. 20, 2021.

always been taught that Smith had just one wife, Emma Hale. She researched Smith's

participation in polygamy but found nothing dispositive on the LDS.org website. She did find

link on LDS.org to another site where Smith's wives were listed. Thinking that since the

Mormon website linked to an outside source from its own site, therefore she was allowed to read

it, she viewed websites that addressed Smith's lies about his polygamy, which led her to sites

where other historical issues were addressed, including the stone in the hat method of *Book of

Mormon* creation, *Book of Abraham* anomalies, Smith's 1826 fraud trial, and other information.

Over time, the conclusion was inevitable--Mormon history was radically different from what

she had been taught.

136.    In late 2019 she learned that the tithing which she had paid under the belief that it was

used for religious expenses had been used to stockpile liquid money assets and for business

enterprises, like City Creek. She flashed back on the time she heard President Hinckley say not

tithing would be used for City Creek and realized his promise was a lie, one of so many.

137.    GADDY attempted to discuss the historical issues with her family and friends, all of

whom either refused to listen to her or trivialized her concerns. She was alone in her despair.

138.    She found that she could not reconcile what she had learned with continuing membership

in the LDS Church. Ultimately, shortly after that rude awakening, she resigned from the Church.

139.    She underwent months of counseling for the severe emotional distress that she has

suffered upon learning that her trusted spiritual advisors have mispresented how her hard-

earned tithing was used in that they ha, the facts about church history, and concealed Smith's

stone, artifacts, original manuscripts, documents, and information, leading her to build her faith

upon an incomplete and misleading premise. Her entire life had been based upon a lie.

140.    In 2019, realizing she could not trust her LDS leaders, she read news stories about the IRS

Whistleblower complaint. She learned that a former employee of EPA claimed that tithing was used for City Creek Mall and to bailout out Beneficial Life Insurance company. She reflected back years ago in 2016 when a friend of hers who had become disaffected from the Church told her that the Church was building a Salt Lake mall using tithing funds. She had mentioned the issue with her husband who checked several sites, among them, an LDS apologists' site. [31] that source quoted directly from both the 2006 *Ensign* report and 2007 *Deseret News* article quoting LDS agents who assured members that no tithing was used for City Creek Mall. Her husband relayed that information to her, and she dismissed her friend's claim as another example of Anti-Mormon propaganda.

141.    Though she heard Hinckley's 2003 claim, she did not connect the phrase "invested reserves" with "tithing" as that information was not provided to her since she was female and not invited to the 1991 and 1995 priesthood conference sessions where Gordon Hinckley allegedly defined the term "invested reserves." She was also just a child at the time. GADDY would not have paid tithing had she known tithes would in fact be used for the development of City Creek Mall.

142.    GADDY reflected on all the times she heard and later, taught others that tithing was only used for Church purposes and activities. She had been misled and misled others. Now it appeared that tithing was used for commercial purposes; it was another breach of trust, a misrepresentation from her leaders who promised to never lead her astray, that they had in fact deceived her. She remembered the numerous hours spent cleaning her local chapel in order to help the Church

---

[31]
https://www.fairmormon.org/answers/Mormonism_and_church_integrity/City_Creek_Center_Mall_in_Salt_Lake_City#Question:_Was_the_Church-funded_redevelopment_project_in_downtown_Salt_Lake_City_known_as_City_Creek_Center_funded_using_tithing.3F (Last accessed Feb. 20, 2021.

conserve janitorial expenses when Defendant had tens of billions of dollars in secure in EPA.

143.   She wept at all the historic deceit, the greedy character of the Church and realized from what she had discovered that her entire life had been dedicated to the service of a fraud.

144.   Additionally, Laura would not have remained LDS, served a mission, graduated from a Church owned college and married a true believing LDS man in an LDS temple, had she learned in her youth how tithing had been sued since the days of the pioneers

## VI. <u>FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF LYLE SMALL</u>

145.   LYLE SMALL is a resident of El Paso County Colorado. He was born in Provo, Utah. Mr. Small obtained a BS in engineering from Cornell, where he attended LDS institute classes, and an executive business master's degree from Harvard. He was born in a highly orthodox Utah LDS family and baptized at age eight. He was a dedicated member of the Church having participated in the Provo temple baptisms for the dead hundreds of times and attended the Hill Cumorah pageant at least three times. Date of birth: October 12, 1967

146.   A 1986 Graduate of Springville High School, Mr. Small was president of the High School seminary. He served as assistant to the bishop in the priest's quorum while in high school. Mr. Small served a two-year full-time LDS mission to Finland. On his mission he taught all investigators that tithing was the means by which God and His servants pay for the expenses associated with running the Church, providing for the spiritual needs of members of the Church and to provide service and assistance to mankind.

