**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**August 26, 2025**

**FOR THE TENTH CIRCUIT**

Christopher M. Wolpert
Clerk of Court

_____

LAURA A. GADDY; LYLE D. SMALL;
LEANNE R. HARRIS, individually and on
behalf of all others similarly situated,

     Plaintiffs - Appellants,

v.

                                No. 23-4110

THE CORPORATION OF THE
PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY
SAINTS, a Utah corporation sole,

     Defendant - Appellee,

and

DOES 1-50,

     Defendants.

------------------------------

GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS;
NATIONAL ASSOCIATION OF
EVANGELICALS; JEWISH COALITION
FOR RELIGIOUS LIBERTY; BECKET
FUND FOR RELIGIOUS LIBERTY,

     Amici Curiae.

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:19-CV-00554-RJS)**

_____

Kay Burningham, Salt Lake City, Utah, for Plaintiffs-Appellants.

David J. Jordan, Foley & Lardner LLP, Salt Lake City, Utah (Wesley F. Harward, Foley
& Lardner LLP, Salt Lake City, Utah, with him on the briefs), for Defendant-Appellee.

Gene C. Shaerr, Shaerr Jaffe LLP, Washington, D.C. (James C. Phillips and Justin A.
Miller, Shaerr Jaffe LLP, Washington, D.C., with him on the brief), for Amici Curiae,
General Conference of Seventh-Day Adventists, National Association of Evangelicals,
and Jewish Coalition for Religious Liberty in support of Defendant-Appellee.

Noel J. Francisco, and David T. Raimer, Jones Day, Washington, D.C.; Eric C. Rassbach,
The Hugh and Hazel Darling Foundation Religious Liberty Clinic, Pepperdine University
School of Law, Malibu, California; and Samuel V. Lioi, Jones Day, Cleveland, Ohio,
filed a brief for Amicus Curiae, The Becket Fund for Religious Liberty, in support of
Defendant-Appellee.

_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

Plaintiffs Laura Gaddy, Lyle D. Small, and Leanne R. Harris are each former

members of the Church of Jesus Christ of Latter-Day Saints.  They filed a putative

class action lawsuit against the Church's religious corporation, Defendant

Corporation of the President of the Church of Jesus Christ of Latter-Day Saints.[1]  As

relevant to this appeal, Plaintiffs asserted a claim pursuant to the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, under

two distinct theories.  First, Plaintiffs base their RICO claim on the Church's alleged

_____

[1] In this opinion, both the Church of Jesus Christ of Latter-Day Saints itself
and Defendant Corporation of the President of the Church of Jesus Christ of Latter-
Day Saints are referred to as "the Church."

2

fraudulent misrepresentations about its history that its leaders allegedly do not sincerely believe.  Second, Plaintiffs base their RICO claim on the Church's alleged fraudulent use of tithing payments.  Below, the district court granted the Church's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss Plaintiffs' second amended complaint based in part on the church autonomy doctrine and in part on a failure to sufficiently state the indictable acts underlying the civil RICO claim.

We affirm.  We hold that the church autonomy doctrine bars Plaintiffs' first RICO theory, because it improperly requires adjudication of ecclesiastical questions, namely, the truth or falsity of religious beliefs.  On Plaintiffs' second RICO theory, we need not decide whether the church autonomy doctrine applies, because Plaintiffs' complaint fails to adequately allege the requisite causal link between the Church's alleged misstatements about how it would use tithes and the Plaintiffs' alleged injury.

# I.

Gaddy, Small, and Harris spent much of their lives dedicating themselves and paying tithing payments to the Church of Jesus Christ of Latter-Day Saints.  That all changed when the three discovered what they believed to be misrepresentations of the Church's history.

Following that revelation, in 2019, Gaddy filed a putative class action lawsuit on the theory that the Church intentionally misrepresents its history to induce membership.  She brought six causes of action primarily based on three alleged misrepresentations involving:  (1) the "First Vision," when the Church's founding prophet Joseph Smith saw God and Jesus Christ; (2) the origins of the Church's

scripture, the Book of Mormon; and (3) the translation of another text, the Book of

Abraham.[2]  App'x Vol. IV at 239.

The Church moved to dismiss.  The district court granted the Church's motion

and dismissed the complaint without prejudice, concluding that the Free Exercise and

Establishment Clauses of the First Amendment (the "Religion Clauses") barred each

of Gaddy's claims.  Specifically, the district court relied on the long line of Supreme

Court and Tenth Circuit precedent recognizing the church autonomy doctrine, which

provides that churches have a "fundamental right" to "decide for themselves, free

from state interference, matters of church government as well as those of faith and

doctrine."  *Id.* at 241–42 (emphasis deleted) (quoting *Bryce v. Episcopal Church in

the Diocese of Colorado*, 289 F.3d 648, 656 (10th Cir. 2002)).  Because the "falsity

of religious beliefs was an essential element of each claim as pleaded," the district

court held that the Religion Clauses required dismissal of Gaddy's complaint.  *Id.* at

242.

Later in 2020, Gaddy filed her first amended complaint.  Much of the

complaint repeated what she had already alleged.  However, among other things, she

added new factual allegations related to locations of certain events in the Book of

Mormon, the Church's history with polygamy, Joseph Smith's personal history, and

the use of tithing funds.  She also claimed that the Church committed common law

---

[2] The six causes of action included:  (1) common law fraud, (2) fraudulent
inducement, (3) fraudulent concealment, (4) civil RICO (18 U.S.C. § 1962(c)),
(5) intentional infliction of emotional distress, and (6) breach of fiduciary duty.

fraud because its own leaders do not sincerely believe the versions of the Church's
history, founding, and doctrines the Church teaches its members.  In addition, Gaddy
claimed that the Church falsely assures that tithing funds are used only for "Church
expenses and humanitarian aid" and not other purposes, such as developing a for-
profit commercial mall.  *Id.* at 246 (quoting App'x Vol. I at 127).

Again, the Church moved to dismiss Gaddy's complaint.  This time, however,
the district court partially granted and partially denied the motion.  The court
dismissed the amended complaint to the extent it involved claims about the First
Vision and the Books of Mormon and Abraham—claims the court had already
rejected in its first order.  And the court stated that the new facts about religious
locations and polygamy would not allow Gaddy to circumvent the Religion Clauses,
because the facts still required an impermissible adjudication of the truth or falsity of
certain statements concerning the Church's religious beliefs.

Although dismissing many of her claims, the court allowed Gaddy's civil
RICO claim to survive to the extent it was based on her new tithing theory.  The
court reasoned that the tithing theory was based on a "secular dispute" because it did
not require examination of the veracity of the Church's beliefs on tithing.  *Id.* at 252.
Rather, the claim, according to the district court, required examination of the
Church's specific statements concerning what its representatives said the tithing
would pay for.