147.   Married in the LDS Temple, Mr. Small held a temple recommend continuously (except for a two-month inadvertent lapse) for over 33 years until his resignation in 2019. He had been a full tithe payer since age eight, during his entire 51 years as a member of the Church.

148.   In late February or early March 2019, he came across a Facebook post by a friend asking

whether Joseph Smith was a sexual predator. He sought to rebut the post and started researching

LDS history which led him to read from independent sources. Prior to that time, he had never been

informed of the LDS essays admitting in many respects the previously characterized "Anti-

Mormon" lies." Growing up he had been admonished that the information he learned from

researching independent LDS history was Anti-Mormon lies that he must avoid.

149.   After researching LDS history, Mr. Small resigned from the LDS Church in October 2019.

Most of his family remain members of the Church. This situation causes significant familial stress.

The emotional trauma he experienced as a result of Defendant's fraud has been intense and

ongoing.

150.   Regarding the LDS tithing slips, Mr. Small understood that tithing would be used for all of

the sub-categories shown since he and others who served in local callings, were specifically told by

local lay leaders that these categories were among the uses for tithing. Mr. Small thought the sub-

categories were for those who had some kind of special interest in one of them, such as a

missionary they wanted to support, or that they wanted additional funds to go toward humanitarian

causes. He never contributed to those categories because he thought that his tithing was going to

them anyway and that 10% of his income was enough.

151.   He believed that the Church would ultimately be using tithing money for religious, not for

growing an empire. He never imagined that the investment returns on tithing money would be

money that the Church could do whatever it wanted with, because the leaders had no other ultimate

sources of funding besides tithing. That was a ludicrous idea to him. Leaders at the general level

were not supposed to be working outside of their sacred callings. Mr. Small assumed the "reserves"

must have come from individual members of the Church who had collaborated in some way with

the Church.

152.   As to Mr. Small, Local leaders (Every bishop and stake president mentioned in his ward or stake below, as well as teachers, Elders Quorum instructors, visiting members of the Area Authorities, etc.,  described the three-fold mission of the church just as all of the Sunday School, Relief Society and Priesthood manuals described it; Perfect the Saints (churches, programs temples, teaching materials), Redeem the Dead (temples, family history research and investment in data), Proclaim the Gospel (missionary work and expenses associated with "bringing others to Christ".)

153.   There was never at any time, any intimation from anyone, that the church had a focus on business or investment as some kind of strategic priority.  He was told explicitly on many occasions that; "If the Church had extra money, they invested it as a responsible thing to do, while they figured out how to best spend it to help God's church and humanity at large." – (Note: This is not an exact quote of a particular leader, but rather the over-arching message repeated often and with specificity regarding the uses of tithing money.)

154.  Had Mr. Small known how the Church had behaved relative to money, he would definitely have been shaken and almost certainly driven to learn more about what was going on. It is difficult to imagine remaining in the Church if he looked for anything factual, because indeed, once he looked for "independent information" it was clear to him that the Church was not what it claimed to be, nor who they said they were. Mr. Small believes that the Church leaders do not act with integrity in any way, particularly when it comes to money and what they do with it.

155.  In December of 2019 Mr. Small read the news reports of the IRS whistleblower claim and learned that the Church used tithing for commercial projects. Prior to that he had understood that it earned interest and invested excess tithing in stocks and bonds, pending eventual use for strictly religious purposes, but had never been told that the tithing funds were actively used for

commercial development or to fund Church businesses.

156.   Mr. Small heard or read and relied on the Church's leaders that they would never lead her astray. Specifically, she heard and relied on the representations E, F, G, H, K, L, O, P, Q and R in the table herein with quotations from Church leaders that LDS members would not be led astray.

157.   Mr. Small specifically heard and relied on Gordon B. Hinckley's April 2003 promise that no tithing would be used for City Creek. He relied on that promise in continuing to pay tithing and to stay active in the Church. Mr. Small would have stopped paying tithing and begun to question how tithes were being spent, had he known tithes were used for the Development of City Creek Mall.

158.   Until he read the Whistleblower report, he did not know that tithing principal was commingled with the Church's business profits in the EPA hedge fund as revealed in that report. He did not connect "invested reserves" with "tithing" as that information was vague and obfuscated in the 1991 and 1995 priesthood-only Gordon B. Hinckley conference speeches, and because the information was preceded and superseded by prior and subsequent misrepresentations in COP's publications, that tithing was not used for City Creek Mall. All of this misdirection, together with the numerous representations by COP's agents, including local lay leaders, that tithing was only used for religious purposes made him trust that the Church was a vehicle for good in the world until 2018-2019.