Gaddy did not proceed to discovery on her surviving RICO claim.  Instead, in
2021, Small and Harris joined Gaddy, and together, they filed a second amended

complaint that spans 203 pages with 555 paragraphs.  Aside from duplicating many of the claims, theories, and allegations of the prior pleadings, the revised complaint brought two new causes of action that relied on the same alleged misrepresentations.  Other than those additions, Plaintiffs expanded on the facts and claims alleged "in almost encyclopedic detail—using tables, charts, artwork, and translation comparisons."  *Id.* at 253.

For a third time, the Church filed a motion to dismiss.[3]  And this time, the district court granted the motion to dismiss in full.  Relying on the church autonomy doctrine, the court began by rejecting each of Plaintiffs' fraud-based claims aimed toward the Church's teachings and representations about the First Vision, translations of the Books of Mormon and Abraham, locations of events in the Book of Mormon, Church history, and Joseph Smith's personal history.  As pertinent to this appeal, this doomed Plaintiffs' RICO claim to the extent it rested on alleged fraud pertaining to those matters.

Next, as relevant here, the court rejected Plaintiffs' RICO claim to the extent it was based on the alleged fraudulent use of tithing payments.  On the tithing theory, the court found that Plaintiffs failed to sufficiently plead "a pattern of predicate acts" as a necessary element of their RICO claim.  *Id.* at 284.  The court reasoned that Plaintiffs failed "to allege even a single actionable instance of fraud, let alone two,

---

[3] Before the district court could rule on the Church's motion to dismiss the second amended complaint, Plaintiffs also moved the court for leave to file a third amended complaint.  The court denied the motion because amendment "would be futile and cause significant prejudice to the Church."  App'x Vol. IV at 290–91.

because they do not allege any specific instances in which Plaintiffs relied on the Church's representations concerning tithing." *Id.*

Plaintiffs timely appealed.

## II.

We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo. *Mocek v. City of Albuquerque*, 813 F.3d 912, 921 (10th Cir. 2015). We can affirm the district court's dismissal on any ground sufficiently supported by the record. *GF Gaming Corp. v. City of Black Hawk*, 405 F.3d 876, 882 (10th Cir. 2005).

Our "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quotation omitted). At the Rule 12(b)(6) stage, "we must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014) (quotation omitted). But we need not accept as true a complaint's conclusory allegations, unwarranted inferences, or legal conclusions. *Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976); *Ryan v. Scoggin*, 245 F.2d 54, 57 (10th Cir. 1957).

Federal Rule of Civil Procedure 8(a)(2) sets out the general pleading standard, requiring a complaint to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." To meet this standard, "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged." *Id.* "Factual
allegations must be enough to raise a right to relief above the speculative level."
*Twombly*, 550 U.S. at 555. "Determining whether a complaint states a plausible
claim for relief will . . . be a context-specific task that requires the reviewing court to
draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Where a complaint alleges fraud, Federal Rule of Civil Procedure 9(b)'s
pleading standard layers over Rule 8(a)(2)'s. In relevant part, Rule 9(b) provides:
"In alleging fraud or mistake, a party must state with particularity the circumstances
constituting fraud or mistake." Fed. R. Civ. P. 9(b). This language requires a
complaint alleging fraud to "set forth the time, place and contents of the false
representation, the identity of the party making the false statements and the
consequences thereof." *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1254 (10th
Cir. 2016) (quotation omitted).

## III.

Plaintiffs appeal the district court's grant of the Church's Rule 12(b)(6) motion
to dismiss Plaintiffs' civil RICO claim. Plaintiffs appeal the dismissal of their RICO
claim based on two distinct theories of liability—one on fraudulent

misrepresentations regarding the Church's history and another on the Church's
fraudulent misuse of tithing payments.

To state a civil RICO claim, a plaintiff must adequately plead that (1) the
defendant violated the RICO statute and (2) the plaintiff was injured "by reason of"
that violation.  18 U.S.C. §§ 1962, 1964(c); *see Safe Streets All. v. Hickenlooper*, 859
F.3d 865, 881 (10th Cir. 2017).  A defendant violates the RICO statute when the
defendant (1) invests in, controls, or participates in the conduct of (2) an enterprise
(3) through a pattern (4) of racketeering activity.  *Tal v. Hogan*, 453 F.3d 1244, 1261
(10th Cir. 2006) (citing 18 U.S.C. § 1962(a), (b), & (c)).  "Racketeering activity" is
defined by statute to include indictable acts of mail and wire fraud as prohibited
under 18 U.S.C. §§ 1341 and 1343, respectively.  18 U.S.C. § 1961(1)(B).  "These
underlying acts are referred to as predicate acts." *Tal*, 453 F.3d at 1261 (internal
quotation mark omitted).

The predicate acts Plaintiffs allege here include mail and wire fraud.  To
sufficiently state a RICO claim based on mail and wire fraud, a plaintiff "must
plausibly allege [1] 'the existence of a scheme or artifice to defraud or obtain money
or property by false pretenses, representations or promises,' and [2] that [the
defendant] communicated, or caused communications to occur, through the U.S. mail
or interstate wires to execute that fraudulent scheme."  *George*, 833 F.3d at 1254
(quoting *Tal*, 453 F.3d at 1263).

As it did below, the Church seeks to interpose the church autonomy doctrine as a defense on both of Plaintiffs' RICO theories. The district court held that the church autonomy doctrine applied as to one of the theories.

The church autonomy doctrine "prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity." *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 655 (10th Cir. 2002) (citing *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116–17 (1952)). The doctrine is rooted in the First Amendment's Religion Clauses,[4] *id.*, which together protect "the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine,'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) (quoting *Kedroff*, 344 U.S. at 116), and "to discuss church doctrine and policy freely . . . with members and non-members," *Bryce*, 289 F.3d at 658.

The church autonomy doctrine's protections can manifest in many ways. For example, the doctrine prevents courts and juries from "engag[ing] in the forbidden process of interpreting and weighing church doctrine." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969). Relatedly, the First Amendment precludes a court or a jury from "enter[ing] [the] forbidden domain" of inquiring into "the truth or verity of [ ] religious doctrines or

---

[4] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

beliefs." *United States v. Ballard*, 322 U.S. 78, 86–87 (1944); *see Van Schaick v. Church of Scientology of California, Inc.*, 535 F. Supp. 1125, 1142–43 (D. Mass. 1982). And as we held in *Bryce*, the church autonomy doctrine bars the imposition of civil liability based solely on the substance of ecclesiastical discussions between and among church leaders and members—there, statements regarding an internal church personnel matter and the doctrinal reasons for a proposed personnel decision, in the context of an internal church dialogue. 289 F.3d at 658–59.