159.   From 2000 through 2004, Mr. Small attended tithing settlement annually and renewed has temple recommend, obtained when a teenager prior to his mission, biennially. In doing so he answered the questions set forth in the paragraphs above. He met with Bishop Chip Fullmer of the Black Forest LDS ward in Colorado Springs East Stake from 2001 through 2004 for tithing settlement. He met with President Edwin Griggs of the Colorado Springs East stake from 2000-2004 for his temple recommend renewal.

160.   Had he been told in April 2003 that tithing would be used to fund the City Creek project (including the mall) he would have immediately quit paying tithing until he could determine how his tithing was in fact being used, which he now realizes would have likely led him to the conclusion that Church leadership was lying to the LDS Church members regarding tithing and many other crucial matters pertaining to their participation as members of the Church.

161.   Due to a mistrust of the Church as to tithing use, he would have certainly begun researching issues about LDS history. At that time, the objective historical narrative would have been available from non-correlated sources and he no doubt would have resigned from the Church within a year of finding the truth about City Creek. This would have been almost a decade and a half before he actually did resign due to discoveries about Smith and manipulated LDS history.

162.   However, from 2004 through 2007, hearing nothing about non-religious uses of tithing, he continued to pay tithing to, and attend tithing settlement with, Bishop Kim Thomas of the Black Forest Ward and meet biennially with President Millen Clawson of the Colorado Springs East Stake (or one of the members of his Stake Presidency) from 2004 through 2007, to renew his temple recommend.

163.   From 2009 through 2013, approximately the years that tithing was being used to fund City Creek overruns (2010-2014), he met with Bishop Marion Shumway from 2009 through 2013 of the Cordera Ward in Colorado Springs, and Bishop Todd Rogers from 2013 through 2018, of the Northgate Ward in the Colorado Springs North Stake for tithing settlement. He also met with Stake President Kevin Woodward (or one of the members of his Stake Presidency) every other year from 2010 to 2019 to renew his temple recommend.

164.   All of the above tithing settlement meetings and temple recommend renewal interviews were confidential and would not have occurred had Mr. Small known of the Church's funding of the

lavish City Creek Mall. Mr. Small relied on the Church to act in good faith toward him since the transaction was essentially a business one, i.e., he paid 10% of his income for full access to LDS benefits.

165.   Besides abandoning the payment of tithing upon learning that tithes would be used to shore up City Creek Mall, Mr. Small would not have remained LDS, served a mission, served in numerous local priesthood capacities in his ward, or married in an LDS temple, had he learned as a young man that tithing had been used for commercial projects since the 19th Century as admitted in Paul Rytting's Declaration.

## XI FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF LEANNE HARRIS

166.   LEANNE HARRIS is a resident of San Luis Obispo County, California. She has a degree in massage therapy. Mormonism was extremely important to her and a way of life for her family growing up. LEANNE was baptized at age eight. She was a dedicated member of the Church, who attended LDS Seminary classes and who paid tithing her entire adult life until 2019.

167.   Mrs. Harris was married in an LDS temple and is the mother of five children. Her oldest son Maxwell passed away in a boating accident at a family reunion in 2010 when he was almost 10 years old. Her oldest sister passed away in a car accident when LEANNE was 10 years old. As a result of these untimely deaths, HARRIS and her husband "doubled down" on LDS doctrine because they trusted and believed the teachings of the Mormon Church, including how tithing was  used. Leanne grew up poor, but her family aid tithing. She was particularly encouraged by her belief that her tithing went to help the poor.

168.    She and was husband were taught that you had to be baptized, go through the temple, pay tithing, give of your time and talents, and then you could live with your family for eternity.

They did their son's temple work only months after his death. After losing a sister and then losing a son, HARRIS held on to what she had believed was the truth and gave the church everything she emotionally and physically could spare.

169. Leanne Harris heard or read and relied on the Church's leaders that they would never lead her astray. Specifically, she heard and relied on the representations L, M, O, and R in the table in herein with quotations from Church leaders that she and LDS members would not be led astray.

170. Leanne Harris thought her tithing was used for all the categories listed below the tithing row, in the tithing forms, and that it was her responsibility, as a faithful member of the church, to donate 10% of her money to the church so the church (not counting fast offerings) could use my money for charitable purposes, just like Jesus would have done. I thought the list of items beneath tithing was simply for those members who had the means and who felt compelled to donate above and beyond the required 10% in tithing to a specific category, or to help one or more of those identified causes. When she read the change in the tithing form in 2012 that funds would be used at the Church's discretion for "overall mission" of the church, it did not bother her because she knew, based on the three and then four-fold declared missions of the church and having heard the phrase "overall mission, that those missions encompassed were solely dedicated to use tithing for religious purposes, for those things that Christ would have used tithes for, and not to stockpile money and buy real estate.