"The church autonomy doctrine is not without limits, however." *Id.* at 657. The doctrine "does not apply to purely secular decisions, even when made by churches." *Id.* To ascertain whether challenged actions are "ecclesiastical or secular," we assess "whether the alleged misconduct is 'rooted in religious belief.'" *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). Put differently, to determine whether the doctrine is implicated as to a given claim, we must determine whether the dispute is, at bottom, "an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law," or a "purely secular [one] between third parties and a particular defendant, albeit a religiously affiliated organization." *Id.* (quoting *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997)). This analysis "may present a most delicate question." *Yoder*, 406 U.S. at 215.

If the alleged misconduct is rooted in religious belief, then the conduct has "the protection of the Religion Clauses." *Id.* The church autonomy doctrine then kicks in as an affirmative defense to such a religiously rooted claim, and the claim

fails. *See Bryce*, 289 F.3d at 654 ("If the church autonomy doctrine applies to the statements and materials on which plaintiffs have based their claims, then the plaintiffs have no claim for which relief may be granted."); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 195 n.4 (2012) (holding that the "ministerial exception" "operates as an affirmative defense to an otherwise cognizable claim"); *cf. Our Lady of Guadalupe*, 591 U.S. at 747 (conceptualizing the ministerial exception as a subset of "the general principle of church autonomy").[5]  Conversely, if the alleged misconduct is *not* rooted in religious belief—such as where the challenged choice is "philosophical and personal rather than religious," or is "merely a matter of personal preference" and not "one of deep religious conviction, shared by an organized group," *Yoder*, 406 U.S. at 216—then the "purely secular" claim will survive the interposition of a church autonomy doctrine defense.  *See Bryce*, 289 F.3d at 657.

With these standards in mind, we turn to the sufficiency of Plaintiffs' RICO claim.  We analyze each of the two RICO theories—the (A) fraudulent misrepresentations of history theory and (B) fraudulent misuse of tithes theory—in turn.

**A.**

---

[5] Because the church autonomy doctrine is an affirmative defense, the defense can only lie at the pleading stage where the factual basis for the defense "appears plainly on the face of the complaint itself."  *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965).

On their fraudulent misrepresentations RICO theory, Plaintiffs make several attacks on the factual accuracy of what the Church teaches its members.  Plaintiffs claim that key historical events for the religion occurred differently than how the Church describes them canonically.  Allegedly, by preaching false statements about its own history, the Church engaged in a "pattern of racketeering."  And Plaintiffs add that the Church has hid some of its own history that would reveal alleged inconsistencies in the historical narrative.  Had Plaintiffs known of these alleged misrepresentations, they say, they would not have committed to the Church.

As a representative example of these alleged misrepresentations—the example on which Plaintiffs focused at oral argument—Plaintiffs argue that the Church provided a false account of the translation of the Book of Mormon.  The Church teaches that founding prophet Joseph Smith translated the Book of Mormon from gold plates with the help of God.  Specifically, the Church teaches that the Book of Mormon is a translation of scripture originally inscribed on gold plates in reformed Egyptian by ancient prophets.  The Church instructs that an angel spoke to Smith and told him where to find the gold plates.  And, particularly relevant to Plaintiffs' claim, the Church teaches that Smith translated the reformed Egyptian on the gold plates while looking at the plates through spectacles consisting of two transparent (or translucent) stones called "Urim and Thummim," "divine instrumentalities."  App'x Vol. III at 77–78.

Plaintiffs allege that Smith did not use gold plates or spectacles to create the Book of Mormon.  Instead, they allege that Smith dictated the Book of Mormon

while looking at an opaque "brown seer stone" that was placed in a hat, while the

gold plates were covered and not in Smith's view.  *Id.* at 65, 78–79.  Plaintiffs further

allege that the Church has had the brown seer stone in its possession for over a

century but concealed and denied the stone's existence from the public until recently.

The concealment of the seer stone, Plaintiffs argue, was part of a concerted effort by

the Church to conceal evidence of "what really happened."  Oral Arg. Audio at

10:11–16; *see* Aplt. Br. at 26.

Ultimately, Plaintiffs want to hold the Church liable for teaching core beliefs

that do not align with what Plaintiffs believe to be the historical truths of the religion.

As Plaintiffs' counsel summarized the theory at oral argument, "what [the Church]

had taught for decades was not true . . . . If we say that these are the correlated true

facts about the Church and the history, and they're not, that's fraud."  Oral Arg.

Audio at 5:19–24, 6:22–32.

We conclude that the church autonomy doctrine applies to Plaintiffs'

allegations about the Church's alleged misrepresentations and omissions about its

history, because the dispute about the accuracy of the Church's representations is

ecclesiastical, not "purely secular."  *See Bryce*, 289 F.3d at 657.  The misconduct

alleged here—teaching Church members facts underlying and informing their

religious beliefs in a way Plaintiffs say is incorrect—is religiously rooted, relating to

core issues of faith.  *See id.* (stating that a "dispute . . . about . . . faith" "is an

ecclesiastical one" (quoting *Bell*, 126 F.3d at 331)).  And Plaintiffs' allegations

require a court to dive into deeply religious waters to assess whether foundational

events for a religion occurred the way the religion teaches.  In other words, Plaintiffs'

theory hinges on the favorable resolution of "questions concerning the truth or falsity

of [ ] religious beliefs," questions which civil courts and juries are incapable of, and

precluded from, answering.  *See Ballard*, 322 U.S. at 86–88.  As the district court

aptly explained in its first order, a court "can no more determine whether Joseph

Smith . . . translated with God's help gold plates . . . , than it can opine on whether

Jesus Christ walked on water or Muhammed communed with the archangel Gabriel."

App'x Vol. I at 115.  We must decline Plaintiffs' invitation to "enter [the] forbidden

domain" of assessing the "truth or falsity" of religious beliefs and doctrine.[6]  *See*

*Ballard*, 322 U.S. at 87.

      Plaintiffs resist on four main grounds.  None convinces.

      First, Plaintiffs contend that the First Amendment only prohibits the

adjudication of religious "beliefs," and they only seek to challenge religious "facts."

*See* Aplt. Br. at 23–26.  As far as we can tell, no court has adopted Plaintiffs'

---

[6] At oral argument, there was some suggestion that Plaintiffs' theory hinged
not on the falsity of the Church's original teachings, but just on the fact that there
were accepted alternative versions of those events, and evidence to that effect was
concealed.  Even assuming *dubitante* that the complaint manages at the margins to
forward this theory in a way that does not at all turn on the truth or falsity of any
religious beliefs (the Church's canonical version or Plaintiffs' versions), *but see* Aplt.
Br. at 21–26 (framing, consistently, the theory as one turning on the Church's
original representations being false), we would still hold that such a theory is barred
by the church autonomy doctrine.  The dispute—now about how much the Church
should have emphasized certain religious historical facts as part of its canon—still is
not "purely secular."  *See Bryce*, 289 F.3d at 657.  This theory ultimately asks a court
or jury to impart liability based on the substance of ecclesiastical discussions
between church leaders and members, something the church autonomy doctrine
serves to prevent.  *See id.* at 657–58.