171. In 2019 HARRIS discovered through the CES letter and other publications that the Church was not what it claimed to be. Soon after her disaffection, she learned of the contents of the Whistleblower report.

172. Harris specifically heard Gordon B. Hinckley state that no tithing would be used for City the Creek Development (including what would be the mall) in April 2003. She relied on that

statement and heard and relied on the subsequent misrepresentations in Defendant's publications and by its agents that tithing was and would not be used for City Creek Mall and was not used, as identified above. Though she heard Hinckley's 2003 claim, she did not connect the phrase "invested reserves" with "tithing" as that information was not provided to her since she was female and not invited to the 1991 and 1995 priesthood conference sessions where Gordon Hinckley allegedly the defined the term "invested reserves." She was also just a teenager at the time.

173.    In 2003, she and her husband attended tithing settlement conference and declared and in fact paid a full tithe in settlement with Bishop Wood of the Oceanside 1st Ward in Oceanside California. She relied on President Hinckley's promise earlier that year in April that no tithing would be used for City Creek Mall. She then met with President Packer of the Oceanside Stake for renewal of her temple recommend which she received just before her temple marriage when she was still a teen.

174.    From 2007 through 2011 she and her husband continued to pay tithing to Bishop Shirley at the Oceanside 1st ward and met every other year with President Packer of the Carlsbad Stake as well. By then, she had heard about the addition of a 4th mission to the 3-fold mission of the church, "to care for the poor and needy," and she was delighted for that addition. During this time, unbeknownst to Leanne, the church bailed out its failing business, Beneficial Life Insurance, with $600 million dollars in tithing. But this was not disclosed to her and so she continued to trust and pay 10% of her income.

175.    From 2011 through 2012 she and her husband had moved and paid tithing to Bishop Casper in the San Luis Obispo 1st Stake. They met with him each year at tithing settlement just as the Church was using hard earned tithes to pay for City Creek Mall cost Overruns in 2010-2014.

176.    From 2013-2016, she met with Bishop Casper of the San Luis Obispo Ward. She does not recall her stake president at the time, but met with him as well for renewal of her temple recommend.

177.    Form 2016-2019 she met at tithing settlement with Bishop Platt where she declared a full tithe and then me with Stake President Casper of the San Luis Obispo stake for her temple recommend.

178.    Although the tithing settlements meetings were annually and the recommend interviews for renewals were held biennially,  it was made clear to her by all of the above LDS authorities, that payment of a full tithe was required to keep her recommend. She knew this was the case from the time she first received her recommend, and understood that tithing was required even as a child when she was first taught about tithing in preparation for baptism.

179.    Although Leanne had seen photographs of the lavish City Creek Mall, she did not visit until 2020, after her resignation. Then she recalls seeing a billboard advertising the Mall with people drinking alcohol on it. They also sold coffee there, and she remembers thinking about how she had been taught growing up in the Church to not even have the appearance of evil, but there the Church was making money from things it taught the LDS members not to do. She also thought of all the people whose suffering could be helped if the Church had used the $1.4 billion dollars of tithing spent on the mall for the poor and needy

180.    HARRIS would not have paid tithing had she known that President Hinckley did not intend to keep his promise, that no tithes would be used for development of City Creek Mall. However, President Hinckley's April 2003 promise reassured her that the church used its tithing only for religious or non-commercial purposes. She relied on that promise when paying her annual tithing, entering in all the contracts with all her bishops in California

181.    Had President Hinckley acknowledged in April of 2003 that $1.4 billion dollars in tithing would or even might be used to develop the lavish City Creek Mall, Leanne would have begun to distrust her leaders and paused paying her tithing while she investigated just how her tithing was being spent. This would have caused her to search outside of correlated LDS

materials where she surely would have come upon an objective narrative of LDS history which is radically different from the misleading historical narrative of the history of Mormonism, including the source of its key scripture, which had been manipulated by Defendant. Ultimately Ms. Harris believes that she would have never resumed paying tithing and that ultimately, she would have left the Church about 15 years earlier than the date of her actual resignation in 2019, had she been told the truth about the planned use of her tithing, for the City Creek redevelopment, including the mall, and that her tithes were in fact planned for the Development of City Creek.