proposed belief–versus–fact reviewability dichotomy.  That is likely so because the

distinction is one without a meaningful difference in cases such as this.  When it

comes to religious claims about historical events, "facts" and "beliefs" are

inextricably intertwined.  *See* Christopher C. Lund, *Rethinking the "Religious-

Question" Doctrine*, 41 Pepp. L. Rev. 1013, 1016 & n.16 (2014) (explaining that

when religions "make theological claims about history," "theological and

metaphysical questions" (questions of belief) and "temporal and empirical questions"

(questions of secular fact) "inevitably overlap").  In that sense, Plaintiffs cannot

plausibly say that the resurrection of Jesus Christ and the appearance of an angel to

Muhammed are *only* religious facts and not *also* religious beliefs.  These sorts of

disputes regarding ecclesiastical claims about history cannot be adjudicated in civil,

secular court.  *Cf. Nayak v. MCA, Inc.*, 911 F.2d 1082, 1083 (5th Cir. 1990) (holding

that a plaintiff could not bring a defamation suit claiming that the film *The Last

Temptation of Christ* made false historical claims about Jesus Christ, because the

court would have "to decide the 'correct' interpretation of the life of Christ").  As

alleged in this case, the church autonomy doctrine applies with equal force to the

challenged religious facts that the Church teaches its members.

Second, Plaintiffs argue that the Church must prove that it is "sincere" about

its religious beliefs and teachings before the church autonomy doctrine applies.  In

the context presented here, we disagree.  True, there is a difference between whether

a belief is true and whether one truly believes it, both logically and in terms of civil

court reviewability.  *See United States v. Seeger*, 380 U.S. 163, 185 (1965).  And

generally, a party invoking their rights under the Religion Clauses must establish

*both* that their beliefs are religious *and* that their beliefs are sincerely held.  *See, e.g.*,

*id.* (discussing this in the context of conscientious objectors to military service);

*Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir. 1991) (discussing this in the

context of a prisoner seeking accommodations).  But given the nature of Plaintiffs'

RICO theory, the Church's sincerity is of no moment.

Where, as here, a fraud claim rests entirely on a representation of religious

doctrine or belief, the functional relevance of the representor's sincerity falls away.

A plaintiff alleging fraud must ultimately prove that a representation is false.  *See*

*George*, 833 F.3d at 1254; *Tal*, 453 F.3d at 1263.  But, again, the truth or falsity of

religious doctrine or beliefs is beyond the proper purview of secular courts and juries.

*See, e.g.*, *Ballard*, 322 U.S. at 86–88.  So even if the Church's leaders did not

sincerely believe the religious teachings at issue here, the district court could not find

for Plaintiffs on the indispensable element of their claim that those teachings are

factually false (and/or that factually accurate versions of those teachings were

suppressed).  *See Ballard v. United States*, 329 U.S. 187, 196–97 (1946) (Jackson, J.,

concurring) ("[The federal criminal mail fraud statute] requires . . . a provably false

representation in addition to knowledge of its falsity to make criminal mail fraud.

Since the trial court is not allowed to make both findings, the indictment should be

dismissed."); *Tilton v. Marshall*, 925 S.W.2d 672, 679 (Tex. 1996) ("[B]ecause the

truth or falsity of a religious representation is beyond the scope of judicial inquiry,

the sincerity of the person making such a representation is irrelevant when the

religious representation forms the basis of a fraud claim.  Whether the statement of religious doctrine or belief is made honestly or in bad faith is of no moment, because falsity cannot be proved.").  Therefore, the church autonomy doctrine will apply to and bar Plaintiffs' fraudulent misrepresentations theory regardless of the Church's sincerity in making the challenged representations.

Third, Plaintiffs advance two related arguments to contend more broadly that the church autonomy doctrine should never apply in the context of fraud claims. They first argue that "given the state's interest in protecting the public against fraud, [the Church's] conduct should not be exempt from neutral fraud laws due to the [church autonomy doctrine]."  Aplt. Br. at 31.  This argument echoes in the Supreme Court's holding in *Employment Division v. Smith*, where the Court held that laws incidentally burdening individuals' religious practices need not satisfy strict scrutiny if the laws are neutral and generally applicable.  494 U.S. 872, 879 (1990).  But as we explained in *Bryce*, *Smith*'s rule addresses the religious rights of individuals, whereas the church autonomy doctrine protects the rights of religious institutions.  *Bryce*, 289 F.3d at 656–57.  We thus held that "the church autonomy doctrine remains viable after *Smith*."  *Id.* at 657; *see also Hosanna-Tabor*, 565 U.S. at 189–90 (holding that *Smith* did not preclude recognition of the ministerial exception, because "*Smith* involved government regulation of only outward physical acts," but *Hosanna-Tabor*, "in contrast, concern[ed] government interference with an internal church decision that affects the faith and mission of the church itself").  Hence, we conclude that the

neutrality and general applicability of fraud laws do not thwart the church autonomy

doctrine's application here.

Moreover, on these facts, the interest in fraud alone cannot carry the day. As

the Supreme Court has long recognized, the values underlying the Religion Clauses

"have been zealously protected, sometimes even at the expense of other interests of

admittedly high social importance." *Yoder*, 406 U.S. at 214. Even though society

has an interest in protecting against fraud, the Court has held that the Religion

Clauses, and the values underlying them, take priority when the two conflict in the

unique way they do here. *See Ballard*, 322 U.S. at 86–88 (precluding jury from

assessing "truth or falsity" of religious doctrine or beliefs in mail fraud prosecution).

Plaintiffs next argue that the Supreme Court "has historically exempted

fraudulent conduct" from protection under the church autonomy doctrine, leaning on

language in the Supreme Court's decision in *Gonzalez v. Roman Catholic Archbishop

of Manila*, 280 U.S. 1 (1929). Aplt. Br. at 32. True, nearly a century ago, the Court

in *Gonzalez* stated that the Religion Clauses insulate against secular court review of

"purely ecclesiastical" matters "[i]n the absence of fraud, collusion, or arbitrariness."

280 U.S. at 16. But in *Serbian Eastern Orthodox Diocese of United States and

Canada v. Milivojevich*, 426 U.S. 696 (1976), the Court explained that *Gonzalez*'s

"suggested 'fraud, collusion, or arbitrariness' exception" to the church autonomy

doctrine "was dictum only." 426 U.S. at 712. "And although references to the

suggested exceptions appear[ed] in opinions" after *Gonzalez*, "no decision of th[e]

Court ha[d] given concrete content to or applied the 'exception.'" *Id. Milivojevich*

went on to address the "arbitrariness" prong of that dictum and held that the

Constitution did not permit such an exception, because such an exception would

"inherently entail inquiry into" religious matters and thus "undermine the general

rule that religious controversies are not the proper subject of civil court inquiry." *Id.*

at 713.