182.    Additionally, LeAnne Harris likely would not have remained LDS or married in an LDS Temple, had she learned in her youth how tithing had been used for commercial projects since the days of Brigham Young.

## XII.  CLASS PROCEDURAL ALLEGATIONS

183.    The following individuals are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, their subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its subsidiaries or dbas, have a controlling interest and their current or former employees, officers and directors; (3) Plaintiffs' attorneys; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Defendant have been fully and finally adjudicated and/or released. Plaintiff anticipates the need to amend the Class definitions following discovery.

184.    Definition of the proposed class: All members of the COJCOLDS who have resigned from the LDS Church as well as those who submit a request to resign to COP or its agent within 90 days of their receipt of the Class Certification notice and who do not opt-out of the Class.

185.    Numerosity [Size]: The exact size of the Class is unknown and not available at this time, but it is clear that individual joinder of all persons is impracticable. COP has in its possession a list of those who have requested that their names be removed from its records. In 2019, the *Salt Lake Tribune* reported that 148,868 LDS members resigned in 2018 alone, based on statistics compiled from LDS sources. [32] Additionally, upon information and belief based on numbers provided by the owner of the website, thousands of LDS have used the website www.quitmormon.org to resign since it was created in or about 2012. Members of the Class can be easily identified through Defendant's records of those Mormons who have resigned.

186.    Commonality/Typicality and Predominance: There are many questions of law and fact common to the claims of named Plaintiffs and the putative class; those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not necessarily limited to: Whether each heard or read the statement by President Gordon Hinckley in 2003 with respect to the City Creek Mall, project, that "tithing funds **have not and will not be** used to acquire this property. **Nor will they be used in developing it for commercial purposes."** Upon information and belief, based on the fact that this was the LDS president and prophet speaking at conference as well as interviews with many potential class members, most all members of the potential Class heard or read this statement. Additionally, all members were part of the intended audience for this statement as well as other relevant rhetoric from Defendant's correlated material about tithing use. Class members relied upon generally the same misrepresentations and material omissions about the use of tithing

---

[32] https://www.sltrib.com/religion/2019/04/06/lds-church-tops-million/ (Last viewed 12/30/20.) "Amid the 2018 statistic report announced Saturday by [T]he Church of Jesus Christ of Latter- day Saints, there is a startling finding: the largest number of membership records ever removed in a single year — 140,868."

funds, upon which they in part, based their belief in, and continuing allegiance to the LDS Church.

187.    Class members either committed to the Church as young adults or as converts. Most all Class members either served LDS missions or were married in an LDS temple or both. Potential Class members entered into a continuing oral contract to pay a full tithe in exchange for LDS temple access and/or membership. All potential Class members reasonably trusted the Brethren and reasonably believed that the Brethren believed the correlated rhetoric that they created, approved, and published, including the material misrepresentations itemized in the above paragraphs. The type of psycho-social issues caused by Defendant's deception, are common to all Plaintiffs and potential class members.

188.    All Class members reasonably believed that tithing was used exclusively for religious and not commercial purposes. Thought Plaintiff SMALL and some class members knew that excess tithing proceeds would be temporarily invested, but not used for commercial development. Most all Plaintiffs had been told by local lay leaders that funds from tithing were never commingled with profit from LDS businesses.

189.    Finally, damages suffered by members of the Class are of the same type: money in the form of tithing paid and other expenses (mission expense, Church school tuition, lost opportunity expense, counseling for emotional distress, familial destruction, and divorce) in reliance on COP's misrepresentations and concealment of its use of tithing are readily calculable.

190.    Adequate Representation: Plaintiffs GADDY, SMALL and HARRIS will fairly and adequately represent and protect the interests of the Class. GADDY and SMALL were leaders who served in various Church callings. Plaintiffs' counsel has more than 30 years' experience as a civil litigation attorney having practiced in both Utah and California, experience in multiparty

litigation from both a defense and Plaintiff side, and class action experience. Neither GADDY, SMALL nor HARRIS, nor their counsel, has any interest adverse to the Class. Neither does Defendant have any defense unique to GADDY, SMALL or HARRIS. Plaintiffs and their counsel is committed to vigorously prosecuting this action on behalf of the members of the Class and have the resources to do so.

191.    <u>Appropriateness per Fed. R. Civ. P. 23 (b) (1):</u> Prosecuting separate actions by individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; and (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

192.    Defendant's business propaganda practices have been promulgated, apply to, and have affected the members of the Class uniformly, and named Plaintiffs' challenge of those practices and claim for damages as a result of those longstanding practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to GADDY, SMALL and/or HARRIS. Additionally, the damages suffered by individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex and protracted litigation necessitated by Defendant's actions/omissions.