*Milivojevich* had no occasion to expressly decide "whether or not there is room

for marginal civil court review under the narrow rubrics of 'fraud' or 'collusion'"

where churches "act in bad faith for secular purposes." *Id.* (some internal quotation

marks omitted). Since *Milivojevich*, the Supreme Court has not applied or shined any

more light on potential fraud or collusion exceptions.[7] Additionally, after *Gonzalez*,

the Supreme Court held in the criminal fraud context that the First Amendment

prevents court and jury adjudication of the alleged falsity of religious beliefs. *See*

*Ballard*, 322 U.S. at 86–88.

Whatever might be left of *Gonzalez*'s dictum vis-à-vis a fraud exception, we

decline Plaintiffs' invitation to afford it talismanic effect in this context. We are

"bound by Supreme Court dicta *almost* as firmly as by the Court's outright holdings,

---

[7] The Court's only post-*Milivojevich* mention of a potential fraud exception in
a merits case that we could locate came in a footnote in *Jones v. Wolf*, but that was
only to say that the case there was not one that involved fraud. *See* 443 U.S. 595,
609 n.8 (1979). Yet another example of a "reference[] to the suggested exception[]
appear[ing] in [an] opinion[]" that does not "give[] concrete content to or appl[y]"
the purported exception. *See Milivojevich*, 426 U.S. at 712. And perhaps tellingly,
there was no mention of any potential fraud exception in the Court's two most recent
cases in the church autonomy space (in any opinion)—*Our Lady of Guadalupe*, 591
U.S. 732, and *Hosanna-Tabor*, 565 U.S. 171.

particularly when the dicta is *recent* and *not enfeebled by later statements*." *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) (emphases added). *Gonzalez*'s dictum is neither. Indeed, *Ballard*'s square holding is that courts and juries cannot adjudicate religious truths, *see* 322 U.S. at 86–88, squarely proscribing review of an essential part of Plaintiffs' fraud theory here. *Gonzalez*'s dictum cannot control in this case.

Fourth and finally, Plaintiffs assert that because Church leaders did not secure Plaintiffs' "informed consent" before they joined the Church, the church autonomy doctrine cannot apply "since consent defines the limits of church autonomy." Aplt. Br. at 34. But Plaintiffs' argument that "[t]here was no informed consent" turns on their claim that the Church made "misrepresentations . . . about church origins" and history (because, the argument goes, if the Church had taught the "true" history, then Plaintiffs *would* have been fully informed). *Id.* (emphasis deleted). Again, these are disputes we cannot adjudicate. *See Ballard*, 322 U.S. at 86–88; *cf. Nayak*, 911 F.2d at 1083. Also, as one of the amici points out, precedent has not required *informed* consent. Rather, "the 'implied consent' of voluntary affiliation suffices in other contexts where the church autonomy doctrine applies." Becket Fund Amicus Br. at 26. As the Supreme Court has explained regarding religious associations:

> All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.

*Kedroff*, 344 U.S. at 114–15 (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729 (1871)).

For these reasons, to the extent Plaintiffs premise their RICO claim on a fraudulent misrepresentations of religious history theory, the church autonomy doctrine bars the claim.

## B.

Plaintiffs' second RICO theory, its fraudulent misuse of tithing funds[8] theory, contains multitudes.  Plaintiffs offer three separate sub-theories of liability in their operative complaint:  (1) the Church represented that it would use tithing funds only for religious purposes, but used the funds for commercial purposes; (2) the Church made several fraudulent omissions about the commercial purposes for which it used tithing funds; and (3) the Church made affirmative representations that it would not use tithing payments for specific commercial projects, yet the Church did so anyway.  By way of example, Plaintiffs' second, omissions sub-theory is based in part on alleged omissions about tithing payments being used to fund a firm called Ensign Peak Advisors and to bail out a company called Beneficial Life Insurance.  And for their third sub-theory, Plaintiffs point to:  (i) statements of the Church's former president, Gordon B. Hinckley, that tithing funds were not being used for the construction of City Creek Mall; (ii) two statements, printed in *Ensign Magazine* and the *Deseret News*, respectively, stating that no tithing funds were used for the

---

[8] As Plaintiffs allege, tithing funds are defined as donations to the Church totaling up to ten percent of a member's income.  App'x Vol. III at 161.

development of the mall; (iii) a statement made by a Church representative to a

Bloomberg Businessweek writer, that "not one penny of tithing goes to the Church's

for-profit endeavors." App'x Vol. III at 113. Plaintiffs' theory is that they "would

not have paid tithing had [they] known" the Church's true uses of those funds. *Id.* at

146, 149, 150.

We conclude that Plaintiffs have failed to plead sufficient facts to support a

reasonable inference of causation between any of the challenged misrepresentations

or omissions by the Church about how it would use tithing payments and the alleged

harm Plaintiffs suffered. That renders Plaintiffs' second RICO theory, as alleged,

implausible. As a result, we need not decide whether the church autonomy doctrine

precludes the adjudication of this theory or the sub-theories.[9]

---

[9] The en banc Ninth Circuit recently addressed a fraud case involving many of
the same alleged misstatements about tithing at issue here, and the court affirmed the
district court's grant of summary judgment to the Church. *See Huntsman v. Corp. of
the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784 (9th
Cir. 2025) (en banc). The majority of the en banc panel held that none of the
statements amounted to a knowingly false representation of fact that could support a
fraudulent misrepresentation claim. *Id.* at 789–92. Its analysis did not "delve into
matters of Church doctrine or policy," and so "the church autonomy doctrine ha[d] no
bearing" on the majority's ruling. *Id.* at 792. Judge Bress, joined by three other
judges, agreed with the majority but would have chosen to dispose of the appeal by
first answering the church autonomy doctrine question and holding that the doctrine
barred the claims. *Id.* at 792–800 (Bress, J., concurring in the judgment). Judge
Bumatay went a step further, arguing that a court *must* first decide whether the
church autonomy doctrine applies in a particular case because "the church autonomy
doctrine operates as a limit on judicial authority itself." *Id.* at 800–14 (Bumatay, J.,
concurring in the judgment). The en banc majority's ruling that none of these
statements could be considered false is not applicable in this case, because we do not
reach that issue.

23

The district court likewise concluded that none of these sub-theories survived Rule 12(b)(6) scrutiny, but the court arrived there differently.  The court reasoned that "Plaintiffs fail[ed] to allege any single predicate act of mail or wire fraud because they fail to allege that they acted in reliance on any particular false statement in choosing to donate tithing."  App'x Vol. IV at 286.  The court explained that the second amended complaint did not "identify any instance in which [Plaintiffs] relied on a particular misrepresentation in choosing to pay tithing."  *Id.*  Instead, the court found that the operative complaint alleged only "in [a] conclusory manner" that Plaintiffs "would not have paid tithing" had they known certain things.  *Id.*  The court held that "[t]hese generalized allegations do not satisfy the heightened pleading standard imposed under Rule 9(b)."  *Id.*

We agree with the district court that Plaintiffs have failed to sufficiently allege their reliance on the alleged misrepresentations by the Church in suffering the alleged harm.  And we agree that this failure is fatal to Plaintiffs' second RICO theory.  But rather than hold, like the district court, that Plaintiffs' failure to sufficiently allege their reliance dooms this theory by way of a failure to allege the underlying predicate acts with particularity, we hold the inability to allege their reliance on these facts evinces Plaintiffs' failure to plausibly plead the distinct, but still necessary, element of their civil RICO claim that the alleged predicate acts *caused* the harm that Plaintiffs suffered.