193.    Upon information and belief, COP is worth in excess of $250-400 billion dollars and has access to the best attorneys in the United States. Thus, it would be virtually impossible for the members of the putative Class to obtain effective relief from COP's fraud on an individual basis. A class action provides the benefits of single adjudication, economies of scale, and

comprehensive supervision by a single court. Economies of time, effort, and expense will be

fostered, and uniformity of decisions will be ensured, especially given that appeals are likely.

194.   <u>Fed. R. Civ. P. 23(b) additional pertinent matters</u>. A class action is superior to other

available methods for fairly and efficiently adjudicating the controversy in that it would be

judicially expeditious for the matter to be litigated in this particular forum, given it is the location

of Defendant's home office and leaders and that most of its actions/omissions occurred in this

jurisdiction. Furthermore, upon information and belief, the majority of the witnesses to said

actions are located within this forum or very nearby.

195.   <u>Fed. R. Civ. P. 23(c) notice to potential class members</u>: Notice required per this

subsection can be easily accomplished as described in the numerosity section above. Notice in

compliance with the above section can be accomplished through discovery requests to

Defendant to identify those who have resigned through COP's membership rolls. It is widely

known that COP maintains records on those who have resigned, often sending representatives to

those members who have moved and/or become inactive or resigned months and even years

after the members' activity has ceased. Additionally, there are numerous social media sites

supportive of former LDS members and the crises they have experienced.

**<u>FIRST  CAUSE OF ACTION:</u>**

**<u>FRAUD IN THE INDUCEMENT TO ENTER INTO AN ORAL CONTRACT</u>**

196.     Plaintiffs incorporate paragraphs 1-195 above as though fully set forth herein.

197.     COP required a full tithe in order to acquire and maintain temple recommends and/or be

baptized and have ongoing full access to an LDS temple.

198.     Defendants, by and through its above-described top and local leader agents, made the

correlated representations to induce all Plaintiffs to enter into an oral contract with Defendant who offered an LDS temple recommend on the condition that Plaintiffs answer affirmatively the question: "Do you have a testimony of the Restoration of the gospel of Jesus Christ [as embodied in the LDS Church]?" and/or similar questions that required Plaintiffs' belief that Smith was a prophet and in LDS theology. And, that Plaintiffs commit to pay a full tithe, defined as 10% of their income, to COP via their local leaders and/or as a COP imposed condition of membership in the LDS Church. The recommend was/is renewable upon the condition that Plaintiffs continue to pay a full tithe and profess faith in the religion.

199.   Defendant made false statements of fact in the form of a promise of future performance that no tithing would [will] be used to develop City Creek mall, as set forth above, to a group of people that included Plaintiffs, in that plaintiffs were regular conference attendees and monthly readers of the *Ensign* magazine. Named Plaintiffs all heard President Hinckley's 2003 statement and all read the 2006 *Ensign* statement attributed to Bishop Burton that "**No tithing funds will be used in the redevelopment"** (including the City Creek project and City Creek Mall) or written and published by *Ensign* magazine editorial staff over which Defendant has exclusive ownership and control, that no tithing would be used for City Creek

200.   Defendant through its President Hinckley, agent Burton and publication the *Ensign*, never intended to keep the promises made by Defendant and its agents that tithing would not be used for the development of City Creek Mall because at the time those statements were made, tithing principal had been commingled with income from on the Church's business properties (those that are taxed) and surplus tithing principal of $1-$2 billion dollars had been deposited into one or more of the investment funds owned and managed by the Church and its agents.

201.   Additionally, when Defendant's CPB agent, Keith McMullen made his statement that **"not one penny of tithing goes to the church's for-profit endeavors,"** to Carolyn Winter in 2011 which statement was published in the Salt Lake Tribune in 2012, without contradiction by the Church,   despite the Tribune's then practice verifying statements with the maker, the Church had by that time been cutting checks form tithing funds for the cost overruns at City Creek Mall.

202.   Hinckley and the Church through its agent Burton and/or *Ensign* publication, never intended to keep its promise that no tithing would be used for City Creek mall because it had a habit of commingling tithing with income from its avowedly commercial entities like Deseret Book, and because all "earnings of invested reserve funds," which he referenced had tithing as their source. Furthermore, the Church's financial agents all believed and considered it all tithing.

203.   Alternatively, the statements made by Hinckley, Burton/the *Ensign* and McMullen were made recklessly knowing that they each had insufficient knowledge upon which to base their representations.