A plaintiff's personal—or, first-party—reliance on a defendant's fraudulent misrepresentation is not an indispensable component of every predicate–act–fraud

RICO claim.  In *Bridge v. Phoenix Bond & Indemnity Co.*, the Supreme Court held

that "a plaintiff asserting a RICO claim predicated on mail fraud need not show,

either as an element of its claim or as a prerequisite to establishing proximate

causation, that it relied on the defendant's alleged misrepresentations."  553 U.S.

639, 661 (2008).

Nevertheless, a plaintiff's reliance remains relevant to RICO's causation—its

"by reason of"—requirement.  "Under RICO's 'by reason of' requirement, 'to state a

claim . . . the plaintiff is required to show that a RICO predicate offense not only was

a but for cause of his injury, but was the proximate cause as well.'"  *CGC Holding*

*Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014) (quoting *Hemi*

*Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (plurality opinion)).  "When a

court evaluates a RICO claim for proximate causation, the central question it must

ask is whether the alleged violation led directly to the plaintiff's injuries."  *Anza v.*

*Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

*Bridge* itself both (1) underscores first-party reliance's relevance in the RICO

causation inquiry and (2) indicates that such reliance might nonetheless be required

to show causation in particular factual circumstances.  In *Bridge*, the Supreme Court

recognized a civil RICO claim where the defendants had submitted fraudulent

documents to Cook County, Illinois, which was conducting property auctions,

thereby giving the defendants an unfair advantage over the plaintiffs in securing

property at those auctions.  553 U.S. at 642–44.  The Court ruled that the plaintiffs

could proceed with the lawsuit even though it was Cook County, and not the

plaintiffs, that had relied on the misrepresentations.  *Id.*

The Court emphasized that its holding was not one "that a RICO plaintiff who

alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that

*someone* relied on the defendant's misrepresentations."  *Id.* at 658.  "In most cases,"

the Court held, "the plaintiff will not be able to establish even but-for causation if no

one relied on the misrepresentation."  *Id.*  "In addition, the complete absence of

reliance may prevent the plaintiff from establishing proximate cause."  *Id.* at 658–59.

The Court continued, "it may well be that a RICO plaintiff alleging injury by

reason of a pattern of mail fraud must establish at least third-party reliance in order to

prove causation."  *Id.* at 659.  "But the fact that proof of reliance is often used to

prove an element of the plaintiff's cause of action, such as the element of causation,

does not transform reliance itself into an element of the cause of action[, n]or does it

transform first-party reliance into an indispensable requisite of proximate causation."

*Id.* (internal quotation marks omitted).  Instead, the Court made clear, the analysis is

case-dependent:  "Proof that the plaintiff relied on the defendant's misrepresentations

may in some cases be sufficient to establish proximate cause," just as "the absence of

first-party reliance may in some cases tend to show that an injury was not sufficiently

direct to satisfy § 1964(c)'s proximate-cause requirement."  *Id.*

Consistent with the Court's "instruction that proximate cause is generally not

amenable to bright-line rules," *id.*, we have understood the upshot as threefold.  First,

the plaintiff's personal reliance will not invariably be dispositive of the causation

issue in every case.  Second, such first-party reliance can itself establish causation.

Third, such reliance might be required to establish causation in some cases.  As we

have synthesized the law post-*Bridge*,

> Although reliance is not an explicit element of a civil RICO claim, it
> frequently serves as a proxy for both legal and factual causation.  But
> despite its usefulness as a stand-in for causation, strict first-party reliance
> is not a prerequisite to establishing a RICO violation.  Nevertheless, in
> cases arising from fraud, a plaintiff's ability to show a causal connection
> between defendants' misrepresentation and his or her injury will be
> predicated on plaintiff's alleged reliance on that misrepresentation.  Put
> simply, causation is often lacking where plaintiffs cannot prove that they
> relied on defendants' alleged misconduct.  Ultimately, . . . proving
> reliance is necessary [where] it is integral to [p]laintiffs' theory of
> causation.

*CGC Holding Co.*, 773 F.3d at 1088–89 (citations and internal quotation marks

omitted).  Swapping out the references in that quotation to "proving," "establishing,"

and "showing" for "alleging" or "pleading" provides the proper framing of the issue

for motions at the pleading stage of a case.

Turning to this case, we find that Plaintiffs' theory of causation wholly hinges

on their reliance on the Church's alleged lies and failures to correct those alleged lies

about how tithing payments were to be used.  Plaintiffs' postulation that they "would

not have paid tithing had [they] known tithes were used for commercial [purposes],"

App'x Vol. III at 146, 149, 150, turns on their personal, or, first-party, reliance on the

Church's representations and omissions.  *See also* Reply Br. at 22 (recognizing that

"third[-]party reliance doesn't apply").  Therefore, in this case, Plaintiffs plausibly

alleging their "reliance is necessary because it is integral to Plaintiffs' theory of

causation."  *CGC Holding Co.*, 773 F.3d at 1089 (brackets and quotation omitted).

Here, Plaintiffs do not allege sufficient facts to plausibly plead their reliance. Plaintiffs merely allege that they "relied on the [Church's] representations as to how their tithing is used" in making continued tithing payments, App'x Vol. III at 163; *see, e.g.*, *id.* at 185 ("Plaintiffs relied on these misrepresentations lacking a full and fair disclosure that [the Church] used their tithing for commercial purposes, in deciding whether or not to donate to the Church."), without providing factual content to plausibly support such reliance.  Nowhere in their 203-page operative complaint do Plaintiffs allege that, after hearing a particular statement that the Church would not use tithing funds for commercial activities, Plaintiffs  affirmatively decided to continue making tithing payments that they would not have otherwise paid.[10]  As the Eleventh Circuit has persuasively held, plaintiffs in reliance-based causation cases like this one do "not adequately plead a RICO claim where their complaint assert[s] only the bald conclusion that the plaintiffs relied on a misrepresentation without showing how that reliance was manifested."  *Ray v. Spirit Airlines, Inc.*, 836 F.3d

---

[10] The complaint also alleges that Plaintiffs had been paying their full tithes for other reasons, as part of their Church membership, "in order to obtain and maintain a temple recommend, and/or be baptized."  App'x Vol. III at 163.  This undercuts proximate causation between the tithes and the alleged fraud about the use of tithes. *Cf. Anza*, 547 U.S. at 459 (finding civil RICO proximate causation inadequately pled in part because the asserted injury "could have resulted from factors other than [the defendants'] alleged acts of fraud").