204.   Upon information and belief, based on Roger Clarke's (EPA's President and Managing Director), statement that people would not know EPA was the source of this funding to City Creek Mall and Beneficial Life. And Mr. Clarke's statement "it was important that people should not know EPA's role as the source of the funds." (Declaration of David Nielsen, ¶10), Defendant intended to deceive Platinffs. However, intent to deceived is a state of mind that is almost exclusively within the control of Defendant and so although, upon information and belief based on comments and articles from former Mormons, there are additional facts which would support the intent element; those facts are in Defendant's control and cannot all be pleaded with particularity.

205.   Nevertheless, Defendant made all of the above representations intending that Named Plaintiffs and potential class members would rely on those representations, to induce all Plaintiffs

to tithe so that the Church could increase its business empire.

206.   Defendant by and through its agents intended to induce Named Plaintiffs and all potential class members to act on these statements, by assuring them, if the face of a growing commercial development near the LDS Temple, that their hard-earned tithing would not be used for the development when historically they had claimed that tithing was only used for religious purposes.

207.   Defendant induced Plaintiffs to enter into and periodically renew the oral contract so that it could maintain a steady stream of tithing proceeds to use a large portion of its annual tithing receipts of it for commercial purposes in building and maintaining the Empire.

208.   Named Plaintiffs and indeed potential class embers acted reasonably in reliance on the above statements in that they were ignorant of how tithing was actually spent, since as of 1959 the Church closed the specifics of its internal financials to its members.

209.   Name Plaintiffs did in fact rely on the statements of Hinckley and Burton/the statement in the 2006 *Ensign*. Upon information and belief, based on numerous interviews with potential class members, the statement in the Salt Lake Tribune by Keith McMullen was also relied upon. Both promises not to use thing for City Creek were relied upon by Named Plaintiffs in continuing to pay tithing and to trust the Church in the face of increasing internet-based publications that claimed the church was a fraud.

210.   Potential class members also relied on the statement of McMullin in the Tribune to continue paying tithing, Plaintiffs had been taught for years that tithing was only used for religious purposes and the tithing form they used said as much, even when changed to list the "overall mission of the church" which had never been described as anything other than a religious mission for which tithing would be used.

211.   As more particularly described in Gaddy, Small and Harris' narratives, each of them did rely on the above-described promises by continuing to trust their leaders with how their tithing was used and continuing to tithe until they learned of the Church's misrepresentations about its key history, and resigned all before the Whistleblower report was made public in late December 2019.

212.   At no time did any of the local leadership, including the named bishops and /or stake presidents with whom Named Plaintiffs met, make any statement that would suggest to Named Plaintiffs that the promises made by Hinckley, Burton/the *Ensign*, or statement of McMullen were insincere or false. Wherefore, GADDY, SMALL, and HARRIS had no reason not to trust those statements. This was particularly true in light of the longstanding mantra that their leaders would never lead the members of the Church astray.

213.   All three Named Plaintiffs have been injured as described in their personal narratives and seek damages as particularly described in the Prayer for damages below. They seek damages for tithing paid, the special damages indicated in the Prayer for Relief, and all fraud-based damages to which they are entitled under the law.

## SECOND CAUSE OF ACTION: FRAUD

214.  Defendant COP, by and through its agents Gordon Hinckley and Mr. Burton/the *Ensign* magazine editorial staff, made false statements about a material fact that no tithing would be used for City Creek Mall.

215.  Their promises that no tithing would be used in the future for City Creek Mall constitute a false statement of fact because at the time they made those promises they did not believe them, due to the fact that historically it was a custom and practice of Defendant church to commingle tithing principal, depositing surplus tithing principal to the tune of $1-2 billion annually, into their invested funds, which held profits from all sorts of ventures. Upon information and belief, based

upon the Whistleblower report, by including the profits from the Church's admitted taxable and
public businesses like Deseret Book, Bonneville Communications and the Polynesian Cultural
Center, etc.

216.  The Church intended that Named Plaintiffs and Plaintiffs who were then regular tithe-paying
members of the LDS Church would rely on those statements as well as the 2011 or 2012 statement
of McMullen that "**not one penny of tithing goes to the church's for-profit endeavors**," so that
it could continue to receive a huge stream of tithing donations annually, and with the 2012 tithing
form disclaimer, claim carte blanche to do with whatsoever its leaders desired.

217.  Named Plaintiffs and potential Class Plaintiffs reasonably relied on those statements as more
fully described above; and,

218.  Named Plaintiff's, and upon information and belief based on interviews with numerous other
former members, potential Class Plaintiffs, suffered damages as a result of relying on one or more
of those statements as more fully described above and in the Prayer for Relief.