Plaintiffs indeed allege that they relied on the Church's misrepresentations and material omissions about Church history and doctrine in paying tithes.  And logically, that might support a broader reliance theory.  But for the reasons we have already explained, any claim based on those sort of representations (necessarily hinging on the truth or falsity of religious beliefs) is barred by the church autonomy doctrine.  This RICO theory must stand solely on reliance on the Church's statements and omissions about tithing use.

1340, 1349 (11th Cir. 2016).  That is this case:  Plaintiffs claim they relied on the

misrepresentations and omissions in paying tithes, but Plaintiffs' complaint fails to

provide enough facts to plausibly tether a direct link between any misrepresentation

or omission about tithing use and Plaintiffs paying tithes that they would not have

paid absent hearing such (uncorrected) representations—that is, causation between

the alleged RICO violation and alleged injury.  We thus agree with the district court

that the complaint's allegations about reliance amount to little more than a

"[t]hreadbare recital[]" of a (theory-specific) requirement "supported by mere

conclusory statements," which "do[es] not suffice" to establish the plausibility that

Rule 8(a)(2) requires.  *Ashcroft*, 556 U.S. at 678; *see* App'x Vol. IV at 286.[11]

Plaintiffs contend that they have sufficiently alleged reliance.  But they merely

argue that they relied on the Church's alleged misrepresentations to "continue[] to

believe that tithing was or would be used for the purposes that had always been

represented."  Aplt. Br. at 47.  That misses the point.  The reliance here needs to

directly link the Church's misrepresentations with Plaintiffs paying tithes they would

not have paid had they not heard those misrepresentations.  It is not enough to just

draw a link between Church misrepresentations and Plaintiffs' belief of those

misrepresentations.  "The mere fact of having been misled does not ineluctably give

---

[11] As noted above, the district court treated this as a failure to allege reliance
with particularity as required by Rule 9(b).  We do not consider Rule 9(b)'s
applicability to allegations of reliance in civil RICO cases predicated on mail and
wire fraud, because we find that Plaintiffs' allegations of reliance are not plausible,
as they must be, under Rule 8(a)(2).

rise to a RICO cause of action unless the act of misleading the plaintiffs actually

caused them injury in their business or to their property that they would not otherwise

have suffered." *Ray*, 836 F.3d at 1350.  Even if the Church's representations misled

Plaintiffs, that does not mean that Plaintiffs sustained their claimed injury of making

continued tithing payments *by reason of* the Church's representations.  And the

complaint just does not allege enough facts to plausibly tether this necessary causal

link.[12]

Plaintiffs fall back on the argument that their "reliance is not an element" of

RICO causation.  *See* Aplt. Br. at 48.  True (as we have already recounted), first-

---

[12] Plaintiffs' counsel tried to tether the necessary causal link at oral argument, asserting that Plaintiffs "might have researched more and left the [C]hurch altogether if [they had] known that [Church leaders] were not straight with [them] about the tithing."  Oral Arg. Audio at 12:22–35.  But Plaintiffs "did not make this argument in their appellate briefs.  As a result, this argument is waived."  *Lebahn v. Nat'l Farmers Union Unif. Pension Plan*, 828 F.3d 1180, 1188 n.8 (10th Cir. 2016).

But even considering the argument, we see no plausible factual basis for such a theory in the complaint.  To the extent the complaint connects Church statements and omissions about the use of tithes with Plaintiffs' continued tithing payments through this would–have–done–research theory, it only does so through a number of speculative links in a conclusory causal chain.  According to the complaint (giving it the *best* possible reading), after learning of the Church's true use of tithes, Plaintiffs would have (1) begun to question Church leaders, (2) done independent research regarding the Church (over the leaders' contrary direction), (3) uncovered damning information about the Church, and (4) chosen to leave the Church or surrender full membership.  *See* App'x Vol. III at 178–79.  But there are not enough facts alleged in the complaint to permit reasonable inferences to support each link in that causal chain.  These "'naked assertion[s] devoid of further factual enhancement' do not 'raise a right to relief above the speculative level'" and thus do not suffice to state a claim.  *See VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1173 (10th Cir. 2021) (first quoting *Iqbal*, 556 U.S. at 678; then quoting *Twombly*, 550 U.S. at 555).

And even if Plaintiffs' counsel managed to put some non-conclusory factual meat on the bone at oral argument, that cannot save this claim.  Just as a plaintiff

party reliance is not strictly required to establish RICO causation.  *See Bridge*, 553

U.S. at 661.  But in cases such as this where the plaintiff's chosen causation theory

hinges on their personal reliance, we have held, such reliance *is* required.  *See CGC*

*Holding Co.*, 773 F.3d at 1089.  Here, a first-party reliance requirement is a feature

of the nature of Plaintiffs' chosen RICO theory.

Retreating further, Plaintiffs assert that the Church's "material omissions are a

basis for" their theory proceeding even if their theory based on the Church's

affirmative representations fails on reliance grounds.  *See* Aplt. Br. at 50.  Indeed,

omissions are conceptually different from affirmative representations.  And it might

be an odd fit to say that Plaintiffs need to show their reliance on omissions

(something not difficult to say about affirmative statements).  But when we speak of

reliance here, we are speaking about RICO causation.  And basing a RICO claim on

omissions does not excuse plaintiffs from adequately pleading but-for and proximate

cause.  *See, e.g.*, *CGC Holding Co.*, 773 F.3d at 1081, 1088–89 (discussing causation

requirement in the context of a civil RICO claim based on misrepresentations and

omissions).  So to the extent Plaintiffs can be understood to argue anything different,

such an argument is rejected.

For the first time in their reply brief, Plaintiffs suggest that "[g]iven a material

omission, reliance is inferred."  Reply Br. at 22 (emphasis deleted).  They point to

---

cannot "remedy [a] deficiency in [their] pleadings by adding new allegations in
[their] appellate brief," *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1286 n.1
(10th Cir. 2019), a plaintiff cannot remedy insufficient pleadings through new facts
provided at oral argument.

our decision in *CGC Holding Co.*, where we applied an inference of reliance in the

context of finding predominance in a RICO class action at the Rule 23 class

certification stage.  *See* 773 F.3d at 1089–93.  But by waiting until their reply to raise

this argument, Plaintiffs have failed to preserve it for appellate review.  "'It is our

general rule . . . that arguments and issues presented at such a late stage are waived.'