### THIRD CAUSE OF ACTION: BREACH OF

### THE DUTY TO DISCLOSE MATERIAL INFORMATION

219.    Plaintiffs hereby incorporate paragraphs 1-215 above as though fully set forth herein.

220.    Plaintiffs entered into a business transaction with COP relying upon representations
which Defendant knew to be materially misleading because of its failure to provide qualifying
material.

221.    Plaintiffs were in privity of contract with COP because Plaintiffs tithed and/or made a
promise to do so, as consideration for a temple recommend and/or membership in the Church.

222.    Under Utah law, Plaintiffs were in a confidential relationship that gave rise to
Defendant's duty to disclose material facts to Plaintiffs. The duty arose due to the following

aspects about the nature of that relationship:  COP by and through the Brethren and other leader-agents engaged in rhetoric inviting members to trust its leaders by promising that they would never lead them astray (See Invitation to Trust Table above). Plaintiffs were in privity of contract with COP, which was a confidential one, as more fully described in the First Cause of Action; the relationship between Plaintiffs and the Brethren and other COP leader agents was generally imbalanced as a result of vast discrepancies in age, knowledge of the contents of LDS archives, lack of knowledge, especially since 1960 when the Church closed its books to its members, of how tithing was used, influence, bargaining power, and sophistication.

223.    Additionally, Plaintiffs had been subjected to ongoing numerous misleading or partial representations, including the phrase "earnings of invested reserve funds," promulgated by the Church through its agents related to its use of tithing as set forth in the paragraphs above. The phrase "earnings of invested reserve funds" is a misleading partial disclosure in that to an average LDS tithe payer it is unknown whether the "funds" in that phrase referred to tithing principal, or profits from Church-owned commercial businesses such as Deseret Book, Bonneville Corporation or the Polynesian Cultural Center, etc.

224.    All of these factors, taken together, gave rise to the Church's duty to fairly and fully disclose how it used and would used its tithes which was information material to Plaintiffs' decision to join, and/or commit more deeply as young adults through paying a full tithe, temple endowments, missions and temple marriage and/or to remain in the LDS Church.

225.    Defendant failed to disclose that a substantial part of tithing is used to fund and/or develop commercial projects, including but not limited to City Creek Mail development, the bailout of Beneficial Life Insurance Co. and many other projects over the last 50 years or more and, upon information and belief based on Paul Rytting's Declaration, since Brigham Young.

226.  Plaintiffs did not know about the Church's use of tithing for commercial purposes, including but not limited to the development of City Creek Mall, the bailout of Beneficial Life, and other projects the exact details of which are unknown to Plaintiffs, due to the Church's secrecy.

227.  COP's failure to disclose how it used tithing for commercial ventures over the decades was a substantial factor in causing Plaintiffs' injuries and damages in that had that fact been disclosed and had they known that Defendant was stockpiling tens of billions of dollars, much of which appears to have been initially funded from tithing principal, Named Plaintiffs would not have paid tithing to the LDS Church. Upon information and belief, based on communication with many potential members of the Class, they would also have stopped tithing had they known the above. A very few members of the potential Class, again based upon communication with many former LDS who might qualify if a Class is certified, less than a single digit percent, had they known the above, but not about the misrepresentations in the orthodox historical narrative, might have paid a reduced amount of tithing and would have begun questioning the Brethren's and Smith's motives leading to research outside the parameters of correlated or Church approved documents, much earlier than they did, thereby saving them years of wasted commitment to an organization that was not what it advertised.

228.  Plaintiffs' injuries and damages are a direct result and/or a reasonably probable consequence of the failure to disclose how their tithes were used.

229.  Defendant's failure to disclose conduct was a substantial factor in bringing about Plaintiffs' injuries which are of a type that a reasonable person would foresee as a likely result of his or her conduct.

230.  GADDY, HARRIS AND SMALL and others like Plaintiffs herein, were damaged as a result of Defendant's failure to disclose of its use of tithing for commercial purposes.

231.    Named Plaintiffs and those like them as potential class members have suffered damages, including general damages for emotional distress and special damages for tithing paid and the value of services rendered to COP, including but not limited to missionary service, tuition for attending an LDS affiliated school and therapy or  counseling expense, and the value of lost opportunity based on the lack of disclosure and well as other damages enumerated in the Prayer for Relief.

## JURY DEMAND

Plaintiffs GADDY, SMALL and HARRIS, individually and on behalf of the prospective class, request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

Dated: April 25, 2023

by: /s/ *Kay Burningham*
Kay Burningham

*Attorney for Laura A. Gaddy, Lyle D. Small and Leanne R. Harris*