We will not address these belated contentions."[13]  *McNellis v. Douglas Cnty. Sch.*

---

[13] In any event, Plaintiffs' reliance on *CGC Holding* is misplaced, and our opinion in *CGC Holding* explains why.  There, we held it was reasonably inferable from the plaintiffs' (would-be loan borrowers) payment of up-front fees to the defendants (would-be lenders) that the plaintiffs relied on the defendants' (ultimately unfulfilled) promises that they had the ability and intention to fulfill the loan payments.  773 F.3d at 1081, 1090–91.  We also highlighted as supporting the inference claimed omitted facts going directly to "the alleged legitimacy of the counterparty to an agreement" (omissions about the mastermind's criminal past) and "the fact that all plaintiffs paid fees in exchange for a promise."  *Id.* at 1090–91.

Critically, we caveated our *CGC Holding* holding with the warning that "[t]his inference would not be appropriate in most RICO class actions."  *Id.* at 1091 n.9.  We explained, "the inference of reliance here is limited to transactional situations— almost always financial transactions—where it is sensible to assume that rational economic actors would not make a payment unless they assumed that they were receiving some form of the promised benefit in return."  *Id.*

Our logic in *CGC Holding* thus does not hold with respect to Plaintiffs' fraudulent misuse of tithing theory here—that the Church lied about not using tithing payments for non-religious purposes and thereby caused Plaintiffs to continue to tithe.  The Church using tithes only for religious purposes is not a sort of "promised benefit in return" that Plaintiffs directly receive.  *Id.*  The logic underpinning our *CGC Holding* inference might work, say, to a claim based on the theory that Plaintiffs paid tithes in return for some sort of personal economic gain.  The logic might even work (though it would be an extension of *CGC Holding*) where the theory was that Plaintiffs paid tithes for promised personal religious gain (though such a theory might run into church autonomy doctrine difficulties, *cf. supra* n.10).  Those are more easily put into the box of "transactional situations" that *CGC Holding* contemplates.  All of this is to say that the case here is like "most" others in that an inference of reliance is "not . . . appropriate."  *CGC Holding Co.*, 773 F.3d at 1091 n.9.

*Dist.*, 116 F.4th 1122, 1136 n.11 (10th Cir. 2024) (quoting *Hill v. Kemp*, 478 F.3d

1236, 1250 (10th Cir. 2007)); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring that the

opening brief contain the "appellant's contentions and the reasons for them, with

citations to the authorities and parts of the record on which the appellant relies").

      In sum, we agree with the district court that Plaintiffs fail to sufficiently allege

reliance. Plaintiffs have not pled enough facts to support the reasonable inference

that they relied on the Church's alleged misrepresentations and omissions in

continuing to pay tithes. We hold that this defect renders implausible the necessary

causation component of Plaintiffs' civil RICO claim—that they were injured "by

reason of" a RICO violation by the Church—to the extent it is based on a fraudulent

use of tithing funds theory. They thus have failed to state a claim upon which relief

may be granted.

### IV.

      For the reasons stated above, we AFFIRM.

23-4110, *Gaddy v. The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*
**PHILLIPS**, J., concurring.

I agree with the majority to affirm the district court's dismissal of the second amended complaint. I write separately because I would also decide that the church autonomy doctrine does not apply to Plaintiffs' second civil RICO theory—that the Church fraudulently used tithing payments for commercial purposes. As discussed by the majority, the "church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002) (citing *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116–17 (1952)). But the church autonomy doctrine has a limit: it "does not apply to purely secular decisions, even when made by churches." *Id.* at 657.

"Before the church autonomy doctrine is implicated, a threshold inquiry is whether the alleged misconduct is 'rooted in religious belief.'" *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). In other words, we ask whether the dispute deals with "discipline, faith, internal organization, or ecclesiastical rule, custom or law," or with "purely secular" issues that merely involve "a religiously affiliated organization." *Id.* (citation modified). For the misuse-of-tithes theory, the Church argues that the adjudication of Plaintiffs' civil RICO claim would require Plaintiffs to prove "whether the Church's use of tithing funds really is for the Lord's work and to support other Church purposes as

directed by the designated servants of the Lord." Resp. Br. at 41 (citation

modified). According to the Church, resolving these issues "would

impermissibly entangle a trial court in an ecclesiastical dispute[.]" *Id.* I

disagree.

As I see it, Plaintiffs' misuse-of-tithes theory concerns only secular

matters. Plaintiffs allege that the Church fraudulently represented how it would

use its tithing funds. They cite various statements from the Church and its

leaders asserting that the Church used tithing funds solely for religious

purposes, not commercial purposes. Plaintiffs allege that despite these

statements, the Church used tithing funds to construct City Creek Mall, finance

Ensign Peak Advisors, and bail out Beneficial Life Insurance Company. None

of these alleged misrepresentations require us to decide the Church's religious

teaching, faith, or doctrine. Instead, this case would resolve whether the Church

injured Plaintiffs through a pattern of fraud by misrepresenting how it would

use its tithing funds—a "purely secular" dispute. *Bryce*, 289 F.3d at 657; *see* 18

U.S.C. §§ 1961(1)(B), 1962, 1964(c); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S.

258, 268 (1992).

In a recent case, an en banc panel of the Ninth Circuit rejected the church

autonomy doctrine under similar circumstances. There, the Ninth Circuit

reviewed whether another plaintiff could maintain a state-law fraud claim

against the Church. *Huntsman v. Corp. of the President of the Church of Jesus

Christ of Latter-Day Saints*, 127 F.4th 784, 786, 789–90 (9th Cir. 2025) (en

banc). For this fraud claim, the plaintiff also advanced a misuse-of-tithes theory, arguing that the Church used tithing funds for commercial purposes despite statements to the contrary. *Id.* And the plaintiff likewise cited the Church's funding of City Creek Mall, Ensign Peak Advisors, and Beneficial Life Insurance Company to support his theory. *Id.* at 786–87. In evaluating the fraud claim, the en banc panel reasoned that "nothing in [the] analysis of [the plaintiff]'s fraud claims delves into matters of Church doctrine or policy," so "the church autonomy doctrine has no bearing here." *Id.* at 792. The Ninth Circuit's ruling reinforces my view that the tithing-fraud allegations in our case deal with purely secular matters.

I would therefore conclude that the church autonomy doctrine does not apply to the civil RICO claim's misuse-of-tithes theory. I join the majority in all other respects.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                                 Jane K. Castro
Clerk of Court                                                   Chief Deputy Clerk

August 26, 2025

Ms. Kay Burningham
Kay Burningham Law Office
299 South Main, Suite 1375
Salt Lake City, UT 84111

RE:     **23-4110, Gaddy, et al v. Corp. of the President of the Church of Jesus, et
al**
Dist/Ag docket: 2:19-CV-00554-RJS

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(d)(1), any petition for rehearing must be filed within 14
days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. *See* Fed.
R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for
rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:    Noel John Francisco
        Wesley F. Harward
        David J. Jordan
        Samuel V. Lioi
        Justin Miller
        James Cleith Phillips
        David Timothy Raimer
        Eric C. Rassbach
        Gene C. Schaerr

CMW/mlb